# IN THE

# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

SAMANTHA ROOP,

*Plaintiff - Appellant,*

v.

NICHOLAS JAMES DESOUSA,

*Defendant - Appellee,*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT RICHMOND

## JOINT APPENDIX - VOLUME I OF II
### (Pages 1 - 400)

Samantha B. Cohn
GEOFF MCDONALD
& ASSOCIATES, P.C.
8720 Stony Point Parkway
Suite 250
Richmond, VA 23235
757-281-8904

John S. Koehler
THE LAW OFFICES OF
JAMES STEELE PLLC
P. O. Box 21542
Roanoke, VA 24018
540-632-5994

*Counsel for Appellant*

Carter T. Keeney
CARTER & SHANDS, PC
9030 Stony Point Parkway
Richmond, VA 23235
804-747-7470

*Counsel for Appellee*

# **TABLE OF CONTENTS**

## **VOLUME I OF II**

JA Page

District Court Docket Sheet [3:21-cv-00675-DJN].....................................................1

Notice of Removal with Exhibits
    Filed October 26, 2021 [ECF1] ........................................................ 13

        Ex. 1:    Complaint [ECF1-1]....................................................... 16

        Ex. 2:    Civil Cover Sheet [ECF1-2].......................................... 19

Answer
    Filed October 26, 2021 [ECF2] ........................................................ 21

Plaintiff's Initial Rule 26(a)(1)(A) Disclosures
    Filed November 15, 2021 [ECF6] ..................................................... 23

Scheduling and Pretrial Order
    Entered December 16, 2021 [ECF8] ................................................. 29

Plaintiff's Expert Designations
    Filed February 21, 2022 [ECF10]..................................................... 42

Motion Seeking Relief from Trial Schedule and Enlargement of Deadlines
    Filed March 21, 2022 [ECF14].......................................................... 47

Memorandum of Fact and Law in Opposition to Plaintiff's
Motion Seeking Relief from Trial Schedule and Enlargement
of Deadlines (with attachments)
    Filed March 23, 2022 [ECF15]......................................................... 54

        Ex. A:    Joint Notice of Deposition [ECF15-1] ......................... 60

        Ex. B:    Deposition Transcript of Nathan Guertte, M.D.
                    taken on 2/8/2022 [ECF15-2] ...................................... 62

Ex. C:     Plaintiff's Expert Designations [ECF15-3]
           *(To Avoid Duplication Located at JA43)*

Order (Denying Motion for Extension)
    Entered March 23, 2022 [ECF16] ..................................................................... 96

Motion in Limine to Exclude Dr. Nathan Guerette from Testifying at Trial,
To Exclude Plaintiff's Medical Bills for Dr. Guerette's Treatment and
To Exclude Any Mention of Any Condition Treated by Dr. Guerette
    Filed March 28, 2022 [ECF18] ........................................................................ 97

Memorandum of Fact and Law in Support of Motion in Limine to
Exclude Dr. Nathan Guerette from Testifying at Trial, To Exclude
Plaintiff's Medical Bills for Dr. Guerette's Treatment and To Exclude
Any Mention of Any Condition Treated by Dr. Guerette with Exhibits
    Filed March 28, 2022 [ECF19] ...................................................................... 100

    Ex. A:     Plaintiff's Answers to Defendant's First Set of
               Interrogatories & Request for Production of Documents
               [ECF19-1] ....................................................................... 107

    Ex. B:     Corresponding Bills of Chippenham Johnston Willis
               Hospital on January 8, 2020, January 28, 2021, and
               February 10-11, 2021 [ECF19-2] ................................................. 110

    Ex. C:     Joint Notice of Deposition [ECF19-3]
               *(To Avoid Duplication Located at JA61)*

    Ex. D:     Deposition Transcript of Nathan Guertte, M.D.
               taken on 2/8/2022 [ECF19-4]
               *(To Avoid Duplication Located at JA63)*

    Ex. E:     Plaintiff's Expert Designations [ECF19-5]
               *(To Avoid Duplication Located at JA43)*

Memorandum of Fact and Law in Opposition of Defendant's
Motion in Limine to Exclude Dr. Guerette from Testifying at
Trial, To Exclude Plaintiff's Medical Bills for Dr. Guerette's
Treatment, And to Exclude Any Mention of Any Mention of
Any Condition Treated by Dr. Guerette with Exhibits
    Filed April 8, 2022 [ECF22].............................................................. 149

        Ex. A:    Deposition Transcript of Nathan Guertte, M.D.
                 taken on 2/8/2022 [ECF22-1]
                 *(To Avoid Duplication Located at JA63)*

        Ex. B:    Memorandum of Fact [ECF22-2] ...............................................161

        Ex. C:    Plaintiff's Answers to Defendant's First Set of
                 Interrogatories & Request for Production of Documents
                 [ECF22-3] *(To Avoid Duplication Located at JA113)*

        Ex. D:    Plaintiff's Initial Rule 26(A)(1)(A) Disclosures [ECF22-4]....... 168

Reply Brief to Plaintiff's Opposition to Defendant's Motion in Limine to
Exclude Dr. Guerette from Testifying at Trial, To Exclude Plaintiff's
Medical Bills for Dr. Guerette's Treatment, And to Exclude Any
Mention of Any Condition Treated by Dr. Guerette
    Filed April 12, 2022 [ECF23].......................................................... 174

Transcript of Motion in Limine Vol I of I
Before the Honorable David J. Novak
    On May 5, 2022 [ECF31] ................................................................ 180

Memorandum Order
(Granting in Part and Denying in Part Motion in Limine)
    Entered 2022.05.03 [ECF25]........................................................... 212

Pleading as Ordered by this Court's
May 3, 2022 Regarding Liability and Injuries
    Filed May 12, 2022 [ECF27]........................................................... 215

Amended Order of Proof as to Witnesses and Evidence
    Entered May 19, 2022 [ECF29]....................................................... 218

Offer of Proof as Required by the Order of May 3, 2022
 Filed May 20, 2022 [ECF30]........................................................................ 222

Memorandum Order
(Clarifying Parameters of Testimony of Dr. Nathan Guerette)
 Entered May 27, 2022 [ECF33]...................................................................... 228

Complete Transcript of Final Pretrial Conference
Before the Honorable David J. Novak
 On July 12, 2022 [ECF56].............................................................................. 231

Order (Clarifying Parameters of Evidence)
 Entered July 12, 2022 [ECF55] ..................................................................... 285

Transcript of Final Pretrial Conference Volume I of I
Before the Honorable David J. Novak
 On September 1, 2022 [ECF84] ..................................................................... 286

    GERARD BARTON
       Direct by Ms. Cohn ................................................................................ 290
       Cross by Mr. Keeney ............................................................................. 300

Order (Directing Clerk to File Revised Jury Instructions) with attachments
 Entered September 6, 2022 [ECF72]............................................................... 341

    Att. 1:    The Court's Jury Instructions on Causation (Phase1)
               [ECF72-1]................................................................................... 342

    Att. 2:    The Court's Jury Instructions on Damages (Phase 2)
               [ECF72-2]................................................................................... 373

    Att. 3:    The Court's Jury Instructions on Damages (Phase 2)
               [ECF72-3]................................................................................... 387

# TABLE OF CONTENTS

## VOLUME II OF II

JA Page

Transcript of Jury Trial - Day 2
Before the Honorable David J. Novak
On September 13, 20223 [ECF85] ................................................. 401

    Preliminary Jury Instructions..................................................... 405

    Opening Statements
        By Ms. Cohn .................................................................. 419
        By Mr. Keeney ............................................................... 424

    SAMANTHA ROOP
        Direct by Ms. Cohn ...................................................... 431
        Cross by Mr. Keeney.................................................... 475
        Redirect by Ms. Cohn................................................... 500

    NATHAN GUERETTE, M.D.
        Direct by Ms. Cohn ...................................................... 505
        Cross by Mr. Keeney.................................................... 517
        Redirect by Ms. Cohn................................................... 525

    GERARD BARTON
        Direct by Ms. Cohn ...................................................... 531
        Cross by Mr. Keeney.................................................... 542
        Redirect by Ms. Cohn................................................... 546

    Plaintiff Rests................................................................... 547
    Defense Rests.................................................................. 562
    Jury Instructions.............................................................. 564

    Closing Arguments
        By Ms. Cohn.................................................................. 582
        By Mr. Keeney ............................................................... 589
        By Ms. Cohn.................................................................. 598

    Verdict ............................................................................. 610

Plaintiff's Trial Exhibits:

Ex. P3: St. Francis Medical Center Records for
Dates of Service 7/8/2019 - 7/10/2019.............................................. 614

Ex. P4: Powhatan Medical Associates Records for
Dates of Service 7/10/2019-7/10/2019............................................. 687

Ex. P5: Chippenham JW Hospital and Radiology Records for
Date of Service 7/15/2019.................................................................. 699

Ex. P7: Intimate Wellness Institute of Virginia Recorde for
Dates of Service 10/08/19-01/27/21.................................................. 752

Defendant's Trial Exhibits:

Ex. D-15: Instagram Screenshot .................................................................. 807

Ex. D-16: Facebook Screenshot..................................................................... 808

Ex. D-17: Facebook Screenshot..................................................................... 809

Ex. D-19: Facebook Screenshot..................................................................... 810

Verdict Form - Causation
Filed September 13, 2022 [ECF79] ................................................... 811

Order
(Granting in Part and Denying in Part Defendant's Rule 50 Motion)
Entered September 14, 2022 [ECF80]............................................... 812

Verdict Form
Filed September 14, 2022 [ECF82] ................................................... 814

Order
(Giving Parties Thirty Days to File Post-Trial Motions)
Entered September 14, 2022 [ECF83]............................................... 815

Plaintiff's Motion for New Trial Under Fed. R. Civ. P. 59(a)
or, in the Alternative, to Alter or Amend the District Court's
Judgment Under Fed. R. Civ. P. 59(e)
    Filed September 14, 2022 [ECF87] ............................................................. 816

Memorandum of Fact and Law in Opposition to Plaintiff's Motion for
New Trial Under Fed. R. Civ. P. 59(a) or, in the Alternative, to Alter
or Amend the District Court's Judgment Under Fed. R. Civ. P. 59(E)
    Filed October 21, 2022 [ECF88] ...................................................................... 842

Plaintiff's Proffer of Excluded Evidence
    Filed October 27, 2022 [ECF89] ...................................................................... 852

Plaintiff's Reply to Defendant's Response to Plaintiff's Motion for
New Trial, Under Fed. R. Civ. P. 59(A) Or, In the Alternative, To Alter
or Amend the District Court's Judgment Under Fed. R. Civ. P. 59(E)
    Filed October 27, 2022 [ECF90] ...................................................................... 858

Memorandum Opinion
    Entered March 9, 2023 [ECF91] ...................................................................... 868

Order
    (Denying Motion for New Trial or to Alter or Amend Judgment)
    Entered March 9, 2023 [ECF92] ...................................................................... 915

Judgment in a Civil Case
    Entered March 10, 2023 [ECF93] .................................................................... 916

Notice of Appeal
    Filed April 5, 2023 [ECF94].............................................................................. 917

**U.S. District Court**
**Eastern District of Virginia - (Richmond)**
**CIVIL DOCKET FOR CASE #: 3:21-cv-00675-DJN**

Roop v. Desousa                                          Date Filed: 10/26/2021
Assigned to: District Judge David J. Novak              Date Terminated: 03/10/2023
Referred to: Magistrate Judge Elizabeth W (MJ)Hanes     Jury Demand: Both
(Settlement)                                            Nature of Suit: 350 Motor Vehicle
Demand: $5,000,000                                      Jurisdiction: Diversity
Case in other court: 23-01376
            City of Richmond Circuit, CL21-97-00002
Cause: 28:1441 Notice of Removal-Auto Negligence

**Plaintiff**

**Samantha Roop**                    represented by    **Samantha Beth Cohn**
                                                      Geoff McDonald & Associates, P.C.
                                                      8720 Stony Point Parkway
                                                      Suite 250
                                                      Richmond, VA 23235
                                                      757-281-8904
                                                      Fax: 804-359-5426
                                                      Email: scohn@mcdonaldinjurylaw.com
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Brandon Kyle Galindo**
                                                      Geoff McDonald and Associates
                                                      8720 Stony Point Pkwy
                                                      Suite 250
                                                      Richmond, VA 23235
                                                      804-888-8888
                                                      Email: bgalindo@mcdonaldinjurylaw.com
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Nikita Wolf**
                                                      Geoff McDonald & Associates
                                                      8720 Stony Point Parkway
                                                      Ste 250
                                                      Richmond, VA 23235
                                                      804-888-8888
                                                      Fax: 804-359-5426
                                                      Email: nwolf@mcdonaldinjurylaw.com
                                                      *TERMINATED: 03/16/2022*

**JA1**

**Theodore Webb Briscoe , III**

Geoffrey McDonald & Associates PC
8720 Stony Point Parkway
Suite 250
Richmond, VA 23235
804-888-8888
Fax: 804-359-5426
Email: tbriscoe@mcdonaldinjurylaw.com
*TERMINATED: 11/08/2021*

**Defendant**

**Nicholas James Desousa**                    represented by

**Carter Taliaferro Keeney**
Carter & Shands PC
9030 Stony Point Pkwy
Suite 530
Richmond, VA 23235
(804) 747-7470
Fax: (804) 747-7977
Email: ckeeney@carterandshands.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/26/2021 | 1 | Notice of Removal (Filing Fee: $402.00, Receipt Number: BVAEDC-8068832), filed by Nicholas James Desousa. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2) (Keeney, Carter) (Entered: 10/26/2021) |
| 10/26/2021 | 2 | ANSWER to Complaint by Nicholas James Desousa.(Keeney, Carter) (Entered: 10/26/2021) |
| 10/26/2021 | | Initial Case Assignment to District Judge David J. Novak. (smej, ) (Entered: 10/26/2021) |
| 11/04/2021 | 3 | Order Setting PRETRIAL Conference - Initial Pretrial Conference set for 12/13/2021 at 04:30 PM in Richmond Telephonically before District Judge David J. Novak. Signed by Patrick F. Dillard with permission of District Judge David J. Novak on 11/4/2021. (cgar) (Entered: 11/04/2021) |
| 11/05/2021 | 4 | MOTION to Substitute Attorney by Samantha Roop. (Wolf, Nikita) (Entered: 11/05/2021) |
| 11/08/2021 | 5 | ORDER (Granting Substitution of Counsel) - This matter comes before the Court on Plaintiffs Motion titled Substitution of Counsel for Plaintiff (ECF No. 4), requesting the Clerk to strike the appearance of Theodore Briscoe, III, on her behalf and substitute with Nikita Wolf of the same law firm, Geoff McDonald & Associates, PC. Upon consideration of the matter, the Court hereby GRANTS IN PART and DENIES IN PART Plaintiffs request. The Clerk shall terminate Mr. Briscoe's representation of Plaintiff and substitute Ms. Wolf. However, the Clerk shall not strike Mr. Briscoe's appearance from the record. Signed by District Judge David J. Novak on 11/8/2021. (smej, ) (Entered: 11/08/2021) |

| 11/09/2021 | | Reset Hearing: Initial Pretrial Conference RESET for 12/20/2021 at 01:15 PM in Richmond Telephonically before District Judge David J. Novak. (cgar) (Entered: 11/09/2021) |
|---|---|---|
| 11/15/2021 | 6 | Rule 26 Disclosure by Samantha Roop. (Wolf, Nikita) (Entered: 11/15/2021) |
| 12/16/2021 | 7 | REFERRAL ORDER - This case is hereby REFERRED to United States Magistrate Judge Elizabeth W. Hanes for settlement. The parties shall be responsible for contacting the chambers of the Magistrate Judge to schedule the settlement conference. If amenable to the Magistrate Judge and otherwise consistent with their calendar, the Court orders the parties to schedule the settlement conference before April 1, 2022. Signed by District Judge David J. Novak on 12/15/2021. Copy of order sent to the chambers of Magistrate Judge Hanes as directed.(jpow, ) (Entered: 12/16/2021) |
| 12/16/2021 | | Case Referred to Magistrate Judge Elizabeth W. Hanes for settlement purposes. (jpow, ) (Entered: 12/16/2021) |
| 12/16/2021 | 8 | SCHEDULING and PRETRIAL ORDER - Final Pretrial Conference set for 7/1/2022 at 10:00 AM; Jury Trial set for 7/22/2022 at 09:30 AM in Richmond Courtroom 6300 and Jury Selection set for 7/21/2022 at 09:30 AM all held in Richmond Courtroom 6300 before District Judge David J. Novak. Signed by District Judge David J. Novak on 12/15/2021. (cgar) (Entered: 12/16/2021) |
| 12/17/2021 | 9 | ORDER REGARDING PROCEDURES FOR SETTLEMENT CONFERENCE - The Court has scheduled this case for a settlement conference on **March 22, 2022 at 9:30 A.M.** At that time, the parties shall report to the chambers of Magistrate Judge Elizabeth W. Hanes. SEE ORDER FOR DETAILS. Signed by Magistrate Judge Elizabeth W. Hanes on 12/17/2021. (smej, ) (Entered: 12/17/2021) |
| 12/30/2021 | | Settlement Conference set for 3/22/2022 at 9:30 AM in Richmond Judges Chamber before Magistrate Judge Elizabeth W. Hanes. (mful) (Entered: 12/30/2021) |
| 02/21/2022 | 10 | Discovery Designation by Samantha Roop.(Wolf, Nikita) (Entered: 02/21/2022) |
| 03/14/2022 | 11 | **(DISREGARD. SEE ECF #12)** - First MOTION to Substitute Attorney *Nikita Wolf* by Samantha Roop. (Cohn, Samantha) Modified on 3/15/2022 (smej, ). (Entered: 03/14/2022) |
| 03/14/2022 | 12 | First MOTION to Substitute Attorney *Nikita Wolf* by Samantha Roop. (Attachments: # 1 Proposed Order)(Cohn, Samantha) (Main Document 12 replaced on 3/15/2022) (smej, ). (Entered: 03/14/2022) |
| 03/16/2022 | 13 | ORDER (Granting in Part and Denying in Part Motion to Substitute Counsel) - This matter comes before the Court on Plaintiff's motion for Substitution of Counsel (ECF No. 12), moving the Court to strike the appearance of Nikita Wolf, Esq. on her behalf and substitute Samantha Cohn of the same law firm, Geoff McDonald & Associates, PC. Upon consideration of the matter, the Court hereby GRANTS IN PART and DENIES IN PART Plaintiffs Motion. The Clerk shall terminate Ms. Wolf's representation of Plaintiff and substitute Mrs. Cohn. However, the Clerk shall not strike Ms. Wolf's appearance from the record. Signed by District Judge David J. Novak on 3/16/2022. (smej, ) (Entered: 03/16/2022) |
| 03/21/2022 | 14 | First MOTION for Extension *Seeking Relief From Trial Schedule and Enlargement of Deadlines* by Samantha Roop. (Cohn, Samantha) (Entered: 03/21/2022) |

| | | |
|---|---|---|
| 03/22/2022 | | Minute Entry for proceedings held before Magistrate Judge Elizabeth W. Hanes:Settlement Conference held on 3/22/2022. (mful) (Entered: 03/23/2022) |
| 03/23/2022 | 15 | Memorandum in Opposition re 14 First MOTION for Extension *Seeking Relief From Trial Schedule and Enlargement of Deadlines* filed by Nicholas James Desousa. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Keeney, Carter) (Entered: 03/23/2022) |
| 03/23/2022 | 16 | ORDER (Denying Motion for Extension) - This matter comes before the Court on Plaintiffs Motion Seeking Relief from Trial Schedule and Enlargement of Deadlines. (ECF No. 14.) Upon review of the Motion and Defendants Response (ECF No. 15), the Court hereby DENIES the Motion as devoid of merit. Signed by District Judge David J. Novak on 3/23/2022. (smej, ) (Entered: 03/23/2022) |
| 03/28/2022 | 17 | First MOTION to Voluntarily Dismiss by Samantha Roop. (Cohn, Samantha) (Entered: 03/28/2022) |
| 03/28/2022 | 18 | MOTION in Limine *to Exclude Dr. Guerette and his bills* by Nicholas James Desousa. (Keeney, Carter) (Entered: 03/28/2022) |
| 03/28/2022 | 19 | Memorandum in Support re 18 MOTION in Limine *to Exclude Dr. Guerette and his bills* filed by Nicholas James Desousa. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Keeney, Carter) (Entered: 03/28/2022) |
| 03/29/2022 | | Set Hearing as to 17 First MOTION to Voluntarily Dismiss , 18 and MOTION in Limine *to Exclude Dr. Guerette and his bills*. Motion Hearing set for 4/13/2022 at 11:00 AM before District Judge David J. Novak. (cgar) (Entered: 03/29/2022) |
| 03/31/2022 | 20 | Withdrawal of Motion by Samantha Roop (Cohn, Samantha) (Entered: 03/31/2022) |
| 03/31/2022 | 21 | ORDER terminating 17 Motion to Voluntarily Dismiss and RESCHEDULING the Motion in Limine Hearing for May 3, 2022 a 11:00 a.m. Signed by District Judge David J. Novak on 3/31/2022. (cgar) (Entered: 03/31/2022) |
| 03/31/2022 | | Reset Hearing as to 18 MOTION in Limine *to Exclude Dr. Guerette and his bills*. Motion Hearing reset for 5/3/2022 at 11:00 AM in Richmond Courtroom 6300 before District Judge David J. Novak. (cgar) (Entered: 03/31/2022) |
| 04/05/2022 | | Final Pretrial Conference reset for 7/13/2022 at 10:00 AM in Richmond Courtroom 6300 before District Judge David J. Novak. (cgar) (Entered: 04/05/2022) |
| 04/08/2022 | 22 | Memorandum in Opposition re 18 MOTION in Limine *to Exclude Dr. Guerette and his bills* filed by Samantha Roop. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B, # 3 Exhibit Exhibit C, # 4 Exhibit Exhibit D)(Cohn, Samantha) (Entered: 04/08/2022) |
| 04/12/2022 | 23 | Reply Brief re 18 MOTION in Limine *to Exclude Dr. Guerette and his bills* filed by Nicholas James Desousa. (Keeney, Carter) Modified on 4/13/2022 (smej, ). (Entered: 04/12/2022) |
| 05/03/2022 | | Reset Hearing: Final Pretrial Conference reset for 7/15/2022 at 02:00 PM in Richmond Courtroom 6300 before District Judge David J. Novak. (cgar) (Entered: 05/03/2022) |
| 05/03/2022 | 24 | Minute Entry for proceedings held before District Judge David J. Novak:Motion Hearing held on 5/3/2022 re 18 MOTION in Limine *to Exclude Dr. Guerette and his bills* filed by Nicholas James Desousa. Matter came on for motion hearing. Arguments heard. Order to enter. FPTC rescheduled for July 15 2022 at 2:00 p.m. (Court Reporter |

| | | |
|---|---|---|
| | | Melissa Custis, OCR.)(cgar) (Entered: 05/03/2022) |
| 05/03/2022 | 25 | MEMORANDUM ORDER (Granting in Part and Denying in Part Motion in Limine) - the Court hereby ORDERS as follows: The parties must meet and confer to determine the injuries for which the parties dispute causation, and those for which causation is not in dispute. Defendant's Motion (ECF. 18) is GRANTED IN PART and DENIED IN PART. The Final Pretrial Conference in this matter is rescheduled for **July 15, 2022, at 2 p.m.**. Signed by District Judge David J. Novak on 5/3/2022. (smej, ) (Entered: 05/03/2022) |
| 05/11/2022 | 26 | NOTICE of Appearance by Samantha Beth Cohn on behalf of Samantha Roop (Cohn, Samantha) (Entered: 05/11/2022) |
| 05/12/2022 | 27 | Response re 25 Memorandum Order - Declaration *of issues in dispute* by Nicholas James Desousa. (Keeney, Carter) Modified on 5/13/2022 (smej, ). (Entered: 05/12/2022) |
| 05/13/2022 | 28 | *Order of Proof as to Witnesses and Evidence* Witness List by Samantha Roop. (Cohn, Samantha) (Entered: 05/13/2022) |
| 05/19/2022 | 29 | *Amended Order of Proof as to Witnesses and Evidence* Witness List by Samantha Roop. (Cohn, Samantha) (Entered: 05/19/2022) |
| 05/20/2022 | 30 | *offer of Proof As Required by order of May 3* Witness List by Nicholas James Desousa. (Keeney, Carter) (Entered: 05/20/2022) |
| 05/23/2022 | 31 | TRANSCRIPT of proceedings held on May 3, 2022, before Judge David J. Novak, Court Reporter Melissa Custis, Telephone number 804-916-2278. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 6/22/2022. Redacted Transcript Deadline set for 7/25/2022. Release of Transcript Restriction set for 8/22/2022.(Custis, Melissa) (Entered: 05/23/2022)** |
| 05/25/2022 | | On-The-Record Status Conference set for 5/27/2022 at 02:00 PM in Richmond Telephonically before District Judge David J. Novak. (cgar) (Entered: 05/25/2022) |
| 05/27/2022 | | RESET Hearing - Final Pretrial Conference RESET for 7/12/22 at 10:00 AM in Richmond Courtroom 6300 before District Judge David J. Novak. (cgar) (Entered: 05/27/2022) |
| 05/27/2022 | | Minute Entry for proceedings held before District Judge David J. Novak:On-The-Record Telephone Conference held on 5/27/2022. (Court Reporter Melissa Custis, OCR.)(cgar) (Entered: 05/27/2022) |
| 05/27/2022 | 32 | ORDER that the Final Pretrial Conference is hereby RESCHEDULED for 10 a.m. on July 12, 2022. Signed by District Judge David J. Novak on 5/27/2022. (jsmi, ) (Entered: 05/27/2022) |
| 05/27/2022 | 33 | MEMORANDUM ORDER (Clarifying Parameters of Testimony of Dr. Nathan Guerette). This matter comes before the Court for pretrial management following a |

| | | |
|---|---|---|
| | | conference call with counsel on May 27, 2022, about the parameters of the testimony of Dr. Nathan Guerette.It is so ORDERED. Signed by District Judge David J. Novak on 5/27/2022. (sbea) (Entered: 05/27/2022) |
| 06/08/2022 | 34 | ORDER (Directing Jury Process) - The Court hereby DIRECTS the Clerk to empanel a jury venire of forty-five prospective jurors for Jury Selection on July 21, 2022. The parties indicated that they do not object to the Court striking unvaccinated individuals from the pool of potential jurors. Accordingly, for the reasons stated below and with the agreement of the parties, the Court hereby DIRECTS the Clerk to strike all members of the venire who indicate on their screening form that they have not received full vaccination for COVID-19. SEE ORDER FOR DETAILS. Signed by District Judge David J. Novak on 6/8/2022. (smej, ) (Entered: 06/08/2022) |
| 06/13/2022 | 35 | *Plaintiff Witness &* Exhibit List by Samantha Roop.. (Cohn, Samantha) (Entered: 06/13/2022) |
| 06/16/2022 | 36 | Witness List by Nicholas James Desousa. (Keeney, Carter) (Entered: 06/16/2022) |
| 06/16/2022 | 37 | Exhibit List by Nicholas James Desousa.. (Keeney, Carter) (Entered: 06/16/2022) |
| 06/16/2022 | 38 | Discovery Designation by Nicholas James Desousa.(Keeney, Carter) (Entered: 06/16/2022) |
| 06/17/2022 | 39 | *Objections to Plaintiff's Witness and* Exhibit List by Nicholas James Desousa.. (Keeney, Carter) (Entered: 06/17/2022) |
| 06/22/2022 | 40 | *Rebuttal* Witness List by Samantha Roop. (Cohn, Samantha) (Entered: 06/22/2022) |
| 06/27/2022 | 41 | Objection to 37 Exhibit List filed by Samantha Roop. (Cohn, Samantha) (Entered: 06/27/2022) |
| 06/28/2022 | 42 | Statement of Undisputed Facts by Nicholas James Desousa. (Keeney, Carter) (Entered: 06/28/2022) |
| 06/28/2022 | 43 | MOTION to Withdraw as Attorney *as Co-Counsel - Frank Hupfl* by Samantha Roop. (Cohn, Samantha) (Entered: 06/28/2022) |
| 06/29/2022 | 44 | ORDER (Granting Motion to Withdraw) - This matter comes before the Court on Plaintiffs Notice of Withdrawal of Co-Counsel, moving to withdraw Frank Hupfl as counsel of record for Plaintiff (ECF No. 43). The Court hereby GRANTS the Motion (ECF No. 43) and DIRECTS the Clerk to terminate Mr. Hupfl as counsel of record for Plaintiff. Signed by District Judge David J. Novak on 6/29/2022. (smej, ) (Entered: 06/29/2022) |
| 06/30/2022 | 45 | Proposed Joint Jury Instructions by Nicholas James Desousa. (Keeney, Carter) Modified on 7/5/2022 (smej, ). (Entered: 06/30/2022) |
| 06/30/2022 | 46 | Proposed Voir Dire by Nicholas James Desousa. (Keeney, Carter) (Entered: 06/30/2022) |
| 06/30/2022 | 47 | Opposition re 45 Proposed Joint Jury Instructions by Nicholas James Desousa. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Keeney, Carter) Modified on 7/5/2022 (smej, ). (Entered: 06/30/2022) |
| 06/30/2022 | 48 | NOTICE of Appearance by Brandon Kyle Galindo on behalf of Samantha Roop (Galindo, Brandon) (Entered: 06/30/2022) |
| 06/30/2022 | 49 | Proposed Voir Dire by Samantha Roop. (Cohn, Samantha) (Entered: 06/30/2022) |

| 07/02/2022 | 50 | Opposition re 45 Proposed Joint Jury Instructions filed by Samantha Roop. (Attachments: # 1 Exhibit, # 2 Exhibit)(Cohn, Samantha) Modified on 7/5/2022 (smej, ). (Attachment 1 replaced on 7/5/2022) (smej, ). (Attachment 2 replaced on 7/5/2022) (smej, ). (Additional attachment(s) added on 7/5/2022: # 3 Exhibit 3) (smej, ). (Entered: 07/02/2022) |
| --- | --- | --- |
| 07/11/2022 | 51 | ORDER (Directing Clerk to Procure Juror Meals) - This matter comes before the Court for pretrial management. Due to the ongoing threat posed by the outbreak of the Coronavirus-2019 ("COVID-19"), the Court finds that an emergency hardship situation exists that requires accommodations to be taken by the Court to protect the health and safety of the jurors. Therefore, to minimize the exposure of the jurors to COVID-19, the Court hereby ORDERS that lunch will be provided for the jurors beginning on Friday, July 22, 2022. Accordingly, the Clerk is hereby DIRECTED to procure juror meals as necessary. Signed by District Judge David J. Novak on 7/11/2022. (smej, ) (Entered: 07/11/2022) |
| 07/11/2022 | 52 | TRIAL BRIEF by Nicholas James Desousa. (Attachments: # 1 Exhibit A)(Keeney, Carter) (Entered: 07/11/2022) |
| 07/12/2022 | 53 | *Amended Submission of Exhibit List* Exhibit List by Samantha Roop.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11)(Cohn, Samantha) (Entered: 07/12/2022) |
| 07/12/2022 | 54 | Minute Entry for proceedings held before District Judge David J. Novak:Final Pretrial Conference held on 7/12/2022. Matter came on for final pretrial conference. Counsel and court addressed pending motions and trial procedures. Order to enter. FPTC continued to July 19, 2022 at 3:30 p.m. (Court Reporter Tracy Stroh, OCR.)(cgar) (Entered: 07/12/2022) |
| 07/12/2022 | | Continued Final Pretrial Conference set for 7/19/2022 at 03:30 PM in Richmond Courtroom 6300 before District Judge David J. Novak. (cgar) (Entered: 07/12/2022) |
| 07/12/2022 | 55 | ORDER (Clarifying Parameters of Evidence) that Plaintiff may not present any evidence of Plaintiffs future damages, because she did not adequately notify Defendant of evidence or expert testimony on this issue. As it pertains to Plaintiff's Interstim device, the testimony of Dr. Nathan Guerette shall be limited to his observations of whether the Interstim was functioning during the course of his treatment of Plaintiff. He may not testify to the cause of the device not functioning nor discuss any readouts from the device. Signed by District Judge David J. Novak on 7/12/22. (adun, ) (Entered: 07/12/2022) |

| | | |
|---|---|---|
| 07/13/2022 | 56 | TRANSCRIPT of proceedings held on July 12, 2022, before Judge David J. Novak, Court Reporter/Transcriber Tracy Stroh, Telephone number 804-916-2267. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 8/12/2022. Redacted Transcript Deadline set for 9/12/2022. Release of Transcript Restriction set for 10/11/2022.(stroh, tracy) (Entered: 07/13/2022)** |
| 07/14/2022 | 57 | Statement of Undisputed Facts by Nicholas James Desousa. (Keeney, Carter) (Entered: 07/14/2022) |
| 07/14/2022 | 58 | ORDER (Directing Clerk to File Jury Documents) - This matter comes before the Court on the parties' Proposed Joint Jury Instructions (ECF No. 45). After consideration of the parties' submissions, the Court has drafted proposed jury instructions to be used during the trial for this action. Accordingly, the Court hereby DIRECTS the Clerk to file, as Exhibits 1 to 7 of this Order. If either party objects to these instructions, the Court will address their objections during the Second Final Pretrial Conference on July 19, 2022. SEE ORDER FOR DETAILS. Signed by District Judge David J. Novak on 7/14/2022. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7) (smej, ) (Entered: 07/14/2022) |
| 07/15/2022 | 59 | *Joint* Exhibit List by Nicholas James Desousa.. (Keeney, Carter) (Entered: 07/15/2022) |
| 07/15/2022 | 60 | *Objections to Plaintiff's Proposed* Exhibit List by Nicholas James Desousa.. (Keeney, Carter) (Entered: 07/15/2022) |
| 07/15/2022 | 61 | Objection to 59 Exhibit List filed by Samantha Roop. (Cohn, Samantha) (Entered: 07/15/2022) |
| 07/15/2022 | 62 | TRIAL BRIEF by Samantha Roop. (Cohn, Samantha) (Entered: 07/15/2022) |
| 07/18/2022 | 63 | ORDER (Directing Clerk to File Jury Documents) - This matter comes before the Court on the parties' Proposed Joint Jury Instructions (ECF No. 45). The Court previously directed the jury clerk to file its proposed jury instructions for the parties' review. (ECF No. 58.) In preparation for the Second Final Pretrial Conference on July 19, 2022, the Court has drafted alternate versions of its proposed closing instructions for Phase Two (Damages) of the trial and Phase Two verdict form, to be used in the event that the jury finds that Defendant caused Plaintiff's undisputed injuries but not her disputed injuries. Accordingly, the Court hereby DIRECTS the Clerk to file, as Exhibits 1 and 2 of this Order, the alternate versions of the Court's proposed closing instructions for Phase Two and Phase Two Verdict form. Signed by District Judge David J. Novak on 7/18/2022. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2) (smej, ) (Entered: 07/18/2022) |
| 07/19/2022 | 64 | ORDER (Rescheduling Trial) - This matter comes before the Court for pretrial management. For the reasons stated on the record during the conference call between the parties and the Court on July 19, 2022, the Court hereby RESCHEDULES the trial in this matter. Jury selection shall occur on September 12, 2022, to be followed by opening statements and evidence on September 13, 2022, and concluding on September 14, 2022. Additionally, the Court hereby SCHEDULES a Final Pretrial Conference on |

| | | |
|---|---|---|
| | | September 1, 2022, at 2 p.m. Signed by District Judge David J. Novak on 7/19/2022. (smej, ) (Entered: 07/19/2022) |
| 07/19/2022 | | Minute Entry for proceedings held before District Judge David J. Novak:On-The-Record Telephone Conference held on 7/19/2022. (Court Reporter Melissa Custis, OCR.)(cgar) (Entered: 07/21/2022) |
| 07/22/2022 | 65 | ORDER. The Court hereby ORDERS that lunch will be provided for the jurors beginning on September 13, 2022 through September 14, 2022. The Clerk is DIRECTED to procure juror meals as necessary. See Order for details. Signed by District Judge David J. Novak on 7/22/2022. (jsmi, ) (Entered: 07/22/2022) |
| 07/22/2022 | 66 | ORDER. The Court hereby DIRECTS the Clerk to strike all members of the venire who indicate on their screening form that they have not received full vaccination for COVID-19. Jury selection on September 12, 2022, will proceed as detailed in Order. Signed by District Judge David J. Novak on 7/22/2022. (jsmi, ) (Entered: 07/22/2022) |
| 08/04/2022 | | RESET Hearings Final Pretrial Conference reset for 9/1/2022 at 02:00 PM; Jury Selection reset for 9/12/2022 at 09:30 AM and Jury Trial reset for 9/13-14/2022 at 09:30 AM in Richmond Courtroom 6300 before District Judge David J. Novak. (cgar) (Entered: 08/04/2022) |
| 08/29/2022 | 67 | ORDER (Directing Clerk to File Revised Voir Dire) - This matter comes before the Court for pretrial management. The Court hereby DIRECTS the Clerk to file as Exhibit 1 the attached revised Court's Proposed Voir Dire to the Jury Panels. Signed by District Judge David J. Novak on 8/29/2022. (Attachments: # 1 Exhibit 1) (smej, ) (Entered: 08/29/2022) |
| 08/29/2022 | 68 | ORDER (Directing Updated Exhibits Filing) - This matter comes before the Court on the parties' Exhibit List for Phase I of the Trial and Exhibit List for Phase 2 of the Trial. The Court hereby ORDERS that Exhibit List for Phase I of the Trial and Exhibit List for Phase 2 of the Trial are filed as updated exhibits for the trial. The Court also instructs counsel that, if they have any additional exhibits, a revised exhibit list must be submitted to the Court no later than Friday, September 2, 2022. Signed by District Judge David J. Novak on 8/29/2022. (smej, ) (Entered: 08/29/2022) |
| 08/29/2022 | 69 | ORDER Requiring Witness Testimony During Final Pretrial Conference - SEE ORDER FOR ALL DETAILS. Signed by District Judge David J. Novak on 8/29/2022. (cgar) (Entered: 08/29/2022) |
| 09/01/2022 | 71 | Minute Entry for proceedings held before District Judge David J. Novak:Continued Final Pretrial Conference held on 9/1/2022. Matter came on for continued final pretrial conference. Witness excused on motion of deft and court. Pltf adduced evidence. Arguments heard. Barton testimony to be admitted. Matter continued as to remaining pending motion, jury procedures and exhibits. (Court Reporter Melissa Custis, OCR.)(cgar) (Entered: 09/01/2022) |
| 09/06/2022 | 72 | ORDER (Directing Clerk to File Revised Jury Instructions) - This matter comes before the Court following Defendant's request to amend the jury instructions to include Virginia Model Jury Instruction 2.220. Plaintiff does not object to this request. Consequently, the Court hereby GRANTS Defendant's request and adds Virginia Model Jury Instruction 2.220 to Instruction No. 25 for the first phase and Instruction No. 10 for the second phase, as agreed by the parties. The Court further DIRECTS the Clerk to file the revised jury instructions as Attachments 1, 2 and 3 for this Order. Signed by District Judge David J. Novak on 9/6/2022. (Attachments: # 1 Attachment 1, # 2 Attachment 2, |

| | | # 3 Attachment 3)(smej, ) (Entered: 09/06/2022) |
|---|---|---|
| 09/06/2022 | 73 | ORDER (Releasing Juror from Jury Service) - This matter comes before the Court following a request from prospective juror Jacqueline Jackson (Juror number 8, panel 1) to be excused from jury service due to medical issues. Based on the note from Ms. Jackson's doctor, the Court hereby GRANTS the request and excuses Ms. Jackson from jury service in this case. Signed by District Judge David J. Novak on 9/6/2022. (smej, ) (Entered: 09/06/2022) |
| 09/09/2022 | 74 | ORDER (Releasing Juror from Jury Service) - This matter comes before the Court following a request from prospective juror Breck Bland (juror number 18, panel 2) to be excused from jury service due to the jurors recent car accident and lack of transportation. Based on the note from Ms. Bland, the Court hereby GRANTS the request and excuses Ms. Bland from jury service in this case. Signed by District Judge David J. Novak on 9/9/2022. (smej, ) (Entered: 09/09/2022) |
| 09/09/2022 | 75 | ORDER (Releasing Juror from Jury Service) - This matter comes before the Court following a request from prospective juror William Black (juror number 2, panel 1) to be excused from jury service due to his age and medical issues. Based on the note from Mr. Black, the Court hereby GRANTS the request and excuses Mr. Black from jury service in this case. Signed by District Judge David J. Novak on 9/9/2022. (smej, ) (Entered: 09/09/2022) |
| 09/12/2022 | 76 | Minute Entry for proceedings held before District Judge David J. Novak:Jury Selection held on 9/12/2022. Jury appeared, sworn, and examined on voire dire. Selected jurors dismissed and instructed to return 9/13/2022. Day One of jury trial to start Tuesday, September 13, 2022 at 9:00 a.m. (Court Reporter Melissa Custis, OCR.)(cgar) (Entered: 09/12/2022) |
| 09/12/2022 | | Jury Trial (Day 1) set for 9/13/2022 at 09:30 AM in Richmond Courtroom 6300 before District Judge David J. Novak. (cgar) (Entered: 09/12/2022) |
| 09/13/2022 | 78 | Minute Entry for proceedings held before District Judge David J. Novak:Jury Trial - Day 1 held on 9/13/2022. Jury empaneled and sworn to try issues; Witnesses excluded on motion of Court; Plaintiff adduced evidence; Rested; Deft's Rule 50 motion GRANTED IN PART AND DENIED IN PART. Deft rested; Evidence concluded; Arguments of counsel heard; Jury charged by the Court as to PHASE ONE ONLY; Verdict in favor of Deft as to damaged as a result of accident not proven. Jurors dismissed and scheduled to return on Wednesday, September 14th for Phase Two -DAMAGES. Jury trial (Day 2) set for September 14, 2022 at 9:30 a.m. (Court Reporter Melissa Custis, OCR.)(cgar) (Attachment 1 -Exhibit and Witness List) . (Entered: 09/13/2022) |
| 09/13/2022 | | Jury Trial - DAY 2 set for 9/14/2022 at 09:30 AM in Richmond Courtroom 6300 before District Judge David J. Novak. (cgar) (Entered: 09/13/2022) |
| 09/13/2022 | 79 | JURY VERDICT as to PHASE ONE (Causation ONLY). (cgar) (Entered: 09/13/2022) |
| 09/14/2022 | 80 | ORDER (Granting in Part and Denying in Part Defendant's Rule 50 Motion) - This matter comes before the Court on Defendant's oral motion for judgment as a matter of law under Federal Rule of Civil Procedure 50. The Court hereby GRANTS IN PART and DENIES IN PART Defendant's motion for judgment as a matter of law. The Court GRANTS Defendant's motion with regard to the issue of causation regarding Plaintiffs pelvic prolapse, due to an insufficient evidentiary basis for a reasonable jury to find for Plaintiff on that issue and as a matter oflaw as the causation issue relating to Plaintiff's |

| | | |
|---|---|---|
| | | pelvic prolapse was too complex for lay testimony only. The Court DENIES Defendant's motion with regard to the issue of causation regarding Plaintiffs Interstim device, of which the jury returned a verdict of not proven. Signed by District Judge David J. Novak on 9/13/2022. (smej, ) (Entered: 09/14/2022) |
| 09/14/2022 | 81 | Minute Entry for proceedings held before District Judge David J. Novak:Jury Trial Day 2 held on 9/14/2022. Trial continued from 9/13/2022. Phase 2 (DAMAGES) started with opening statements; Pltf adduced evidence and rested; Deft rested; Motion as to prejudgment interest DENIED W/O PREJUDICE; Evidence concluded; Arguments of counsel heard; Jury charged by the Court; No objections and/or exceptions to the jury charge; Jury returned verdict in favor of Pltf in the amount of $105,216.00. Post Trial filing deadlines - 30/14/6 days. (Court Reporter Melissa Custis, OCR.)(cgar) (Entered: 09/14/2022) |
| 09/14/2022 | 82 | JURY VERDICT as to PHASE TWO (Damages ONLY). (cgar) (Entered: 09/14/2022) |
| 09/14/2022 | 83 | ORDER. The Court ORDERS that a party shall have 30 days, measured from September 14, 2022, within which to file any post-verdict motions. The non-moving party shall have 14 days to file a response, and the moving party shall have 6 days to reply. Signed by District Judge David J. Novak on 9/14/2022. (jsmi, ) (Entered: 09/14/2022) |
| 09/28/2022 | 84 | TRANSCRIPT of proceedings held on September 1, 2022, before Judge David J. Novak, Court Reporter Melissa Custis, Telephone number 804-916-2278. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 10/28/2022. Redacted Transcript Deadline set for 11/28/2022. Release of Transcript Restriction set for 12/27/2022.(Custis, Melissa) (Entered: 09/28/2022)** |
| 09/28/2022 | 85 | TRANSCRIPT of proceedings held on September 13, 2022, before Judge David J. Novak, Court Reporter Melissa Custis, Telephone number 804-916-2278. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 10/28/2022. Redacted Transcript Deadline set for 11/28/2022. Release of Transcript Restriction set for 12/27/2022.(Custis, Melissa) (Entered: 09/28/2022)** |
| 09/28/2022 | 86 | TRANSCRIPT of proceedings held on September 14, 2022, before Judge David J. Novak, Court Reporter Melissa Custis, Telephone number 804-916-2278. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our** |

| | | |
|---|---|---|
| | | website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 10/28/2022. Redacted Transcript Deadline set for 11/28/2022. Release of Transcript Restriction set for 12/27/2022.(Custis, Melissa) (Entered: 09/28/2022) |
| 10/14/2022 | 87 | First MOTION for New Trial, or in the alternative, to Alter Judgment by Samantha Roop. (Attachments: # 1 Exhibit Document 31 - Transcript of May 3, 2022 Hearing, # 2 Exhibit Document 56 - Transcript of July 12, 2022 Hearing, # 3 Exhibit Document 80 - Order re: Rule 50 Motion, # 4 Exhibit Document 83 - Order re: Filing of Post Judgment Motions, # 5 Exhibit Document 84 - Transcript of September 1, 2022 Hearing, # 6 Exhibit Document 85 - Transcript of Jury Trial Day 2 September 13, 2022) (Cohn, Samantha) Modified on 10/18/2022 (smej, ). (Entered: 10/14/2022) |
| 10/21/2022 | 88 | Memorandum in Opposition re 87 First MOTION for New Trial First MOTION to Alter Judgment filed by Nicholas James Desousa. (Keeney, Carter) (Entered: 10/21/2022) |
| 10/27/2022 | 89 | Declaration *Proffer of Excluded Evidence* by Samantha Roop. (Cohn, Samantha) (Entered: 10/27/2022) |
| 10/27/2022 | 90 | REPLY to Response to Motion re 87 First MOTION for New Trial First MOTION to Alter Judgment *Plaintiff's Reply to Defendant's Motion in Opposition* filed by Samantha Roop. (Cohn, Samantha) (Entered: 10/27/2022) |
| 03/09/2023 | 91 | MEMORANDUM OPINION. Signed by District Judge David J. Novak on 3/9/2023. (smej, ) (Entered: 03/09/2023) |
| 03/09/2023 | 92 | ORDER (Denying Motion for New Trial or to Alter or Amend Judgment) - This matter comes before the Court on Plaintiff's Motion for New Trial under Fed. R. Civ. P. 59(a) or, in the alternative, to Alter or Amend the District Court's Judgment under Fed. R.Civ. P. 59(c) ("Motion" (ECF No. 87)), moving the Court to grant a new trial, or in the alternative, amend or alter a judgment against her under Rules 59(a) and (e), respectively. For the reasons stated in the accompanying Memorandum Opinion, and pursuant to Federal Rules of Civil Procedure 59(a) and (e), the Court hereby DENIES Plaintiff's Motion (ECF No. 87). Signed by District Judge David J. Novak on 3/9/2023. (smej, ) (Entered: 03/09/2023) |
| 03/10/2023 | 93 | CLERK'S JUDGMENT entered on 3/10/2023. (cgar) (Entered: 03/10/2023) |
| 04/05/2023 | 94 | NOTICE OF APPEAL as to 80 Order,,, by Samantha Roop. Filing fee $ 505, receipt number VAEDC-8875710. (Cohn, Samantha) (Main Document 94 replaced on 4/6/2023) (smej, ). (Entered: 04/05/2023) |
| 04/06/2023 | 95 | Transmission of Notice of Appeal to US Court of Appeals re 94 Notice of Appeal (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (smej, ) (Entered: 04/06/2023) |
| 04/07/2023 | | USCA Case Number 23-1376, Case Manager J. Neal, for 94 Notice of Appeal filed by Samantha Roop. (smej, ) (Entered: 04/07/2023) |

**PACER Service Center**

**Transaction Receipt**

IN THE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| SAMANTHA ROOP | ) | Plaintiff, |
| | ) | |
| v. | ) | Civil Action No.: 3:21-cv-00675 |
| | ) | |
| NICHOLAS JAMES DESOUSA | ) | Defendant. |

### NOTICE OF REMOVAL

COMES NOW Defendant Nicholas James Desousa, by counsel, pursuant to 28 U.S.C.

§1332 and 1441 et. seq. and state for his grounds for removal as follows:

1.      Plaintiff in this matter, Samantha Roop, was at all times relevant to this cause of

action and at the time of filing and any attempted service a citizen of the Commonwealth of

Virginia.   Plaintiff Roop is currently a citizen of the Commonwealth of Virginia.

2.      Defendant Nicholas James Desousa was at all times relevant to this cause of

action and at the time of filing and any attempted service was a Citizen of the State of Maryland

and resided in Chesapeake Beach, Calvert County Maryland.   Defendant is not a citizen of the

Commonwealth of Virginia for the purposes of diversity jurisdiction.

3.      This lawsuit was filed in the Circuit Court of the City of Richmond on June 3,

2021.   Defendants time for filing responsive pleadings has not expired as the Affidavit of Service

has not been filed with the Clerk of Court for the City of Richmond.   Defendant has had notice of

this lawsuit for less than thirty days.

4.      The amount in controversy exceeds the sum of Seventy-Five Thousand Dollars

($75,000.00), exclusive of interest and costs, Plaintiff's *ad damnum* being the sum of Five Million

Dollars and Zero Cents ($5,000, 000.00), plus costs and pre- and post-judgment interest.

5.      This Court has jurisdiction over this action by reason of the amount in controversy and diversity of the parties under 28 U.S.C. §§1332, 1441 and 1446.

6.      Venue is proper in the Eastern District of Virginia, Richmond Division, as this matter arises out of an automobile accident that occurred in Middlesex County, Virginia and the Plaintiff filed the lawsuit in the Circuit Court for the City of Richmond.

7.      Plaintiff's original Complaint filed in the Circuit Court of the City of Richmond is attached hereto as Exhibit 1.

8.      The Civil Cover Sheet is attached hereto as Exhibit 2.

9.      Defendant is diverse from Plaintiff.

10.     Defendant consents to the removal of this action.

WHEREFORE, Defendant Nicholas James Desousa, by counsel, respectfully request that this Court accept jurisdiction of this cause of action from the Circuit Court of the City of Richmond, Virginia.

<div style="margin-left:40%">

NICHOLAS JAMES DESOUSA,
By Counsel

</div>

_____/s/_____, p.d.
Carter T. Keeney, Esquire (VSB# 82275)
Carter & Shands, P.C.
9030 Stony Point Parkway, Suite 530
Richmond, VA 23235
Telephone:    (804) 747-7470
Facsimile:    (804) 747-7977
ckeeney@carterandshands.com
*Counsel for Defendant*

<div style="text-align:right">2</div>

**JA14**

CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT on the 26ht day of October, 2021, I will email the foregoing

to counsel listed below and I will electronically file the foregoing with the Clerk of Court using

the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Theodore Briscoe, III, Esquire (VSB# 86040)
Geoff McDonald & Associates, P.C.
8720 Stony Point Parkway, Suite 250
Richmond, VA  23235
Telephone:     (804) 888-8888
Facsimile:      (804) 355-9988
tbriscoe@mcdonaldinjurylaw.com
*Counsel for Plaintiff*

                              _____/s/_____, p.d.
                                Carter T. Keeney, Esquire (VSB# 82275)
                                Carter & Shands, P.C.
                                9030 Stony Point Parkway, Suite 530
                                Richmond, VA 23235
                                Telephone:     (804) 747-7470
                                Facsimile:      (804) 747-7977
                                ckeeney@carterandshands.com
                                *Counsel for Defendant*

3

**JA15**

**VIRGINIA:**

**IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND**

SAMANTHA ROOP,

      **Plaintiff,**

    v.                        Case No. CL 21-2397-2

**NICHOLAS JAMES DESOUSA,**
Serve:  c/o Office of the Secretary of the Commonwealth, Registered Agent
       **Service of Process Department**
       **Post Office Box 2452**
       **Richmond, VA 23218**



### COMPLAINT

    COMES NOW the Plaintiff, Samantha Roop, by counsel, and for her Complaint seeking

judgment against the Defendant Nicholas J. DeSouza, and states as follows:

    1.    Plaintiff, Samantha Roop (hereinafter "Ms. Roop" or "Plaintiff"), is an adult

individual and, for all times relevant to this action, a resident and domiciliary of the County of

Powhatan, Virginia.

    2.    Upon information and belief, Defendant, Brad L. DeSouza, (hereinafter "Mr.

DeSouza" or "Defendant") is an adult individual and, for all times relevant to this action, a resident

and domiciliary of the state of Maryland, with a last known address of 3113 Blue Heron Drive S,

Chesapeake Beach, MD 20732. By operation of law, his statutory registered agent is the Secretary

of the Commonwealth of Virginia, in the City of Richmond.

### VENUE

    3.    Because the defendant has been appointed, by operation of the law, a service agent

located in the city of Richmond, Virginia, venue is proper in this Court, pursuant to Code of

Virginia §8.01-262(2).

**JA16**

**FACTS**

4.     At approximately 8:45 pm on July 7, 2019, Ms. Roop was operating a vehicle traveling westbound on Route 17 Business, at or about its intersection with Route 17, in Middlesex Virginia.

5.     At that same time and place, Defendant was operating a motor vehicle travelling northbound on Route 17 near its intersection with Route 17 Business, in Middlesex Virginia.

6.     Defendant was operating his vehicle without headlights engaged.

7.     At the same time and place, the Sun had already set, and the roadway was not illuminated by any source.

8.     Ms. Roop attempted to cross Route 17 to continue westbound on Route 17 Business.

9.     Ms. Roop was unable to see Defendant's approaching vehicle.

10.    Suddenly, and without warning, Defendant struck Ms. Roop's vehicle.

11.    As a result of Defendant's actions, Ms. Roop was injured.

12.    At the time and place aforesaid, Defendant had a duty to pay full time and attention while driving, to keep a proper lookout, to keep his vehicle under proper control, and to operate the vehicle in a safe manner under the conditions then and there prevailing, and to utilize the headlights of his vehicle, but failed to do so.

13.    Defendant was negligent in that he, to include but not be limited to:

a.     Failed to keep a proper lookout;

b.     Failed to give full time and attention to the operation of his vehicle;

c.   Failed to maintain his vehicle under proper control;

d.   Failed to operate his vehicle in a safe manner;

e.   Failed to engage his vehicle's headlights; and

f.   Caused a collision between the two vehicles.

12.   As a direct and proximate result thereof, Ms. Roop has sustained serious and permanent injuries, has suffered inconvenience, has suffered and will continue to suffer great pain of body and mind; has sustained physical limitations, loss of enjoyment of life, mental anguish, scarring and emotional injury; and has incurred and will continue to incur in the future hospital, doctor, and related bills in an effort to be cured of said injuries.

WHEREFORE, the Plaintiff, Samantha Roop, respectfully prays for judgment against the defendant, Nicholas J. DeSouza in the sum of Five-Million Dollars ($5,000,000.00) and interest from the date of this crash, pursuant to Virginia Code §8.01-382, and all other costs this Honorable Court deems fair and just.

**TRIAL BY JURY IS DEMANDED**.

SAMANTHA ROOP

By: _____
Of Counsel

Theodore W. Briscoe III (VSB No. 86040)
Kyle J. Matykowski (VSB No. 82397)
Geoff McDonald & Associates, P.C.
8720 Stony Point Pky, Ste. 250
Richmond, Virginia 23235
804.888.8888 Phone
804.359.5426 Facsimile
tbriscoe@mcdonaldinjurylaw.com
kmatykowski@mcdonaldinjurylaw.com

3

**JA18**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Roop, Smantha | Desousa, Nicholas J. |
| **(b)** County of Residence of First Listed Plaintiff **Powhatan, VA** *(EXCEPT IN U.S. PLAINTIFF CASES)* | County of Residence of First Listed Defendant **Calvert Co., MD.** *(IN U.S. PLAINTIFF CASES ONLY)* NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |
| **(c)** Attorneys *(Firm Name, Address, and Telephone Number)* See attachment | Attorneys *(If Known)* See attachment |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☐ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 U.S. Government Defendant | ☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**  **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane   ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product    Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | Liability   ☐ 367 Health Care/ | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel &    Pharmaceutical   Slander    Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'    Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability   ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| Student Loans (Excludes Veterans) | ☐ 340 Marine    Injury Product   ☐ 345 Marine Product    Liability | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | Liability   **PERSONAL PROPERTY**   ☒ 350 Motor Vehicle   ☐ 370 Other Fraud | **LABOR** | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle   ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | Product Liability   ☐ 380 Other Personal | ☐ 720 Labor/Management | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal    Property Damage | Relations | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ |
| ☐ 196 Franchise | Injury   ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | Exchange |
| | ☐ 362 Personal Injury -    Product Liability | ☐ 751 Family and Medical | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| | Medical Malpractice | Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS**   **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights    **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting   ☐ 463 Alien Detainee | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment   ☐ 510 Motions to Vacate | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure |
| ☐ 240 Torts to Land | ☐ 443 Housing/    Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | Accommodations   ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -    ☐ 535 Death Penalty   Employment   **Other:** | **IMMIGRATION** | | |
| | ☐ 446 Amer. w/Disabilities -    ☐ 540 Mandamus & Other   Other   ☐ 550 Civil Rights | ☐ 462 Naturalization Application   ☐ 465 Other Immigration Actions | | |
| | ☐ 448 Education   ☐ 555 Prison Condition   ☐ 560 Civil Detainee - Conditions of Confinement | | | |

EXHIBIT 2

## V. ORIGIN *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 Original Proceeding | ☒ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 USC 1332 and 1441

Brief description of cause:
MVA: Plaintiff alleges she was injured as a result of Defendant's negligence.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ 5,000,000

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____ DOCKET NUMBER _____

| DATE 10/26/2021 | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

IN THE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| SAMANTHA ROOP | ) | Plaintiff, |
| | ) | |
| v. | ) | Civil Action No.: |
| | ) | |
| NICHOLAS JAMES DESOUSA | ) | Defendant. |

**Attachment to Civil Cover Sheet**

Theodore Briscoe, III, Esquire (VSB# 86040)
Geoff McDonald & Associates, P.C.
8720 Stony Point Parkway, Suite 250
Richmond, VA  23235
Telephone:    (804) 888-8888
Facsimile:    (804) 355-9988
tbriscoe@mcdonaldinjurylaw.com
*Counsel for Plaintiff*

Carter T. Keeney, Esquire (VSB# 82275)
Carter & Shands, P.C.
9030 Stony Point Parkway, Suite 530
Richmond, VA 23235
Telephone:    (804) 747-7470
Facsimile:    (804) 747-7977
ckeeney@carterandshands.com
*Counsel for Defendant*

**JA20**

IN THE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| SAMANTHA ROOP | ) | Plaintiff, |
| | ) | |
| v. | ) | Civil Action No.: 3:21-cv-00675 |
| | ) | |
| NICHOLAS JAMES DESOUSA | ) | Defendant. |

### **ANSWER**

COMES NOW Defendant Nicholas James Desousa, by counsel, and for his Answer to Plaintiff's Complaint filed herein against him, state as follows:

1.    Defendant admits the allegations in Paragraphs Number 1 and 2 of Plaintiff's Complaint.

2.    Defendant denies the allegations contained in Paragraphs Number 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 13a, 13b, 13c, 13d, 13e, 13f, second Paragraph 12, and the last unnumbered Paragraph of Plaintiff's Complaint, and calls for strict proof thereof.

3.    Defendant admits he was involved in an automobile accident on July 7, 2019.

4.    Defendant admits that he is an adult individual who resides at 3113 Blue Heron Drive South, Chesapeake Beach, Maryland.  However, Defendant asserts he resides in the County of Calvert County, Maryland.

5.    Defendant state that Plaintiff's claim may be barred by her contributory negligence and reserves the right to amend this Answer to reflect any other defense that may arise hereinafter.

6.    Defendant states that Plaintiff was not injured in the manner, nor to the extent, alleged.

7.    Defendant states that he owes Plaintiff no sum whatsoever.

1

**JA21**

WHEREFORE, Defendant Nicholas James Desousa, by counsel, asks that this Court dismiss the Complaint filed herein against him and enter an Order in his favor with his costs and attorney's fees herein expended.

TRIAL BY JURY IS DEMANDED

NICHOLAS JAMES DESOUSA,
By Counsel

_____/s/_____, p.d.
Carter T. Keeney, Esquire (VSB# 82275)
Carter & Shands, P.C.
9030 Stony Point Parkway, Suite 530
Richmond, VA 23235
Telephone:     (804) 747-7470
Facsimile:      (804) 747-7977
ckeeney@carterandshands.com
*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT on the 26th day of October, 2021, I will send via email the foregoing to counsel listed below and I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Theodore Briscoe, III, Esquire (VSB# 86040)
Geoff McDonald & Associates, P.C.
8720 Stony Point Parkway, Suite 250
Richmond, VA  23235
Telephone:     (804) 888-8888
Facsimile:      (804) 355-9988
tbriscoe@mcdonaldinjurylaw.com
*Counsel for Plaintiff*

_____/s/_____, p.d.
Carter T. Keeney, Esquire (VSB# 82275)
Carter & Shands, P.C.
9030 Stony Point Parkway, Suite 530
Richmond, VA 23235
Telephone:     (804) 747-7470
Facsimile:      (804) 747-7977
ckeeney@carterandshands.com
*Counsel for Defendant*

2

**JA22**

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

SAMANTHA ROOP,

        Plaintiff,

        v.                          Civil Action No.: 3:21-cv-00675-DJN

NICHOLAS JAMES DESOUSA,

        Defendant.

**PLAINTIFF'S INITIAL RULE 26(a)(1)(A) DISCLOSURES**

        Plaintiff, Samantha Roop, by counsel, hereby makes the following initial disclosures in accordance with Rule 26(a)(1)(A) of the Federal Rules of Civil Procedure:

        **1.**        **Individuals who are likely to have discoverable information:**

        a.        The Defendant, Nicholas James Desousa.  Upon information and belief, the Defendant resides at 3113 Blue Herron Drive S, Chesapeake Beach, Maryland 20732.

        b.        Samantha Roop, plaintiff, may be contacted through counsel.  Ms. Roop has knowledge of the incident, her pre-incident life, and her post-incident life and difficulties.  Plaintiff resides at 2291 Mill Road, Powhatan, Virginia 23139.

        c.        Gerard Barton, Plaintiff's husband.  Mr. Barton has knowledge of Plaintiff's pre-incident life and her post-incident life and difficulties.  He is aware of the incident through the Plaintiff and their children who were passengers in the vehicle at the time of the incident.  Mr. Barton resides at 2291 Mill Road, Powhatan, Virginia 23139.

**JA23**

d.      Kelsey Hendershot, minor, was a passenger in Plaintiff's vehicle at the time of the incident and has knowledge of the incident and Plaintiff's post-incident life and difficulties. Miss Hendershot resides at 2291 Mill Road, Powhatan, Virginia 23139.

e.      Kendra Barton, minor, was a passenger in Plaintiff's vehicle at the time of the incident and has knowledge of the incident and Plaintiff's post-incident life and difficulties. Miss Barton resides at 2291 Mill Road, Powhatan, Virginia 23139.

f.      John Barton, minor, was a passenger in Plaintiff's vehicle at the time of the incident and has knowledge of the incident and Plaintiff's post-incident life and difficulties.  Mr. Barton resides at 2291 Mill Road, Powhatan, Virginia 23139.

g.      Jim Miller, a witness to the incident.  Mr. Miller has knowledge of the incident.

h.      Trooper Adam N. Cavins.  Trooper Cavins investigated the incident and has knowledge thereof.  Trooper Cavins also prepared the crash report associated with the incident.

i.      Plaintiff's family, friends, and co-workers, to be specifically identified in discovery, who may have knowledge of Plaintiff's pre-incident life and post-incident life and difficulties.

j.      Plaintiff's treating physicians, healthcare professionals, and employees of healthcare facilities, specifically:

    i.      St. Francis Watkins Center

    ii.     Richmond Emergency Physicians

2

**JA24**

      iii.      Emergency Coverage Corporation

      iv.      Commonwealth Radiology

      v.      Powhatan Medical Associates

      vi.      Chippenham & Johnston Willis Hospital

      vii.      Alliance Physical Therapy

      viii.      Intimate Wellness Institute of Virginia

      ix.      Bon Secours Neurology Clinic

      x.      Tuckahoe Orthopedics

      xi.      OrthoVirginia

k.      Plaintiff's prior treating physicians, healthcare professionals, and employees of healthcare facilities who have knowledge of Plaintiff's pre-incident state of health, specifically:

      i.      All previous disclosed medical providers in section 1(j) above.

l.      Any other individual identified in Defendant's Rule 26(a)(1) Disclosure.

**2.**      **Documents and things:**

a.      The following categories of documents are in the possession of plaintiff and may be used to support plaintiff's claim:

      i.      Crash Report prepared by Trooper Cavins, attached hereto.

      ii.      Field notes taken by Trooper Cavins, attached hereto.

      iii.      Statements from Plaintiff and Defendant taken as part of Trooper Cavins' investigation, attached hereto.

3

      iv.     Video recording containing in-car video of the incident scene, attached hereto.

      v.     Audio recordings received from Plaintiff's FOIA request, attached hereto.

      vi.     Photographs of the vehicles involved in the incident, attached hereto.

      vii.     Plaintiff's pre- and post-incident medical bills and records currently in Plaintiff's possession and as may be otherwise obtained during discovery.

      viii.     Any document identified in Defendant's Rule 26 Disclosures

b.     The following categories of documents are being withheld from production at this time on the grounds of attorney-client privilege and/or subject to protective order and/or work product and/or settlement negotiation privilege: communications between plaintiff and her attorneys and research (legal and/or factual) by, or directed by, such attorneys.

3.     **Computation of Damages Claimed by Plaintiff:**

a.  Past pain

b.  Past suffering.

c.  Current and future pain

d.  Current and future suffering.

e.  Past inconvenience.

f.  Current and future inconvenience.

g.  Past emotional distress.

h.  Current and future emotional distress.

      i.   Pre-judgment and post-judgment interest.

      j.   The total amount of damages are estimated at $5,000,000.00, plus reasonable attorneys fees and costs, pre-judgment interest and post-judgment interest, to be computed at the close of litigation.

**4. Insurance agreements:**

      a.   Plaintiff has none applicable to this action.

Respectfully submitted,
**SAMANTHA ROOP**
Plaintiff

/s/_____Nikita Wolf, Esq._____

Nikita Wolf (VSB No. 86939)
Geoff McDonald & Associates, P.C.
8720 Stony Point Parkway, Suite 250
Richmond, VA 23235
Phone: (804) 888-8888
Facsimile: (804) 359-5426
Email: nwolf@mcdonaldinjurylaw.com
Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of November, 2021, the foregoing Rule 26(a)(1) disclosures was electronically mailed to the following:

Carter T. Keeney, Esq. (VSB # 82275)
Carter & Shands, P.C.
9030 Stony Point Parkway, Suite 530
Richmond, VA 23235
Phone: (804) 747-7470
Facsimile: (804) 747-7977

**JA27**

Email: ckeeney@carterandshands.com
*Counsel for Defendant*

/s/      Nikita Wolf, Esq.
　　　　　Nikita Wolf, Esq.

**JA28**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

SAMANTHA ROOP,
    Plaintiff,

v.                                     Civil No. 3:21cv675 (DJN)

NICHOLAS DESOUSA,
    Defendant.

### SCHEDULING AND PRETRIAL ORDER

The following shall govern the progress of this action in addition to the provisions of the

Federal Rules of Civil Procedure as modified and/or enlarged upon by the Local Rules for this

Court. This Order shall control if any conflict is perceived between it and either the Federal or

Local Rules. The term "Rule(s)" refers to the Federal Rules of Civil Procedure and "Local

Rule(s)" refers to the Local Rules for this District. This Order supersedes any previous

scheduling order(s).

### Trial Date

1.      Trial is scheduled with a jury to commence at 9:30 a.m. with jury selection only

on **July 21, 2022** and to continue with opening statements and testimony beginning on **July 22,**

**2022,** and concluding that day.

### Answer and Joinder

2(a). Any defendant that has not filed an Answer shall do so within eleven (11) calendar

days from the date of this Order without prejudice to any motions already filed by the defendant.

2(b). Any motions for joinder of additional parties shall be filed within fifteen (15)

calendar days after entry of this Order.

**JA29**

## Motions Challenging Pleadings and Leave to Amend

3(a).   If a party has filed or hereafter files a motion to dismiss a pleading pursuant to Rules 12(b)(1)-(3) or 12(b)(6), a motion for judgment on the pleadings pursuant to Rule 12(h)(2)(B), a motion for a more definite statement pursuant to Rule 12(e), or a motion to strike pursuant to Rule 12(f), consistent with Rule 15(a)(1), the party/parties whose pleading is challenged by the motion shall have twenty-one (21) days from service of the motion or seven (7) days from the issuance of this Order, whichever is later, in which to file an amended pleading.

3(b).  If the nonmovant(s) files an amended pleading within the period prescribed in Paragraph 3(a), the Court shall as a matter of course deny the motion challenging the original pleading with leave to refile the motion based on the amended pleading.  The party/parties whose pleading is challenged by the refiled motion shall not have leave to file a second or subsequent amended pleading without filing a separate motion for leave to amend, which shall be granted only upon satisfaction of Rule 16(b)(4) and Rule 15.  *See Nourison Rug Corp. v. Parvizian*, 535 F.3d 295, 298 (4th Cir. 2008) (requiring parties moving for leave to amend outside of the deadlines prescribed in a scheduling order to satisfy the good cause requirement of Rule 16(b)(4) and the requirements of Rule 15).

3(c).  If the nonmovant(s) does not file an amended pleading within the period prescribed in Paragraph 3(a), the Court will resolve the relevant motion based on the original pleading, with leave to amend the original pleading granted only upon satisfaction of the requirements of Rule 16(b)(4) and Rule 15.

**JA30**

**Rule 26 Disclosures**

4(a).  Not later than **February 21, 2022**, each party shall identify all persons it expects to call as expert witnesses in its case-in-chief at trial in support of any complaint, counterclaim, cross-claim, or third-party complaint, and shall serve all other parties with a copy of a written report complying with the requirements of Rule 26(a)(2)(B) and (C) for each such expert witness.  Rule 26(a)(2)(B) shall <u>not</u> be deemed to include the opinion(s) of treating professionals and the terms of this Order shall supersede any conflicting provisions of Rule 26.

4(b).  Not later than **March 23, 2022**, each defending party shall identify all persons it expects to call as expert witnesses in opposition to any complaint, counterclaim, cross-claim, or third-party complaint, and shall serve all other parties with a copy of a written report complying with the requirements of Rule 26(a)(2)(B) and (C) for each such expert witness.

4(c).  Not later than **April 4, 2022**, each party shall identify all persons expected to be called as expert witnesses solely to contradict or rebut any witness identified pursuant to Paragraph 4(b) and shall serve all other parties with a copy of a written report complying with the requirement of Rules 26(a)(2)(B) and (C) for each such expert witness.

4(d).  The parties may rely upon the testimony of only one expert per topic, except by order of the Court.

4(e).  Any motions challenging expert testimony based upon *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny shall be filed not later than **April 12, 2022**.  Any response to such a motion shall be filed not later than ten (10) calendar days after the filing of the motion and any reply shall be filed not later than three (3) calendar days thereafter.

**Completion of Discovery**

5(a).  All discovery, including the required time period for response to any discovery demand(s), must be concluded not later than **March 23, 2022**, except by order of the Court.

5(b).  Counsel are expected to resolve discovery disputes without filing motions or involving the Court.  Should a dispute arise, consistent with Local Rule 37(E), counsel must confer in good faith to resolve the dispute.  "Good faith" means that the parties have met in person and engaged in one-on-one discussions, not that the parties have merely exchanged correspondence.  If, after good faith effort, counsel are unable to resolve a dispute and need the Court to intervene, the parties shall file a <u>joint</u> motion not exceeding twenty (20) pages in length setting forth (1) the posture of the case, (2) the nature of the discovery dispute, (3) the efforts made by the parties to resolve the dispute, (4) the position of each party regarding the dispute, (5) whether a hearing is necessary to address the issue, and (6) a certification under Local Rule 37(E) signed by counsel for each party that they have met in person and conferred in good faith to resolve the dispute before involving the Court.  The Court strongly prefers that the parties file a joint motion, so that the dispute can be addressed in an expedited manner.  In extraordinary situations where the parties believe that a joint pleading is not feasible, the parties must file a motion for leave to file separate submissions, setting forth the reasons that a joint submission cannot suffice.  The parties must file any motions with sufficient time for the Court to resolve the dispute before the completion of discovery, because the Court will not extend the discovery deadline due to a dispute except in extraordinary circumstances.  Counsel are reminded that discovery disputes requiring judicial intervention are strongly disfavored and that the Court will impose sanctions pursuant to Rule 37 and Local Rule 37 against any party not acting in good

4

**JA32**

faith to resolve a dispute before involving the Court. *See Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1186 (2017) (recognizing a trial court's inherent authority to control the litigation of a case and impose sanctions for abuse of the judicial process); *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 642-43 (1976) (affirming the power of district courts to, in their discretion, issue Rule 37 sanctions).

5(c).  No discovery materials shall be filed with the Clerk except by order of the Court.

5(d).  If a party objects to the production of documents on the grounds of attorney-client privilege, attorney work-product doctrine, or any other protection, the objecting party must provide the requesting party with an inventory list of the documents to which objection is made (i.e., a privilege log), together with a brief description of the document, including the date, the author, identity of each recipient including their job titles at the pertinent time, and the claimed basis for its protection, all of which shall be sufficient to permit the opposing party to assess the claim of privilege or protection.  Unless otherwise ordered by the Court, the claim of privilege or protection shall be waived unless the privilege log is served with the responses to the request for production in the time required by the Federal Rules, the Local Rules or by a deadline established by an order of the Court.

5(e).  If any party anticipates difficulty meeting the deadline for asserting discovery objections or serving the opposing party with a privilege log, the Court instructs the party to move for an extension of time at the earliest reasonable opportunity, preferably before objections or privilege logs become due.  Such motion will be granted for good cause shown.  If any party is shown to have unnecessarily delayed in seeking such an extension of time, the Court will strictly enforce the deadlines established by the Local Rules.

**JA33**

5(f).   No party shall take more than five (5) depositions of non-party witnesses without leave of Court.  For purposes of this paragraph, a deposition of a non-party entity under Rule 30(b)(6) shall count as one deposition, even if the entity designates multiple witnesses to testify.

5(g).   Counsel shall serve all discovery requests by e-mail and hardcopy, unless the parties otherwise agree in writing.  *Pro se* litigants are not required to serve discovery requests by e-mail, and represented parties are not required to serve *pro se* litigants by e-mail.

### Dispositive Motions

6. All dispositive motions shall be filed not later than **April 12, 2022**.  This deadline shall not change, except by order of the Court.  Counsel must submit two (2) courtesy copies of all motions and one (1) copy of all exhibits to Chambers.  Counsel are reminded of the requirements of Local Rule 56(B), which are specifically incorporated herein regarding motions for summary judgment.

### Non-Dispositive Motions

7. All non-dispositive motions, including all motions *in limine* (excluding *Daubert* motions, *see* ¶ 4(e) *supra*) shall be filed not later than **June 21, 2022**.  The brief in opposition to such non-dispositive motions shall be filed not later than six (6) days after the motion is filed.  The reply brief in support of such non-dispositive motions, if any, shall be filed not later than three (3) days after the opposition is filed.

### Oral Argument

8(a). Consistent with Local Rule 7(J), the Court will decide all motions on the papers unless the Court orders oral argument on its own initiative or on separate motion filed by the

**JA34**

parties.  The separate motion must include an incorporated brief explaining why oral argument will materially aid in the decisional process.

8(b).  The Court will not enforce the provisions of Local Rule 7(E) to the extent that it requires a movant to schedule a hearing within thirty (30) days after filing a motion.

### Proposed Witnesses

9.  Each plaintiff shall file a list of proposed witnesses not later than **June 13, 2022**, and each defendant shall designate its witnesses not later than **June 21, 2022**.  Plaintiff(s) shall file a list of any rebuttal witnesses not later than six (6) days after defendant designates its witnesses. Failure to comply with the provisions of this paragraph shall result in preclusion of a witness's testimony at trial, absent exceptional circumstances.

### Discovery To Be Used As Evidence

10.  Each plaintiff shall file a designation not later than **June 13, 2022** specifically identifying any discovery material that is intended to be offered into evidence and each defendant shall do likewise not later than **June 21, 2022**.  Any designation must identify the specific item of discovery intended to be offered into evidence by exhibit number, title of the document and the specific page and sentence of the relevant information, along with a statement of relevance and basis for admission.  For nonjury trials, pursuant to Local Rule 30(G), counsel shall provide summaries of any deposition testimony, pointing to the salient points to be noted by the Court.  Any objection to the introduction of any discovery material shall be filed not later than **June 27, 2022** or the objection will be deemed waived.  This paragraph does not apply to discovery materials that will be used at trial solely for cross-examination and/or for impeachment purposes.

**JA35**

**Jury Trial**

11(a).  If this matter is to be tried by a jury, counsel for all parties shall <u>jointly</u> file

electronically any requested jury instructions, including all requested standard instructions, not

later than **June 30, 2022**.  The submission of proposed jury instructions shall include each

requested jury instruction (regardless whether agreed or objected to) fully set forth on a separate

page with a citation in support of the instruction set forth at the bottom of the requested

instruction.  The submission shall be organized as follows.  First, the parties shall tender the

agreed set of instructions (to be labeled "J-1," "J-2," etc.), including any special interrogatory

verdict form.  Second, the parties shall tender any of Plaintiff's proposed instructions (to be

labeled "P-1," P-2," etc.) to which Defendant objects.  Third, the parties shall tender any of

Defendant's proposed instructions (to be labeled "D-1," "D-2," etc.) to which Plaintiff objects.

Counsel shall also provide a copy of the requested jury instructions in Microsoft Word format

via e-mail to Chambers.

11(b).  Not less than three (3) calendar days after the filing of the requested jury

instructions, the objecting party shall submit its memorandum in opposition to any jury

instructions requested by the other side that are not agreed upon.  The objecting party shall set

forth the nature of the dispute, any authority on the issue and any alternative instruction.

11(c).  Not less than five (5) calendar days after the filing of the requested jury

instructions, the party proposing any requested instructions that are not agreed upon may submit

a memorandum in support of the requested instructions.

*Voir Dire*

12. Any proposed jury *voir dire* to be requested by any party shall be filed not later than **June 30, 2022**. Parties are encouraged to submit an instruction that succinctly summarizes the position of each party for use by the Court during *voir dire*.

## Bench Trial

13. If this matter is to be tried without a jury, the parties shall file proposed findings of fact and conclusions of law not later than **July 7, 2022**. Counsel shall also provide a copy of the proposed findings of fact and conclusions of law in Microsoft Word format via e-mail to Chambers.

## Written Stipulations

14. Not later than **June 27, 2022**, counsel for each party shall meet and confer in a good faith effort to enter into written stipulations of uncontroverted facts. Written stipulations shall be signed by each counsel and filed with the Clerk not later than **June 30, 2022**.

## Proposed Exhibits

15(a). Each plaintiff shall file a list of proposed exhibits not later than **June 13, 2022** and shall provide a copy of all proposed exhibits to all parties. Each defendant shall file a list of proposed exhibits and shall provide a copy of same to every party not later than **June 21, 2022**. Any objection to any exhibit shall be noted by a motion that includes the subject exhibit(s) filed not later than six (6) days following defendant's filing of proposed exhibits.

15(b). In anticipation of trial, each party shall ensure that three (3) sets of pre-marked, indexed copies of that party's exhibits are submitted in binders to the Clerk at least one day

9

**JA37**

before trial begins for use by the courtroom deputy clerk during trial proceedings and the jury during its deliberations.

## Deadlines

16. Unless otherwise specified, any deadline established herein shall be governed by Rule 6. For purposes of Rule 6(d), all electronically filed documents shall be deemed electronically served regardless of additional service by any other means.

## Settlement

17(a). This case is hereby REFERRED to United States Magistrate Judge **Elizabeth W. Hanes** for settlement. The parties shall be responsible for contacting the chambers of the Magistrate Judge to schedule the settlement conference. If amenable to the Magistrate Judge and otherwise consistent with their calendar, the Court orders the parties to schedule the settlement conference before **April 1, 2022**. The parties may elect to utilize a mediator for settlement purposes; however, if they elect to do so, the parties must still schedule a settlement conference with the Magistrate Judge before the deadline and then meet with the private mediator before the scheduled settlement conference with the Magistrate Judge.

17(b). The parties shall file notice of any settlement, either in whole or in part, as soon as practicable but not later than 12:00 p.m. on the nearest business day following the date of settlement. Counsel shall submit a stipulation of dismissal not later than fourteen (14) calendar days after filing the notice of settlement, unless otherwise ordered by the Court. If such stipulation is not timely filed, the Court will dismiss this action with prejudice as to all parties involved in the settlement.

10

**JA38**

## Final Pretrial Conference

18.  A Final Pretrial Conference will be held on **July 1, 2022** at **10:00 a.m.**  Not later than seven (7) days before the Final Pretrial Conference, the parties shall <u>jointly</u> submit a proposed Final Pretrial Order to the Court, endorsed by counsel and setting forth all resolved and disputed matters related to trial evidentiary issues.  The proposed Final Pretrial Order shall be broken down by the following sections:  (1) Stipulated Facts; (2) Legal and Evidentiary Stipulations (including jurisdiction and venue); (3) List of Proposed Witnesses by Each Party; (4) Exhibits (including identification of those exhibits to which there is no objection); (5) Factual Contentions as set forth by each party; and (6) Triable Issues as set forth by each party.

## Pretrial Briefs

19.  The parties may file pretrial bench briefs on material issues expected to arise at trial; indeed, the Court encourages such practice.  Pretrial briefs, however, may not serve as a substitute for motions *in limine*, because pretrial briefs do not seek a remedy.  Instead, pretrial briefs serve as a vehicle for counsel to educate the Court about a potential trial issue.  If counsel elects to file a pretrial brief, it must be filed not later than **July 15, 2022.**

## Courtroom Technology

20(a).  All exhibits will be presented by available electronic means during trial.  The courtroom is equipped with a document viewer that displays evidence on monitors located on counsel tables, on the bench and in the jury box.  The parties may also use personal laptop computers to aid in the presentation of evidence.  The Court does not provide laptops.  The Court advises the parties to visit the following webpage for more information on the Court's

**JA39**

technological capabilities: http://www.vaed.uscourts.gov/resources/Court%20Technology/ evidence_presentation_systems.htm.

20(b).  Any party wishing to use courtroom technology during a proceeding should submit a Request to Use the Court's Evidence Presentation System form and confer with the undersigned's courtroom deputy at least ten (10) days before the proceeding.  The Court expects all parties using courtroom technology to conduct a test run before any proceeding.

20(c).  Any party wishing to bring personal electronic devices, including laptops and cell phones, to a proceeding should submit a Request for Authorization form to the undersigned's law clerks at least three (3) days before the proceeding.  While in the courthouse, all devices should be turned off (not in silent or vibrate modes) unless in use for court-related matters.

### Attorneys' Fees

21.     Any motion for an award of attorneys' fees will be addressed after trial pursuant to Rule 54 and Local Rule 54 (if fees are treated as costs by statute or rule).  Such motions shall be governed by applicable statutory and decisional law and must be accompanied by a brief.  A party moving for attorneys' fees must submit an affidavit or declaration itemizing time spent on the case, describing the work done and the hourly rate of the person billing the case.  In addition, a movant must submit an affidavit or declaration from an expert establishing the reasonableness of the fees.

12

**JA40**

**Communications with Chambers**

22.     *Ex parte* communications with chambers are strongly discouraged and should be limited to scheduling questions and other clerical matters.  All other requests and communications should be made via filings on the public docket.

The Clerk is DIRECTED to provide a copy of this Order to all counsel of record and any party not represented by counsel.

It is so ORDERED.

_____/s/_____

David J. Novak
United States District Judge

Richmond, Virginia
Date:  December 15, 2021

13

**JA41**

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

SAMANTHA ROOP,

         Plaintiff,

    v.                                    Civil Action No.: 3:21-cv-00675-DJN

NICHOLAS JAMES DESOUSA,

         Defendant.

## PLAINTIFF'S EXPERT DESIGNATIONS

COMES NOW, the Plaintiff, Samantha Roop, by and through counsel, and for her Expert

Witness Designations, respectfully states that she may call the following witnesses at the trial of this

matter:

> **Teresa Camden, M.D.**
> **New Medical Spa**
> **2235 Old Brick Road**
> **Short Pump, VA 23060**
> **Phone: (804) 376-8008**

Dr. Camden is a medical physician specializing in Family Medicine, Sports Medicine, and

Cosmetic Medicine and is one of Plaintiff's treating healthcare providers. This designation will be

supplemented with Dr. Camden's *curriculum vitae*.

Dr. Camden is expected to testify that on July 8, 2019, Plaintiff, Samantha Roop, then a

34-year old female, was in a motor vehicle crash (the "Crash") in which Plaintiff was a driver.

Plaintiff's vehicle was struck by another vehicle in a t-bone fashion, and that Plaintiff sustained

**JA42**

significant injuries as a result of said incident. Dr. Camden is expected to testify that Plaintiff suffered from an injury to her head, neck, left shoulder, and also multiple contusions, and these injuries were all due to the Crash. Dr. Camden is expected to testify that upon examination by Richard Gill, M.D. at St. Francis Medical Center, Plaintiff presented with, among other things, the aforementioned injuries, and underwent CT scans and x-rays of her left hip, left shoulder, and cervical spine.

Dr. Camden is further expected to testify that upon later examination, on July 10, 2019, Plaintiff presented to Powhatan Medical Associates presenting with headaches, nausea, light sensitivity, tenderness to the left side of her body, back pain, and diffuse joint pain, and these injuries were all due to the Crash.  Dr. Camden is expected to testify that Plaintiff was examined by Madeline Klim, NP, diagnosed with nausea and a concussion due to the Crash, was given prescriptions, and referred to a follow-up evaluation with a neurologist and to return to her PCP as needed for continued or worsening symptoms.

Dr. Camden is expected to testify that on July 15, 2019, Plaintiff presented to CJW Medical Center – Johnston-Willis Campus with complaints of head pain, back pain, and neck pain.  Dr. Camden is expected to testify that a physical examination and review of symptoms was performed by Karen Gardella, NP, and John Bantle, M.D., and revealed positive signs of photophobia, nausea, vomiting, neck pain, back pain, headache, dizziness, tenderness of the neck and low back, and that a check of the Plaintiff's range of motion was unable to be completed due to reported pain in the low back.  Dr. Camden is expected to testify that these injuries were all due to the Crash.  Dr. Camden is expected to testify that as a result of the aforementioned injuries, CT scans were taken of Plaintiff's cervical spine, thoracic spine, and head which came back as normal.  Dr. Camden is further expected

2

**JA43**

to testify that Plaintiff was given pain medications while at the ER and that her symptoms were later re-checked after the administration of these medications; as a result, Plaintiff's pain and range of motion were mildly improved. Dr. Camden will testify that Plaintiff was discharged with prescriptions for Fioricet and muscle relaxers and advised to follow up with her pain specialist for further evaluation regarding her new injuries. Dr. Camden is expected to testify that Plaintiff was diagnosed with back pain, concussion, headache, and neck muscle spasms due to the Crash

Dr. Camden is expected to testify that on July 19, 2019, Plaintiff presented to Alliance Physical Therapy for the first of several visits. Dr. Camden is expected to testify that on the July 19, 2019 visit, Plaintiff presented with complaints of headache, pain in left hip, low back pain/stiffness, neck and shoulder pain, and decreased sleep. Dr. Camden is expected to testify that upon physical examination, Plaintiff showed positive signs of decreased range of motion in neck and back, decreased strength and flexibility, increased headaches, poor vestibulo-ocular reflex and gaze-stab tolerance. Dr. Camden is expected to testify that Plaintiff was diagnosed with cervicalgia, pain in left shoulder, pain in left arm, headaches, concussion, generalized muscle weakness, strain of muscle, fascia, and tendon at neck level, sprain of ligaments of cervical spine, pain in left hip, and low back pain. Dr. Camden is expected to testify that these injuries were all due to the Crash. Dr. Camden is expected to testify that the plan of care developed at this time was for Plaintiff to be seen at the physical therapy office 2-3 times per week for 4-6 weeks.

Dr. Camden is further expected to testify that Plaintiff underwent the recommended course of physical therapy treatment and completed her physical therapy regimen on October 16, 2019. Dr. Camden is expected to testify regarding the therapies and modalities performed on Plaintiff during her treatment period at Alliance Physical Therapy as well as their effect and duration on Plaintiff's

3

**JA44**

overall health.   Dr. Camden is expected to testify in accordance with the contents of the documentation concerning each of Plaintiff's individual physical therapy appointments which were created close in time and/or contemporaneously with Plaintiff's physical therapy visits and in accordance with the regular business practice of Alliance Physical Therapy.

Dr. Camden is expected to testify that upon his review of Plaintiff's medical records and Dr. Camden's examination of Plaintiff that all of the above-referenced diagnoses and pain stem from the vehicle collision which occurred on July 7, 2019. Dr. Camden is further expected to testify that Plaintiff sustained all of the above-listed injuries due to the vehicle collision which occurred on July 7, 2019.

Dr. Camden is expected to testify that it is not unusual for the pain and physical issues listed above to present themselves due to the Crash.

Dr. Camden is expected to testify that the above-referenced medical evaluation and treatment Plaintiff received was reasonable, necessary, and causally related to the Crash, and that the bills for such services were reasonable.

Dr. Camden is expected to testify that the physical therapy Plaintiff received was reasonable, necessary, and causally related to the Crash, and that the bills for such services were reasonable.

She is also expected to testify that the medications prescribed to Plaintiff were reasonable and necessary, and that the need for the medication was causally related to the Crash.

Dr. Camden's testimony will be based upon her personal examinations of Samantha Roop as well as the records of Ms. Roop's treatment at Saint Francis Medical Center, Bon Secours Powhatan Medical Associates, Chippenham Johnston Willis Hospital, and Alliance Physical Therapy, and by Dr. Richard Gill, Dr. John Bantle, Madeline Klim, NP, Karen Gardella, NP,

**JA45**

All of the opinions that Dr. Camden will provide are expected to be to a reasonable degree of medical probability.

SAMANTHA ROOP,
By Counsel

_____/s/_____
Nikita Wolf (VSB No. 86939)
Geoff McDonald & Associates, P.C.
8720 Stony Point Pky, Ste. 250
Richmond, Virginia 23235
804.888.8888 Phone
804.359.5426 Facsimile
nwolf@mcdonaldinjurylaw.com
*Counsel for the Plaintiff*

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY THAT a true and correct copy of the foregoing Plaintiff's Expert Disclosure has been forwarded by electronic mail, on this 21st day of February, 2022, to the counsel of record set forth below.

_____/s/_____
Nikita Wolf, Esquire

Carter T. Keeney, Esq. (VSB No. 82275)
Carter & Shands, P.C.
9030 Stony Point Parkway, Suite 530
Richmond, VA 23235
Telephone:    (804) 747-7470
Facsimile:    (804) 747-7977
ckeeney@carterandshands.com
*Counsel for Defendant*

**JA46**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Richmond Division**

**SAMANTHA ROOP,**

> Plaintiff**,**

**v.**                                                                   **Case No.: 3:17-CV-00675-DJN**

**NICHOLAS JAMES DESOUSA,**

> Defendant.

<u>**MOTION SEEKING RELIEF FROM TRIAL SCHEDULE**</u>
<u>**AND ENLARGEMENT OF DEADLINES**</u>

The Plaintiff, Samantha Roop, move this Court for relief from the trial schedule and also

for an enlargement of deadlines currently set by the Orders of this Court.  In particular, the Plaintiff

sets forth as follows:

1.  On December 15, 2021, the Court entered its Initial Pre-Trial Order (ECF No. 23).

Pursuant to this Order, and of pertinence to this Motion, the following deadlines were established.

> a.   Plaintiff's Expert Disclosures – February 21, 2022
> b.   Defendant's Expert Disclosures – March 23, 2022
> c.   Rebuttal Expert Disclosures – April 4, 2022
> d.   Close of  Discovery – March 23, 2022
> e.   Deadline for filing Daubert Motions – April 12, 2022
> f.   Deadline for filing Dispositive Motions – April 12, 2022
> h.   Final Pre-Trial Conference – July 1, 2022
> i.   Trial – July 21, 2022 through July 22, 2022.

2.        The *Federal Rules of Civil Procedure* Rule 26(a)(2)(C) dictates that a party must

disclose to the other parties the identity of any witness it may use as trial to present evidence under

the *Federal Rules of Civil Procedure* Rule 702, Rule, 703, or Rule 705.  Furthermore, the Rule

states that there are expert witnesses that fall under this Rule regarding the mandatory disclosure

however, there are such experts that are not required to provide a written report.

3. *Walter Banks v. Guy Cook*, No. 3:08CV514, 2009 U.S. Dist. LEXIS 5107 (E.D. Va. Jan. 26, 2009), states:

> Pursuant to *Federal Rule of Civil Procedure* 26(a)(2)(B), any party offering an expert witness's testimony at trial is required to produce a written report . . . An exception to this rule is recognized in Virginia law whereby a party's "treating physician [may] offer opinions 'without the necessity of a report under Fed. R. Civ. P. 26(a)(2)(B).'" *McDonald v. Wal-Mart Stores East, L.P.,* No. 3:07cv425, 2008 U.S. Dist. LEXIS 2599, 2008 WL 153782, at *3 (E.D. Va. Jan. 14, 2008) (quoting *Hall v. Sykes*, 164 F.R.D. 46, 48 (E.D. Va. 1995)). The rationale supporting the exception is that while treating physicians process knowledge and opinions as to causation and prognosis that result from their ongoing treatment of a patient, they are not specifically retained to testify and offer an expert opinion as to causation in a particular matter. See id.; see also *Moore v. McKibbon Brothers Inc*., No. 5:98cv923BO2, 1999 U.S. Dist. LEXIS 1728, 1999 WL 1940029, at *1 (E.D.N.C. January 8, 1999). As one Court has explained: "[t]reating physicians are really fact witnesses whose testimony flows from information they learned during the course of their treatment." See *Moore*, 1999 U.S. Dist. LEXIS 1728, 1999 WL 1940029, at *1. However, the exception has been narrowly applied, and Rule 26(a)(2)(B) requirements are only waived when the treating physician's testimony will address only the knowledge they have gained from the ordinary treatment of the patient. See *McDonald*, 2008 U.S. Dist. LEXIS 2599, 2008 WL 153782, at *3 (emphasis added).

4. Counsel for Plaintiff in the instant matter was previously Nikita Wolf, Esquire, formerly of Geoff McDonald and Associates, PC.  The separation between Wolf and Geoff McDonald and Associates occurred suddenly with little to no notice on or about Friday February 25, 2022.

5. Shortly thereafter, the case was transferred to Samantha Cohn, current counsel for Plaintiff pursuant to ECFS. 11 through 13, on or about Monday February 28, 2022 within the firm itself and on or about March 16, 2022 by Order of the Court.

6. This new substitution of counsel for Plaintiff occurred informally one week after Plaintiff's Formal Expert Designations were due and officially with the Court by Order, as stated above, more than three weeks after the designations were due as new counsel had to be sworn in to appear before the United States District Court Eastern Division which could not be scheduled until March 8, 2022.

7.   Pursuant to Rule 6(b)(1) of the *Federal Rules of Civil Procedure*, the Court may extend deadlines in a case, for good cause shown, both before and after the passage of certain deadlines.

8.   Local Rule 7(G) and (I) also give the Court power to extend time although such extensions are looked upon with disfavor.

9.   Local Rule 16(B) admonishes that counsel is bound by the dates in the Pre-Trial Scheduling Trial Order and shall not be granted extensions absent a showing of good cause.  The Rule further cautions that a failure to proceed promptly with normal discovery responses, alone, shall not constitute good cause.

10.  Counsel for Plaintiff presents this *Motion* to the Court, implicating the Rules outlined above, seeking a relief from the Trial Schedule by means of an enlargement of deadlines.  Namely, the enlargement sought is an extension by which Plaintiff is permitted to file a singular expert disclosure that does not require a written report.

11.  Counsel for Plaintiff is aware, "[t]here is no principle that each new attorney for a litigant must have an independent opportunity to conduct discovery." *Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 159 (7th Cir. 1996) (quoted in Dkt. No. 838 at 4). Furthermore, Counsel for Plaintiff acknowledges, "that a delay [in the conduct of discovery] attributed to a change in counsel does not constitute good cause [for an extension of the discovery period] because new counsel is bound by the actions of their predecessor. . . Nonetheless, the court has discretion to consider all factors in a case when determining whether the reopening of discovery should be permitted after remand." *Carnell Constr. Corp. v. Danville Redevelopment & Hous. Auth.,* Civil Action No. 4:10-cv-00007, 2015 U.S. Dist. LEXIS 67033, at *7-8 n.3 (W.D. Va. May 22, 2015).

**JA49**

12. The facts in the instant matter go far beyond a simple change in counsel which, in and of itself, does not rise to the requisite level of good cause demonstratively required for a request to enlarge deadlines to be granted.

13. The change in Plaintiff's Counsel was not requested nor executed by Plaintiff herself in addition to the fact that the change was sudden, unexpected, and without notice.

14. Samantha Cohn, Plaintiff's current counsel, would be under no requirement of due diligence or professional responsibility to be aware of this matter's deadlines as she was not of counsel mor materially participating in the case prior to its transfer to her therefore she did not avail herself of the same. As soon as current counsel became aware of the expired deadlines, acting in good faith, current counsel took affirmative action to move swiftly to rectify the shortcomings of prior counsel.

15. What is tantamount to Plaintiff's argument in support of her *Motion to Enlarge the Deadlines Seeking Relief from the Trial Schedule* is that the Defendant is neither harmed nor prejudiced by Plaintiff's plea.  The Plaintiff, however, would be severely prejudiced should her request be denied.

16. Plaintiff wishes to enlarge the deadline to add Dr. Nathan Guerette as a treating physician expert witness that does not require a report as he will only be testifying to his firsthand factual knowledge of his treatment of the Plaintiff.  Furthermore, any knowledge or opinions expressed by Dr. Guerette will solely be based on the knowledge he has gained from the ordinary treatment of the patient, the Plaintiff.

17. Plaintiff suffered and continues to suffer a prolapse, a damaged InterStim device, and other intimate pelvic injuries as a result of the accident that is the basis for the instant matter. Dr. Guerette treated and continues to treat Plaintiff for the aforementioned injuries.

**JA50**

18. These intimate pelvic injuries and the costs associated with them account for roughly ninety-five percent (95%) of the Plaintiff's overall injuries and by far have caused the most pain and suffering physically, emotionally, and psychologically.

19. The initial Complaint filing for Plaintiff was submitted to the jurisdiction of the City of Richmond Circuit Court and filed on June 3, 2021. Defense Counsel moved to have the matter removed to Federal Court in October of 2021 due to diversity jurisdiction.

20. Defendant propounded discovery on Plaintiff to which Plaintiff timely responded to in December 2021. Said discovery responses included Dr. Guerette by name as an answer to Interrogatories seven (7), sixteen (16), and nineteen (19) detailing her complaints and his treatments of Plaintiff as a result thereof.

21. Additionally, Dr. Guerette's practice, the Intimate Wellness Institute, was named as an answer to Interrogatories four (4), five (5), and eight (8) as medical providers or facilities where the Plaintiff has sought treatment and incurred expenses.

22. As part of discovery and requirements, the Defendant has been and will continued to be supplied with any and all records of Plaintiff's treatment with Dr. Guerette prior to the close of the discovery deadlines.

23. Furthermore, Defendant is not harmed or prejudiced by this request as Counsel for the Defendant has already deposed Dr. Guerette which occurred on February 8, 2022.

24. Disclosure of Dr. Guerette as an expert witness treating physician of the Plaintiff was properly, albeit informally, made by Plaintiff's previous counsel, Ms. Wolf, and this *Motion* is submitted out of an abundance of caution as it pertains to formal disclosure ensuring the Plaintiff is allowed to call him as a fact witness, to prevent her an enormous prejudice, to elucidate on his treatment of her and any the successive information he gleaned therefrom.

**JA51**

25. Counsel for Plaintiff is cognizant of the fact that enlarging this singular deadline will impact the subsequent deadlines that come after it.  These deadlines include Defendant's Expert Disclosures, Rebuttal Expert Disclosures, the Close of Discovery, the Deadline for filing Daubert Motions, and the Deadline for filing Dispositive Motions.

26. The trial is not scheduled until July 21 and 22 of this year with the Final Pe-Trial Conference scheduled for July 1, 2022.  Non-Depositive Motions are due by June 21, 2022 and further designations, such as pertaining to witnesses and evidence, June 13, 2022 and June 21, 2022.  There is ample time to enlarge the deadlines up to and through the deadlines for filing Despositive Motions without impacting the remaining scheduled dates including, most importantly, the trial itself.

27. A three-week extension of the affected deadlines would place the April deadlines to May 3rd at the latest leaving a still full additional month before any subsequent requirements are due further preventing any prejudice or harm to the Defendant as Defendant would still have an adequate opportunity to submit his initial expert disclosures and rebuttal expert disclosures.

28. Additionally, should Defendant request it, Plaintiff is agreeable to making Dr. Guerette available for furthering deposing at the Plaintiff's expense to make certain to Defendant suffers no harm or prejudice by Plaintiff's request.

**CONCLUSION**

For all the foregoing reasons, the Plaintiff requests that the Court grant this Motion for

Relief from Trial Schedule and an Enlargement of Deadlines asserting that good cause exists for

the request consist with the Rules as stated within.

<div align="right">

**SAMANTHA ROOP**

By Counsel

</div>

_____/s/_____
Samantha Cohn (VSB# 89081)
Geoff McDonald & Associates, P.C.
8720 Stony Point Parkway, Suite 250
Richmond, VA 23235
Phone: (804) 888-8888
Facsimile: (804) 359-5426
Email: scohn@mcdonaldinjurylaw.com
*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 21st day of March, 2022, I electronically file the
foregoing with the Clerk of Court using the CM/ECF system, which will send notification of
such filing to the following:

Carter T. Keeney, Esq. (VSB # 82275)
Carter & Shands, P.C.
9030 Stony Point Parkway, Suite 530
Richmond, VA 23235
Phone: (804) 747-7470
Facsimile: (804) 747-7977
Email: ckeeney@carterandshands.com
*Counsel for Defendant*

<div align="right">

_____/s/_____
Samantha Cohn, Esquire

</div>

**JA53**

IN THE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| SAMANTHA ROOP | ) | Plaintiff, |
| | ) | |
| v. | ) | Civil Action No.: 3:21-cv-00675-DJN |
| | ) | |
| NICHOLAS JAMES DESOUSA | ) | Defendant. |

## MEMORANDUM OF FACT AND LAW IN OPPOSITION TO PLAINTIFF'S MOTION SEEKING RELIEF FROM TRIAL SCHEDULE AND ENLARGMENT OF DEADLINES

COMES NOW, the Defendant Nicholas James Desousa, by counsel, and for his Memorandum of Fact and Law in Opposition to Plaintiff's Motion Seeking Refief from Trial Schedule and Enlargement of Deadlines states as follows:

### PROCEDURAL AND FACTUAL BACKGROUND

This matter arises out of an automobile accident that occurred on July 7, 219 in Middlesex, Virginia.  This matter was removed to this court by the Defendant and is based on diversity jurisdiction.   This matter is scheduled for trial on July 21-22, 2022.  This Court entered a Scheduling Order on December 21, 2022. *See*, ECF No. 8.  Said Order required the Plaintiff to identify any and all experts witnesses no later than February 21, 2022.  Treating physicians did not have to provide a written report, but still has to disclose the subject matter on which the witness was expected to testify and a summary of the facts and opinions to which the witness was expected to testify.

Plaintiff in her interrogatory claimed a pelvic prolapse and other intimate pelvic/bladder injuries.  This condition was treated by Dr. Nathan Guerrette.  He had treated the Plaintiff in the past for previous issues, which required surgery and the implantation of a device.  After the motor vehicle accident, Dr. Guerette first saw the Plaintiff on October 8, 2019.  Dr. Guerrette

**JA54**

treated and performed multiple procedures.  The medical bills for his treatment are in excess of $500,000.

These are not conditions that normally occur in motor vehicle accidents.  As such, defense counsel sent a subpoena *duces tecum* to Dr. Guerette's practice and collected his records. Given the abnormal nature of the claim, then Plaintiff's former counsel Nikita Wolf, Esq. and defense counsel agreed to take the joint discovery deposition of Dr. Guerrette.  The parties split the cost of the deposition and even submitted a joint deposition notice, which is attached hereto as Exhibit A.

The deposition of Dr. Guerrette was conducted on February 8, 2022, well before the Plaintiff's expert witness disclosure deadline.  A copy of Dr. Guerette's deposition is attached hereto as Exhibit B.  Defense counsel went through all of his treatment and then Defense counsel asked the seminal question multiple times.  Specifically, Defense counsel asked Dr. Guerrette if he had an opinion to a reasonable degree of medical probability, whether or not the car accident contributed to, in any way to all of the issues he treated the Plaintiff for.  Guerrete Dep: 26:14-31:13 (Feb. 8, 2022).  Counsel even explained what reasonable degree of medical probability meant to the doctor.  At no point did Dr. Guerette relate his treatment to the accident.  He testified he could not relate the same.

Following the deposition, Ms. Wolf and defense counsel spoke and defense counsel was under the distinct impression Dr. Guerrette's treatment was not being claimed.  This impression was confirmed on February 21, 2022 when Plaintiff filed her expert witness disclosure and did not disclose Dr. Guerrette.  Plaintiff only disclosed Dr. Teresa Camden, who treated the Plaintiff for a head injury and musculoskeletal injuries.  *See*, Pls. Exp. Designation, ECF No. 10 a copy which is attached hereto as Exhibit C.

Nikita Wolf, Esq. informed defense counsel that she was leaving Geoff McDonald and Associates, P.C. via text message on February 28, 2022.  Samantha Cohn, Esq. then informed counsel she was taking over the case.  Of note, Ms. Cohn sat in on the deposition of the parties on January 28, 2022.

Prior to the settlement conference, defense counsel requested an updated statement of damages without Dr. Guerrette's treatment.  It was at that point, the Defendant learned that said treatment was still being claimed.  Defense counsel informed Ms. Cohn via email he was objecting to the bills and Dr. Guerette testifying as the expert deadline passed.

Then on March 21, 2022 without meeting and conferring, Plaintiff file the motion seeking to change the expert deadlines.  At this point, Plaintiff in a signed pleading stated that the Plaintiff suffered a damaged INterStim device, and other intimate pelvic injuries as a result of the accident despite Dr. Guerette testifying in his deposition that he could not relate said treatment to the subject accident.  Void from the motion to extend the deadlines is any rational for the extension.  Plaintiff fails to state any grounds for good cause. There is no reason given as why the deadlines should be enlarged and no real reason as to why the request was made a month after the deadline.

Defense counsel spoke with Plaintiff's counsel after the settlement conference of March 22, 2022, in person and asked her to withdrawal her motion for failing to meet and confer and Plaintiff declined to do so.  Counsel also informed her that he would not agree to the deadlines.

Defendant intends to file a motion in limine to exclude the bills for Dr. Guerrete's treatment, to exclude him from testifying and to exclude any mention of the pelvic issues. Plaintiff's counsel is aware of this intention.

**JA56**

## DISCUSSION OF LAW AND ARGUMENT

There is no basis for extending the Plaintiff's expert witness deadline and Plaintiff's motion should be denied.  Rule 6(b) of the Federal Rules of Civil Procedure states that the court may extend for **good cause** "on motion made **after the time** has expired if the party failed to act because of **excusable neglect**."  Local Civil Rule 7(G) and 7(I) concerns continuance of trial and hearing and extension of time for filing motions, not for discovery deadlines.  Pursuant to Local Civil Rule 16(B) states that parties are bound by the Pre-Trial Scheduling Order and Trial Order and that extensions will be granted only for good cause.  Plaintiff admits change in counsel is not good cause.

In this case, Plaintiff has failed to put forth any argument as to what constitutes good cause or excusable neglect.  Plaintiff dances around the issue but is tacitly claiming that a sudden change in counsel after her expert deadline is good cause for changing the deadline.  There is no contention that Ms. Wolf was not diligent or competent counsel.  This is not a situation wherein Plaintiff did not file any expert disclosure.  She disclosed Dr. Camden.  Further, Plaintiff had conducted the discovery deposition of Dr. Guerrette wherein he did not relate the treatment to the accident.  Thereafter, he was not disclosed.  Defendant suggest Dr. Guerrette was not disclosed because he did not relate the treatment.

Now, a month after the deadline, Ms. Cohn wants to disclose Dr. Guerrette and offers no explanation as to why the change in course.  Deadlines exist for a reason, and she has offered no rational for changing the same other than that she now wants to claim all of this treatment.  This is not a new condition that came to light after the deadline but had been around for a long time.

Plaintiff claims that is significant that the Defendant will suffer no harm of prejudice.  However, she provides no case law stating that is a relevant factor.  Regardless, the Defendant

would be harmed by this action as it would allow over $500,000 in medical bills to come into evidence and completely changes the posture of the case.  Defendant has not retained an expert to combat these claims as none was needed.  Whether or not the Defendant would suffer harm or prejudice is not even a necessary inquiry because Plaintiff does not have good cause for the extension.

## CONCLUSION

WHEREFORE, the Defendant, by counsel, respectfully requests that this honorable Court deny Plaintiff's motion seeking relief from trial schedule and enlargement of deadlines and for such other relief as justice may require.

NICHOLAS JAMES DESOUSA,
By Counsel

_____/s/_____, p.d.
Carter T. Keeney, Esquire (VSB# 82275)
Carter & Shands, P.C.
9030 Stony Point Parkway, Suite 530
Richmond, VA 23235
Telephone:     (804) 747-7470
Facsimile:     (804) 747-7977
ckeeney@carterandshands.com
*Counsel for Defendant*

**JA58**

CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT on the 23rd day of March, 2022, I will send via email the

foregoing to counsel listed below and I will electronically file the foregoing with the Clerk of Court

using the CM/ECF system, which will then send a notification of such filing (NEF) to the

following:

Samantha Cohn, Esquire (VSB# 89081)
Geoff McDonald & Associates, P.C.
8720 Stony Point Parkway, Suite 250
Richmond, VA  23235
Telephone:     (804) 888-8888
Facsimile:      (804) 355-9988
tbriscoe@mcdonaldinjurylaw.com
*Counsel for Plaintiff*

_____/s/_____, p.d.
Carter T. Keeney, Esquire (VSB# 82275)
Carter & Shands, P.C.
9030 Stony Point Parkway, Suite 530
Richmond, VA 23235
Telephone:     (804) 747-7470
Facsimile:      (804) 747-7977
ckeeney@carterandshands.com
*Counsel for Defendant*

**JA59**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

SAMANTHA ROOP,

      Plaintiff,

      v.                        Civil Action No.: 3:21-cv-00675-DJN

NICHOLAS JAMES DESOUSA,

      Defendant.

## JOINT NOTICE OF DEPOSITION

PLEASE TAKE NOTICE that on **February 8, 2022**, beginning at **5:00 p.m., EST**, at **2931 Polo Parkway, Midlothian, VA  23113,** before a Court Reporter and Notary Public who are not of counsel to either of the parties or interested in the event of the cause, the Plaintiff and the Defendant will take the discovery deposition of **Dr. Nathan Guerette, MD**, pursuant to the Rules of Court, for all purposes relevant to this action.  Said deposition will be for the purposes of discovery.  Dr. Guerette is requested to bring to the deposition any and all medical records, documents and things, concerning Samantha Roop, last known address: 2291 Mill Road, Powhatan, VA  23139.  This deposition may be taken by audio video recording.

                Respectfully submitted,
                **SAMANTHA ROOP**
                Plaintiff

                _____
                By Counsel

EXHIBIT
A

Nikita Wolf (VSB No. 86939)

**JA60**

Geoff McDonald & Associates, P.C.
8720 Stony Point Parkway, Suite 250
Richmond, VA 23235
Phone: (804) 888-8888
Facsimile: (804) 359-5426
Email: nwolf@mcdonaldinjurylaw.com
*Counsel for Plaintiff*

**NICHOLAS JAMES DESOUSA**
Defendant

By Counsel

Carter T. Keeney, Esq. (VSB # 82275)
Carter & Shands, P.C.
9030 Stony Point Parkway, Suite 530
Richmond, VA 23235
Phone: (804) 747-7470
Facsimile: (804) 747-7977
Email: ckeeney@carterandshands.com
*Counsel for Defendant*

```
 1              IN THE UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF VIRGINIA
 2                      RICHMOND DIVISION
                Civil Action No. 3:21-CV-00675-DIN
 3

 4

 5
        SAMANTHA ROOP
 6
        vs.
 7
        NICHOLAS JAMES DESOUSA
 8

 9

10

11

12          DEPOSITION OF NATHAN GUERETTE, M.D.

13

14

15                  Midlothian, Virginia

16                  February 8th, 2022

17

18

19

20

21

22              RIVER CITY REPORTING
                  9100 Belcherwood Road
23              Chesterfield, Virginia 23832
                    (804) 370-4051
24      Reported by:  Keith Williamson, RPR, CSR

25
```

EXHIBIT
B

**JA62**

```
 1          Deposition of NATHAN GUERETTE, M.D. taken by

 2   and before Keith Williamson, RPR, CSR, Notary Public

 3   in and for the Commonwealth of Virginia at large,

 4   pursuant to the Rules of the Supreme Court of

 5   Virginia and by notice and agreement to take

 6   depositions, commencing at approximately 5:06 p.m.

 7

 8

 9   Appearances:

10   Nikita Wolf, Esquire
     GEOFFREY McDONALD & ASSOCIATES
11   nwolf@mcdonaldinjurylaw.com
     Attorney, of counsel for plaintiff
12

13

14   Carter T. Keeney, Esquire
     CARTER & SHANDS, PC
15   ckeeney@carterandshands.com
     Attorney, of counsel for defendant
16

17

18

19

20

21

22

23

24

25
```

**JA63**

```
 1

 2

 3

 4                    INDEX OF WITNESSES

 5                              DRX   CRX   RDX   RCX

 6

 7    NATHAN GUERETTE, M.D.          4    31

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                   NATHAN GUERETTE, M.D.

 2         was duly sworn and testified as follows:

 3                     DIRECT EXAMINATION

 4     BY MR. KEENEY:

 5         Q      Doctor, can you please state your name?

 6         A      Nathan Guerette.

 7         Q      Dr. Guerette, my name is Carter Keeney.

 8     I'm a lawyer defending a lawsuit filed by one

 9     of your patients, Samantha Roop, against my

10     client, Nicholas Desousa, from an automobile

11     accident.

12              I know obviously you're a doctor.  I

13     don't know, you're not like an orthopedist who

14     gets deposed all day.  Have you given a

15     deposition before?

16         A      Many.

17         Q      Well, then I don't need to go over the

18     ground rules with you, but I'm going to speak

19     with you about a patient of yours by the name

20     of Samantha Roop.

21              I understand that she first came under

22     your care back, do you know how far back it

23     was?  And I know you don't have access to those

24     records.

25         A      I have dates.  I don't have the details.
```

1    It appears that it was January 7th, 2011.

2    Q      All right.  And then do you have any

3    recollection of anywhere saying on your

4    computer as to what you initially treated her

5    for back in 2011?

6    A      I have to go through these one by one.

7    Incontinence and bladder pain were the main

8    complaints.

9    Q      And at some point in that timeframe, it

10   may have been 2012, 2013, did you perform some

11   sort of surgery or implant any sort of device?

12   A      She was implanted with a sacral nerve

13   stimulator.

14   Q      What is that?

15   A      So a sacral nerve stimulator is an

16   implant that is stimulating the third sacral

17   nerve root which is the nerve root that feeds

18   the bladder and the pelvic floor muscles.  So

19   it's used for severe overactive bladder that's

20   unresponsive to conservative therapy.  It's

21   used for urinary retention, not emptying your

22   bladder well, and it's also used for bowel

23   incontinence because it treats the nerve that

24   feeds those three areas.

25   Q      And I think you said you put that in in

```
 1    2012?
 2     A     The original one, I don't have the
 3    surgery date in front of me for the original
 4    one, but it's somewhere in that neighborhood
 5    because the original time I saw her was between
 6    '11 and '13.
 7     Q     Did you see her at all between 2013 and
 8    October 8th of 2019?
 9     A     Not based on the records I have in front
10    of me.
11     Q     Perfect.  The device that you implanted
12    in her, I know you listed as to what their
13    purpose is.  Do you know what particular reason
14    you put it into Ms. Roop?
15     A     So the original implant was for
16    overactive bladder and associated bladder spasm
17    pain and pelvic floor muscle dysfunction which
18    is --
19     Q     Do you have any notes in front of you?
20    And I know these are way back so if you can't,
21    just tell me that.  Do you have any notes as to
22    what formed the causation of that with her?
23     A     The original?
24     Q     Yes, sir.
25     A     Her original was idiopathic.
```

1   Q       And the device, I'm sorry, I forgot the

2   name of it.  What was it called?

3   A       The brand name is InterStim.  That's

4   easier.

5   Q       The InterStim that you implanted in her,

6   does it have a shelf life?

7   A       Yeah, it's five years.

8   Q       And what happens after five years, does

9   the battery run out?

10  A       It stops working, yeah.

11  Q       And then if the patient's problems come

12  back then, do you need to do a revision?

13  A       You need a replacement.

14  Q       Or replacement?

15  A       Of the battery portion.

16  Q       Gotcha.  All right.  And I take it's

17  fair that from the time you didn't see her from

18  sometime in 2013 up until October 8th of 2019,

19  you had no idea how she was doing; is that

20  fair?

21  A       That is fair to say.

22  Q       So she reported to your office on

23  October 8th of 2019; is that correct?  And I'm

24  going to go to the present now, or relatively

25  present.

```
 1    A      Yeah.  This is pre-COVID so the world

 2   has changed.  October 8th, 2019, correct.  Yes.

 3    Q      And did you take -- what was the reason

 4   for her visit at that time?

 5    A      That she reported worsening urinary

 6   incontinence recently and reported that she had

 7   had an MVA a short time prior to that which she

 8   reported, temporally reported as a significant

 9   worsening of her overactive bladder symptoms.

10    Q      Do you know or did you ever know when

11   that automobile accident happened?

12    A      I do not have a specific date in that

13   record.

14    Q      And I take it you spoke with her, took a

15   history and conducted an exam at that point?

16    A      I did.

17    Q      And did she tell you specifically what

18   symptoms she had that were worsening?

19    A      Yes.

20    Q      And what were those?

21    A      Worsening incontinence and she reported

22   what we call mixed incontinence symptoms

23   meaning that she was having urgent continence,

24   so urgency, frequency, and not making it to the

25   restroom in time due to urgency, as well as
```

 1   stress incontinence meaning leaking with

 2   coughing, sneezing, lifting.

 3   **Q       And stress incontinence doesn't mean**

 4   **stress from anxiety, it means stress from**

 5   **physical activity?**

 6   A       Physical pressure.

 7   **Q       And at that point did you have a**

 8   **diagnosis?**

 9   A       At this point, no.  I had the assessment

10   at the end of this visit.  She was also noted

11   to have some loss of support in her anterior

12   vaginal wall with a bladder on that visit and

13   she was diagnosed with unspecified urinary

14   incontinence because the character of her

15   symptoms had changed since we'd last seen her

16   as well as the cystocele, which is the loss of

17   bladder support, and pelvic pain.  And she was

18   scheduled for a further evaluation.

19   **Q       And then I take it she came back to you**

20   **for that further evaluation?**

21   A       She did.

22   **Q       And when was that?  Is that**

23   **December 3rd?**

24   A       So she saw my nurse for urodynamic

25   evaluation on December 2nd and then saw me for

1    that cystoscopy and consultation on

2    December 3rd.

3    **Q       What is a cystoscopy?**

4    A       A cystoscopy, that's looking in the

5    bladder with a camera.

6    **Q       Gotcha.  And what did your nurse**

7    **practitioner do the day before?**

8    A       She did a urodynamics test which is a

9    computer assessment of bladder function.

10   **Q       And after doing those two things, did**

11   **you form any sort of opinion as to what was**

12   **going on with Ms. Roop?**

13   A       So after evaluation she was diagnosed

14   with worsening overactive bladder since her

15   last evaluation.  She had urinary retention, so

16   she was not emptying her bladder well, and the

17   cystocele, which is a loss of bladder support.

18   And she was also noted to have what's called

19   dyssynergic voiding meaning that she was not

20   coordinating her pelvic floor muscles or your

21   Kegel muscles appropriately when she was

22   emptying her bladder.  So she was essentially

23   squeezing her muscles when she was trying to

24   empty adding to the retention.  In simple

25   terms, fighting herself when she's trying to

**JA71**

```
 1   pee.
 2     Q      Thank you.  And I forgot to mention this
 3   earlier, but for any opinions that I ask, I ask
 4   that you only give those opinions to a
 5   reasonable degree of medical certainty or
 6   probability?
 7     A      Agreed.
 8     Q      And at that point in December, did you
 9   develop a plan of care?
10     A      We did.  So the plan at that stage was
11   to replace the InterStim unit as it was not
12   functioning appropriately anymore and past its
13   point of expiration, and also to initiate a
14   pelvic floor therapy for her pelvic floor
15   muscle dysfunction.
16     Q      And how did you know that the InterStim
17   was not working anymore?
18     A      One, based on her symptoms and the
19   testing.  And two, we can inquire the device.
20   So just like a pacemaker we can inquire with a
21   remote and look at how it's functioning, look
22   at the battery life, look at whether there's
23   what we call impedances which are if the wires
24   are in any way damaged or not functioning
25   anymore, the electrical current doesn't reach
```

```
 1    the target area with the same degree of

 2    efficiency that it should.

 3    Q       So is it fair to say at this point your

 4    theory was that her current problems were being

 5    caused by the InterStim not working properly?

 6    A       Well, not that simple.  So she had

 7    essentially three things going on.  She had

 8    muscle dysfunction, which was new.  That did

 9    not exist in the last time that we saw her in

10    2013.  She had pelvic organ prolapse which is

11    the bladder coming down, which also was new,

12    and then she had worsening of her overactive

13    bladder symptoms, again, which was not new but

14    had been improved in that at the end of 2013,

15    the last time that we saw her, what happened

16    obviously in that six year gap, I don't know.

17    Q       I understand.  And then what was your

18    plan of care at that point, to try replacing

19    the e stim?

20    A       Right.  So after her reevaluation when

21    she came back to replace the InterStim, that

22    included both replacing the battery and the

23    lead because we can't trust that that lead is

24    intact at that stage, and also to do pelvic

25    floor therapy.
```

```
 1    Q      What is pelvic floor therapy?

 2    A      That's essentially physical therapy on

 3  the muscles of the pelvis.

 4    Q      And did she actually do that, or did you

 5  give her at home exercises for that?

 6    A      I do not have any record that she

 7  actually did the pelvic floor therapy.

 8    Q      And my records reflect that you did

 9  replace the e stim, I believe, in January of

10  2020, and I think that was done at

11  Johnston-Willis.  And I've got that.  I don't

12  know if you have access to those surgical

13  operative reports, but I've got it if you need

14  it.

15    A      I do, but it will take me a moment to

16  find it.

17    Q      I believe it was January 8th of 2020.

18    A      I can agree that I believe you.

19    Q      And then after that I take it the normal

20  process is for a patient to follow up after the

21  procedure?

22    A      Correct.

23    Q      And it looks like she followed up with

24  you on January 22nd.  Do you have that note?

25    A      January 22nd.
```

```
 1    Q      Of 2020.

 2    A      I was too far.  Yes, I do have that.

 3    Q      And how was she doing at that time?

 4    A      Just to be clear, she saw my nurse

 5  practitioner.  She did not see me.

 6    Q      And your nurse practitioner practices

 7  under your supervision?

 8    A      Yes.

 9    Q      And how was she doing at that time when

10  she reported to your office?

11    A      She reported that regarding her

12  overactive bladder symptoms that she was doing

13  well.  Her frequency had returned to normal and

14  she was not incontinent any longer.  However

15  her and her bladder pain syndrome, which is

16  interstitial cystitis, was stable but her

17  prolapse was still bothering her.  She reported

18  that she could feel her bladder coming down at

19  that stage.

20    Q      And looking at the diagnosis there in

21  addition to overactive bladder, which we've

22  talked about, I think it notes inner, and I'm

23  going to butcher this, but interstitial

24  cystitis?

25    A      Interstitial cystitis.
```

**JA75**

1    Q      What is that?

2    A      That's a chronic inflammatory condition
3    of the bladder that causes urgency, frequency
4    and bladder pain.

5    Q      What caused that?

6    A      We don't know.

7    Q      So it's idiopathic?

8    A      That is unknown, yes.

9    Q      And then it looks like the next time she
10   came to your office was when, February of 2020?

11   A      That was February 19th, 2020.

12   Q      Did she see your nurse at that time as
13   well?

14   A      She saw my nurse practitioner, yes.

15   Q      And how was she doing at that time?

16   A      That time she reported that the urgency
17   and frequency was more of an issue again, but
18   not complaining of incontinence and her
19   InterStim was reprogrammed.

20   Q      Was it not working properly?

21   A      No, just it's not uncommon that they
22   need to be reprogrammed when they're initially
23   put back in to find the ideal settings.

24   Q      Okay.

25   A      And then her prolapse, the bladder

**JA76**

1    prolapse was still bothering her.

2    Q      And then it looks like there was quite a

3    large gap and she didn't come back to you until

4    the end of the year, February, or excuse me,

5    December 4th of 2020?

6    A      Correct.

7    Q      And how was she doing at that point?

8    A      At that point she reported that she was

9    worsened and her voids had significantly

10   improved in frequency.  So she was voiding more

11   than 11 times during the day, more than four

12   times at night.  She did not have any

13   incontinence.  Was having pain with sex,

14   particularly along the front wall of the vagina

15   and having worsening symptoms with her

16   interstitial cystitis, which we abbreviate IC.

17   Q      Did you decide to do something different

18   at this point?

19   A      Again, the InterStim was reprogrammed,

20   and we made an appointment to have Medtronic

21   evaluate her InterStim unit.  So that's the

22   company that makes the unit.  So when we need

23   more advanced investigation into the unit, we

24   often get their technician to come in.  And

25   that was all we did at that point.

SAMANTHA ROOP vs NICHOLAS JAMES DESOUSA
Nathan Guerette, M.D. on 02/08/2022                    Page 17

```
 1     Q       And on December 15th, 2020, is that when
 2   the rep came in from Medtronic?
 3     A       Yes, a technician, not a rep.
 4     Q       It was not the sales rep, it was the
 5   technician?
 6     A       Yes.
 7     Q       And so on the 5th of December the
 8   technician from Medtronic came in your office
 9   under your supervision, or you were there as
10   well?
11     A       Correct.
12     Q       Tried to adjust the InterStim; is that
13   fair?
14     A       He did adjust it.  He investigated it
15   and adjusted it.
16     Q       Was there anything -- do you know what
17   adjustment he did?
18     A       Yeah.
19     Q       What did he do or she?  I don't know.
20     A       It's a he.
21     Q       Okay.
22     A       He put in new programs so what we call
23   the IPG is just the battery inside can have
24   programs changed.  There are four contact
25   points on the nerve with the lead and so the
```

**JA78**

```
 1   way that the electrical field can be shaped is
 2   fairly flexible.  And so if the standard way is
 3   that we start with aren't working, it can be
 4   changed.  So he put in some new options and
 5   then changed her to one of those options.
 6     Q     And is that normal for a patient who has
 7   an InterStim for awhile, you need to adjust the
 8   settings to find what works properly for that
 9   patient?
10     A     That's not all that unusual to have to
11   do.
12     Q     And then it looks like she comes back to
13   you January 5th of 2021; is that right?
14     A     Yes.
15     Q     And what were her complaints on that
16   visit?
17     A     Again, she reports that she was worse
18   again, that her interstitial cystitis was
19   flaring up.  So the bladder pain was worse.
20   She was still having frequency, not any
21   incontinence, still having pain with sex
22   located along the front wall of the vagina and
23   the bladder, and the bladder prolapse was noted
24   to have gotten worse at that stage.  So we
25   stage bladder prolapse or any prolapse zero is
```

1   normal support, four is coming out of the body.

2   She had a stage two when she initially

3   presented in 2019 and on this visit with the

4   reevaluation she had a stage three.

5      Q      I want to back up.  I forgot to ask you

6   a question.  She didn't come between February

7   of 2020 and December of 2020.  Obviously COVID

8   hit in between there.

9            Did your office close at all under

10  COVID?

11     A      No.

12     Q      Did you offer telemedicine or video

13  conferences with patients as well?

14     A      We did, but pelvic exams are a

15  challenge.

16     Q      The technology is not there.  But she

17  didn't call into your office at that time

18  period or send any e-mails or anything?

19     A      I wouldn't know how to look up all the

20  phone notes myself right here, but nothing that

21  substantially altered her care.

22     Q      So in January 5th when you discovered

23  that, I guess, she was at now stage three

24  prolapse, what was your plan at that particular

25  time?

```
 1    A      So this is January 5th, 2021?

 2    Q      Yes, sir.

 3    A      So at this point based on the

 4    evaluation, it looked like the prolapse was

 5    causing more symptoms both in terms of bladder

 6    function and sexual function, and the decision

 7    was made to reevaluate her bladder for a

 8    lightweight repair of her support.

 9    Q      And so January 12th, 2021 she came back

10    to your office I have as the next visit.  What

11    was the purpose of that visit?

12    A      So again, she'd had bladder testing

13    prior to that with my nurse, and then I did a

14    cystoscopy again to reevaluate her bladder, and

15    then we had a consultation to decide what to

16    do.

17    Q      And when was that consultation?  I think

18    I have January 27th of 2021.

19    A      It's February 1st.

20    Q      Oh, okay.

21    A      No, that's her birthday.  The

22    consultation was the same day.  It was

23    January 12th.

24    Q      And the consultation was about whether

25    or not to try to fix the issue surgically; is
```

```
 1    that fair?

 2    A     That is correct.

 3    Q     And what was the outcome of that?  What

 4    did she decide to do?

 5    A     Yes, we decided to do a vaginal vault

 6    suspension bringing the top of the vagina up

 7    and fixing the bladder wall.  So a cystocele

 8    repair.

 9    Q     And is the idea there to just kind of

10    support the bladder in the place it's supposed

11    to be?

12    A     Correct.  Yes, both for the discomfort

13    associated with the prolapse and for function

14    and for pain in her case.

15    Q     And I think you ultimately did that

16    procedure.  I believe it was at Johnston-Willis

17    Hospital again on February 10th of 2021?  And

18    I've got that operative note if you can't lay

19    your hands on it.

20    A     Yeah, I'll take a look at it.

21    Q     It will speed things up.

22    A     Yes.

23    Q     This starts on Bates stamp 120, for the

24    record, if I'm reading that right.

25          MR. KEENEY:  Nikita, I've got one for
```

```
1    you.

2    A      Okay.

3    Q      And what was your postoperative

4    diagnosis?

5    A      Was uterine prolapse, vaginal vault

6    prolapse, vaginal prolapse and stress urinary

7    incontinence.

8    Q      And what did you do in that procedure?

9    A      You want the technical names?

10   Q      Layman's terms is great.

11   A      All right.  We supported the uterus, the

12   top of the vagina, the bladder, the rectum and

13   supported the urethra to help with the

14   incontinence.

15   Q      The idea was you sort of put everything

16   back where it's supposed to go; is that fair?

17   A      Correct.

18   Q      And then in the hope that that would

19   return function to normal?

20   A      Correct.

21   Q      And tell me about her recovery from

22   that?  I think she came back to you on the 19th

23   of February, 2021.

24   A      She saw my -- I believe she saw my nurse

25   practitioner then as well and she was nine days
```

```
 1    postoperative at this point.  She'd come in to
 2    have her catheter removed and she successfully
 3    voided.  So her catheter was removed and told
 4    to come back for her routine two week post-op
 5    visit.
 6    Q      Which she did on February 26th, 2021?
 7    A      Correct.
 8    Q      And how was she doing at that point?
 9    A      She was doing better, and her frequency
10    had returned to normal.  So she was voiding
11    four to six times a day, which is normal, and
12    not going at night, no incontinence.  She was
13    just told to continue her postoperative
14    restrictions and follow up in a month, so six
15    weeks from the surgery.
16    Q      And then I take it she followed up, I
17    have in March 25th of 2021.  Is that what you
18    have?
19    A      Correct.
20    Q      And how was she doing at that point?
21    A      She was doing well.  Normal voiding.  No
22    incontinence.  No difficulty emptying her
23    bladder or moving her bowels normally.  And on
24    exam her support was normal so the prolapse was
25    corrected.  And she had a urinary tract
```

**JA84**

 1   infection which was treated, and her InterStim

 2   was checked and doing fine at that point.

 3   **Q       And then I have, and we're almost done**

 4   **going through all these, that she came back**

 5   **May 24th of 2021.  I think she had some bladder**

 6   **pain, but was still progressing; is that fair?**

 7   A     Yes.  So she was four months post-op.

 8   She had a little more frequency that day.  She

 9   was complaining of pain with sex.  She had

10   become sexually active again from the -- after

11   the surgery and was still having pain with sex.

12   Her exam was normal except that her bladder was

13   tender, consistent with the interstitial

14   cystitis.  And this was with my nurse

15   practitioner and because of the pelvic pain she

16   wanted her to come back and see me.

17   **Q       And she did that, I believe, in June of**

18   **2021?**

19   A     Yes.  The next visit is June 15th of

20   2021 with me.

21   **Q       And how was she doing at that time?  I**

22   **have June 29th.**

23   A     Yes, I was just going to say I think we

24   had an appointment but she didn't show up.

25   Yes.  So the next appointment was June 29th.

**JA85**

1    Q    And how was she doing at that point?

2    A    It looks like she was improved at this

3    point.  No incontinence, normal voiding but

4    complaining of pain with sex and bladder pain

5    and the InterStim was reprogrammed.  And then

6    she was instructed to follow up in two months

7    to see if that helped and she has not followed

8    up since.

9    Q    From the time you saw her back in

10   October of '19 up until that June 2021 visit,

11   do you have an opinion to a reasonable degree

12   of medical probability as to what caused her

13   issues?

14   A    Start the first part again, if you

15   could:

16   Q    Yes.  From when she came back to you in

17   2019, so October of 2019 through the last time

18   that you saw her, do you have an opinion to a

19   reasonable degree of medical probability as to

20   what caused those issues?

21   A    Caused the issues from the point where

22   she re-presented to my final visit with her?

23   Q    Yes, sir.

24   A    So when she re-presented in 2019, she

25   had exacerbation of some chronic issues.  So

```
 1   the two things were overactive bladder and
 2   interstitial cystitis.  Those were issues that
 3   we had seen her back from '11 to '13 for.  And
 4   then she had new issues which were the prolapse
 5   and the pelvic floor muscle dysfunction and the
 6   retention.  And so our process when we
 7   initially reevaluated her was to get her
 8   chronic problems back under control which was
 9   redoing the InterStim and pelvic floor therapy,
10   at least recommendation which she apparently
11   elected not to do.  And then due to persistent
12   issues with the prolapse, we ended up
13   addressing that as well with the surgery.
14   Q      And I'll come out and ask you, do you
15   have an opinion either way, to a reasonable
16   degree of medical probability, whether or not
17   the car accident contributed to, in any way to
18   all of the issues you treated her for, or you
19   can't say?
20   A      I can't say with 100 percent
21   probability.  Only thing I can say temporally
22   she relays worsening of her symptoms to when
23   she decided to come in.  I obviously only see
24   the aftereffect which was the prolapse, the
25   muscle dysfunction and the overactive bladder.
```

**JA87**

1    So I can't know if that caused it, but I do

2    know that she related to it that time period.

3    That's all I can report on.  It's certainly not

4    the only thing that can cause these issues.

5          These issues are common issues in

6    general.  So anything that causes a force in

7    the pelvis, be it having a baby or lifting

8    heavy things or straining or a traumatic force

9    can cause you to lose support.  And then as far

10   as a device goes, that either can wear out with

11   time or can be broken like any device.  But I

12   can't know to 100 percent degree of

13   probability.

14   **Q      Can you testify one way or the other to**

15   **a reasonable degree of medical probability, and**

16   **Nikita will smack me if I'm wrong, that just**

17   **means more likely than not, not necessarily**

18   **100 percent.  It's not like a criminal**

19   **standard.**

20   A      Because of the large gap in time, I

21   can't say to a high degree of medical

22   probability that that event occurred in direct

23   relationship with the car accident.

24   **Q      I think for the -- let's take the**

25   **InterStim.  It can just wear out on its own.**

**JA88**

```
 1   It could break from some traumatic event or

 2   just anything; is that fair?

 3          It can be any number of things why it

 4   stops working; is that fair?

 5   A     Well, it's not any number.  There's a

 6   limited number of things, but, yes, it can wear

 7   out like any battery, or it can be either the

 8   battery or more often the wire can be broken.

 9   Q     If this sort of condition was either

10   exacerbated or caused by an automobile

11   accident, how long after that incident or any

12   trauma would the individual notice the

13   symptoms?

14   A     From the InterStim, relatively quickly.

15   A matter of days or weeks at most.

16   Q     And what about the other issues?

17   A     The prolapse can be a little bit more

18   insidious in terms of onset.  So there tends to

19   be something that causes an insult to the

20   support and then that can worsen over time to

21   the point where it becomes symptomatic.  Just

22   like with childbirth, often times we don't see

23   people get symptomatic until years later, but

24   the event occurred then.  But that doesn't mean

25   I can pinpoint when that issue started.
```

```
 1    Q      Can the issues that Mrs. Roop had, can
 2   that be caused by repetitive weightlifting
 3   heavy objects?
 4    A      It's possible.
 5    Q      And is it more likely if you do it
 6   repetitively as opposed to just picking
 7   something once?
 8    A      More likely.
 9    Q      How about, say, helping your husband in
10   his mechanic shop?
11    A      Doesn't sound very hypothetical.
12    Q      But hypothetically could that also be a
13   cause of these issues?
14    A      In general, lifting, straining,
15   childbirth, traumatic events.  So anything that
16   falls under any of those umbrellas would apply.
17    Q      What about riding a horse?
18    A      No.
19    Q      So the up and down on a horse won't have
20   any issue?
21    A      Not with prolapse, no.
22    Q      What about falling off a horse and
23   getting dragged through a field, could that do
24   it?
25    A      That's not good.  That's certainly a
```

1    trauma.  That would not likely cause prolapse,

2    but that certainly can damage the InterStim.

3    **Q      And one final question, and I know we've**

4    **sort of been through there, but we are lawyers**

5    **after all.  Can you testify to a reasonable**

6    **degree of medical probability whether or not**

7    **your treatment from October of 2019 to the**

8    **present was causally related to the automobile**

9    **accident, and I'll represent to you that it**

10   **happened in July of 2019, that brings us here**

11   **today?**

12   A      I mean, even without that date, I can't

13   say to a high degree of medical probability

14   that it occurred at that time in a six month

15   gap.  It increases that likelihood that it was

16   not an acute traumatic event, but -- and I'll

17   break it down, if I could answer a little bit

18   more thoroughly, I'll break it down into some

19   pieces.

20          So one aspect is you have a device

21   helping your bladder function and if you're in

22   a car accident, in a traumatic event, and I've

23   been doing this a long time, that definitely

24   happens.  People in traumatic accidents break

25   these things.  And that absolutely can happen.

**JA91**

```
1      It would take less time than six months to

2      notice that.

3              Prolapse, also a high force traumatic

4      event, can initiate that weakening process, but

5      I would not be able to temporally attribute it

6      to an accident happening six months prior, one,

7      because of the time gap and two, because

8      there's other risk factors as well.  So to make

9      it simple, I can't, with a high degree of

10     medical probability, attribute it directly to

11     the accident.

12     Q      All right.  Well, I appreciate your

13     time.  I don't have any other questions.

14              CROSS-EXAMINATION

15  BY MS. WOLF:

16     Q      I've got a couple of quick follow-ups.

17     And I understand you don't have your records

18     going back further than 2019, and I'm going to

19     keep the depo open so we can get those records

20     and perhaps ask some more follow-up questions

21     about how the other records may influence

22     anything that you may have testified to here

23     today.

24              MR. KEENEY:  That's fine.

25     A      Sure.
```

```
 1    Q      The new muscle dysfunction and the new
 2   pelvic prolapse that you noted in Ms. Roop on
 3   the December 19th visit, would you expect to
 4   see those issues after an InterStim device
 5   failed in a patient?
 6    A     One has nothing to do with the other.
 7    Q      Do you remember, actually jumping back
 8   to the prior records, do you happen to know who
 9   referred Ms. Roop to you initially all the way
10   back in 2011?  I don't know if you have access
11   to that information.
12    A     Sorry.  It's possible.  Charles Miller.
13    Q     Charles Miller?
14    A     Who is a retired Ob/Gyn.
15    Q      Most of my questions have comparative
16   value to them so a lot of questions I want to
17   ask you I think it would be better if we came
18   back at another time once you have access to
19   those earlier records.  So I'm just going to
20   hold open the depo until we can get access to
21   those records.  So thank you very much.
22        MR. KEENEY:  I don't have any other
23   questions.  And Doctor, I don't know if you
24   know the procedure, but you have to tell Keith
25   if you want to read the transcripts and review
```

**JA93**

```
 1          it or waive it.

 2                  THE WITNESS:  I will waive that right.

 3                  MR. KEENEY:  Okay.  I'll order it.

 4                  MS. WOLF:  And I'll take a copy.

 5                  MR. KEENEY:  And we're splitting the

 6          appearance fee.

 7                  MS. WOLF:  Yes.

 8

 9     The deposition concluded at approximately 5:48 p.m.

10

11             AND FURTHER THIS DEPONENT SAITH NOT
                   READING AND SIGNATURE WAIVED

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1

 2      COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

 3

 4      I, Keith Williamson, RPR, CSR, Notary Public in

 5   and for the Commonwealth of Virginia at large

 6   certify that the aforementioned appeared before me,

 7   was sworn by me, and was thereupon examined by

 8   counsel and that the foregoing is a true, correct,

 9   and full transcript of the testimony adduced.

10      I further certify that I am neither related to

11   nor associated with any counsel or party to this

12   proceeding, nor otherwise interested in the event

13   thereof.

14      Given under my hand and notarial seal at

15   Richmond, Virginia, on February 21st, 2022.

16

17

18   _____

19          Keith Williamson, RPR, CSR
            Notary Public in and for the
20        Commonwealth of Virginia at Large

21

22

23

24

25
```

**JA95**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

SAMANTHA ROOP,
     Plaintiff,

v.                                       Civil No. 3:21cv675 (DJN)

NICHOLAS JAMES DESOUSA,
     Defendant.

**<u>ORDER</u>**
**(Denying Motion for Extension)**

     This matter comes before the Court on Plaintiff's Motion Seeking Relief from Trial

Schedule and Enlargement of Deadlines.  (ECF No. 14.)  Upon review of the Motion and

Defendant's Response (ECF No. 15), the Court hereby DENIES the Motion as devoid of merit.

     Let the Clerk file a copy of this Order electronically and notify all counsel of record.

     It is so ORDERED.

                                  _____/s/_____

                                  David J. Novak
                                  United States District Judge

Richmond, Virginia
Date:  <u>March 23, 2022</u>

IN THE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| SAMANTHA ROOP | ) | Plaintiff, |
| | ) | |
| v. | ) | Civil Action No.: 3:21-cv-00675 |
| | ) | |
| NICHOLAS JAMES DESOUSA | ) | Defendant. |

**<u>MOTION IN LIMINE TO EXCLUDE DR. NATHAN GUERETTE FROM TESTIFYING
AT TRIAL, TO EXCLUDE PLAINTIFF'S MEDICAL BILLS FOR DR. GUERETTE'S
TREATMENT AND TO EXCLUDE ANY MENTION OF ANY CONDITION TREATED
BY DR. GUERETTE</u>**

COMES NOW, Nicholas James Desousa, by counsel and for his motion in limine to

exclude Dr. Nathan Guerette from testifying at trial, to exclude Plaintiff's medical bills for Dr.

Guerette's treatment, and to exclude any mention of any condition treated by Dr. Guerette and

states the following.

1. The Defendant moves to exclude Dr. Guerrette from testifying at trial, to exclude the

   medical bills for his treatment from evidence at trial and any mention of the issues for

   which he provided treatment as the Plaintiff does not have an expert to relate the

   same and an expert witness is required to opine to the medical necessity and causal

   relationship between the subject motor vehicle accident and the treatment for the

   pelvic/bladder injuries.

2. Defendant incorporates his memorandum of fact and law by reference.

WHEREFORE, for the foregoing reasons, the Defendant, by counsel, respectfully

requests that this honorable court exclude Dr. Guerette from testifying at trial, exclude the

medicals bills attached to the corresponding brief as Exhibit B, and exclude any mention of

Plaintiff's treatment with Dr. Guerette and for such other relief as justice may require.

**JA97**

NICHOLAS JAMES DESOUSA,
By Counsel

_____/s/_____, p.d.
Carter T. Keeney, Esquire (VSB# 82275)
Carter & Shands, P.C.
9030 Stony Point Parkway, Suite 530
Richmond, VA 23235
Telephone:     (804) 747-7470
Facsimile:     (804) 747-7977
ckeeney@carterandshands.com
*Counsel for Defendant*

CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT on the 28th day of March, 2022, I will send via email the foregoing to counsel listed below and I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Samantha Cohn, Esquire (VSB# 89091)
Geoff McDonald & Associates, P.C.
8720 Stony Point Parkway, Suite 250
Richmond, VA  23235
Telephone:     (804) 888-8888
Facsimile:     (804) 355-9988
Scohn@mcdonaldinjurylaw.com
*Counsel for Plaintiff*

_____/s/_____, p.d.
Carter T. Keeney, Esquire (VSB# 82275)
Carter & Shands, P.C.
9030 Stony Point Parkway, Suite 530
Richmond, VA 23235
Telephone:     (804) 747-7470

**JA98**

Facsimile:      (804) 747-7977
ckeeney@carterandshands.com
*Counsel for Defendant*

IN THE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

SAMANTHA ROOP              )                                 **Plaintiff,**
                                       )

v.                              )        Civil Action No.: 3:21-cv-00675
                                       )

NICHOLAS JAMES DESOUSA     )                           **Defendant.**

### MEMORANDUM OF FACT AND LAW IN SUPPORT OF MOTION IN LIMINE TO EXCLUDE DR. NATHAN GUERETTE FROM TESTIFYING AT TRIAL, TO EXCLUDE PLAINTIFF'S MEDICAL BILLS FOR DR. GUERETTE'S TREATMENT AND TO EXCLUDE ANY MENTION OF ANY CONDITION TREATED BY DR. GUERETTE

COMES NOW, Nicholas James Desousa, by counsel and for his motion in limine to exclude Dr. Nathan Guerette from testifying at trial, to exclude Plaintiff's medical bills for Dr. Guerette's treatment, and to exclude any mention of any condition treated by Dr. Guerette and states the following in support thereof:

### FACTUAL BACKGROUND

This matter arises out of an automobile accident that occurred on July 7, 2019 in Middlesex, Virginia.  This matter was removed to this court by the Defendant and is based on diversity jurisdiction.   This matter is scheduled for trial on July 21-22, 2022.  This Court entered a Scheduling Order on December 21, 2022.  *See*, ECF No. 8.  Said Order required the Plaintiff to identify any and all expert witnesses no later than February 21, 2022.  Treating physicians did not have to provide a written report.

Per her interrogatory answers, Plaintiff is claiming a pelvic prolapse.  *See*, Pls. Ans. to Int. 2 and 3, a copy of which is attached hereto as Exhibit A.

**JA100**

Plaintiff first presented to Dr. Guerrette's office on October 8, 2019, Three months after the accident. She had not mentioned any pelvic or bladder issues to any treating provider prior to that date. She treated with Dr. Guerrette on 10/8/2019, 12/2/2019, 12/3/2019, 12/19/2019, 12/26/2019, 1/8/2020, 1/22/2020, 2/19/2020, 12/4/2020, 12/15/2020, 1/5/2021, 1/11/2021, 1/12/2021, 1/27/2021, 2/19/2021, 2/26/2021, 3/5/2021, 5/24/2021, and 6/29/2021. Plaintiff also had procedures performed by Dr. Guerette at Chippenham Johnston Willis Hospital on January 8, 2020, January 28, 2021, and February 10-11, 2021. A copy of the corresponding bills for the aforementioned treatment is attached hereto as Exhibit B. (All personal identifiers have been redacted).

On February 8, 2022, both parties jointly took the discovery deposition of Dr. Guerette to discern if he would relate the above referenced treatment. A copy of the Joint Notice of Deposition is attached hereto as Exhibit C. At said deposition, Defense counsel went through all of Dr. Guerette's treatment. Defense counsel also asked Dr. Guerette if he had an opinion to a reasonable degree of medical probability whether or not the car accident contributed in any way to all of the issues, he treated the Plaintiff for. Dr. Gurette could not testify to the same. *See*, Gurette Depo. 26:14-31:11 (Feb. 8, 2022). A copy Dr. Guerette's deposition are attached hereto as Exhibit D.

On February 21, 2022, Plaintiff filed her expert witness disclosure. Dr. Guerette was not disclosed. The only witness disclosed was Dr. Camden, who treated the Plaintiff for injuries to her head, neck, left shoulder, and contusions. A copy of Plaintiff's Expert Witness Disclosure is attached hereto as Exhibit E. Dr. Camden's disclosure makes no mention of Plaintiff's pelvic/bladder issues and no expert was disclosed to opine on these issues. Based on Plaintiff's Expert Disclosure, Defendant was under the impression that Dr. Guerette's treatment and/or the

pelvic/bladder issues were not being claimed.  Further, Defendant's interrogatory number 11 requested that Plaintiff identify all experts she will rely upon at trial and Plaintiff did not disclose Dr. Guerette in response to the same.

Plaintiff filed a motion to extend the expert deadlines, but this court denied the same, so the Plaintiff will not have an expert on said issue.

After the Court denied the motion to extend the expert deadlines, defense counsel spoke with Plaintiff's counsel and asked her to drop the claim for the bills listed herein.  The request was denied.

Defendant certifies he made a good faith effort to resolve this dispute, prior to filing this motion.

### DISCUSSION OF LAW AND ARGUMENT

I.  *Dr. Guerrette should not be permitted to testify as an expert or fact witness as Plaintiff failed to disclose him as an expert and any factual testimony is not relevant to any fact at issue.*

Plaintiff failed to disclose Dr. Guerette as an expert witness pursuant to this Court's Scheduling Order.  Pursuant to Rule 26(a)(2)(C) Plaintiff was required to disclose the subject matter on which the witness was expected to testify and a summary of the facts and opinions to which the witness was expected to testify.  Pursuant to Rule 37(c)(1) of the Federal Rules of Civil Procedure if a party fails to identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence at trial unless the failure was substantially justified or is harmless.

> "A party must disclose to the other parties the identity of any witness it may use at trial to present" expert testimony. Fed. R. Civ.P. 26(a)(2)(A)…in cases where a full report is not required, the disclosure need only state "(i) the subject matter on which the witness is expected to present evidence ...; and (ii) a summary of the facts and opinions to which the witness is expected to testify." Fed. R. Civ. P. 26(a)(2)(C). **As they are not typically "retained or specially employed to**

**JA102**

> provide expert testimony," treating physicians are not ordinarily required to file Rule 26(a)(2)(B) expert reports. *See Perkins v. United States*, 626 F. Supp. 2d 587, 590 (E.D. Va. 2009). A party seeking to introduce treating physician testimony should generally comply with Rule 26(a)(2)(C). *Schmitt-Doss v. Am. Regent, Inc.*, 2014 U.S. Dist. LEXIS 107505 (W.D.Va. 2014) aff'd, 599 F. App'x 71 (4th Cir. 2015).

A Plaintiff's treating doctors must be disclosed in accordance with Rule 26(a)(2)(C), because "testimony as to the diagnosis and treatment of a patient and the reasons, therefore, is beyond the ability of the average lay witness' competency and is necessarily based on the experts scientific, technical, or other specialized knowledge, in the form of doctors' medical training and experience. *Cripe v. Henkel Corp.*, 318 F.R.D. 356, 362 (N.D. Ind.), aff'd, 858 F.3d 1110 (7th Cir. 2017) (excluding plaintiff's treating physician from testifying at trial since they were not disclosed).

Any party that fails to make a disclosure pursuant to Rule 26(a) is not permitted to use as any of the non-disclosed information as evidence. *See*, *Sharpe v. United States*, 230 F.R.D. 452, 456 (E.D.Va. 2005). A failure to disclose an expert results in that expert being excluded from testifying at trial pursuant to Rule 37(c)(1). *Id*. at 458.

In this case, Plaintiff failed to disclose Dr. Guerette and as such he should not be permitted to testify as an expert. The failure to disclose him is not substantially justified or harmless. Plaintiff had counsel who took his discovery deposition and thereafter chose not to disclose him because he would not relate the treatment to the subject accident. A change in counsel after the expert deadline is not justification. Further, this is not harmless to the defense as the defense has not retained an expert to refute Dr. Guerrette because he testified, he was not relating the treatment and Plaintiff did not disclose him. Without Dr. Guerette over $500,000 in medical bills are excluded from trial.

Wherefore, Dr. Guerette should be excluded as an expert witness from trial.

**JA103**

If he is not testifying as an expert, any factual testimony is not relevant to any fact at issue in this matter.  Without an expert to opine that Dr. Guerette's treatment and said injuries are causally related to the subject accident, such evidence is not relevant to any fact at issue.

II.      *The medical bills for Dr. Guerette's treatment should be excluded from evidence as no expert will opine they were causally related to the subject accident.*

Plaintiff's medical bills for Dr. Guerrette's treatment should be excluded from trial as no expert will opine that said treatment was causally related to the subject accident.  Since this is a diversity case, the court under *Erie R.R. Co. v Tompkins*, 304 U.S. 64, 78-79, 58 S. Ct. 817, 82 L. Ed. 1188 (1938) must apply Virginia substantive law.  While this motion addresses the evidence the court will allow to be presented at trial, the court's decision turns on the type of damages that are allowed in personal injury cases under Virginia substantive law.  Thus, Virginia substantive law controls.  *Wright v. Smith*, 641 F. Supp. 2d 536 (W.D.Va. 2009).  The question of whether a particular treatment is medically necessary, as well as causally related to a condition resulting from some act or omission on a defendant's part, can usually only be determined by a medical expert qualified in the appropriate field.  *Id*. (citing, *McMunn v. Tatum*, 237 Va. 558, 379 S.E.2d 908 (1989).  *McMunn*, also states that where a Defendant objects to the introduction of medical bills, indicating that the Defendant's evidence will raise a substantial contest as to the question of medical necessity or causal relationship, then the medical bills can only come into evidence with expert testimony establishing the same.  *Id*. at 541 (holding that *McMunn v. Tatum a*pplies in federal cases based on diversity).

Defendant has a substantial contest to the bills given the gap in treatment, Dr. Guerette's prior deposition testimony, the fact the Plaintiff told her physical therapist she was 100% recovered from the accident in October of 2019 and the fact in September of 2019 Plaintiff was

dragged through a field by a horse, the fact the Plaintiff had prior issues with the same part of her body and the substantial gap in time before any complaints concerning her pelvis/bladder.

The causation of a complicated medical issue like a prolapse and bladder issues certainly requires expert testimony as it is beyond the purview of a layperson. In general, the causation of a plaintiff's injury requires expert testimony. *Fitzgerald v. Manning*, 679 F.2d 341, 350 (4th Cir. 1982).

Without an expert to opine the medical bills are related to the subject accident, the medical bills are not admissible under *McMunn v. Tatum*. Further, said bills are not admissible without the proper foundational testimony from an expert.

Wherefore, the Defendant moves to exclude from evidence at trial all of the medical bills attached hereto as Exhibit B.

III.   *Any mention of the conditions plaintiff treated with Dr. Guerette for should be excluded from trial as they are not relevant to any fact at issue.*

Plaintiff should be excluded from mentioning any pelvic or bladder issue at trial as they are not relevant to any fact at issue. As stated herein, a doctor is required to opine as to the causation of the injuries to Plaintiff's pelvic/bladder area. As no such doctor can testify to that, any testimony by the Plaintiff regarding the same is not relevant and would serve to confuse or mislead the jury and should be excluded pursuant to Rules 401, 402 and 403 of the Federal Rules of Evidence. Plaintiff herself should not be permitted to testify that these issues were caused by the accident as she is not qualified to state the same.

## CONCLUSION

WHEREFORE, for the foregoing reasons, the Defendant, by counsel, respectfully requests that this honorable court exclude Dr. Guerette from testifying at trial, exclude the medicals bills attached hereto as Exhibit B, and exclude any mention of Plaintiff's treatment

**JA105**

with Dr. Guerette and or any pelvic/bladder issues, and for such other relief as justice may require.

NICHOLAS JAMES DESOUSA,
By Counsel

_____/s/_____, p.d.
Carter T. Keeney, Esquire (VSB# 82275)
Carter & Shands, P.C.
9030 Stony Point Parkway, Suite 530
Richmond, VA 23235
Telephone:     (804) 747-7470
Facsimile:     (804) 747-7977
ckeeney@carterandshands.com
*Counsel for Defendant*

CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT on the 28th day of March, 2022, I will send via email the foregoing to counsel listed below and I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Samantha Cohn, Esquire (VSB# 89091)
Geoff McDonald & Associates, P.C.
8720 Stony Point Parkway, Suite 250
Richmond, VA  23235
Telephone:     (804) 888-8888
Facsimile:     (804) 355-9988
scohn@mcdonaldinjurylaw.com
*Counsel for Plaintiff*

_____/s/_____, p.d.
Carter T. Keeney, Esquire (VSB# 82275)
Carter & Shands, P.C.
9030 Stony Point Parkway, Suite 530
Richmond, VA 23235
Telephone:     (804) 747-7470
Facsimile:     (804) 747-7977
ckeeney@carterandshands.com
*Counsel for Defendant*

**JA106**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Richmond Division**

SAMANTHA ROOP,

     Plaintiff,

     v.                             Civil Action No.: 3:21-cv-00675-DJN

NICHOLAS JAMES DESOUSA,

     Defendant.

## PLAINTIFF'S ANSWERS TO DEFENDANT'S FIRST SET OF INTERROGATORIES & REQUEST FOR PRODUCTION OF DOCUMENTS

COMES NOW Plaintiff, Samantha Roop, by counsel, and for her Answers to Defendant's

First Set of Interrogatories and Requests for Production of Documents, states as follows:

ANSWERS TO INTERROGATORIES

1.    State your full legal name, address, date of birth, Social Security Number, telephone

number, educational background, occupation, and marital status.

**ANSWER: Samantha Roop,**                       **39; DOB:**

~~may ca~~ **Counsel for Plaintiff to obtain Plaintiff's telephone**

**number and social security number.  These will not be disclosed in a public document.**

2.    Identify each and every specific injury you claim to have sustained in the accident

sued upon, whether they be physical, mental, emotional or otherwise, describing each specific

---

*Roop v. Desousa*
*Plaintiff's Answers to Defendant's First Set of Discovery*
*Case No: 3:21-cv-00675*
*Page 1*



injury by the exact parts of the anatomy affected and the approximate time or date each such injury was first detected.  <u>If medical records are attached, list below those records which are responsive to this Interrogatory</u>.    You are under a continuing duty to supplement this as well as all Interrogatories.

**ANSWER: To the best of her ability as a layperson, Plaintiff understands that her crash-related injuries were: concussion, migraines, pelvic prolapse, bruises on shoulder and hips, bruise and abrasion on head from hitting seat belt holder, whiplash, and concussion-related symptoms such as light and noise sensitivity, trouble processing, nausea, irritability, etc.**

**Plaintiff hereby further relies upon and incorporates the opinions of her expert witnesses and treating providers as if fully restated herein.**

3.    Identify any similar condition, injury and/or handicap you have experienced at any time prior to the accident, giving a full and complete description of those difficulties, including time and circumstances of the occurrence and frequency and duration of those difficulties.

**ANSWER: Plaintiff states that she has a prior history of pelvic issues, but never had a prolapse before this crash.  It is Plaintiff's understanding that her doctor initially thought her stomach pain/cramps were related to the previously-placed pelvic device, but after he replaced the battery in the device and that didn't relieve her pain, her doctor then believed that it was a combination of the force of the impact knocking her bladder out of its sling**

**JA108**

**coupled with the weakened muscles that occurred as a result of being bedridden immediately**

**following the crash that led to the prolapse.**

4.      Identify the names, **including complete street address, city, and state**, of any and

all hospitals where you were confined or treated for any purpose whatsoever within the last fifteen

(15) years before your receipt of these Interrogatories, specifying in each case the year, the nature

of the treatment or other service, as well as the condition, injury, or reason for same.  In your

Answer, state your Social Security Number and date of birth.

**ANSWER: Plaintiff's date of birth and social security number were previously**

**addressed in her Answer to Interrogatory 1.**

**St. Francis Watkins Center**
**601 Watkins Centre Pkwy, Midlothian, VA 23113**
**(804) 594-2100**

**Richmond Emergency Physicians**
**5855 Bremo Rd, Richmond, VA 23226**
**(804) 287-7066**

**Emergency Coverage Corporation**
**7101 Jahnke Rd Richmond, VA 23225**

**Commonwealth Radiology**
**2810 N Parham Rd Suite 315, Richmond, VA 23294**
**(804) 288-8327**

**Powhatan Medical Associates**
**3452 Anderson Hwy Suite D, Powhatan, VA 23139**
**(804) 285-6050**

**JA109**

# HEALTH INSURANCE CLAIM FORM

Blue Cross Blue Shield Virginia (Anthem BCBS VA)

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

VA

**CARRIER**

PICA | PICA

| 1. MEDICARE MEDICAID TRICARE CHAMPVA GROUP HEALTH PLAN FECA BLK LUNG OTHER | 1a. INSURED'S I.D. NUMBER (For Program in Item 1) |
|---|---|
| [ ] (Medicare#) [ ] (Medicaid#) [ ] (ID#/DoD#) [ ] (Member ID#) [ ] (ID#) [ ] (ID#) [X] | |

| 2. PATIENT'S NAME (Last Name, First Name, Middle Initial) | 3. PATIENT'S BIRTH DATE MM DD YY | SEX M [ ] F [X] | 4. INSURED'S NAME (Last Name, First Name, Middle Initial) |
|---|---|---|---|
| ROOP, SAMANTHA J | | | ROOP, SAMANTHA J |

| 5. PATIENT'S ADDRESS (No., Street) | 6. PATIENT RELATIONSHIP TO INSURED | 7. INSURED'S ADDRESS (No., Street) |
|---|---|---|
| | Self [X] Spouse [ ] Child [ ] Other [ ] | |

| CITY | STATE | 8. RESERVED FOR NUCC USE | CITY | STATE |
|---|---|---|---|---|

| ZIP CODE | TELEPHONE (Include Area Code) | | ZIP CODE | TELEPHONE (Include Area Code) |
|---|---|---|---|---|

| 9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial) | 10. IS PATIENT'S CONDITION RELATED TO: | 11. INSURED'S POLICY GROUP OR FECA NUMBER |
|---|---|---|

| a. OTHER INSURED'S POLICY OR GROUP NUMBER | a. EMPLOYMENT? (Current or Previous) [ ] YES [X] NO | a. INSURED'S DATE OF BIRTH | SEX M [ ] F [X] |
|---|---|---|---|

| b. RESERVED FOR NUCC USE | b. AUTO ACCIDENT? [ ] YES [X] NO  PLACE (State) | b. OTHER CLAIM ID (Designated by NUCC) |
|---|---|---|

| c. RESERVED FOR NUCC USE | c. OTHER ACCIDENT? [ ] YES [X] NO | c. INSURANCE PLAN NAME OR PROGRAM NAME |
|---|---|---|

| d. INSURANCE PLAN NAME OR PROGRAM NAME | 10d. CLAIM CODES (Designated by NUCC) | d. IS THERE ANOTHER HEALTH BENEFIT PLAN? [ ] YES [X] NO  If yes, complete items 9, 9a, and 9d. |
|---|---|---|

**READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.**

12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED  Signature on file   DATE  10|15|2019

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED  Signature on file

| 14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP) MM DD YY  QUAL. | 15. OTHER DATE MM DD YY  QUAL. | 16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION MM DD YY  FROM TO |
|---|---|---|

| 17. NAME OF REFERRING PROVIDER OR OTHER SOURCE  DN JOSEPH, SHARON | 17a. | 18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES MM DD YY  FROM TO |
|---|---|---|
| | 17b. NPI 1659484525 | |

| 19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC) | 20. OUTSIDE LAB? [ ] YES [ ] NO  $ CHARGES  0  00 |
|---|---|

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY Relate A-L to service line below (24E)  ICD Ind. 0

| A. L R32 | B. L N8110 | C. L R102 | D. L |
|---|---|---|---|
| E. L | F. L | G. L | H. L |
| I. L | J. L | K. L | L. L |

22. RESUBMISSION CODE | ORIGINAL REF. NO.

23. PRIOR AUTHORIZATION NUMBER  49D2137274

| 24. A. DATE(S) OF SERVICE From  To | | | | | | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS | MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID QUAL | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MM | DD | YY | MM | DD | YY | | | | | | | | | | | |
| 1 | 10 08 2019 | 10 08 2019 | 11 | | 51798 | | A B C | 29 | 04 | 1 | | ZZ | 207VF0040X |
| | | | | | | | | | | | NPI | 1942230040 |
| 2 | 10 08 2019 | 10 08 2019 | 11 | | 88142 | | A B C | 40 | 00 | 1 | | ZZ | 207VF0040X |
| | | | | | | | | | | | NPI | 1942230040 |
| 3 | 10 08 2019 | 10 08 2019 | 11 | | 82570 | QW | A B C | 10 | 00 | 1 | | ZZ | 207VF0040X |
| | | | | | | | | | | | NPI | 1942230040 |
| 4 | 10 08 2019 | 10 08 2019 | 11 | | 99204 | 25 | A B C | 246 | 06 | 1 | | ZZ | 207VF0040X |
| | | | | | | | | | | | NPI | 1942230040 |
| 5 | 10 08 2019 | 10 08 2019 | 11 | | 81003 | QW | A B C | 5 | 00 | 1 | | ZZ | 207VF0040X |
| | | | | | | | | | | | NPI | 1942230040 |
| 6 | | | | | | | | | | | | NPI | |

| 25. FEDERAL TAX I.D. NUMBER  SSN [ ] EIN [X] | 26. PATIENT'S ACCOUNT NO. | 27. ACCEPT ASSIGNMENT? [X] YES [ ] NO | 28. TOTAL CHARGE  $ 330 10 | 29. AMOUNT PAID  $ 0 00 | 30. Rsvd for NUCC Use |
|---|---|---|---|---|---|

| 31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)  GUERETTE, NATHAN  1942230040  SIGNED  10|15|2019  DATE | 32. SERVICE FACILITY LOCATION INFORMATION  DO NOT USE 5.  5875 BREMO RD SUITE 701  RICHMOND  VA 23226-1900  a. 1356571616  b. | 33. BILLING PROVIDER INFO & PH #  (804) 5232533  FEMALE PELVIC MEDICINE INSTITUTE O  5875 BREMO RD SUITE 701  RICHMOND  VA 232261900  a. 1356571616  b. ZZ193400000X |
|---|---|---|

NUCC Instruction Manual available at: www.nucc.org   PLEASE PRINT OR TYPE   APPROVED OMB-0938-1197 FORM 1500 (02-12)



EXHIBIT  B

**JA110**

# HEALTH INSURANCE CLAIM FORM

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

ANTHEM HEALTHKEEPERS PLUS
PO BOX 27401

RICHMOND VA 23279

| PICA | | | | | | | | PICA |
|---|---|---|---|---|---|---|---|---|

| 1. | MEDICARE (Medicare#) | MEDICAID X (Medicaid#) | TRICARE (ID#/DoD#) | CHAMPVA (Member ID#) | GROUP HEALTH PLAN (ID#) | FECA BLK LUNG (ID#) | OTHER (ID#) | 1a. INSURED'S I.D. NUMBER (For Program in Item 1) |
|---|---|---|---|---|---|---|---|---|

| 2. PATIENT'S NAME (Last Name, First Name, Middle Initial) | 3. PATIENT'S BIRTH DATE / SEX | 4. INSURED'S NAME (Last Name, First Name, Middle Initial) |
|---|---|---|
| ROOP, SAMANTHA J | M☐ F☒ | ROOP, SAMANTHA J |

| 5. PATIENT'S ADDRESS (No., Street) | 6. PATIENT RELATIONSHIP TO INSURED | 7. INSURED'S ADDRESS (No., Street) |
|---|---|---|
| | Self X  Spouse  Child  Other | |

| CITY | STATE | 8. RESERVED FOR NUCC USE | CITY | STATE |
|---|---|---|---|---|

| ZIP CODE | TELEPHONE (Include Area Code) | | ZIP CODE | TELEPHONE (Include Area Code) |
|---|---|---|---|---|

| 9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial) | 10. IS PATIENT'S CONDITION RELATED TO: | 11. INSURED'S POLICY GROUP OR FECA NUMBER |
|---|---|---|

| a. OTHER INSURED'S POLICY OR GROUP NUMBER | a. EMPLOYMENT? (Current or Previous) ☐YES ☒NO | a. INSURED'S DATE OF BIRTH / SEX  M☐ F☒ |
|---|---|---|

| b. RESERVED FOR NUCC USE | b. AUTO ACCIDENT? ☐YES ☒NO  PLACE (State) | b. OTHER CLAIM ID (Designated by NUCC) |
|---|---|---|

| c. RESERVED FOR NUCC USE | c. OTHER ACCIDENT? ☐YES ☒NO | c. INSURANCE PLAN NAME OR PROGRAM NAME |
|---|---|---|

| d. INSURANCE PLAN NAME OR PROGRAM NAME | 10d. CLAIM CODES (Designated by NUCC) | d. IS THERE ANOTHER HEALTH BENEFIT PLAN? ☐YES ☒NO  If yes, complete items 9, 9a, and 9d. |
|---|---|---|

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.
12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED  Signature on file    DATE  02/26/2021

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED  Signature on file

| 14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP)  QUAL. | 15. OTHER DATE  QUAL. | 16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION  FROM    TO |
|---|---|---|

| 17. NAME OF REFERRING PROVIDER OR OTHER SOURCE | 17a. | 18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES |
|---|---|---|
| DN  JOSEPH, SHARON | 17b. NPI  1659484525 | FROM    TO |

| 19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC) | 20. OUTSIDE LAB?  ☐YES ☐NO    $ CHARGES  0  00 |
|---|---|

| 21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY Relate A-L to service line below (24E)  ICD Ind. 0 | 22. RESUBMISSION CODE 7   ORIGINAL REF. NO. 176741544700 |
|---|---|

A. L R32   B. L R102   C. L R399   D. L _____
E. L _____   F. L _____   G. L _____   H. L _____
I. L _____   J. L _____   K. L _____   L. L _____

23. PRIOR AUTHORIZATION NUMBER  49D2137274

| 24. A. DATE(S) OF SERVICE |  | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) | | E. DIAGNOSIS POINTER | F. $ CHARGES | | G. DAYS OR UNITS | H. EPSDT Fam Plan | I. ID. QUAL. | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| From MM DD YY | To MM DD YY | | | CPT/HCPCS | MODIFIER | | | | | | | |
| 1 | 12 02 2019 | 12 02 2019 | 11 | | 51729 | | A B C | 513 | 32 | 1 | | NPI | 1942230040 |
| 2 | 12 02 2019 | 12 02 2019 | 11 | | 51784 | | A B C | 215 | 00 | 1 | | NPI | 1942230040 |
| 3 | 12 02 2019 | 12 02 2019 | 11 | | 51797 | | A B C | 168 | 83 | 1 | | NPI | 1942230040 |
| 4 | 12 02 2019 | 12 02 2019 | 11 | | 51741 | | A B C | 23 | 87 | 1 | | NPI | 1942230040 |
| 5 | | | | | | | | | | | | NPI |
| 6 | | | | | | | | | | | | NPI |

| 25. FEDERAL TAX I.D. NUMBER  SSN☐ EIN☒ | 26. PATIENT'S ACCOUNT NO. | 27. ACCEPT ASSIGNMENT? (For govt. claims, see back) ☒YES ☐NO | 28. TOTAL CHARGE $ 921 02 | 29. AMOUNT PAID $ 0 00 | 30. Rsvd for NUCC Use |
|---|---|---|---|---|---|

| 31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)  GUERETTE, NATHAN  1942230040  SIGNED    DATE 02/26/2021 | 32. SERVICE FACILITY LOCATION INFORMATION  DO NOT USE 5 5875 BREMO RD SUITE 701 RICHMOND VA 23226-1900  a. 1356571616   b. | 33. BILLING PROVIDER INFO & PH #  (804) 5232533 FEMALE PELVIC MEDICINE INSTITUTE O 5875 BREMO RD SUITE 701 RICHMOND VA 23226-1900  a. 1356571616   b. ZZ193400000X |
|---|---|---|

NUCC Instruction Manual available at: www.nucc.org     PLEASE PRINT OR TYPE     APPROVED OMB-0938-1197 FORM 1500 (02-12)

**JA111**

# HEALTH INSURANCE CLAIM FORM

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

ANTHEM HEALTHKEEPERS PLUS
PO BOX 27401

RICHMOND VA 23279

CARRIER →

| PICA | | | | | | | | | PICA |
|---|---|---|---|---|---|---|---|---|---|

| 1. | MEDICARE | MEDICAID | TRICARE | CHAMPVA | GROUP HEALTH PLAN | FECA BLK LUNG | OTHER | 1a. INSURED'S I.D. NUMBER (For Program in Item 1) |
|---|---|---|---|---|---|---|---|---|
| | (Medicare#) | X (Medicaid#) | (ID#/DoD#) | (Member ID#) | (ID#) | (ID#) | | |

**2. PATIENT'S NAME (Last Name, First Name, Middle Initial)**
ROOP, SAMANTHA J

**3. PATIENT'S BIRTH DATE** SEX
M  F X

**4. INSURED'S NAME (Last Name, First Name, Middle Initial)**
ROOP, SAMANTHA J

**5. PATIENT'S ADDRESS (No., Street)**

**6. PATIENT RELATIONSHIP TO INSURED**
Self X  Spouse  Child  Other

**7. INSURED'S ADDRESS (No., Street)**

| CITY | | STATE |
|---|---|---|

**8. RESERVED FOR NUCC USE**

| CITY | | STATE |
|---|---|---|

| ZIP CODE | TELEPHONE (Include Area Code) |
|---|---|

| ZIP CODE | TELEPHONE (Include Area Code) |
|---|---|

**9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)**

**10. IS PATIENT'S CONDITION RELATED TO:**

**11. INSURED'S POLICY GROUP OR FECA NUMBER**

**a. OTHER INSURED'S POLICY OR GROUP NUMBER**

a. EMPLOYMENT? (Current or Previous)
YES  X NO

**a. INSURED'S DATE OF BIRTH** SEX
M  F X

**b. RESERVED FOR NUCC USE**

b. AUTO ACCIDENT?  PLACE (State)
YES  X NO

**b. OTHER CLAIM ID (Designated by NUCC)**

**c. RESERVED FOR NUCC USE**

c. OTHER ACCIDENT?
YES  X NO

**c. INSURANCE PLAN NAME OR PROGRAM NAME**

**d. INSURANCE PLAN NAME OR PROGRAM NAME**

10d. CLAIM CODES (Designated by NUCC)

**d. IS THERE ANOTHER HEALTH BENEFIT PLAN?**
YES  X NO  If yes, complete items 9, 9a, and 9d.

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.
**12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE** I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED   Signature on file   DATE  02|26|2021

**13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE** I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED   Signature on file

**14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP)**
MM  DD  YY   QUAL.

**15. OTHER DATE**  MM  DD  YY
QUAL.

**16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION**
FROM   TO

**17. NAME OF REFERRING PROVIDER OR OTHER SOURCE**
DN  JOSEPH, SHARON
17a.
17b. NPI  1659484525

**18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES**
FROM   TO

**19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC)**

**20. OUTSIDE LAB?**  $ CHARGES
YES  NO   0  00

**21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY** Relate A-L to service line below (24E)   ICD Ind. 0

A. N8110  B. R102  C. N3281  D. R339
E.   F.   G.   H.
I.   J.   K.   L.

**22. RESUBMISSION CODE**
7   ORIGINAL REF. NO. 176815207000

**23. PRIOR AUTHORIZATION NUMBER**
49D2137274

| 24. A. DATE(S) OF SERVICE | | | | | | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS | MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | | G. DAYS OR UNITS | H. EPSDT Fam Plan | I. ID QUAL | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| From MM | DD | YY | To MM | DD | YY | | | | | | | | | | | |
| 12 | 03 | 2019 | 12 | 03 | 2019 | 11 | | 82570 | | A B C D | 10 | 00 | 1 | | NPI | 1942230040 |
| 12 | 03 | 2019 | 12 | 03 | 2019 | 11 | | 99214 | 25 | A B C D | 161 | 24 | 1 | | NPI | 1942230040 |
| 12 | 03 | 2019 | 12 | 03 | 2019 | 11 | | 81003 | QW | A B C D | 5 | 00 | 1 | | NPI | 1942230040 |
| 12 | 03 | 2019 | 12 | 03 | 2019 | 11 | | 52285 | | A B C D | 424 | 49 | 1 | | NPI | 1942230040 |
| | | | | | | | | | | | | | | NPI | |
| | | | | | | | | | | | | | | NPI | |

**25. FEDERAL TAX I.D. NUMBER**  SSN EIN

**26. PATIENT'S ACCOUNT NO.**

**27. ACCEPT ASSIGNMENT?**
X YES  NO

**28. TOTAL CHARGE**
$ 600  73

**29. AMOUNT PAID**
$ 0

**30. Rsvd for NUCC Use**

**31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS**
(I certify that the statements on the reverse apply to this bill and are made a part thereof.)
GUERETTE, NATHAN
1942230040
SIGNED   02|26|2021  DATE

**32. SERVICE FACILITY LOCATION INFORMATION**
DO NOT USE 5
5875 BREMO RD SUITE 701
RICHMOND
VA 23226-1900
a. 1356571616  b.

**33. BILLING PROVIDER INFO & PH #** ( 804 ) 5232533
FEMALE PELVIC MEDICINE INSTITUTE O
5801 BREMO RD
RICHMOND
VA 23226-1900
a. 1356571616  b. ZZ193400000X

NUCC Instruction Manual available at: www.nucc.org    PLEASE PRINT OR TYPE    APPROVED OMB-0938-1197 FORM 1500 (02-12)

# HEALTH INSURANCE CLAIM FORM

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

ANTHEM HEALTHKEEPERS PLUS
PO BOX 27401

RICHMOND VA 23279

| | PICA | | | | | | PICA |

**1. MEDICARE** ☐ (Medicare#) **MEDICAID** ☒ (Medicaid#) **TRICARE** ☐ (ID#DoD#) **CHAMPVA** ☐ (Member ID#) **GROUP HEALTH PLAN** ☐ (ID#) **FECA BLK LUNG** ☐ (ID#) **OTHER** ☐ (ID#)

**1a. INSURED'S I.D. NUMBER** (For Program in Item 1)

**2. PATIENT'S NAME** (Last Name, First Name, Middle Initial)
ROOP, SAMANTHA J

**3. PATIENT'S BIRTH DATE** | **SEX** M ☐ F ☒

**4. INSURED'S NAME** (Last Name, First Name, Middle Initial)
ROOP, SAMANTHA J

**5. PATIENT'S ADDRESS** (No., Street)

**6. PATIENT RELATIONSHIP TO INSURED**
Self ☒ Spouse ☐ Child ☐ Other ☐

**7. INSURED'S ADDRESS** (No., Street)

CITY | STATE

**8. RESERVED FOR NUCC USE**

CITY | STATE

ZIP CODE | TELEPHONE (Include Area Code)

ZIP CODE | TELEPHONE (Include Area Code)

**9. OTHER INSURED'S NAME** (Last Name, First Name, Middle Initial)

**10. IS PATIENT'S CONDITION RELATED TO:**

**11. INSURED'S POLICY GROUP OR FECA NUMBER**

**a. OTHER INSURED'S POLICY OR GROUP NUMBER**

**a. EMPLOYMENT?** (Current or Previous)
☐ YES ☒ NO

**a. INSURED'S DATE OF BIRTH** | **SEX** M ☐ F ☒

**b. RESERVED FOR NUCC USE**

**b. AUTO ACCIDENT?** ☐ YES ☒ NO | PLACE (State)

**b. OTHER CLAIM ID** (Designated by NUCC)

**c. RESERVED FOR NUCC USE**

**c. OTHER ACCIDENT?** ☐ YES ☒ NO

**c. INSURANCE PLAN NAME OR PROGRAM NAME**

**d. INSURANCE PLAN NAME OR PROGRAM NAME**

**10d. CLAIM CODES** (Designated by NUCC)

**d. IS THERE ANOTHER HEALTH BENEFIT PLAN?**
☐ YES ☒ NO  If yes, complete items 9, 9a, and 9d.

**READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.**
**12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE** I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED  Signature on file  DATE 02/26/2021

**13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE** I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED  Signature on file

**14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP)** MM DD YY  QUAL.

**15. OTHER DATE** QUAL. MM DD YY

**16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION**
FROM MM DD YY  TO MM DD YY

**17. NAME OF REFERRING PROVIDER OR OTHER SOURCE**
DN JOSEPH, SHARON
17a.
17b. NPI 1659484525

**18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES**
FROM MM DD YY  TO MM DD YY

**19. ADDITIONAL CLAIM INFORMATION** (Designated by NUCC)

**20. OUTSIDE LAB?** ☐ YES ☐ NO | $ CHARGES 0 00

**21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY** Relate A-L to service line below (24E)  ICD Ind. 0

A. N8110  B. R102  C. N3281  D. R339
E. ___  F. ___  G. ___  H. ___
I. ___  J. ___  K. ___  L. ___

**22. RESUBMISSION CODE** 7 | ORIGINAL REF. NO. 177621623700

**23. PRIOR AUTHORIZATION NUMBER** 49D2137274

| 24. A. DATE(S) OF SERVICE From MM DD YY | To MM DD YY | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS | MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID. QUAL. | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 12 19 2019 | 12 19 2019 | 11 | | 64561 | 50 | C D | 2484 58 | 2 | | NPI | 1942230040 |
| 2 | | | | | | | | | | | NPI | |
| 3 | | | | | | | | | | | NPI | |
| 4 | | | | | | | | | | | NPI | |
| 5 | | | | | | | | | | | NPI | |
| 6 | | | | | | | | | | | NPI | |

**25. FEDERAL TAX I.D. NUMBER** ☐ SSN ☒ EIN

**26. PATIENT'S ACCOUNT NO.**

**27. ACCEPT ASSIGNMENT?** (For govt. claims, see back)
☒ YES ☐ NO

**28. TOTAL CHARGE** $ 2484 58

**29. AMOUNT PAID** $ 0 00

**30. Rsvd for NUCC Use**

**31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS** I certify that the statements on the reverse apply to this bill and are made a part thereof.)
GUERETTE, NATHAN
1942230040
SIGNED  02/26/2021  DATE

**32. SERVICE FACILITY LOCATION INFORMATION**
DO NOT USE 5
5875 BREMO RD SUITE 701
RICHMOND
VA 23226-1900
a. 1356571616  b.

**33. BILLING PROVIDER INFO & PH #** (804) 5232533
FEMALE PELVIC MEDICINE INSTITUTE G
5875 BREMO RD SUITE 701
RICHMOND
VA 23226-1900
a. 1356571616  b. ZZ193400000X

NUCC Instruction Manual available at: www.nucc.org  **PLEASE PRINT OR TYPE**  APPROVED OMB-0938-1197 FORM 1500 (02-12)

**HEALTH INSURANCE CLAIM FORM**

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

ANTHEM HEALTHKEEPERS PLUS
PO BOX 27401

RICHMOND VA 23279

CARRIER

☐ PICA                                                                                          PICA ☐

| 1. MEDICARE ☐ (Medicare#) | MEDICAID ☒ (Medicaid#) | TRICARE ☐ (ID#DoD#) | CHAMPVA ☐ (Member ID#) | GROUP HEALTH PLAN ☐ (ID#) | FECA BLK LUNG ☐ (ID#) | OTHER ☐ (ID#) | 1a. INSURED'S I.D. NUMBER | (For Program in Item 1) |

2. PATIENT'S NAME (Last Name, First Name, Middle Initial)
ROOP, SAMANTHA J

3. PATIENT'S BIRTH DATE     SEX
MM   DD   YY              M ☐  F ☒

4. INSURED'S NAME (Last Name, First Name, Middle Initial)
ROOP, SAMANTHA J

5. PATIENT'S ADDRESS (No., Street)

6. PATIENT RELATIONSHIP TO INSURED
Self ☒  Spouse ☐  Child ☐  Other ☐

7. INSURED'S ADDRESS (No., Street)

CITY                                    STATE

7. RESERVED FOR NUCC USE

CITY                                    STATE

ZIP CODE          TELEPHONE (Include Area Code)

ZIP CODE          TELEPHONE (Include Area Code)

9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)

10. IS PATIENT'S CONDITION RELATED TO:

11. INSURED'S POLICY GROUP OR FECA NUMBER

a. OTHER INSURED'S POLICY OR GROUP NUMBER

a. EMPLOYMENT? (Current or Previous)
☐ YES  ☒ NO

a. INSURED'S DATE OF BIRTH        SEX
MM   DD   YY               M ☐  F ☒

b. RESERVED FOR NUCC USE

b. AUTO ACCIDENT?           PLACE (State)
☐ YES  ☒ NO

b. OTHER CLAIM ID (Designated by NUCC)

c. RESERVED FOR NUCC USE

c. OTHER ACCIDENT?
☐ YES  ☒ NO

c. INSURANCE PLAN NAME OR PROGRAM NAME

d. INSURANCE PLAN NAME OR PROGRAM NAME

10d. CLAIM CODES (Designated by NUCC)

d. IS THERE ANOTHER HEALTH BENEFIT PLAN?
☐ YES  ☒ NO   If yes, complete items 9, 9a, and 9d.

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.
12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED   Signature on file          DATE   02/26/2021

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED   Signature on file

14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP)
MM   DD   YY        QUAL.

15. OTHER DATE
QUAL.   MM   DD   YY

16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION
MM   DD   YY             MM   DD   YY
FROM              TO

17. NAME OF REFERRING PROVIDER OR OTHER SOURCE
DN   JOSEPH, SHARON

17a.
17b. NPI   1659484525

18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES
MM   DD   YY             MM   DD   YY
FROM              TO

19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC)

20. OUTSIDE LAB?        $ CHARGES
☐ YES  ☐ NO         0 | 00

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY  Relate A-L to service line below (24E)     ICD Ind. 0

A. LN8110     B. LR102     C. LN3281     D. LR339
E. L          F. L         G. L          H. L
I. L          J. L         K. L          L. L

22. RESUBMISSION
CODE   7     ORIGINAL REF. NO.   178197388500

23. PRIOR AUTHORIZATION NUMBER
49D2137274

| 24. A. DATE(S) OF SERVICE From MM DD YY To MM DD YY | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS | MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID QUAL | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|---|
| 12 26 2019 12 26 2019 | 11 | | 51798 | | A B C D | 29 04 | 1 | | NPI | 1942230040 |
| 12 26 2019 12 26 2019 | 11 | | 82570 | | A B C D | 10 00 | 1 | | NPI | 1942230040 |
| 12 26 2019 12 26 2019 | 11 | | 99214 | 25 | A B C D | 161 24 | 1 | | NPI | 1942230040 |
| 12 26 2019 12 26 2019 | 11 | | 81003 | QW | A B C D | 5 00 | 1 | | NPI | 1942230040 |
| | | | | | | | | | NPI | |
| | | | | | | | | | NPI | |

25. FEDERAL TAX I.D. NUMBER        SSN  EIN ☒

26. PATIENT'S ACCOUNT NO.

27. ACCEPT ASSIGNMENT? (For govt. claims, see back)
☒ YES  ☐ NO

28. TOTAL CHARGE
$ 205 | 28

29. AMOUNT PAID
$ 0 | 00

30. Rsvd for NUCC Use

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)
GUERTTE, NATHAN
1942230040
SIGNED   02/26/2021   DATE

32. SERVICE FACILITY LOCATION INFORMATION
DO NOT USE 5
5875 BREMO RD SUITE 701
RICHMOND
VA 23226-1900

a. 1356571616     b.

33. BILLING PROVIDER INFO & PH #   ( 804 ) 5232533
FEMALE PELVIC MEDICINE INSTITUTE O
5875 BREMO RD SUITE 701
RICHMOND
VA 23226-1900

a. 1356571616     b. ZZ193400000X

NUCC Instruction Manual available at: www.nucc.org          PLEASE PRINT OR TYPE          APPROVED OMB-0938-1197 FORM 1500 (02-12)

**JA114**

# HEALTH INSURANCE CLAIM FORM

ANTHEM HEALTHKEEPERS PLUS
PO BOX 27401

RICHMOND VA 23279

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

| PICA | | | | | | PICA |
|---|---|---|---|---|---|---|

**1.** MEDICARE ☐ (Medicare#)   MEDICAID ☒ (Medicaid#)   TRICARE ☐ (ID#/DoD#)   CHAMPVA ☐ (Member ID#)   GROUP HEALTH PLAN ☐ (ID#)   FECA BLK LUNG ☐ (ID#)   OTHER ☐ (ID#)

**1a. INSURED'S I.D. NUMBER** (For Program in Item 1)

**2. PATIENT'S NAME** (Last Name, First Name, Middle Initial)
ROOP, SAMANTHA J

**3. PATIENT'S BIRTH DATE** | **SEX** M ☐ F ☒

**4. INSURED'S NAME** (Last Name, First Name, Middle Initial)
ROOP, SAMANTHA J

**5. PATIENT'S ADDRESS** (No., Street)

**6. PATIENT RELATIONSHIP TO INSURED**
Self ☒  Spouse ☐  Child ☐  Other ☐

**7. INSURED'S ADDRESS** (No., Street)

CITY | STATE

**8. RESERVED FOR NUCC USE**

CITY | STATE

ZIP CODE | TELEPHONE (Include Area Code)

x

ZIP CODE | TELEPHONE (Include Area Code)

**9. OTHER INSURED'S NAME** (Last Name, First Name, Middle Initial)

**10. IS PATIENT'S CONDITION RELATED TO:**

**11. INSURED'S POLICY GROUP OR FECA NUMBER**

**a. OTHER INSURED'S POLICY OR GROUP NUMBER**

**a. EMPLOYMENT?** (Current or Previous) ☐ YES  ☒ NO

**a. INSURED'S DATE OF BIRTH** | **SEX** M ☐ F ☒

**b. RESERVED FOR NUCC USE**

**b. AUTO ACCIDENT?** ☐ YES  ☒ NO   PLACE (State)

**b. OTHER CLAIM ID** (Designated by NUCC)

**c. RESERVED FOR NUCC USE**

**c. OTHER ACCIDENT?** ☐ YES  ☒ NO

**c. INSURANCE PLAN NAME OR PROGRAM NAME**

**d. INSURANCE PLAN NAME OR PROGRAM NAME**

**10d. CLAIM CODES** (Designated by NUCC)

**d. IS THERE ANOTHER HEALTH BENEFIT PLAN?** ☐ YES  ☒ NO   If yes, complete items 9, 9a, and 9d.

**READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.**
**12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE** I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED   Signature on file   DATE   11/16/2020

**13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE** I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED   Signature on file

**14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP)** QUAL.

**15. OTHER DATE** QUAL. | MM DD YY

**16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION**
FROM   TO

**17. NAME OF REFERRING PROVIDER OR OTHER SOURCE**
DN  JOSEPH, SHARON
17b. NPI  1655484525

**18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES**
FROM   TO

**19. ADDITIONAL CLAIM INFORMATION** (Designated by NUCC)

**20. OUTSIDE LAB?** ☐ YES  ☒ NO   $ CHARGES  0  00

**21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY** Relate A-L to service line below (24E)   ICD Ind. 0
A. LN3281   B.   C.   D.
E.   F.   G.   H.
I.   J.   K.   L.

**22. RESUBMISSION CODE** 7   ORIGINAL REF. NO. 178456690100

**23. PRIOR AUTHORIZATION NUMBER**

| 24. A. DATE(S) OF SERVICE From MM DD YY | To MM DD YY | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES CPT/HCPCS | MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID. QUAL. | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 01 08 2020 | 01 08 2020 | 22 | | 64581 | | A | 1015 61 | 1 | | NPI | 1942230040 |
| 2 | 01 08 2020 | 01 08 2020 | 22 | | 64590 | | A | 400 86 | 1 | | NPI | 1942230040 |
| 3 | 01 08 2020 | 01 08 2020 | 22 | | 95972 | | A | 87 63 | 1 | | NPI | 1942230040 |
| 4 | | | | | | | | | | | NPI | |
| 5 | | | | | | | | | | | NPI | |
| 6 | | | | | | | | | | | NPI | |

**25. FEDERAL TAX I.D. NUMBER** | SSN ☐ EIN ☒

**26. PATIENT'S ACCOUNT NO.**

**27. ACCEPT ASSIGNMENT?** ☒ YES  ☐ NO

**28. TOTAL CHARGE** $ 1504 10

**29. AMOUNT PAID** $ 0 00

**30. Rsvd for NUCC Use**

**31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS**
(I certify that the statements on the reverse apply to this bill and are made a part thereof.)
GUERETTE, NATHAN
1942230040
SIGNED   11/16/2020   DATE

**32. SERVICE FACILITY LOCATION INFORMATION**
JW OP
1491 JOHNSTON WILLIS DR
N CHESTERFIELD
VA 23354789
a.   b. 1356571616

**33. BILLING PROVIDER INFO & PH #** ( 804 ) 5232533
FEMALE PELVIC MEDICINE INSTITUTE O
5875 BREMO RD SUITE 701
RICHMOND
VA 23226190O
a. ZZ193400000X

NUCC Instruction Manual available at: www.nucc.org   **PLEASE PRINT OR TYPE**   APPROVED OMB-0938-1197 FORM 1500 (02-12)

**HEALTH INSURANCE CLAIM FORM**

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

ANTHEM HEALTHKEEPERS PLUS
PO BOX 27401

RICHMOND VA 23279

PICA | | | | | | PICA

| 1. MEDICARE (Medicare#) | MEDICAID [X] (Medicaid#) | TRICARE (ID#/DoD#) | CHAMPVA (Member ID#) | GROUP HEALTH PLAN (ID#) | FECA BLKLUNG (ID#) | OTHER (ID#) | 1a. INSURED'S I.D. NUMBER (For Program in Item 1) |

2. PATIENT'S NAME (Last Name, First Name, Middle Initial)
ROOP, SAMANTHA J

3. PATIENT'S BIRTH DATE / SEX  M [ ] F [X]

4. INSURED'S NAME (Last Name, First Name, Middle Initial)
ROOP, SAMANTHA J

5. PATIENT'S ADDRESS (No., Street)

6. PATIENT RELATIONSHIP TO INSURED
Self [X] Spouse [ ] Child [ ] Other [ ]

7. INSURED'S ADDRESS (No., Street)

CITY | STATE

8. RESERVED FOR NUCC USE

CITY | STATE

ZIP CODE | TELEPHONE (Include Area Code)

| | ZIP CODE | TELEPHONE (Include Area Code)

9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)

10. IS PATIENT'S CONDITION RELATED TO:

11. INSURED'S POLICY GROUP OR FECA NUMBER

a. OTHER INSURED'S POLICY OR GROUP NUMBER

a. EMPLOYMENT? (Current or Previous)  YES [ ] NO [X]

a. INSURED'S DATE OF BIRTH | SEX  M [ ] F [X]

b. RESERVED FOR NUCC USE

b. AUTO ACCIDENT?  YES [ ] NO [X]  PLACE (State)

b. OTHER CLAIM ID (Designated by NUCC)

c. RESERVED FOR NUCC USE

c. OTHER ACCIDENT?  YES [ ] NO [X]

c. INSURANCE PLAN NAME OR PROGRAM NAME

d. INSURANCE PLAN NAME OR PROGRAM NAME

10d. CLAIM CODES (Designated by NUCC)

d. IS THERE ANOTHER HEALTH BENEFIT PLAN?  YES [ ] NO [X]  If yes, complete items 9, 9a, and 9d.

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.
12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.
SIGNED  Signature on file  DATE 02/26/2021

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.
SIGNED  Signature on file

14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP)  QUAL.

15. OTHER DATE  QUAL.  MM DD YY

16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION  FROM  TO

17. NAME OF REFERRING PROVIDER OR OTHER SOURCE
DN JOSEPH, SHARON
17a. | 17b. NPI 1699484525

18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES  FROM  TO

19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC)

20. OUTSIDE LAB?  YES [ ] NO [ ]  $ CHARGES  0 | 00

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY Relate A-L to service line below (24E)  ICD Ind. 0
A. N3281  B. N8110  C. R102  D. R339
E. N3011  F.  G.  H.
I.  J.  K.  L.

22. RESUBMISSION CODE 7 | ORIGINAL REF. NO. 179094449000

23. PRIOR AUTHORIZATION NUMBER
49D2137274

| 24. A. DATE(S) OF SERVICE | | | | | | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) | | E. DIAGNOSIS POINTER | F. $ CHARGES | | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID. QUAL. | J. RENDERING PROVIDER ID. # |
| From MM | DD | YY | To MM | DD | YY | | | CPT/HCPCS | MODIFIER | | | | | | | |
| 1 | 01 | 22 | 2020 | 01 | 22 | 2020 | 11 | | 95972 | | ABCD | 87 | 63 | 1 | | NPI | 1942230040 |
| 2 | 01 | 22 | 2020 | 01 | 22 | 2020 | 11 | | 62570 | | ABCD | 10 | 00 | 1 | | NPI | 1942230040 |
| 3 | 01 | 22 | 2020 | 01 | 22 | 2020 | 11 | | 51798 | | ABCD | 29 | 04 | 1 | | NPI | 1942230040 |
| 4 | 01 | 22 | 2020 | 01 | 22 | 2020 | 11 | | 99024 | | ABCD | 0 | 00 | 1 | | NPI | 1942230040 |
| 5 | 01 | 22 | 2020 | 01 | 22 | 2020 | 11 | | 81003 | QW | ABCD | 5 | 00 | 1 | | NPI | 1942230040 |
| 6 | | | | | | | | | | | | | | | | NPI | |

25. FEDERAL TAX I.D. NUMBER  SSN [ ] EIN [X]

26. PATIENT'S ACCOUNT NO.

27. ACCEPT ASSIGNMENT? (For govt. claims, see back)  YES [X] NO [ ]

28. TOTAL CHARGE $ 131 | 67

29. AMOUNT PAID $ 0 | 00

30. Rsvd for NUCC Use

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)
GUERETTE, NATHAN
1942230040
SIGNED  02/26/2021  DATE

32. SERVICE FACILITY LOCATION INFORMATION
DO NOT USE 5
5875 BREMO RD SUITE 701
RICHMOND
VA 23226-1900
a. 1356571616  b. ZZ193400000X

33. BILLING PROVIDER INFO & PH # 804 | 5232533
FEMALE PELVIC MEDICINE INSTITUTE O
5875 BREMO RD SUITE 701
RICHMOND
VA 23226-1900
a. 1356571616  b. ZZ193400000X

NUCC Instruction Manual available at: www.nucc.org  PLEASE PRINT OR TYPE  APPROVED OMB-0938-1197 FORM 1500 (02-12)

**JA116**

# HEALTH INSURANCE CLAIM FORM

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

ANTHEM HEALTHKEEPERS PLUS
PO BOX 27401

RICHMOND VA 23279

| | |
|---|---|
| PICA | PICA |

| 1. | MEDICARE (Medicare#) | MEDICAID [X] (Medicaid#) | TRICARE (ID#/DoD#) | CHAMPVA (Member ID#) | GROUP HEALTH PLAN (ID#) | FECA BLK LUNG (ID#) | OTHER (ID#) | 1a. INSURED'S I.D. NUMBER (For Program in Item 1) |
|---|---|---|---|---|---|---|---|---|

| 2. PATIENT'S NAME (Last Name, First Name, Middle Initial) | 3. PATIENT'S BIRTH DATE | SEX | 4. INSURED'S NAME (Last Name, First Name, Middle Initial) |
|---|---|---|---|
| ROOP, SAMANTHA J | MM DD YY | M ☐ F [X] | ROOP, SAMANTHA J |

| 5. PATIENT'S ADDRESS (No., Street) | 6. PATIENT RELATIONSHIP TO INSURED | 7. INSURED'S ADDRESS (No., Street) |
|---|---|---|
| | Self [X] Spouse ☐ Child ☐ Other ☐ | |

| CITY | STATE | 8. RESERVED FOR NUCC USE | CITY | STATE |
|---|---|---|---|---|
| | | X | | |

| ZIP CODE | TELEPHONE (Include Area Code) | | ZIP CODE | TELEPHONE (Include Area Code) |
|---|---|---|---|---|
| | | | | |

| 9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial) | 10. IS PATIENT'S CONDITION RELATED TO: | 11. INSURED'S POLICY GROUP OR FECA NUMBER |
|---|---|---|

| a. OTHER INSURED'S POLICY OR GROUP NUMBER | a. EMPLOYMENT? (Current or Previous) | a. INSURED'S DATE OF BIRTH | SEX |
|---|---|---|---|
| | YES ☐ NO [X] | MM DD YY | M ☐ F [X] |

| b. RESERVED FOR NUCC USE | b. AUTO ACCIDENT? PLACE (State) | b. OTHER CLAIM ID (Designated by NUCC) |
|---|---|---|
| | YES ☐ NO [X] | |

| c. RESERVED FOR NUCC USE | c. OTHER ACCIDENT? | c. INSURANCE PLAN NAME OR PROGRAM NAME |
|---|---|---|
| | YES ☐ NO [X] | |

| d. INSURANCE PLAN NAME OR PROGRAM NAME | 10d. CLAIM CODES (Designated by NUCC) | d. IS THERE ANOTHER HEALTH BENEFIT PLAN? |
|---|---|---|
| | | YES ☐ NO [X] If yes, complete items 9, 9a, and 9d. |

**READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.**

12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED   Signature on file      DATE   11/16/2020

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED   Signature on file

| 14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP) MM DD YY | QUAL. | 15. OTHER DATE MM DD YY | QUAL. | 16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION MM DD YY FROM TO |
|---|---|---|---|---|

| 17. NAME OF REFERRING PROVIDER or OTHER SOURCE | 17a. | | 18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES MM DD YY |
|---|---|---|---|
| DN JOSEPH, SHARON | 17b. NPI 1659484525 | | FROM TO |

| 19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC) | 20. OUTSIDE LAB? $ CHARGES |
|---|---|
| | YES ☐ NO [X]   0  00 |

| 21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY. Relate A-L to service line below (24E) | ICD Ind. | 0 | 22. RESUBMISSION CODE | ORIGINAL REF. NO. |
|---|---|---|---|---|
| a. LN3281  b. LN8110  c. LR102  d. R339 | | | 7 | 180473488400 |
| e. LN3011  f.  g.  h. | | | 23. PRIOR AUTHORIZATION NUMBER | |
| i.  j.  k.  l. | | | 49D2137274 | |

| 24. A. DATE(S) OF SERVICE From | | To | | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS | MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID QUAL. | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MM | DD | YY | MM | DD | YY | | | | | | | | | | |
| 1 | 02 | 19 | 2020 | 02 | 19 | 2020 | 11 | | 95972 | | A B C D | 87 | 63 | 1 | | NPI | 1942230040 |
| 2 | 02 | 19 | 2020 | 02 | 19 | 2020 | 11 | | 82570 | QW | A B C D | 10 | 00 | 1 | | NPI | 1942230040 |
| 3 | 02 | 19 | 2020 | 02 | 19 | 2020 | 11 | | 51798 | | A B C D | 29 | 04 | 1 | | NPI | 1942230040 |
| 4 | 02 | 19 | 2020 | 02 | 19 | 2020 | 11 | | 99024 | | A B C D | 0 | 00 | 1 | | NPI | 1942230040 |
| 5 | 02 | 19 | 2020 | 02 | 19 | 2020 | 11 | | 81003 | QW | A B C D | 0 | 00 | 1 | | NPI | 1942230040 |
| 6 | | | | | | | | | | | | | | | | NPI | |

| 25. FEDERAL TAX I.D. NUMBER SSN EIN | 26. PATIENT'S ACCOUNT NO. | 27. ACCEPT ASSIGNMENT? | 28. TOTAL CHARGE | 29. AMOUNT PAID | 30. Rsvd for NUCC Use |
|---|---|---|---|---|---|
| [X] | | YES [X] NO ☐ | $ 131  67 | $ 0  00 | |

| 31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.) | 32. SERVICE FACILITY LOCATION INFORMATION | 33. BILLING PROVIDER INFO & PH #  804  5232533 |
|---|---|---|
| GUERETTE, NATHAN 1942230040 | DO NOT USE 5 5875 BREMO RD SUITE 701 RICHMOND VA 23226-1900 | FEMALE PELVIC MEDICINE INSTITUTE O 5875 BREMO RD SUITE 701 RICHMOND VA 232261900 |
| SIGNED   11/16/2020 DATE | a. 1356571616   b. | a. 1356571616   b. ZZ193400000X |

NUCC Instruction Manual available at: www.nucc.org      **PLEASE PRINT OR TYPE**      APPROVED OMB-0938-1197 FORM 1500 (02-12)

**JA117**

# HEALTH INSURANCE CLAIM FORM

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

ANTHEM HEALTHKEEPERS PLUS
PO BOX 27401

RICHMOND VA 23279

PICA

| 1. MEDICARE | MEDICAID | TRICARE | CHAMPVA | GROUP HEALTH PLAN | FECA BLK LUNG | OTHER | 1a. INSURED'S I.D. NUMBER (For Program in item 1) |
|---|---|---|---|---|---|---|---|
| (Medicare#) | [X] (Medicaid#) | (ID#/DoD#) | (Member ID#) | (ID#) | (ID#) | (ID#) | |

| 2. PATIENT'S NAME (Last Name, First Name, Middle Initial) | 3. PATIENT'S BIRTH DATE | SEX | 4. INSURED'S NAME (Last Name, First Name, Middle Initial) |
|---|---|---|---|
| ROOP, SAMANTHA J | | M | F [X] | ROOP, SAMANTHA J |

| 5. PATIENT'S ADDRESS (No., Street) | 6. PATIENT RELATIONSHIP TO INSURED | 7. INSURED'S ADDRESS (No., Street) |
|---|---|---|
| | Self [X] Spouse Child Other | |

| CITY | STATE | 8. RESERVED FOR NUCC USE | CITY | STATE |
|---|---|---|---|---|

| ZIP CODE | TELEPHONE (Include Area Code) | | ZIP CODE | TELEPHONE (Include Area Code) |
|---|---|---|---|---|

| 9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial) | 10. IS PATIENT'S CONDITION RELATED TO: | 11. INSURED'S POLICY GROUP OR FECA NUMBER |
|---|---|---|

| a. OTHER INSURED'S POLICY OR GROUP NUMBER | a. EMPLOYMENT? (Current or Previous) YES [X] NO | a. INSURED'S DATE OF BIRTH    M    F [X] |
|---|---|---|

| b. RESERVED FOR NUCC USE | b. AUTO ACCIDENT? YES [X] NO  PLACE (State) | b. OTHER CLAIM ID (Designated by NUCC) |
|---|---|---|

| c. RESERVED FOR NUCC USE | c. OTHER ACCIDENT? YES [X] NO | c. INSURANCE PLAN NAME OR PROGRAM NAME |
|---|---|---|

| d. INSURANCE PLAN NAME OR PROGRAM NAME | 10d. CLAIM CODES (Designated by NUCC) | d. IS THERE ANOTHER HEALTH BENEFIT PLAN? YES [X] NO  If yes, complete items 9, 9a, and 9d. |
|---|---|---|

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.
12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED  Signature on file    DATE  02|26|2021

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED  Signature on file

| 14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP) QUAL. | 15. OTHER DATE QUAL. MM DD YY | 16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION FROM    TO |
|---|---|---|

| 17. NAME OF REFERRING PROVIDER OR OTHER SOURCE | 17a. | 18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES FROM    TO |
|---|---|---|
| DN  JOSEPH, SHARON | 17b. NPI 1659484525 | |

| 19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC) | 20. OUTSIDE LAB? YES NO  $ CHARGES  0  00 |
|---|---|

| 21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY  Relate A-L to service line below (24E)  ICD Ind 0 | 22. RESUBMISSION CODE    ORIGINAL REF. NO. |
|---|---|
| A. LN3281  B. LR102  C. LR339  D. N3011 | |
| E. LN813  F.  G.  H. | 23. PRIOR AUTHORIZATION NUMBER |
| I.  J.  K.  L. | 49D2107215 |

| 24. A. DATE(S) OF SERVICE From To | | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS    MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID. QUAL | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 12 04 2020 | 12 04 2020 | 11 | | 51798 | | A B C D | 29 | 04 | | NPI | 1942230040 |
| 2 | 12 04 2020 | 12 04 2020 | 11 | | 81002  QW | | A B C D | 5 | 00 | | NPI | 1942230040 |
| 3 | 12 04 2020 | 12 04 2020 | 11 | | 82570  QW | | A B C D | 10 | 00 | | NPI | 1942230040 |
| 4 | 12 04 2020 | 12 04 2020 | 11 | | 95972 | | A B C D | 87 | 63 | | NPI | 1942230040 |
| 5 | 12 04 2020 | 12 04 2020 | 11 | | 99211  25 | | A B C D | 161 | 24 | | NPI | 1942230040 |
| 6 | | | | | | | | | | | NPI | |

| 25. FEDERAL TAX I.D. NUMBER    SSN EIN [X] | 26. PATIENT'S ACCOUNT NO. | 27. ACCEPT ASSIGNMENT? YES [X] NO | 28. TOTAL CHARGE $ 292  91 | 29. AMOUNT PAID $ 0  00 | 30. Rsvd for NUCC Use |
|---|---|---|---|---|---|

| 31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.) GUERETTE, NATHAN  1942230040  SIGNED  02|26|2021  DATE | 32. SERVICE FACILITY LOCATION INFORMATION POLO PARKWAY 2931 POLO PARKWAY MIDLOTHIAN VA 231131453  a. 1356571616  b. | 33. BILLING PROVIDER INFO & PH # ( 804 ) 5232533 FEMALE PELVIC MEDICINE INSTITUTE O 5875 BREMO RD SUITE 701 RICHMOND VA 232261900  a. 1356571616  b. ZZ193400000X |
|---|---|---|

NUCC Instruction Manual available at: www.nucc.org    PLEASE PRINT OR TYPE    APPROVED OMB-0938-1197 FORM 1500 (02-12)

JA118

# HEALTH INSURANCE CLAIM FORM

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

ANTHEM HEALTHKEEPERS PLUS
PO BOX 27401

RICHMOND VA 23279

| | | | PICA | | | | | | PICA |
|---|---|---|---|---|---|---|---|---|---|

| 1. MEDICARE ☐ (Medicare#) MEDICAID ☒ (Medicaid#) TRICARE ☐ (ID#/DoD#) CHAMPVA ☐ (Member ID#) GROUP HEALTH PLAN ☐ (ID#) FECA BLK LUNG ☐ (ID#) OTHER ☐ (ID#) | 1a. INSURED'S I.D. NUMBER ▓▓▓▓▓ (For Program in Item 1) |
|---|---|

| 2. PATIENT'S NAME (Last Name, First Name, Middle Initial) ROOP, SAMANTHA J | 3. PATIENT'S BIRTH DATE MM DD YY SEX M ☐ F ☒ | 4. INSURED'S NAME (Last Name, First Name, Middle Initial) ROOP, SAMANTHA J |
|---|---|---|

| 5. PATIENT'S ADDRESS (No., Street) | 6. PATIENT RELATIONSHIP TO INSURED Self ☒ Spouse ☐ Child ☐ Other ☐ | 7. INSURED'S ADDRESS (No., Street) |
|---|---|---|

| CITY | STATE | 8. RESERVED FOR NUCC USE | CITY | STATE |
|---|---|---|---|---|

| ZIP CODE | TELEPHONE (Include Area Code) | | ZIP CODE | TELEPHONE (Include Area Code) |
|---|---|---|---|---|

| 9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial) | 10. IS PATIENT'S CONDITION RELATED TO: | 11. INSURED'S POLICY GROUP OR FECA NUMBER |
|---|---|---|

| a. OTHER INSURED'S POLICY OR GROUP NUMBER | a. EMPLOYMENT? (Current or Previous) ☐ YES ☒ NO | a. INSURED'S DATE OF BIRTH ▓▓▓ MM DD YY SEX M ☐ F ☒ |
|---|---|---|

| b. RESERVED FOR NUCC USE | b. AUTO ACCIDENT? ☐ YES ☒ NO PLACE (State) | b. OTHER CLAIM ID (Designated by NUCC) |
|---|---|---|

| c. RESERVED FOR NUCC USE | c. OTHER ACCIDENT? ☐ YES ☒ NO | c. INSURANCE PLAN NAME OR PROGRAM NAME |
|---|---|---|

| d. INSURANCE PLAN NAME OR PROGRAM NAME | 10d. CLAIM CODES (Designated by NUCC) | d. IS THERE ANOTHER HEALTH BENEFIT PLAN? ☐ YES ☒ NO If yes, complete items 9, 9a, and 9d. |
|---|---|---|

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.

12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED Signature on file     DATE 02/26/2021

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED Signature on file

| 14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP) MM DD YY QUAL. | 15. OTHER DATE MM DD YY QUAL. | 16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION MM DD YY MM DD YY FROM TO |
|---|---|---|

| 17. NAME OF REFERRING PROVIDER OR OTHER SOURCE DN JOSEPH, SHARON | 17a. 17b. NPI 1659484525 | 18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES MM DD YY MM DD YY FROM TO |
|---|---|---|

| 19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC) | 20. OUTSIDE LAB? ☐ YES ☒ NO $ CHARGES 0 00 |
|---|---|

| 21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY Relate A-L to service line below (24E) ICD Ind. 0 A. N3281 B. N8110 C. R102 D. R339 E. N3011 F. G. H. I. J. K. L. | 22. RESUBMISSION CODE ORIGINAL REF. NO. |
|---|---|
| | 23. PRIOR AUTHORIZATION NUMBER 49D2107215 |

| | 24. A. DATE(S) OF SERVICE From MM DD YY To MM DD YY | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS | MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID. QUAL. | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 12 15 2020 12 15 2020 | 11 | | 51798 | | A B C D | 29 04 | 1 | | NPI | 1942230040 |
| 2 | 12 15 2020 12 15 2020 | 11 | | 81000 | QW | A B C D | 5 00 | 1 | | NPI | 1942230040 |
| 3 | 12 15 2020 12 15 2020 | 11 | | 82570 | QW | A B C D | 10 00 | 1 | | NPI | 1942230040 |
| 4 | 12 15 2020 12 15 2020 | 11 | | 95972 | | A B C D | 87 63 | 1 | | NPI | 1942230040 |
| 5 | 12 15 2020 12 15 2020 | 11 | | 99214 | 25 | A B C D | 161 24 | 1 | | NPI | 1942230040 |
| 6 | | | | | | | | | | NPI | |

| 25. FEDERAL TAX I.D. NUMBER ▓▓▓▓▓ SSN ☐ EIN ☒ | 26. PATIENT'S ACCOUNT NO. | 27. ACCEPT ASSIGNMENT? ☒ YES ☐ NO | 28. TOTAL CHARGE $ 292 91 | 29. AMOUNT PAID $ 00 | 30. Rsvd for NUCC Use |
|---|---|---|---|---|---|

| 31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.) GUERETTE, NATHAN 1942230040 SIGNED 02/26/2021 DATE | 32. SERVICE FACILITY LOCATION INFORMATION POLO PARKWAY 2931 POLO PARKWAY MIDLOTHIAN VA 231131453 a. 1356571616 b. | 33. BILLING PROVIDER INFO & PH # ( 804 ) 5232533 FEMALE PELVIC MEDICINE INSTITUTE O 5875 BREMO RD SUITE 701 RICHMOND VA 232281900 a. 1356571616 b. ZZ193400000X |
|---|---|---|

NUCC Instruction Manual available at: www.nucc.org     PLEASE PRINT OR TYPE     APPROVED OMB-0938-1197 FORM 1500 (02-12)

**JA119**

# HEALTH INSURANCE CLAIM FORM

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

**ANTHEM HEALTHKEEPERS PLUS**
PO BOX 27401

RICHMOND VA 23279

PICA

| | |
|---|---|
| 1. MEDICARE ☐ MEDICAID ☒ TRICARE ☐ CHAMPVA ☐ GROUP HEALTH PLAN ☐ FECA BLK LUNG ☐ OTHER ☐ | 1a. INSURED'S I.D. NUMBER (For Program in Item 1) |
| 2. PATIENT'S NAME (Last Name, First Name, Middle Initial) ROOP, SAMANTHA J | 3. PATIENT'S BIRTH DATE SEX M☐ F☒ | 4. INSURED'S NAME (Last Name, First Name, Middle Initial) ROOP, SAMANTHA J |

5. PATIENT'S ADDRESS (No., Street)

6. PATIENT RELATIONSHIP TO INSURED: Self ☒ Spouse ☐ Child ☐ Other ☐

7. INSURED'S ADDRESS (No., Street)

CITY / STATE

8. RESERVED FOR NUCC USE

CITY / STATE

ZIP CODE / TELEPHONE (Include Area Code)

ZIP CODE / TELEPHONE (Include Area Code)

9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)

10. IS PATIENT'S CONDITION RELATED TO:

11. INSURED'S POLICY GROUP OR FECA NUMBER

a. OTHER INSURED'S POLICY OR GROUP NUMBER

a. EMPLOYMENT? (Current or Previous) YES☐ NO☒

a. INSURED'S DATE OF BIRTH SEX M☐ F☒

b. RESERVED FOR NUCC USE

b. AUTO ACCIDENT? YES☐ NO☒ PLACE (State)

b. OTHER CLAIM ID (Designated by NUCC)

c. RESERVED FOR NUCC USE

c. OTHER ACCIDENT? YES☐ NO☒

c. INSURANCE PLAN NAME OR PROGRAM NAME

d. INSURANCE PLAN NAME OR PROGRAM NAME

10d. CLAIM CODES (Designated by NUCC)

d. IS THERE ANOTHER HEALTH BENEFIT PLAN? YES☐ NO☒ If yes, complete items 9, 9a, and 9d.

12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE
SIGNED Signature on file   DATE 02/26/2021

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE
SIGNED Signature on file

14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP)

15. OTHER DATE

16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION

17. NAME OF REFERRING PROVIDER OR OTHER SOURCE DN JOSEPH, SHARON
17b. NPI 1659484525

18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES

19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC)

20. OUTSIDE LAB? YES☐ NO☐ $ CHARGES 0 00

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY ICD Ind. 0
A. N3281   B. R102   C. R339   D. N3011
E. N813   F.   G.   H.

22. RESUBMISSION CODE / ORIGINAL REF. NO.

23. PRIOR AUTHORIZATION NUMBER 49D2107215

| # | DATE(S) OF SERVICE From MM DD YY | To MM DD YY | PLACE OF SERVICE | EMG | CPT/HCPCS | MODIFIER | DIAGNOSIS POINTER | $ CHARGES | DAYS OR UNITS | EPSDT Family Plan | ID QUAL | RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 01 05 2021 | 01 05 2021 | 11 | | 51798 | | A B C D | 29 04 | 1 | | NPI | 1942230040 |
| 2 | 01 05 2021 | 01 05 2021 | 11 | | 81003 | QW | A B C D | 5 00 | 1 | | NPI | 1942230040 |
| 3 | 01 05 2021 | 01 05 2021 | 11 | | 82570 | QW | A B C D | 10 00 | 1 | | NPI | 1942230040 |
| 4 | 01 05 2021 | 01 05 2021 | 11 | | 95972 | | A B C D | 87 63 | 1 | | NPI | 1942230040 |
| 5 | 01 05 2021 | 01 05 2021 | 11 | | 99214 | 25 | A B C D | 161 24 | 1 | | NPI | 1942230040 |
| 6 | | | | | | | | | | | NPI | |

25. FEDERAL TAX I.D. NUMBER SSN☐ EIN☒

26. PATIENT'S ACCOUNT NO.

27. ACCEPT ASSIGNMENT? YES☒ NO☐

28. TOTAL CHARGE $ 292 91

29. AMOUNT PAID $ 0 00

30. Rsvd for NUCC Use

31. SIGNATURE OF PHYSICIAN OR SUPPLIER
GUERETTE, NATHAN 1942230040
SIGNED 02/26/2021

32. SERVICE FACILITY LOCATION INFORMATION
POLO PARKWAY
2931 POLO PARKWAY
MIDLOTHIAN VA 231131453
a. 1356571616

33. BILLING PROVIDER INFO & PH # (804) 5232533
FEMALE PELVIC MEDICINE INSTITUTE O
5875 BREMO RD SUITE 701
RICHMOND VA 232261900
a. 1356571616   b. ZZ193400000X

NUCC Instruction Manual available at: www.nucc.org   PLEASE PRINT OR TYPE   APPROVED OMB-0938-1197 FORM 1500 (02-12)

**JA120**

# HEALTH INSURANCE CLAIM FORM

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

ANTHEM HEALTHKEEPERS PLUS
PO BOX 27401

RICHMOND VA 23279

**CARRIER**

PICA | | | PICA

| 1. MEDICARE | MEDICAID | TRICARE | CHAMPVA | GROUP HEALTH PLAN | FECA BLK LUNG | OTHER | 1a. INSURED'S I.D. NUMBER | (For Program in Item 1) |
|---|---|---|---|---|---|---|---|---|
| (Medicare#) | ☒ (Medicaid#) | (ID#/DoD#) | (Member ID#) | (ID#) | (ID#) | (ID#) | | |

2. PATIENT'S NAME (Last Name, First Name, Middle Initial)
ROOP, SAMANTHA J

3. PATIENT'S BIRTH DATE / SEX
M ☐  F ☒

4. INSURED'S NAME (Last Name, First Name, Middle Initial)
ROOP, SAMANTHA J

5. PATIENT'S ADDRESS (No., Street)

6. PATIENT RELATIONSHIP TO INSURED
Self ☒  Spouse ☐  Child ☐  Other ☐

7. INSURED'S ADDRESS (No., Street)

CITY | STATE

8. RESERVED FOR NUCC USE

CITY | STATE

ZIP CODE | TELEPHONE (Include Area Code)

ZIP CODE | TELEPHONE (Include Area Code)

9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)

10. IS PATIENT'S CONDITION RELATED TO:

11. INSURED'S POLICY GROUP OR FECA NUMBER

a. OTHER INSURED'S POLICY OR GROUP NUMBER

a. EMPLOYMENT? (Current or Previous)
☐ YES  ☒ NO

a. INSURED'S DATE OF BIRTH / SEX
M ☐  F ☒

b. RESERVED FOR NUCC USE

b. AUTO ACCIDENT?   PLACE (State)
☐ YES  ☒ NO

b. OTHER CLAIM ID (Designated by NUCC)

c. RESERVED FOR NUCC USE

c. OTHER ACCIDENT?
☐ YES  ☒ NO

c. INSURANCE PLAN NAME OR PROGRAM

d. INSURANCE PLAN NAME OR PROGRAM NAME

10d. CLAIM CODES (Designated by NUCC)

d. IS THERE ANOTHER HEALTH BENEFIT PLAN?
☐ YES  ☒ NO   If yes, complete items 9, 9a, and 9d.

**READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.**
12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE  I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED  Signature on file   DATE  02|26|2021

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE  I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED  Signature on file

14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP)   QUAL.

15. OTHER DATE   QUAL.   MM DD YY

16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION
FROM   TO

17. NAME OF REFERRING PROVIDER OR OTHER SOURCE
DN  JOSEPH, SHARON

17a. 
17b. NPI  1659484525

18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES
FROM   TO

19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC)

20. OUTSIDE LAB?   $ CHARGES
☐ YES  ☐ NO   0 | 00

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY Relate A-L to service line below (24E)   ICD Ind. 0

A. R150   B. R102   C. R339   D. R32
E.   F.   G.   H.
I.   J.   K.   L.

22. RESUBMISSION
CODE   ORIGINAL REF. NO.

23. PRIOR AUTHORIZATION NUMBER
49D2107215

| 24. A. DATE(S) OF SERVICE From / To | | | | | | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS / MODIFIER | | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID QUAL. | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MM | DD | YY | MM | DD | YY | | | | | | | | | | |
| 01 | 11 | 2021 | 01 | 11 | 2021 | 11 | | 51729 | | A B C D | 513 32 | 1 | | NPI | 1942230040 |
| 01 | 11 | 2021 | 01 | 11 | 2021 | 11 | | 51784 | 59 | A B C D | 215 00 | 1 | | NPI | 1942230040 |
| 01 | 11 | 2021 | 01 | 11 | 2021 | 11 | | 51797 | | A B C D | 168 83 | 1 | | NPI | 1942230040 |
| 01 | 11 | 2021 | 01 | 11 | 2021 | 11 | | 51741 | | A B C D | 23 87 | 1 | | NPI | 1942230040 |
| 01 | 11 | 2021 | 01 | 11 | 2021 | 11 | | 91120 | | A B C D | 637 11 | 1 | | NPI | 1942230040 |
| 01 | 11 | 2021 | 01 | 11 | 2021 | 11 | | 91122 | | A B C D | 343 55 | 1 | | NPI | 1942230040 |

25. FEDERAL TAX I.D. NUMBER   SSN  EIN ☒

26. PATIENT'S ACCOUNT NO.

27. ACCEPT ASSIGNMENT?
☒ YES  ☐ NO

28. TOTAL CHARGE
$ 1901 68

29. AMOUNT PAID
$ 0 00

30. Rsvd for NUCC Use

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)
GUERETTE, NATHAN
1942230040

SIGNED  02/26/2021   DATE

32. SERVICE FACILITY LOCATION INFORMATION
POLO PARKWAY
2931 POLO PARKWAY
MIDLOTHIAN
VA 231131453

a. 1356571616   b.

33. BILLING PROVIDER INFO & PH #  (804) 5232533
FEMALE PELVIC MEDICINE INSTITUTE
5975 BREMO RD SUITE 701
RICHMOND
VA 232261900

a. 1356571616   b. ZZ193400000X

NUCC Instruction Manual available at: www.nucc.org   **PLEASE PRINT OR TYPE**   APPROVED OMB-0938-1197 FORM 1500 (02-12)

**JA121**

**HEALTH INSURANCE CLAIM FORM**

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

ANTHEM HEALTHKEEPERS PLUS
PO BOX 27401

RICHMOND VA 23279

| | | | | PICA |
|---|---|---|---|---|

☐ PICA

1. ☐ MEDICARE (Medicare#) ☐ MEDICAID [X] (Medicaid#) ☐ TRICARE (ID#/DoD#) ☐ CHAMPVA (Member ID#) ☐ GROUP HEALTH PLAN (ID#) ☐ FECA BLK LUNG (ID#) ☐ OTHER (ID#)  1a. INSURED'S I.D. NUMBER (For Program in Item 1)

2. PATIENT'S NAME (Last Name, First Name, Middle Initial)
ROOP, SAMANTHA J

3. PATIENT'S BIRTH DATE | SEX  M ☐  F [X]

4. INSURED'S NAME (Last Name, First Name, Middle Initial)
ROOP, SAMANTHA J

5. PATIENT'S ADDRESS (No., Street)

6. PATIENT RELATIONSHIP TO INSURED  Self [X]  Spouse ☐  Child ☐  Other ☐

7. INSURED'S ADDRESS (No., Street)

CITY | STATE VA

8. RESERVED FOR NUCC USE

CITY | STATE

ZIP CODE | TELEPHONE (Include Area Code)

ZIP CODE | TELEPHONE (Include Area Code)

9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)

10. IS PATIENT'S CONDITION RELATED TO:

11. INSURED'S POLICY GROUP OR FECA NUMBER

a. OTHER INSURED'S POLICY OR GROUP NUMBER

a. EMPLOYMENT? (Current or Previous)  ☐ YES  [X] NO

a. INSURED'S DATE OF BIRTH | SEX  M ☐  F [X]

b. RESERVED FOR NUCC USE

b. AUTO ACCIDENT?  ☐ YES  [X] NO  PLACE (State)

b. OTHER CLAIM ID (Designated by NUCC)

c. RESERVED FOR NUCC USE

c. OTHER ACCIDENT?  ☐ YES  [X] NO

c. INSURANCE PLAN NAME OR PROGRAM NAME

d. INSURANCE PLAN NAME OR PROGRAM NAME

10d. CLAIM CODES (Designated by NUCC)

d. IS THERE ANOTHER HEALTH BENEFIT PLAN?  ☐ YES  [X] NO  If yes, complete items 9, 9a, and 9d.

**READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.**
12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.
SIGNED   Signature on file   DATE   02/26/2021

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.
SIGNED   Signature on file

14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP)  QUAL.

15. OTHER DATE  QUAL.  MM DD YY

16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION  FROM   TO

17. NAME OF REFERRING PROVIDER OR OTHER SOURCE
DN  JOSEPH, SHARON

17a.
17b. NPI  1659484525

18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES  FROM   TO

19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC)

20. OUTSIDE LAB?  ☐ YES  ☐ NO  $ CHARGES  0   00

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY  Relate A-L to service line below (24E)  ICD Ind. 0
A. LN3281   B. N8110   C. LR102   D. R339
E. N3011   F. N393   G.   H.
I.   J.   K.   L.

22. RESUBMISSION CODE   ORIGINAL REF. NO.

23. PRIOR AUTHORIZATION NUMBER
49D2107215

| 24. A. DATE(S) OF SERVICE From MM DD YY | To MM DD YY | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS | MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID. QUAL. | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 01 12 2021 | 01 12 2021 | 11 | | 81003 | QW | A B C D | 5 00 | 1 | | NPI | 1942230040 |
| 2 | 01 12 2021 | 01 12 2021 | 11 | | 82570 | QW | A B C D | 10 00 | 1 | | NPI | 1942230040 |
| 3 | 01 12 2021 | 01 12 2021 | 11 | | 99214 | 25 | A B C D | 161 24 | 1 | | NPI | 1942230040 |
| 4 | 01 12 2021 | 01 12 2021 | 11 | | 52285 | | A B C D | 424 49 | 1 | | NPI | 1942230040 |
| 5 | | | | | | | | | | | NPI | |
| 6 | | | | | | | | | | | NPI | |

25. FEDERAL TAX I.D. NUMBER  SSN ☐ EIN [X]

26. PATIENT'S ACCOUNT NO.

27. ACCEPT ASSIGNMENT? For govt. claims, see back.  [X] YES  ☐ NO

28. TOTAL CHARGE  $ 600   73

29. AMOUNT PAID  $ 0   00

30. Rsvd for NUCC Use

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)
GUERETTE, NATHAN
1942230040
SIGNED   02/26/2021   DATE

32. SERVICE FACILITY LOCATION INFORMATION
POLO PARKWAY
2931 POLO PARKWAY
MIDLOTHIAN
VA 231131453
a. 1356571616   b.

33. BILLING PROVIDER INFO & PH #  (804) 5232533
FEMALE PELVIC MEDICINE INSTITUTE/O
5875 BREMO RD SUITE 701
RICHMOND
VA 232261900
a. 1356571616   b. ZZ193400000X

NUCC Instruction Manual available at: www.nucc.org   **PLEASE PRINT OR TYPE**   APPROVED OMB-0938-1197 FORM 1500 (02-12)

**HEALTH INSURANCE CLAIM FORM**

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

ANTHEM HEALTHKEEPERS PLUS
PO BOX 27401

RICHMOND VA 23279

| | | |
|---|---|---|
| PICA | | PICA |

| 1. | MEDICARE | MEDICAID | TRICARE | CHAMPVA | GROUP HEALTH PLAN | FECA BLK LUNG | OTHER | 1a. INSURED'S I.D. NUMBER (For Program in Item 1) |
|---|---|---|---|---|---|---|---|---|
| | (Medicare#) | [X] (Medicaid#) | (ID#/DoD#) | (Member ID#) | (ID#) | (ID#) | (ID#) | |

2. PATIENT'S NAME (Last Name, First Name, Middle Initial)
ROOP, SAMANTHA J

3. PATIENT'S BIRTH DATE   SEX  M [ ]  F [X]

4. INSURED'S NAME (Last Name, First Name, Middle Initial)
ROOP, SAMANTHA J

5. PATIENT'S ADDRESS (No., Street)

6. PATIENT RELATIONSHIP TO INSURED
Self [X]  Spouse [ ]  Child [ ]  Other [ ]

7. INSURED'S ADDRESS (No., Street)

CITY                    STATE

8. RESERVED FOR NUCC USE

CITY                    STATE

ZIP CODE      TELEPHONE (Include Area Code)

ZIP CODE      TELEPHONE (Include Area Code)

9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)

10. IS PATIENT'S CONDITION RELATED TO:

11. INSURED'S POLICY GROUP OR FECA NUMBER

a. OTHER INSURED'S POLICY OR GROUP NUMBER

a. EMPLOYMENT? (Current or Previous)
YES [ ]  NO [X]

a. INSURED'S DATE OF BIRTH   SEX  M [ ]  F [X]

b. RESERVED FOR NUCC USE

b. AUTO ACCIDENT?
YES [ ]  NO [X]   PLACE (State)

b. OTHER CLAIM ID (Designated by NUCC)

c. RESERVED FOR NUCC USE

c. OTHER ACCIDENT?
YES [ ]  NO [X]

c. INSURANCE PLAN NAME OR PROGRAM NAME

d. INSURANCE PLAN NAME OR PROGRAM NAME

10d. CLAIM CODES (Designated by NUCC)

d. IS THERE ANOTHER HEALTH BENEFIT PLAN?
YES [ ]  NO [X]   If yes, complete items 9, 9a, and 9d.

**READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.**
12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE  I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.
SIGNED  Signature on file   DATE  02/26/2021

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE  I authorize payment of medical benefits to the undersigned physician or supplier for services described below.
SIGNED  Signature on file

14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP)   QUAL.

15. OTHER DATE  QUAL.   MM  DD  YY

16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION
FROM        TO

17. NAME OF REFERRING PROVIDER OR OTHER SOURCE
DN  JOSEPH, SHARON
17a.
17b. NPI  1659484525

18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES
FROM        TO

19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC)

20. OUTSIDE LAB?  YES [ ]  NO [ ]   $ CHARGES  0  00

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY  Relate A-L to service line below (24E)  ICD Ind  D
A. LN813   B.   C.   D.
E.   F.   G.   H.

22. RESUBMISSION CODE   ORIGINAL REF. NO.

23. PRIOR AUTHORIZATION NUMBER
49D2107215

| 24. A. DATE(S) OF SERVICE | | | | | | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) | | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID. QUAL. | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | From MM DD YY | | To MM DD YY | | | | | CPT/HCPCS | MODIFIER | | | | | | |
| 1 | 01 27 2021 | | 01 27 2021 | | | 11 | | 99214 | | A | 161 | 24 | 1 | NPI | 1942230040 |
| 2 | | | | | | | | | | | | | | NPI | |
| 3 | | | | | | | | | | | | | | NPI | |
| 4 | | | | | | | | | | | | | | NPI | |
| 5 | | | | | | | | | | | | | | NPI | |
| 6 | | | | | | | | | | | | | | NPI | |

25. FEDERAL TAX I.D. NUMBER   SSN EIN [X]

26. PATIENT'S ACCOUNT NO.

27. ACCEPT ASSIGNMENT? (For govt. claims, see back)  YES [X]  NO [ ]

28. TOTAL CHARGE  $ 161  24

29. AMOUNT PAID  $ 0  00

30. Rsvd for NUCC Use

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)
GUERETTE, NATHAN
1942230040
SIGNED         DATE  02/26/2021

32. SERVICE FACILITY LOCATION INFORMATION
POLO PARKWAY
2931 POLO PARKWAY
MIDLOTHIAN
VA 23113453
a. 1356571616   b.

33. BILLING PROVIDER INFO & PH #  ( 804 ) 5232533
FEMALE PELVIC MEDICINE INSTITUTE O
5875 BREMO RD SUITE 701
RICHMOND
VA 232261900
a. 1356571616   b. ZZ193400000X

NUCC Instruction Manual available at: www.nucc.org   **PLEASE PRINT OR TYPE**   APPROVED OMB-0938-1197 FORM 1500 (02-12)

# HEALTH INSURANCE CLAIM FORM

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

ANTHEM HEALTHKEEPERS PLUS
PO BOX 27401

RICHMOND VA 23279

| | | | | |
|---|---|---|---|---|
| PICA | | | | PICA |

**1.** MEDICARE ☐ (Medicare#)   MEDICAID ☒ (Medicaid#)   TRICARE ☐ (ID#/DoD#)   CHAMPVA ☐ (Member ID#)   GROUP HEALTH PLAN ☐ (ID#)   FECA BLK LUNG ☐ (ID#)   OTHER ☐ (ID#)   **1a. INSURED'S I.D. NUMBER** (For Program in Item 1)

**2. PATIENT'S NAME** (Last Name, First Name, Middle Initial)
ROOP, SAMANTHA J

**3. PATIENT'S BIRTH DATE**   **SEX** M ☐ F ☒

**4. INSURED'S NAME** (Last Name, First Name, Middle Initial)
ROOP, SAMANTHA J

**5. PATIENT'S ADDRESS** (No., Street)

**6. PATIENT RELATIONSHIP TO INSURED** Self ☒ Spouse ☐ Child ☐ Other ☐

**7. INSURED'S ADDRESS** (No., Street)

CITY        STATE
**8. RESERVED FOR NUCC USE**
CITY        STATE

ZIP CODE     TELEPHONE (Include Area Code)

ZIP CODE     TELEPHONE (Include Area Code)

**9. OTHER INSURED'S NAME** (Last Name, First Name, Middle Initial)

**10. IS PATIENT'S CONDITION RELATED TO:**

**11. INSURED'S POLICY GROUP OR FECA NUMBER**

**a. OTHER INSURED'S POLICY OR GROUP NUMBER**

**a. EMPLOYMENT?** (Current or Previous) YES ☐ NO ☒

**a. INSURED'S DATE OF BIRTH**   **SEX** M ☐ F ☒

**b. RESERVED FOR NUCC USE**

**b. AUTO ACCIDENT?** YES ☐ NO ☒   PLACE (State)

**b. OTHER CLAIM ID** (Designated by NUCC)

**c. RESERVED FOR NUCC USE**

**c. OTHER ACCIDENT?** YES ☐ NO ☒

**c. INSURANCE PLAN NAME OR PROGRAM NAME**

**d. INSURANCE PLAN NAME OR PROGRAM NAME**

**10d. CLAIM CODES** (Designated by NUCC)

**d. IS THERE ANOTHER HEALTH BENEFIT PLAN?** YES ☐ NO ☒   If yes, complete items 9, 9a, and 9d.

**READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.**
**12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE** I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED   Signature on file   DATE   03/25/2021

**13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE** I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED   Signature on file

**14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP)**   QUAL.

**15. OTHER DATE** QUAL.   MM DD YY

**16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION** FROM   TO

**17. NAME OF REFERRING PROVIDER OR OTHER SOURCE**
DN   JOSEPH, SHARON

**17a.**
**17b.** NPI 1659484525

**18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES** FROM   TO

**19. ADDITIONAL CLAIM INFORMATION** (Designated by NUCC)

**20. OUTSIDE LAB?** YES ☐ NO ☐   $ CHARGES   0   00

**21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY** Relate A-L to service line below (24E)   ICD Ind. 0

A. LR339   B.   C.   D.
E.   F.   G.   H.
I.   J.   K.   L.

**22. RESUBMISSION CODE**   ORIGINAL REF. NO.

**23. PRIOR AUTHORIZATION NUMBER**
49D2107215

| 24. A. DATE(S) OF SERVICE From MM DD YY | To MM DD YY | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS | MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID QUAL. | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 02 19 2021 02 19 2021 | 11 | | 51700 | | A | 109 | 86 | 1 | | NPI | 1942230040 |
| 2 | | | | | | | | | | | NPI | |
| 3 | | | | | | | | | | | NPI | |
| 4 | | | | | | | | | | | NPI | |
| 5 | | | | | | | | | | | NPI | |
| 6 | | | | | | | | | | | NPI | |

**25. FEDERAL TAX I.D. NUMBER**   SSN ☐ EIN ☒

**26. PATIENT'S ACCOUNT NO.**

**27. ACCEPT ASSIGNMENT?** (For govt. claims, see back) YES ☒ NO ☐

**28. TOTAL CHARGE**   $ 109   86

**29. AMOUNT PAID**   $ 0   00

**30. Rsvd for NUCC Use**

**31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS** (I certify that the statements on the reverse apply to this bill and are made a part thereof.)
GUERETTE, NATHAN
1942230040
SIGNED   03/25/2021   DATE

**32. SERVICE FACILITY LOCATION INFORMATION**
POLO PARKWAY
2931 POLO PARKWAY
MIDLOTHIAN
VA 231131453
a. 1356571616   b.

**33. BILLING PROVIDER INFO & PH #** ( 804 ) 5232533
FEMALE PELVIC MEDICINE INSTITUTE O
2931 POLO PARKWAY
MIDLOTHIAN
VA 231131453
a. 1356571616   b. ZZ193400000X

NUCC Instruction Manual available at: www.nucc.org     **PLEASE PRINT OR TYPE**     APPROVED OMB-0938-1197 FORM 1500 (02-12)

**JA124**

# HEALTH INSURANCE CLAIM FORM

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

ANTHEM HEALTHKEEPERS PLUS
PO BOX 27401

RICHMOND VA 23279

| | | |
|---|---|---|
| **CARRIER** | | PICA |

**1.** MEDICARE ☐ (Medicare#)  MEDICAID ☒ (Medicaid#)  TRICARE ☐ (ID#/DoD#)  CHAMPVA ☐ (Member ID#)  GROUP HEALTH PLAN ☐ (ID#)  FECA BLK LUNG ☐ (ID#)  OTHER ☐ (ID#)

**1a. INSURED'S I.D. NUMBER** (For Program in Item 1)

**2. PATIENT'S NAME** (Last Name, First Name, Middle Initial)
ROOP, SAMANTHA J

**3. PATIENT'S BIRTH DATE**   **SEX** M ☐ F ☒

**4. INSURED'S NAME** (Last Name, First Name, Middle Initial)
ROOP, SAMANTHA J

**5. PATIENT'S ADDRESS** (No., Street)

**6. PATIENT RELATIONSHIP TO INSURED**
Self ☒  Spouse ☐  Child ☐  Other ☐

**7. INSURED'S ADDRESS** (No., Street)

CITY ___ STATE ___

**8. RESERVED FOR NUCC USE**

CITY ___ STATE ___

ZIP CODE ___   TELEPHONE (Include Area Code) ___

ZIP CODE ___   TELEPHONE (Include Area Code) ___

**9. OTHER INSURED'S NAME** (Last Name, First Name, Middle Initial)

**10. IS PATIENT'S CONDITION RELATED TO:**

**11. INSURED'S POLICY GROUP OR FECA NUMBER**

**a. OTHER INSURED'S POLICY OR GROUP NUMBER**

**a. EMPLOYMENT?** (Current or Previous)  ☐ YES  ☒ NO

**a. INSURED'S DATE OF BIRTH**   **SEX** M ☐ F ☒

**b. RESERVED FOR NUCC USE**

**b. AUTO ACCIDENT?** ☐ YES ☒ NO   PLACE (State) ___

**b. OTHER CLAIM ID** (Designated by NUCC)

**c. RESERVED FOR NUCC USE**

**c. OTHER ACCIDENT?** ☐ YES ☒ NO

**c. INSURANCE PLAN NAME OR PROGRAM NAME**

**d. INSURANCE PLAN NAME OR PROGRAM NAME**

**10d. CLAIM CODES** (Designated by NUCC)

**d. IS THERE ANOTHER HEALTH BENEFIT PLAN?** ☐ YES ☒ NO   If yes, complete items 9, 9a, and 9d.

**READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.**
**12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE** I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED   Signature on file   DATE   03|05|2021

**13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE** I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED   Signature on file

**14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP)**   QUAL. ___

**15. OTHER DATE**   QUAL. ___   MM DD YY

**16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION**   FROM ___ TO ___

**17. NAME OF REFERRING PROVIDER OR OTHER SOURCE**
DN   JOSEPH, SHARON
**17b. NPI** 1659484525

**18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES**   FROM ___ TO ___

**19. ADDITIONAL CLAIM INFORMATION** (Designated by NUCC)

**20. OUTSIDE LAB?** ☐ YES ☒ NO   $ CHARGES 0 | 00

**21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY** Relate A-L to service line below (24E)   ICD Ind. 0
A. LN B13   B. LN B110   C. L N3281   D. L N393
E. L R102   F. L R300   G. L___   H. L___

**22. RESUBMISSION CODE** ___   ORIGINAL REF. NO. ___

**23. PRIOR AUTHORIZATION NUMBER**
49D2107215

| 24. A. DATE(S) OF SERVICE From MM DD YY | To MM DD YY | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS | MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Fam Plan | I. ID. QUAL | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 02 26 2021 | 02 26 2021 | 11 | | 51798 | | A B C D | 29 | 04 | 1 | NPI | 1942230040 |
| 2 | 02 26 2021 | 02 26 2021 | 11 | | 82570 | QW | A B C D | 10 | 00 | 1 | NPI | 1942230040 |
| 3 | 02 26 2021 | 02 26 2021 | 11 | | 81003 | QW | A B C D | 5 | 00 | 1 | NPI | 1942230040 |
| 4 | 02 26 2021 | 02 26 2021 | 11 | | 99024 | | A B C D | 0 | 00 | 1 | NPI | 1942230040 |
| 5 | | | | | | | | | | | NPI | |
| 6 | | | | | | | | | | | NPI | |

**25. FEDERAL TAX I.D. NUMBER**   SSN ☐ EIN ☒

**26. PATIENT'S ACCOUNT NO.**

**27. ACCEPT ASSIGNMENT?** (For govt. claims, see back) ☒ YES ☐ NO

**28. TOTAL CHARGE** $ 44 | 04

**29. AMOUNT PAID** $ 0 | 00

**30. Rsvd for NUCC Use**

**31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS** (I certify that the statements on the reverse apply to this bill and are made a part thereof.)
GUERETTE, NATHAN
1942230040
SIGNED   03/05/2021 DATE

**32. SERVICE FACILITY LOCATION INFORMATION**
POLO PARKWAY
2931 POLO PARKWAY
MIDLOTHIAN
VA 231131453
a. 1356571616   b.

**33. BILLING PROVIDER INFO & PH #** ( 804 ) 5232533
FEMALE PELVIC MEDICINE INSTITUTE O
2931 POLO PARKWAY
MIDLOTHIAN
VA 231131453
a. 1356571616   b. ZZ193400000X

**JA125**

# HEALTH INSURANCE CLAIM FORM

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

ANTHEM HEALTHKEEPERS PLUS
PO BOX 27401

RICHMOND VA 23279

CARRIER

| | PICA | | | | | | PICA | |
|---|---|---|---|---|---|---|---|---|

**1.** MEDICARE ( ) MEDICAID [X] (Medicaid#) TRICARE ( ) (ID/DoD#) CHAMPVA ( ) (Member ID#) GROUP HEALTH PLAN ( ) (ID#) FECA BLK LUNG ( ) (ID#) OTHER ( ) (ID#)  **1a.** INSURED'S I.D. NUMBER (For Program in Item 1)

**2.** PATIENT'S NAME (Last Name, First Name, Middle Initial)
ROOP, SAMANTHA J

**3.** PATIENT'S BIRTH DATE MM DD YY    SEX M [ ] F [X]

**4.** INSURED'S NAME (Last Name, First Name, Middle Initial)
ROOP, SAMANTHA J

**5.** PATIENT'S ADDRESS (No., Street)

**6.** PATIENT RELATIONSHIP TO INSURED
Self [X] Spouse [ ] Child [ ] Other [ ]

**7.** INSURED'S ADDRESS (No., Street)

CITY                    STATE

**8.** RESERVED FOR NUCC USE

CITY                    STATE

ZIP CODE    TELEPHONE (Include Area Code)

ZIP CODE    TELEPHONE (Include Area Code)

**9.** OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)

**10.** IS PATIENT'S CONDITION RELATED TO:

**11.** INSURED'S POLICY GROUP OR FECA NUMBER

**a.** OTHER INSURED'S POLICY OR GROUP NUMBER

**a.** EMPLOYMENT? (Current or Previous)
YES [ ] NO [X]

**a.** INSURED'S DATE OF BIRTH MM DD YY    SEX M [ ] F [X]

**b.** RESERVED FOR NUCC USE

**b.** AUTO ACCIDENT?
YES [ ] NO [X]    PLACE (State)

**b.** OTHER CLAIM ID (Designated by NUCC)

**c.** RESERVED FOR NUCC USE

**c.** OTHER ACCIDENT?
YES [ ] NO [X]

**c.** INSURANCE PLAN NAME OR PROGRAM NAME

**d.** INSURANCE PLAN NAME OR PROGRAM NAME

**10d.** CLAIM CODES (Designated by NUCC)

**d.** IS THERE ANOTHER HEALTH BENEFIT PLAN?
YES [ ] NO [X]    If yes, complete items 9, 9a, and 9d.

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.
**12.** PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.
SIGNED    Signature on file    DATE 04 01 2021

**13.** INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.
SIGNED    Signature on file

**14.** DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP) MM DD YY    QUAL.

**15.** OTHER DATE QUAL. MM DD YY

**16.** DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION MM DD YY    FROM    TO

**17.** NAME OF REFERRING PROVIDER OR OTHER SOURCE
DN   JOSEPH, SHARON

**17a.**
**17b.** NPI 1659484525

**18.** HOSPITALIZATION DATES RELATED TO CURRENT SERVICES MM DD YY    FROM    TO

**19.** ADDITIONAL CLAIM INFORMATION (Designated by NUCC)

**20.** OUTSIDE LAB?
YES [ ] NO [ ]    $ CHARGES    0    00

**21.** DIAGNOSIS OR NATURE OF ILLNESS OR INJURY Relate A-L to service line below (24E)    ICD Ind. 0

A. N613    B. N8110    C. N3281    D. N393
E. R102    F. R300    G.    H.
I.    J.    K.    L.

**22.** RESUBMISSION CODE    ORIGINAL REF. NO.

**23.** PRIOR AUTHORIZATION NUMBER
49D2107215

| 24. A. DATE(S) OF SERVICE From | | | To | | | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS | MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID QUAL. | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MM | DD | YY | MM | DD | YY | | | | | | | | | | | |
| 03 | 25 | 2021 | 03 | 25 | 2021 | 11 | | 51798 | | A B C D | 29 | 04 | 1 | | NPI | 1942230040 |
| 03 | 25 | 2021 | 03 | 25 | 2021 | 11 | | 82570 | QW | A B C D | 10 | 00 | 1 | | NPI | 1942230040 |
| 03 | 25 | 2021 | 03 | 25 | 2021 | 11 | | 81003 | QW | A B C D | 5 | 00 | 1 | | NPI | 1942230040 |
| 03 | 25 | 2021 | 03 | 25 | 2021 | 11 | | 99024 | | A B C D | 0 | 00 | 1 | | NPI | 1942230040 |
| | | | | | | | | | | | | | | | NPI | |
| | | | | | | | | | | | | | | | NPI | |

**25.** FEDERAL TAX I.D. NUMBER    SSN EIN [X]

**26.** PATIENT'S ACCOUNT NO.

**27.** ACCEPT ASSIGNMENT? (For govt. claims, see back)
[X] YES [ ] NO

**28.** TOTAL CHARGE $ 44 00

**29.** AMOUNT PAID $ 0 00

**30.** Rsvd for NUCC Use

**31.** SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)
GUERETTE, NATHAN
1942230040
SIGNED    04 01 2021    DATE

**32.** SERVICE FACILITY LOCATION INFORMATION
POLO PARKWAY
2931 POLO PARKWAY
MIDLOTHIAN
VA 231131453
a. 1356571616    b.

**33.** BILLING PROVIDER INFO & PH # (804) 5232533
FEMALE PELVIC MEDICINE INSTITUTE O
2931 POLO PARKWAY
MIDLOTHIAN
VA 231131453
a. 1356571616    b. ZZ193400000X

NUCC Instruction Manual available at: www.nucc.org    PLEASE PRINT OR TYPE    APPROVED OMB-0938-1197 FORM 1500 (02-12)

**JA126**

# HEALTH INSURANCE CLAIM FORM

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

HealthKeeper (Anthem VA BCBS HMO)

VA

**CARRIER**

| | |
|---|---|
| PICA | PICA |

| 1. MEDICARE (Medicare#) | MEDICAID (Medicaid#) | TRICARE (ID#/DoD#) | CHAMPVA (Member ID#) | GROUP HEALTH PLAN (ID#) | FECA BLK LUNG (ID#) | OTHER [X] (ID#) | 1a. INSURED'S I.D. NUMBER (For Program in Item 1) |

| 2. PATIENT'S NAME (Last Name, First Name, Middle Initial) | 3. PATIENT'S BIRTH DATE  MM DD YY  SEX M [ ] F [x] | 4. INSURED'S NAME (Last Name, First Name, Middle Initial) |
|---|---|---|
| ROOP, SAMANTHA J | | ROOP, SAMANTHA J |

| 5. PATIENT'S ADDRESS (No., Street) | 6. PATIENT RELATIONSHIP TO INSURED  Self [x] Spouse [ ] Child [ ] Other [ ] | 7. INSURED'S ADDRESS (No., Street) |
|---|---|---|
| CITY                       STATE | 8. RESERVED FOR NUCC USE | CITY                       STATE |
| ZIP CODE    TELEPHONE (Include Area Code) | | ZIP CODE    TELEPHONE (Include Area Code) |

| 9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial) | 10. IS PATIENT'S CONDITION RELATED TO: | 11. INSURED'S POLICY GROUP OR FECA NUMBER |
|---|---|---|
| a. OTHER INSURED'S POLICY OR GROUP NUMBER | a. EMPLOYMENT? (Current or Previous)  YES [ ] NO [x] | a. INSURED'S DATE OF BIRTH  MM DD YY  SEX M [ ] F [x] |
| b. RESERVED FOR NUCC USE | b. AUTO ACCIDENT?  YES [ ] NO [x]  PLACE (State) | b. OTHER CLAIM ID (Designated by NUCC) |
| c. RESERVED FOR NUCC USE | c. OTHER ACCIDENT?  YES [ ] NO [x] | c. INSURANCE PLAN NAME OR PROGRAM NAME |
| d. INSURANCE PLAN NAME OR PROGRAM NAME | 10d. CLAIM CODES (Designated by NUCC) | d. IS THERE ANOTHER HEALTH BENEFIT PLAN?  YES [ ] NO [x]  If yes, complete items 9, 9a, and 9d. |

**READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.**

12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED  Signature on file    DATE  06|16|2021

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED  Signature on file

| 14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP)  MM DD YY    QUAL. | 15. OTHER DATE  QUAL.  MM DD YY | 16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION  FROM MM DD YY   TO MM DD YY |
|---|---|---|
| 17. NAME OF REFERRING PROVIDER OR OTHER SOURCE  DN  JOSEPH, SHARON | 17a.  17b. NPI  1659484525 | 18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES  FROM MM DD YY   TO MM DD YY |
| 19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC) | | 20. OUTSIDE LAB?  YES [ ] NO [ ]   $ CHARGES  0  00 |

| 21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY  Relate A-L to service line below (24E)  ICD Ind. 0 | 22. RESUBMISSION CODE    ORIGINAL REF. NO. |
|---|---|
| A. LN813   B. LNB110   C. LN3281   D. LN393 | 23. PRIOR AUTHORIZATION NUMBER |
| E. LR102   F. L   G. L   H. L | 49D2107215 |
| I. L   J. L   K. L   L. L | |

| 24. A. DATE(S) OF SERVICE  From  To  MM DD YY MM DD YY | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances)  CPT/HCPCS  MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID. QUAL | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 05 24 2021 05 24 2021 | 11 | | 51798 | C D | 29 | 04 | 1 | | ZZ / NPI | 207VF0040X / 1942230040 |
| 2 | 05 24 2021 05 24 2021 | 11 | | 62570 | QW | C D | 10 | 00 | 1 | ZZ / NPI | 207VF0040X / 1942230040 |
| 3 | 05 24 2021 05 24 2021 | 11 | | 61003 | QW | C D | 5 | 00 | 1 | ZZ / NPI | 207VF0040X / 1942230040 |
| 4 | 05 24 2021 05 24 2021 | 11 | | 99024 | | A B C D | 0 | 00 | 1 | ZZ / NPI | 207VF0040X / 1942230040 |
| 5 | | | | | | | | | NPI | |
| 6 | | | | | | | | | NPI | |

| 25. FEDERAL TAX I.D. NUMBER    SSN [ ] EIN [X] | 26. PATIENT'S ACCOUNT NO. | 27. ACCEPT ASSIGNMENT?  YES [X] NO [ ] | 28. TOTAL CHARGE  $ 44 00 | 29. AMOUNT PAID  $ 0 00 | 30. Rsvd for NUCC Use |
|---|---|---|---|---|---|

| 31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.) | 32. SERVICE FACILITY LOCATION INFORMATION | 33. BILLING PROVIDER INFO & PH #  ( 804 ) 5232533 |
|---|---|---|
| GUERETTE, NATHAN  1942230040 | POLO PARKWAY  2931 POLO PARKWAY  MIDLOTHIAN  VA 231131453 | FEMALE PELVIC MEDICINE INSTITUTE O  2931 POLO PARKWAY  MIDLOTHIAN  VA 231131453 |
| SIGNED    06|16|2021 DATE | a. 1356571616   b. | a. 1356571616   b. 2Z193400000X |

NUCC Instruction Manual available at: www.nucc.org    **PLEASE PRINT OR TYPE**    APPROVED OMB-0938-1197 FORM 1500 (02-12)

**JA127**

HealthKeeper (Anthem VA BCBS HMO)

# HEALTH INSURANCE CLAIM FORM

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

VA

| | |
|---|---|
| PICA | PICA |

| 1. MEDICARE | MEDICAID | TRICARE | CHAMPVA | GROUP HEALTH PLAN | FECA BLK LUNG | OTHER | 1a. INSURED'S I.D. NUMBER | (For Program in Item 1) |
|---|---|---|---|---|---|---|---|---|
| ☐ (Medicare#) | ☐ (Medicaid#) | ☐ (ID#/DoD#) | ☐ (Member ID#) | ☐ (ID#) | ☐ (ID#) | ☒ | | |

| 2. PATIENT'S NAME (Last Name, First Name, Middle Initial) | 3. PATIENT'S BIRTH DATE | SEX | 4. INSURED'S NAME (Last Name, First Name, Middle Initial) |
|---|---|---|---|
| ROOP, SAMANTHA J | MM DD YY | M ☐ F ☒ | ROOP, SAMANTHA J |

| 5. PATIENT'S ADDRESS (No., Street) | 6. PATIENT RELATIONSHIP TO INSURED | 7. INSURED'S ADDRESS (No., Street) |
|---|---|---|
| | Self ☒ Spouse ☐ Child ☐ Other ☐ | |

| CITY | STATE | 8. RESERVED FOR NUCC USE | CITY | STATE |
|---|---|---|---|---|

| ZIP CODE | TELEPHONE (Include Area Code) | | ZIP CODE | TELEPHONE (Include Area Code) |
|---|---|---|---|---|

| 9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial) | 10. IS PATIENT'S CONDITION RELATED TO: | 11. INSURED'S POLICY GROUP OR FECA NUMBER |
|---|---|---|

| a. OTHER INSURED'S POLICY OR GROUP NUMBER | a. EMPLOYMENT? (Current or Previous) ☐ YES ☒ NO | a. INSURED'S DATE OF BIRTH MM DD YY  SEX  M ☐ F ☒ |
|---|---|---|

| b. RESERVED FOR NUCC USE | b. AUTO ACCIDENT? ☐ YES ☒ NO  PLACE (State) | b. OTHER CLAIM ID (Designated by NUCC) |
|---|---|---|

| c. RESERVED FOR NUCC USE | c. OTHER ACCIDENT? ☐ YES ☒ NO | c. INSURANCE PLAN NAME OR PROGRAM NAME |
|---|---|---|

| d. INSURANCE PLAN NAME OR PROGRAM NAME | 10d. CLAIM CODES (Designated by NUCC) | d. IS THERE ANOTHER HEALTH BENEFIT PLAN? ☐ YES ☒ NO  If yes, complete items 9, 9a, and 9d. |
|---|---|---|

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.
12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE  I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED   Signature on file   DATE   10|08|2021

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE  I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED   Signature on file

| 14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP)  MM DD YY  QUAL. | 15. OTHER DATE  QUAL.  MM DD YY | 16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION  FROM  MM DD YY  TO  MM DD YY |
|---|---|---|

| 17. NAME OF REFERRING PROVIDER OR OTHER SOURCE | 17a. | 18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES |
|---|---|---|
| DN  GUERETTE, NATHAN | 17b. NPI  1942230040 | FROM  TO |

| 19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC) | 20. OUTSIDE LAB?  ☐ YES ☐ NO | $ CHARGES  0   00 |
|---|---|---|

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY  Relate A-L to service line below (24E)  ICD Ind  0

| A. L N813 | B. L N8110 | C. L N3281 | D. L N393 |
|---|---|---|---|
| E. L R339 | F. L | G. L | H. L |
| I. L | J. L | K. L | L. L |

| 22. RESUBMISSION  CODE | ORIGINAL REF. NO. |
|---|---|

23. PRIOR AUTHORIZATION NUMBER
49D2137274

| 24. A. DATE(S) OF SERVICE  From  To  MM DD YY  MM DD YY | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES  (Explain Unusual Circumstances)  CPT/HCPCS  MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID. QUAL. | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 06 29 2021 06 29 2021 | 11 | | 76857 | | C E | 69 60 | 1 | | ZZ  207VF0040X  NPI  1942230040 |
| 2 | 06 29 2021 06 29 2021 | 11 | | 81003  QW  59 | | C E | 5 00 | 1 | | ZZ  207VF0040X  NPI  1942230040 |
| 3 | 06 29 2021 06 29 2021 | 11 | | 62570  QW | | C E | 10 00 | 1 | | ZZ  207VF0040X  NPI  1942230040 |
| 4 | 06 29 2021 06 29 2021 | 11 | | 95972 | | C E | 80 99 | 1 | | ZZ  207VF0040X  NPI  1942230040 |
| 5 | 06 29 2021 06 29 2021 | 11 | | 99214  25 | | A B D | 184 05 | 1 | | ZZ  207VF0040X  NPI  1942230040 |
| 6 | | | | | | | | | NPI |

| 25. FEDERAL TAX I.D. NUMBER  SSN  EIN ☒ | 26. PATIENT'S ACCOUNT NO. | 27. ACCEPT ASSIGNMENT?  ☒ YES ☐ NO | 28. TOTAL CHARGE  $ 349 64 | 29. AMOUNT PAID  $ 0 00 | 30. Rsvd for NUCC Use |
|---|---|---|---|---|---|

| 31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)  GUERETTE, NATHAN  1942230040  SIGNED  10|08|2021  DATE | 32. SERVICE FACILITY LOCATION INFORMATION  POLO PARKWAY  2931 POLO PARKWAY  MIDLOTHIAN  VA 231131453  a. 1356571616  b. | 33. BILLING PROVIDER INFO & PH #  ( 804 ) 5232533  FEMALE PELVIC MEDICINE INSTITUTE O  2931 POLO PARKWAY  MIDLOTHIAN  VA 231131453  a. 1356571616  b. ZZ193400000X |
|---|---|---|

NUCC Instruction Manual available at: www.nucc.org   **PLEASE PRINT OR TYPE**   APPROVED OMB-0938-1197 FORM 1500 (02-12)

**JA128**

```
PATIENT NO:        ████████    CHIPPENHAM JW HOSPITAL   BILLING DATE   PAGE   1    00035
MED REC NO:          ██████     7101 JAHNKE ROAD         01/12/20
GUARANTOR NO:
PATIENT:                        RICHMOND                 ████████████   ADMITTED    DISCHARGED
ROOP SAMANTHA JEAN                                                      01/08/20    01/08/20

PAY TO ADDRESS:    CHIPPENHAM JW HOSPITAL
                   P.O. BOX 402486
                   ATLANTA
                   GA 303842486

BILL TO:
      ROOP SAMANTHA JEAN              SAME-DAY SURGERY         FC=09
                                      ADMIT THRU DISCHARGE CLAIM
      ██████████████


DATE OF  BATCH      F     NDC/CPT-4/
SERVICE  REF    DEPT S PROC    HCPCS      QTY SERVICE DESCRIPTION      CHARGES

   250-PHARMACY
010820  06B388  0712   006594           4-GLYCOPYRROLATE 0.2MG V     488.16-
010820  06B374  0712   006594           4 GLYCOPYRROLATE 0.2MG V     488.16
010820  06B375  0712   008227           2 LIDO/EPI 1½/1:100M 20M     164.16
010820  09B784  0712   008227           2-LIDO/EPI 1½/1:100M 20M     164.16-
010820  09B771  0712   008227           1 LIDO/EPI 1½/1:100M 20M      82.08
010820  11B358  0712   009174           1 METRONIDAZOL 500MG/100     537.84
010820  11B358  0712   008286           1 LIDOCAINE 2% 5ML SYR I     729.00
010820  11B358  0712   079215           1 DEXMEDET 200MCG/50ML I    1314.36
                                              SUBTOTAL:             2663.28

   270-MED SURG SUPPLY
010820  09B778  0718   469927   C1787   1 PROGRAMMER NRSTM VRF 4    8046.00
                                              SUBTOTAL:             8046.00

   272-MED SURG SUPPLY/STERILE
010820  09B778  0718   406652           1 PENCIL ESURG BOVIE 10F     204.00
010820  09B778  0718   425545           1 DRESSING TGDRM 2.75X2I      16.00
010820  09B778  0718   436580           1 SOLUTION IRR H2O 1L PL     159.00
010820  09B778  0718   496771           1 KIT INTSTM SMART PROGR   27270.00
```

INSURANCE BENEFITS ASSIGNED TO CJW MEDICAL CENTER.
PLEASE RETAIN FOR YOUR RECORDS.

E ROOP 002109

**JA129**

PATIENT NO:  CHIPPENHAM JW HOSPITAL BILLING DATE PAGE 2 00035
MED REC NO: 7101 JAHNKE ROAD 01/12/20
GUARANTOR NO:
PATIENT: RICHMOND  ADMITTED DISCHARGED
ROOP SAMANTHA JEAN 01/08/20 01/08/20

| DATE OF SERVICE | BATCH REF | DEPT | F S | PROC | NDC/CPT-4/ HCPCS | QTY | SERVICE DESCRIPTION | CHARGES |
|---|---|---|---|---|---|---|---|---|
| 010820 | 09B778 | 0718 | | 408869 | | 1 | SUTURE VCRYL 2-0 J417H | 100.00 |
| 010820 | 09B778 | 0718 | | 408973 | | 1 | SUTURE MONCRYL 4-0 Y49 | 314.00 |
| 010820 | 09B778 | 0718 | | 432394 | | 1 | ADHESIVE SKNCLS DRMBND | 898.00 |
| 010820 | 09B778 | 0718 | | 374111 | C1894 | 1 | KIT LEAD INTRO NEURO | 5584.00 |
| | | | | | | | SUBTOTAL: | 34545.00 |
| 278-MED SURG SUPPLY/IMPLANT | | | | | | | | |
| 010820 | 09B778 | 0717 | | 379475 | C1767 | 1 | GENERATOR INTERSTIM 30 | 99999.00 |
| 010820 | 09B778 | 0717 | | 404448 | C1778 | 1 | LEAD NRSTM 28CM 1.27X3 | 52807.00 |
| | | | | | | | SUBTOTAL: | 152806.00 |
| 307-LAB/UROLOGY | | | | | | | | |
| 010820 | 08B270 | 0736 | | 037032 | 81025 | 1 | PREG URINE QUAL BY DOO | 168.48 |
| | | | | | | | SUBTOTAL: | 168.48 |
| 310-LAB PATHOLOGY | | | | | | | | |
| 010820 | 09B676 | 0732 | | 046566 | 88300 | 1 | SURG PATH LEVEL 1 | 190.08 |
| | | | | | | | SUBTOTAL: | 190.08 |
| 320-RADIOLOGY DIAGNOSTIC | | | | | | | | |
| 010820 | 08B379 | 0728 | | 031492 | 76000 | 1 | XR FLUOROSCOPY 0-60 MI | 2089.50 |
| 010820 | 08B379 | 0728 | | 031229 | 72100 | 1 | XR L-SPINE 2/3 VIEWS | 1149.75 |
| | | | | | | | SUBTOTAL: | 3239.25 |
| 360-O.R. SERVICES | | | | | | | | |
| 010820 | 09B778 | 0701 | | 047728 | | 1 | BASIC OR SERVICES | 4985.66 |
| 010820 | 09B778 | 0701 | | 047734 | | 69 | OR PER MIN LEVEL 3 | 21434.85 |
| 010820 | 09B778 | 0701 | | 087434 | 95970 | 1 | ANALYZE NEUROSTIM NO P | 594.05 |
| | | | | | | | SUBTOTAL: | 27014.56 |
| 370-ANESTHESIA | | | | | | | | |
| 010820 | 09B778 | 0722 | | 048182 | | 69 | ANESTH PER MINUTE | 3437.58 |

INSURANCE BENEFITS ASSIGNED TO CJW MEDICAL CENTER.
PLEASE RETAIN FOR YOUR RECORDS.

S ROOP 000110

```
PATIENT NO:      ▓▓▓▓▓      CHIPPENHAM JW HOSPITAL   BILLING DATE   PAGE   3    00035
MED REC NO:           ▓▓▓   7101 JAHNKE ROAD         01/12/20
GUARANTOR NO:
PATIENT:                    RICHMOND                 ▓▓▓▓▓▓▓▓    ADMITTED    DISCHARGED
ROOP SAMANTHA JEAN                                              01/08/20    01/08/20
```



```
DATE OF  BATCH      F    NDC/CPT-4/
SERVICE  REF   DEPT S PROC   HCPCS        QTY SERVICE DESCRIPTION       CHARGES

010820 09B778 0722  048183            1 BASIC ANES SERVICES          4064.16
            636-DRUGS/DETAIL CODE             SUBTOTAL:              7521.76

010820 08B388 0712  072841  J1940     1-FUROSEMIDE 20 MG INJ           91.30-
010820 08B388 0712  084373  J2704     2-PROPOFOL 200 MG INJ          1491.60-
010820 08B376 0712  084373  J2704     2 PROPOFOL 200 MG INJ          1491.60
010820 08B374 0712  072841  J1940     1 FUROSEMIDE 20 MG INJ           91.30
010820 08B280 0716  017470  J7120     1 LACTATED RINGERS 1000         686.40
010820 08B377 0712  084373X J2704    20 PROPOFOL 200 MG INJ           745.80
010820 08B376 0712  006378X J1580     1 GENTAMICIN UP TO 80 MG        216.70
010820 08B374 0712  077154X J0330     1 SUCCINYLCHOL UP TO 20          19.80
010820 08B377 0712  071495X J3010     1 FENTANYL CIT 0.1 MG IN        217.80
010820 08B374 0712  071495X J3010     1 FENTANYL CIT 0.1 MG IN        217.80
010820 08B374 0712  071398X J2250     2 MIDAZOLAM 2 MG INJ            198.00
010820 08B375 0712  084373X J2704    40 PROPOFOL 200 MG INJ          1491.60
                                        SUBTOTAL:                    3793.90
            637-SELF-ADMINISTRABLE DRUG
010820 08B388 0712  069447            1-ALBUTEROL HFA 8 GMS             4.40-
010820 08B375 0712  069447            1 ALBUTEROL HFA 8 GMS             4.40
                                        SUBTOTAL:                       .00
            710-RECOVERY ROOM
010820 09B778 0786  052902           60 PHASE 2 POST OP PER MI       5585.40
010820 09B778 0786  062792            1 BASIC POST OP SERVICES       2371.12
```

INSURANCE BENEFITS ASSIGNED TO CJW MEDICAL CENTER.
PLEASE RETAIN FOR YOUR RECORDS.

S ROOP 070111

**JA131**

```
PATIENT NO:        ▮▮▮▮▮   CHIPPENHAM JW HOSPITAL    BILLING DATE    PAGE  4    00035
MED REC NO:              ▮▮▮▮   7101 JAHNKE ROAD         01/12/20
GUARANTOR NO:
PATIENT:                   RICHMOND              ▮▮▮▮▮▮▮      ADMITTED    DISCHARGED
ROOP SAMANTHA JEAN                                          01/08/20    01/08/20
```



```
DATE OF  BATCH    F     NDC/CPT-4/
SERVICE  REF   DEPT S PROC   HCPCS        QTY SERVICE DESCRIPTION       CHARGES

                                          SUBTOTAL:        7956.52

                              TOTAL ANCILLARY CHARGES    247946.83


DATE OF  BATCH  PAY        INS    BILL
PAYMENT  REFER  TYPE PROC  PLAN   THRU DT  DESCRIPTION / COMMENT    AMOUNT

01/08/20 12NBIL  4   999999        01/08/20 NON-BILLABLE ADJ         3,107.50
                                            TOTAL PAYMENTS           3,107.50

                                   TOTAL CHARGES      247946.83
                                        PAYMENTS            .00
                                     ADJUSTMENTS         3107.50
                                        BALANCE       244839.33
```

INSURANCE BENEFITS ASSIGNED TO CJW MEDICAL CENTER.
PLEASE RETAIN FOR YOUR RECORDS.

§ ROOP 000112

**JA132**

```
PATIENT NO:        ████████      CHIPPENHAM JW HOSPITAL    BILLING DATE    PAGE   5    00035
MED REC NO:           ████████   7101 JAHNKE ROAD          01/12/20
GUARANTOR NO:
PATIENT:                         RICHMOND                  ████████        ADMITTED    DISCHARGED
ROOP SAMANTHA JEAN                                                         01/08/20    01/08/20
```



DEPARTMENTAL CHARGE SUMMARY

| DEPT | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 0701 | CMC OR | 27,014.56 |
| 0712 | PHARMACY | 5,770.78 |
| 0716 | INTRAVENOUS THERAPY | 686.40 |
| 0717 | JW CSS | 152,806.00 |
| 0718 | SUPPLIES | 42,593.00 |
| 0722 | ANESTHESIA | 7,521.76 |
| 0728 | RADIOLOGY X-RAY | 3,239.25 |
| 0732 | PATHOLOGY UNIT | 190.08 |
| 0736 | LABORATORY | 168.48 |
| 0786 | DAYSURGERY RECOVERY ROOM | 7,956.52 |

REVENUE CHARGE SUMMARY

| REV CD | DESCRIPTION | BILLABLE | NON-BILLABLE | TOTAL |
|--------|-------------|----------|--------------|-------|
| 0250 | PHARMACY | 2,663.28 | .00 | 2,663.28 |
| 0270 | MED SURG SUPPLY | 8,048.00 | .00 | 8,048.00 |
| 0272 | MED SURG SUPPLY/STERILE | 34,545.00 | .00 | 34,545.00 |
| 0278 | MED SURG SUPPLY/IMPLANT | 152,806.00 | .00 | 152,806.00 |
| 0307 | LAB/UROLOGY | 168.48 | .00 | 168.48 |
| 0310 | LAB PATHOLOGY | 190.08 | .00 | 190.08 |
| 0320 | RADIOLOGY DIAGNOSTIC | 3,239.25 | .00 | 3,239.25 |
| 0360 | O.R. SERVICES | 27,014.56 | .00 | 27,014.56 |
| 0370 | ANESTHESIA | 7,521.76 | .00 | 7,521.76 |
| 0636 | DRUGS/DETAIL CODE | 686.40 | 3,107.50 | 3,793.90 |
| 0710 | RECOVERY ROOM | 7,956.52 | .00 | 7,956.52 |

S ROOP 000113

**JA133**

PATIENT NO:         CHIPPENHAM JW HOSPITAL   BILLING DATE    PAGE   6   00035
MED REC NO:                  7101 JAHNKE ROAD        01/12/20
GUARANTOR NO:
PATIENT:                     RICHMOND                                ADMITTED     DISCHARGED
ROOP SAMANTHA JEAN                                                   01/08/20     01/08/20

```
            TOTAL CHARGES:    247,946.83
            TOTAL PAYMENTS:         .00
             TOTAL ADJUST:      3,107.50
```

**JA134**



**JA135**

```
PATIENT NO:          ████████    CHIPPENHAM JW HOSPITAL   BILLING DATE    PAGE   1   00035
MED REC NO:                      7101 JAHNKE ROAD         02/01/21
GUARANTOR NO:        ████████
PATIENT:                         RICHMOND                          ████████  ADMITTED    DISCHARGED
ROOP SAMANTHA JEAN                                                           01/28/21    01/28/21

PAY TO ADDRESS:      CHIPPENHAM JW HOSPITAL
                     P.O. BOX 402486
                     ATLANTA
                     GA 303842486

BILL TO:
     ROOP SAMANTHA JEAN              OUTPATIENT               FC=09
                                     ADMIT THRU DISCHARGE CLAIM

     ████████████████████
```

```
DATE OF   BATCH       F      NDC/CPT-4/
SERVICE   REF   DEPT  S PROC  HCPCS      QTY SERVICE DESCRIPTION      CHARGES

    402-OTHER IMAG SERVICES
012821 208556 0729   032944  76856      1 US PELVIC COMPLETE          2029.98
012821 208556 0729   032943  76830      1 US TRANSVAGINAL             1457.86
                                                  SUBTOTAL:           3487.84

                                        TOTAL ANCILLARY CHARGES       3487.84

                                               TOTAL CHARGES          3487.84
                                                   PAYMENTS               .00
                                                ADJUSTMENTS               .00
                                                    BALANCE           3487.84
```

```
INSURANCE BENEFITS ASSIGNED TO CJW MEDICAL CENTER.
PLEASE RETAIN FOR YOUR RECORDS.
```

**JA136**

```
PATIENT NO:        ▓▓▓▓▓   CHIPPENHAM JW HOSPITAL   BILLING DATE   PAGE   2   00035
MED REC NO:        ▓▓▓▓▓   7101 JAHNKE ROAD         02/01/21
GUARANTOR NO:
PATIENT:                   RICHMOND                          ▓▓▓▓▓   ADMITTED   DISCHARGED
ROOP SAMANTHA JEAN                                                   01/28/21   01/28/21
```



```
                    DEPARTMENTAL CHARGE SUMMARY
              DEPT      DESCRIPTION              AMOUNT

              0729   ULTRASOUND                 3,487.84

                    REVENUE CHARGE SUMMARY
        REV CD DESCRIPTION            BILLABLE   NON-BILLABLE        TOTAL

        0402   OTHER IMAG SERVICES    3,487.84        .00       3,487.84


        TOTAL CHARGES:      3,487.84
        TOTAL PAYMENTS:          .00
          TOTAL ADJUST:          .00
```

S ROOP 000115

**JA137**



| | | | | | | 3a PAT CNTL # | | | | | 4 TYPE OF BILL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CHIPPENHAM JW HOSPITAL | CHIPPENHAM JW HOSPITAL | | | | | | | | | | 0131 |
| 7101 JAHNKE ROAD | PO BOX 402486 | | | | 3b MED REC # | | | | | | |
| RICHMOND VA 232254017 | ATLANTA GA30384 | | | 5 FED. TAX NO. | | | | 6 STATEMENT COVERS PERIOD FROM 012821 THROUGH 012821 | | | 7 |
| 8042673700 | | | | | | | | | | | |
| 8 PATIENT NAME a | | 9 PATIENT ADDRESS a | | | | | | | | b | |
| ROOP, SAMANTHA J. | | | | | | | | | | | |

| 10 BIRTHDATE | 11 SEX | 12 DATE | ADMISSION 13 HR | 14 TYPE | 15 SRC | 16 DHR | 17 STAT | 18 | 19 | 20 | CONDITION CODES 21 22 23 24 25 26 27 | 28 | 29 ACDT STATE | 30 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | F | 3 | 1 | 01 | | | | | | | | | | |

| 31 OCCURRENCE CODE DATE | 32 OCCURRENCE CODE DATE | 33 OCCURRENCE CODE DATE | 34 OCCURRENCE CODE DATE | 35 OCCURRENCE SPAN CODE FROM THROUGH | 36 OCCURRENCE SPAN CODE FROM THROUGH | 37 |
|---|---|---|---|---|---|---|
| 11 012821 | A1 020105 | A2 100119 | | | | |

| 38 | | 39 CODE VALUE CODES AMOUNT | 40 CODE VALUE CODES AMOUNT | 41 CODE VALUE CODES AMOUNT |
|---|---|---|---|---|
| HEALTHKEEPERS MEDICAIDZ | a | A3 348784 | | |
| BLUE CROSS OF VA | b | | | |
| PO BOX 27401 | c | | | |
| RICHMOND, VA 23279 | d | | | |

| 42 REV. CD | 43 DESCRIPTION | 44 HCPCS / RATE / HIPPS CODE | 45 SERV. DATE | 46 SERV. UNITS | 47 TOTAL CHARGES | 48 NON-COVERED CHARGES | 49 |
|---|---|---|---|---|---|---|---|
| 0402 | US TRANSVAGINAL | 76830 | 012821 | 1 | 145786 | | |
| 0402 | US PELVIC COMPLETE | 76856 | 012821 | 1 | 202998 | | |
| | | | | | | | |
| 0001 | PAGE 001 OF 001 | | CREATION DATE 020121 | TOTALS | 348784 | | |

| 50 PAYER NAME | 51 HEALTH PLAN ID | 52 REL INFO | 53 ASG BEN | 54 PRIOR PAYMENTS | 55 EST. AMOUNT DUE | 56 NPI 1598708513 |
|---|---|---|---|---|---|---|
| HEALTHKEEPERS MEDICAIDZ | | Y | Y | 0G0 | | 57 OTHER PRV ID |

| 58 INSURED'S NAME | 59 P.REL | 60 INSURED'S UNIQUE ID | 61 GROUP NAME | 62 INSURANCE GROUP NO. |
|---|---|---|---|---|
| ROOP, SAMANTHA J. | 18 | | | |

| 63 TREATMENT AUTHORIZATION CODES | 64 DOCUMENT CONTROL NUMBER | 65 EMPLOYER NAME |
|---|---|---|

| 66 DX N83201 N814 | | | | | | | | 67 | | | | a | b | c |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| 69 ADMIT DX | 70 PATIENT REASON DX N814 | 71 PPS CODE | 72 ECI |
|---|---|---|---|

| 74 PRINCIPAL PROCEDURE CODE DATE | a. OTHER PROCEDURE CODE DATE | b. OTHER PROCEDURE CODE DATE | 75 | 76 ATTENDING NPI 942230040 LAST GUERETTE FIRST NATHAN | QUAL |
|---|---|---|---|---|---|
| c. OTHER PROCEDURE CODE DATE | d. OTHER PROCEDURE CODE DATE | e. OTHER PROCEDURE CODE DATE | | 77 OPERATING NPI LAST FIRST | QUAL |
| 80 REMARKS PT DISCOUNTS AVAILA | 81CC a B3282N00000X b B1T c B2S d | | | 78 OTHER NPI LAST FIRST | QUAL |
| | | | | 79 OTHER NPI LAST FIRST | QUAL |

UB-04 CMS-1450 APPROVED OMB NO. 0938-0997 ⊕ Printed on Recycled Paper NUBC™ LIC9910586 THE CERTIFICATIONS ON THE REVERSE APPLY TO THIS BILL AND ARE MADE A PART HEREOF.

00035 Relay 02/02/2021

S ROOP 000/00

**JA138**

| | Financial Transaction Listing | 04/23/2021 |
|---|---|---|
| **User:** BQE7613 | By Entry Date | 9:47 am |

Facility: **00035**    CJW Medical Center

Patient: **ROOP SAMANTHA JEAN**

| Facility | Acct Number | Entry Date | Trans Date | ProcCode | Type | Amount | Payer | Comment |
|---|---|---|---|---|---|---|---|---|
| 00035 | 35064875127 | 02/10/2021 | 02/10/2021 | 11221 | 01 | $-160.97 | 31550 | ERA BC P  02/11/21 |
| | | | | | | | | ICN: 196098407100742 |
| 00035 | 35064875127 | 02/02/2021 | 01/28/2021 | 999999 | 05 | $-3,326.87 | 31550 | CONTRACTUAL ADJ CC |
| 00035 | 35064875127 | 01/28/2021 | 01/28/2021 | 32944 | 06 | $2,029.98 | | US PELVIC COMPLETE |
| 00035 | 35064875127 | 01/28/2021 | 01/28/2021 | 32943 | 06 | $1,457.86 | | US TRANSVAGINAL |

Account Total:  **$0.00**

Facility Total for  **00035 - CJW Medical Center :**    **$0.00**

Report Total:  **$0.00**

- CONFIDENTIAL -

Type 01= Payment, 04= Adjustment, 05= Allowance, 06= Charge

S. ROOP 020121

**JA139**

```
PATIENT NO:        ████████   CHIPPENHAM JW HOSPITAL   BILLING DATE   PAGE   1    00035
MED REC NO:         ██████     7101 JAHNKE ROAD         02/15/21
GUARANTOR NO:
PATIENT:                       RICHMOND                              ADMITTED    DISCHARGED
ROOP SAMANTHA JEAN                        ████████████               02/10/21    02/11/21

PAY TO ADDRESS:    CHIPPENHAM JW HOSPITAL
                   P.O. BOX 402486
                   ATLANTA
                   GA 303842486

BILL TO:
      ROOP SAMANTHA JEAN             SAME-DAY SURGERY          FC=09
      ███████████████████            ADMIT THRU DISCHARGE CLAIM
      ███████████████████


DATE OF  BATCH     F       NDC/CPT-4/
SERVICE  REF   DEPT S PROC   HCPCS      QTY SERVICE DESCRIPTION       CHARGES

   250-PHARMACY
021021 10B308  0712   005461           1 ESMOLOL 100MG/10ML VL      1140.71
021021 10B191  0712   005694           1 FAMOTIDINE 20MG/2ML VL      321.38
021021 10B187  0712   008245           1 LIDO/EPI0.5%/1:200M IN      447.34
021021 10B187  0712   076191           1 KETAMINE 50MG/1ML VL        113.01
021021 10B191  0712   114709X J3490    1 LIDOCAINE 2% 100 MG IN       54.00
021021 10B191  0712   889167X J3490    1 ROCURONIUM 10 MG INJ         45.00
                                         SUBTOTAL:                  2121.44
   258-IV THERAPY
021021 10B396  0716   003976  338012504 1 D5LRS 1000ML               852.29
021021 10B446  0716   003976  338012504 1 D5LRS 1000ML               852.29
                                         SUBTOTAL:                  1704.58
   272-MED SURG SUPPLY/STERILE
021021 11B742  0718   367466           1 SET IRRIG CYSTO STRAIG      323.00
021021 11B742  0718   408652           1 PENCIL ESURG BOVIE 10F      215.00
021021 11B742  0718   435110           1 PACKING VAG 72X2IN          452.00
021021 11B742  0718   436334           1 SOLUTION IRR H2O1L URM      311.00
021021 11B742  0718   436353           1 SOLUTION IRR 0.9% NACL      194.00


INSURANCE BENEFITS ASSIGNED TO CJW MEDICAL CENTER.
PLEASE RETAIN FOR YOUR RECORDS.
```

S ROOP 000122

**JA140**

PATIENT NO:     CHIPPENHAM JW HOSPITAL   BILLING DATE   PAGE   2   00035
MED REC NO:                 7101 JAHNKE ROAD          02/15/21
GUARANTOR NO:
PATIENT:                    RICHMOND                              ADMITTED   DISCHARGED
ROOP SAMANTHA JEAN                                                02/10/21   02/11/21

| DATE OF | BATCH | | F | NDC/CPT-4/ | | | | |
|---------|-------|------|---|-----------|-----|---------------------|---------|
| SERVICE | REF | DEPT | S PROC | HCPCS | QTY | SERVICE DESCRIPTION | CHARGES |
| 021021 | 11B742 | 0718 | 470357 | | 1 | TRAY CATH LBRCTH 16FR | 573.00 |
| 021021 | 11B742 | 0718 | 368486 | | 1 | SUTURE VCL 2 BR SH J31 | 109.00 |
| 021021 | 11B742 | 0718 | 399649 | | 6 | SUTURE CPRSYN 2-0 V20 | 5754.00 |
| 021021 | 11B742 | 0718 | 418564 | | 6 | SUTURE PDS 0 ABSRB Z33 | 1038.00 |
| 021021 | 11B742 | 0718 | 712251 | | 2 | SUTURE VCRYL 0 SH J418 | 226.00 |
| | | | | | | SUBTOTAL: | 9195.00 |
| 278-MED SURG SUPPLY/IMPLANT | | | | | | | |
| 021021 | 11B742 | 0717 | 477120 | C1771 | 1 | IMPLANT MID-URETHRAL S | 23722.00 |
| 021021 | 11B742 | 0717 | 482498 | C2631 | 1 | ANCHRNG DVC SYS SACROS | 8705.00 |
| 021021 | 11B742 | 0717 | 482545 | C2631 | 1 | IMPLANT ANCH PLVC FLR | 3796.00 |
| | | | | | | SUBTOTAL: | 36223.00 |
| 307-LAB/UROLOGY | | | | | | | |
| 021021 | 10B181 | 0736 | 037032 | 81025 | 1 | PREG URINE QUAL BY DOO | 181.96 |
| | | | | | | SUBTOTAL: | 181.96 |
| 360-O.R. SERVICES | | | | | | | |
| 021021 | 11B742 | 0701 | 047728 | | 1 | BASIC OR SERVICES | 5449.33 |
| 021021 | 11B742 | 0701 | 047734 | | 172 | OR PER MIN LEVEL 5 | 58400.88 |
| | | | | | | SUBTOTAL: | 63850.21 |
| 370-ANESTHESIA | | | | | | | |
| 021021 | 11B742 | 0722 | 048182 | | 172 | ANESTH PER MINUTE | 9339.60 |
| 021021 | 11B742 | 0722 | 048183 | | 1 | BASIC ANES SERVICES | 4451.76 |
| | | | | | | SUBTOTAL: | 13791.36 |
| 636-DRUGS/DETAIL CODE | | | | | | | |
| 021021 | 10B454 | 0712 | 067971 | J2405 | 1-ONDANSETRON 4 MG VL | | 370.26- |
| 021021 | 10B191 | 0712 | 067971 | J2405 | 1 | ONDANSETRON 4 MG VL | 370.26 |

INSURANCE BENEFITS ASSIGNED TO CJW MEDICAL CENTER.
PLEASE RETAIN FOR YOUR RECORDS.

© ROOP 000193

**JA141**

PATIENT NO: 
MED REC NO:
GUARANTOR NO:
PATIENT:
ROOP SAMANTHA JEAN

CHIPPENHAM JW HOSPITAL    BILLING DATE    PAGE   3     00085
7101 JAHNKE ROAD               02/15/21

RICHMOND

ADMITTED    DISCHARGED
02/10/21    02/11/21

| DATE OF SERVICE | BATCH REF | DEPT | F S | PROC | NDC/CPT-4/ HCPCS | QTY | SERVICE DESCRIPTION | CHARGES |
|---|---|---|---|---|---|---|---|---|
| 021021 | 11B742 | 0717 | | 482273 | Q4152 | 140 | DERMAPURE 1SQCM | 111860.00 |
| 021021 | 10B312 | 0712 | | 079320 | J1170 | 1 | HYDROMORPH 0.5 MG INJ | 82.28 |
| 021021 | 10B312 | 0712 | | 079320 | J1170 | 1 | HYDROMORPH 0.5 MG INJ | 82.28 |
| 021021 | 10B312 | 0712 | | 079320 | J1170 | 1 | HYDROMORPH 0.5 MG INJ | 82.28 |
| 021021 | 10B312 | 0712 | | 079320 | J1170 | 1 | HYDROMORPH 0.5 MG INJ | 82.28 |
| 021021 | 10B399 | 0712 | | 073216 | J2270 | 1 | MORPHINE SULF 2MG INJ | 176.66 |
| 021021 | 10B444 | 0712 | | 073216 | J2270 | 1 | MORPHINE SULF 2MG INJ | 176.66 |
| 021021 | 10B447 | 0712 | | 073216 | J2270 | 1 | MORPHINE SULF 2MG INJ | 176.66 |
| 021021 | 11B522 | 0712 | | 073216 | J2270 | 1 | MORPHINE SULF 2MG INJ | 176.66 |
| 021021 | 10B447 | 0712 | | 067971 | J2405 | 4 | ONDANSETRON 4 MG VL | 370.26 |
| 021021 | 11B522 | 0712 | | 004908 | J1200 | 1 | DIPHENHYDRAMNE 50 MG I | 238.37 |
| 021021 | 10B312 | 0712 | | 006767 | J1630 | 1 | HALOPERIDOL LACT 5MG I | 430.76 |
| 021021 | 10B188 | 0712 | | 084373X | J2704 | 20 | PROPOFOL 200 MG INJ | 820.38 |
| 021021 | 10B191 | 0712 | | 077154X | J0330 | 1 | SUCCINYLCHOL UP TO 20 | 21.78 |
| 021021 | 10B191 | 0712 | | 067856X | J0690 | 4 | CEFAZOLIN 1 G VL | 786.50 |
| 021021 | 10B191 | 0712 | | 070816X | J1100 | 4 | DEXAMETH NA PHOS 4 MG | 100.43 |
| 021021 | 10B187 | 0716 | | 017470X | J7120 | 1 | LACTATED RINGERS 1000 | 755.04 |
| 021021 | 10B310 | 0712 | | 084373X | J2704 | 20 | PROPOFOL 200 MG INJ | 820.38 |
| 021021 | 10B167 | 0712 | | 071495X | J3010 | 1 | FENTANYL CIT 0.1 MG IN | 239.58 |
| 021021 | 10B187 | 0712 | | 071398X | J2250 | 2 | MIDAZOLAM 2 MG INJ | 217.80 |

INSURANCE BENEFITS ASSIGNED TO CJW MEDICAL CENTER.
PLEASE RETAIN FOR YOUR RECORDS.

S ROOF 010124

```
PATIENT NO:              CHIPPENHAM JW HOSPITAL    BILLING DATE   PAGE   4    00035
MED REC NO:              7101 JAHNKE ROAD          02/15/21
GUARANTOR NO:
PATIENT:                 RICHMOND                               ADMITTED    DISCHARGED
ROOP SAMANTHA JEAN                                             02/10/21    02/11/21


DATE OF  BATCH     F       NDC/CPT-4/
SERVICE  REF   DEPT S PROC HCPCS        QTY SERVICE DESCRIPTION        CHARGES

021021 10B187  0712  007179X J1170      1 HYDROMORPH 2 MG INJ          173.03
021021 10B187  0712  084373X J2704     20 PROPOFOL 200 MG INJ          820.38
021021 13B174  0712  017470X J7120      1 LACTATED RINGERS 1000        755.04
021021 13B174  0712  077154X J0330      5 SUCCINYLCHOL UP TO 20        108.90
021021 13B174  0712  072841X J1940      1 FUROSEMIDE 20 MG INJ         100.43
                                          SUBTOTAL:                  119654.82
       637-SELF-ADMINISTRABLE DRUG
021021 10B187  0712  009168             1 METRONIDAZO 0.75% 70GG      1333.42
021021 10B444  0712  007725   121115430 1 LACTULOSE 10GM/15ML LI       271.04
021021 10B187  0712  067607   378647016 1 SCOPOLAMIN 1.5MG/72H P       125.84
021021 10B396  0712  007183   406324401 1 HYDROMORPHONE 4MG TAB         66.55
021021 10B446  0712  007183   406324401 1 HYDROMORPHONE 4MG TAB         66.55
021021 10B444  0712  004953   904645760 1 DOCUSATE 100MG                60.50
                                          SUBTOTAL:                   1923.90
       710-RECOVERY ROOM
021021 11B742  0704  047815             1 BASIC POST OP SERVICES      2489.68
021021 11B742  0704  047816            97 POST OP PER MINUTE          9480.78
                                          SUBTOTAL:                  11970.46
       762-OBSERVATION ROOM
021021 11B519  0604  063298   G0378    12 OBS PER HOUR                2982.24
                                          SUBTOTAL:                   2982.24
       305-LAB/HEMATOLOGY
021121 11B528  0736  037438   85018     1 HEMOGLOBIN                    96.81
021121 11B528  0736  037434   85014     1 HEMATOCRIT                    96.81


INSURANCE BENEFITS ASSIGNED TO CJW MEDICAL CENTER.
PLEASE RETAIN FOR YOUR RECORDS.
```

© ROOP 000105

**JA143**

```
PATIENT NO:        ███████       CHIPPENHAM JW HOSPITAL    BILLING DATE    PAGE   5    00035
MED REC NO:        ███████       7101 JAHNKE ROAD          02/15/21
GUARANTOR NO:      ███████
PATIENT:                         RICHMOND              ███████       ADMITTED   DISCHARGED
ROOP SAMANTHA JEAN                                                   02/10/21   02/11/21
```



```
DATE OF   BATCH      F      NDC/CPT-4/
SERVICE   REF   DEPT S PROC   HCPCS        QTY SERVICE DESCRIPTION          CHARGES

                                                   SUBTOTAL:         193.62
     636-DRUGS/DETAIL CODE
021121 11B536  0712   073216   J2270        1 MORPHINE SULF 2MG INJ    176.66
021121 11B534  0712   073216   J2270        1 MORPHINE SULF 2MG INJ    176.66
021121 11B523  0712   073216   J2270        1 MORPHINE SULF 2MG INJ    176.66
                                                   SUBTOTAL:         529.98
     637-SELF-ADMINISTRABLE DRUG
021121 11B646  0712   001546   185084201    2 AMPHET/DEXAMPHT 10MG T   104.06
021121 11B523  0712   007183   406324401    1 HYDROMORPHONE 4MG TAB     66.55
021121 11B650  0712   007183   406324401    1 HYDROMORPHONE 4MG TAB     66.55
021121 11B534  0712   007183   406324401    1 HYDROMORPHONE 4MG TAB     66.55
021121 11B646  0712   017796   904506860    1 SIMETHICONE 80MG CHEW     73.81
021121 11B646  0712   004953   904645760    1 DOCUSATE 100MG            60.50
021121 11B646  0712   007725   50383077930  1 LACTULOSE 10GM/15ML LI   271.04
                                                   SUBTOTAL:         709.06
     762-OBSERVATION ROOM
021121 12B843  0604   063298   G0378       14 OBS PER HOUR            3479.28
                                                   SUBTOTAL:        3479.28

                          TOTAL ANCILLARY CHARGES       268510.91

DATE OF   BATCH  PAY          INS    BILL
PAYMENT   REFER  TYPE PROC    PLAN   THRU DT  DESCRIPTION / COMMENT      AMOUNT

02/11/21 15NBIL   4   999999          02/11/21 NON-BILLABLE ADJ         5,818.67
                                               TOTAL PAYMENTS          5,818.67
```

INSURANCE BENEFITS ASSIGNED TO CJW MEDICAL CENTER.
PLEASE RETAIN FOR YOUR RECORDS.

0 ROOP 002126

**JA144**

```
PATIENT NO:        ████████    CHIPPENHAM JW HOSPITAL    BILLING DATE    PAGE   6    00035
MED REC NO:        ████████    7101 JAHNKE ROAD          02/15/21
GUARANTOR NO:
PATIENT:                       RICHMOND                      ████████     ADMITTED    DISCHARGED
ROOP SAMANTHA JEAN                                                        02/10/21    02/11/21
```

```
                              TOTAL CHARGES        268510.91
                                  PAYMENTS              .00
                               ADJUSTMENTS           5818.67
                                   BALANCE         262692.24
```

INSURANCE BENEFITS ASSIGNED TO CJW MEDICAL CENTER.
PLEASE RETAIN FOR YOUR RECORDS.

S ROOP 000127

**JA145**

```
PATIENT NO:         [redacted]      CHIPPENHAM JW HOSPITAL    BILLING DATE    PAGE   7    00035
MED REC NO:              [redacted] 7101 JAHNKE ROAD           02/15/21
GUARANTOR NO:
PATIENT:                            RICHMOND              [redacted]   ADMITTED    DISCHARGED
ROOP SAMANTHA JEAN                                                     02/10/21    02/11/21
```



### DEPARTMENTAL CHARGE SUMMARY

| DEPT | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 0604 | NURSING UNT-HOSP DEFINED | 6,461.52 |
| 0701 | CMC OR | 63,850.21 |
| 0704 | CMC PACU | 11,970.46 |
| 0712 | PHARMACY | 11,569.12 |
| 0716 | INTRAVENOUS THERAPY | 3,214.66 |
| 0717 | JW CSS | 148,083.00 |
| 0718 | SUPPLIES | 9,195.00 |
| 0722 | ANESTHESIA | 13,791.36 |
| 0736 | LABORATORY | 375.58 |

### REVENUE CHARGE SUMMARY

| REV CD | DESCRIPTION | BILLABLE | NON-BILLABLE | TOTAL |
|--------|-------------|----------|--------------|-------|
| 0250 | PHARMACY | 2,022.44 | 99.00 | 2,121.44 |
| 0258 | IV THERAPY | 1,704.58 | .00 | 1,704.58 |
| 0272 | MED SURG SUPPLY/STERILE | 9,195.00 | .00 | 9,195.00 |
| 0278 | MED SURG SUPPLY/IMPLANT | 36,223.00 | .00 | 36,223.00 |
| 0305 | LAB/HEMATOLOGY | 193.62 | .00 | 193.62 |
| 0307 | LAB/UROLOGY | 181.96 | .00 | 181.96 |
| 0360 | O.R. SERVICES | 63,850.21 | .00 | 63,850.21 |
| 0370 | ANESTHESIA | 13,791.36 | .00 | 13,791.36 |
| 0636 | DRUGS/DETAIL CODE | 114,465.13 | 5,719.67 | 120,184.80 |
| 0637 | SELF-ADMINISTRABLE DRUG | 2,632.96 | .00 | 2,632.96 |
| 0710 | RECOVERY ROOM | 11,970.46 | .00 | 11,970.46 |
| 0762 | OBSERVATION ROOM | 6,461.52 | .00 | 6,461.52 |

S ROOP 000109

PATIENT NO:            CHIPPENHAM JW HOSPITAL      BILLING DATE     PAGE   8     00035
MED REC NO:                                7101 JAHNKE ROAD             02/15/21
GUARANTOR NO:
PATIENT:                                   RICHMOND                                      ADMITTED     DISCHARGED
ROOP SAMANTHA JEAN                                                                       02/10/21     02/11/21

```
            TOTAL CHARGES:     268,510.91
            TOTAL PAYMENTS:          .00
             TOTAL ADJUST:       5,818.67
```

S ROOP 000129

**JA147**



**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

**SAMANTHA ROOP,**

      Plaintiff**,**

**v.**                                                                            **Case No.: 3:21-CV-00675-DJN**

**NICHOLAS JAMES DESOUSA,**

      Defendant.

**MEMORANDUM OF FACT AND LAW IN OPPOSITION OF DEFENDANT'S MOTION**
**IN LIMINE TO EXCLUDE DR. GURETTE FROM TESTIFYING AT TRAIL, TO**
**EXCLUDE PLAINTIFF'S MEDICAL BILLS FOR DR. GUERETTE'S TREATMENT,**
**AND TO EXCLUDE ANY MENTION OF ANY MENTION OF ANY CONDITION**
**TREATED BY DR. GUERETTE**

      COMES NOW the Plaintiff, Samantha Roop, and proffers this Memorandum of Fact and

Law in Opposition of Defendant's Motion in Limine and accompanying Memorandum in Support

of the same and in support thereof states:

**FACTUAL BACKGROUND**

      Plaintiff affirms the first two paragraphs of Defendant's recitation of the facts of this

case.  Particularly that treating physicians did not have to provide a written report.

      Plaintiff returned to Dr. Guerette's care after the July 7, 2019 motor vehicle accident that

is the basis for this instant matter.  Her first scheduled appointment after said accident was on or

about October 8, 2019.  Prior to 2019, Samantha Roop has previously seen and was treated by Dr.

Guerette for bladder issues.  *See,* Guerette Depo 4:21-5:8 (Feb. 8, 2022). A copy of Dr. Guerette's

Deposition is attached hereto as Exhibit A. Plaintiff will further affirm Defendant's recitation of

the facts that Ms. Roop had several appointments with Dr. Guerette from October 2019 through

June 2021 for pelvic prolapse issues as well as bladder concerns.  *See,* Guerette Memorandum of

**JA149**

Fact, generally (April 7, 2022). Said Memorandum of Fact is attached as Exhibit B. The Plaintiff will concede the bills, as presented by Defendant, speak for themselves regarding dates and services rendered as well as that Dr. Guerette's treatment of the Plaintiff in 2019 to 2021 treating to the bladder and prolapse issues required several procedures.

On February 8, 2022 Dr. Guerette was deposed by both parties. During this deposition, when asked about his opinion regarding whether or not his treatment from October of 2019 to present was causally related to the automobile accident in July 2019 his consistent answer was that he could not say that with a, "high degree of medical probability." *See,* Guerette Depo 30:21, 31:9 (Feb. 8, 2022). Dr. Guerette points out during his deposition that a prolapse is a high force traumatic event as well that is not likely to be caused by falling off a horse and being dragged. *See,* Guerette Depo 30:1, 31:3 (Feb. 8, 2022). Furthermore, Dr. Guerette states that traumatic accidents can break the Interstim device Dr. Guerette has previously used to treat Ms. Roop. *See,* Guerette Depo 30:20-25 (Feb. 8, 2022). Roop herself temporally related the worsening of her bladder issues to the July 7, 2019 accident. *See,* Guerette Depo 8:5-9 (Feb. 8, 2022). Absent from the deposition is the clarification, by either party, as to what Guerette meant by "high degree".

Plaintiff concedes that there are no expert designated by either party in the instant matter. Furthermore, there has been no motion or filing submitted by Plaintiff to the Court amending the claims for Plaintiff's bladder and pelvic prolapse injuries that were stated in both the Complaint and throughout Plaintiff's Discovery responses. To the contrary, Plaintiff specifically stated her pelvic and bladder injuries as specific injuries she sustained in the accident, timely named Dr. Guerette as a treating physician for said injuries, properly disclosed the name of Dr. Guerette's practice as a facility where she received services, and appropriately provided Defendant with Dr. Guertte's bills and records. *See,* Pls. Ans. To Int. 4, 5, 7, 8, and 16. Attached as Exhibit C.

Dr. Guerette's Intimate Wellness Institute, and its physicians, was also previously disclosed timely as required by Rule 26(a)(1)(A) on November 15, 2021. *See,* Plaintiff's Initial Rule 26(a)(1)(A) Disclosures, 1(j)(viii) (November 15, 2021). The Rule 26(a)(1)(A) Disclosure is attached as Exhibit D.

On April 7, 2022 Dr. Guerette endorsed a Memorandum of Fact based observations made in the normal course of duty in his treatment of Plaintiff. Dr. Guerette states that Ms. Roop did not have any visits with him from 2013 to 2019. *See,* Guerette Memorandum of Fact,4 (April 7, 2022). Dr. Guerette states that he had an appointment with Ms. Roop in October 2019 regarding the worsening of urinary incontinence that Plaintiff temporally related to the motor vehicle accident in July 2019. *See,* Guerette Memorandum of Fact, 5(April 7, 2022). He further states that upon examination due to Plaitniff's concerns in October 2019, he determined Plaintiff had some loss of support of the anterior vaginal wall and pelvic organ prolapse which were noted changes since her prior treatment in 2011 and 2012. *See,* Guerette Memorandum of Fact, 7 (April 7, 2022). Dr. Guerette observed that the Interstim bladder device previously implanted to regulate Ms. Roop's bladder had malfunctioned and said malfunction was present in the unit's programming upon his examination of the device. The unit's malfunctioning was consistent with physical damage and said programming indicated the malfunction began to occur on July 7, 2019. *See,* Guerette Memorandum of Fact, 11 (April 7, 2022). Dr. Guerette indicates that there was no evidence of other significant risk factor present during his observation and treatment of Ms. Roop that could cause damage to the Interstim, the bladder issues, or the prolapse aside from the July 7, 2019 motor vehicle accident. *See,* Guerette Memorandum of Fact, 13, 28 (April 7, 2022). Moreover, Dr. Guerette certifies that he can state it is more likely than not that the car accident between the Defendant and Plaintiff on July 7, 2019 caused Ms. Roop's Interstim to malfunction

as well as the prolapses and pelvic floor dysfunction. *See*, Guerette Memorandum of Fact, 29 (April 7, 2022).

Furthermore, Dr. Guerette certifies that he is a business records custodian of any of his records regarding the bills or treatment of Ms. Roop, that said records were reasonable and necessary, and that the proper foundation is present for said records to be entered into evidence. *See*, Guerette Memorandum of Fact, 30 (April 7, 2022).

Plaintiff's Counsel contacted Defendant's Counsel to inform him of Dr. Guerette's Memorandum of Fact requesting that he, based thereon, withdraw his Motion in Limine. Defendant's Counsel declined.

Plaintiff certifies that she has made a good faith effort to resolve this dispute prior to filing this Motion.

### DISCUSSION OF LAW AND ARGUMENT

1. **Dr. Guertte should be permitted to testify as a fact witness as Plaintiff timely disclosed him and his practice, the Intimate Wellness Institute, as a treating physician regarding injuries Plaintiff incurred as a result of the July 7, 2019 accident with Defendant.**

Plaintiff timely and properly disclosed Dr. Guerette as an actively treating physician, his practice, and provided his bills and records as required to Defendant in discovery pursuant to Rule37(c)(1) as well as Rule (2)(a) and (e).  Said disclosures were initially made in December of 2021.  Furthermore, Dr. Guerette's Intimate Wellness Institute was properly disclosed in Defendant, as stated above, has already deposed Dr. Guerette on February 8, 2022.  All of these occurrences took place prior to the close of discovery on March 23, 2022.  It is well established by Federal Courts that treating physicians can be called as fact witnesses as long as they only provide testimony as to, "their individual observations and treatment . . . (and) will be permitted to testify to their observations, course of treatment, and diagnosis," at the time the patient was

treated.  Springs v. Waffle House, Inc., Civil Action No. 3:18-cv-03516-JMC, 2021 U.S. Dist. LEXIS 6031, at *8 (D.S.C. Jan. 13, 2021).  The Court's decision in the aforementioned case is consistent with prior treatment of similar issues in this district prohibiting the testimony of treating physicians but prohibiting specific testimony by the same only as to expert opinion which consists of prognosis and future medical needs.  *Id.*  This District has held that, "a person with specialized training does not testify as an expert by giving first-hand participant testimony, even though it appears to be expert testimony." Quoting, *Gomez v. Rivera Rodriguez,* 344 F.3d 103, 113 (1st Cir. 2003). Additionally, as stated by the court in *Gomez,* 344 F.3d at 113-114, and quoted by *Indem,* "a party need not identify a witness as an expert so long as the witness played a personal role in the unfolding of the events at issue and the anticipated questioning seeks only to elicit the witness's knowledge of those events." Indem. Ins. Co. of N. Am. v. Am. Eurocopter LLC, 227 F.R.D. 421, 424 (M.D.N.C. 2005).  In the instant matter Dr. Guerette is a treating physician who can qualify as an expert but will not be doing so as he is a treating physician of Ms. Roop with firsthand participant knowledge who played a personal role in the diagnosis and treatment of Ms. Roop and will only be asked the same.

The same Indem goes on to quote that *Fed. R. Civ. P. 26*, "focuses on the substance of the testimony which is offered as opposed to the status of the witness." *Id.* Dr. Guerette will only be asked about his firsthand knowledge regarding Ms. Roop, her treatment by him, and his diagnosis of her at the time of treating making him squarely a fact witness and his testimony relevant and admissible without the need for a Rule 26 expert disclosure.  More cases in this District have upheld the same stating that, "the nature of a witness's testimony, [*2] and the source of the facts on which it is based, determines the disclosure requirements.  To the extent

that a treating physician's testimony is based on facts learned or "observations made in the normal course of duty," the treating physician is a fact witness and need not submit an expert report." Barnes v. Costco Wholesale Corp., No. JKB-18-3377, 2019 U.S. Dist. LEXIS 134225, at *2 (D. Md. Apr. 18, 2019). The same case goes on to further distinguish that, "a treating physician is required to submit at least an abbreviated expert report . . . if he or she offers opinion testimony or testif[ies] as to scientific, technical, or specialized information," per Rule 26(a)(2)(c) as such opinion testimony makes them a hybrid/fact witness. *Id.* Dr. Guerette will not offer any opinion testimony that would require him to be disclosed as an expert hybrid/fact witness under Rule 26(a)(2)(c).

Defendant cites a Seventh Circuit case in support of his argument, *Cripe v. Henkle*. This decision is not controlling given the aforementioned case law out of the appropriate district, the Fourth, which clearly states that treating physicians can testify as fact witnesses with no report or disclosure required under Rule 26(2)(a) or (c). Given that Plaintiff has properly and timely disclosed Dr. Guerette as a fact witness he must be permitted to testify as to his actual treatment, observations, and diagnosis of Ms. Roop at the time of treatment as said testimony is incredibly relevant to the issues of the instant matter.

> **2. The medical bills for Dr. Guertte's treatment should be admissible because an expert is not required to opine to causation regarding injuries that arose from a motor vehicle accident**

Plaintiff agrees with Defendant that since the Court has this case as a matter of diversity jurisdiction, the Court must apply Virginia substantive law. Furthermore, the Plaintiff further agrees that the Court's decision depends on the evidence and types of damages permitted in personal injury cases under Virginia substantive law.

Here the Defendant seeks to exclude Dr. Guerette's medical bills and treatment due to a lack of expert opinion regarding causation. Defendant's reliance on *McMunn v. Tatum* is misplaced. *McMunn* is a medical malpractice case. The *Code of Virginia* §8.01-20.1, the *Code* Section directly on point with the *McMunn* case and its ruling arising subsequently thereto, requires an expert witness for only medical malpractice cases. The case clarifies that, "whether a particular treatment is medically necessary and whether it was causally related to a condition resulting from some act or omission on the Defendant's part can usually be determined only by a medical expert," when referring to medical malpractice cases due to the requirement to establish the defendant deviated from the applicable standard of care and that deviation was the proximate cause of the plaintiff's injuries. McMunn v. Tatum, 237 Va. 558, 560, 379 S.E.2d 908, 909 (1989); Summers v. Syptak, 293 Va. 606, 608, 801 S.E.2d 422, 423 (2017); Va. Code Ann. § 8.01-20.1.

This Circuit has acknowledged that, "Virginia tort law does not mandate expert testimony to show proof of causation." McCauley v. Purdue Pharma L.P., 331 F. Supp. 2d 449, 450 (W.D. Va. 2004). The Virginia Supreme Court has made it clear, particularly regarding motor vehicle accident and the injuries incurred as a result thereof, that not only is expert testimony not required to demonstrate causation, "direct medical evidence to establish a causal connection between an accident and injury is ***not*** a prerequisite to discovery. Here the testimony of the plaintiff alone, with all reasonable inferences which could be drawn therefrom, coupled with the medical evidence offered, was sufficient to present a Jury issue as to causation. Sumner v. Smith, 220 Va. 222, 223, 257 S.E.2d 825, 825 (1979). In the instant matter Plaintiff is going beyond her own testimony regarding her injuries and their timing and presenting her treating physician as a fact witness to testify as to his treatment, observations, and diagnosis. The Virginia Supreme Court has established that lay testimony is admissible on the question of causation

regarding injuries sustained in motor vehicle accident. *Summers,* 293 Va. 606, 614, 801 S.E.2d 422, 426 (2017).  Lay testimony of causal connection between an automobile accident and injury is admissible for whatever weight the fact finder may choose to give it, even when medical testimony fails to establish causal connection expressly. Todt v. Shaw, 223 Va. 123, 124, 286 S.E.2d 211, 212 (1982).

This Virginia Supreme Court cases support the Plaintiff's argument and are directly on point.  Plaintiff and her treating physician, both non-expert fact witnesses, can testify as to causation of her injuries that arose out of a motor vehicle accident with Defendant.  Additionally, Roop's daughter and significant other, also timely and appropriately disclosed as required, will offer further lay witness testimony as to the causal relationship between Roop's injuries and the July 7, 2019 accident.

The bills themselves are business record affidavits that are admissible if the proper foundation is laid.  Dr. Guerette certified that he is a records custodian of his own bills and records and further certified the requisite conditions for said bills and records to be admissible over typical hearsay exclusions.  The Defendant's own proffered case McMunn v. Tatum states that question of authenticity as to medical bills and records is subject to verification from lay sources such as the Plaintiff. McMunn v. Tatum, 237 Va. 558, 569, 379 S.E.2d 908, 914 (1989).  Courts in Virginia, "expressly permit[s] the introduction of certain portions of medical records under the business records exception to its hearsay rule. Parker v. Commonwealth, 41 Va. App. 643, 646, 587 S.E.2d 749, 750 (2003).  Virginia Courts, including the Supreme Court, have adopted the modern Shopbook Rule allowing the admission of medical records, particularly those arising from a motor vehicle accident, "where a proper foundation is laid and the need to do so, as an exception to the hearsay rule, is apparent." Dalton

v. Johnson, 204 Va. 102, 103, 129 S.E.2d 647, 648 (1963).  The same case goes even further to state that the admissions of the records does not require proof of the original observers or record keepers.  *Id.*  Here Dr. Guerette created some if not most of the records and bills that will be introduced using his testimony as a foundation.  He is the original observer and record keeper for the majority of the records to be introduced.  This is conjunction with the fact-based testimony he will give makes it clear he is not only a business record custodian but the actual person who created said bills and records.  Bills and records that will demonstrate a clear need to be admitted based on his testimony in conjunction with the other witnesses Plaintiff will produce that give lay testimony as to causation of Plaintiff's injuries, namely the car accident on July 7, 2019.

Plaintiff does point out to the Court, and will abide by the same, that this business record exception for medical records does not include the admission of the opinions of physicians. Plaintiff would not seek to enter any opinion testimony, whether through oral evidence or business records, as such is within the purview of an expert and there is not an expert to testify on Plaintiff's behalf.  Arnold v. Wallace, 283 Va. 709, 711, 725 S.E.2d 539, 540 (2012).

As an aside but as a relevant contention that may arise given the admission of the medical bills, the Supreme Court of Virginia has held that medical bills received by an injured party are *prima facie* evidence that the charges were reasonable and necessary. *See Walters v. Littleton*, 223 Va. 446, 290 S.E.2d 839 (1982). *See also Nationwide Mutual Ins. Co. v. Jewel Tea Co.*, 202 Va.527, 118 S.E.2d 646 (1961). Bogle Dev. Co. v. Buie, 19 Va. App. 370, 375, 451 S.E.2d 682, 685 (1994).

### 3. The medical bills for Dr. Guertte's treatment are relevant and admissible and therefore should be permitted to be entered into evidence

Dr. Guerette's bills and records, as proffered by Dr. Guerette qualifying as a business records custodian for the same, are admissible and should be permitted to be entered into evidence are they are completely relevant to a significant fact at issue. "Court have defined as relevant every fact, however remote or insignificant, that tends to establish the probability or improbability of a fact in issue." <u>McMunn v. Tatum</u>, 237 Va. 558, 560, 379 S.E.2d 908, 909 (1989). The bills and records of Dr. Guerette are relevant regarding the issue of whether or not Plaintiff's injuries were caused by the motor vehicle between the Plaintiff and Defendant that is the basis of the instant matter taking place on July 7, 2019. The bills and records help establish the probability or improbability of those injuries being caused by the July 7th accident. As explicated herein, supra, an expert is not required to opine as to causation of the injuries. In the instate matter, a doctor will testify as to the Plaintiff's injuries and his treatment, diagnosis, and observations of the same. The records and bills clearly make the issue, and the facts related thereto, of whether or not the accident caused Roop's injuries more or less probable, completely relevant, and their probative value is clear without confusing any issues comporting with Rules 401, 402, and 403. Dr. Guerette stated in his Memorandum of fact that there were no other additional significant risk factors present that can cause the injuries the Plaintiff complained of after the July 2019 accident, that Roop temporally related the worsening bladder issues to the July 7th accident during his treatment of her, and that the Interstim programming demonstrated a malfunction consistent with physical damage on the date of the accident. All incredibly relevant facts for the trier of fact, the jury, to draw inferences from as to the causation of Roop's injuries.

**JA158**

## CONCLUSION

WHEREFORE, for the foregeoing reasons mentioned above, the Plaintiff, by Counsel, respectfully requests that the Court permit Dr. Guerette to testify as a fact witness to his direct observations, treatment, and diagnosis of Plaintiff as well as admit his bills and records which are undoubtedly relevant and admissible and clearly defined exceptions to the Hearsay Rule.

**SAMANTHA ROOP**

By Counsel

_____/s/_____

Samantha Cohn (VSB# 89081)
Geoff McDonald & Associates, P.C.
8720 Stony Point Parkway, Suite 250
Richmond, VA 23235
Phone: (804) 888-8888
Facsimile: (804) 359-5426
Email: scohn@mcdonaldinjurylaw.com
*Counsel for Plaintiff*

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 8th day of April, 2022, I electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

Carter T. Keeney, Esq. (VSB # 82275)
Carter & Shands, P.C.
9030 Stony Point Parkway, Suite 530
Richmond, VA 23235
Phone: (804) 747-7470
Facsimile: (804) 747-7977
Email: ckeeney@carterandshands.com
*Counsel for Defendant*

_____/s/_____

Samantha Cohn, Esquire

**JA159**

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

**SAMANTHA ROOP,**

  Plaintiff,

**v.**              Case No.: **3:21-CV-00675-DJN**

**NICHOLAS JAMES DESOUSA,**

  Defendant.

<u>**MEMORANDUM OF FACT**</u>

  COMES NOW the Plaintiff, Samantha Roop, and proffers this Memorandum of Fact endorsed by Dr. Nathan Guerrette who will give factual testimony as to his actual treatment of the intimate pelvic injuries the Plaintiff complained of and exhibited subsequent to the motor vehicle accident that is the basis for this instant matter.  Namely, that Dr. Guerette will testify in a manner consistent with the Plaintiff's requisite burden of proof that his treatment of the Plaintiff's complaints was necessary, reasonable, and relevant to the instant matter.  In support thereof,  Dr. Guerette states:

  **1.** Plaintiff Ms. Roop first came under Dr. Guerette's care in early 2011 for incontinence, overactive bladder, pelvic floor muscle dysfunction, and bladder pain.

  **2.** Dr. Guerette is a board-certified Urogynecologist as well as holding board-certifications in Female Pelvic Medicine, Reconstructive Surgery, Obstetrics, and Gynecology.

  **3.** During his course of treatment, in or about 2012 or 2013, Dr. Guerette implanted a sacral nerve stimulator to simulate the third sacral nerve root that stimulates the bladder when alternative treatments are unsuccessful.

**JA161**

4. Dr. Guerette did not see the Plaintiff between 2013 and October of 2019 and was not aware of any new complaints by Plaintiff requiring his treatments or services.

5. Plaintiff had an appointment with Dr. Guerette on or about October 8, 2019 at which time she complained of a worsening of urinary incontinence that Plaintiff temporally related to a motor vehicle accident that occurred on or about July 7, 2019.

6. On the October 8, 2019 visit Plaintiff complained of mixed incontinence symptoms that were not present prior to the July 7, 2019 motor vehicle accident she was involved in.

7. Upon examination and assessment Dr. Guerette also determined Plaintiff with some loss of support of the anterior vaginal wall, cystocele, pelvic pain, and pelvic organ prolapse which were noted as changes in her symptoms since her last visit.

8. Plaintiff had further follow up appointments in early December 2019 with Dr. Guerette and his staff at which time she was diagnosed with a worsening overactive bladder since her last evaluation after a urodynamic evaluation and cystoscopy. The previous assessment of urinary retention and cystocele were confirmed as well as a diagnosis of dyssynergic voiding.

9. Dr. Guerette noted the Interstim, the sacral nerve stimulator, was not functioning properly, so because of that and in conjunction with the diagnosis, it was determined the Interstim battery needed to be replaced and pelvic floor therapy initiated.

10. The Interstim has a general "shelf-life" of five years at which time the unit ceases working meaning there is no ability to read the unit's programming as the unit has died due to lack of battery life.

11. In Ms. Roop's case, the Interstim malfunctioned as it ceased to work properly but continued to operate which allowed Dr. Guerette to read its programming. The programming indicated a malfunction of the unit consistent with physical damage on July 7, 2019.

**JA162**

**12.** Dr. Guerette will testify that the force caused by a car accident can cause an Interstim to malfunction.

**13.** Dr. Guerette will testify that there are other factors that can cause an Interstim to malfunction but none of those other factors were indicated or uncovered during the course of his treatment of Ms. Roop.

**14.** The Interstim battery and leads were replaced by Dr. Guerette in January 2020 which did relieve some of the overactive bladder symptoms for a short period of time however the prolapse was still a persistent complaint.

**15.** In February 2020 the Plaintiff once again returned to Dr. Guerette's office for complaints f urgency and frequency resulting in a reprogramming of the Insterstim as well as discomfort from the prolapse.

**16.** Plaintiff continued seeking the treatment of Dr. Guerette throughout 2020 and in December complained that her voids had drastically increased in frequency, eleven times a day and more than four times at night, as well as pain with sex and a worsening of her interstitial cystitis symptoms. The interstitial cystitis was initially diagnosis in early 2020.

**17.** The Interstim was once again reprogrammed and examined by a technician from Medtronic, the company that makes the unit.

**18.** In January 2021 Plaintiff was once again seen by Guerette for continued pain during sex, ongoing interstitial cystitis, worsening bladder pain, excess void frequency, and the bladder prolapse was noted to have increased from stage 2 upon initial diagnosis in 2019 to a stage three at this appointment.

**19.** During several January 2021 visits to Guerette and his staff by the Plaintiff, the decision was made to fix the prolapse surgically in order to attempt to alleviate the prolapse and ease and/or lessen the pain Plaintiff was experiencing. The procedure was a vaginal vault suspension.

**20.** The procedure was conducted on or about February 10, 2021 at which time Plaintiff was diagnosed with a uterine prolapse, a vaginal vault prolapse, a vaginal prolapse, and stress urinary incontinence.

**21.** Follow up appointment were attended by Plaintiff with Guerette and staff in February 2021 at which time voiding had returned to normal an in March of 2021 Plaintiff's prolapse was determined to have been corrected.

**22.** In May 2021 Plaintiff again returned to Guerette for a follow up and had continued complaints of pain associated with sexual activity and bladder tenderness due to interstitial cystitis.

**23.** At another appointment in June of 2021 Plaintiff had reoccurring complaints of pain with sex and baldder pain resulting in another reprogramming of the Interstim.

**24.** In 2019 Plaintiff presented to Guerette with an exacerbation of some chronic issues related to her bladder and new complaints of prolapse and pelvic floor dysfunction.

**25.** Plaintiff related these exacerbations of former complaints and the appearance of the new complaints in 2019 to the motor vehicle accident that occurred between Plaintiff and Defendant on July 7, 2019.

**26.** Dr. Guerette will testify that traumatic force, such as force caused by a car accident, can cause a loss of support in the pelvis leading to prolapse and pelvic floor dysfunction.

**27.** Dr. Guerette will testify that there are other factors besides traumatic force that can cause prolapse.

**JA164**

28. During Dr. Guerette's treatment of Ms. Roop in 2019 to present, whether through her statements made for medical treatment or his own observations during said treatment, there were no additional significant risk factors that could caused the prolapses or pelvic floor dysfunction aside from the car accident that is the basis of this matter which took place on July 7, 2019.

29. While Dr. Guerette will not be asked by Plaintiff to opine as he is solely a fact witness, Dr. Guerette can state that it is more likely than not that the car accident that occurred between the Plaintiff and Defendant on July 7, 2019 caused Ms. Roop's Interstim to malfunction as well as the pelvic prolapses and pelvic floor dysfunction.

30. Any records relied on and/or provided by Dr. Guerette to be entered into evidence are reasonable and necessary. Dr. Guerette is a business custodian of said records and will testify that said records were made at or near the time of the occurrence of the matters set forth therein, by or from information transmitted by a person with knowledge of those matters, were kept in the course of regularly conducted business activity, and were made by this business as a regular practice.

I, Dr. Nathan Guerette, having duly read the above statements, certify that the contents of this memorandum are true and accurate. I certify that said facts as contained above were observed by me during my actual treatment of Plaintiff Samantha Roop and that none of the above statements or conclusions are based on medical records provided by other providers or treatments that were not performed by me. I declare under penalty of perjury that the foregoing is true and correct.

_____

Dr. Nathan Guerette

*Intimate Wellness Institute*

**JA165**

**Samantha Cohn**

| | |
|---|---|
| **From:** | Office Manager <office.manager@iwiva.com> |
| **Sent:** | Thursday, April 7, 2022 5:29 PM |
| **To:** | Samantha Cohn |
| **Subject:** | Re: URGENT - PLEASE FORWARD TO DR> GUERETTE IMMEDIATELY |
| **Attachments:** | SKM_300i22040717250.pdf |

He signed!

**Kae Snyder, Practice Manager**
**Nathan L. Guerette, MD**
**Jennifer Reilly, NP**
**The Intimate Wellness Institute of Virginia**
2931 Polo Parkway
Midlothian, VA 23113
P) 804-523-2533 ext. 305
F) 804-523-2534

On Thu, Apr 7, 2022 at 5:19 PM Samantha Cohn <SCohn@mcdonaldinjurylaw.com> wrote:

Let's try this one

**From:** Office Manager <office.manager@iwiva.com>
**Sent:** Thursday, April 7, 2022 5:13 PM
**To:** Samantha Cohn <SCohn@mcdonaldinjurylaw.com>
**Subject:** Re: URGENT - PLEASE FORWARD TO DR> GUERETTE IMMEDIATELY

Here is another one.

**Kae Snyder, Practice Manager**

**Nathan L. Guerette, MD**

**Jennifer Reilly, NP**

**The Intimate Wellness Institute of Virginia**

2931 Polo Parkway

Midlothian, VA 23113

1

**JA166**

P) 804-523-2533 ext. 305

F) 804-523-2534

On Thu, Apr 7, 2022 at 5:03 PM Samantha Cohn <SCohn@mcdonaldinjurylaw.com> wrote:

Awesome. You're best.

**From:** Office Manager <office.manager@iwiva.com>
**Sent:** Thursday, April 7, 2022 5:02 PM
**To:** Samantha Cohn <SCohn@mcdonaldinjurylaw.com>
**Subject:** Re: URGENT - PLEASE FORWARD TO DR> GUERETTE IMMEDIATELY

I will get this to him now.

**Kae Snyder, Practice Manager**

**Nathan L. Guerette, MD**

**Jennifer Reilly, NP**

**The Intimate Wellness Institute of Virginia**

2931 Polo Parkway

Midlothian, VA 23113

P) 804-523-2533 ext. 305

F) 804-523-2534

On Thu, Apr 7, 2022 at 4:52 PM Samantha Cohn <SCohn@mcdonaldinjurylaw.com> wrote:

Thank you!  I corrected paragraph eleven with the inserted words, thank you doctor for clarifying.  I need something similar to the language in paragraph 28 stating that while there are other factors that can cause the injuries, there were no indicated or observed during his treatment.  I tweaked it a little but I have sent a word doc if he wants to further correct.

2

**JA167**

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

SAMANTHA ROOP,

        Plaintiff,

    v.                                    Civil Action No.: 3:21-cv-00675-DJN

NICHOLAS JAMES DESOUSA,

        Defendant.

**PLAINTIFF'S INITIAL RULE 26(a)(1)(A) DISCLOSURES**

Plaintiff, Samantha Roop, by counsel, hereby makes the following initial disclosures in accordance with Rule 26(a)(1)(A) of the Federal Rules of Civil Procedure:

**1.    Individuals who are likely to have discoverable information:**

    a.    The Defendant, Nicholas James Desousa. Upon information and belief, the Defendant resides at 3113 Blue Herron Drive S, Chesapeake Beach, Maryland 20732.

    b.    Samantha Roop, plaintiff, may be contacted through counsel. Ms. Roop has knowledge of the incident, her pre-incident life, and her post-incident life and difficulties. Plaintiff resides at 2291 Mill Road, Powhatan, Virginia 23139.

    c.    Gerard Barton, Plaintiff's husband. Mr. Barton has knowledge of Plaintiff's pre-incident life and her post-incident life and difficulties. He is aware of the incident through the Plaintiff and their children who were passengers in the vehicle at the time of the incident. Mr. Barton resides at 2291 Mill Road, Powhatan, Virginia 23139.

**JA168**

d.      Kelsey Hendershot, minor, was a passenger in Plaintiff's vehicle at the time

of the incident and has knowledge of the incident and Plaintiff's post-incident life

and difficulties. Miss Hendershot resides at 2291 Mill Road, Powhatan, Virginia

23139.

e.      Kendra Barton, minor, was a passenger in Plaintiff's vehicle at the time of

the incident and has knowledge of the incident and Plaintiff's post-incident life and

difficulties. Miss Barton resides at 2291 Mill Road, Powhatan, Virginia 23139.

f.      John Barton, minor, was a passenger in Plaintiff's vehicle at the time of the

incident and has knowledge of the incident and Plaintiff's post-incident life and

difficulties.  Mr. Barton resides at 2291 Mill Road, Powhatan, Virginia 23139.

g.      Jim Miller, a witness to the incident.  Mr. Miller has knowledge of the

incident.

h.      Trooper Adam N. Cavins.  Trooper Cavins investigated the incident and has

knowledge thereof.  Trooper Cavins also prepared the crash report associated with

the incident.

i.      Plaintiff's family, friends, and co-workers, to be specifically identified in

discovery, who may have knowledge of Plaintiff's pre-incident life and post-

incident life and difficulties.

j.      Plaintiff's treating physicians, healthcare professionals, and employees of

healthcare facilities, specifically:

        i.      St. Francis Watkins Center

        ii.     Richmond Emergency Physicians

2

**JA169**

      iii.      Emergency Coverage Corporation

      iv.      Commonwealth Radiology

      v.      Powhatan Medical Associates

      vi.      Chippenham & Johnston Willis Hospital

      vii.      Alliance Physical Therapy

      viii.      Intimate Wellness Institute of Virginia

      ix.      Bon Secours Neurology Clinic

      x.      Tuckahoe Orthopedics

      xi.      OrthoVirginia

k.      Plaintiff's prior treating physicians, healthcare professionals, and employees of healthcare facilities who have knowledge of Plaintiff's pre-incident state of health, specifically:

      i.      All previous disclosed medical providers in section 1(j) above.

l.      Any other individual identified in Defendant's Rule 26(a)(1) Disclosure.

**2.**      **Documents and things:**

a.      The following categories of documents are in the possession of plaintiff and may be used to support plaintiff's claim:

      i.      Crash Report prepared by Trooper Cavins, attached hereto.

      ii.      Field notes taken by Trooper Cavins, attached hereto.

      iii.      Statements from Plaintiff and Defendant taken as part of Trooper Cavins' investigation, attached hereto.

iv.     Video recording containing in-car video of the incident scene, attached hereto.

v.      Audio recordings received from Plaintiff's FOIA request, attached hereto.

vi.     Photographs of the vehicles involved in the incident, attached hereto.

vii.    Plaintiff's pre- and post-incident medical bills and records currently in Plaintiff's possession and as may be otherwise obtained during discovery.

viii.   Any document identified in Defendant's Rule 26 Disclosures

b.      The following categories of documents are being withheld from production at this time on the grounds of attorney-client privilege and/or subject to protective order and/or work product and/or settlement negotiation privilege: communications between plaintiff and her attorneys and research (legal and/or factual) by, or directed by, such attorneys.

3.      **Computation of Damages Claimed by Plaintiff:**

a.  Past pain

b.  Past suffering.

c.  Current and future pain

d.  Current and future suffering.

e.  Past inconvenience.

f.  Current and future inconvenience.

g.  Past emotional distress.

h.  Current and future emotional distress.

4

**JA171**

      i.   Pre-judgment and post-judgment interest.

      j.   The total amount of damages are estimated at $5,000,000.00, plus reasonable attorneys fees and costs, pre-judgment interest and post-judgment interest, to be computed at the close of litigation.

**4. Insurance agreements:**

      a.   Plaintiff has none applicable to this action.

Respectfully submitted,
**SAMANTHA ROOP**
Plaintiff

/s/     Nikita Wolf, Esq.

Nikita Wolf (VSB No. 86939)
Geoff McDonald & Associates, P.C.
8720 Stony Point Parkway, Suite 250
Richmond, VA 23235
Phone: (804) 888-8888
Facsimile: (804) 359-5426
Email: nwolf@mcdonaldinjurylaw.com
Counsel for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on the 15th day of November, 2021, the foregoing Rule 26(a)(1)

disclosures was electronically mailed to the following:

Carter T. Keeney, Esq. (VSB # 82275)
Carter & Shands, P.C.
9030 Stony Point Parkway, Suite 530
Richmond, VA 23235
Phone: (804) 747-7470
Facsimile: (804) 747-7977

**JA172**

Email: ckeeney@carterandshands.com
*Counsel for Defendant*

/s/    Nikita Wolf, Esq.
        Nikita Wolf, Esq.

**JA173**

IN THE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| SAMANTHA ROOP | ) | Plaintiff, |
| | ) | |
| v. | ) | Civil Action No.: 3:21-cv-00675 |
| | ) | |
| NICHOLAS JAMES DESOUSA | ) | Defendant. |

**REPLY BRIEF TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION IN LIMINE TO EXCLUDE DR. GUERRETTE FROM TESTIFYING AT TRIAL, TO EXCLUDE PLAINTIFF'S MEDICAL BILLS FOR DR. GUERETTE'S TREATMENT, AND TO EXCLUDE ANY MENTION OF ANY CONDITION TREATED BY DR. GUERETTE**

COMES NOW, Nicholas James Desousa, by counsel and for his reply to Plaintiff's opposition to Defendant's Motion in Limine to exclude Dr. Nathan Guerette from testifying at trial, to exclude Plaintiff's medical bills for Dr. Guerette's treatment, and to exclude any mention of any condition treated by Dr. Guerette and states the following in support thereof:

**DISCUSSION OF LAW AND ARGUMENT**

*I.        Dr. Guerrette's testimony is not relevant to any fact at issue.*

Dr. Guerrette should not be permitted to testify as his testimony is not relevant to any fact at issue.  Plaintiff is attempting to get around her failure to disclose an expert witness by calling Dr. Guerrette as a fact witness.  Plaintiff claims Dr. Guerrette will not offer any expert opinions, but the Guerrette Memorandum of Fact, which is also untimely as discovery has closed, is replete with opinions.  In said Memorandum paragraphs 7, 8, 9, 11, 12, 13, 14, 16, 18, 20, 25, 26, 27 28, and 29 all contain expert opinions.  Paragraph 29 claims that Dr. Guerrette "can state that it is more likely than not that the car accident that occurred between the Plaintiff and

**JA174**

Defendant on July 7, 2019 caused Ms. Roop's Interstim to malfunction as well as the pelvic

prolapse and pelvic floor dysfunction.

Plaintiff admits no expert can opine that the subject accident caused the condition for

which Dr. Guerrete treated the Plaintiff and that no expert can opine the medical bills for the

same were causally related to the subject accident.  Without this key link needed to establish the

damages for the same, none of his testimony is relevant.

In *Springs v. Waffle House, Inc.*, Civil Action No.: 3:18-cv-03516-JMC, 2021 U.S. Dist.

LEXIS 6031 (D.S.C. Jan. 13, 2021) a district court in a South Carolina diversity case ruled that

when a Plaintiff failed to disclose treating physicians as experts, they could not offer expert

opinions.  In that case a Waffle House employee allowed hot coffee to be spilled on a fourteen

month old toddler, which resulted in second degree burns.  The court stated that it would not

permit the non disclosed doctors to provide any expert opinions, including "expert opinions on

the infant's diagnosis, prognosis and future medical needs." *Id.* at *8.  The doctors could only

testify as to their observations and course of treatment.  The court in that case did not address

whether such testimony was relevant to any fact at issue, presumably because there was no

dispute about the causation of the burns on the toddler.  In this case, there is absolutely a dispute

about the causation of the Plaintiff's claimed injuries.

Plaintiff's reliance on *Gomes v. Rivera Rodriguez*, 344 F.Ed 103, 133 (1st. Cir. 2003) and

*Indemns. Ins. Co. of N. Am. V. Am. Eurocopter, LLC*, 227 F.R.D. 41 (M.D.N.C. 2005) is also

misguided.  Dr. Guerrette did not play a personal role in the unfolding of the events.  His

involvement is solely as a medical doctor treating a complicated medical issue.  Further, under

Virginia law, "an opinion concerning the causation of a particular physical human injury is a

component of a diagnosis, which is the practice of medicine." *John v. Im*, 263 Va. 315, 321, 559

**JA175**

S.E2d, 694, 697 (2002).  Expert testimony is required to state the causation of a physical injury

and as such, Dr. Guerrette cannot testify as to the causation of any injury.

Again, Plaintiff fails to address the seminal issue: in order to claim damages for the

bladder and prolapse issues, the Plaintiff needs an expert to opine such issues were caused by the

subject accident.  Absent an expert to opine as to the causal relation, there is no relevance.

Plaintiff does not have an expert to opine as to causation and therefore any testimony regarding

the same is not relevant.

II.     *Plaintiff's medical bills should be excluded as an expert is required to opine as to causation regarding injuries that arose from a motor vehicle accident.*

Plaintiff cannot introduce her medical bills for Dr. Guerrette's treatment absent expert

testimony concerning causation because Defendant has a substantial contest.  *McMunn v. Tatum*

237 Va. 558, 379 S.E.2d 908 (1989) does not limit its holding to medical malpractice cases when

it states:

> We now hold that where the defendant objects to the introduction
> of medical bills, indicating that the defendant's evidence will raise
> a substantial contest as to either the question of medical necessity
> or the question of causal relationship, the court may admit the
> challenged medical bills only with foundation expert testimony
> tending to establish medical necessity or causal relationship, or
> both, as appropriate.

In fact, in *Mcmunn v. Tatum*, the Supreme Court was clarifying an opinion from *Walters*

*v. Littlejohn*, 223 Va. 446, 290 S.E.2d 839 (1982), which was a personal injury lawsuit involving

an automobile accident.

Plaintiff also provided an incomplete quotation of *McCauley v. Purdue Pharma L.P.*, 331

F. Supp. 2d 449, 450 (W.D. Va. 2004).  In that case, the opinion actually reads, "[i]t is of course

true that Virginia tort law does not mandate expert testimony to show proof of causation in every

case.  However, in a products liability action, proof of causation must ordinarily be supported by

**JA176**

expert testimony because of the complexity of causation facts." Again, *McMunn* states the expert testimony as to proof of causation is required when there is a substantial contest as in this case. Further, this is a complicated medical issue that requires medical expert testimony. This is not some instance of coffee burns or immediate neck and back pain from an accident. In *McCauley*, the Court granted Defendant's motion for summary judgment because Plaintiffs could not proffer expert testimony as to the causation of an injury and absent said expert testimony, there was no issue of fact for the jury.

To allow the jury to consider Plaintiff's bills for Dr. Guerrette's treatment absent expert testimony would require speculation. It is well settled Virginia law that "proof of defendant's tortious conduct and of the plaintiff's injury is not sufficient to establish a cause of action. These elements alone do nothing more than place the dispute in the realm of speculation and conjecture." *Id*. at 461 (citing, *Blacka v. James*, 205 Va. 646, 139 S.E.2d 47, 50 (1964)).

*Sumner v. Smith*, 220 Va. 222, 257 S.E.2d 825, (1979) and *Todt v. Shaw*, 223 Va. 123, 286 S.E.2d 211 (1982) do not concern the admissibility of medical bills.

Plaintiff also states on page ten of her brief that the bills and records help establish the probability or improbability of the injuries being caused by the July 7th accident. Her brief states,"…a doctor will testify as to the Plaintiff's injuries and his treatment diagnosis and observations of the same." In this sentence, the Plaintiff is revealing her true purpose, which is to back door an expert opinion from Dr. Guerrette and to invite the jury to speculate in an effort to recover over $500,000 in medical bills without a doctor opining that the treatment for the same is medically necessary. However, an expert is required to opine as to the causation and medical necessity of such treatment and without the same the bills are not admissible.

Additionally, with no expert to opine as to causation, Dr. Guerrette's testimony and the bills for

his treatment are not relevant and are not admissible.

## <u>CONCLUSION</u>

WEHREFORE, the Defendant, by counsel, respectfully requests that this honorable court

grant Defendant's Motion in Limine and exclude Dr. Guerrette from testifying at trial, exclude

Dr. Guerrette's bills from evidence, exclude any mention of Dr. Guerrette's treatment and for

such other relief as justice may require.

NICHOLAS JAMES DESOUSA,
By Counsel

_____/s/_____, p.d.
Carter T. Keeney, Esquire (VSB# 82275)
Carter & Shands, P.C.
9030 Stony Point Parkway, Suite 530
Richmond, VA 23235
Telephone:     (804) 747-7470
Facsimile:     (804) 747-7977
ckeeney@carterandshands.com
*Counsel for Defendant*

**JA178**

CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT on the 12th day of April, 2022, I will send via email the foregoing to counsel listed below and I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Samantha Cohn, Esquire (VSB# 89091)
Geoff McDonald & Associates, P.C.
8720 Stony Point Parkway, Suite 250
Richmond, VA  23235
Telephone:     (804) 888-8888
Facsimile:     (804) 355-9988
scohn@mcdonaldinjurylaw.com
*Counsel for Plaintiff*

_____/s/_____, p.d.
Carter T. Keeney, Esquire (VSB# 82275)
Carter & Shands, P.C.
9030 Stony Point Parkway, Suite 530
Richmond, VA 23235
Telephone:     (804) 747-7470
Facsimile:     (804) 747-7977
ckeeney@carterandshands.com
*Counsel for Defendant*

**JA179**

UNITED STATES DISTRICT COURT

FOR THE

EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION


* * * * * * * * * * * * * *
SAMANTHA ROOP,            * CIVIL NO. 3:21-CV-00675
                         * MAY 3, 2022  11:00 A.M.
          Plaintiff,     * MOTION IN LIMINE
                         * VOLUME I OF I
vs.                      *
                         *
NICHOLAS JAMES DESOUSA,   * Before:
                         * HONORABLE DAVID J. NOVAK
          Defendant.     * UNITED STATES DISTRICT JUDGE
* * * * * * * * * * * * * * * EASTERN DISTRICT OF VIRGINIA

APPEARANCES:

For the Plaintiff:      SAMANTHA BETH COHN, ESQUIRE
                        Geoff McDonald & Associates, P.C.
                        8720 Stony Point Parkway
                        Suite 250
                        Richmond, Virginia 23235


For the Defendant:      CARTER TALIAFERRO KEENEY, ESQUIRE
                        Carter & Shands PC
                        9030 Stony Point Parkway
                        Suite 530
                        Richmond, Virginia 23235




Court Reporter:         Melissa H. Custis, RPR
                        701 East Broad Street
                        Richmond, Virginia 23219
                        (804)916-2278

        Proceedings recorded by mechanical stenography,
transcript produced by computer.

 1      (Court convened at 11:00 a.m.)

 2          THE CLERK:  Civil Action 3:21-CV-675, *Samantha Roop*

 3  *versus Nicholas James Desousa*.

 4          Representing the plaintiff is Samantha B. Cohn.

 5  Representing the defendant is Carter T. Keeney.

 6          Counsel, are we ready to proceed?

 7          MR. KEENEY:  Yes, ma'am.

 8          MS. COHN:  Yes, madam.

 9          THE COURT:  Okay.  Mr. Keeney, we're here on your

10  motion.

11          MR. KEENEY:  Yes, Your Honor.  May it please the

12  Court.  Would you like me to stand here or at the podium?

13          THE COURT:  At the lectern.

14          And I'm going to ask you some questions before you

15  get wound up there.

16          MR. KEENEY:  Yes, sir.

17          THE COURT:  Because I know you get wound up.

18          MR. KEENEY:  Just a little, Your Honor.

19          THE COURT:  All right.  So am I right to believe that

20  you're admitting liability in this case?

21          MR. KEENEY:  We have not formally admitted liability.

22  There is a -- in all likelihood, yes, Your Honor.

23          THE COURT:  I'm going to give you 10 days to figure

24  that out.  Okay?

25          MR. KEENEY:  Yes, sir.

1        THE COURT: Number two is am I right to believe that

2 if you admit liability, you're not contesting what are what

3 I'm going to refer to as the standard traffic accident

4 damages? This is all about this pelvic prolapse, right?

5        MR. KEENEY: Up until a certain point, Your Honor.

6 The initial injuries in this was certainly sufficient impact

7 to cause soft tissue injuries, and she's claiming a

8 concussion. As I put in my brief, in early September, while

9 she was still treating with Dr. Camden and the physical

10 therapist, the records reflect the plaintiff was thrown from a

11 horse and dragged through a field. It will be the defense's

12 position at trial that any problem after that would be related

13 to the fact that she got dragged through a field. And, in

14 fact, in one of the medical records, she stated that she was

15 doing well until that event occurred.

16        THE COURT: Okay.

17        MR. KEENEY: So it would be no real contest up until

18 that date, which I believe is September 8th of '19.

19        THE COURT: That's the horse accident?

20        MR. KEENEY: Yes, Your Honor.

21        THE COURT: Okay.

22        MR. KEENEY: And the other soft tissue treatment is

23 only about another month.

24        THE COURT: Okay. It seems to me here that while the

25 doctor cannot testify -- provide expert testimony for the

1  reasons you say in your motion, he can provide fact-based

2  testimony.  Do you disagree with that?  Because the case law

3  is pretty clear on that.

4          MR. KEENEY:  Well, here's the question on that, Your

5  Honor:  What is that fact-based testimony?  The bills under

6  *McMunn versus Tatum* do not come in where there's a substantial

7  contest.  And if you look at the affidavit, Memorandum of Fact

8  that the plaintiff provided in this case, it's replete with

9  opinions.  In there, the plaintiff suggests that Dr. Guerette

10 should be able to testify that it's more likely than not that

11 the injury was caused by the accident.

12         THE COURT:  He can't do that.  But here's kind of

13 what I'm thinking, okay?  It seems to me that, as I understand

14 the facts here, he treated the plaintiff from 2011 to 2013,

15 right?

16         MR. KEENEY:  I believe so, yes, Your Honor.

17         THE COURT:  So he could say, "Look, I treated her for

18 this" -- is it pelvic prolapse?  Is that the appropriate

19 description?

20         MR. KEENEY:  There are other -- in layman's terms, I

21 believe so.  I don't know the exact --

22         THE COURT:  All right.  You know my point.

23         MR. KEENEY:  Yes, Your Honor.

24         THE COURT:  He treats her for the two years.  He

25 installs this device, the InterStim bladder device, right?

 1          MR. KEENEY:  Yes, sir.

 2          THE COURT:  The last time -- if I'm wrong on the

 3    facts, the two of you, I want you to correct me on this, okay?

 4    You'll get your chance.  But he can say that he installed this

 5    device, and then the last time he observed her she was fine.

 6    Did not see her again until after the accident.  I think he

 7    starts seeing her again on October 8th, 2019.  And he can

 8    say that -- give factual testimony, "I observed her and this

 9    was her condition."

10          Now, I think the case law is pretty clear about that.

11    Then the question becomes, and I think you've made this point,

12    is, what is the relevance of that?  But the case law is also

13    clear that lay testimony can establish causation.  So it seems

14    to me that she could testify to the following.  I mean, I'm

15    not sure she would, I mean, but she could.

16          MR. KEENEY:  She being the doctor or the plaintiff,

17    Your Honor?

18          THE COURT:  The plaintiff.

19          MR. KEENEY:  Okay.

20          THE COURT:  I thought the doctor was a male.

21          MR. KEENEY:  The doctor is a male.  I was just making

22    sure I was on the same page.

23          THE COURT:  Yeah.  So the plaintiff could come in and

24    say, "I had this issue with my pelvic prolapse.  I saw

25    Dr. Guerette from 2011 to 2013.  He put this device in me.  My

1  life was perfect.  I'm in a car accident and all of a sudden

2  my life is crap.  And the reason that -- the only change is

3  the car accident.  I go to him; now the device is not

4  working."  And he could say, "I'm looking at it and the device

5  is not working."  That's a factual thing.  Now, he can't opine

6  on what the cause is, okay?  But she can say that the factual

7  difference is the only thing that caused the change was this

8  accident.

9       Now, you then could come back and put on evidence

10 about this horse accident and the jury would decide whether or

11 not it's the accident or the horse that caused the difference.

12 What's wrong with that?  Because that seems to me to be all

13 supported by the case law.

14      MR. KEENEY:  Well, Your Honor, and it is.  I believe

15 *Fitzgerald*, it's a 4th Circuit case, Your Honor, *Fitzgerald*

16 *versus Manning*, a 1982 case, that invites speculation and

17 conjecture from the jury, which the jury is not allowed to do.

18      THE COURT:  No, there's no speculation.  They have to

19 prove it beyond a preponderance of the evidence.  They have to

20 say, draw reasonable inferences, and I would give jury

21 instructions that their -- they would have to establish beyond

22 a preponderance that what caused the change was this car

23 accident.  You would say, no, it's the horse, right?

24      MR. KEENEY:  I think we're -- for lack of a pun,

25 we're putting the cart before the horse, Your Honor.  I

1 wouldn't submit that saying that an Interstim is broken, a

2 layperson can't do that. That requires a trained expert to

3 say that this device is malfunctioning.

4       THE COURT: Well, no. The doctor can say, "I

5 evaluated her in" -- I think it was October, September or

6 October.

7       MR. KEENEY: It was October 8th, yes, Your Honor.

8       THE COURT: Okay. "I examined her. She complained

9 of issues. I took a look, and this device is no longer

10 functioning." Now, why the device is no longer functioning he

11 cannot opine on, right?

12       MR. KEENEY: Correct.

13       THE COURT: But she could say, "I had no -- I felt

14 great until the day I got hit by the car, and after that I

15 started feeling crappier and crappier. I went to see the

16 doctor, and, oh, my device is not working. The only

17 intervening event that could have caused that was the car

18 accident." You come in and say, "No. It was the horse that

19 did it," and the jury decides. Because you're really asking

20 me to decide causation now, and I think juries decide these

21 issues.

22       MR. KEENEY: Well, Your Honor, I think under *Todt v.*

23 *Shaw* she can say, "This part of my body hurt after the

24 accident." The question is should the plaintiff or her

25 counsel be allowed to argue or suggest that it was caused by

1  the accident absent a medical doctor opining to the same,

2  which is --

3          THE COURT:  The case law is clear that it can be

4  established by lay evidence.  She cited the *Sumner* case, and

5  she's right about that, and the *McCauley case versus Purdue*

6  *Pharma*.  This could all be established by lay testimony.  And

7  it makes sense; it's common sense.  She can say, "I felt like

8  this one day," you know -- and this is not like a small period

9  of time.  As I understand the facts, she's treated from 2011

10  to 2013.  She then has six years of, like, "I'm feeling

11  great."  And then all of a sudden this accident happens in

12  2019 and all of a sudden she's got problems.  I mean, I think

13  that's a reasonable argument for the plaintiff to go to the

14  jury on that.

15          MR. KEENEY:  Your Honor, again, pushing back a little

16  bit.  On *McCauley versus Purdue Pharma*, it wasn't always that

17  they don't have to have an expert, as I cited in my reply

18  brief.  In straightforward situations, you don't need one.  I

19  think the plaintiff cited the case of the child in South

20  Carolina having the coffee, the hot coffee spilled on them and

21  burned.  Well, obviously, right after an accident or an

22  incident of hot coffee is spilled on someone and there's a

23  burn, you don't -- common sense tells us that.

24          What the Western District says in *McCauley versus*

25  *Purdue Pharma* is, "It is a settled principle of Virginia tort

1  law that proof of defendant's" --

2      THE COURT:  Hold on one second.  Why don't you slow

3  down.  I've got a new court reporter.

4      MR. KEENEY:  Okay.

5      THE COURT:  And I don't want her to quit on me just

6  because of you.

7      MR. KEENEY:  Yes, Your Honor.

8      "It is a settled principle of Virginia tort law that

9  proof of the defendant's tortious conduct and of the

10 plaintiff's injury is not sufficient to establish a cause of

11 action.  These elements alone do nothing more than place the

12 dispute in 'the realm of speculation and conjecture.'"  They

13 cite *Blacka v. James*, a 1964 Virginia Supreme Court case.

14 "Instead, a plaintiff seeking recovery bears the burden of

15 producing -- to produce evidence showing that the defendant

16 was the proximate cause of the injury sustained.  'The

17 proximate cause of an event is that act or omission which, in

18 natural and continuous sequence, unbroken by'" --

19     THE COURT:  You're picking up speed again.

20     MR. KEENEY:  -- "'an efficient intervening cause.'"

21 And then it goes on from there.

22     But the point, Your Honor, is under *John v. Im*, a

23 diagnosis is part of the practice of medicine, and to have

24 that, you have to have an expert opinion.  That is what the

25 Virginia Supreme Court has said.  So if there's no doctor that

1  is the linchpin to tie all this together, she can say, "This

2  part of my body hurt after the accident." *Todt v. Shaw* and

3  *Sumner* say that.  But to say that --

4       THE COURT:  And then the doctor says, "I examined

5  her" -- because he can do that as a fact witness -- "I

6  examined her and the device is no longer working."  He can't

7  say why the device is not working.  He can't opine that it's

8  because of the accident.  All he can say is, "The last time I

9  saw her was in 2013; the device worked.  Now, six years later,

10 she comes to me making these complaints that she's not feeling

11 well.  I examine her and I can see that the reason is the

12 device is no longer working."

13      Now, why the device is no longer working, that's

14 what's in dispute.  And what she would say is, "I felt

15 fine" -- I suspect this is what she's going to say.  If it's

16 not, I want to hear otherwise.  "I felt fine until the

17 accident.  Accident happens, and now all of a sudden I'm

18 feeling terrible to the point that I go see the doctor and the

19 doctor says, 'Hey, your device is not working.  That's why

20 you're not feeling well,'" right?  That's enough to go to the

21 jury in my view.

22      Now, you can put on a defense.  To be clear, you can

23 make all your arguments about the horse, or you could even put

24 on that the -- I don't know what the lifespan is of an

25 InterStim bladder device.  You know, maybe they only last five

1  years.  But you can put on that expert testimony if you've

2  preserved your notices as well.  I haven't looked at that.

3  But the jury should decide that.

4        Now, here's what I'm thinking, just so we're on the

5  same page, because I'm going to talk to Ms. Cohn about this:

6  I'm thinking about bifurcating this.  Assuming you're

7  admitting liability, which it seems to me you ought to, I'm

8  thinking of bifurcating simply on the issue of causation,

9  right?  So you would tell me which injuries you're in

10 agreement on, and you would tell me which injuries you're in

11 disagreement on.  It seems like the home run issue here, all

12 the money is about this pelvic prolapse issue, right?  I mean,

13 the other stuff, it's minor.

14        MR. KEENEY:  This case would in all likelihood be

15 resolved if that was the only --

16        THE COURT:  Right.  Right.  So what I'm thinking is

17 we do -- we're going to do a bifurcated trial.  Part 1, again,

18 assuming you're admitting liability, is simply causation on

19 the injuries in dispute.  I would charge the jury you admit

20 that your client is -- well, the driver is responsible for the

21 car accident.  You have a dispute as to what injuries the car

22 accident caused.  The jury is going to decide simply whether

23 these particular injuries are from the car accident, okay?  No

24 evidence of damages during that; simply a finding on

25 causation, okay?  They find "no" on causation, case is over.

1  They find "yes" on causation, we go to the second phase of the
2  trial.
3         And I commonly anyhow bifurcate civil cases, damages
4  and liability, anyhow, right?  Because I think that you don't
5  want -- this is what she wants to do.  She's trying to use all
6  these bills to get the jury all worked up to find in her
7  favor, right?  Well, she can't introduce any of the bills,
8  that's the bad news for her, until the second phase.
9         So there's no evidence about damages, there's no
10 introduction of bills or anything like that in phase 1.  That
11 only goes to phase 2.  So what you would do is you would open
12 and close during phase 1 on simply the issue of causation.
13        Now, I'm assuming you're admitting liability because
14 I thought you told me that during the initial pretrial
15 conference.  Maybe I'm wrong, but I thought that's what you
16 had said.  You'll tell me that.  But if you don't, we'll have
17 a trial on liability and causation, okay?
18        But there will be no evidence about damages during
19 phase 1.  Jury comes back in her favor, we go to phase 2.
20 They come back in your favor, there is no phase 2.  It's over,
21 right?  Phase 2, again, you stand up, you open, it's another
22 trial.  You argue to the jury, "Here's what you found these --
23 this is the causation.  Now let me talk to you about the
24 damages, how this woman has been harmed by this and why you
25 should give her a million dollars," or whatever it is, right?

1  And you would put on your evidence but simply on damages.  She

2  would put on hers, they would -- you would put on yours.  But

3  none of that would come in during phase 1.

4       What's wrong with that plan?  Because I think it's

5  pretty ingenious since I came up with it.

6       MR. KEENEY:  Well, Your Honor, the reality is this is

7  all tied in together in that she wants to -- because it

8  prejudices my client in presenting the entire defense, which

9  is, really what's going on here is the plaintiff is trying to

10  back door an expert opinion that all of these pelvic, vaginal,

11  complicated issues were caused by the accident without an

12  expert to get $500,000 in medical bills.

13       THE COURT:  I'm not letting her do that.  I'm not

14  letting her back door an expert.  I'm telling you that right

15  now.  I'm putting very strict limits on what it is.

16       But the case law is clear, this doctor can testify as

17  a fact witness; he cannot testify as an expert witness.  The

18  case law is clear on that.  So then the question is, and your

19  point was well taken, what is the relevance, right?  And the

20  answer to that is -- because that was my first thought, well,

21  you know, how is that relevant, then?

22       The answer is, through lay testimony, they can

23  establish causation.  Juries should decide this, not judges.

24  The jury should decide whether or not this accident caused

25  this pelvic injury or any other injuries that you think are in

**JA192**

1  dispute.

2       But I'm going to isolate that so there's no prejudice

3  to your client.  So there will be no discussion about

4  long-term effects or bills or anything like that.  It's just

5  the plaintiff could testify, "Hey, I had this injury in 2011.

6  In 2013, I got this device put in me; the doctor did it.

7  After that, my life was perfect.  I'm in a car accident.  Hey,

8  they admit that he hit me.  I start feeling crummy, it gets

9  worse, I go see the doctor.  The doctor tells me my device is

10  not working anymore and so I had to get treated for that."

11  That's it.  And then the jury decides whether that's enough.

12       And you put on your horse evidence, you put on

13  whatever else you want in defense that you've preserved.  They

14  prevail, we go to phase 2.  You prevail, the case is over.

15  But the jury has decided that.  Juries decide questions of

16  fact, not humble judges like me.

17       MR. KEENEY:  Yes, Your Honor.  I will say that at

18  least the second part is, under *McMunn versus Tatum*,

19  regardless of whether or not a jury ultimately believes that

20  an injury was caused by an accident, the bills under black

21  letter Virginia law only come in with expert testimony.  And I

22  think the Court has already stated there is no expert

23  testimony, so I'm not sure it would be that judicially

24  efficient to bifurcate the trial on the issue of damages if

25  the $500,000 in bills are not coming in regardless.

**JA193**

1      THE COURT:  Well, your motion only addressed

2 causation.  You didn't really address the damage issue.  Why

3 is it that they -- I mean, if there is an issue of causation,

4 right, if the jury finds against you and for her, why would

5 not all the bills for that treatment just come in

6 automatically?

7      MR. KEENEY:  Because the Virginia Supreme Court has

8 explicitly said they don't in *McMunn versus Tatum*.  It is

9 not -- they have stated that where the defense says they have

10 a substantial contest as to the causation medical necessity of

11 bills, that absent expert testimony, they do not come into

12 evidence.  There are other elements under Virginia Model Jury

13 Instruction 9.000, the standard injury instruction, that a

14 plaintiff can recover.  But the Virginia Supreme Court in

15 *McMunn versus Tatum*, as well as *Norfolk Bev Company v. Cho*,

16 259 Va. 348, a 2000 Virginia Supreme Court case, have

17 explicitly said the bills do not come in without expert

18 testimony.

19      THE COURT:  Well, your motion really doesn't address

20 that, but if that's what it takes, I'm going to let her put it

21 in.

22      You're on notice here.  This is all about a notice

23 issue, right?  And you know what the bills are.  Listen, this

24 case is going to be decided by the jury.  It's going to be

25 decided on causation first, and then I'm going to let her put

1  the bills in if she makes it.  Now, I don't know if she's

2  going to make it or not, right?  That's what the other issue

3  is.

4          But if you want to file something on this -- but I'm

5  going to let her put the bills in.  So if you want to file

6  something, I'll let her put the expert testimony on about just

7  the bills.

8          MR. KEENEY:  Your Honor, I did file a motion in

9  limine to exclude the bills.  That's part of my motion.

10          THE COURT:  I thought it was focused on causation.

11  I'll go back and take a look at it.  But I'm going to let her

12  put the bills in.  So if that means allowing her to put that

13  doctor on for that, I'm going to let them do it.

14          MR. KEENEY:  In the second part of the trial?

15          THE COURT:  In the second part, right.  It seems to

16  me you ought to stipulate to that, but that's up to you.

17  That's up to you.

18          MR. KEENEY:  No, Your Honor, I preserve my objection

19  for that --

20          THE COURT:  Yeah.

21          MR. KEENEY:  -- citing *McMunn versus Tatum*.

22          THE COURT:  Yeah.  I think the question is whether

23  they can make it to the jury after phase 1.  I mean, to me,

24  the only evidence I'm aware of is the plaintiff.  But I think

25  that's enough to go to the jury.

 1      MR. KEENEY:  And, Your Honor, frankly, my point on

 2 the bills and sort of this is it's essentially a motion to

 3 strike that portion of the case because the evidence that they

 4 have at the close of discovery requires speculation and

 5 conjecture by the jury, because they do not have a medical

 6 expert to opine that that treatment was medically necessary.

 7      THE COURT:  Okay.  We're past that, okay?  I've

 8 already told you the jury is going to decide this issue of

 9 causation.  I'm going to bifurcate it, and I'm going to

10 proceed in this fashion.  The only question is, is how these

11 bills are going to come in.  I think you ought to meet and

12 confer about that, and then if you want to file something,

13 I'll take a look at it.

14      MR. KEENEY:  Yes, sir.

15      THE COURT:  And we'll kind of go from there.  But I'm

16 letting them put on their damage case, okay, but only in phase

17 2 and only if they prevail past causation.

18      MR. KEENEY:  So as a point of clarification, phase 1

19 would be causation simply on the pelvic bladder injuries,

20 phase 2 will --

21      THE COURT:  Hold on.  No.  It is -- I thought that

22 was the only injury in dispute.  You just told me something

23 different when we got started.  You said there might be

24 another injury.

25      MR. KEENEY:  Yeah.

1    THE COURT:  What I'm saying to you is I need to know

2  first are you admitting liability?

3    MR. KEENEY:  Yes, sir.

4    THE COURT:  I'm giving you 10 days, okay?  In that 10

5  days, I also want you to tell me what injuries are in dispute,

6  which ones are not, okay?  Phase 1, assuming you're admitting

7  liability -- if you're not, it's going to be liability and

8  causation, okay? -- no damages.  There will be no damages in

9  phase 1, okay?

10    If they make it over the hump on -- well, if you

11  contest liability, they have to establish that too.  I don't

12  think that would be a good idea for you, frankly, but that's

13  up to you -- then they'd have to establish causation.  They

14  make it on causation, we go to phase 2.

15    Now, you're going to give me, under my scheduling

16  order, now two sets of jury instructions.  You're going to

17  open twice if the jury finds causation.  Again, if they find

18  for you, it's only phase 1, right?  But I have to plan for

19  both, right?  So they find for the plaintiff on phase 1, we

20  immediately come back, you open to the jury -- well, she'll

21  open first, you'll open second, she'll put on her evidence on

22  damages, you can put on any evidence you want, and you close.

23  So I'm looking for two sets of jury instructions now on this

24  as well.

25    MR. KEENEY:  Yes, Your Honor.  And my question for

1  clarification is, in my mind there would have to be a phase 2,

2  regardless, to decide the pain and suffering, noneconomic

3  damages for the injuries that we agree were caused by the

4  accident.

5          THE COURT:  That's fine.  Yeah, it all comes in

6  there.  Yeah.  Maybe you'll still settle this case now that

7  you know what's going on here.

8          I mean, look, to me, you both have major risk here,

9  right?  I mean, if the jury finds causation against you, the

10  number is going to be pretty big.  But they might get nothing

11  out of it.  It could be they find nothing because the only

12  witness that's testifying, that I'm aware of, is the

13  plaintiff.  I'm going to hear from plaintiff's counsel right

14  now to see what this is going to look like.  And you can put

15  on all this stuff about the horse accident, and you can -- if

16  you've preserved your notice about the life span of an

17  InterStim bladder device -- I mean, I don't know how long

18  these things last.

19          MR. KEENEY:  Dr. Guerette testified to it in his

20  deposition, and I, in a supplemental answer, mentioned that.

21          THE COURT:  Okay.  But are you having him opine on

22  that?  Because once you ask him that, the door is open, right?

23          MR. KEENEY:  And, Your Honor, I guess that's back to

24  the original question:  If he can say -- if it's a factual

25  statement that the Interstim is broken, how is it not also a

1  factual statement that the life span of this device is five

2  years, or whatever?

3          THE COURT:  Because that's an opinion.  That's not an

4  observation.

5          MR. KEENEY:  Well, if it's in the literature, how --

6          THE COURT:  If it's in the literature, that's an

7  expert opinion.

8          MR. KEENEY:  I'm sorry.

9          THE REPORTER:  One at a time, please.

10         MR. KEENEY:  I guess my point is it would be

11  Dr. Guerette.  I can't look at an InterStim, you can't look at

12  an InterStim and say that it's not working.

13         THE COURT:  Right.  Dr. Guerette would say, "This is

14  broken."  The question is, "Why is it broken?" right?  Now,

15  what I'm limiting them, I'm saying you can't ask the doctor,

16  "Why is this broken?" because that would be expert opinion.

17  But if you do, that opens the door to them, right?  If you

18  say, "Hey, could it be that the thing just ran out of gas,

19  because they normally only last five years?"  Well, then she

20  can come back -- because that's an opinion, right?  That's

21  different than fact testimony.

22         MR. KEENEY:  Yes, sir.

23         THE COURT:  Do you understand what I'm saying to you?

24         MR. KEENEY:  Yes, sir.

25         THE COURT:  I think what you ought to do is, I'm

1  going to give you my order, you're going to respond in 10 days

2  about what's in dispute.  I think the two of you ought to meet

3  and confer a little bit about what this is now going to look

4  like, since I'm telling you about this.  I think you ought to

5  have another settlement conference too, but that's up to you

6  guys.  I'm not going to make you do that.  And then we ought

7  to flesh out what you think this is going to look like.  And

8  if there's further dispute, you could file another motion in

9  limine.  You'll get my parameters -- I've already told you --

10        MR. KEENEY:  Yes, Your Honor.

11        THE COURT:  -- but you'll get my parameters, and then

12  you ought to take a look at this.  I mean, I'm hitting you

13  with it now.  I know you haven't digested it in the way that

14  you really need to digest it.  Sit back and think about it,

15  confer with your opponent, and you can both talk about how you

16  think this is going to go in.  If there's a dispute, you file

17  another motion in limine and we'll reconvene, okay?

18        MR. KEENEY:  Yes, Your Honor.

19        THE COURT:  All right.  Ms. Cohn.

20        So, Ms. Cohn, I suspect you like my ingenious idea

21  because you have not a whole lot left to work with.  Am I

22  right about that?

23        MS. COHN:  Can I put on the record that you're the

24  smartest judge I've ever been in front of?

25        THE COURT:  Well, look, you'd just be one of many in

**JA200**

1   a long line, but that's okay.  But, no.  Look, here's the

2   issue:  Without Dr. Guerette opining as to what the cause is,

3   are we left with the plaintiff essentially saying what I said?

4          MS. COHN:  Somewhat, Your Honor.  I tried to make it

5   clear in my memo of fact, and I do agree with defense counsel,

6   that 29, paragraph 29, particularly does delve into opinion

7   testimony.  However, the preface of that sentence was that he

8   will not be asked that question.  It was simply a

9   demonstrative aid for the Court to understand that I'm not

10  trying to shove a square peg into a round hole.

11         So we have Ms. Roop; we have her partner, Mr. Barton,

12  that's been with her for 15 years; her daughter was also in

13  the vehicle, who is 17 years old; and then we have

14  Dr. Guerette.

15         THE COURT:  Hold on.  Let's put Dr. Guerette aside.

16  So we've got the partner and the daughter, right?  They're in

17  the car, right?

18         MS. COHN:  Well, the partner is not in the car.

19         THE COURT:  Okay.  What does he have that's relevant?

20         MS. COHN:  The testimony of, Your Honor, as the case

21  law states, what he witnessed transpire after the accident

22  happened, her physical condition, how it affected her.  That

23  was in the case law that I stated in my motion, Your Honor,

24  the lay opinion testimony that's allowed as to a change in

25  physical condition.

1          THE COURT:  Well, he can say, "Look, I saw that, you

2    know, she was a healthy person before.  This accident happens,

3    and then this is the change that I observed in her personal

4    condition."

5          MS. COHN:  Correct.

6          THE COURT:  That's it, though.  He can't attribute it

7    to the accident.

8          MS. COHN:  Absolutely not, Your Honor.

9          THE COURT:  He can just say, "This is my

10   observation."  If they admit liability, then, what's the

11   daughter going to say, then, that's any different?  It's the

12   same as the husband?

13         MS. COHN:  It would probably be cumulative at that

14   point.  Your Honor, at no point during this proceeding would I

15   have anybody point a finger and say, "It was the car

16   accident."  I am very aware of the four corners that I am

17   bound by.  Given the procedural history of this matter, I'm

18   more than confident that I can navigate within those four

19   corners and not have anybody opine and violate Your Honor's

20   decision as to the expert testimony.

21         THE COURT:  Well, you would be able to argue.

22   Essentially, the plaintiff -- am I right about this:  The

23   plaintiff is going to say, "This device worked perfect until I

24   got hit by the car.  Then I started feeling crummy.  I go to

25   the doctor, and then we realize the device is not working"?

1  Is that essentially what she's going to say?

2       MS. COHN:  Your Honor, so initially when Dr. Guerette

3  treated her in 2011 through 2013, it was for an overactive

4  bladder issue.  And the Interstim is specifically implanted

5  into the third sacral nerve, and it literally is a pacemaker

6  between your bladder and your brain, to zap your bladder to

7  work appropriately with your nerve and respond and fully empty

8  and things of that nature.  The prolapse was never an issue

9  prior to the accident.

10       So it is going to be testimony as to a change in her

11  condition that she will attribute to the accident.  The

12  doctor, as stated, will testify to his treatment, diagnosis,

13  and observations at that time and the change of her condition.

14  There will be no mention as to causation out of -- in his

15  testimony.

16       THE COURT:  Okay.  All right.  You know the

17  limitation now on the damages?  There's not going to be any

18  discussion whatsoever, "Hey, I've had to pay $500,000 in

19  medical bills," or none of that.  You understand that?

20       MS. COHN:  I completely understand, Your Honor.

21       THE COURT:  Now, you know you're going to have to

22  give me two sets of jury instructions, then, too.  I think

23  you'll probably haggle a little bit over the instructions.

24       So what I want you to do is this:  I gave him the 10

25  days to address liability and what injuries are exactly in

1  dispute.  After that, I want the two of you to sit down and

2  meet and confer about what this is going to look like in terms

3  of proof, right?  And then if there is a difference of

4  opinion, I want -- file a motion and we're going to reconvene.

5  I don't want any surprises on this going into it.  But I also

6  want the two of you, then, to take my order and put it into

7  jury instructions.  Again, you're giving me two sets of

8  instructions, right?

9          MS. COHN:  Causation and damages.

10         THE COURT:  Causation and damages.  Unless they

11  contest liability, then we'd have to have liability

12  instructions with the causation.  I don't think they're going

13  to do that, but that's up to them.  And then we'll go from

14  there.  Does that make sense?

15         MS. COHN:  That makes perfect sense, Your Honor.  And

16  I do appreciate your understanding with this matter.  Thank

17  you.

18         THE COURT:  Well, it's not an understanding; I just

19  follow the law.  Look, you know, I'm from Pittsburgh.  We have

20  a saying, you're hanging by a gnat's eyelash here, right,

21  which tells me -- look, the stuff that you wrote in your

22  pleadings, if I were your law firm I wouldn't be too thrilled

23  about.  You basically admitted malpractice on behalf of your

24  law firm.  You know, that's not what I would have been

25  writing.

 1          I think you need to work this out, though; maybe you

 2    can't.  But, I mean, to me, you've got a one- or two-witness

 3    case going to the jury on causation.  Just because I'm letting

 4    it go to the jury doesn't mean I think you're going to win in

 5    front of the jury.  Those are two different issues, right?

 6          MS. COHN:  Understood, Your Honor.

 7          THE COURT:  Now, if you do get over that hump, his

 8    number is going to be a big number and his adjustor is not

 9    going to like that, right?  That's why life is about

10    compromise, right?  You both need to compromise on this.  But

11    to me it's all about whether you get over it.

12          But I will say this:  Jurors are not stupid.  They're

13    going to use their common sense, and if your client is

14    credible and she gets up there and says, "Everything was fine,

15    and then I get hit by this truck," or car, whatever it is,

16    "and all of a sudden I feel crappy all the time," people are

17    not dumb about what's going on.  You know what I'm saying to

18    you?

19          MS. COHN:  I wouldn't be fighting so hard, Your

20    Honor, if I didn't have faith in this.

21          THE COURT:  Well, that's fine.  Okay.

22          Go ahead.

23          MR. KEENEY:  Your Honor, one point of clarification,

24    if the Court would indulge me, on what Dr. Guerette can

25    testify to, as Ms. Cohn just mentioned about his diagnosis.

1  And I will quote *John versus Im*, a 2002 Supreme Court opinion.
2  "We also hold that the trial court properly excluded Nash's
3  opinion testimony that John sustained a mild traumatic brain
4  injury as a result of the automobile accident.  An opinion
5  concerning the causation of a particular physical human injury
6  is a component of a diagnosis, which is part of the practice
7  of medicine."
8       THE COURT:  All right.  I've already told you this 25
9  times.  He cannot testify about the cause of the accident.  He
10 can say that he looked at -- examined her, and this was her
11 condition and the change since he had seen it.  He can look at
12 the -- he can say, "I looked at this Interstim bladder device
13 and it was functioning" or "not functioning."  That's it.  He
14 can't say it's from the car accident.  He can't say it's from
15 the horse accident.  He can't say -- he can just say, "This is
16 what her condition is."  The case law is clear on that.
17      MR. KEENEY:  Well, yes, sir.  And my question, I
18 guess, and I didn't phrase it properly, he also diagnosed her
19 with some other conditions.  I believe it was a pelvic
20 prolapse.  And was there another prolapse as well?
21      MS. COHN:  It was a vaginal vault, vaginal bladder,
22 and uterine prolapse.
23      THE COURT:  He can testify to what he observed;
24 that's what he can do.  He can't opine why that happened.  He
25 can say, "This is what I see."  But he can't say, "This is why

1  it happened."  Does that make sense?

2          MR. KEENEY:  Yes, Your Honor.

3          THE COURT:  I am going to allow any testimony about

4  the damages, so -- if they make it over the hump, you know.

5          MR. KEENEY:  Yes, sir.

6          THE COURT:  I don't know if they're going to make it

7  over the hump.

8          I'm going to give you an order.  You guys are going

9  to sit down, you're going to meet and confer.  I want you to

10 file something in 10 days, then meet and confer with her.

11 You-all talk about what this case is going to look like then,

12 and if you still have a further dispute, you'll file something

13 and come back to me.

14         I will say this:  I would like to move the final

15 pretrial conference due to a scheduling conflict we have now.

16 I think it's set for July the 13th, a Wednesday.  I would

17 like to move it to Friday, the 15th, because I put another

18 trial in there that day and I'm afraid it's going to overlap.

19 Are you open on the 15th?

20         MR. KEENEY:  At what time, Your Honor?

21         THE COURT:  Pick your time.

22         MR. KEENEY:  I have depositions in the morning so I

23 will be free in the afternoon, or I can try to move the

24 depositions.

25         THE COURT:  We can do it in the afternoon.

1      MS. COHN:  Whatever the Court would like, Your Honor.

2      THE COURT:  How about 2:00 o'clock?

3      MR. KEENEY:  That works fine, Your Honor.

4      THE COURT:  So the final pretrial conference now will

5  be moved to July 15th at 2:00 p.m.

6      MR. KEENEY:  And, Your Honor, will the plan still be

7  to pick the jury on the 21st?

8      THE COURT:  Everything else is the same.  I want to

9  see what your -- I think what the wise thing is -- let's do

10 this:  You file within 10 days the issue about liability and

11 which injuries are in dispute and which ones are not, okay?

12 Then 10 days later -- now, in between I want you-all to meet

13 and confer.  Ten days later I want an offer of proof from each

14 of you as to what you would put in in your phase, witness and

15 a brief summary, so everybody knows what's going on here.  And

16 then if there's a dispute, you can come back to me.  Does that

17 make sense?

18      I really want you to sit down -- I know you disagree

19 with my ruling.  That's the way life works, okay?  That's what

20 I get paid for.  Half the people at least always think I'm an

21 idiot.  There is a few that think I'm a genius, but half of

22 them think I'm an idiot.  That's just the way I get paid.

23      But I want you to meet and confer and say, this is

24 the ruling, what is this case going to look like now, and

25 break it down by phases.

 1        So phase 1 on causation, Ms. Cohn, this is what you
 2   would put on.  I'm not going to have cumulative evidence.
 3   You're going to obviously put your client on.  You can pick
 4   one of the two, the husband or the daughter, to corroborate.
 5   Because corroboration is one thing; cumulative is another
 6   thing.
 7        Now, if he opens the door, you can save one for
 8   rebuttal, though.  So if he starts challenging on the horse
 9   thing and all that, and one of them you want to save for
10   rebuttal to say, "Hey, you know, I observed her; she was
11   already messed up before the horse incident," or something
12   else, you can do that.  I'll deal with that down the road, but
13   put that in your offer of proof.
14        You do the same so I know what you intend to put on.
15   And then the same thing for damages, okay?  And that way I
16   kind of know what's going on.  You make sure you meet and
17   confer also on the jury instructions.  I suspect you might
18   have a dispute on that.  Most of it should be agreed to, but
19   if there is a dispute, you let me know so I can take a look at
20   that.
21        Go back to the scheduling order.  I'm kind of
22   fanatical about complying with my scheduling order.  I just
23   threatened the public defender's office with a $1,000 fine for
24   not meeting my deadlines.  And they have less money than you
25   guys do, since you're in private practice, so I would think

1  I'd add a zero for you-all.

2       MR. KEENEY:  Yes, Your Honor.  And in the offer of

3  proof, I take it I don't have to put my impeachment evidence

4  in, do I?

5       THE COURT:  No.  No.  I just want to know your

6  witnesses and just like a brief summary, just so I know what's

7  going on, you know.

8       MR. KEENEY:  Yes, sir.

9       THE COURT:  But I really -- I want you to meet and

10 confer.  I do think you need to go back to the magistrate

11 judge and see if you can resolve this a little bit.  Again,

12 that's up to you.  I'm not going to make you do it.  I kind of

13 think this is now going to be a trial.  That's kind of what

14 I'm banking on.  But, again, that's what we get paid for.

15      MR. KEENEY:  Yes, sir.

16      THE COURT:  We're glad to have trials.  Trials are

17 good.

18      MR. KEENEY:  Yes, sir.

19      THE COURT:  We're going to move our courtroom back,

20 by the way.  It's going to be back to normal by then.

21      MR. KEENEY:  Yes, sir.  Thank you, Your Honor.

22      THE COURT:  Okay.  Anything else?

23      MS. COHN:  No, Your Honor.  Thank you.

24      THE COURT:  All right.  You know what to do now.

25 We'll get an order out to you.

1      MR. KEENEY:  Please note my --

2      THE COURT:  What?  What's that?

3      MR. KEENEY:  Please note my obsession -- why can't I

4  talk, Your Honor?  Exception for the record, Your Honor.

5      THE COURT:  Well, you can't talk because you're

6  wrong; that's why.  Your tongue knows.  Your brain is telling

7  your tongue you're fighting a losing battle here.

8          (Court recessed at 11:29 a.m.)

9

10

11

12

13

14

15                      CERTIFICATE

16  I, Melissa H. Custis, certify that the foregoing is

17  a correct transcript from the record of proceedings

18  in the above-entitled matter.

19

20  /s/  Melissa H. Custis, RPR        Date:  05/16/2022

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

SAMANTHA ROOP,
     Plaintiff,

v.                                Civil No. 3:21cv675 (DJN)

NICHOLAS JAMES DESOUSA,
     Defendant.

**MEMORANDUM ORDER**
**(Granting in Part and Denying in Part Motion *in Limine*)**

       This matter comes before the Court on Defendant's Motion *in Limine*, moving to exclude

(1) Dr. Nathan Guerette from testifying at trial, (2) Plaintiff's medical bills for Dr. Guerette's

treatment and (3) any mention of any condition of Plaintiff's that Dr. Guerette treated (ECF No.

18).  For the reasons stated on the record during the May 3, 2022 hearing on the Motion, the

Court hereby ORDERS as follows:

       1.      The parties must meet and confer to determine the injuries for which the parties

dispute causation, and those for which causation is not in dispute.  Within ten (10) days of the

entry hereof, Defendant shall file a pleading indicating (1) whether he admits liability and (2) the

injuries for which the parties dispute causation and those for which they do not dispute causation.

       2.      Assuming that Defendant admits liability the Court will bifurcate the trial into two

phases.  Phase 1 will cover causation of all disputed injuries and will include opening statements,

testimony and closing statements.  At the conclusion of Phase 1, the jury will deliberate and

return a verdict.  If there are undisputed injuries, and/or, if the jury finds in Plaintiff's favor on

causation, the trial will immediately move to Phase 2.  Phase 2 will cover

damages for undisputed injuries and/or those injuries on which the jury found in Plaintiff's favor on causation, and will include opening statements, testimony and closing statements.

3.      Defendant's Motion (ECF No. 18) is GRANTED IN PART and DENIED IN PART.  Dr. Guerette shall be permitted to testify as a fact witness regarding Plaintiff's course of treatment but may not testify as an expert or opine on the causation of Plaintiff's injuries. *See, e.g., Springs ex rel. C.S. v. Waffle House, Inc.*, 2021 WL 119303, at *3 (D.S.C. Jan. 13, 2021) (when plaintiff failed to disclose treating physicians as experts, court permitted them to provide testimony about their observations and course of treatment at the time they treated him, but not any opinions that they formulated based on scientific, technical or specialized knowledge after they treated plaintiff); *Ingram v. ABC Supply Co., Inc.*, 2010 WL 233859, at *3 (D.S.C. Jan. 14, 2010) (when plaintiff failed to disclose treating physicians as experts, court prohibited them from opining on "plaintiff's diagnosis, prognosis, and future medical needs [and restricted them] to providing testimony about their individual factual treatment of plaintiff, as such treatment is documented in the medical records").

Plaintiff may introduce Dr. Guerette's bills only during Phase 2, the damages phase, but is prohibited from introducing them as evidence during Phase 1, the causation phase.  The parties must submit two sets of jury instructions — one for each phase — in accordance with the deadlines set forth in the Court's Pretrial and Scheduling Order (ECF No. 8).

4.      Ten (10) days after Defendant files the pleading described above, the parties must each file an offer of proof, including a list of witnesses and brief summary of the evidence that they plan to present, for each phase of the trial.

2

**JA213**

5.      The Final Pretrial Conference in this matter is rescheduled for **July 15, 2022, at 2**

**p.m.**

Let the Clerk file a copy of this Order electronically and notify all counsel of record.

It is so ORDERED.

_____/s/_____

David J. Novak
United States District Judge

Richmond, Virginia
Date:  May 3, 2022

3

**JA214**

IN THE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| SAMANTHA ROOP | ) | Plaintiff, |
| | ) | |
| v. | ) | Civil Action No.: 3:21-cv-00675 |
| | ) | |
| NICHOLAS JAMES DESOUSA | ) | Defendant. |

## PLEADING AS ORDERED BY THIS COURT'S MAY 3, 2022 REGARDING LIABILTIY AND INJURIES

COMES NOW, the Defendant, Nicholas James Desousa, by counsel and for his pleading as ordered by this Court's May 3, 2022 order regarding liability and injuries states as follows:

### PRELIMINARY STATEMENT

1.  By filing this pleading, Defendant is not waiving any objection to the Court's ruling on Defendant's Motion in Limine.  Specifically, Defendant maintains his position that admitting any medical bills for Dr. Guerette's treatment is error as under *McMunn v. Tatum*, 237 Va. 558, 379 S.E.2d 908 (1989) when a Defendant objects to the introduction of medicals bills, indicating he has a substantial contest to the medical necessity and/or causation relation, the court may admit the bills only with foundation expert testimony tending to establish medical necessity and/or causal relationship. Defendant has objected to these bills under *McMunn v. Tatum* and Dr. Guerette is not permitted to offer any expert testimony.  Further, Dr. Guerette's testimony is not relevant to any fact at issue if he cannot opine as to the causation of the conditions for which he provided treatment.

**JA215**

LIABILITY

1. Defendant admits that his negligence was the proximate cause of the accident sued

   upon.

INJURIES

1. At trial, the Defense will not contest that the Plaintiff sustained soft tissue injuries to

   her neck and back.  Defendant will also not contest that Defendant sustained a head

   injury.  Defendant is contesting all other claimed injuries.  Specifically, Defendant

   disputes all of Dr. Guerette's treatment, including that Plaintiff sustained a pelvic

   prolapse, any damage to her Interstim, any injury to her bladder, pelvic pain, uterus

   etc.  Defendant's position is that Plaintiff had made a complete recovery from all

   injuries sustained in the subject accident on or before September 8, 2019.  The extent

   of the injuries, when she recovered, and the impact on her life will be left to the jury.

   There is evidence that as early as August 6, 2019, she was back doing strenuous

   work, which is evidence she was recovered from her soft tissue injuries.  Defendant

   refers Plaintiff to his Supplemental Answers to Plaintiff's interrogatory number 26 for

   a detailed description of what is being claimed.[1]  Defendant reserves the right to

   object to any of Dr. Camden's testimony to the extent it contains hearsay is not

   relevant or is beyond her expert witness disclosure.


NICHOLAS JAMES DESOUSA,
By Counsel


_____/s/_____, p.d.
Carter T. Keeney, Esquire (VSB# 82275)
Carter & Shands, P.C.
9030 Stony Point Parkway, Suite 530

---

[1] If the Court wished to have a copy of the Supplemental Interrogatory, please inform counsel and the same will be provided promptly.

**JA216**

Richmond, VA 23235
Telephone:     (804) 747-7470
Facsimile:     (804) 747-7977
ckeeney@carterandshands.com
*Counsel for Defendant*

CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT on the 12th  day of May, 2022, I will send via email the

foregoing to counsel listed below and I will electronically file the foregoing with the Clerk of Court

using the CM/ECF system, which will then send a notification of such filing (NEF) to the

following:

Samantha Cohn, Esquire (VSB# 89091)
Geoff McDonald & Associates, P.C.
8720 Stony Point Parkway, Suite 250
Richmond, VA  23235
Telephone:     (804) 888-8888
Facsimile:     (804) 355-9988
Scohn@mcdonaldinjurylaw.com
*Counsel for Plaintiff*

           /s/           , p.d.
Carter T. Keeney, Esquire (VSB# 82275)
Carter & Shands, P.C.
9030 Stony Point Parkway, Suite 530
Richmond, VA 23235
Telephone:     (804) 747-7470
Facsimile:     (804) 747-7977
ckeeney@carterandshands.com
*Counsel for Defendant*

**JA217**

# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF VIRGINIA

### Richmond Division

SAMANTHA ROOP,

      Plaintiff

    V.                        Civil Action No.: 3:21-cv-00675-DJN

NICOLAS JAMES DESOUSA,

      Defendant

## AMENDED ORDER OF PROOF AS TO WITNESSES AND EVIDENCE

COMES NOW Plaintiff, Samantha Roop, and presents to this Court her Order of Proof as required regarding her intended witnesses and the evidence they will submit at trial and sets forth as follows:

**Plaintiff's Case in Chief**

1. Samantha Roop:

   a. Phase 1: facts as to accident; causation as to injuries – neck, head, back, and pelvis; injuries themselves; experience of injuries; the absence of a fall from a horse; treatment by doctors for injuries attributed to accident including, but not limited to, Guerette, Alliance Physical Therapy, PCP, and ER visits; medical procedures endured as a result of the accident; life preceding accident and subsequent thereto; medical records; physical limitations and inabilities as a result of accident

   b. Phase 2: pain and suffering; medical bills; experience of injuries; life preceding accident and subsequent thereto; physical limitations and inabilities as a result of accident; injuries' impact on relationships

**JA218**

2. Dr. Guerrette:

   a. Phase 1: actual treatment of Plaintiff from 2011 to present; actual observations during said treatment; actual diagnosis during said treatment; Roop's gap in treatment; changes in patient throughout actual treatment; medical records; Plaintiff's condition prior to July 2019 and subsequent thereto

   b. Phase 2: bills/costs of Roop's treatment; statements by Roop regarding pain and suffering during treatment

3. Gerard Barton:

   a. Phase 1: Plaintiff's physical/emotional/mental conditions before and after the accident; Plaintiff's treatment before and after the accident; facts as to accident; medical appointments; treating physicians; Plaintiff's medical treatment received as a result of the accident; observations of Plaintiff's condition and injuries as a result of the accident; medical records; firsthand involvement in Plaintiff's treatment and recovery from injuries attributed to accident; physical limitations and inabilities as a result of accident

   b. Phase 2: observations of Plaintiff before and after accident – pain and suffering; Plaintiff's physical/emotional/mental conditions before and after the accident changes to Plaintiff's life from before and after the accident; physical limitations and inabilities as a result of accident; injuries' impact on relationships; medical bills

**JA219**

**Rebuttal Witness**

1. Samantha Roop or Dr. Guerette dependent on how cross-examination/defendant's case in chief is presented

<div align="right">

**SAMANTHA ROOP**

By Counsel

</div>

_____/s/_____

Samantha Cohn (VSB# 89081)
Geoff McDonald & Associates, P.C.
8720 Stony Point Parkway, Suite 250
Richmond, VA 23235
Phone: (804) 888-8888
Facsimile: (804) 359-5426
Email: scohn@mcdonaldinjurylaw.com
_Counsel for Plaintiff_

**CERTIFICATE OF SERVICE ON THE FOLLOWING PAGE**

**JA220**

**<u>CERTIFICATE OF SERVICE</u>**

    I HEREBY CERTIFY that on the 18th day of May, 2022, I electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

Carter T. Keeney, Esq. (VSB # 82275)
Carter & Shands, P.C.
9030 Stony Point Parkway, Suite 530
Richmond, VA 23235
Phone: (804) 747-7470
Facsimile: (804) 747-7977
Email: ckeeney@carterandshands.com
*Counsel for Defendant*

<div align="right">

         /s/               
Samantha Cohn, Esquire

</div>

**JA221**

IN THE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| SAMANTHA ROOP | ) | Plaintiff, |
| | ) | |
| v. | ) | Civil Action No.: 3:21-cv-00675 |
| | ) | |
| NICHOLAS JAMES DESOUSA | ) | Defendant. |

**<u>OFFER OF PROOF AS REQUIRED BY THE ORDER OF MAY 3, 2022</u>**

COMES NOW, the Defendant, by counsel and for his offer of proof as ordered by this Court's

Order of May 3, 2022 states as follows:

<u>PRELIMINARY STATEMENT</u>

1. By filing this pleading, Defendant is not waiving any objection to the Court's ruling on
   Defendant's Motion in Limine.  Specifically, Defendant maintains his position that
   admitting any medical bills for Dr. Guerette's treatment is error as under *McMunn v.
   Tatum*, 237 Va. 558, 379 S.E.2d 908 (1989) when a Defendant objects to the introduction
   of medicals bills, indicating he has a substantial contest to the medical necessity and/or
   causation relation, the court may admit the bills only with foundation expert testimony
   tending to establish medical necessity and/or causal relationship.  Defendant has objected
   to these bills under *McMunn v. Tatum* and Dr. Guerette is not permitted to offer any expert
   testimony.

2. Defendant maintains his position that Dr. Guerrette should not be permitted to testify as
   absent being able to offer any expert testimony, his testimony is not relevant to any fact at
   issue.

**JA222**

3. As a preliminary matter, most of the Defendant's evidence will be based on his cross-examination and impeachment of the Plaintiff.  Below, it what the defense anticipates bringing out from the witnesses below and/or from the referenced records.  However, the exact evidence elicited will depend largely on the Plaintiff's case.

## <u>PHASE 1 EVIDENCE</u>

1. **Samantha Roop**: Defense counsel intends to cross examine her regarding her claimed injuries and her prior medical history.  Defense counsel will also cross examine her on her activities.  If the Plaintiff is truthful, the defense may not need to call all of the witnesses listed below.

2. **Richard Gill, M.D. and/or the Custodian of Records at St. Frances Medical Center:** Dr. Gill treated Plaintiff at St. Francis Medical Center.  His note indicates that Plaintiff has a history of abuse, anemia, anxiety, arthritis, bipolar disorder, chronic pain (on chronic opiates) Depression, GERD, interstitial cystitis, RA.  He then will testify about her complaints from the auto accident and importantly that she denied abdominal pain.  Roop Bates Stamp 779.

3. **Custodian of Records from CJW Medical Center:**    On 7/15/19 Plaintiff went to the ER and reported history of chronic back pain which she sees a specialist for and takes oxycodone several times daily, but her back pain was worse since the accident.  Plaintiff made no mention of pelvic pain and denied abdominal pain.  Roop Bates Stamp: 707-708.

4. **Nathan Michels**, PT, DPT, OCS, CSCS and/or Custodian of Records from Alliance Physical Therapy: Nathan Michels was a physical therapist at Alliance Physical Therapy.  As he is Plaintiff's treating medical provider, Defense cannot speak with him pursuant to

Virginia code section 8.01-399.  It is anticipated he will testify consistently with the records from Alliance Physical Therapy, which were produced in discovery.  Specifically, it is anticipated he will testify regarding Plaintiff's complaints and her lack of complaints for any pelvic injury.  As evidenced by the records from Alliance Physical Therapy, Plaintiff was progressing well as she was in therapy.  Defendant will also call the Custodian of Records for Alliance to Authenticate the records.  Defendant anticipates offering at least the information listed below but reserves the right to offer additional evidence should the need arise.

   a.  July 19, 2019, Plaintiff reported to her therapist that she works in an automotive repair shop and was out of work.  She also reported she has arthritis and a lower back decompression fusion in 2011.  Roop Bates Stamp 844.

   b.  On August 6, 2019, she told her therapist that she had returned to work in her husband's auto repair shop.  Roop Bates Stamp 854.

   c.  On August 22, 2019, she stated she had no current headaches.  Roop Bates Stamp 858.

   d.  On September 6, 2019, she stated that working aggravated her left shoulder pain.  Roop Bates Stamp 862.

   e.  On September 12, 2019, Plaintiff reported 90% functional improvement.  Also noted working full time in an automotive repair shop and that it was heavy duty.  Roop Bates Stamp 866.

   f.  On October 10, 2019, she reported continued pain in her left shoulder with heavy lifting and her last headache was 2 weeks ago.  Roop Bates Stamp 882.

**JA224**

g. On October 16, 2019, Plaintiff reported full recovery with no headaches, back to activities of daily living, and independent activities of daily living with no concerns. Plaintiff stated she was ready for discharged and was pleased with her progress. She reported 0/10 pain and 100% improvement.  Plaintiff reported a full recovery. Roop Bates Stamp 884-891.

h. a.-h. above is descriptive of the testimony to be elicited by the witnesses.  However, in total, the evidence adduced will be that the Plaintiff made a good quick recovery, was back to strenuous activity relatively quickly, made no complaints of pelvic issues and aggravated her shoulder while working.[1]

5. **Dr. Teresa Camden and/or the custodian of records for Alliance Physical Therapy:**

Dr. Camden was a medical doctor who saw the Plaintiff after the accident. She is Plaintiff's treating medical provider; Defense cannot speak with her pursuant to Virginia code section 8.01-399.  It is anticipated he will testify consistently with her records, which were produced in discovery.  It is anticipated she will testify that the Plaintiff has done pain management for her lower back since 2012 and normally takes Hydrocodone twice daily, did not complain of any pelvic or bladder issues, that she did not miss any days of work after her accident, that she helps her husband in his mechanic shop, she has a lifting requirement of 100 pounds with working on tractor trailers and larger vehicles.  This is all referenced in the July 22, 2019, note from Dr. Camden's office.  It is also anticipated she will testify that on September 9, 2019, Plaintiff stated that her shoulder was pain free until yesterday while riding her horse she states her horse dragged her across the field causing

---

[1] The records from Alliance Physical Therapy total approximately 41 pages.  If the Court would like the same for review, please inform counsel of the same and the same will be provided.

**JA225**

pain.  Plaintiff also reported on October 16, 2019, that she was completely recovered.

These records are Roop Bates Stamp 893-898.

6. **Dr. Nathan Guerrette, M.d.:**    It is anticipated that the Defense will cross-examine

Dr. Guerrette.  It is anticipated that Dr. Guerrette will testify as to the following:[2]

    a.  Back in 2012 or 2013 he implanted a sacral nerve stimulator in the Plaintiff.

*That the Interstim has a shelf life of five years*.  He will testify that she first

reported to his officer on October 8, 2019 with reports of worsening

incontinence.  That there was a gap in is treatment from February 19, 2020

until December 4, 2020.  *Repetitive heavy lifting can cause the issues Dr.*

*Guerrette treated the Plaintiff for.  Getting dragged through a field by a horse*

*could damage the Interstim.*

## PHASE 2 EVIDENCE

In phase 2, Defendant's evidence will be base don his cross examination of the plaintiff's

witnesses.


NICHOLAS JAMES DESOUSA,
By Counsel

_____/s/_____, p.d.
Carter T. Keeney, Esquire (VSB# 82275)
Carter & Shands, P.C.
9030 Stony Point Parkway, Suite 530
Richmond, VA 23235
Telephone:    (804) 747-7470
Facsimile:    (804) 747-7977
ckeeney@carterandshands.com
*Counsel for Defendant*

---

[2] The defense will only ask about the subjects in italics if the Court holds that asking about the same does not open the door to Dr. Guerrette offering any expert opinion testimony regarding the causation of plaintiff's condition.  The defense will ask the court for a ruling on these issues prior to asking Dr. Guerrette.

CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT on the 20th day of May, 2022, I will I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Samantha Cohn, Esquire (VSB# 89091)
Geoff McDonald & Associates, P.C.
8720 Stony Point Parkway, Suite 250
Richmond, VA  23235
Telephone:     (804) 888-8888
Facsimile:     (804) 355-9988
Scohn@mcdonaldinjurylaw.com
*Counsel for Plaintiff*

_____/s/_____, p.d.
Carter T. Keeney, Esquire (VSB# 82275)
Carter & Shands, P.C.
9030 Stony Point Parkway, Suite 530
Richmond, VA 23235
Telephone:     (804) 747-7470
Facsimile:     (804) 747-7977
ckeeney@carterandshands.com
*Counsel for Defendant*

**JA227**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

SAMANTHA ROOP,
    Plaintiff,

v.                              Civil No. 3:21cv675 (DJN)

NICHOLAS JAMES DESOUSA,
    Defendant.

**MEMORANDUM ORDER**
**(Clarifying Parameters of Testimony of Dr. Nathan Guerette)**

    This matter comes before the Court for pretrial management following a conference call with counsel on May 27, 2022, about the parameters of the testimony of Dr. Nathan Guerette. The Court previously granted in part Defendant's Motion *in Limine* to Exclude Dr. Nathan Guerette from Testifying at Trial, to Exclude Plaintiff's Medical Bills for Dr. Guerette's Treatment and to Exclude Any Mention of Any Condition Treated by Dr. Guerette (ECF No. 18). In its Memorandum Order (ECF No. 25), the Court prohibited expert testimony by Dr. Guerette as to the issue of causation and bifurcated the trial into two phases addressing: (1) causation as to the contested injuries, including injuries involving Plaintiff's pelvic and bladder areas; and, if and only if Plaintiff establishes causation to the satisfaction of the jury as to the contested injuries, (2) the treatment and related medical bills, along with pain and suffering, resulting from injuries arising from the car accident.

    On May 12, 2022, Defendant filed a pleading (ECF No. 27) admitting liability and indicating that Defendant would not contest that Plaintiff sustained soft tissue injuries to her head, neck and back. The pleading, however, wrongly stated that the Court prohibited Dr.

**JA228**

Guerette from offering *any* expert testimony and, therefore, admitting the medical bills would offend the Virginia Supreme Court's holding in *McMunn v. Tatum*, 379 S.E.2d 908 (Va. 1989). But this position misunderstands the Court's ruling on the limits of Dr. Guerette's testimony.

Again, Dr. Guerette may not provide expert testimony as to the cause of Plaintiff's injuries. However, Dr. Guerette may testify as Plaintiff's treating physician in both phases of the trial. During Phase One (addressing the issue of causation), Dr. Guerette may only provide testimony about his treatment of Plaintiff during the time period of 2011-13 and then the results of his examination when Plaintiff returned to him for treatment in October of 2019, including providing testimony on the functionality of her Interstim device before and after the accident at issue. To reiterate, Dr. Guerette may not provide any expert testimony about the cause of any injuries that he observed when he examined and treated Plaintiff in October of 2019.

If Plaintiff meets her burden during the first phase and the jury finds that the car accident caused or contributed to any of the contested injuries, the case will then proceed to the second phase, which will cover damages for undisputed injuries and those injuries on which the jury found in Plaintiff's favor on causation, if any. During Phase Two, Dr. Guerette may provide expert testimony as Plaintiff's treating physician as to the medical necessity of the treatment that he provided to Plaintiff beginning in October of 2019. The medical bills for this treatment can be admitted as evidence during this phase, based on Dr. Guerette's testimony as Plaintiff's

2

**JA229**

treating physician.

Let the Clerk file a copy of this Order electronically and notify all counsel of record.

It is so ORDERED.

_____/s/_____

David J. Novak
United States District Judge

Richmond, Virginia
Date:  May 27, 2022

3

**JA230**

1            UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF VIRGINIA
2                  RICHMOND DIVISION

3

4    _____)
     SAMANTHA ROOP                    )
5                                     )
     v.                               )    Civil Action No.:
6                                     )    3:21 CV 675
     NICHOLAS JAMES DESOUSA           )
7    _____)
                                           July 12, 2022
8

9

10       COMPLETE TRANSCRIPT OF FINAL PRETRIAL CONFERENCE
             BEFORE THE HONORABLE DAVID J. NOVAK
             UNITED STATES DISTRICT COURT JUDGE
11

12

13   APPEARANCES:

14   Samantha B. Cohn, Esquire
     Brandon K. Galindo, Esquire
15   GEOFF MCDONALD & ASSOCIATES, P.C.
     8720 Stony Point Parkway
16   Suite 250
     Richmond, Virginia 23235
17
                 Counsel on behalf of the Plaintiff
18
     Carter T. Keeney, Esquire
19   CARTER & SHANDS PC
     9030 Stony Point Parkway
20   Suite 530
     Richmond, Virginia 23235
21
                 Counsel on behalf of the Defendant
22

23

24                 TRACY J. STROH, RPR
                 OFFICIAL COURT REPORTER
25              UNITED STATES DISTRICT COURT

1          (The proceeding commenced at 10:05 a.m.)

2          THE CLERK:  Civil action 3:21 CV 675, *Samantha*

3 *Roop v. Nicholas James Desousa*.

4          Representing the plaintiff, Samantha Cohn and

5 Brandon Galindo.

6          Representing the defendant is Carter Keeney.

7          Counsel, are we ready to proceed?

8          MS. COHN:  Ready, madam.

9          MR. KEENEY:  Yes, Your Honor.

10          THE COURT:  Okay.  The way we're going to

11 proceed here today is that you're going to keep your mask

12 on until it's your turn to speak.  When it's your turn to

13 speak, you're going to come up to the lectern, remove your

14 mask so the court reporter can hear you.  When you're done

15 speaking, you'll put your mask back on.

16          All right.  We're here for the final pretrial

17 conference.  I want to go through a number of items to get

18 us ready for the trial next week.

19          It looks like we're going to trial; is that

20 right?

21          MS. COHN:  Yes, Your Honor.

22          THE COURT:  All right.  Let's -- I want to first

23 ask, Ms. Cohn, who is going to be sitting at your table?

24          MS. COHN:  Your Honor, seated at the table --

25          THE COURT:  I need you to take your mask off.

1    MS. COHN:  Seated at the table, Your Honor, will

2  be Brandon Galindo and the plaintiff, Ms. Roop, as well as

3  myself.

4    THE COURT:  Okay.

5    All right.  And, Mr. Keeney, who's going to be

6  at your table?

7    MR. KEENEY:  Just myself and my client is my

8  current understanding, Your Honor.

9    THE COURT:  So Mr. Desousa is going to be here?

10    MR. KEENEY:  Mr. Desousa is going to be here,

11  yes, sir.

12    THE COURT:  So when you say your client, you're

13  really representing the insurance company.

14    MR. KEENEY:  No, sir.

15    THE COURT:  Oh, you got Mr. Desousa?

16    MR. KEENEY:  He's my client.

17    THE COURT:  Okay.  That's fine.  All right.  I'm

18  glad I asked that.

19    MR. KEENEY:  No, there should be no mention of

20  State Farm, Your Honor.

21    THE COURT:  Of course, not.

22    MR. KEENEY:  Right.

23    THE COURT:  I'm not going to do that.  I'm just

24  trying to figure out who's going to be sitting there.

25  That's all.

1    MR. KEENEY: There was some question as to
2 whether or not Mr. Shands would appear, but I think he's
3 booked himself into other things. So it's all me.

4    THE COURT: Oh, I think you can handle this.

5    Okay. All right. No paralegals?

6    MR. KEENEY: No, Your Honor.

7    THE COURT: Okay.

8    Same for you, Ms. Cohn?

9    MS. COHN: Not at the table, Your Honor.

10    THE COURT: All right. Okay.

11    All right. I want to go through a couple issues
12 here first. On stipulations -- Mr. Keeney, do you want to
13 come up to the lectern --

14    MR. KEENEY: Yes, Your Honor.

15    THE COURT: -- because I really want to ask you
16 this?

17    So I looked at your stipulations, and the one
18 thing I noticed is this. You don't have a stipulation as
19 to damages as to the undisputed injuries. And I wonder if
20 it may make -- it seems to me that's an identifiable
21 number other than pain and suffering, right?

22    MR. KEENEY: There's a portion of that that is,
23 Your Honor. And here's where it gets wishy-washy.

24    During the course of her physical therapy
25 treatment, within the records there are some notations in

1  there about her doing things that aggravate her condition,

2  such as lifting things.  Obviously, we have the horse

3  incident, and then she continues treating with physical

4  therapy after that.

5         So when exactly Alliance Physical Therapy would

6  get cut off, really, that's up to the jury.  As far as --

7  I believe it is the two initial ER visits and the

8  beginning of physical therapy.  That is not in dispute.

9  Ms. Cohn and myself have not come up with what that

10  specific number is at this point, Your Honor.

11         THE COURT:  All right.

12         MR. KEENEY:  I'm not disputing those bills.  We

13  just haven't done the math within our stipulation.  And I

14  think within the stipulation, number 4 through 9 indicate

15  that we agree that the treatment referenced in those

16  stipulations was medically necessary to treat the injuries

17  and the cost was reasonable and -- everything that allows

18  the plaintiff to recover for this.

19         THE COURT:  Okay.  I want you to think about

20  what my question -- why I'm asking this question --

21         MR. KEENEY:  Uh-huh.

22         THE COURT:  -- before you give me your next

23  answer.  Okay?

24         MR. KEENEY:  Okay.

25         THE COURT:  I'm going to try to explain to you

**JA235**

1   what I'm thinking.  Okay?

2           It seems to me one of three things are going to

3   happen at trial.  Particularly, I just read your trial

4   memos.  That's why I was running a little bit late here.

5           So the jury is going to get the issue of

6   causation.  Okay.  Particularly focusing on the pelvic

7   prolapse.  They could find for you.  Okay.  And then the

8   only issue -- and to me, this is, at best for them, a

9   50/50 chance on that.  I'm letting the jury decide it,

10  though.  I'm not taking it away from them, right?

11          As I understand it, what their evidence is going

12  to be is she's going to testify, "I had this issue before

13  back in 2011, 2013.  I had this device put in me.  The

14  device was fine.  I had this accident.  Now I got issues.

15  It had to come from the accident."  Right?

16          And you're going to come back and say, "We have

17  no idea if that's what caused it, and by the way, she has

18  all these other issues.  She fell off a horse.  She was

19  lifting stuff.  Nobody knows.  It would be pure

20  speculation."

21          That's essentially the trial, right?

22          MR. KEENEY:  Yes, sir.

23          THE COURT:  The first phase.  Okay.  If the jury

24  comes back in your favor, we got no issues.  We're just

25  going on the pain and suffering from the -- these --

1 really, the undisputed injuries. There might be a

2 question about how far those go, but that's miniscule.

3             MR. KEENEY: Correct.

4             THE COURT: Okay. Option two is jury comes back

5 in her favor. Okay. We then go to the jury. And we're

6 going to the jury really on two issues, in my mind. The

7 undisputed injuries and the disputed injuries. Okay?

8             Now, you say there's a little bit of a twist on

9 the undisputed injuries in terms of how far the physical

10 therapy went. That's what you just said right now.

11             MR. KEENEY: Correct.

12             THE COURT: But then you're also -- you're going

13 to file a motion for judgment without regard to the

14 verdict afterwards, right? Your Rule 50 motion no matter

15 what, right?

16             MR. KEENEY: Well, and that was one of the

17 questions I had for the Court. Obviously, if I lose, I

18 will do that.

19             But at some point during trial, my position

20 is -- I think the Court is clearly aware -- is that while

21 she can say she injured these parts, under *McMunn* --

22             THE COURT: I understand.

23             MR. KEENEY: Right. But my question is when

24 would the Court like me to renew that?

25             THE COURT: Why don't you just hear me out for a

1  second --

2          MR. KEENEY:  Okay.

3          THE COURT:  -- and then I think we'll all be in

4  better shape.

5          Even if she prevails in the first phase and the

6  jury then awards the damages, I'm going to allow you to

7  file a motion under Rule 50.  Okay?  And I'm going to look

8  at it again as a matter of law whether or not it's

9  sufficient, right?

10          I think the jury should make the determination

11  first, right?  And then I -- I don't even know what the

12  evidence is.  I just -- I'm speculating based upon what

13  you all have told me.  But you would have a -- you're

14  going to have a full opportunity -- because I think this

15  is a tight legal issue here, okay, if she prevails.  All

16  right.  Now, if she doesn't prevail, there's no legal

17  issue, right?

18          But what I'm saying to you is this.  So what if,

19  after the verdict -- let's say they award -- I'm just

20  making up numbers -- 50,000 for the undisputed and they'd

21  have 500,000 for the disputed and then I grant your motion

22  for judgment notwithstanding the verdict, right?

23          How do I -- the verdict form that you have given

24  me lumps them all together.  We would have to have another

25  trial.  Okay?

1       Now, I'm going to do a different verdict form to
2  try to deal with that.  But it seems to me the wiser move
3  here is for you to stipulate to the broadest reasonable
4  sense that you can as to what the damages are on what are
5  the undisputed injuries and then tell that to the jury.
6  Okay.  This is -- this is the damages that they're
7  entitled to for the head, the neck, all the soft tissue
8  injuries, right?

9       I would then have a separate answer as to what
10 is the pain and suffering attributed to that alone.

11      And then what is the damages, the medical
12 expenses that you attribute to the pelvic prolapse, and
13 what is the pain and suffering there.

14      I'm not going to allow them to do futures.
15 We'll get to that here in a second.

16      But the -- but my point to you is I think the
17 wise move is -- because you're really fighting about the
18 pelvic prolapse.  If it wasn't for that, you would have
19 settled this case.  Do you know what I'm saying to you?

20      MR. KEENEY:  Correct.

21      THE COURT:  So why don't you all -- so we don't
22 have to try this case a second time -- because if I would
23 rule in your favor on the Rule 50 motion, I'd have to go
24 back and have another trial on damages.  We're going to be
25 doing this thing all over again, right, which seems to me

1  to be quite silly and a waste of money.

2          And, of course, the third option is I could deny

3  your motion.  But we would have a verdict form that you

4  could then appeal -- you would want to do that to --

5  you're going to appeal me if you lose on this.  Because

6  you're so in love with *McMunn* that I'm sure that you want

7  the Fourth Circuit to review that, right?  And I think

8  it's a sizable amount of money such that your client would

9  want to appeal it, right?

10          It seems to me the wiser move is to get into the

11  weeds and break down what the damages are.  And we're

12  going to do that no matter what.  But since -- to your

13  credit, you're not fighting the liability on what I'm

14  calling the soft tissue injuries.  Why don't you all sit

15  down and stipulate to what that number is.  It doesn't

16  include pain and suffering.  We'll let them decide that.

17          Of course, I'll change the verdict form if the

18  jury comes back in your favor.  But I'm playing this out

19  worst-case scenario because that's what my job is, right?

20          Do you understand?

21          It seems to me to be a lot more -- makes a lot

22  more common sense to do that, to have an additional

23  stipulation on just damages.

24          If you want to stipulate also to what the pain

25  and suffering would be also, that would be fine.  I don't

1  think you want to.  But we could have that line, right?

2          Do you want to ponder this?

3          We're going to have another final pretrial

4  conference, by the way, next week because the exhibit list

5  is not acceptable here.

6          What I normally do for a final pretrial

7  conference is I normally have everything done by now.  The

8  exhibit list -- particularly Ms. Cohn's exhibit list -- is

9  not cutting it.  We're going to have to redo some things.

10         I'm going to redo some of the jury instructions.

11 I'm going to take your agreed instructions, but there's

12 more things that we have to put in there.  Okay?  I'm

13 working on that today.

14         I'm going to give you all -- I'm going to give

15 you everything I'm going to say to the jury.  But it would

16 be helpful to me to know this answer on whether you're

17 willing to stipulate to the damages.  And I can modify it

18 afterwards, right, if you want, but --

19         MR. KEENEY:  Your Honor, we can come up with a

20 number for the treatment that I referenced -- or that are

21 referenced in the stipulation of facts.  Whatever that

22 total is, I can do the math on that and let the Court

23 know.

24         I think special verdict forms are disfavored at

25 law.

1          THE COURT:  No, they're not.  Not -- no, they're

2  not.  Not here they're not.  Maybe in state court.

3          MR. KEENEY:  In state court --

4          THE COURT:  The problem is you want to try this

5  case -- you're both struggling because you're state court

6  practitioners and you keep viewing it that way.

7          You're in federal court.  We apply the federal

8  rules.  So that's the way this rolls.

9          MR. KEENEY:  Yes, Your Honor.

10          I'll try to come up with that number.  I mean

11  that --

12          THE COURT:  Well, you have to get with her.

13          But what I'm saying to you is if you're going to

14  try to parse it and say, well, hey, I want to fight about

15  this additional physical therapy, that's not going to

16  work.  I'm going to tell you that right now, if that's

17  what you're going to do.  It can't be much money.

18          It seems to me this whole case is about the

19  pelvic prolapse.  If you want to fight about it, you can.

20  And I'm going to do a detailed special verdict form on

21  everything, and we'll let the jury decide that.

22          Because I have to say to myself, what if I word

23  it to grant your motion post trial?  This is a -- this is

24  going to be a tough issue.  You know, I don't know if

25  she's going to sustain her burden in front of the jury.

1 But if she does, I want to look at what that evidence

2 looks like in relation to the law.  I'm going to give you

3 a chance to brief it.  I'm going to give her a chance to

4 brief it.  It seems to me if she hits it, she's hitting it

5 big, you know.  I don't know if she is going to hit it,

6 but I'd want to know what those numbers are.

7           Does that make sense to you?

8           MR. KEENEY:  Yes, sir.

9           THE COURT:  So why don't -- when we're done, why

10 don't the two of you huddle.  And if you can file

11 something, try to get it in by tomorrow.  If you cannot

12 agree, which is your prerogative -- I can't make you

13 stipulate, okay -- just e-mail my law clerk and say we

14 couldn't reach an agreement.  Don't say anything else

15 other than that, just so I know what the deal is.

16           But you're going to see, hopefully by tomorrow,

17 certainly no later by -- I'll tell you what.  I'm going to

18 wait until Thursday until I hear from you because I might

19 change the jury instructions.

20           You'll get the jury instructions no later than

21 Thursday.  Okay?  But I'd like to see what you guys

22 decide.  Does that make sense?

23           MR. KEENEY:  Yes, sir.

24           THE COURT:  Ms. Cohn, did you want to say

25 anything about that point or not?  With your mask off.

1      MS. COHN:  No, Your Honor.  I think Carter and I

2  are of the same opinion that --

3      THE COURT:  We're going to call him Mr. Keeney

4  around here.

5      MS. COHN:  Mr.  My apologies.

6      THE COURT:  I've got to get you ready for

7  federal court.  You're struggling here a little bit.

8      MS. COHN:  Mr. Keeney and I are of the same ilk

9  that there is the discrepancy.  But I do understand

10  completely what Your Honor is saying regarding the

11  stipulation to that miniscule amount versus the amount

12  potentially to come for the prolapse issue.

13      THE COURT:  Why don't you essentially reach a

14  settlement on that point?  Do you know what I'm saying to

15  you?

16      You could agree -- you could go halfway in

17  between the number and agree amongst yourselves and we

18  take that away from the jury, leaving just pain and

19  suffering on that point.  And then we come back and let

20  them find what this is really about, the pelvic prolapse.

21      That's what I think you should do.  But you

22  talk, get back to us by tomorrow, okay, and let us know.

23      MS. COHN:  Thank you.

24      MR. KEENEY:  Thank you, Your Honor.

25      THE COURT:  All right.

1    Ms. Cohn, do you want to come on up to the

2 lectern?

3    So your exhibit list is just not cutting it.

4 It's just not the way we do things around here.

5    Essentially, what you did is you gave me your

6 discovery list.  That's not the way we do it.  Here's what

7 you have to do.  You're going to give -- both of you are

8 going to redo this.  You're going to give me two exhibit

9 lists, one for liability and one for damages.  Your

10 exhibits are going to be on both of them.  Then you're

11 going to give me a binder with the exhibits in them.  It's

12 going to be what is going to go to the jury so I can look

13 at them in advance.

14    You're going to redact out all the hearsay.

15 You're going to redact out all the personal identifiers,

16 like her date of birth, for example.  Anything that's not

17 relevant in the medical records has to be taken out.

18    Now, exhibit lists around here, okay, is you

19 identify the specific exhibit.  So picture of horse on

20 June 1st.  Okay?  So it's not -- you're just, like, giving

21 broad descriptions of stuff.  That's not what we're doing

22 here.

23    So what you're going to do is this.  It's going

24 to be -- I think we e-mailed you a sample.  But column 1

25 is exhibit number.  Okay?  The first set of exhibits are

1   all going to start with a P.  P for plaintiff.  P1, P2,

2   P3.  Okay.  When you're done with yours, the next ones are

3   D1, D2, D3, D4.  Okay?  So forth.

4         Category 2 is a very short description of what

5   the item is.  Okay?  If you want to put the Bates

6   number -- I think, Mr. Keeney, you had Bates numbers --

7   you can put it in parentheses around the description if

8   that helps you.

9         You have to remember, I'm sending to the jury

10   the exhibit list.  I'm sending to the jury the

11   stipulations, right?  You want that.  You want them to

12   know what they're doing so that they can leaf -- and

13   they're going to have a copy of the exhibits in there with

14   them, right?

15         So it's essentially a guide to them that, hey, I

16   want to look at that picture of that horse again.  What

17   number is it?  Do you understand what I'm saying to you?

18         MS. COHN:  (Nodding head.)

19         THE COURT:  If you want to put the Bates number

20   in there, I don't care.  You don't have to.  That's for

21   your benefit, not mine.  Okay.

22         Column 3 is -- the title of that column is

23   sponsoring witness or stipulation.  If it's a -- if it

24   relates -- this is who's going to -- who is going to

25   authenticate based on whose testimony is that exhibit

1   going to be admitted, right?

2           Essentially, your case is down to three people,

3   right?

4           MS. COHN:  Correct.

5           THE COURT:  You've got Ms. Roop, her boyfriend,

6   and the doctor, right?

7           MS. COHN:  Correct, Your Honor.

8           THE COURT:  Okay.  But you also have

9   stipulations.  So let's say you want to introduce medical

10  records.  Okay?

11          The medical records are broken down by day, by

12  treatment, right?  It's a set.  It's not like all the

13  medical records from St. Mary's at one time.  Do you know

14  what I'm saying to you?

15          MS. COHN:  Absolutely, Your Honor.

16          THE COURT:  So if she's treated on July 9th,

17  it's those specific medical records for July 9th have

18  their own exhibit number.  Okay?

19          So if they're going to be admitted via

20  stipulation, you type in stipulation number.  So, for

21  example, stipulation number 9.  I'm just making this up.

22  Do you know what I'm saying to you?

23          MS. COHN:  Absolutely, Your Honor.

24          THE COURT:  All right.  And then the last column

25  is admitted or denied.  Now, normally, we put in there the

1  date for it to be admitted or denied, but we're trying

2  this case in one day.  That's what you all told me.  I'm

3  not sure we're going to make it here with two openings and

4  two closings for each, but that's what we're going to do.

5  And that allows me, and most importantly my staff, to

6  check off if I allow it to be admitted or not, right?

7          And then if it's -- if it's stipulated to, it's

8  automatically admitted.  You can just put a check box in

9  already.  Do you know what I'm saying to you?  Otherwise,

10  you leave that open.  Okay?  But I need you to redo your

11  exhibit list.

12          Mark every one of your exhibits separately.  You

13  all are going to have a meet and confer no later than

14  Thursday.  You're going to file, on Friday, a new exhibit

15  list.  Both of you.  Okay?  It's a combined exhibit list.

16  Exhibit list 1 is for liability.  Exhibit list 2 is for

17  damages.

18          Now, every -- every exhibit that is admitted

19  during phase one is automatically then going to be carried

20  to phase two.  But my point is this is what I'm giving the

21  jury.  So when they go deliberate on phase one, I'm going

22  to give them the phase one exhibits.  When they go to

23  deliberate on phase two, I'm going to give them both phase

24  one and phase two and all the exhibits from both.  You got

25  that?  So you don't have to replicate on the exhibit list

1  for phase two what you've already written on phase one.

2  Does that make sense to you?

3  　　　　MS. COHN:  Absolutely, Your Honor.

4  　　　　And unfortunately, my paralegal was out with

5  COVID when everything was due.  Carter and I have since

6  exchanged proper exhibits.  And getting your list in

7  yesterday, we've actually reworked it just for our

8  portion.  And that should have been submitted to you

9  already, but I will go back and make a combined one with

10  Carter.

11  　　　　THE COURT:  Okay.  We're going to redo them.

12  　　　　MS. COHN:  Mr. Keeney.

13  　　　　THE COURT:  But I want to make sure you're doing

14  it the right way here, because what you gave me is not

15  appropriate.  Okay?

16  　　　　MS. COHN:  I completely understand, Your Honor.

17  　　　　THE COURT:  Okay.  So we gave you a sample so

18  you know what to do, right?

19  　　　　And you're going to break it down.  Each item is

20  going to have an exhibit number, and then you're going to

21  make -- you need to make a book for me.  Okay?  And you

22  need to have a set for the jury as well, right?  So --

23  now, do you want to publish them over the television or do

24  you want them to have a hard copy?

25  　　　　Because, you know, in the jury -- I don't know

1  if you know this.  In the jury box, they each have their

2  own monitor.  How are you going to do this?

3        MS. COHN:  We have the tech walk-through next

4  week.  So I honestly hadn't given much thought about the

5  electronic version.  However, if they each have their own

6  monitor, that might be the easiest way to go so it's not a

7  whole bunch of paper shuffling around.

8        THE COURT:  Okay.  But you said you're not going

9  to have a paralegal sitting at your counsel table, right?

10 So who's going to run all this?

11        MR. GALINDO:  Your Honor, I'll be running

12 technology from counsel table.

13        THE COURT:  You're Mr. Galindo?

14        MR. GALINDO:  Yes, Your Honor.

15        THE COURT:  Okay.  All right.  That's fine.

16        I'm going to make a suggestion to you.  I have a

17 feeling that this is not going to go the way that we all

18 are hoping.  You might want -- we're going to have seven

19 jurors.  Okay?  I suggest you make ten books.  Okay?

20        MS. COHN:  Okay.

21        THE COURT:  One for me.  One for each of the

22 jurors, right?  One for the witness.  That gets us to

23 nine.  Actually, make 11.  And then one for my law clerk,

24 and then one for my courtroom deputy.  Okay?

25        MS. COHN:  Better safe than sorry.  Tech never

1  works when you want it to.

2  THE COURT:  Better safe than sorry.  You don't

3  want me blowing a blood vessel here in the middle of this

4  trial.  We want to go in nice and clean.  If you want to

5  show something on the monitor, I'm fine with that.

6  MS. COHN:  Okay.

7  THE COURT:  I will tell you, the way this really

8  works, when it gets to reading print on stuff -- I don't

9  know if that's at issue here in this case.  But if you

10  want them to read something specifically in medical

11  records, it's really difficult to see it on the monitors.

12  Mr. Galindo, there's a way to do that.  My

13  courtroom deputy will show how you to do it.  You bring it

14  out.

15  You too, Mr. Keeney.

16  But it seems to me that the book is the way to

17  go.  Now, if there is an exhibit that is in dispute, we

18  can't put that in the book, right?  So if you're fighting

19  over an exhibit, leave that out of the book, and we'll

20  just have to deal with it at trial.  Okay?

21  MS. COHN:  Thank you, Your Honor.

22  THE COURT:  All right.  So you know what you're

23  doing?  This is important to me.

24  MS. COHN:  Yes, Your Honor.

25  THE COURT:  Because you're kind of off the rails

1  a little bit.  Do you know what you're doing?

2          MS. COHN:  I'm back on the rails.

3          THE COURT:  You're back on the rails.

4          All right.  Mr. Keeney, do you know what you're

5  doing?

6          MR. KEENEY:  Yes, Your Honor.  Mine is already

7  drafted.  I spoke with Ms. Cohn after --

8          THE COURT:  All right.  Let's talk about the

9  objections here, then, to the witness list and exhibit

10 list while you're there.

11         Do you need your notes or anything?

12         MS. COHN:  No, Your Honor.  I do believe for

13 his -- for Mr. Keeney's exhibit list, there were a couple

14 corrections to an ER record that we've agreed to, and he

15 has since redacted them.

16         THE COURT:  Okay.

17         MS. COHN:  So the filing was more to preserve

18 the objection should it be necessary, but it does not seem

19 to be necessary any longer.

20         THE COURT:  Well, I'm more worried about his

21 objections to yours.  So you have not designated any

22 discovery to be used as an exhibit.

23         MS. COHN:  We've exchanged and he has agreed to

24 pictures of the motor vehicles, both the defendant's and

25 the plaintiff's, as well as medical records as authentic,

 1  not -- we've preserved objections to the medical records

 2  for other reasons, such as hearsay and whatnot.  However,

 3  the records as to the Intimate Wellness Institute and

 4  Chippenham regarding the surgeries he has agreed to allow

 5  me to enter.

 6          THE COURT:  He's saying no.  He's shaking his

 7  head no.  Why don't you stand up and take your mask off

 8  and say --

 9          MR. KEENEY:  No, Your Honor.  Our agreement was

10  we didn't need to bring any custodians of records.

11  Dr. Guerette is going to be here live, and he can testify

12  as to what's in there and --

13          THE COURT:  All right.  Here's what we're going

14  to do.  Okay?  Because normally, I'm ruling on this, but I

15  don't have the exhibits because I don't have your

16  exhibits.  So here's what we're going to do.

17          You're going to file your exhibit list on

18  Friday.  You're going to meet and confer by Thursday.  We

19  are going to have another final pretrial conference next

20  week.  We're going to do it on Tuesday.

21          I think you're scheduled to come over here at,

22  like, 2:30, or something like that, for the tech thing; is

23  that right?

24          MR. KEENEY:  3:30, Your Honor.

25          THE COURT:  So are you available at noon?

1         MR. KEENEY:  Your Honor, I have another federal

2 pretrial conference in Alexandria at 10 a.m.  I'm --

3         THE COURT:  All right.  We'll do it at 4:00.

4         MR. KEENEY:  Well, Your Honor, I'm -- I may be

5 out of the case by then.  I've submitted everything.  I

6 just need the Court to sign an order.  I submitted it on

7 Sunday, the motion.

8         THE COURT:  What are you talking about?  You're

9 talk about the Alexandria case?

10        MR. KEENEY:  Yes, sir.  Yes, sir.  So that

11 hearing may go away for me.

12        THE COURT:  What time do you want to do it on

13 Tuesday?  That's what I'm asking you.

14        MR. KEENEY:  We can do 4:00.

15        THE COURT:  I'll tell you what.  Let's do this.

16 Hold on one second.  We're going to say 3:30.  We'll do

17 the final pretrial conference.  I'll leave the bench, and

18 then you can do with the tech walk-through with

19 Ms. Garner.  Does that make sense?

20        MS. COHN:  Works for me, Your Honor.

21        MR. KEENEY:  Yes, Your Honor.

22        THE COURT:  Okay.  So here's what we're going to

23 do, just so we're all on the same page.  You, then, are --

24 after you file the exhibit list, you're each going to file

25 a pleading.  If you object to the admission of one of the

1  exhibits of each other, on Friday you're also going to

2  file a list and what the objections are so I can

3  understand what's in dispute and what's not.  We should

4  have been doing this today, but we're off the rails.

5       We're going to get back on the rails.  You're

6  going to meet and confer so I know exactly what's in

7  dispute.  You're going to tell me why.  It sounds more

8  like you're disputing her exhibits.

9       MR. KEENEY:  Your Honor, if I may.  Part of it's

10 I was never given any exhibits.

11      THE COURT:  We're past whose fault it is.  I've

12 got a trial next -- I blocked out one day for the trial.

13 One day for jury selection.  We've got to get this stuff

14 done, right?

15      MS. COHN:  Yes, Your Honor.

16      THE COURT:  So you're going to meet and confer

17 by Thursday.  You're going to file your exhibit list.

18 You're going to give me the exhibits so I can look at

19 them, too, and you're going to tell me what the objections

20 are as to each other's.  And we're going to go over those

21 next Tuesday.  Okay?

22      Now, I have the list so far of what the

23 objections are, and -- so on the medical records, which

24 first is identified as Exhibits 1 and 14, you know,

25 hearsay has to come out.  If there's opinions of

1  undisclosed experts, they need to be removed.

2          I don't know what the collateral source

3  information is, but you can tell me about that.

4          And -- now, the diagnosis -- well, it depends on

5  what the diagnosis is.  They can't say what the causation

6  is for number 1.

7          MS. COHN:  Correct.

8          THE COURT:  So you'll have to discuss that.

9  That should -- the other stuff should all be redacted out.

10          Now, Exhibits 2 and 3.  There's no medical bills

11  going into --

12          MS. COHN:  Part one.

13          THE COURT:  -- phase one, right?

14          MS. COHN:  Correct, Your Honor.

15          THE COURT:  Okay.  All right.

16          MS. COHN:  I'm very clear that the pain and

17  suffering and any financials are for phase two.

18          THE COURT:  Okay.  And that includes the

19  statement of damages.

20          What's Exhibits 4 and 13?  What are those?

21          MS. COHN:  Well, correct.  Your Honor, I'm

22  sorry.  Can I grab my laptop?

23          THE COURT:  Yeah, sure.

24          MR. KEENEY:  Your Honor, it's the demonstrative

25  of the statement of damages.  And that's fine for phase

1  two for what is --

2          THE COURT:  Okay.  All right.  That's fine.

3          MS. COHN:  Thank you, Mr. Keeney.

4          THE COURT:  Okay.  So that's only phase two.

5          All right.  Exhibits 5 and 6, they're horse

6  records.  What are horse records?

7          MS. COHN:  There are none, Your Honor.  We were

8  not able to procure them.  Therefore, they were not shared

9  with the defense, and so it would not be fair to attempt

10 to introduce them.

11         THE COURT:  Okay.  So they're out.  Okay.

12         What's Exhibits 7 and 8?  It said -- they say

13 you didn't identify it under the order.  What is that?

14         MS. COHN:  Your Honor, if I may make this a

15 little bit easier.  I know this was kind of like a grab

16 bag/kitchen sink situation, and I do apologize for that.

17         Moving forward, again, Your Honor, I have shared

18 with Mr. Keeney the plans to introduce simply pictures of

19 the vehicles.  You know, the medical records were

20 discussed.  The bills were discussed for phase two.

21         We did exchange -- I understand that he is still

22 disputing Guerette's bills and whatnot.  Those can be

23 testified to by Guerette, who will be here.  However, it's

24 going to be very --

25         THE COURT:  He can't testify about that during

1 phase one. Only phase two.

2          MS. COHN: Correct. But his records he can

3 testify to in phase one as long as there's no causation or

4 opinion or anything of that nature.

5          So going through this, Your Honor, I will admit,

6 off the rails. Not going to necessarily be very

7 purposeful in this hearing now.

8          I will get my cleaned up exhibit list to

9 Your Honor. Make it very clear what's going to come in

10 and clearly denote and mark everything so we can have a

11 fruitful and educated discussion about it moving forward.

12          THE COURT: Okay. But while we're here, though,

13 I want to address some of this stuff. I don't know what 7

14 and 8 is. It sounds like that's something you're still

15 talking about.

16          Virginia code sections. That doesn't come in.

17 We don't put that in.

18          MS. COHN: No, Your Honor.

19          THE COURT: Deposition transcripts. There's

20 been no designations. So they're not coming in.

21          You can use them to impeach. Either side can

22 use to impeach. So if there's a deposition, you can

23 impeach the other side. Okay?

24          MS. COHN: Your Honor, the defense has no

25 witnesses that I'm aware of. So therefore, I would not

1  have any need for any deposition because there would be no

2  impeachment.

3            THE COURT:  Okay.  But he can.

4            MS. COHN:  Absolutely.

5            THE COURT:  Right.  Okay.

6            Sixteen was just all medical, work records.

7  You're going to work through that.

8            Eighteen and 19 is pleadings and discovery.

9  That's not coming in.

10            And then you've just renewed your objections to

11  Dr. Guerette.  You've objected so many times.  You've

12  covered your basis.  Okay?

13            And I'm also telling you, you're going to get a

14  chance on Rule 50 if you were to lose.  Okay?

15            MR. KEENEY:  Yes, Your Honor.

16            THE COURT:  All right.  On defense exhibits, the

17  surgical history thing, you've resolved that?  Is that

18  what you're saying?  Have you resolved all your objections

19  to his exhibits?

20            MR. KEENEY:  Yes, Your Honor.  I've got a

21  redacted stack.

22            MS. COHN:  Correct, Your Honor.

23            THE COURT:  Okay.  So that's fine.

24            All right.  So you know what to do on exhibits.

25  So you'll fix that.  You'll file them on Friday.  If

1    there's exhibits in contest yet, the objecting party has

2    to file something on Friday saying which ones you object

3    to and why you object so I can look at it before Tuesday.

4            And you're going to deliver this book, at least

5    one book to me, on Friday.  You can make the other ten

6    copies by next week if you want.

7            Okay.  Let's talk about jury instructions.  As I

8    understand it, the only instruction in dispute is as to

9    future damages.  To me, you haven't noticed up an expert

10   and you haven't -- there's no basis for it.  Why is it

11   that you would be able to -- just saying she's got an

12   appointment in the future is not going to cut it.

13           MS. COHN:  Your Honor, the case law that I

14   provided to the Court -- and I do have an additional copy

15   for you here, should I be able to submit it -- clearly

16   says, in multiple Virginia Supreme Court cases, that

17   plaintiffs were testifying that they were still under

18   active treatment with physicians, and based on that, the

19   instruction was proper in order to introduce any

20   reasonable expected medical expenses in the future.

21           In this case -- and in those cases, Your Honor,

22   I do apologize.  It was through the plaintiff.  It was not

23   through an expert.  Also, there are cases where it was

24   through the treating physician as a lay witness describing

25   the current pain that they were still in at the time of

1 trial.

2      THE COURT:  Did you give notice of that, though,
3 in discovery?

4      MS. COHN:  In number 19, Your Honor, the answer
5 to any future medical, Ms. Roop specifically stated that
6 she has reevaluations after the bladder surgery and it has
7 been discussed that she will need a hysterectomy moving
8 forward.

9      THE COURT:  Hold on a second, though.  But
10 that's just -- being discussed, that's speculative.
11 That's what your issue is.

12      What the case -- this is where he's actually
13 right about *McMunn* and then the western district case of
14 *Rice v. Williams,* which is you have to have expert
15 testimony saying it's medically necessary.  And you don't
16 have that here.

17      MS. COHN:  Your Honor, the hysterectomy was
18 simply a statement that was part of the answer.  I
19 understand we cannot seek the hysterectomy.  That's
20 totally speculative.  That's total conjecture.

21      However, it has been stated to Ms. Roop, which
22 under 701 and 803 for the Rules of Evidence, she can
23 testify as to Guerette's recommendations and statements as
24 to necessary treatment for the symptoms that she's
25 currently experiencing.

1          THE COURT:  How is that not hearsay?

2          MS. COHN:  Your Honor, 803 says that "a

3  statement made for medical diagnosis or treatment and is

4  reasonably pertinent to a medical diagnosis or treatment

5  and describes medical history, past or present symptoms

6  and sensations and their inception or their general

7  cause."

8          THE COURT:  That's from the treated person to

9  the doctor, not the doctor opining about what's necessary.

10 I'm going to rule against you on this.

11         MS. COHN:  Okay, Your Honor.

12         THE COURT:  I'm precluding any future damages

13 under *McMunn* and *Rice.*  So I'm ruling in favor of the

14 defense on that.

15         All right.  So he, Dr. Guerette, I should say,

16 can testify in phase one -- and we're going to make sure

17 we have these parameters down.  In phase one, he can

18 testify, "I treated her back in" -- that he treated her

19 back in 2011, 2013.  Whatever her physical issues were, he

20 implanted this InterStim device.  It was fine.  You know,

21 she was fine.  He didn't see her again until October 2019.

22 He -- at that time, he performed an evaluation of her, and

23 this is what was wrong with her.  He can't say why.

24         MS. COHN:  Correct.

25         THE COURT:  That's the limit of his testimony on

1  phase one.

2          Now, in phase two, if, and only if, the jury

3  comes back in your favor as to finding causation on the

4  pelvic prolapse issue, he can then say what the treatment

5  was that he has given to this point to treat those

6  injuries.  That's it.  He cannot opine for the future.

7          And, of course, he can -- the bills will come in

8  based upon what he -- he has to be able to opine, though,

9  that it was medically necessary, the treatment -- which

10 I'm sure he's going to say the treatment that he gave her

11 was medically necessary.  Assuming he says that, those

12 bills come in, but not future bills.

13         Do you understand the limits?

14         MS. COHN:  Just for clarification, Your Honor,

15 for phase one, the October 2019 visits to present day,

16 Guerette -- is Guerette allowed to discuss the diagnosis

17 and his observations?  Not causation.  Simply what he

18 observed and what he treated her for, but not the

19 treatment itself or the amount of visits or bills or

20 anything of that nature.

21         THE COURT:  He can only testify to his

22 observation and her need for treatment.  What treatment

23 happened doesn't really matter at that point, right?

24         Because phase two he's going to say, "Okay.

25 This is the treatment that I gave after that.  After I saw

1  the" -- I guess he's going to say the InterStim device

2  wasn't working.  Is that what he's going to say?

3          MS. COHN:  It malfunctioned consistent with

4  damage due to physical force.

5          THE COURT:  Well, he can't say that.  He cannot

6  say that.  He can only say it was not functioning.  He

7  can't say -- he can't opine that it was due to physical

8  force.

9          MS. COHN:  Your Honor, it's not an opinion.

10 It's the programming that we're going back to, when he's

11 reading the programming.

12         THE COURT:  What do you mean?  I'm not

13 understanding.

14         MS. COHN:  So this was brought up, Your Honor,

15 in my memo of fact from Guerette, which is the difference

16 between how he knew it was malfunctioning versus how it

17 was -- Carter's argument that -- Mr. Keeney's argument

18 that it's expired.

19         So, Your Honor, the InterStim is essentially a

20 pacemaker for your bladder, and it has electronic

21 programming.  And Guerette can read that programming.  And

22 this came up in the motion in limine hearing that he can

23 read that and state that the programming indicated a

24 malfunction with physical force on the date of the

25 accident.

1      That is part of his observations in diagnosing

2 and treating her for the injuries she alleged are related

3 to the accident.

4          THE COURT:  And how -- I mean, that's expert

5 testimony, though, right?

6          MS. COHN:  I do not believe so, Your Honor.  It

7 is a fact that the machine indicated to him the

8 malfunction.  It's not -- we're not saying from the car

9 accident.  I'm not saying it's physical force from the car

10 accident.

11          THE COURT:  You're saying multiple things.

12 Okay.  First -- the first point you're saying is that he's

13 going to say the InterStim device was not functioning.

14 Okay?

15          MS. COHN:  Correct.

16          THE COURT:  That's an observation.  As a doctor,

17 he can look at it and say why and say that it's not

18 operable.

19          But then the next step that you're going to is

20 why it's not operable, which you're saying -- and I don't

21 know how these InterStim things work.  You're saying that

22 he can read data --

23          MS. COHN:  Correct.

24          THE COURT:  -- and interpret that, right?

25 That's essentially -- it doesn't -- there's not -- the

1  InterStim is not going to spit out that says I'm not

2  working because physical damage.  It's going to be he has

3  to look at it and interpret that.

4        How is that not expert opinion?

5        MS. COHN:  Then, Your Honor, I can limit it to

6  the malfunction on the date, which is clearly indicated in

7  the programming.  It's not an interpretation.  It's the

8  readout from the machine.  I can limit it to not say

9  physical force if Your Honor believes that that's a

10  causation issue.

11       THE COURT:  I want to see what it says.  Do you

12  have it with you?

13       MS. COHN:  I do not have it with me.  I can get

14  it to Your Honor, and I can get it to Mr. Keeney.

15       THE COURT:  You mean you haven't given it to him

16  already?

17       MS. COHN:  I do not have it in my possession,

18  Your Honor.  It's simply testimony that's going to be

19  provided by Dr. Guerette.

20       THE COURT:  Well, you can't do that.  You needed

21  to turn that over a long time ago.  I'm striking that.

22       All you can put on is he can testify he observed

23  the InterStim device, it was not operable, period.

24       You needed to disclose that, and he had the

25  right to have an expert review that material to determine

1  whether or not it was accurate.

2        I'm going to tell you, you're -- this is --

3  you're hanging by a gnat's eyelash, what I like to say, as

4  to this phase.  I'm letting you put on her testimony.

5        All he can say in that first phase is, "I

6  examined her for treatment purposes because she complained

7  that she had injuries."  He can't report what the injuries

8  were.  Just, "I'm not feeling well."

9        "I examined her.  I looked at the InterStim

10 device.  It was not operable," period.  That's it.

11            MS. COHN:  Your Honor --

12            THE COURT:  That's it.

13            MS. COHN:  So he cannot discuss the diagnosis of

14 what her injuries were when she appeared to be treated by

15 him in October of 2019?

16            THE COURT:  Not in phase one.  All he can say

17 is -- well, he can say, "I was treating her for an

18 inoperable InterStim device."

19            The issue in this case is why the InterStim was

20 not operable.  You needed to disclose that.

21            MS. COHN:  Your Honor, I think there's some

22 confusion here.

23            The InterStim is simply part of the overactive

24 bladder situation.  However, the prolapse is a wholly new

25 and different complaint that was not present previously.

1    And that's also part of the treatment that she sought from

2    him in October of 2019.

3              THE COURT:  And what does that diagnosis entail,

4    him looking at her pelvic area?

5              MS. COHN:  Yes, him doing --

6              THE COURT:  I mean, I'm not a doctor.  I need to

7    know, like, what he's going to say.

8              MS. COHN:  Yes.  Him examining her, doing

9    internal exams, doing external exams, diagnosing her with

10   the pains and the complaints that she presented with on

11   that date.

12             THE COURT:  He can testify to his observations

13   from the evaluation.  Okay?  But he cannot interpret

14   anything that is coming from the InterStim device.  He can

15   look at the InterStim device and say whether it was

16   functioning or not, period.  That's it.

17             MS. COHN:  Okay.

18             THE COURT:  All right.  Is there any other point

19   you want to make about this, Mr. Keeney?

20             MR. KEENEY:  I don't think so, Your Honor.

21             The only -- and I think the Court addressed this

22   earlier, but I just want to make sure we're on the same

23   page.  In 2019, his diagnosis is expired InterStim.  Am I

24   allowed to have him say that it was expired or does that

25   open the door?

1          THE COURT:  Well, that's going to be up to you

2  as to whether you open the door.  If you go into the

3  reasons -- what I'm saying is is he can testify that it

4  was not functioning.

5          MR. KEENEY:  Okay.

6          THE COURT:  The question is is why was it not

7  functioning?

8          Now, if you start opening that door, I'm going

9  to let her go back at it again, right?

10          It seems to me --

11          MS. COHN:  Your Honor, I apologize.

12          THE COURT:  Just hold on a second.

13          MS. COHN:  I just -- I need to take a seat,

14  Your Honor.  I'm not feeling very well right now.

15          THE COURT:  All right.  Go ahead.  Have a seat.

16          MS. COHN:  Thank you.

17          THE COURT:  Do you need a recess?  Do you want

18  to take a recess?

19          We're going to take a recess here.

20          (Recess from 10:48 a.m. until 11:02 a.m.)

21          THE COURT:  Everybody just sit down.  Just sit

22  down.

23          MS. COHN:  Your Honor, I'm fine.  And I promise

24  you I will eat next time before I come to your court.

25          THE COURT:  It's okay.  Why don't you have a

1  seat.  Just have a seat.

2         We're fortunate we have microphones there.  And

3  that's what we're going to do.  And that's for both of

4  you.  Okay?  So when you -- but just take your mask off

5  when you speak.

6         So just talk into the microphone so we can get

7  through this.  Okay?

8         So we know -- here's what I want you to do.

9  I've ruled on what the limits are on Dr. Guerette for

10 phase one.  When you have your meet and confer, go over

11 this so that both sides know exactly what's going to

12 happen.  And if there's a dispute, I'll deal with it next

13 week.

14        All right.  Is there anything else on the

15 exhibits I need to address now or can I wait until after

16 you file your exhibit lists?

17        MR. KEENEY:  I don't think so, Your Honor.  I

18 think that's it.

19        THE COURT:  Okay.

20        MS. COHN:  I think that's it, Your Honor.

21        THE COURT:  Okay.  All right.

22        Let's talk about voir dire here for a second.

23 What I'm going to do is I'm going to take what I think are

24 the appropriate -- the appropriate questions and work them

25 in, but I had a couple questions.

1          Where's the voir dire in here, Hannah?  Which

2   binder is it in?  Do you know?

3          MS. GOURDIE:  No.  I can't remember.

4          THE COURT:  Oh, I found it.

5          All right.  What's the -- what's the issue about

6   being a mechanic?  I'm referring to you, Mr. Keeney.

7   Your -- you mention about East Coast Repair Center and

8   have you ever been a mechanic.  What's that about?

9          MR. KEENEY:  Yes, Your Honor.

10         THE COURT:  Hold on.  Sit down.

11         MR. KEENEY:  Okay.

12         THE COURT:  We're going to do this again.

13  You're both going to remain seated.  You're going to talk

14  into the microphone at the table, and you're going to take

15  your mask off when you speak.  Okay?

16         MR. KEENEY:  Sorry, Your Honor.  Force of habit.

17         THE COURT:  All right.  What does East Coast

18  Repair Center have to do with this case?

19         MR. KEENEY:  Yes, Your Honor.  It is the

20  mechanic shop owned by her boyfriend/fiancé.  And in her

21  deposition, Ms. Roop said she doesn't work.  However, the

22  Alliance Physical Therapy records indicate that she is

23  working as a mechanic.  And this goes to what I was saying

24  about when she was recovering and the records indicate

25  that she is doing heavy lifting and working as a mechanic

1   while she is in physical therapy.

2          So it goes to knowledge about what a mechanic

3   does and the physical exertion of a mechanic and the

4   impact that it may have on someone's, say, neck, back and

5   shoulder.

6          THE COURT:  All right.  I'm going to ask about

7   East Coast Repair only in case they would know her, but

8   I'm not going to ask about the mechanic.  You can just

9   bring that out.  What's relevant is what she did.  You can

10  cross-examine her on that.

11         All right.  Let me just see.  Why are we asking

12  the question about do you have experience riding a horse?

13         MR. KEENEY:  Well, I think we both asked that,

14  Your Honor.  But it would be whether or not someone had --

15  if they understood the force with getting dragged by a

16  horse.

17         THE COURT:  I'm not doing that.

18         MR. KEENEY:  Okay.

19         THE COURT:  So that's going to be a no.

20         Same thing about being dragged through a field.

21         All right.  The rest of this stuff I'm going to

22  work into my own version of the voir dire.

23         Let me go to the plaintiff's ones.

24         MR. KEENEY:  And, Your Honor, I know you're not

25  going to read the first -- I put the wrong date in

1   number 1 of mine.

2           THE COURT:  I'm going to fix all this.  Don't

3   worry about it.

4           The questions about a horse are out.

5           Let's see.  The comfortable awarding damages.

6   I'm not asking that kind of stuff.  They'll be instructed

7   on that.

8           Let's see here.  I am going to ask questions

9   about InterStim devices or similar devices, but it won't

10  be to the depth of questioning that you all are asking.

11          What's -- Ms. Cohn, what's the -- why do you

12  want me to ask about do you have children, complications

13  from childbirth?  What's that about?

14          MS. COHN:  Your Honor, I think it goes directly

15  to the prolapse issues and things of that nature.  But if

16  Your Honor is going to strike any mention of future, then

17  it would probably not be applicable.

18          THE COURT:  Okay.

19          All right.  Okay.  I'm going to take what I

20  think are the appropriate questions that you all

21  submitted, and you'll get a copy of that in advance.  And

22  if you have any objections to it, you can tell me next

23  Tuesday.

24          All right.  Let's talk about argument for a

25  second.  I'm going to limit openings for both sides in

1  both phases to 15 minutes.  Closings to 30 minutes.  That

2  includes rebuttal.  I instruct the jury before closing

3  arguments.  That's the way I do it.  So I'll instruct.

4  Ms. Cohn, then you'll argue.

5          Is Mr. Galindo going to argue, too, or is it

6  just you, Ms. Cohn?

7          MS. COHN:  It's all me, Your Honor.

8          THE COURT:  Okay.  So what I'm going to say is

9  this.  I'm a maniac about time.  So if you use 30 minutes

10 on your beginning argument, you'll have nothing left for

11 rebuttal.  You're cheating yourself here, too.  So you

12 don't have to worry about cheating Mr. Galindo.  It's just

13 you, right?  So it's 30 minutes combined, closing and

14 rebuttal.

15         So I'll give the instructions.  You'll close.

16 Mr. Keeney will then close.  And whatever time you have

17 left you can do for rebuttal.

18         What I then do is go over with the jury one more

19 time -- it will be the last instruction on how to do your

20 job.  You'll see this.  It's a standard instruction I

21 give.  Just go over with them one more time about picking

22 the foreperson and filling this out right.

23         I am going to change the verdict form around a

24 little bit, too.  You'll see that as well.

25         All right.  Let's talk about jury selection,

1  okay, so everybody is on the same page about what's going
2  to happen here.  Okay?
3          Now, as you all have agreed, we struck
4  unvaccinated jurors.  The issue came up with our jury
5  clerk as to, well, what does it mean to be unvaccinated --
6  or to be vaccinated?
7          I did not require boosters.  So anybody that is
8  coming in here has had two shots.  That does not mean,
9  though, they've had a booster.
10          Do you have any objection to that, Ms. Cohn?
11          MS. COHN:  No, Your Honor, I do not.
12          THE COURT:  All right.
13          Mr. Keeney?
14          MR. KEENEY:  No, Your Honor.
15          THE COURT:  Okay.  We will select 7 jurors.
16  Okay?  Each of you has 3 peremptory strikes.  We will
17  bring in 3 panels of 15 each, totaling 45 jurors.  You
18  should have already gotten a jury list.  Am I right about
19  that?
20          MS. COHN:  Yes, Your Honor, we did.
21          MR. KEENEY:  Yes, Your Honor.
22          THE COURT:  Physically, I just want to walk
23  through this with you so you know what's going on.
24          By the way, I understand one of you has interns,
25  or something like that, that might want to watch.  Do you

1  have interns?

2         MS. COHN:  Correct, Your Honor.  They're

3  actually currently seated in our courtroom.

4         THE COURT:  Okay.  Well, we have a zillion

5  interns in our building.

6         They'll have to watch jury selection on the

7  fifth floor.  We're going to broadcast jury selection

8  to -- do you know what courtroom it's going to be?

9         THE CLERK:  I'm sorry, Your Honor.  We have not

10  been assigned a courtroom, but one has been requested.

11  I'm pretty sure it's going to be fifth floor.

12         THE COURT:  Okay.  So Ms. Garner will let you

13  know by Tuesday when we have our follow-up -- another

14  final pretrial conference.

15         THE CLERK:  Yes, sir.

16         THE COURT:  She'll let you know.  Jurors -- or

17  your interns are to go there.

18         No witnesses can go there, right, because the

19  rule on sequestration is going to apply?

20         And that courtroom -- we'll probably have that

21  open as well for the trial, then, as well, just in case.

22         THE CLERK:  Okay.

23         THE COURT:  So if somebody wants to watch, they

24  can watch.  They just can't be a witness.

25         So let's say, for example, Ms. Roop's boyfriend,

1   if he's going to testify, he can't go in and watch because

2   it would be like he would be in here.

3         Do you understand that, Ms. Cohn?

4         MS. COHN:  I already made that very clear to

5   him, Your Honor.

6         THE COURT:  Okay.

7         Do you understand that, Mr. Keeney?

8         MR. KEENEY:  Yes, Your Honor.

9         THE COURT:  Okay.  Now, so here's how we're

10  going to do this.  Okay?

11        The 15 jurors will come in.  So the first panel

12  is told to be here at 9.  You all have to be in place

13  before 9:30.  Say 9:25.  I come out.  I take the bench at

14  9:30.  Okay.  It takes a half an hour for us to move

15  people around in the building to get here.

16        I'll take the bench at 9:30.  We will bring the

17  jury in.  So the jury is not brought in until I take the

18  bench.  Okay?  They'll be brought in.  They'll be seated

19  out there in the public area, which is why no interns or

20  no members of the public can be seated there.  That's why

21  we have the public room.  Okay?

22        I will then go through the voir dire.  I'll read

23  the script that you're going to have.  We're going to file

24  it by Thursday.  So you'll know exactly what I'm going to

25  say, exclusive of the voir dire.  Okay?

1          So I'll ask general questions to the panel,
2   consistent with what you've submitted, consistent with
3   what I think is appropriate.  Okay?  They'll raise their
4   hands.  They'll -- you know, let's say, "Hey, do you know
5   anything about this East Coast Auto Body?"  The person
6   raises their hand.  I'll take down their number.  Okay.
7   We'll go through all the questions.  Okay?
8          When I'm done with the general questions,
9   Ms. Garner then will call up the jurors one by one to the
10  witness box.  Okay.  And I will then ask any follow-up
11  questions.  All right.
12         So let's say somebody says, "Hey, I go to that
13  repair shop."  I'm going to say, "Hey, did you ever deal
14  with Ms. Roop?  Did you ever deal with Mr. Barton?  Is
15  there anything about that that would affect your ability
16  to be fair okay here?"  Okay.  That's just an example.
17  Okay?  I'll do my follow-up.
18         When I'm done with my follow-up, you will have
19  headsets.  This is part of your tech you're going to walk
20  through.  It's like airplane pilots, right?  You're going
21  to put your headset on.  All right.  It's got a little
22  microphone.  Ms. Garner will turn on white noise.
23         I will then turn to Ms. Cohn first and I'll say,
24  "What says the plaintiff?  Accept or strike?"
25         If you have a motion for cause, you'll say it

1  then.  Okay?

2          So what I'm saying to you is because of COVID,

3  we don't do sidebars.  We use these headsets.  Headset is

4  essentially equivalent to a sidebar.  Before COVID, I'd

5  have you come up.  We would do it all on the side, right?

6  We don't do that now.  So you'll have your own headsets.

7  You'll put them on, and you'll communicate.

8          You've got to make sure you -- you generally

9  cover your mouth when you speak so that nobody else can

10  hear what you're saying, right?  You'll speak into the

11  microphone.

12          So, Ms. Cohn, you say "accept."  I then turn to

13  Mr. Keeney and I'll say, "What says the defense?  Accept

14  or strike?"

15          You'll then say "accept" or "strike."  Okay?

16          When it's done, if they're accepted, we tell

17  them to come back the next day at 9:00.  We'll start

18  promptly on Friday at 9:30.  Okay.  If they're struck --

19  we also -- if they're accepted, we also give them a

20  handout.  We'll give you a copy of it before.  It's really

21  instructions if they get sick that night.  It's all about

22  COVID, right?  So let's say they go home, they're not

23  feeling well.  I don't want somebody coming in for jury

24  service when they might have COVID, right?

25          The good thing is this is a one-day trial, as

1  you all have promised me.  So we'll give them

2  instructions.  It's, like, who to call.  I go over the

3  fact that they're not supposed to talk about their

4  testimony and all that kind of stuff.  They leave.  If

5  they -- if they're struck, I just say, "Thank you for your

6  service.  Have a nice life."  Okay?

7          Now, there is no backstriking.  Meaning that

8  once you say "accept" and they're on the jury, they're on

9  the jury.  So you can't go back.

10          So let's say Juror Number 1, you accept,

11  Ms. Cohn.  You accept, Mr. Keeney.  I say, "Okay, you're

12  on the jury."  They leave.  Well, it turns out at the end

13  of the day, you only used one of your strikes and you got

14  two left.  You can't come back to me and say, "Hey,

15  Judge Novak, that person, now I want to strike them."

16          We can't do that.  That's what it means by no

17  backstriking.  So once I say they're on, they're on.

18          Ms. Cohn, do you understand that?

19          MS. COHN:  Absolutely, Your Honor.

20          THE COURT:  Mr. Keeney, do you understand?

21          MR. KEENEY:  Yes, Your Honor.

22          THE COURT:  All right.  We will go through the

23  first one.  It normally takes about an hour and 15 minutes

24  to do a panel.  Okay?

25          When that panel is done, we'll then take a

1  break.  I think the next panel is supposed to come at 11.

2  I take the bench at 11:30.  It talks us a half an hour.

3  It's all about the elevators.  What we have found --

4  because you can't stuff all these people in elevators

5  because of COVID, right?  It works better if I do

6  individual striking because of the elevators because of

7  COVID.  That's what we're really trying to accomplish

8  here, right?

9       So we'll do the same thing with panel 2, and if

10  necessary, we'll go to panel 3.  My guess is we'll have

11  the jury by the second panel, to be honest with you.

12       Okay.  Is there -- does anybody have any

13  questions about how we're going to proceed on jury

14  selection, then?  Ms. Cohn?

15       MS. COHN:  None, Your Honor.

16       THE COURT:  Okay.

17       Mr. Keeney?

18       MR. KEENEY:  Your Honor, will we know the order

19  in which each panel, like, Juror 1, 2, 3, will come into

20  the box or will you --

21       THE COURT:  No, because it's random selection.

22       MR. KEENEY:  Out of 15, it will be random.

23       THE COURT:  We don't have the order like that,

24  right?

25       THE CLERK:  No, sir.

1          THE COURT:  Right.  So she does random

2    selection.

3          Okay.  That's all I have for right now.

4          Ms. Cohn, do you have anything else you want to

5    address?

6          MS. COHN:  Not at the moment, Your Honor.

7          THE COURT:  Okay.

8          Mr. Keeney?

9          MR. KEENEY:  No, Your Honor.

10         The only question I would have for the Court is

11   I think when we scheduled this for actually one day, it

12   wasn't going to be bifurcated.  In theory, would the court

13   like to do openings on Thursday or something?

14         THE COURT:  Well, the problem with that, I can't

15   do that.

16         MR. KEENEY:  I was just asking.  That's fine.

17         THE COURT:  Look, in the old days, we did that.

18   Because of COVID, I can't have somebody sitting around all

19   day.

20         So we're going to do what we have to do.  If it

21   spills into a second day, I'll move it.  I'm going to let

22   you try your case.  Okay?  So if I got to go to a second

23   day, we'll go to a second day.  We'll just move to that

24   Monday if we have to.  We just -- I mean, I think I have a

25   lot that day.  But we'll figure that out when we get

1    there.

2          MR. KEENEY:  And, Your Honor, my only other

3    question, I just remembered this.  Given the current mask

4    situation, will the jurors, when they're in the witness

5    box, take their mask off so we can observe their face

6    or --

7          THE COURT:  Anybody that hits the witness box,

8    the reason we have plexiglass is they take their mask off

9    so you can observe them.

10          MR. KEENEY:  Perfect.

11          THE COURT:  And that will be true for witnesses,

12    too.

13          We have a standard procedure on how we've done

14    this.  So -- it's actually worked fine.  We've tried seven

15    juries so far during COVID, even before vaccinations.

16    Nobody got sick.

17          The other thing you have to worry about is you

18    don't want people rendering verdicts just because they

19    want to get out of here, right, because they're afraid

20    they're going to get sick.  So I'll talk to them a little

21    bit about why we've got a good plan here to kind of calm

22    them down.  Okay?

23          All right.  Anything else, then?  Are we good?

24          MR. KEENEY:  Yep.

25          THE COURT:  All right.  I'll look forward to

1  seeing you next Tuesday.  You know what you have to do

2  between now and Friday, though.  Okay?

3           MS. COHN:  Thank you, Your Honor.

4           MR. KEENEY:  Thank you, Your Honor.

5           (The proceeding concluded at 11:19 a.m.)

6                REPORTER'S CERTIFICATE

7     I, Tracy J. Stroh, OCR, RPR, Notary Public in and for

8  the Commonwealth of Virginia at large, and whose

9  commission expires September 30, 2023, Notary Registration

10 Number 7108255, do hereby certify that the pages contained

11 herein accurately reflect the stenographic notes taken by

12 me, to the best of my ability, in the above-styled action.

13    Given under my hand this 12th day of July 2022.

14

15           _____/s/_____
             Tracy J. Stroh, RPR

16

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

SAMANTHA ROOP,
    Plaintiff,

v.                                       Civil No. 3:21cv675 (DJN)

NICHOLAS JAMES DESOUSA,
    Defendant.

**ORDER**
**(Clarifying Parameters of Evidence)**

This matter comes before the Court following the Final Pretrial Conference ("FPTC") between the parties and the Court on July 12, 2022.  For the reasons stated on the record during the FPTC, the Court hereby ORDERS as follows:

1.     Plaintiff may not present any evidence of Plaintiff's future damages, because she did not adequately notify Defendant of evidence or expert testimony on this issue.

2.     As it pertains to Plaintiff's Interstim device, the testimony of Dr. Nathan Guerette shall be limited to his observations of whether the Interstim was functioning during the course of his treatment of Plaintiff.  He may not testify to the cause of the device not functioning nor discuss any readouts from the device.

Let the Clerk file a copy of this Order electronically and notify all counsel of record.

It is so ORDERED.

                                              _____/s/_____
                                              David J. Novak
                                              United States District Judge

Richmond, Virginia
Date:  July 12, 2022

**JA285**

UNITED STATES DISTRICT COURT

FOR THE

EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION


```
* * * * * * * * * * * * * *
SAMANTHA ROOP,              * CIVIL NO. 3:21-CV-00675
                           * SEPTEMBER 1, 2022  2:01 P.M.
            Plaintiff,     * FINAL PRETRIAL CONFERENCE
                           * VOLUME I OF I
vs.                        *
                           *
NICHOLAS JAMES DESOUSA,    * Before:
                           * HONORABLE DAVID J. NOVAK
            Defendant.     * UNITED STATES DISTRICT JUDGE
* * * * * * * * * * * * * * * EASTERN DISTRICT OF VIRGINIA
```

APPEARANCES:

For the Plaintiff:        SAMANTHA BETH COHN, ESQUIRE
                          Geoff McDonald & Associates, P.C.
                          8720 Stony Point Parkway
                          Suite 250
                          Richmond, Virginia 23235


For the Defendant:        CARTER TALIAFERRO KEENEY, ESQUIRE
                          Carter & Shands PC
                          9030 Stony Point Parkway
                          Suite 530
                          Richmond, Virginia 23235




Court Reporter:           Melissa H. Custis, RPR
                          701 East Broad Street
                          Richmond, Virginia 23219
                          (804)916-2278

        Proceedings recorded by mechanical stenography,
transcript produced by computer.

1                        **WITNESS INDEX**

2   PLAINTIFF'S WITNESSES:                              PAGE NO.

3   **Gerard Barton:**

4   Direct by Ms. Cohn                                    5

5   Cross by Mr. Keeney                                   15

6

7                        **EXHIBIT INDEX**

8   **PLAINTIFF'S EXHIBITS:**          **MARKED**      **RECEIVED**

9   1                                    11

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**JA287**

1    (Court convened at 2:01 p.m.)

2    THE CLERK:  Civil Action 3:21-CV-675, *Samantha B.*

3 *Cohn versus Nicholas James Desousa.*

4    Representing the plaintiff is Samantha Cohn.

5    On behalf of the defendant is Carter Keeney.

6    Counsel, are we ready to proceed?

7    MS. COHN:  Ready, madam.

8    MR. KEENEY:  Yes, ma'am.

9    THE COURT:  The way we're going to proceed is this:

10 Everybody is going to keep their mask on until it's your turn

11 to speak.  But when you speak, if you feel comfortable doing

12 so, you've got to take your mask down so the court reporter

13 can hear you.  And we'll proceed in that fashion.

14    I ordered, Ms. Cohn, for Mr. Barton to be here.  I

15 gather -- is he here?  He's behind you?

16    MS. COHN:  Correct, Your Honor.  He's the gentleman

17 behind me in the salmon-colored shirt.

18    THE COURT:  So here's what we're going to do:  It

19 seems to me, since there is this dispute and we've had all

20 these discovery issues, frankly, this all should have been

21 ferreted out in discovery.  But whatever happened happened.

22 We're going to take his limited testimony on this issue about

23 the operability of the InterStim.  It's really designed for me

24 to understand what's going on here so I can make a pretrial

25 ruling.

1    I say that, Mr. Keeney, we're going to have relaxed

2 evidentiary rules here.  This is more informative.  It's not

3 going to replace his testimony at trial.  You're not waiving

4 any objections on hearsay or anything like that.  It's really

5 designed for me to figure out what's going on here, and then

6 you-all can make your arguments.

7    What we're going to do is, after Mr. Barton

8 testifies, though, I'm going to sequester him outside, because

9 I gather you're invoking the rule --

10    MR. KEENEY:  Yes, Your Honor.

11    THE COURT:  -- for trial?

12    Is Ms. Roop here?

13    MS. COHN:  No, Your Honor, she is not.

14    THE COURT:  Do you have any other witnesses here?

15    MS. COHN:  No, Your Honor.  You simply asked for me

16 to bring Mr. Barton here today to testify, so he's the only

17 person here.

18    THE COURT:  That's actually perfect.  That's what I

19 wanted to do.

20    Mr. Barton, do you want to come on up to the witness

21 stand?

22    And, Ms. Cohn, do you want to go to the lectern?

23 You're going to do the examination on just this limited issue

24 that you want to introduce about the operability of the

25 InterStim.

1          MR. KEENEY:  And, Your Honor, if I understood you

2     correctly, I'll just stay silent, and then I can say what my

3     issues are after Mr. Barton has left the courtroom?

4          THE COURT:  Yes.  But you're going to get a chance to

5     cross-examine him about this point too.

6          MR. KEENEY:  Right.  Right.

7          THE COURT:  The idea is I need to understand what's

8     going on here, what the fight is about, okay?

9          GERARD O. BARTON, JR., PLAINTIFF'S WITNESS, SWORN

10                        DIRECT EXAMINATION

11          THE COURT:  So, Mr. Barton, in a loud, clear voice --

12     you can scoot up a little bit.  In a loud, clear voice, can

13     you tell us your full name, spelling both your first and your

14     last names?

15          THE WITNESS:  Gerard O'Donnell Barton, Jr.

16     G-E-R-A-R-D.  B-A-R-T-O-N.

17          THE COURT:  Go ahead, Ms. Cohn.

18          MS. COHN:  Thank you, Your Honor.

19          Your Honor, just to make it clear to the Court before

20     we proceed, Mr. Barton, in his statements as proffered today,

21     are not in violation of any discovery request or lack

22     thereof --

23          THE COURT:  Just do the exam and then we'll have that

24     discussion down the road.

25          MS. COHN:  Thank you, Your Honor.

1   BY MS. COHN:

2   Q    Mr. Barton, you're obviously here because you know

3   Ms. Roop.

4           MS. COHN:  Your Honor, may I give just a little

5   brevity to get to the point?

6           THE COURT:  I'll tell you what, I'll do this.

7           Mr. Barton, are you the life partner of Ms. Roop?

8           THE WITNESS:  Yes, I am.

9           THE COURT:  How long have you been her life partner?

10          THE WITNESS:  Going on 16 years.

11          THE COURT:  Okay.  And were you her life partner at

12  the time of this accident in July of 2019?

13          THE WITNESS:  Yes, I was.

14          THE COURT:  And was she using an InterStim device at

15  that time?

16          THE WITNESS:  Yes, she was.

17          THE COURT:  Could you tell me what it looks like, or

18  could you visibly see it?

19          THE WITNESS:  It is a cell phone-looking device that

20  has a remote piece that attaches or that you hold up against

21  her body, and then the cell phone does everything else.

22          MS. COHN:  Your Honor, if I may to clarify, it's not

23  the InterStim itself.  It's an external monitor that hooks up

24  to the InterStim.

25          THE COURT:  Okay.  I'm going to do this.

1           MS. COHN:  Okay.

2           THE COURT:  So the InterStim is in her device --

3           THE WITNESS:  Yes.

4           THE COURT:  -- projecting information to another

5  device?  Is that what's going on?

6           THE WITNESS:  The InterStim is a small unit inside of

7  her body that has leads that go to her bladder.

8           THE COURT:  Okay.  And then does it have some kind of

9  transponder that disseminates to, like, the cell phone-type

10 looking device?

11          THE WITNESS:  The transponder piece is the piece that

12 you use externally.

13          THE COURT:  Okay.  Is that connected to her body?

14          THE WITNESS:  No.

15          THE COURT:  Does she have something that the external

16 device, which you describe is similar to a cell phone, that it

17 connects to something on her body?

18          THE WITNESS:  You have two pieces.  One of them is

19 the cell phone that you can use to operate, and then you have

20 another piece that goes over her scar where they inserted the

21 InterStim.

22          THE COURT:  Okay.  And the piece that goes over her

23 scar, is it attached to her body or she just waves it over top

24 of it, or what does she do?

25          THE WITNESS:  You hold it overtop of it.

1           THE COURT:  Okay.  So it's not --

2           THE WITNESS:  It's not attached to her body.

3           THE COURT:  Okay.  And how often would she check its

4  operability?

5           THE WITNESS:  We check it once a month.

6           THE COURT:  Okay.  And describe to me what happens

7  when you were checking it before the accident.  Just walk me

8  through the process, what happens.

9           THE WITNESS:  She's had it for years and we checked

10  it once -- we always checked it once a month for visual and

11  battery life and everything.  We had checked at the end of

12  June, prior to the accident.

13          THE COURT:  And tell me how you -- when you say you

14  checked it, that's what I need you -- I need to get in the

15  weeds.  Tell me physically what you did on the end of June of

16  2019.

17          THE WITNESS:  Like we always do, we hold the monitor

18  to her left buttocks and --

19          THE COURT:  That's where the scar is?

20          THE WITNESS:  Yes, sir.  And then you have the cell

21  phone piece that tells you battery life, you can change

22  settings, programs, and everything to that effect.  And we

23  always check battery life every month on the InterStim.

24          THE COURT:  Okay.  So now I want to talk about

25  exactly what you would see and what you saw on, I guess, the

1  end of June, okay?  So you hold the one device, which looks

2  like what, that you hold over her scar?  What does that look

3  like?

4      THE WITNESS:  It basically looks like a cell phone,

5  just a flat piece of plastic that you can turn on.

6      THE COURT:  Okay.

7      THE WITNESS:  There's -- it looks like a cell phone

8  with a button in the back.

9      THE COURT:  So when you turn that on and you hold it

10  over the scar, what happens?

11      THE WITNESS:  When you turn it on, it connects with

12  the cell phone; and then when you hold it over the scar, it

13  brings up all of her numbers that her InterStim is set at

14  already, it brings up the InterStim battery life, and at that

15  point you can change settings on it.

16      THE COURT:  So, essentially, let me -- and I want you

17  to correct me if I'm wrong, okay?  Because this is really

18  important that I understand what's going on.

19      It sounds like, essentially, the device that's like a

20  cell phone-type of device that you're holding over the scar is

21  essentially pulling information from the InterStim device and

22  then translating it over to her cell phone that you can then

23  extrapolate information from; is that right?

24      THE WITNESS:  Correct.  Except for the piece that

25  it's translating to is not an actual cell phone; it just looks

1  like a cell phone.

2      THE COURT:  So you have two devices that look like

3  cell phones?

4      THE WITNESS:  It's the --

5      THE COURT:  Let's do it this way:  Device Number 1,

6  we're going to call the scar device.

7      THE WITNESS:  Okay.

8      THE COURT:  You just hold over the scar.  Device

9  Number 2, we're going to call the information device.

10      THE WITNESS:  Okay.

11      THE COURT:  Does that make sense to you?

12      THE WITNESS:  Yes.

13      MS. COHN:  Your Honor, I'm sorry.  There's a video

14  that I have that is from the actual website that runs the

15  device, that -- it's not the same exact device.  But I sent it

16  to him and he said it's relatively the same.  If I show the

17  Court the video, it might give a visual explanation just for

18  demonstrable purposes, not for the introduction at trial or

19  anything of that nature.

20      THE COURT:  That's fine.  Let's mark that Plaintiff's

21  Exhibit Number 1.  Do you have it there with you?

22      MS. COHN:  Yes.  I can pull it up, Your Honor.

23      THE COURT:  And is there audio on it or not?

24      MS. COHN:  There's audio.  They're discussing how it

25  works.  It's like a semi-training video.

 1      (Plaintiff's Exhibit Number 1 was marked for

 2  identification.)

 3          THE COURT:  So, Mr. Barton, while this is playing, if

 4  there's something that you want to add, say, like, it's

 5  different, her device is different in this way, you chime in

 6  while it's playing, okay?

 7          THE WITNESS:  Okay.

 8          THE COURT:  Because it's not exactly the same, right?

 9          I'll tell you what, we'll play the video and then you

10  tell me what you want to tell me.  How does that sound?

11          THE WITNESS:  Okay.

12          THE COURT:  So for purposes of this hearing, it's P1,

13  is the video.

14          MS. COHN:  My apologies to the Court.  I'm not sure

15  how to connect it to broadcast it.

16          THE COURT:  How do we do that, Cheryl?

17          THE CLERK:  Are you connected?

18          MS. COHN:  I'm not connected.

19          MR. KEENEY:  You probably just need to plug in the

20  HDMI cable.

21          THE CLERK:  Do you have the wire for our system?  You

22  have to plug into us first.

23          MS. COHN:  Right.  I just don't want to break

24  anything.  That's really what it boils down to.

25          THE CLERK:  I don't know if that's the right cord.

1          MS. COHN:  No, it's right there.

2          THE CLERK:  Good job, Tim.

3          THE COURT:  Okay.  I've got it.

4     (Video is playing.)

5          THE COURT:  All right.  Just for the record, you

6  played something from a website for Medtronic.

7          MS. COHN:  Medtronic is who produces the InterStim,

8  Your Honor.

9          THE COURT:  So what you're going to do, though, is we

10  need to have a record for appellate purposes.  So you've going

11  to download that to a CD and then give it to my clerk.

12          MS. COHN:  Happily, Your Honor.

13          THE COURT:  We'll mark it as P1 for purposes of the

14  motion.

15          So, Mr. Barton, is that the way that you-all operate

16  Ms. Roop's InterStim device, or is there differences?

17          THE WITNESS:  Yes, that is the way.

18          THE COURT:  So, essentially, what I call the scar

19  device is really the communicator, right?

20          THE WITNESS:  Yes, sir.

21          THE COURT:  So as I'm understanding, and you tell me

22  if I'm wrong, you're putting the communicator over her scar,

23  that's projecting the information to the programmer.

24          THE WITNESS:  Yes.

25          THE COURT:  And then you tap on the menu icon for

1 battery life, and then it reveals whether the battery is

2 operating?

3          THE WITNESS:  Yeah.  You can tap on the battery life

4 and it tells you what the battery life is of the InterStim

5 inside of her body.

6          THE COURT:  And you did that at the end of June of

7 2019?

8          THE WITNESS:  Yes, sir.

9          THE COURT:  Do you recall what you observed?

10          THE WITNESS:  I don't recall the actual number, but

11 it was over 50 percent battery life.

12          THE COURT:  Okay.  How do you know that?

13          THE WITNESS:  Because I remember the reading on

14 the -- I don't remember exactly what the reading was, but it

15 was over 50 percent battery life.

16          THE COURT:  And you personally did that?

17          THE WITNESS:  Yes, sir.

18          THE COURT:  Okay.  When was the next time that you

19 looked at that after the accident?

20          THE WITNESS:  The day after the accident.

21          THE COURT:  And did you go through the same process?

22          THE WITNESS:  Yes, sir.

23          THE COURT:  What did you observe?

24          THE WITNESS:  I was able to -- the communicator and

25 the device were able to communicate and connect, I was able to

1  check battery life, but I was not able to change any settings.

2  And as you heard in the video that you change settings

3  according to comfortability, and none of the settings were

4  changing.

5        THE COURT:  Okay.  So what did the battery life say?

6        THE WITNESS:  Again, it was still over 50 percent.  I

7  don't remember the exact number.

8        THE COURT:  Okay.  So, in summary, the difference

9  between the two times is essentially the operability to change

10  settings?  The battery life was still there.

11        THE WITNESS:  Yes, sir.

12        THE COURT:  It's just you couldn't change settings;

13  is that right?

14        THE WITNESS:  Yes, sir.

15        THE COURT:  Did you have follow-up questions?

16        MS. COHN:  Thank you, Your Honor.

17  BY MS. COHN:

18  Q    Mr. Barton, were you primarily the one who checked

19  Samantha's monitor for the InterStim?

20  A    Normally, yes, I was.

21  Q    And how long had you been doing that for her?

22  A    For the length of time that she's had it.

23  Q    Did you go with Samantha to --

24        THE COURT:  We're going to do Ms. Roop.

25        MS. COHN:  Sorry.

 1 BY MS. COHN:

 2 Q    Did you go with Ms. Roop to her appointments at

 3 Dr. Guerette's office regarding the InterStim?

 4 A    Yes, I did.

 5 Q    Were you present with Ms. Roop when the InterStim had

 6 first been implanted in her body?

 7 A    Yes, I was.

 8 Q    And did the doctor's office show you how to use the

 9 monitoring system?

10 A    Yes, they did.

11 Q    So it's fair to say you had been checking it on a monthly

12 basis since its initial implantation?

13 A    Yes.

14 Q    What made you check it after the accident?

15 A    Pain.

16 Q    Can you go a little bit more in depth with that?  Whose

17 pain?

18 A    Samantha's pain.  And that was the only thing I knew what

19 to do, is check that, because of where she was describing the

20 pain at.

21        MS. COHN:  Your Honor, I have no more questions.

22        THE COURT:  Mr. Keeney.

23        MR. KEENEY:  Thank you, Your Honor.

24                     CROSS-EXAMINATION

25

1  BY MR. KEENEY:

2  Q    Sir, my name is Carter Keeney.  I represent Mr. Desousa

3  in this lawsuit.

4      Where was the pain?

5  A    In her lower left abdominal area.

6  Q    On the front?

7  A    Yes.

8  Q    And you testified that after this accident when you

9  tested it, it looked the same, but you couldn't change the

10  settings, correct?

11  A    Correct.

12  Q    Did you try to change the settings two weeks before?

13  A    No, we had checked it --

14  Q    The end of June.

15  A    -- the end of June.  I don't remember the exact date.

16  Q    Well, let me ask a more specific question.  The last time

17  you checked it, did you try to change the settings?

18  A    Yes.

19  Q    Okay.  And they changed?

20  A    Yes.

21  Q    Why did you change the settings last time?

22  A    It gives her comfortability with urinating.  It depends

23  upon -- you know, if she drinks soda or anything like that, we

24  can change settings at least a point, between one point -- one

25  point and three points to help her bladder urinate.

1 Q    And what uncomfortability was she having at the end of

2 June?

3 A    She was having severe pain.

4 Q    At the end of June?

5 A    At the end of June, no.

6 Q    Well, you told me you changed it at the end of June

7 because you had -- let me back up.  You would only change the

8 device if she was having issues?

9 A    Comfortability issues, yes.

10 Q    Okay.  And you just told me at the end of June you

11 changed the settings on the device, correct?

12 A    Right.

13 Q    Why did you change the settings at the end of June?  What

14 were the issues?

15 A    We changed the settings at the end of every month,

16 checking battery life and to give her bladder the

17 comfortability to -- it's hard to describe because it's not

18 inside my body.  But when she says it starts to tingle, I turn

19 it down two points, exactly what the doctor's office told us

20 to do.

21 Q    Okay.  So end of June, she told you when you were

22 checking it, she told you it tingled and that's --

23 A    When I communicate with the InterStim and I turned it up

24 two -- I forgot if it was two or three points, it started to

25 tingle, I backed it down two points.

1  Q    So in your monthly checkups, you always ratchet it up

2  until she starts to tingle and then back off?

3  A    I either ratchet it up or -- I either increase it or

4  decrease it.

5  Q    Okay.  Ms. Roop retained counsel for this lawsuit within

6  a week after the accident, correct?

7  A    Yes.

8  Q    Okay.  And you were with her when the InterStim was

9  explanted, when it was removed, correct?

10 A    Yes.

11 Q    And that was in the beginning of 2020, correct?

12 A    Yes.

13 Q    And at that point, y'all threw the device away, correct?

14 A    You don't get to keep the InterStim from inside the body.

15 Q    Well, you had the handheld device, correct?

16 A    The handheld unit?  The old handheld unit?

17 Q    Yeah.

18 A    I don't know if we do or don't.  I don't think we do.  I

19 do not know if we threw that out or we had to turn it in.  I

20 do not remember.

21 Q    Okay.  But at that point, your wife was already making a

22 claim -- or excuse me, Ms. Roop -- I know y'all aren't legally

23 married -- was already making a claim for this accident,

24 correct?

25        MS. COHN:  Your Honor --

1          THE COURT:  I don't know if that really affects this

2  motion.

3          MS. COHN:  Thank you.

4          THE COURT:  You can bring that out at trial.

5          MR. KEENEY:  Yeah.

6          THE COURT:  Do you have anything else?  I was more

7  concerned about other issues about how it operated.

8          MR. KEENEY:  Yes, sir.  My point was being if --

9          THE COURT:  I've got it.  Do you have anything else?

10         MR. KEENEY:  Nothing further on that, Your Honor.

11         THE COURT:  Do you have any redirect?

12         MS. COHN:  No, Your Honor.

13         THE COURT:  Mr. Barton, thank you for coming here,

14 particularly on short notice.  I know I ordered this on

15 Monday.  And I gather you're a working man and you had to do

16 this.  But, actually, it was really helpful to me.  So I'm

17 going to ask you to not talk about your testimony with anybody

18 until our trial is over, and that includes Ms. Roop.  All

19 right?

20         THE WITNESS:  Yes, sir.

21         THE COURT:  If you could just step outside for a few

22 moments, putting your mask back on, and then when we're done,

23 we'll let you know, and then you can leave.  Is that all right

24 with you?

25         THE WITNESS:  Yes, sir.

 1            THE COURT:  Okay.  Mr. Keeney, what is precisely your

 2  objection now to that testimony?

 3            MR. KEENEY:  Yes, Your Honor.  Well --

 4            THE COURT:  First of all, did you have an opportunity

 5  to depose him?

 6            MR. KEENEY:  No, Your Honor, I did not take his

 7  deposition.

 8            THE COURT:  That's a different question.

 9            MR. KEENEY:  I could have asked to take his

10  deposition.

11            THE COURT:  But you did not.

12            MR. KEENEY:  I did not.  Step one on this, if you'll

13  recall our last hearing, I believe it was July 12th or

14  13th, we had a similar issue where the plaintiff claimed

15  Dr. Guerette was going to say he had read the InterStim

16  software, and then you excluded it.

17            THE COURT:  Right.

18            MR. KEENEY:  July 15th was the first time I was

19  ever informed that Mr. Barton was going to give this testimony

20  in plaintiff's pretrial brief that was filed.

21            THE COURT:  Yeah.  But you could have deposed him.

22  Wasn't he listed as a witness?

23            MR. KEENEY:  Right.  But on Rule 26 disclosures, they

24  didn't say he was going to testify about the functionality of

25  the InterStim or the device.

1          THE COURT:  Well, you could have asked that, though.

2          MR. KEENEY:  Again, the burden is on the plaintiff to

3  disclose under the rules what their individual witnesses are

4  going to testify, the subject of which.

5          THE COURT:  And what was disclosed to you?

6          MR. KEENEY:  About how the accident happened and then

7  generally, I believe, about her condition after the accident.

8  This is not about her condition after the accident.  This is

9  about what a device readout said.

10          THE COURT:  Actually, to be precise, it's not true,

11  because you, in your paper, or at least at some point you

12  referenced hearsay.  It seems to me that he's not relaying the

13  information.  Like, if he was reading a printout, which is

14  what I thought Dr. Guerette was going to do, which to me,

15  frankly, if that had been properly disclosed, this would be a

16  slam dunk case for the plaintiffs.  I don't know why we didn't

17  do that in the beginning, but we are where we are.

18          But what Dr. Guerette can say is, he can look at it

19  and say it's operable or not operable.  It sounds like it was

20  operable.  The battery life is over 50 percent.  So all we

21  have is can't change the settings.

22          Now, the impact of that nobody is going to know

23  because neither one of you have an expert to talk about this,

24  right?  So, to me, there's no hearsay because it's not

25  projecting information.  It's simply, "I couldn't do the

1 settings." Why that is, nobody knows, right? And the import

2 of that, again, nobody is going to know because we don't have

3 expert testimony. So, to me, I think I should let this in.

4      MR. KEENEY: Well, Your Honor, if no one knows the

5 import of it, it's not relevant to any fact at issue.

6      THE COURT: Well, they can argue inferences from

7 that, I think.

8      I mean, look, this is not the way this case should

9 have been tried, but we are where we are now. And so I don't

10 think it's hearsay. There's some relevance -- the relevance

11 is that there is a change in the device from the end of June

12 until the day after the accident. The import of that, you're

13 going to bring that out, right? I'm going to give you free

14 rein to cross-examine both of them about that, particularly in

15 light of what he just said, that every month they would change

16 the settings.

17      Now, the fact that the settings is not operable, what

18 does that do? But I think I have to let that go to the jury.

19      MR. KEENEY: Your Honor, the other thing I would say,

20 it's a violation of the best evidence rule. He could have

21 brought the computer screen or the programming on it. And

22 that's why I asked about when counsel was retained --

23      THE COURT: Right.

24      MR. KEENEY: -- which was before the InterStim was

25 explanted, and they should have kept it, and they could have

1 produced that device and the software readout of it, that it

2 was malfunctioning, just like Ms. Cohn was talking about last

3 time.  So what he's really doing is parroting and reading off

4 a reading off a computer screen.  And not having the actual

5 device or the printout from it is a violation of the best

6 evidence rule.

7         THE COURT:  Well, if he were going to testify about a

8 printout or the readout, I think you would have something

9 there and I think you would be right, which is why I'm denying

10 Dr. Guerette from doing that, right?

11         But his inability to change the settings, I don't

12 think that would fall under that.

13         So I will say this:  If she prevails, you're going to

14 get a chance to brief all this posttrial and I'm going to take

15 a hard look at it then.  But I'm going to let this testimony

16 in --

17         MR. KEENEY:  Yes, sir.

18         THE COURT:  -- as it is, and then we'll kind of go

19 from there.

20         I have to tell you something.  Have you thought about

21 trying -- now that you know what the evidence is going to look

22 like -- to me, this is a compelling piece of evidence.  Have

23 you thought about discussing with your client about a

24 last-minute resolution here?  Because you both have

25 significant risks here.  And I don't know if she's going to

 1  meet her burden on liability, but even if she does, I could
 2  set it aside, because I think there's significant legal issues
 3  that I'm going to have to look at.
 4        On the other hand, if they hit liability -- and,
 5  look, I haven't met Ms. Roop, but I have a feeling the jury is
 6  going to be very sympathetic towards her and I think that
 7  number is going to be big.  Have you thought about that?
 8        MR. KEENEY:  Have I thought about it?  Yes, Your
 9  Honor.
10        THE COURT:  Have you had any last-minute discussions?
11  I mean, I don't want you to tell me what the substance is.
12        MR. KEENEY:  With Ms. Cohn?
13        THE COURT:  Yeah.
14        MR. KEENEY:  No, Your Honor.
15        THE COURT:  All right.
16        MR. KEENEY:  Not --
17        THE COURT:  We'll try the case, then.
18        MR. KEENEY:  Not since she gave me a seven-figure
19  bottom line.
20        THE COURT:  Well, I don't want to know numbers.  I
21  just said that, right?  That's between you-all.
22        Okay.  So I'm ruling that Mr. Barton's testimony on
23  this InterStim device -- now, he can testify to more, the
24  other issues.  It's just I wanted to hear this today so I
25  understood exactly what was going on.  The testimony he gave

1  today, he can give at trial.  Do you want to let him know he

2  can leave, because he's probably got to go back to work?

3        MS. COHN:  Thank you, Your Honor.

4     (Pause in the proceedings.)

5        THE COURT:  All right.  Now, I think everybody is

6  okay with the jury instructions, except for, Mr. Keeney, you

7  want to add Virginia Model Jury Instruction that reads, "You

8  must not base your verdict in any way upon sympathy, bias,

9  guesswork, or speculation.  Your verdict must be based solely

10 on the evidence, instructions of the Court."

11       I'm understanding that, Ms. Cohn, you don't object to

12 that; is that right?

13       MS. COHN:  No objection, Your Honor.

14       THE COURT:  So here's what I thought I would do:  You

15 have the last version of our instructions.  I think I'm going

16 to just add it to the duty to deliberate instruction, which

17 is, for phase 1, Instruction 25 and, for phase 2, Number 10.

18 It's the same instruction.  I'm just going to add -- it will

19 be the last thing in that instruction, because I think it fits

20 there.

21       MS. COHN:  Your Honor, I did notice on the jury

22 instructions -- sorry, Your Honor -- that the witnesses listed

23 to testify include Teresa Camden and Nathan -- starts with an

24 M.  I do not believe they are testifying any longer.

25       THE COURT:  Hold on a second.  You're talking about

 1  in my voir dire?

 2          MS. COHN:  Yes, Your Honor, I do believe.

 3          THE COURT:  Hold on a second.  I must have missed

 4  that page here.  I'm looking at the wrong thing here.  I have

 5  it.

 6          MS. COHN:  My apologize to switch gears.

 7          THE COURT:  It's my fault.

 8          Nathan Michaels and Teresa Camden.

 9          MR. KEENEY:  Correct.  I'm not calling them, Your

10  Honor.

11          THE COURT:  I'm sorry?

12          MR. KEENEY:  They're not witnesses, Your Honor.

13          THE COURT:  Okay.  So I'm deleting both of them from

14  the voir dire, then, so, okay.

15          Are you okay with me putting -- I'm granting your

16  request to add that Virginia instruction.  Are you okay with

17  the placement?

18          MR. KEENEY:  That's fine, Your Honor.

19          THE COURT:  Okay.  Now, the next thing I have is

20  these medical records.  Do you-all still have a dispute about

21  the redactions, or did you resolve that?

22          MR. KEENEY:  We still have a dispute, Your Honor.

23          THE COURT:  Why don't you tell me the dispute is.

24          MS. COHN:  May I just grab my laptop quickly?

25          THE COURT:  Yeah.  Go ahead.

1    MS. COHN:  I just didn't want to take any longer for

2  him to get up there.

3    THE COURT:  That's fine.

4    And I need to know which exhibits -- you can go

5  back -- which exhibits are we talking about here?

6    MR. KEENEY:  Yes, Your Honor.

7    And it is -- they are all for purposes of phase 1.

8    THE COURT:  Right.

9    MR. KEENEY:  They are Plaintiff's Exhibit Number 7.

10    THE COURT:  Hold on a second here.  My notebook is

11  coming apart.

12    Number 7.

13    MR. KEENEY:  Which are the collective records for the

14  Intimate Wellness Institute of Virginia from October 8th,

15  2019, to January 27th of 2021.

16    THE COURT:  Okay.  So where am I looking at?  What

17  page?

18    MR. KEENEY:  And if you go -- the first one is on the

19  December 3rd visit.

20    THE COURT:  Can you just tell me the page number?  I

21  mean, you gave me records and the exhibits.  So what page am I

22  looking at?

23    MR. KEENEY:  It is Bates stamp -- it begins on Bates

24  stamp 6, so 7006.  It's kind of hard to read on my version.

25    THE COURT:  I can't read your Bates stamp.  Is there

1  a marking?  Is it already redacted?

2       MR. KEENEY:  The one that the Court currently has is

3  redacted, and I have unredacted copies for everyone as well.

4       THE COURT:  Why don't you pass the unredacted up so I

5  see what we're talking about?  And then maybe I can figure out

6  what page we're on.

7       MR. KEENEY:  This is the first unredacted one.  It's

8  the second unredacted one.  There's one more.  Here's the

9  third one.

10       THE COURT:  All right.  Thank you, Tim.

11       So I'm on Exhibit P7, and --

12       MR. KEENEY:  Down at the bottom, Your Honor, for the

13  December 3rd visit, do you see the December 3rd visit

14  at -- their dates are on the top right of each page.

15       THE COURT:  So I've got -- all right.  I've got

16  2/9/22, two of those.  No.  Where's the dates at?

17       MR. KEENEY:  So for each visit, each visit is about

18  five pages.  On the first page, it's the top right of each

19  visit.  If you go to the very first page of P7, it will say

20  October 28th, 2019, at the top.  Not on the ones I handed

21  you, Your Honor.

22       THE COURT:  All right.  Let me just see if I can

23  match these up somehow so I can figure out where we're at.

24  I'm in P7, though, right?

25       MR. KEENEY:  Correct.

1          One, two, three, four, five, six, seven -- it should
2    be the tenth page in; at least it is in my stack, Your Honor.
3          THE COURT:  The whole page is not redacted, is it?
4          MR. KEENEY:  No, sir.  What's redacted is the care
5    plan.
6          THE COURT:  All right.  I'm still trying to find the
7    page here.
8          I have one now.  The one that's -- all right.
9    Where's a marking on this?
10         MR. KEENEY:  Your Honor --
11         THE COURT:  It's the one that has "assessment,
12   diagnosis, plan, office procedures," and the PNE is redacted
13   out, right?
14         MR. KEENEY:  That is not the first one, Your Honor.
15   Do you see up at the top, is there --
16         THE COURT:  I'll tell you what, I'm going to give you
17   my binder and you're going to put a sticky on it so I can
18   figure out what I'm doing here.
19         MR. KEENEY:  Yes, sir.
20         THE COURT:  Put a sticky on the three pages.
21         All right.  Thank you, Tim.
22         COURT SECURITY OFFICER:  Yes, sir.
23         THE COURT:  Let's start with the first one.
24         So what's redacted here is the evaluation plan.  I'm
25   going to read it into the record, because we need to have an

1  appellate review of this as well.

2      MR. KEENEY:  Yes, Your Honor.  And, for the record, I

3  did take PDF pictures and copied and pasted these into my

4  objections to her reformatted witness and exhibit lists, and

5  that was filed.

6      THE COURT:  Okay.

7      MR. KEENEY:  Which was ECF Number 60.

8      THE COURT:  That's good.  So then I don't have to

9  worry about reading it.

10      So what you're talking about, it says, "Evaluation

11  plan: Surgery.  Replace InterStim.  Following procedure I

12  reviewed the results and spent an additional 25 minutes

13  reviewing all findings and treatment options.  Patient is

14  noted to have severe overactive bladder and" -- how do you say

15  that?

16      MR. KEENEY:  Dyssynergic.

17      THE COURT:  -- "dyssynergic voiding.  After a

18  comprehensive discussion of options, she'll replace her

19  InterStim, as it is at the end of life, and proceed with

20  pelvic floor therapy.  The risks, benefits, and alternatives

21  were fully discussed.  She acknowledge understanding."

22      What is that you're objecting to?

23      MR. KEENEY:  Well, the plaintiff wants to redact all

24  of that, and there's an overarching theme in all of these, is

25  that my understanding is Dr. Guerette's apparently going to

1  lay the foundation and say all of these records are true,

2  accurate, and complete.  But the only things that have been

3  redacted from these records are any reference to the InterStim

4  being at the end of its life or expired.

5        And my position is if the record is going to come

6  into evidence, the entire record needs to come into evidence.

7  There are other points within --

8        THE COURT:  I'm in agreement with you.  What I'm

9  understanding Dr. Guerette is going to say is, first, he

10 treated her, I guess, up to 2013.

11       MR. KEENEY:  Yes, sir.

12       THE COURT:  She then comes to see him in October

13 2019.  He performs an exam, InterStim is not functioning

14 properly.  Why it's not functioning properly he cannot say.

15 Are you in agreement on that?

16       MR. KEENEY:  The Court has ruled that he cannot

17 testify to that.

18       THE COURT:  Right.

19       MR. KEENEY:  So while I think I --

20       THE COURT:  Cannot testify as to causation.

21       MR. KEENEY:  The Court cannot -- I think the ruling

22 is he cannot testify as to causation.

23       THE COURT:  Right.

24       MR. KEENEY:  Now, my issue is, within the records

25 there's a number of diagnoses and talks about treatment plans.

1    THE COURT: Right.

2    MR. KEENEY: Within there, it is explicitly said that

3    the InterStim is at its end of life. Nowhere in the records

4    does it say that the accident caused any of these issues.

5    THE COURT: And that should come in. This should not

6    be redacted, okay?

7    MR. KEENEY: That's my whole argument.

8    THE COURT: My perspective is it's either all or

9    nothing. And so, to me, it should all go in. As long as

10   there's nothing that says that the accident caused the

11   InterStim to stop. That's what they're using lay testimony

12   for. They're going to say the InterStim stopped because of

13   the accident. It was fine before, and it didn't work

14   afterwards. That's, essentially, what the case is, right?

15   And the jury will decide that.

16   So is there any other issues that I need look at? To

17   me, just don't redact any of them. Unless there's a -- where

18   he says, "the accident caused it," just put them all in. Now,

19   take out personal identifies, like social security numbers and

20   that kind of stuff.

21   Are you with me, Ms. Roop?

22   MS. COHN: Ms. Cohn?

23   THE COURT: Or Ms. Cohn. I apologize.

24   MS. COHN: We're both Samanthas. It's fine.

25   THE COURT: Okay. Do you want to take your mask

1   down?

2       MS. COHN:  I do understand what you're saying, Your

3   Honor, however, I do have a difference of opinion.

4       THE COURT:  But it's the same issue throughout,

5   right?

6       MR. KEENEY:  As long as Ms. Cohn agrees, it is the

7   same throughout.  Do you agree, Ms. Cohn?

8       MS. COHN:  The expired InterStim, yes.

9       THE COURT:  Okay.  Go ahead.

10      What's your take there, Ms. Cohn?

11      MS. COHN:  So, Your Honor, the plaintiff's position

12  and why that was specifically done was not to prejudice the

13  defendant at all.  It was during the Court's previous rulings

14  in two transcripts from previous hearings, as well as orders,

15  that it was clear from the Court's words that "expired

16  InterStim" was not to be said and was causation and was --

17      THE COURT:  I don't think I said that about the

18  "expired."  I said he can't say why it's not working.  I said

19  he could talk about that it's not functional.  Actually, I

20  read the transcripts again last night, just to make sure I

21  wasn't missing something.

22      But if I got something wrong, you tell me.

23      MR. KEENEY:  So, Your Honor, on page 38 of the

24  July 12th --

25      THE COURT:  Hold on a second.  Page 38.  Just give me

**JA318**

1    a second.

2             MR. KEENEY:  No worries, Your Honor.

3             THE COURT:  Go ahead.  What line am I looking at?

4             MR. KEENEY:  You're looking at the bottom three

5    lines, Your Honor, on page 38.  Specifically, Mr. Keeney

6    asked, "In 2019, his diagnosis is expired InterStim.  Am I

7    allowed to have him say that, that it was expired, or does

8    that open the door?"

9             THE COURT:  And I said it's up to him.  It will open

10   the door.

11            You can only say -- here's what you can do:  If it

12   says "expired" -- to me the issue is why is it not working,

13   right?  And expired can mean -- it also means nonfunctioning,

14   right?  So you could ask him, "When you wrote 'expired,' does

15   that also mean it just wasn't working?"  You can't ask him why

16   it wasn't working, right?

17            MS. COHN:  So can I discern the difference, Your

18   Honor, between nonfunctioning and ceased to have functioned?

19            THE COURT:  You can say expired can include no longer

20   functioning.  Whatever reason, you can't go into it.

21            MS. COHN:  I understand the reason.  But there's a

22   difference between functioning properly and ceasing to

23   function.

24            THE COURT:  Yeah, but he can't say that it ceased.

25   He can say that it was not operable, okay?  Why it wasn't

1  operable, whether it expired due to natural -- its natural

2  life or there was an intervening event, he cannot say.

3          MS. COHN:  The crux of it for me, Your Honor, is the

4  difference between it not working, period, and it's still

5  functioning, just not properly.  So can he say it was

6  improperly functioning?

7          THE COURT:  Is that from his own observation?

8          MS. COHN:  Yes.

9          THE COURT:  Yes, from his own observation, he can

10  look at it and say -- it's kind of like what Mr. Barton just

11  testified, right?  Mr. Barton can say, "I went to do it, and I

12  couldn't operate the changes -- the settings change," right?

13          Now, why that happened and what the consequence of

14  that is, neither he nor Dr. Guerette can say, right?

15          But what I'm saying is, all the records are coming

16  in, but I don't want to mislead the jury, you know, due to the

17  evidentiary rulings here.  Expired encompasses it not

18  functioning properly.  Why that's true, though, he cannot

19  opine.

20          MS. COHN:  That is fine, Your Honor.  Thank you very

21  much for the clarification.  I simply wanted to make it clear

22  to the Court I was not attempting to prejudice the defendant.

23          THE COURT:  I know that.

24          MS. COHN:  It was simply the Court's rulings.

25          So he can state that -- can he state what his

```
 1  definition of expired is in these terms regarding this case?

 2          THE COURT:  He can say that includes a

 3  nonfunctioning -- a not properly functioning device.

 4          MS. COHN:  And in this case, that's what I meant by

 5  expired?

 6          THE COURT:  The word "expired" includes non -- it

 7  wasn't functioning properly.

 8          MS. COHN:  Pertaining specifically to Ms. Roop?

 9          THE COURT:  Yes.

10          MS. COHN:  Thank you, Your Honor.

11          THE COURT:  Hold on a second.

12          Mr. Keeney, do you have anything you want to comment

13  on that?

14          MR. KEENEY:  No, Your Honor.

15          THE COURT:  Okay.  So that's where we're at.

16          MS. COHN:  Sorry.  Being a lawyer and mincing words.

17          THE COURT:  Listen, this is a tight line you're going

18  to have to walk, because I'm letting you do this on the lay

19  testimony.  We'll see how it goes.

20          MS. COHN:  It's going to go great.

21          THE COURT:  We'll see.

22          Let me just go down.  Is there anything else on the

23  medical records, then, Mr. Keeney?  So it's all coming in

24  unless there's something that says about causation.  If

25  something says, "Accident caused this," okay?
```

1    MR. KEENEY:  Yes, Your Honor.  Ms. Cohn and I can

2 talk about this, the same thing happened in the surgical

3 records, but I don't think those were coming in in phase 1

4 anyway.

5    MS. COHN:  Those were solely for phase 2, because

6 they do not go to causation.  From my perspective, the surgery

7 records were equal to the big bills coming in in phase 1

8 because they are very in depth.  So I did not want to

9 introduce them in phase 1 where it could sway with sympathy or

10 bias, because it's not as to causation.

11    THE COURT:  Let me ask you this:  So I need now to

12 replace the medical records, because the ones -- the book that

13 I have is with the redacted ones.  I'm going to give the book

14 back to you and you'll put in the unredacted versions into my

15 book, and that will be the ones that will go into evidence.

16 Everybody in agreement on that?

17    MS. COHN:  Yes, Your Honor.

18    MR. KEENEY:  Yes, Your Honor.

19    MS. COHN:  When would you like that back by, Your

20 Honor?

21    THE COURT:  Any time by the end of next week.  I

22 don't care.  Just deliver it to Ms. Garner so I have it.

23    No.  No.  That goes to Ms. Cohn.  Ms. Cohn is going

24 to deliver it to Ms. Garner.

25    MR. KEENEY:  Will you make me a copy, and then you're

**JA322**

1  going to do --

2       MS. COHN:  I do all the binders, yes.  We already

3  have them ready.

4       MR. KEENEY:  You just have to switch them.

5       MS. COHN:  Yes.

6       THE COURT:  Okay.  So we'll have seven also for the

7  jury, then, too, one for each of the jurors.

8       MS. COHN:  Give me one moment?

9       How many binders so we have?

10      UNIDENTIFIED FEMALE VOICE:  11.

11      MS. COHN:  We have 11.

12      THE COURT:  Excellent.  That's perfect.

13      Let me see what other issues I have.

14      MS. COHN:  We simply wanted to wait, Your Honor, to

15  hear about the decision on these records before bringing them

16  all to the Court.

17      THE COURT:  I'm with you.  I'm with you.

18      The exhibit lists, are they still okay?

19      MS. COHN:  Nothing has changed.

20      MR. KEENEY:  They should be fine, Your Honor.

21      THE COURT:  Good.

22      I was going to go over just as to how this is going

23  to work a little bit with you guys, just so we're all on the

24  same page.  So why don't you have a seat.  Is there anything

25  else in dispute I need to resolve?

1        MS. COHN:  I don't there are necessarily any --

2        THE COURT:  Can you just remove the mask because the

3   court reporter --

4        MS. COHN:  I'm so sorry.  At least I'm not fainting

5   this time --

6        THE COURT:  That's all right.

7        MS. COHN:  -- so that's a plus.

8        THE COURT:  Well, we still have some time to go.

9        Go ahead.

10       MS. COHN:  Thank you, Your Honor.  That makes me feel

11   good.

12       I did have a couple of more issues that I would just

13   like to present to the Court to get a decision on before

14   moving forward.

15       THE COURT:  Okay.  Go ahead.

16       MS. COHN:  Thank you, Your Honor.

17       Your Honor, given the fact that there are no bills or

18   financial statements or damages to be introduced in phase 1, I

19   would request that the defense is not allowed to discuss the

20   addendum in phase 1, opening or closing.

21       THE COURT:  Absolutely.  Why would you do that?

22       MR. KEENEY:  Because it goes to their bias and whole

23   motivation for bringing the lawsuit and claiming all of this.

24   They're here because they're asking for millions of dollars,

25   and they're asking this jury to find that it's related so then

1  in phase 2 they can get millions of dollars.

2        THE COURT:  Actually, no, he's right about that.  Why

3  can't he cross-examine Ms. Roop and Mr. Barton about that?

4        MS. COHN:  I'm not saying he cannot in phase 2.

5        THE COURT:  No, in phase 1.  He's right.  Look, this

6  whole case, to me, is the causation.  Because if you win on

7  causation, the jury is going to come -- the number is going to

8  be huge, right?

9        And I'm going to tell you, I think I've stretched the

10 limit here on this, because of the issues that we've already

11 addressed, to the point that I may -- I'm not saying I

12 would -- if you win, I still could reverse this.  I just want

13 to see how everything plays out first.

14       The whole evidence from my perspective on causation

15 is lay testimony from the plaintiff and her boyfriend.  And I

16 think her boyfriend, from having heard his testimony today,

17 might be the most important testimony in the trial.  They both

18 have an incentive, as he just made clear to me, to say what

19 they're saying, and there's no corroborative evidence because

20 there's no printouts or anything like that.  So I think I'm

21 going to allow him to make that point.

22       MS. COHN:  Your Honor, I think that that somewhat,

23 then, prejudices the plaintiff, because obviously that amount

24 of ask is based on the medical expenses and the medical bills

25 and things of that nature and the damages she suffered, which

 1  are also financial in nature.  And so if the defense gets to
 2  gets bring up financial matters in phase 1 but the plaintiff's
 3  hands are bound and tied and cannot, it seems to be very
 4  one-sided almost.
 5          THE COURT:  But what's the relevance of you
 6  introducing that in phase 1?  Theirs is bias, right?
 7          MS. COHN:  But that's my point, Your Honor, is that
 8  there is no relevance in phase 1 as causation.  Now, if he
 9  wants to argue a financial motive, obviously that would be
10  acceptable.  However, I think if he's going to put numbers on
11  it based on what, you know, the plaintiff has asked for
12  reasonably, given the medical specials that she's incurred and
13  things of that nature, the financial detriment, I don't think
14  it would be fair for him to present exact figures and the
15  plaintiff be bound to present none.  If he wants to present
16  financial motive, I understand that wholly.
17          THE COURT:  I think the answer is this:  If he brings
18  that out, you on -- so if he says, "Ms. Roop, you've made
19  a" -- what's the demand here?
20          MS. COHN:  5 million.
21          THE COURT:  5 million, and that's it.  Like, you're
22  not going to go into breakdowns.  You would just say, "Your
23  lawsuit seeks $5 million.  You have a $5 million interest in
24  testifying."  Same with -- and Mr. Barton, I guess they live
25  together; is that right?

 1          MS. COHN:  They're very much married for all intents
 2  and purposes.
 3          THE COURT:  Right.  So they both have a $5 million
 4  incentive.  You, then, on redirect can say, "That number is
 5  based upon your medical treatment and expenses and such,"
 6  right?  It's not just -- it's not a lottery number made up.
 7  That's it.
 8          MS. COHN:  Okay.
 9          THE COURT:  All right?
10          MS. COHN:  As long as I can just clarify.  As long as
11  I have some leeway to clarify that a little bit.
12          THE COURT:  Right.  And if I have to, I'll instruct
13  the jury in the middle of it just to make sure it's not
14  misleading.  We're not going to beat a dead horse on that,
15  though.  You can bring out that it's not just a magical
16  number.  It's based upon medical stuff that we would deal with
17  in phase 2, if we get there.
18          MS. COHN:  I appreciate the clarification, Your
19  Honor.
20          THE COURT:  What I'll probably do, if you -- when
21  he's cross-examining her, I'll probably jump in and give an
22  instruction to the jury saying what's going on here.
23          MS. COHN:  Thank you, Your Honor.
24          THE COURT:  Your point is well taken.
25          MS. COHN:  Your Honor, didn't make a statement

1  specifically, but is it correct to just have the surgeries in

2  phase 2?

3          THE COURT:  Yes.

4          MS. COHN:  Okay.  And then --

5          THE COURT:  That are a result of the accident if they

6  find causation.

7          MS. COHN:  Correct.

8          THE COURT:  You're going to have to put on some

9  evidence to say that that treatment was medically necessary.

10          MS. COHN:  Well, Your Honor, under Virginia law,

11  bills and --

12          THE COURT:  I guess it's presumed.

13          MS. COHN:  It's presumed reasonable and necessary.

14  It's a rebuttable presumption.

15          THE COURT:  Yeah, but it still has to be connected to

16  the accident.

17          MS. COHN:  Well, that's causation in phase 1.

18          THE COURT:  Right.  Well, I think it's a little more

19  than that.  I think it's three parts.  Part 1 is:  Did the

20  accident cause the pelvic prolapse/InterStim device not

21  working?  Dr. Guerette can say, "I looked at the device.  It

22  wasn't functioning."

23          Mr. Barton is saying, "I observed it the next day.

24  It wasn't functioning as it was a couple weeks before."

25          Jury finds that.  Okay.

1      Then the next thing is:  Well, what treatment does
2  she need to address that?  And if Dr. Guerette is going to
3  say, "Her options were X, Y, Z, and we believe the best course
4  of treatment was X, was, you know, getting the surgeries,"
5  then all the bills come in.
6      MS. COHN:  That's what he's going to say, Your Honor.
7      THE COURT:  So, to me, it's a three-part thing.
8      MS. COHN:  Okay.
9      THE COURT:  And you'll have room to cross-examine on
10  that, too, Mr. Keeney.
11      But go ahead.
12      MS. COHN:  And then the last question, Your Honor,
13  given that Guerette is a lay witness treating physician -- and
14  I do apologize; I didn't grab the case.  My apologies.  The
15  case that I presented in the motion in limine rebuttal was
16  that *Springs v. Waffle House* case.  And there's been some
17  argument, but I haven't been able to discern a definitive
18  ruling as to exactly what Dr. Guerette can testify to.  And
19  from the reading of that case, it is the --
20      THE COURT:  I don't care about that case.  I care
21  about my ruling.
22      What I have ruled is this:  That he can, first of
23  all, talk about her treatment of her -- I guess it was up to
24  2013?
25      MS. COHN:  Uh-huh.

1    THE COURT:  I guess, what, she had a child, she had

2  bladder issues, and they decided to put in this InterStim

3  device.  He last sees her in 2013.  Everything was fine,

4  essentially.  I'm paraphrasing.

5    She comes to see him in 2019.  She's reporting pain

6  in her pelvic area, he performs an examination, and then he

7  will describe what the examination revealed, including the

8  functionality of the InterStim device, and then he made some

9  conclusions about the type of treatment that she needed, and

10  this is what the treatment is that -- path that he chose with

11  her.

12    MS. COHN:  More specifically, Your Honor, I'm

13  looking --

14    THE COURT:  Well, for phase 1, it is simply -- it's

15  going to end with, "I examined her, and this was the nature of

16  her injuries that I observed, and the InterStim device was

17  nonfunctional, it expired, whatever.  Expired means --

18  includes nonfunctioning."  And that's it, though.  He can't

19  say beyond that.

20    MS. COHN:  Well, when it comes to nature of injuries,

21  as I argued in my motion in limine, does that include

22  diagnosis at that time?

23    THE COURT:  Yes.

24    MS. COHN:  Okay.  That was it.  Thank you.

25    THE COURT:  He can't testify to causation of the

1  injuries.

2          MS. COHN:  Correct.  I understand that loud and

3  clear, Your Honor.

4          THE COURT:  Did you have anything else before I get

5  into just how things are going to operate, Mr. Keeney?

6          MR. KEENEY:  I don't think so, Your Honor.  The

7  only -- and because of how we're doing this, it's a little bit

8  of gray area, because there is a world where the jury could

9  say the initial Dr. Guerette treatment is related but not the

10 stuff after the 10-month gap, so we will have to talk about it

11 a little bit.  Because on the final verdict form for phase 1,

12 the jury is to give a date of how long they recognize

13 treatment.

14         THE COURT:  Right.  Okay.  At the last hearing, I had

15 asked to see if you agreed to the money amount for the

16 injuries that are not in dispute, and I believe it was a

17 decision of $30,000; is that correct?

18         MR. KEENEY:  Yes, Your Honor.  That encompasses the

19 first two emergency room visits and the one PCP visit.

20         THE COURT:  So I think what my question to you is

21 this:  Should we put that in the verdict form or should I

22 leave it as is?

23         MR. KEENEY:  You mean the phase 2 verdict form?

24         THE COURT:  Yes, in terms of the damages.  Because it

25 doesn't -- this goes back to what my question is, is that

 1  if -- you know, if they win it all and I decide that I have to

 2  reverse on the injuries in dispute, I think it's good for us

 3  to know -- have the jury say, okay, these injuries are not in

 4  dispute.  That amount is 30,000, whatever you guys came up

 5  with, and then the rest that are in dispute, the value is X.

 6          MR. KEENEY:  Your Honor, on the verdict form that we

 7  already have, I think you already did this.

 8          THE COURT:  I already did this?  I'm ahead of myself.

 9          MR. KEENEY:  So undisputed injuries, we have past

10  medical expenses of $30,000 and change already written in, and

11  then other damages based on --

12          THE COURT:  All right.  We already did it, then.

13          MR. KEENEY:  Right.

14          THE COURT:  Okay.  That's perfect.  I'm ahead of

15  myself.  All right.  Good.

16          So you have nothing else, then?  All right.  Perfect.

17          So I just want to go over again how we're going to do

18  things around here.  All right?  You know my legal rulings

19  already; I'm not going to go over those again.

20          So let's talk about jury selection first, okay?

21          By the way, one of our jurors asked to be excused,

22  it's juror 15 on panel 1, Thomas Seagraves.  And I have

23  excused him because he just performed jury service in the

24  state and missed some work, and he didn't want to miss work

25  again.  And I didn't think we should tax him a second time.

**JA332**

1          Did you have any objection to that, Ms. Cohn?

2          MS. COHN:  No objection, Your Honor.

3          THE COURT:  Mr. Keeney?

4          MR. KEENEY:  No objection, Your Honor.

5          THE COURT:  So we have 13 [sic] panels.  There were

6    16 each, now the first panel is 15.  By the way, my guess is

7    that between now and jury selection, we'll have a couple more

8    jurors that will say that they can't serve for whatever

9    reason.  And if I think it's appropriate -- if it's a slam

10   dunk decision that they should be excused, I just excuse them,

11   and then I'll enter an order so you know I excused them.  If

12   it's a close call, I make them come in and we'll deal with it.

13          So we'll bring the three panels in.  The first panel

14   is to report at 9:00 a.m.  They will be brought into the

15   courtroom about 9:30.  I will take the bench at 9:25.  So

16   you-all need to be in place by 9:25 ready to go, all right?

17          Then the same will be true for the panel at

18   11:00 a.m.  They'll be brought in at 11:30, and then 1:00 p.m.

19   for 1:30.  Although, I'm pretty sure we'll have our jury from

20   this by the time we get to the second panel.

21          Again, we'll be picking seven jurors.  Each of you

22   have three peremptory strikes.  I have incorporated the

23   appropriate questions that you submitted from voir dire into

24   my script, which I have now given you.  We'll update that

25   script to -- well, I won't file it again.  I'm just going to

 1  strike out Michaels and Camden, right?  I just handwrote that

 2  in.

 3        They will be brought in, they're going to sit in the

 4  public area, all right?  Once they're there, I will then read

 5  the script.  All right?  So we'll get answers from every one

 6  of them about those questions.  All right?

 7        And then after that, Ms. Garner shuffles the deck,

 8  and we will call up the jurors one by one to the witness

 9  stand -- or the jurors will be brought up to the witness

10  stand.  They are remaining masked while they do the general

11  questioning.  But once they get to the witness stand, as we

12  did with Mr. Barton today, they'll be asked to take their mask

13  down if they feel comfortable, so you can see their faces,

14  first of all.

15        Then I will ask any appropriate follow-up that I need

16  to ask based upon their responses to the general questions,

17  and when I am done, we will then put on these headsets.  You

18  should have one there, and when we're done, you should do a

19  test run with Ms. Garner if you haven't already done that,

20  okay?

21        Essentially, a headset is equivalent to what used to

22  be a sidebar back when I tried cases, right?  And so what

23  we'll do is we put the headsets on.

24        I will start with you, Ms. Cohn, first, and I'll say,

25  "What says the plaintiff?"

1          Now, you really have two options at that point.
2   Well, you have three options.  One is if there's a reason for
3   cause that comes up, you would make the cause motion then.  I
4   generally handle that on that own, though.  If it's a close
5   call -- we have more than enough jurors.  If it's a close
6   call, I just excuse them.
7          But if there is a cause for either one of you, that's
8   when you say it with the headset, okay?
9          I think it's generally wise to cover this so the
10  jurors can't read your lips, so to speak, right?  And I'll
11  say, "What says you?"  You can either say "for cause," and
12  tell me why.  You can say "strike," which means I'm exercising
13  my peremptory, or "accept," okay?
14         If she says "accept," Mr. Keeney, I'll turn to you
15  and I'll say, "What says the defense?"  You will then say
16  either "cause," "strike," or "accept."  All right?
17         If you both say "accept," they're accepted.  I will
18  tell them they've been selected for the jury.
19         I will tell you there's no back striking.  So once
20  you both say "accept," they're on the jury.
21         So it's not like, hey, you only used one of your
22  strikes and you're like, "Oh, I wish I had done that on Juror
23  Number 2.  Let's go back and do that."  You can't do that,
24  right?
25         Because what I found out during COVID, our real

1  problem is the elevators; we can't release them all at the

2  same time.  So if you-all say "accept," I will say, "You've

3  been selected.  You'll report here tomorrow no later than

4  9:00 a.m.  We're going to start at 9:30."  I'm going to tell

5  them it's a two-day trial.  You probably saw that in the

6  script.

7          And we give them a written handout that tells them

8  what to do if they start getting sick, you know, if they have

9  COVID symptoms, call this number.  It also tells them not to

10 talk about the case and stuff like that.  And if you want,

11 Ms. Garner can print the handout for you and give it to you

12 today if you want to look at it.  But it's nonconsequential.

13 And I orally go over everything except for the phone number

14 anyhow.

15         If they're stricken, I just thank them for their

16 service, and they go.

17         And we're going to do that until we exhaust the

18 panel.  If we need more jurors until we get to seven, we'll go

19 it to the next panel, and then so forth until the end, all

20 right?  They're told to come back the next day.

21         Does anybody have any questions at all, Ms. Cohn,

22 about how we're going to do this?

23         MS. COHN:  None, Your Honor.

24         THE COURT:  Mr. Keeney?

25         MR. KEENEY:  No, Your Honor.

1    THE COURT:  I want to talk to you about publishing

2 stipulations.  Now, thankfully, you-all did what I asked you

3 to do which was to stipulate to a lot of the information

4 that's not in dispute.  The stipulations are not in until they

5 are published.

6    So, Ms. Cohn, this really goes for you.  So when you

7 get to the point that you want to introduce a stipulation, all

8 you do is you turn to me and say, "Your Honor, I would like to

9 publish Stipulation Number 1," okay?  At that point, I read

10 the stipulation to the jury.

11    When I do the first one, I will explain to them what

12 a stipulation is.  All right?  And then we kind of go from

13 there.  Do you understand that, Ms. Cohn?

14    MS. COHN:  Yes, Your Honor.

15    THE COURT:  Mr. Keeney?

16    MR. KEENEY:  Yes, Your Honor.

17    THE COURT:  Now, so none of the exhibits now are in

18 dispute, right?  Because I've already ruled now.  So you'll

19 have a binder for each.  What we'll do is the jury is going to

20 be seated in the jury box.  What we're going to do, we're

21 going to alternate.  1 will be at the end, Number 2 will be at

22 the -- the second chair of the back.  We're going to like

23 zigzag the whole way, so that there's like a chair in between.

24 You understand?

25    THE CLERK:  Yes, sir.

1      THE COURT:  So we'll leave a binder and that will be

2  their binder there going forward.

3      I think I told you before, openings will be 15

4  minutes, closings are 30 minutes.  I'm a maniac about time.

5  So 30 minutes, you're done.  All right?

6      Do you-all have any other questions?

7      Ms. Cohn, anything else you want to raise?  Speak now

8  or forever hold your peace, as they say.

9      MS. COHN:  I am content, Your Honor.  Thank you.

10      THE COURT:  Mr. Keeney?

11      MR. KEENEY:  Your Honor, as far as actually moving in

12  the exhibits at trial, would it be all right if the Court,

13  just at the beginning of evidence, we agreed they were all

14  admitted?

15      THE COURT:  Well, you can do it right now.  Do you

16  want to agree that they're all in?

17      MR. KEENEY:  I mean, just to speed things up.

18      MS. COHN:  Yes.  I mean, we've agreed to them, so --

19      THE COURT:  So all the exhibits that you've given me

20  in the exhibit list, that's on the exhibit list will be

21  admitted.

22      MR. KEENEY:  Once Ms. Cohn -- once we give you the --

23      THE COURT:  The final version.

24      MR. KEENEY:  -- the final copy as we discussed today.

25      THE COURT:  Right.  They're all admitted.

1           MS. COHN:  Perfect.

2           THE COURT:  So you don't have to ask to admit them.

3  You don't have to lay the foundation.  We just want to keep

4  moving, right?  And we'll kind of go from there.

5           MR. KEENEY:  That's exactly my point, Your Honor.

6           THE COURT:  Okay.  Did you have anything else,

7  Mr.Keeney?

8           MR. KEENEY:  That's it, Your Honor.

9           THE COURT:  I look forward to seeing you-all, then, a

10 week from Monday.  Okay?

11          MS. COHN:  Have a good holiday weekend, Your Honor.

12          THE COURT:  You too.

13          MR. KEENEY:  Your Honor, I guess one last thing.  If

14 we get -- we're going to have to do phase 2 regardless.  If we

15 get -- were you going to automatically divide it up into two

16 days, or if we get through phase 1 quickly, we'll go --

17          THE COURT:  No, we'll go straight to phase 2.  No, I

18 want to keep moving.

19          I can't do it with the jurors because of COVID.

20          MR. KEENEY:  Right.

21          THE COURT:  You know, we used to pick the jury and go

22 straight to openings.  We can't do that because of COVID.

23 But, you know, when the jury comes back on causation, we get

24 that verdict, you know, depending on where they are with

25 breaks and lunch and stuff, I'll probably give you 15 minutes

1   or something like that, and then we'll get started again.

2          MS. COHN:  I would prefer that, Your Honor.  I've

3   only blocked off Dr. Guerette for the 13th.

4          THE COURT:  We want to keep moving.

5          MS. COHN:  He is costly.

6          THE COURT:  That's okay.  Well, you want $5 million,

7   that's why he's costly.  I think we're done.

8       (Court recessed at 3:09 p.m.)

9                       CERTIFICATE

10  I, Melissa H. Custis, certify that the foregoing is

11  a correct transcript from the record of proceedings

12  in the above-entitled matter.

13

14  /s/  Melissa H. Custis, RPR          Date:  09/28/2022

15

16

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

SAMANTHA ROOP,
    Plaintiff,

    v.                                  Civil No. 3:21cv675 (DJN)

NICHOLAS JAMES DESOUSA,
    Defendant.

**ORDER**
**(Directing Clerk to File Revised Jury Instructions)**

This matter comes before the Court following Defendant's request to amend the jury

instructions to include Virginia Model Jury Instruction 2.220.  Plaintiff does not object to this

request.  Consequently, the Court hereby GRANTS Defendant's request and adds Virginia

Model Jury Instruction 2.220 to Instruction No. 25 for the first phase and Instruction No. 10 for

the second phase, as agreed by the parties.  The Court further DIRECTS the Clerk to file the

revised jury instructions as Attachments 1, 2 and 3 for this Order.

Let the Clerk file a copy of this Order electronically and notify all counsel of record.

It is so ORDERED.

                                      _____/s/_____
                                      David J. Novak
                                      United States District Judge

Richmond, Virginia
Date:  September 6, 2022

**JA341**

**Attachment 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

SAMANTHA ROOP,
       Plaintiff,

      v.                                  Civil Action No.:  3:21cv675 (DJN)

NICHOLAS JAMES DESOUSA,
       Defendant.

## THE COURT'S JURY INSTRUCTIONS ON CAUSATION (PHASE 1)

| | |
|---|---|
| 1 | Opening Instruction |
| 2 | Province of the Court and Jury |
| 3 | Outline of the Instructions |
| 4 | Evidence Received in this Case |
| 5 | Judging the Evidence |
| 6 | Objections and Rulings |
| 7 | Court's Questions to Witnesses |
| 8 | Jury's Recollection Controls |
| 9 | Direct and Circumstantial Evidence |
| 10 | Inferences from the Evidence |
| 11 | The Question Is Not Evidence |
| 12 | Credibility of Witnesses |
| 13 | Parties' Testimony to Facts Within Their Own Knowledge |
| 14 | Impeachment — Inconsistent Statement or Conduct |
| 15 | Effect of Prior Inconsistent Statements or Conduct |

**JA343**

16          What Is Not Evidence

17          Defendant's Admission of Liability

18          Burden of Proof

19          Proximate Cause

20          Injury Must Have Been Reasonably Foreseeable

21          Pre-Existing Condition

22          Mitigation of Damages

23          Juror Use of Electronic Communication Technologies

24          Election of Foreperson

25          Duty to Deliberate

26          Jury's Responsibility

27          Communications Between the Court and Jury

**JA344**

**Instruction No. 1**

<u>Opening Instruction</u>

Ladies and Gentlemen of the jury, you have now heard all of the evidence in this case as it relates to the first phase, that is, the liability phase, of the case.  The Court will now give you the instructions of law that you are to apply in deciding this case.

You will be able to take these written instructions into the jury room with you when you deliberate; nevertheless, I would appreciate your full attention as I read them to you.

**JA345**

**Instruction No. 2**

Province of the Court and Jury

It is your duty to follow the law as I state it and to apply it to the facts as you find them

from the evidence in the case.  Do not single out one instruction as stating the law, but consider

the instructions as a whole.  You are not to be concerned about the wisdom of any rule of law

stated by me.  You must follow and apply the law.

Counsel may properly refer to some of the applicable rules of law in their closing

arguments.  If, however, any difference appears to you between the law as stated by counsel and

that as stated by the Court in these instructions, you, of course, are to be governed by the

instructions given to you by the Court.

No statement or ruling or remark that I may make during the course of the trial is

intended to indicate my opinion as to what the facts are.  It is the function of the jury to consider

the evidence and determine the facts in this case.  You, not I, have the duty to determine the

facts.

The evidence which you are to consider consists of testimony of witnesses, any exhibits

admitted into evidence, and any facts agreed upon between the parties and presented to you

in the form of a stipulation.  The admission of evidence in court is governed by rules of law;

and from time to time, it may be the duty of the attorneys to make objections and my duty as

judge to rule on those objections and decide whether or not you can consider certain evidence.

You must not consider testimony or exhibits to which an objection was sustained, or which

has been ordered stricken.  If an objection was overruled, then you may consider that

evidence together with all other evidence in the case.  The opening statements and closing

arguments of the attorneys are intended to help you in understanding the evidence and in

4

applying the law, but their statements are not in evidence.

You have been chosen and sworn as jurors in this case to try the issues of fact. You must perform your duties as jurors without bias or prejudice to any party. The law does not permit you to be controlled by sympathy, prejudice or public opinion. All parties expect that you will carefully and impartially consider all the evidence, follow the law as it is now being given to you, and reach a just verdict, regardless of the consequences.

5

**Instruction No. 3**

<u>Outline of the Instructions</u>

Before I begin going through the instructions with you, I want to describe for you how they are set up and how you should generally approach your duties.

As I just noted, you are the finders of the facts. The first part of these instructions provides you with the tools to determine the facts. The instructions that follow pertain to the substance of the dispute. The final instructions will inform you about the mechanics of carrying out your responsibilities.

The issue in this first phase of the case is:

Did the Defendant's negligence cause the Plaintiff's injuries?

And, if yes, which injuries did the Defendant's negligence cause?

Your decision on this issue must be governed by these instructions.

6

**JA348**

**Instruction No. 4**

Evidence Received in this Case

The evidence in the case consisted of the following:

1.  The sworn testimony of the witnesses, no matter who called a witness.

2.  All exhibits received in evidence, regardless of who may have produced the exhibits.

3.  All facts that have been agreed to through stipulation.

Statements and arguments of the lawyers are not evidence in the case, unless made as an admission or stipulation of fact. A "stipulation" is an agreement between both sides that certain facts are true. When the lawyers on both sides stipulate or agree to the existence of a fact, you must, unless otherwise instructed, accept the stipulation as evidence, and regard that fact as proved. However, it is for you to determine the effect, if any, to be given that stipulation.

If I sustain an objection to any evidence or if I order evidence stricken, that evidence must be entirely ignored.

Some evidence is admitted for a limited purpose only. When I instruct you that an item of evidence has been admitted for a limited purpose, you must consider it only for that limited purpose and for no other purpose.

You are to consider only the evidence in the case. But in your consideration of the evidence, you are not limited to the statements of the witness. In other words, you are not limited solely to what you see and hear as the witnesses testified.

You may draw from the facts that you find have been proved such reasonable inferences or conclusions as you feel are justified in light of your experience and common sense.

7

**JA349**

**Instruction No. 5**

<u>Judging the Evidence</u>

There is nothing particularly different in the way that a juror should consider the evidence in a trial from that in which any reasonable and careful person would treat any very important question that must be resolved by examining facts, opinions and evidence.  You are expected to use your good sense in considering and evaluating the evidence in the case for only those purposes for which it has been received and to give such evidence a reasonable and fair construction in light of your common knowledge of the natural tendencies and inclinations of human beings.

8

**Instruction No. 6**

<u>Objections and Rulings</u>

It is the sworn duty of the attorneys on each side of a case to object when the other side offers testimony or exhibits which that attorney believes is not properly admissible. Only by raising an objection can a lawyer request and obtain a ruling from the Court on the admissibility of the evidence being offered by the other side. You should not be influenced against an attorney or his client because the attorney has made objections.

Do not attempt, moreover, to interpret my rulings on objections as somehow indicating to you what I believe the outcome of the case should be.

**Instruction No. 7**

<u>Court's Questions to Witnesses</u>

During the course of the trial, I have occasionally asked questions of a witness. Do not

assume that I hold any opinion on the matters to which my questions related. The Court may ask

a question simply to clarify a matter — not to help one side of the case or to hurt another side.

**JA352**

**Instruction No. 8**

<u>Jury's Recollection Controls</u>

If any reference by the Court or by counsel to matters of evidence does not coincide with your own recollection of that evidence, it is your recollection which should control during your deliberations and not the statements of the Court or of counsel.

You are the sole judges of the evidence in this case.

**Instruction No. 9**

<u>Direct and Circumstantial Evidence</u>

Generally, there are two types of evidence that are presented during a trial — direct evidence and circumstantial evidence. "Direct evidence" is the testimony of a person who asserts or claims to have actual knowledge of a fact, such as an eyewitness. "Indirect" or "circumstantial" evidence is proof of facts and circumstances indicating the existence or nonexistence of a fact.

The law makes no distinction between the weight or value to be given to either direct or circumstantial evidence. Nor is a greater degree of certainty required of circumstantial evidence. You are simply required to weigh all the evidence in the case.

12

**JA354**

**Instruction No. 10**

<u>Inferences from the Evidence</u>

Inferences are simply deductions or conclusions which reason and common sense lead the jury to draw from the evidence received in this case.

**JA355**

**Instruction No. 11**

<u>The Question Is Not Evidence</u>

The questions asked by a lawyer for either party to this case are not evidence.  If a lawyer asks a question of a witness which contains an assertion of fact, therefore, you may not consider the assertion by the lawyer as any evidence of that fact.  Only the answers are evidence.

**JA356**

**Instruction No. 12**

Credibility of Witnesses

You are the judges of the facts, the credibility of the witnesses, and the weight of the evidence.  You may consider the appearance and manner of the witnesses on the stand, their intelligence, their opportunity for knowing the truth and for having observed the things about which they testified, their interest in the outcome of the case, their bias, and, if any have been shown, their prior inconsistent statements, or whether they have knowingly testified untruthfully as to any material fact in the case.

You may not arbitrarily disregard believable testimony of a witness.  However, after you have considered all the evidence in the case, then you may accept or discard all or part of the testimony of a witness as you think proper.

You are entitled to use your common sense in judging any testimony.  From these things and all the other circumstances of the case, you may determine which witnesses are more believable and weigh their testimony accordingly.

15

**JA357**

**Instruction No. 13**

<u>Parties' Testimony to Facts Within Their Own Knowledge</u>

When one of the parties testifies unequivocally to facts within his or her own knowledge, those statements of fact and the necessary inferences from them are binding upon him or her.  He or she cannot rely on other evidence in conflict with his or her own testimony to strengthen their case.

However, you must consider his or her testimony as a whole, and you must consider a statement made in one part of his or her testimony in the light of any explanation or clarification made elsewhere in his testimony.

16

**JA358**

**Instruction No. 14**

Impeachment — Inconsistent Statement or Conduct

A witness may be discredited or impeached by contradictory evidence or by evidence that at some other time the witness has said or done something, or failed to say or do something, that is inconsistent with the witness's present testimony.

If you believe any witness has been impeached and thus discredited, you may give the testimony of that witness such credibility, if any, you think it deserves.

If a witness is shown knowingly to have testified falsely about any material matter, you have a right to distrust such witness's other testimony and you may reject all the testimony of that witness or give it such credibility as you may think it deserves.

Any act or omission is "knowingly" done, if the act is done voluntarily and intentionally, and not because of mistake or accident or other innocent reason.

**JA359**

**Instruction No. 15**

<u>Effect of Prior Inconsistent Statements or Conduct</u>

If you believe from the evidence that a witness previously made a statement inconsistent with their testimony at this trial, the only purpose for which the statement may be considered by you is for its bearing on the witness's credibility. It is not evidence that what the witness previously said is true.

When the witness is a party to this case, and you believe from the evidence that the witness previously made a statement inconsistent with their testimony at this trial, that previous statement may be considered by you as evidence that what the witness previously said was true.

18

**JA360**

**Instruction No. 16**

<u>What Is Not Evidence</u>

In deciding the facts of this case, you are not to consider the following as evidence:

statements and arguments of the lawyers, questions and objections of the lawyers, testimony that

I instructed you to disregard, and anything you may see or hear when the court is not in session

even if what you see or hear is done or said by one of the parties or by one of the witnesses.

19

**Instruction No. 17**

<u>Defendant's Admission of Liability</u>

The Defendant has admitted that he is liable for any injury the Plaintiff received from the accident.  Therefore, the only issue that you have to decide is what injuries the Plaintiff sustained as a result of the subject accident.

An admission of liability should not influence you in any way in considering the issue of damages or what injuries plaintiff sustained in the accident.

**JA362**

## Instruction No. 18

### Burden of Proof

The preponderance of the evidence is sometimes called the greater weight of the evidence.  It is the evidence which you find more persuasive.  The burden is on the Plaintiff, Samantha Roop, to prove by the greater weight of the evidence each injury that she claims and to prove that each injury was caused by the negligence of the Defendant, Nicholas Desousa.  If the Plaintiff fails to do so, then she cannot recover for that item.

"The preponderance of the evidence," means evidence, which as a whole, shows that the fact sought to be proved is more probable than not. In other words, a preponderance of the evidence means such evidence as, when considered and compared with the evidence opposed to it, has more convincing force, and produces in your mind a belief that what is sought to be proved is more likely true than not true. This standard does not require proof to an absolute certainty, given that proof to an absolute certainty is seldom possible in any case.  Furthermore, the testimony of one witness whom you believe can alone constitute the greater weight of the evidence.

In determining whether any fact in issue has been proved by a preponderance of the evidence, unless otherwise instructed, you may consider the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have produced them.

21

**JA363**

**Instruction No. 19**

<u>Proximate Cause</u>

A proximate cause of an injury is a cause that, in natural and continuous sequence, produces injury. It is a cause without which the injury would not have occurred.

22

**Instruction No. 20**

Injury Must Have Been Reasonably Foreseeable

The Defendant is not required to have anticipated or foreseen the precise injury that occurred, but it is sufficient that a reasonably prudent person would have anticipated or foreseen that some injury might probably result from the negligent act.

**JA365**

**Instruction No. 21**

<u>Pre-Existing Condition</u>

If you find that the Plaintiff had a condition before the accident that was aggravated as a result of the accident or that the pre-existing condition made the injury that she received in the accident more severe or more difficult to treat, then, if you find your verdict for the Plaintiff, she may recover for the aggravation and for the increased severity or difficulty of treatment, but she is not entitled to recover for the pre-existing condition.

**Instruction No. 22**

<u>Mitigation of Damages</u>

The Plaintiff has a duty to minimize her injuries.  If you find that the Plaintiff did not act reasonably to minimize her injuries and that, as a result, they increased, then she cannot recover the amount by which they increased.

**Instruction No. 23**

<u>Juror Use of Electronic Communication Technologies</u>

During your deliberations, you must not communicate with or provide any information to anyone by any means about this case. You may not use any electronic device or media, such as the telephone, a cell phone, smart phone, iPhone, tablet, blackberry or computer, the Internet, any Internet service, any text or instant messaging service, any Internet chat room, blog, or website such as Facebook, Instagram, MySpace, Linkedin, YouTube or Twitter to communicate to anyone any information about the case or to conduct any research about this case until I accept your verdict. In other words, you cannot talk to anyone on the phone, correspond with anyone, or electronically communicate with anyone about this case. You can only discuss the case in the jury room with your fellow jurors during deliberations. I expect you will inform me as soon as you become aware of another juror's violation of these instructions.

You may not use these electronic means to investigate or communicate about the case, because it is important that you decide this case based solely on the evidence presented in this courtroom. Information on the internet or available through social media might be wrong, incomplete, or inaccurate. You are only permitted to discuss the case with your fellow jurors during deliberations, because they have seen and heard the same evidence you have. In our judicial system, it is important that you are not influenced by anything or anyone outside of this courtroom. Otherwise, your decision may be based on information known only by you and not your fellow jurors or the parties in the case. This would unfairly and adversely impact the judicial process.

**Instruction No. 24**

<u>Election of Foreperson</u>

Upon retiring to the jury room, you will select one of you to act as your foreperson.  The foreperson will preside over your deliberations, and will be your spokesperson here in court.

A verdict form has been prepared for your convenience.

You will take these forms to the jury room and, when you have reached unanimous agreement as to your verdict, you will have your foreperson fill in, date and sign the form that sets forth the verdict upon which you unanimously agree.  You will then return your verdict to the courtroom.

**JA369**

**Instruction No. 25**

Duty to Deliberate

The verdict must represent the considered judgment of each of you.  In order to return a verdict, it is necessary that each juror agree.  Your verdict must be unanimous.

It is your duty, as jurors, to consult with one another and to deliberate with a view of reaching an agreement, if you can do so without disregard of individual judgment.  You must each decide the case for yourself, but only after an impartial consideration of the evidence in the case with your fellow jurors.  In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion, if convinced it is erroneous.  But do not surrender your honest conviction as to the weight or effect of evidence solely because the opinion of your fellow jurors, or for the mere purpose of returning a verdict.  Remember at all times that you are not partisans.  You are judges — judges of the facts.  Your sole interest is to seek the truth from the evidence in the case.

I again remind you that you must not base your verdict in any way upon sympathy, bias, guesswork or speculation.  Your verdict must be based solely on the evidence and the instructions given by the Court.

28

**JA370**

**Instruction No. 26**

<u>Jury's Responsibility</u>

Nothing said in these instructions and nothing in any verdict form prepared for your convenience is meant to suggest or convey in any manner any suggestion or hint as to what verdict I think you should find. What the verdict shall be is your sole and exclusive duty and responsibility.

**JA371**

**Instruction No. 27**

Communications Between the Court and Jury

If it becomes necessary during your deliberations to communicate with me, you may send a note by a court security officer, signed by your foreperson or by one or more members of the jury. No member of the jury should ever attempt to communicate with me by any means other than a signed writing. I will never communicate with any member of the jury on any subject touching the merits of the case otherwise than in writing, or orally here in open court.

The court security officers, as well as all other persons, are forbidden to communicate in any way or manner with any member of the jury on any subject touching the merits of the case.

Bear in mind also that you are never to reveal to any person — not even to me — how the jury stands, numerically or otherwise, on the questions before you, until after you have reached a unanimous verdict.

**JA372**

**Attachment 2**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

SAMANTHA ROOP,
      Plaintiff,

      v.                                Civil Action No.:  3:21cv675 (DJN)

NICHOLAS JAMES DESOUSA,
      Defendant.

**THE COURT'S JURY INSTRUCTIONS ON DAMAGES (PHASE 2)**

| | |
|---|---|
| 1 | Continuing Effect of Instructions |
| 2 | Types of Compensatory Damages |
| 3 | Amount of Damages Requested Is Not Evidence |
| 4 | Burden of Proof |
| 5 | Mitigation of Damages |
| 6 | Effect of Insurance or Benefits |
| 7 | Pre-Judgment Interest |
| 8 | Juror Use of Electronic Communication Technologies |
| 9 | Role of Foreperson |
| 10 | Duty to Deliberate |
| 11 | Jury's Responsibility |
| 12 | Communications Between the Court and Jury |

**JA374**

**Instruction No. 1**

Continuing Effect of Instructions

In the first phase of this trial, I provided you with instructions on what constitutes the evidence in this case, weighing and evaluating the evidence, and the meaning of "preponderance of the evidence." Those instructions apply with equal force in this phase of the case. I will provide you with a written copy of those instructions for your deliberations. Additionally, you will be able to take these written instructions into the jury room with you when you deliberate.

In your deliberations, you may consider all of the evidence you have heard, unless it has been stricken. It does not matter whether it was introduced by the Plaintiff or the Defendant, or whether it was introduced in the first or second phase of this trial.

**Instruction No. 2**

Types of Compensatory Damages

In determining the damages to which the Plaintiff is entitled, you shall consider any of the following which you believe by the greater weight of the evidence was caused by the negligence of the Defendant:

(1)     any bodily injuries that the Plaintiff sustained and their effect on her health according to their degree and probable duration;

(2)     any physical pain and mental anguish that the Plaintiff suffered in the past;

(3)     any disfigurement or deformity and associated humiliation or embarrassment;

(4)     any inconvenience caused in the past and any that probably will be caused in the future; and,

(5)     any medical expenses incurred in the past.

The parties have stipulated to the medical expenses related to the injuries for which they agree Defendant is responsible. Specifically, they have agreed that the past medical expenses for the undisputed injuries was $30,031.00. In addition to the agreed past medical expenses for the undisputed injuries, you must also determine whether the Plaintiff should receive an additional recovery for the other types of damages available as set forth in the first four categories for the undisputed injuries and, if so, what the value of those damages are. As to the disputed injuries, you must evaluate all five of the categories of damages to determine whether the Plaintiff should recover damages for the disputed injuries and, if so, the amount of the recovery for those injuries.

Your verdict shall be for such sum as will fully and fairly compensate the Plaintiff for the damages sustained as a result of the Defendant's negligence.

**JA376**

**Instruction No. 3**

<u>Amount of Damages Requested Is Not Evidence</u>

Any amount of damages requested is not evidence in this case; you should not consider it as evidence in arriving at your verdict.

**Instruction No. 4**

<u>Burden of Proof</u>

The burden is on the Plaintiff to prove by the greater weight of the evidence each item of damage she claims and to prove that each item was caused by the Defendant's negligence.  She is not required to prove the exact amount of her damages, but she must show sufficient facts and circumstances to permit you to make a reasonable estimate of each item.  If the Plaintiff fails to do so, then she cannot recover for that item.

**JA378**

**Instruction No. 5**

<u>Mitigation of Damages</u>

The plaintiff has a duty to minimize her damages. If you find that the plaintiff did not act reasonably to minimize her damages and that, as a result, they increased, then she cannot recover the amount by which they increased.

**Instruction No. 6**

<u>Effect of Insurance or Benefits</u>

The presence or absence of insurance or benefits of any type, whether liability insurance, health insurance, or employment-related benefits for either the Plaintiff or the Defendant, is not to be considered by you in any way in considering the issue of damages.

The existence or lack of insurance or benefits shall not enter into your discussions or deliberations in any way in deciding the issues in this case. You shall decide this case solely on the basis of the testimony and evidence presented in the courtroom, as well as the other instructions given to you by the Court.

**Instruction No. 7**

<u>Pre-Judgment Interest</u>

For any damages that you award, you must determine whether to also award prejudgment interest to the Plaintiff as to those injuries that you find.  The award of prejudgment interest is designed to compensate a plaintiff for the loss sustained by not receiving the amount to which she was entitled at the time that she was entitled to receive it.  It is within your discretion to award or not award prejudgment interest.

Consequently, on the Verdict Form, you must first answer whether you have decided to award prejudgment interest.  If you decide to do so, you must then indicate the date on which to begin the calculation of the interest.  The date may be any date after the date of the incident at issue.  If you decide not to award prejudgment interest, you should not enter any date on the Verdict Form in that section.

If you elect to award prejudgment interest, you should not be concerned with the interest rate or a calculation of the amount of the interest, as those issues fall with the purview of the Court.

**Instruction No. 8**

<u>Juror Use of Electronic Communication Technologies</u>

During your deliberations, you must not communicate with or provide any information to anyone by any means about this case.  You may not use any electronic device or media, such as the telephone, a cell phone, smart phone, iPhone, tablet, blackberry or computer, the Internet, any Internet service, any text or instant messaging service, any Internet chat room, blog, or website such as Facebook, Instagram, MySpace, Linkedin, YouTube or Twitter to communicate to anyone any information about the case or to conduct any research about this case until I accept your verdict.  In other words, you cannot talk to anyone on the phone, correspond with anyone, or electronically communicate with anyone about this case. You can only discuss the case in the jury room with your fellow jurors during deliberations.  I expect you will inform me as soon as you should become aware of another juror's violation of these instructions.

You may not use these electronic means to investigate or communicate about the case, because it is important that you decide this case based solely on the evidence presented in this courtroom.  Information on the internet or available through social media might be wrong, incomplete, or inaccurate.  You are only permitted to discuss the case with your fellow jurors during deliberations, because they have seen and heard the same evidence you have.  In our judicial system, it is important that you are not influenced by anything or anyone outside of this courtroom.  Otherwise, your decision may be based on information known only by you and not your fellow jurors or the parties in the case. This would unfairly and adversely impact the judicial process.

**JA382**

**Instruction No. 9**

<u>Role of Foreperson</u>

Upon retiring to the jury room, the foreperson will preside over your deliberations, just as he or she did during the liability phase of this trial.  Your foreperson will be your spokesperson here in court.

A verdict form has been prepared for your convenience.

You will take these forms to the jury room and, when you have reached unanimous agreement as to your verdict, you will have your foreperson fill in, date and sign the form that sets forth the verdict upon which you unanimously agree.  You will then return your verdict to the courtroom.

**Instruction No. 10**

<u>Duty to Deliberate</u>

The verdict must represent the considered judgment of each of you.  In order to return a verdict, it is necessary that each juror agree.  Your verdict must be unanimous.

It is your duty, as jurors, to consult with one another and to deliberate with a view of reaching an agreement, if you can do so without disregard of individual judgment.  You must each decide the case for yourself, but only after an impartial consideration of the evidence in the case with your fellow jurors.  In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion, if convinced it is erroneous.  But do not surrender your honest conviction as to the weight or effect of evidence solely because the opinion of your fellow jurors, or for the mere purpose of returning a verdict.  Remember at all times that you are not partisans.  You are judges — judges of the facts.  Your sole interest is to seek the truth from the evidence in the case.

I again remind you that you must not base your verdict in any way upon sympathy, bias, guesswork or speculation.  Your verdict must be based solely on the evidence and the instructions given by the Court.

**JA384**

**Instruction No. 11**

<u>Jury's Responsibility</u>

Nothing said in these instructions and nothing in any verdict form prepared for your convenience is meant to suggest or convey in any manner any suggestion or hint as to what verdict I think you should find.  What the verdict shall be is your sole and exclusive duty and responsibility.

**Instruction No. 12**

<u>Communications Between the Court and Jury</u>

If it becomes necessary during your deliberations to communicate with me, you may send a note by a court security officer, signed by your foreperson or by one or more members of the jury. No member of the jury should ever attempt to communicate with me by any means other than a signed writing. I will never communicate with any member of the jury on any subject touching the merits of the case otherwise than in writing, or orally here in open court.

The court security officers, as well as all other persons, are forbidden to communicate in any way or manner with any member of the jury on any subject touching the merits of the case.

Bear in mind also that you are never to reveal to any person — not even to me — how the jury stands, numerically or otherwise, on the questions before you, until after you have reached a unanimous verdict.

**JA386**

**Attachment 3**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

SAMANTHA ROOP,
     Plaintiff,

     v.                                            Civil Action No.:  3:21cv675 (DJN)

NICHOLAS JAMES DESOUSA,
     Defendant.

## THE COURT'S JURY INSTRUCTIONS ON DAMAGES (PHASE 2)

| | |
|---|---|
| 1 | Continuing Effect of Instructions |
| 2 | Types of Compensatory Damages |
| 3 | Amount of Damages Requested Is Not Evidence |
| 4 | Burden of Proof |
| 5 | Mitigation of Damages |
| 6 | Effect of Insurance or Benefits |
| 7 | Pre-Judgment Interest |
| 8 | Juror Use of Electronic Communication Technologies |
| 9 | Role of Foreperson |
| 10 | Duty to Deliberate |
| 11 | Jury's Responsibility |
| 12 | Communications Between the Court and Jury |

**JA388**

**Instruction No. 1**

<u>Continuing Effect of Instructions</u>

In the first phase of this trial, I provided you with instructions on what constitutes the evidence in this case, weighing and evaluating the evidence, and the meaning of "preponderance of the evidence." Those instructions apply with equal force in this phase of the case. I will provide you with a written copy of those instructions for your deliberations. Additionally, you will be able to take these written instructions into the jury room with you when you deliberate.

In your deliberations, you may consider all of the evidence you have heard, unless it has been stricken. It does not matter whether it was introduced by the Plaintiff or the Defendant, or whether it was introduced in the first or second phase of this trial.

**JA389**

## Instruction No. 2

### Types of Compensatory Damages

In determining the damages to which the Plaintiff is entitled, you shall consider any of the following which you believe by the greater weight of the evidence was caused by the negligence of the Defendant:

(1)    any bodily injuries that the Plaintiff sustained and their effect on her health according to their degree and probable duration;

(2)    any physical pain and mental anguish that the Plaintiff suffered in the past;

(3)    any disfigurement or deformity and associated humiliation or embarrassment;

(4)    any inconvenience caused in the past and any that probably will be caused in the future; and,

(5)    any medical expenses incurred in the past.

The parties have stipulated to the medical expenses related to the injuries for which they agree Defendant is responsible. Specifically, they have agreed that the past medical expenses for the undisputed injuries was $30,031.00. In addition to the agreed past medical expenses for the undisputed injuries, you must also determine whether the Plaintiff should receive an additional recovery for the other types of damages available as set forth in the first four categories for the undisputed injuries and, if so, what the value of those damages are.

Your verdict shall be for such sum as will fully and fairly compensate the Plaintiff for the damages sustained as a result of the Defendant's negligence.

**Instruction No. 3**

Amount of Damages Requested Is Not Evidence

Any amount of damages requested is not evidence in this case; you should not consider it as evidence in arriving at your verdict.

**Instruction No. 4**

<u>Burden of Proof</u>

The burden is on the Plaintiff to prove by the greater weight of the evidence each item of damage she claims and to prove that each item was caused by the Defendant's negligence. She is not required to prove the exact amount of her damages, but she must show sufficient facts and circumstances to permit you to make a reasonable estimate of each item. If the Plaintiff fails to do so, then she cannot recover for that item.

**Instruction No. 5**

<u>Mitigation of Damages</u>

The plaintiff has a duty to minimize her damages. If you find that the plaintiff did not act reasonably to minimize her damages and that, as a result, they increased, then she cannot recover the amount by which they increased.

**Instruction No. 6**

<u>Effect of Insurance or Benefits</u>

The presence or absence of insurance or benefits of any type, whether liability insurance, health insurance, or employment-related benefits for either the Plaintiff or the Defendant, is not to be considered by you in any way in considering the issue of damages.

The existence or lack of insurance or benefits shall not enter into your discussions or deliberations in any way in deciding the issues in this case. You shall decide this case solely on the basis of the testimony and evidence presented in the courtroom, as well as the other instructions given to you by the Court.

**Instruction No. 7**

<u>Pre-Judgment Interest</u>

For any damages that you award, you must determine whether to also award prejudgment interest to the Plaintiff as to those injuries that you find.  The award of prejudgment interest is designed to compensate a plaintiff for the loss sustained by not receiving the amount to which she was entitled at the time that she was entitled to receive it.  It is within your discretion to award or not award prejudgment interest.

Consequently, on the Verdict Form, you must first answer whether you have decided to award prejudgment interest.  If you decide to do so, you must then indicate the date on which to begin the calculation of the interest.  The date may be any date after the date of the incident at issue.  If you decide not to award prejudgment interest, you should not enter any date on the Verdict Form in that section.

If you elect to award prejudgment interest, you should not be concerned with the interest rate or a calculation of the amount of the interest, as those issues fall with the purview of the Court.

## Instruction No. 8

### Juror Use of Electronic Communication Technologies

During your deliberations, you must not communicate with or provide any information to anyone by any means about this case. You may not use any electronic device or media, such as the telephone, a cell phone, smart phone, iPhone, tablet, blackberry or computer, the Internet, any Internet service, any text or instant messaging service, any Internet chat room, blog, or website such as Facebook, Instagram, MySpace, Linkedin, YouTube or Twitter to communicate to anyone any information about the case or to conduct any research about this case until I accept your verdict. In other words, you cannot talk to anyone on the phone, correspond with anyone, or electronically communicate with anyone about this case. You can only discuss the case in the jury room with your fellow jurors during deliberations. I expect you will inform me as soon as you should become aware of another juror's violation of these instructions.

You may not use these electronic means to investigate or communicate about the case, because it is important that you decide this case based solely on the evidence presented in this courtroom. Information on the internet or available through social media might be wrong, incomplete, or inaccurate. You are only permitted to discuss the case with your fellow jurors during deliberations, because they have seen and heard the same evidence you have. In our judicial system, it is important that you are not influenced by anything or anyone outside of this courtroom. Otherwise, your decision may be based on information known only by you and not your fellow jurors or the parties in the case. This would unfairly and adversely impact the judicial process.

**Instruction No. 9**

<u>Role of Foreperson</u>

Upon retiring to the jury room, the foreperson will preside over your deliberations, just as he or she did during the liability phase of this trial.  Your foreperson will be your spokesperson here in court.

A verdict form has been prepared for your convenience.

You will take these forms to the jury room and, when you have reached unanimous agreement as to your verdict, you will have your foreperson fill in, date and sign the form that sets forth the verdict upon which you unanimously agree.  You will then return your verdict to the courtroom.

**Instruction No. 10**

<u>Duty to Deliberate</u>

The verdict must represent the considered judgment of each of you.  In order to return a verdict, it is necessary that each juror agree.  Your verdict must be unanimous.

It is your duty, as jurors, to consult with one another and to deliberate with a view of reaching an agreement, if you can do so without disregard of individual judgment.  You must each decide the case for yourself, but only after an impartial consideration of the evidence in the case with your fellow jurors.  In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion, if convinced it is erroneous.  But do not surrender your honest conviction as to the weight or effect of evidence solely because the opinion of your fellow jurors, or for the mere purpose of returning a verdict.  Remember at all times that you are not partisans.  You are judges — judges of the facts.  Your sole interest is to seek the truth from the evidence in the case.

I again remind you that you must not base your verdict in any way upon sympathy, bias, guesswork or speculation.  Your verdict must be based solely on the evidence and the instructions given by the Court.

**Instruction No. 11**

<u>Jury's Responsibility</u>

Nothing said in these instructions and nothing in any verdict form prepared for your convenience is meant to suggest or convey in any manner any suggestion or hint as to what verdict I think you should find.  What the verdict shall be is your sole and exclusive duty and responsibility.

**Instruction No. 12**

<u>Communications Between the Court and Jury</u>

If it becomes necessary during your deliberations to communicate with me, you may send a note by a court security officer, signed by your foreperson or by one or more members of the jury.  No member of the jury should ever attempt to communicate with me by any means other than a signed writing.  I will never communicate with any member of the jury on any subject touching the merits of the case otherwise than in writing, or orally here in open court.

The court security officers, as well as all other persons, are forbidden to communicate in any way or manner with any member of the jury on any subject touching the merits of the case.

Bear in mind also that you are never to reveal to any person — not even to me — how the jury stands, numerically or otherwise, on the questions before you, until after you have reached a unanimous verdict.

**JA400**