# IN THE

# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

SAMANTHA ROOP,

*Plaintiff - Appellant,*

v.

NICHOLAS JAMES DESOUSA,

*Defendant - Appellee,*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT RICHMOND

## JOINT APPENDIX - VOLUME II OF II
### (Pages 401 - 917)

Samantha B. Cohn
GEOFF MCDONALD
& ASSOCIATES, P.C.
8720 Stony Point Parkway
Suite 250
Richmond, VA 23235
757-281-8904

John S. Koehler
THE LAW OFFICES OF
JAMES STEELE PLLC
P. O. Box 21542
Roanoke, VA 24018
540-632-5994

*Counsel for Appellant*

Carter T. Keeney
CARTER & SHANDS, PC
9030 Stony Point Parkway
Richmond, VA 23235
804-747-7470

*Counsel for Appellee*

# TABLE OF CONTENTS

## VOLUME I OF II

JA Page

District Court Docket Sheet [3:21-cv-00675-DJN] ..................................................... 1

Notice of Removal with Exhibits
    Filed October 26, 2021 [ECF1] .......................................................... 13

        Ex. 1:    Complaint [ECF1-1] ............................................................ 16

        Ex. 2:    Civil Cover Sheet [ECF1-2] ........................................... 19

Answer
    Filed October 26, 2021 [ECF2] .......................................................... 21

Plaintiff's Initial Rule 26(a)(1)(A) Disclosures
    Filed November 15, 2021 [ECF6] ....................................................... 23

Scheduling and Pretrial Order
    Entered December 16, 2021 [ECF8] ................................................... 29

Plaintiff's Expert Designations
    Filed February 21, 2022 [ECF10] ...................................................... 42

Motion Seeking Relief from Trial Schedule and Enlargement of Deadlines
    Filed March 21, 2022 [ECF14] .......................................................... 47

Memorandum of Fact and Law in Opposition to Plaintiff's
Motion Seeking Relief from Trial Schedule and Enlargement
of Deadlines (with attachments)
    Filed March 23, 2022 [ECF15] .......................................................... 54

        Ex. A:    Joint Notice of Deposition [ECF15-1] ......................... 60

        Ex. B:    Deposition Transcript of Nathan Guertte, M.D.
                taken on 2/8/2022 [ECF15-2] ....................................... 62

Ex. C:   Plaintiff's Expert Designations [ECF15-3]
         *(To Avoid Duplication Located at JA43)*

Order (Denying Motion for Extension)
   Entered March 23, 2022 [ECF16] ..................................................................... 96

Motion in Limine to Exclude Dr. Nathan Guerette from Testifying at Trial,
To Exclude Plaintiff's Medical Bills for Dr. Guerette's Treatment and
To Exclude Any Mention of Any Condition Treated by Dr. Guerette
   Filed March 28, 2022 [ECF18]........................................................................ 97

Memorandum of Fact and Law in Support of Motion in Limine to
Exclude Dr. Nathan Guerette from Testifying at Trial, To Exclude
Plaintiff's Medical Bills for Dr. Guerette's Treatment and To Exclude
Any Mention of Any Condition Treated by Dr. Guerette with Exhibits
   Filed March 28, 2022 [ECF19]...................................................................... 100

   Ex. A:   Plaintiff's Answers to Defendant's First Set of
            Interrogatories & Request for Production of Documents
            [ECF19-1].................................................................................. 107

   Ex. B:   Corresponding Bills of Chippenham Johnston Willis
            Hospital on January 8, 2020, January 28, 2021, and
            February 10-11, 2021 [ECF19-2]............................................... 110

   Ex. C:   Joint Notice of Deposition [ECF19-3]
            *(To Avoid Duplication Located at JA61)*

   Ex. D:   Deposition Transcript of Nathan Guertte, M.D.
            taken on 2/8/2022 [ECF19-4]
            *(To Avoid Duplication Located at JA63)*

   Ex. E:   Plaintiff's Expert Designations [ECF19-5]
            *(To Avoid Duplication Located at JA43)*

Memorandum of Fact and Law in Opposition of Defendant's
Motion in Limine to Exclude Dr. Guerette from Testifying at
Trial, To Exclude Plaintiff's Medical Bills for Dr. Guerette's
Treatment, And to Exclude Any Mention of Any Mention of
Any Condition Treated by Dr. Guerette with Exhibits
    Filed April 8, 2022 [ECF22]........................................................... 149

        Ex. A:    Deposition Transcript of Nathan Guertte, M.D.
                  taken on 2/8/2022 [ECF22-1]
                  *(To Avoid Duplication Located at JA63)*

        Ex. B:    Memorandum of Fact [ECF22-2] ...............................161

        Ex. C:    Plaintiff's Answers to Defendant's First Set of
                  Interrogatories & Request for Production of Documents
                  [ECF22-3] *(To Avoid Duplication Located at JA113)*

        Ex. D:    Plaintiff's Initial Rule 26(A)(1)(A) Disclosures [ECF22-4]....... 168

Reply Brief to Plaintiff's Opposition to Defendant's Motion in Limine to
Exclude Dr. Guerette from Testifying at Trial, To Exclude Plaintiff's
Medical Bills for Dr. Guerette's Treatment, And to Exclude Any
Mention of Any Condition Treated by Dr. Guerette
    Filed April 12, 2022 [ECF23].......................................................... 174

Transcript of Motion in Limine Vol I of I
Before the Honorable David J. Novak
    On May 5, 2022 [ECF31] .............................................................. 180

Memorandum Order
(Granting in Part and Denying in Part Motion in Limine)
    Entered 2022.05.03 [ECF25]........................................................... 212

Pleading as Ordered by this Court's
May 3, 2022 Regarding Liability and Injuries
    Filed May 12, 2022 [ECF27]........................................................... 215

Amended Order of Proof as to Witnesses and Evidence
    Entered May 19, 2022 [ECF29]........................................................ 218

Offer of Proof as Required by the Order of May 3, 2022
Filed May 20, 2022 [ECF30].......................................................... 222

Memorandum Order
(Clarifying Parameters of Testimony of Dr. Nathan Guerette)
Entered May 27, 2022 [ECF33]...................................................... 228

Complete Transcript of Final Pretrial Conference
Before the Honorable David J. Novak
On July 12, 2022 [ECF56]............................................................. 231

Order (Clarifying Parameters of Evidence)
Entered July 12, 2022 [ECF55] ..................................................... 285

Transcript of Final Pretrial Conference Volume I of I
Before the Honorable David J. Novak
On September 1, 2022 [ECF84] ..................................................... 286

GERARD BARTON
Direct by Ms. Cohn .............................................................. 290
Cross by Mr. Keeney ........................................................... 300

Order (Directing Clerk to File Revised Jury Instructions) with attachments
Entered September 6, 2022 [ECF72]............................................. 341

Att. 1:    The Court's Jury Instructions on Causation (Phase1)
           [ECF72-1]................................................................. 342

Att. 2:    The Court's Jury Instructions on Damages (Phase 2)
           [ECF72-2]................................................................. 373

Att. 3:    The Court's Jury Instructions on Damages (Phase 2)
           [ECF72-3]................................................................. 387

# TABLE OF CONTENTS

## VOLUME II OF II

JA Page

Transcript of Jury Trial - Day 2
Before the Honorable David J. Novak
   On September 13, 20223 [ECF85] ............................................... 401

   Preliminary Jury Instructions..................................................... 405

   Opening Statements
      By Ms. Cohn ............................................................... 419
      By Mr. Keeney ............................................................. 424

   SAMANTHA ROOP
      Direct by Ms. Cohn ........................................................ 431
      Cross by Mr. Keeney ....................................................... 475
      Redirect by Ms. Cohn ...................................................... 500

   NATHAN GUERETTE, M.D.
      Direct by Ms. Cohn ........................................................ 505
      Cross by Mr. Keeney ....................................................... 517
      Redirect by Ms. Cohn ...................................................... 525

   GERARD BARTON
      Direct by Ms. Cohn ........................................................ 531
      Cross by Mr. Keeney ....................................................... 542
      Redirect by Ms. Cohn ...................................................... 546

   Plaintiff Rests.................................................................. 547
   Defense Rests................................................................... 562
   Jury Instructions............................................................... 564

   Closing Arguments
      By Ms. Cohn............................................................... 582
      By Mr. Keeney ............................................................. 589
      By Ms. Cohn............................................................... 598

   Verdict ........................................................................ 610

Plaintiff's Trial Exhibits:

Ex. P3:   St. Francis Medical Center Records for
          Dates of Service 7/8/2019 - 7/10/2019.............................................. 614

Ex. P4:   Powhatan Medical Associates Records for
          Dates of Service 7/10/2019-7/10/2019............................................. 687

Ex. P5:   Chippenham JW Hospital and Radiology Records for
          Date of Service 7/15/2019................................................................. 699

Ex. P7:   Intimate Wellness Institute of Virginia Recorde for
          Dates of Service 10/08/19-01/27/21.................................................. 752

Defendant's Trial Exhibits:

Ex. D-15:   Instagram Screenshot ................................................................... 807

Ex. D-16:   Facebook Screenshot..................................................................... 808

Ex. D-17:   Facebook Screenshot..................................................................... 809

Ex. D-19:   Facebook Screenshot..................................................................... 810

Verdict Form - Causation
Filed September 13, 2022 [ECF79] ..................................................... 811

Order
(Granting in Part and Denying in Part Defendant's Rule 50 Motion)
Entered September 14, 2022 [ECF80]............................................. 812

Verdict Form
Filed September 14, 2022 [ECF82] ..................................................... 814

Order
(Giving Parties Thirty Days to File Post-Trial Motions)
Entered September 14, 2022 [ECF83]............................................. 815

Plaintiff's Motion for New Trial Under Fed. R. Civ. P. 59(a)
or, in the Alternative, to Alter or Amend the District Court's
Judgment Under Fed. R. Civ. P. 59(e)
  Filed September 14, 2022 [ECF87] ............................................................... 816

Memorandum of Fact and Law in Opposition to Plaintiff's Motion for
New Trial Under Fed. R. Civ. P. 59(a) or, in the Alternative, to Alter
or Amend the District Court's Judgment Under Fed. R. Civ. P. 59(E)
  Filed October 21, 2022 [ECF88] ................................................................... 842

Plaintiff's Proffer of Excluded Evidence
  Filed October 27, 2022 [ECF89] ................................................................... 852

Plaintiff's Reply to Defendant's Response to Plaintiff's Motion for
New Trial, Under Fed. R. Civ. P. 59(A) Or, In the Alternative, To Alter
or Amend the District Court's Judgment Under Fed. R. Civ. P. 59(E)
  Filed October 27, 2022 [ECF90] ................................................................... 858

Memorandum Opinion
  Entered March 9, 2023 [ECF91] ................................................................... 868

Order
  (Denying Motion for New Trial or to Alter or Amend Judgment)
  Entered March 9, 2023 [ECF92] ................................................................... 915

Judgment in a Civil Case
  Entered March 10, 2023 [ECF93] ................................................................. 916

Notice of Appeal
  Filed April 5, 2023 [ECF94] .......................................................................... 917

UNITED STATES DISTRICT COURT

FOR THE

EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION


* * * * * * * * * * * * * *
SAMANTHA ROOP,            * CIVIL NO. 3:21-CV-00675
                         * SEPTEMBER 13, 2022  9:30 A.M.
         Plaintiff,       * JURY TRIAL - DAY 2
                         *
vs.                      *
                         *
NICHOLAS JAMES DESOUSA,   * Before:
                         * HONORABLE DAVID J. NOVAK
         Defendant.       * UNITED STATES DISTRICT JUDGE
* * * * * * * * * * * * * * * EASTERN DISTRICT OF VIRGINIA

APPEARANCES:

For the Plaintiff:       SAMANTHA BETH COHN, ESQUIRE
                         BRANDON K. GALINDO, ESQUIRE
                         Geoff McDonald & Associates, P.C.
                         8720 Stony Point Parkway
                         Suite 250
                         Richmond, Virginia 23235


For the Defendant:       CARTER TALIAFERRO KEENEY, ESQUIRE
                         Carter & Shands PC
                         9030 Stony Point Parkway
                         Suite 530
                         Richmond, Virginia 23235




Court Reporter:          Melissa H. Custis, RPR
                         701 East Broad Street
                         Richmond, Virginia 23219
                         (804)916-2278

         Proceedings recorded by mechanical stenography,
transcript produced by computer.

| 1 | **INDEX** | |
|---|---|---|
| 2 | | PAGE NO. |
| 3 | PRELIMINARY JURY INSTRUCTIONS | 5 |
| 4 | | |
| 5 | OPENING STATEMENTS: | |
| 6 | By Ms. Cohn | 19 |
| 7 | By Mr. Keeney | 24 |
| 8 | | |
| 9 | **WITNESS INDEX** | |
| 10 | PLAINTIFF'S WITNESSES: | PAGE NO. |
| 11 | **Samantha Roop:** | |
| 12 | Direct by Ms. Cohn | 31 |
| 13 | Cross by Mr. Keeney | 75 |
| 14 | Redirect by Ms. Cohn | 100 |
| 15 | | |
| 16 | **Nathan Guerette, M.D.:** | |
| 17 | Direct by Ms. Cohn | 105 |
| 18 | Cross by Mr. Keeney | 117 |
| 19 | Redirect by Ms. Cohn | 125 |
| 20 | | |
| 21 | **Gerard Barton:** | |
| 22 | Direct by Ms. Cohn | 131 |
| 23 | Cross by Mr. Keeney | 142 |
| 24 | Redirect by Ms. Cohn | 146 |
| 25 | | |

**JA402**

| 1 | **INDEX** | |
| 2 | | PAGE NO. |
| 3 | PLAINTIFF RESTS | 147 |
| 4 | DEFENSE RESTS | 162 |
| 5 | JURY INSTRUCTIONS | 164 |
| 6 | | |
| 7 | CLOSING ARGUMENTS: | |
| 8 | By Ms. Cohn | 182 |
| 9 | By Mr. Keeney | 189 |
| 10 | By Ms. Cohn | 198 |
| 11 | | |
| 12 | VERDICT | 210 |
| 13 | | |
| 14 | | |
| 15 | **EXHIBIT INDEX** | |

| 16 | **DEFENDANT'S EXHIBITS:** | **MARKED** | **RECEIVED** |
| --- | --- | --- | --- |
| 17 | 15 | 76 | 77 |
| 18 | 16 | 78 | 79 |
| 19 | 17 | 79 | 80 |
| 20 | 18 | 92 | |
| 21 | 19 | 95 | 96 |
| 22 | 20 | 119 | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

 1          (Court convened at 9:30 a.m.)

 2          THE CLERK:  Civil Action 3:21-CV-675, *Samantha Roop*

 3  *versus Nicholas James Desousa*.

 4          Representing the plaintiff is Samantha B. Cohn and

 5  Brandon K. Galindo.

 6          Representing the defendant is Carter T. Keeney.

 7          Counsel, are we ready to proceed?

 8          MS. COHN:  Yes, Your Honor.

 9          MR. KEENEY:  Yes, Your Honor.

10          THE COURT:  Okay.  Bring the jury in.

11      (Jury in at 9:31.)

12          THE COURT:  Y'all can have a seat.  You can have a

13  seat.

14          Ms. Cohn, you can have a seat.

15          We're waiting for one.

16          We left you presents on your seat.  We'll get to that

17  in a second, okay?

18          All right.  Good morning, everybody.  I hope

19  everybody is doing well.  We're going to get started by I'm

20  going to ask you to rise, and Ms. Garner is going to swear you

21  in as jurors.  I'm going to ask the seven of you to rise.  You

22  get another oath.  You're that special; you get two oaths.

23      (Jury is sworn.)

24          THE COURT:  You can have a seat.

25          By the way, I'm going to ask you, the seats that

1  you're sitting in now are going to be your assigned seats

2  during this trial, okay?  We left you some presents; I'm going

3  to talk about those in a few moments.  Those are for you to

4  use during the trial.  So that's your set.  You can leave them

5  there when you go for breaks and stuff like that, but that's

6  going to be your assigned seat as we go forward.

7          So, Jurors, now that you have been sworn in, I'm

8  going to ask, first of all, if everybody followed my

9  instructions about not talking about the case, not going onto

10 the Internet and doing outside research.  Is everybody still

11 pure as the driven snow?  Anybody didn't listen to my

12 instructions?

13         All right.  It looks like everybody behaved

14 themselves.  It's so important.  I'm going to ask you to

15 continue to do that throughout the trial.

16         So now I'm going to give you some preliminary

17 instructions that are to guide you in your participation

18 during this trial.

19         During the trial, you're going to hear me use a few

20 terms that you may not have heard before.  So let me briefly

21 explain some of the most common to you.  The party who sues is

22 called the plaintiff.  In this action, the plaintiff is

23 Samantha Roop.  The party being sued is called the defendant.

24 In this action, the defendant is Nicholas Desousa.

25         This is a civil case commenced by the plaintiff,

1  Samantha Roop, who I may sometimes refer to simply as "the

2  plaintiff," against Nicholas Desousa, who I may sometimes

3  refer to as just "the defendant."  The case is initiated by

4  way of a complaint, which is simply the document that an

5  individual files when suing another individual.  It is not, in

6  any sense, evidence of the allegations or statements that it

7  contains.

8          The plaintiff, Samantha Roop, claims that the

9  defendant, Nicholas Desousa, negligently operated a motor

10 vehicle and caused an accident, and that she was injured in

11 the accident.  The defendant, Nicholas Desousa, has admitted

12 that it was his negligence that caused the accident and that

13 he is liable for any injuries that the plaintiff sustained in

14 the accident.  However, the defendant denies that he caused

15 all of the injuries that the plaintiff is claiming from the

16 accident.  So that's what the fight is about here, okay?

17         The plaintiff has the burden of proving each injury

18 that she is claiming was caused by the defendant by what is

19 called a preponderance of the evidence.  If you find that the

20 plaintiff has met her burden as to the injuries in dispute,

21 then you must find the defendant liable.  If not, then you

22 must find the defendant not liable for the injuries in

23 dispute.

24         So before you begin hearing the evidence, I want to

25 explain to you how this case is going to proceed.  The case

1   will proceed in two separate phases as follows:

2       The first phase of the trial will simply concern the

3   issue of causation, that is to say, the issue of whether or

4   not it was the defendant's negligence that caused the injuries

5   in dispute that the plaintiff is claiming in the lawsuit.  As

6   I said, the defendant admits that he has caused some of the

7   injuries, as you'll hear from the attorney, but not all the

8   injuries that the plaintiff is claiming.  So phase 1 is:  Did

9   the negligence cause the disputed injuries?  Okay?

10      The second phase of the trial will then address the

11  issue of damages, that is to say, the issue of what sum of

12  money should be awarded to the plaintiff as a remedy for the

13  injuries that you have determined to have been caused by the

14  defendant's negligence.

15      So part 1 is what injuries did he cause; part 2 is

16  the damages.  You got that?

17      Each phase of the trial will follow the same order.

18  First, you're going to hear brief opening statements from the

19  lawyers about the view of their case.  Then each side will

20  have an opportunity to present evidence.  When the evidence

21  has been admitted for that phase, I will then instruct you as

22  to the law that you are to use when rendering your verdict,

23  and then the lawyers will be given an opportunity to give

24  their closing arguments to you.  And then after they finish

25  their closing arguments, I'll give you some final instructions

1  about how to do your job, how to deliberate.  You'll then go

2  to your room, select a foreperson, deliberate, and arrive at

3  your verdict.  You're going to do that for both phases.  So,

4  essentially, this is a two-step process.  You got that?

5       Members of the jury, your function in the trial of

6  this case is to reach a unanimous verdict that is based solely

7  on the evidence and the instructions of law which you will be

8  given after all the evidence has been presented.  The law

9  applicable to this case is given to you in these instructions

10 and in the other instructions that you will receive at the

11 close of all the evidence.

12      By the way, I'll give you a hard copy of the closing

13 instructions so you don't have to take notes.  You can just

14 take the hard copy -- you'll follow along when I'm reading

15 them to you -- these are just preliminary instructions.

16 You'll follow along while I'm reading them to you, but then

17 you'll take them with you to the jury room.  That's your road

18 map, so to speak, to reach your verdict.

19      It is your sworn duty to follow all of the

20 instructions that I give you.

21      You must keep an open mind to both the plaintiff and

22 the defendant during this trial.

23      As you know, there are generally two sides to most

24 stories and you must not make up your mind about any of the

25 questions in this case until you have heard all of the

1  evidence and all the law which you must then apply to that

2  evidence.  In other words, wait until you begin your

3  deliberations, all right?

4       The evidence which you are to consider consists of

5  testimony of witnesses, any exhibits admitted into evidence,

6  and any facts agreed upon between the parties and presented to

7  you in the form of a stipulation.

8       I will tell you, the lawyers have done a great job

9  here to try to streamline this case, and they've reached a

10 number of stipulations, which means they agree that the fact

11 is not in controversy.  That way we can move -- move the

12 trains a little bit faster.  You know what I'm saying to you?

13 You'll hear and receive those stipulations during the trial.

14      The admission of the evidence, though, in court is

15 governed by the rules of law.

16      The questions that the lawyers ask are not evidence.

17 It is the answers to the questions that are the evidence.

18 Objections that the lawyers make are not evidence either.

19 They've been told not to make what are called speaking

20 objections and to keep their objections short, so you should

21 not be burdened with this, but sometimes it happens.

22      Now, what the lawyers say in these objections is not

23 evidence, no matter what they say.  That is the way that they

24 get rulings in the event that they think the other side is

25 acting outside of the rules of evidence or the rules of

1  procedure.  So don't upset up with a lawyer or his or her

2  client because they make objections.  They're just doing what

3  they need to do under the law to represent their client.

4        Now, if a question asked is proper and it's objected

5  to and the objection is overruled, I'll simply say

6  "overruled."  That means the question was appropriate, and

7  then you'll hear the answer.  And you should pay attention to

8  that answer just like you would any other answer to any other

9  question.

10       If the question asked is improper and an objection is

11 raised, I will say "sustained," which is otherwise -- in other

12 words, it's me saying it was an improper question.  And you'll

13 not hear the answer to the question.  So forget about that

14 question and we'll just move on.

15       Any testimony that I tell you to disregard or ignore

16 or to strike you cannot consider in your deliberations.

17       Well, how does that circumstance happen?  Most of

18 time it happens this way:  A lawyer is asking questions of a

19 witness on the stand, the other side has an objection, and

20 before I can rule, sometimes before even the objection gets

21 out of the lawyer's mouth, the witness blurts out an answer,

22 all right?  If I find that the question was improper, I'll

23 say, well, the objection should be sustained, and then I'll

24 turn to you folks and I'll tell you then that you're to

25 disregard that answer because they shouldn't have answered it

 1  in the first place, all right?  And we would expect that

 2  during your deliberations, you will not take that testimony in

 3  account when deciding your verdict.

 4       Additionally, the opening statements and the closing

 5  arguments of the attorneys are not evidence.  They are simply

 6  intended to help you to understand the evidence and applying

 7  the law, but again, their statements are not evidence.

 8       Likewise, no statement or ruling or remark that I

 9  make during the course of the trial is intended to indicate my

10  opinion as to what the facts are.  It is the function of the

11  jury alone to consider the evidence and determine the facts of

12  this case.  In other words, my view of the case is what your

13  view of the case is.  My job is to only tell you what the law

14  is.  You decide the facts and then you'll render a verdict.

15  It's not what I think; it's what you think.  Everybody got

16  that?

17       All right.  In your determination of what the facts

18  are, you alone must determine the credibility of the witnesses

19  and the weight of the evidence.  You may consider the

20  appearance and the manner of the witness on the stand, their

21  intelligence, their opportunity for knowing the truth and for

22  having observed the things about which they have testified,

23  their interest in the outcome of their case, any bias, and, if

24  any have been shown, their prior inconsistent statements, or

25  whether they have knowingly testified untruthfully as to any

1  material fact in this case.

2        You should not arbitrarily disregard believable

3  testimony of a witness.  However, after you have considered

4  all of the evidence in the case, then you may accept or

5  discard all or part of the testimony of a witness as you think

6  proper.  You should use your common sense, I can't over stress

7  that, use your common sense in considering the evidence, and

8  you may draw reasonable inferences from that evidence; but in

9  doing so, you should not indulge in guesswork or speculation.

10 From consideration of these things and all the other

11 circumstances of the case, you should determine which

12 witnesses are more believable and weigh their testimony

13 accordingly.

14        Until this case is submitted to you for your

15 deliberations, you should not decide any issue in this case,

16 and you should not discuss the case with anyone or remain

17 within hearing of anyone who is discussing it.  This includes

18 discussing the case in person, in writing, by phone or

19 electronic means, text messages, e-mail, Facebook, Twitter,

20 blogging, or any Internet chat rooms, website, social media,

21 or other means.  You know by now you've got to be pure as the

22 driven snow, right?  You got that.  I can't over stress how

23 important that is.

24        Now, there is going to be occasional recesses, as I

25 told you, during the trial.  During the recesses, you should

1  not discuss the case with your fellow jurors or make any

2  independent investigation or receive any information about the

3  case from radio, television, or newspapers.  Once your

4  deliberations commence, then you can discuss the case, but

5  only in the jury room when all the members of the jury are

6  present.

7       Here's what I like to say:  When you were selected as

8  jurors, you became superheroes.  I like to use Superman as an

9  example, right?  You've got these magical powers.  But like

10 Superman, you have kryptonite.  You lose your magical powers

11 when all seven of you are together.  You understand that?  You

12 can only work when seven of you are together, and that's

13 during deliberations.  So don't try to be Superman until it's

14 your turn to save the world.  That's deliberations.  You got

15 that?

16      Kryptonite is when not all seven are there.  You got

17 that?  So if somebody is in the bathroom, you stop.

18 Kryptonite has happened; you lost your powers.  You got that?

19 Only when you're together because you're working as a team.

20 You got that?

21      So you are to decide this case solely on the evidence

22 presented in this courtroom and not on the basis of anything

23 anyone who hasn't heard the evidence may think about this

24 case.  So if you're asked or approached in any way about your

25 jury service or anything about this case before you render a

1  verdict, you should respond that you have been ordered by the

2  Judge not to discuss this matter, and you should report the

3  contact to this court as soon as possible.

4        I don't think that's going to happen, but I'll tell

5  you where the vulnerability is: elevators.  People get on the

6  elevator, they don't know you're a juror and they start

7  yacking away and they say something stupid.  All right?  You

8  have to discipline yourself.  If you're on the elevator or

9  anywhere else like that, if somebody starts talking about the

10  case, say, "Hey, I'm a juror.  I can't talk about the case."

11  You know what I'm saying to you?  Pure as the driven snow.

12        Do not attempt at any time prior to the conclusion of

13  the case to research any fact, issue, or law related to this

14  case whether by discussion with others, by researching the

15  library or the Internet, or by any other means or source

16  including dictionaries, reference books, or anything on the

17  Internet.  You must not use Internet maps, or any other

18  program or device to search for and view any location

19  discussed in the testimony.  You must not search for any

20  information about the case, or the law which applies to the

21  case, or the people involved in the case, including the

22  parties, the witnesses, the lawyers, or the Judge.  We're all

23  boring anyhow.  Don't research us.  But, also, there's going

24  to be a lot of medical evidence here.  Do not research

25  anything about medical issues, okay, under any circumstances.

 1  Just stay away from the Internet; it's full of lies anyhow.

 2       Your sworn duty is to decide the case solely and

 3  wholly on the evidence presented in this courtroom.  You must

 4  not communicate with anyone about the case by any other means,

 5  including by telephone, text message, e-mail, Internet chat or

 6  chat rooms, blogs, or social websites.  Pure as the driven

 7  snow, right?  And I expect that you will inform me if you

 8  become aware of another juror's violation of these

 9  instructions; although, I don't expect that.

10       Now, I told you we left you some presents, okay?  The

11  first thing is a notebook.  The second thing is a book of

12  exhibits.  As I told you, very much to the credit of the

13  lawyers, they worked to get this case down to the true issue.

14  So one binder, the bigger binder is going to be the exhibits

15  that are not in dispute that you may be called upon to refer

16  to during the trial in terms of the evidence.  The other is a

17  notebook.

18       Now, you're permitted to take notes, but you don't

19  have to take notes.  You'll each have your own notebook.  It

20  has some things in it already.  It has places for you to take

21  notes in it, and it's all right if you want to take notes.  In

22  taking notes, though, do not get so tied up in taking notes

23  that you forget to keep an eye on the witness that's

24  testifying, because you want to view their appearance when the

25  witness is testifying to you, because that is, in part, how

1  you make credibility determinations, all right?

2      At the end of the trial, your notes will be taken up

3  and discarded.  Those notes are for your individual use.  You

4  cannot show them to another juror, even during deliberations.

5      And although I know you would not do this, I'm

6  required to tell you this because you can't say during

7  deliberations, "Well, I know I'm right about this because I

8  take better notes than you do."  There's some people who

9  remember things better without taking notes, and that's okay.

10     Now, unlike what you have seen on television or

11  otherwise heard, we don't have the capacity to read back to

12  you the testimony or to send a transcript back to you in the

13  jury room.  So you're going to have to reach your verdict

14  based on what you remember as being correct.  And that's what

15  you have to do.  As I told you, this is a short trial.  We're

16  going to be done by tomorrow, all right?

17     Now, finally, for the reminder of the trial, we will

18  impose the rule on witnesses.  Any witness in this case, other

19  than a party, must step outside the courtroom or the public's

20  courtroom, the public viewing courtroom, and may not re-enter

21  until they are called to testify.

22     Have you already excluded your witnesses, Ms. Cohn?

23     MS. COHN:  Yes, Your Honor.  They both made me aware

24  that they are on their way, but I made it clear that they have

25  to remain outside.

1      THE COURT:  All right.  That's fine.

2      You as well?

3      MR. KEENEY:  Yes, Your Honor.

4      THE COURT:  Any witness in this case, other than a

5  party, must step outside the courtroom, as well as the

6  public's courtroom, as I said, and may not re-enter until

7  they're called to testify.  They may also not enter the public

8  viewing courtroom on the fifth floor.  The purpose of

9  separating witnesses is to ensure that as each testifies, they

10  do so from their own recollection and without being influenced

11  by the testimony of others.  For that reason, witnesses are

12  not to discuss their testimony with any other witness either

13  before or after they have testified.

14      So for the witnesses, please remain in the witness

15  room until you're called to testify, don't leave until you've

16  been excused by the Court, and do not discuss this case or

17  testimony with any other witnesses, any spectator or any party

18  during the course of the trial.

19      Again, Counsel, you're required to ensure that no

20  witnesses are in the courtroom or in the public courtroom.

21      Now, here's the way we're going to roll:  As I said,

22  we're going to take a break around 11:00 o'clock.  We don't

23  like to go more than an hour and a half, okay?  I'll probably

24  take about a 15-, 20-minute break then, and we'll break for

25  lunch about an hour and a half later on for an hour.

1    Did y'all get your free lunch?  Did y'all order your
2  lunches this morning?  It's going to be fantastic.
3    We'll then resume, after I give you an hour, we'll
4  come back and then we'll go for about no more than an hour and
5  a half.  Now, that may be a little bit choppy depending on how
6  the evidence goes.  You know, don't hold me to 11:00 o'clock,
7  or whatever, because it depends on what the witnesses are
8  doing and where we are in the case.  As I said, we'll take an
9  afternoon break and then we'll go to about 5:00 o'clock.
10    That's going to be our rough schedule.  But, again,
11  we will take a break at any time you need to take a break.  I
12  want you focused on the evidence, not your bladder.  So if you
13  need to take a break, you just raise your hand and we will
14  take an immediate break.  Everybody got that?
15    Now, does anybody have any questions about how we're
16  going to proceed?  Folks, you're good?
17    All right.  The faithful and proper performance of
18  your duties is vital, as I said, to the administration of
19  justice.  So, again, on behalf of the Court and the litigants,
20  we appreciate you giving us your complete attention to this
21  case as presented.
22    We're now going to proceed to opening statements from
23  each side.  We're going to begin with counsel for the
24  plaintiff.
25    Ms. Cohn, do you want to step up?

1        MS. COHN:  Good thing I wore heels today so y'all can
2   see me.  This is super tall.

3        Good morning, everybody.  Thank you very much for
4   being here.  I know this is not joyful and pleasurable to take
5   time out of your schedule, but we're very grateful for it.

6        So, ladies and gentleman, we're here today for a car
7   accident that took place on July 7th of 2019 at the
8   intersection of Route 17 Northbound and Route 17 Business in
9   Middlesex County, Virginia.

10       The evidence will demonstrate that the defendant,
11  Nicholas Desousa, traveling approximately 70 miles an hour in
12  his dark-colored Toyota Camry, with no lights on, after
13  sunset, in the rain, caused an accident with Ms. Roop, giving
14  her no chance to avoid it.

15       Ms. Roop was driving in her Suburban with her family,
16  with her kids, heading home after celebrating the holiday
17  weekend at the campground that they frequently visit, Gray's
18  Point.

19       She stopped at the intersection; she had a stop sign.
20  She looked both ways.  Not seeing any traffic coming, she
21  slowly proceeded into the intersection.  She stood no chance.
22  She was blindsided on her driver's side door, pardon, her
23  driver's side fender.

24       THE COURT:  You're putting up exhibits.  What exhibit
25  numbers are they?

1      MS. COHN:  Your Honor, they're part of Exhibit 1 and

2 Exhibit 2.

3      THE COURT:  Okay.

4      MS. COHN:  It's Mr. Desousa's vehicle and then

5 Ms. Roop's vehicle.

6      THE COURT:  All right.

7      MS. COHN:  If I can fit them.  I just didn't want to

8 block everybody.

9      As you can see here, ladies and gentlemen, to your

10 left is Mr. Desousa's dark-colored Toyota Camry that he was

11 driving when the accident occurred, and the picture directly

12 next to me is Ms. Roop's vehicle.  This by no means

13 encompasses the damages in total that occurred to her vehicle.

14 You'll hear about that testimony later.

15      Upon impact, when the defendant's car violently

16 struck Ms. Roop's, both cars were totaled.  She hit her head

17 and her body jerked around the cabin, hitting other surfaces

18 in the car as her seat belt locked and her air bags deployed.

19      You already heard from the Court the defendant

20 concedes that he is at fault for this accident.  He, likewise,

21 concedes that Ms. Roop did, in fact, injure her head, her

22 neck, her hip, her shoulder, as well as aggravating a

23 pre-existing back condition.

24      Now, this is the major divergence of the two parties

25 and where they begin to disagree:

1    You will hear from Ms. Roop; you'll hear from her

2 husband, Gerard Barton; and you will hear from her doctor,

3 Dr. Nathan Guerette, today.  You will hear from them that in

4 this accident Ms. Roop had an exacerbation of a pre-existing

5 bladder condition.

6    MR. KEENEY:  Your Honor, what she just said violates

7 the Court's ruling about what they're going to hear.

8    THE COURT:  Overruled.  She's making her argument.

9 We'll deal with it.

10    MS. COHN:  Thank you, Your Honor.

11    You'll hear about Dr. Guerette's treatment of

12 Ms. Roop from 2011 to 2013, prior to this accident occurring

13 in 2019.  You'll hear about what he treated her for then.

14 You'll hear from him about what the differences in that

15 treatment was from now, in 2019, when she presented back to

16 his office.

17    The bladder injury was the just the tip of the

18 iceberg.  You'll hear about the more grievous injuries from

19 Dr. Guerette himself and Samantha and Gerard when they

20 testify.  You will also hear that these injuries were as a

21 result of the accident.

22    During this trial, you will not hear from a single

23 witness on the defense side.  Not the defendant.  Not a

24 doctor.  Nobody.  The only witnesses here today are going to

25 be the plaintiff, her husband, and her doctor.  No one is here

1 to say that the injuries that she alleged she received in this

2 accident weren't from the accident.

3       You heard from the Judge that this is going to be

4 bifurcated into two phases, and this phase is just going to be

5 causation.  So the evidence during this phase is going to show

6 that the injuries that Ms. Roop tells you were caused by the

7 accident were, indeed, caused by the accident.

8       You also heard from the Court that the burden of

9 proof that the plaintiff carries is by a preponderance of the

10 evidence.  This is much different than you hear in a criminal

11 trial, which is beyond a reasonable doubt.  Preponderance of

12 the evidence is simply having two scales and putting a feather

13 on one side.  That's all it is.  It's not beyond a reasonable

14 doubt, it's not beyond any other possibilities, it's simply a

15 feather on one side.

16       You will hear in the evidence today that there was

17 nothing but the car accident in relation to Ms. Roop's

18 injuries.  You'll hear about her other treatment for the

19 agreed-upon injuries: a couple visits to the ER; PCP, primary

20 care physician; physical therapy; and then eventually ending

21 up with Dr. Guerette.

22       You'll hear that all of these appointments were as a

23 result of the injuries that she received and the treatment she

24 needed as a result of the accident.

25       Now, again, I'm going to come back to the fact that

1 this trial is bifurcated. So it's going to come at you a

2 little bit piecemeal and it's going to possibly seem a little

3 bit disjointed at times as we try to present it per the way

4 that it's been set up. So please keep an open mind and

5 realize at the end of this, the end of phase 1 and phase 2,

6 all of the pieces will, in fact, fit together. It may not

7 look like it on the surface. In the beginning, you might not

8 understand where it goes or how all the evidence fits

9 together, but in the end, by the end of phase 2, you'll see

10 how all the pieces do.

11 You also heard from the Judge that nothing that the

12 defense counsel says is evidence. His argument is not

13 evidence; his questions are not evidence. The evidence is the

14 testimony and documents that are entered into the Court by the

15 witnesses.

16 That evidence that you will hear only from the

17 plaintiff's witnesses will demonstrate to you clearly that all

18 of the injuries that Ms. Roop alleges occurred in this

19 accident were, in fact, from this accident and nothing else.

20 Thank you very much for your time here today.

21 THE COURT: Do you want to take your exhibits down?

22 MS. COHN: I'm a tiny person and I can only carry so

23 many things, but I will get there.

24 THE COURT: All right. Mr. Keeney.

25 MR. KEENEY: Thank you, Your Honor.

1    Good morning, ladies and gentlemen -- gentleman.

2 Again, my name is Carter Keeney and I represent Nicholas

3 Desousa in this $5 million lawsuit filed.  That is why you're

4 here today.  This is an important case and I thank y'all for

5 your time and attention.

6    Again, this is about an automobile accident that

7 happened back on July 7th of 2019, in Middlesex County.

8 Mr. Desousa has admitted that this accident was his fault and

9 as taken responsibility for the same.  What we need y'all's

10 help in deciding is what injuries the plaintiff sustained in

11 the accident and how long it took her to recover from some of

12 those injuries as well.

13    So let's specifically talk about what the evidence is

14 going to be and what the exhibits are going to show.  I

15 noticed Ms. Cohn didn't point out any of the actual exhibits.

16    As the Judge explained to y'all earlier, the

17 plaintiff has the burden of proving beyond a preponderance of

18 evidence every injury she claims.  If she cannot prove that,

19 she can not recover for the same.

20    So going back, this accident, again, happened

21 July 7th, 2019, in the evening in Middlesex County.  The

22 plaintiff did not go back to her home in Powhatan that

23 evening.  She stayed at their place at the river that evening.

24 Late the next evening -- and you have the big binder so you

25 will have all of these exhibits, and you can read all of them

1  for yourself.  But late the next evening, she goes to

2  St. Francis Medical Center.  That is the first time she seeks

3  medical treatment.

4       And the records that are already in evidence and

5  you'll see show that she has a history of arthritis; chronic

6  pain; being on chronic opioids; interstitial cystitis, which

7  is -- you'll hear from Dr. Guerette is a pelvic issue;

8  rheumatoid arthritis.  And at that time, she complained of

9  head pain with suspected loss of consciousness; neck pain;

10  left shoulder pain; hip pain, and said it's moderate, worse

11  with movement; and that she had taken her normal oxycodone

12  earlier in the day.  Importantly there, she mentioned -- she

13  says no chest pain, no abdominal pain, and then they check her

14  out and is discharged.

15       She follows up a few days later at her primary care

16  physician, Powhatan Medical Associates, and you'll have that

17  record.  You won't hear from that doctor -- the plaintiff

18  didn't call them or is not calling that doctor -- about her

19  complaints at that point.  And those were, essentially, that

20  she was having a head injury and problems from that.

21       July 15th, she then goes to Chippenham

22  Johnston-Willis Hospital, and, essentially, for there, it is

23  worsening of her head injury symptoms.  At that exam, again,

24  they check her out.  She says she has no abdominal pain.  They

25  do an exam on her abdomen: soft, nontender.  There's no pain

1    at that time, as the record shows, with urination, anything

2    wrong with the pelvic area.

3           Then on referral from her attorney, she goes to

4    Alliance Physical Therapy, and she begins physical therapy

5    there in July 19th, if I'm remembering the date correctly,

6    for mainly her concussion symptoms, also some neck, back, soft

7    tissue things.  And you will have all the records of Alliance

8    Physical Therapy in there.

9           And you will see she goes three times to Alliance

10   Physical Therapy.  And then on July 22nd, one of those visits,

11   Alliance Physical Therapy has an in-house doctor, Dr. Teresa

12   Camden.  She's since left that practice but is still in

13   Richmond.  You won't hear from Dr. Camden today, but we've got

14   her records.

15          She goes into Dr. Camden on July 22nd, says her pain

16   is -- she had pain from a prior accident in her lower back

17   that was worse, but her pain was 1 to 2 out of 10 at rest and

18   3 to 4 out of 10 with activity.  Talking about her head

19   injury, she said she initially was nauseous had some vomiting,

20   but on July 22nd, she said she had not vomited for one week.

21          She also claims in that record that she did not miss

22   any days from work and that she helps her husband in his auto

23   mechanic store.  She's a mechanic and lifts 100 pounds a day.

24   That's her lifting requirement.

25          And then on August 6th, she goes back to physical

1 therapy and says she's getting better.

2      Then she and her family go on a vacation to Hatteras,

3 in the Outer Banks, for a week, where she will tell you she

4 went horseback riding. She will claim nothing abnormal

5 happened. Mind you, during this time there have been no

6 complaints to any medical providers about any pelvic issues,

7 any prolapse. And that's really what this case is about,

8 whether or not she sustained a pelvic prolapse in this case

9 accident.

10      She comes back to physical therapy August 20th,

11 after her vacation to the Outer Banks, says she's doing much

12 better than when she initially began therapy; states she still

13 has things that bother her, like bright lights, but she's able

14 to tolerate them when driving. And that's the theme when you

15 go through the Alliance Physical Therapy records, she's

16 quickly improving.

17      Then September 9th, and this is an important date,

18 she goes and has a follow-up with Dr. Camden. And this is a

19 record and it's a record, by the way, the plaintiff put into

20 evidence. She said that she had two headaches in the last

21 week and she's getting better. But she also says that her

22 shoulder was pain free until yesterday; while riding her

23 horse, she was dragged through a field by the horse. Mind

24 you, at this time, still no complaint to any medical

25 professional about any problem with her pelvis.

1      She then gets and finishes physical therapy the

2  middle of October, says, "I'm 100 percent better."  And that's

3  in the records.  No concussion symptoms.  No nothing.  "I'm

4  100 percent better," and she's discharged.

5      October 9th, middle of October, around there, she

6  goes and sees Dr. Guerette for the first time and says that

7  she has worsening symptoms of the pelvic prolapse.

8      Before this accident back in 2012, '13, she had an

9  InterStim implanted in her, which is a sacral nerve

10 stimulator.  It stimulates the muscles in her bladder and in

11 her pelvic area, so the bladder, the uterus, the vagina, to

12 help keep everybody in place.

13     She goes back to see Dr. Guerette.  Dr. Guerette's

14 initial diagnosis, and you'll hear from him, is expired

15 InterStim, it had reached the end of its life, and overactive

16 bladder.  That is what is in the records that the plaintiff

17 submitted into evidence already.  He replaces the InterStim in

18 January of 2020, calibrates it a couple times, and then

19 there's nothing for 10 months, when she comes back in December

20 of 2020, and then there's another procedure you'll hear about

21 from Dr. Guerette.

22     So that's, essentially, what the evidence is.  And as

23 Ms. Cohn said, the real dispute in this case was:  Has the

24 plaintiff or is the plaintiff going to prove that the pelvic

25 prolapse was caused by the accident?  So listen carefully to

1 all the evidence. Listen to what all the doctors and

2 witnesses tell you, think about what Ms. Barton and her fiancé

3 have to gain from this, and also listen to what Dr. Guerette

4 doesn't say.

5         And so at the close of evidence, I'm going to come up

6 here -- and Judge Novak will show you a verdict form; this is

7 just for part 1. And you essentially, really, have two things

8 to do. The first is to find the date when the head injury,

9 the soft tissue injuries, and things of that nature, things

10 that Alliance Physical Therapy treated her for, when did she

11 get all better. You just pick a date.

12         And then the bigger question and that I'll ask to do

13 you is: Has the plaintiff proven or not proven beyond a

14 preponderance of the evidence that the pelvic prolapse was

15 from this accident? So at the end of this phase in the trial,

16 I'll get up here and simply ask you to circle "not proven."

17         I appreciate y'all's time. What I say is not

18 evidence. What Ms. Cohn is not saying is evidence. You've

19 got a bunch of evidence already in front of you in the form of

20 exhibits, and you'll also hear from the witnesses. And keep

21 in mind their bias and what they say and what they don't say.

22 Thank y'all very much.

23         THE COURT: Ms. Cohn, do you want me to read in any

24 of the stipulations before you call your first witness?

25         MS. COHN: Thank you, Your Honor. You read my mind.

1  If you could, please, read in stipulations 1 and 2, Your

2  Honor.

3          THE COURT:  Okay.  Folks, as I told you, the lawyers,

4  both sides, very much to their credit, sat down and worked out

5  what the facts are in agreement.  You already know what the

6  dispute is about.  It's about this pelvic injury, right?  I'm

7  about to read to you and will read to you additional

8  stipulations as we go forward.

9          A stipulation is simply both sides agreeing to a

10  fact.  You should accept those facts, then, as proven.  It

11  just makes the trial shorter because there was no dispute

12  about it, okay?

13          Stipulation Number 1 reads as follows:  Samantha Roop

14  and Nicholas James Desousa were involved in a motor vehicle

15  accident on July 7th of 2019, at the intersection of Route

16  17 and Route 17 Business in Middlesex County, Virginia, at

17  approximately 8:45 in the evening.  The defendant's headlights

18  were not on and it was after sunset.

19          Stipulation 2 is:  The accident was caused solely by

20  Nicholas James Desousa's negligence.

21          And, by the way, you'll receive a copy of these.  The

22  stipulations will be sent back to you, so you don't have to

23  worry about writing these down.  We'll give you a hard copy.

24  I should have told you that before you took all your notes,

25  right?  But you'll get those to go back to the jury room.

1        Ms. Cohn, do you want to call your first witness?

2        MS. COHN:  Thank you, Your Honor.  I would ask -- I

3    see that this is on wheels.  If maybe we could rotate this.

4        THE COURT:  Yeah.  They're going to turn it around.

5        MS. COHN:  Thank you.

6        THE COURT:  Is Ms. Roop your first witness?

7        MS. COHN:  Yes, Your Honor.

8        THE COURT:  Ms. Roop, do you want to come on up to

9    the witness stand, please.

10        Swear in the witness.

11          SAMANTHA ROOP, PLAINTIFF'S WITNESS, SWORN

12                    DIRECT EXAMINATION

13        THE COURT:  Ma'am, in a loud, clear voice, can you

14    tell us all your first and your last names, spelling both for

15    the court reporter.

16        THE WITNESS:  Samantha Roop.  S-A-M-A-N-T-H-A,

17    R-O-O-P.

18        THE COURT:  Ms. Cohn.

19        MS. COHN:  Thank you very much, Your Honor.

20        And ladies and gentleman of the jury --

21        THE COURT:  Whoa, whoa.  We don't do that.

22        MS. COHN:  Oh, I apologize.

23        THE COURT:  The only person that talks to the jury

24    during a trial is me, except for during argument.  Don't do

25    that again.

1          MS. COHN:  Thank you.

2          THE COURT:  Talk to your witness.  Ask her questions.

3  BY MS. COHN

4  Q    Thank you for pronouncing your name clearly for the

5  record.

6      Can you please state where you live?

7  A    In Powhatan, Virginia, at 2291 Mill Road.

8  Q    And how long have you lived there?

9  A    13 years.

10  Q    So most certainly in 2019?

11  A    Yes.

12  Q    And, Ms. Roop, what is your occupation?

13  A    I'm a stay-at-home mom.

14  Q    And how long have you been a stay-at-home mom?

15  A    My youngest, 13 years.

16  Q    Any particular reason why you decided to become a

17  stay-at-home mom?

18  A    I personally grew up without a mother, she died when I

19  was young, so I wanted to be able to be there for my kids.

20  Q    How many kids do you have?

21  A    I have two of my own and a stepson.

22  Q    And what are their ages?

23  A    Now my stepson is 18; my oldest daughter is 18; and my

24  youngest daughter is 13.

25  Q    Do you ever have plans to go back to work at any point?

1 A    I do.

2         MR. KEENEY:  Objection.  Relevance, Your Honor.

3         THE COURT:  This is causation.  Let's go to the issue

4 about the accident and what injuries were caused from that.

5         Ma'am, I'm guessing you're a little bit nervous over

6 there, right?

7         THE WITNESS:  Yeah.

8         THE COURT:  Take a deep breath, relax.  We're going

9 to take our time, but we're going to hear your testimony.  All

10 right?

11        MS. COHN:  Your Honor, the question is relevant as to

12 the records that Mr. Keeney brought up.

13        THE COURT:  Overruled.  Or the objection is

14 sustained.  Come on, let's get to the facts.

15 BY MS. COHN:

16 Q    Ms. Roop, in 2019, did you have any medical issues that

17 you were dealing with at that time prior to this accident?

18 A    No.

19 Q    Had you ever had back surgery?

20 A    Yes.

21 Q    Did you ever have pain from that back surgery in 2019,

22 prior to the accident?

23 A    Yes.

24 Q    If you had to describe that pain on a scale of 1 to 10

25 prior to the accident, what would it be?

1  A    It's -- daily it ranges.  If you average it, a four.

2  Q    Were you in pain management therapy for that back issue?

3  A    Yes.

4  Q    And what does that involve?

5  A    I am prescribed a controlled narcotic, and I abide by a

6  contract that's provided from the physician that I see in the

7  pain management program.

8  Q    And what's the narcotic?

9  A    Can you repeat that?

10 Q    What was the narcotic that you were prescribed?

11 A    It was oxycodone.

12 Q    And how many are you prescribed to take a day?

13 A    Three.

14 Q    And how many do you take a day?

15 A    Not three.  It is two; sometimes it's one.

16 Q    Did you have any bladder issues prior to 2019?

17 A    Yes.

18 Q    Can you please describe those?

19 A    I have a condition called interstitial cystitis.

20 Q    What?

21     THE COURT:  Hold on a second.  Do you want to spell

22 that?  Look, at least you know what it says.  My court

23 reporter is dying down there.  Do you want to take a rough

24 guess as to what -- how to spell that?  Endo, E-N-D-O.

25     THE WITNESS:  It starts with an I.  I think it's

**JA434**

 1 | I-C --

 2 |         MS. COHN:  Your Honor, may I provide the spelling?

 3 |         THE COURT:  Yes, please.

 4 |         MS. COHN:  I-N-T-E-R-S-T-I-T-I-A-L, space,

 5 | C-Y-S-T-I-T-I-S.

 6 |         THE COURT:  Sounds perfect to me.  Okay.  Go ahead.

 7 |         THE WITNESS:  I'll go with that.

 8 | BY MS. COHN:

 9 | Q    And what does that mean to you?

10 | A    It's painful bladder syndrome.

11 | Q    When did that start occurring?

12 | A    I don't have a date.  It was -- I've dealt with it for a

13 | while, a long time.

14 | Q    And did you seek any treatment for that?

15 | A    I did.

16 | Q    And who did you seek treatment with?

17 | A    Dr. Guerette.

18 | Q    When was the last time you saw Dr. Guerette for that

19 | prior to this accident?

20 | A    Years prior.  I don't have an exact date.  It was years

21 | prior.  Thankfully Dr. Guerette got to me a point where I was

22 | comfortable.

23 | Q    What do you mean by he got you to a point that you were

24 | comfortable?

25 | A    Through trying to find out what was going on at that

1  point.  I was seeing an OB, went through multiple procedures,

2  testing for this and testing for that, and a long list of

3  painful stuff; was referred by my OB at the time to

4  Dr. Guerette, since my OB could not help me anymore.

5  Dr. Guerette, again, did lengthy procedures, painful to try to

6  find a -- find out what was going on.  And after a very long

7  time of dealing with Dr. Guerette, an InterStim was placed to

8  help deal with the effects of the painful bladder syndrome.

9  Q    And what is an InterStim in your understanding?

10 A    It's a medical device that's implanted to help control

11 the muscles and the overstimulations that comes from the

12 bladder from IC.

13 Q    And was that InterStim implanted around that "years ago"

14 time frame that you referred to?

15 A    Yes.

16 Q    And did that InterStim alleviate your bladder symptoms at

17 that time?

18 A    Yes, finally.

19 Q    Were you experiencing any bladder symptoms in 2019?

20 A    No.

21 Q    During that initial treatment with Dr. Guerette, had you

22 ever been diagnosed with a prolapse?

23 A    No.

24 Q    Had you ever heard that word before?

25 A    No.

**JA436**

1  Q    That InterStim, are you able to monitor it?

2  A    Yes.

3  Q    How do you monitor it?

4  A    I have a device that -- antenna reads the device that's

5  implanted in me.  My device kind of looks like an oldstyle

6  phone.  I can change the programming, monitor the battery

7  life.

8  Q    And did you, in fact, do that?

9  A    Yes.  Again, years of struggle and pain, once I finally

10 go to a baseline where I was comfortable, I didn't ever want

11 to backtrack.  There is a repeated alarm on my phone that goes

12 off every 27 days for me to check programming and battery

13 life.

14 Q    And that 27th day, does that align with a particular

15 time of the month?

16 A    It's normally towards the end of the month.

17 Q    Have you ever been diagnosed with rheumatoid arthritis?

18 A    Yes.

19 Q    And where do you have the effects of rheumatoid

20 arthritis?

21 A    My lower back.

22 Q    Had you ever had any pain in your pelvis, head, neck,

23 shoulder, or hip prior to this accident?

24 A    No, other than years prior with the IC.

25 Q    What do you mean by "years prior"?

1  A    When I was going through trying to find out what was

2  wrong, before Dr. Guerette.

3  Q    Would that be the bladder pain?

4  A    Yes.

5  Q    But no other pelvis pain?

6  A    No.

7  Q    Now, what was the incident or situation that hurt your

8  back initially years ago?

9  A    I had fallen down a couple of faulty steps taking a

10 friend into a hospital.

11 Q    And how long ago was that?

12 A    2003.

13 Q    And did you have any procedures on your back as a result

14 of that?

15 A    I did.

16 Q    And what did you have done?

17 A    I had a spinal decompression and lower lumbar fusion.

18 Q    And is that where the baseline four comes from that you

19 testified not too long ago for your back pain?

20 A    Yes.

21 Q    Have you ever been in any other car accidents?

22 A    No.

23 Q    Have you fallen off a horse in the last 15 years?

24 A    No.

25      MR. KEENEY:  Your Honor, I'm going to object.  She

1  can't approbate and reprobate.

2          THE COURT:  I'm sorry, say that again.

3          MR. KEENEY:  She cannot approbate and reprobate.  She

4  put into evidence records saying contrary to that.

5          THE COURT:  I'm going to let the evidence decide.

6  We'll deal with it.

7          MS. COHN:  Thank you, Your Honor.

8  BY MS. COHN:

9  Q    Have you had any other significant events, such as a car

10  accident or fall, since the July 7th, 2019, accident?

11  A    No.

12  Q    Any changes to your life or circumstances or activities

13  in 2018 or 2019?

14  A    No.

15  Q    What is your husband's name?

16  A    Gerard Barton.

17  Q    And what does Gerard do?

18  A    He is a mechanic.

19  Q    And where does he work?

20  A    East Coast Repair Center.

21  Q    And do you ever help him there?

22  A    No.

23  Q    Do you work for him?

24  A    No.

25  Q    Do you work with him?

1  A    No.

2  Q    Have you ever?

3  A    I mean, I'm guilty of answering the phone if I bring him

4  lunch and he's in the middle of doing something.  He has

5  called me when he's the only one there and said, "Can you just

6  stand here and watch in case something happens and somebody

7  needs to call 911?"

8  Q    Is it his shop?

9  A    Yes.

10  Q    So you're not in the habit of lifting 100 pounds?

11  A    I wish.  No.

12  Q    Have you ever been able to lift 100 pounds?

13  A    No.

14  Q    So I'm going to take you back to July 7, 2019, now

15  Ms. Roop.  What were you doing that weekend?

16  A    I was at the Gray's Point Campground with my family.

17  Q    Do you have a site there?

18  A    Yes.

19  Q    How long have you had a site there?

20  A    We had just gotten it in 2019.

21  Q    Do you still have it today?

22  A    Yes.

23  Q    So on the evening of July 7th, what were you doing when

24  this accident occurred?

25  A    I was driving home with my family.

**JA440**

1  Q    Who was in the car with you?

2  A    Myself; my daughter, Kendra; my stepson, John; my

3  daughter, Kelsey; and her best friend, Autumn, and I also had

4  my two dogs in the car.

5  Q    Would you consider yourself familiar with that

6  intersection when this accident happened?

7  A    Yes.

8  Q    How often had you visited that campground or that

9  campsite?

10 A    Every weekend since the end of February, beginning of

11 March in 2019; and prior, when we were what you call weekend

12 campers, when we would go there for the weekend, before we had

13 a site there.

14 Q    Where did exactly this accident happen?

15 A    At the intersection of Route 17 and I guess it's business

16 17.

17 Q    Can you describe that intersection for me?

18 A    It's a divided highway.  The route I take, there's a stop

19 sign before the divided highway, and the route that I take

20 home would require me to cross the divided highway.

21 Q    So would that stop sign regulate your traffic flow?

22 A    Yes.

23 Q    Are there any lights at this intersection?

24 A    No.

25 Q    Approximately what time did this accident happen?

1  A      Approximately, it was --

2           THE COURT:  Well, I just read a stipulation saying it

3  was 8:45 in the evening.

4           MS. COHN:  Fair enough, Your Honor.  Thank you.

5           THE COURT:  I mean, look, I read the stipulation.

6  They've agreed that it's his fault.  Let's talk about what

7  happened to her because he hit her.

8           He ran into you at the intersection, right?

9           THE WITNESS:  Yes, Your Honor.

10          THE COURT:  What kind of injuries did you suffer?

11          THE WITNESS:  When I was hit, I hit my head off of

12  the window.

13          THE COURT:  What side of the car -- you were driving?

14          THE WITNESS:  Yes.

15          THE COURT:  What side of the car did he hit?

16          THE WITNESS:  The driver's side.

17          THE COURT:  So you were the one that was

18  predominantly injured; is that right?

19          THE WITNESS:  Yes.

20          THE COURT:  And you hit your head on what?

21          THE WITNESS:  The window and the -- they refer to it

22  as the B pillar, where the seat belt comes out of.

23          THE COURT:  Okay.

24          THE WITNESS:  My body shifted.  I had bruising from

25  hitting the center console, air bags deployed.

**JA442**

 1          THE COURT:  What if I read -- do you want me to read

 2   Stipulation Number 3 here for you?

 3          MS. COHN:  I was getting there, Your Honor.  I was

 4   going to introduce the pictures of the vehicles now and ask

 5   the --

 6          THE COURT:  That's fine.  It's your case.  Go ahead.

 7   I'm just trying to pick it up a little bit.

 8          MS. COHN:  I understand, Your Honor.  I'll pick up

 9   the pace.

10          THE COURT:  Go ahead.  Let's go.

11   BY MS. COHN

12   Q    Ms. Roop, at the time of the accident, what type of

13   vehicle were you driving?

14   A    A 2013 Chevy Suburban.

15          MS. COHN:  Your Honor, I would ask at this point that

16   the jury refer to Exhibit 1 in their binder.

17          THE COURT:  Okay.  All these exhibits have already

18   been admitted into evidence by agreement of the lawyers,

19   again, to save time.  So if you would just take a look, then,

20   at Exhibit 1.

21          And is there a particular thing that you want to

22   direct their attention to, Ms. Cohn?

23          MS. COHN:  No, Your Honor.  I would just wish for the

24   jury to flip through all of the pictures included.

25          THE COURT:  All right.  Exhibit 1 is her vehicle; is

1  that right?

2        MS. COHN:  Exhibit 1 is Ms. Roop's vehicle.

3        THE COURT:  And there's an agreement that those

4  pictures look like what happened to her from the accident.

5  That's why they were admitted.  So that's P1.

6        MS. COHN:  Thank you, Your Honor.

7        THE COURT:  And is P2 the pictures of Mr. Desousa's

8  car?

9        MS. COHN:  Yes, Your Honor.

10       THE COURT:  Do you want them to look at those, then,

11 too?

12       MS. COHN:  Sure.

13       THE COURT:  So they've agreed as well that P2 is the

14 pictures of his car.  This is all so you can see the nature of

15 the impact from the accident.

16       Go ahead, Ms. Cohn.

17       MS. COHN:  Thank you, Your Honor.

18 BY MS. COHN:

19 Q    Ms. Roop, can you generally, in layman's terms, because

20 I'm not a car person, explain the damages to your vehicle?

21 A    The driver's side fender was crinkled, the hood was open,

22 the hood latch was sheered off of the hood.  The passenger's

23 side fender was buckled.  Both doors, driver and passenger,

24 were unable to be opened; they had to be pried open.  And

25 there was a, I guess, like toe hitch on the front of it that

1 carries a -- almost like a basket for when we go to the beach,

2 and that was completely bent and mangled.

3 Q    And what's that hitch made out of?

4 A    The same thing that the hitch on the back of a car is

5 made out of; it's just made for the front.  It's thick metal.

6 I don't know.

7 Q    I'm not a car person.

8     So the Judge already briefly got into it.  You hit your

9 head.  Did anything happen to your left shoulder in the

10 accident?

11 A    My shoulder was bruised.  Hit my shoulder off of, I'm

12 assuming, my door; I don't know.  Like I said, it was bruised.

13 Q    Did you have a period at all after the impact where you

14 were out of sorts or not fully there, for lack of a better way

15 to put it?

16 A    Initially, at the scene, I did not think so, and then

17 when talking to the personnel that was on the scene, it was my

18 children that spoke up and said, "We said, 'Mommy' and you

19 didn't answer."

20     MR. KEENEY:  Objection.  Hearsay.  Move to strike the

21 last --

22     THE COURT:  It's not offered for the truth of the

23 matter asserted.  That's overruled.

24     Why don't I just read the stipulation, because

25 you-all have agreed what these injuries are.

1        Stipulation Number 3 says as follows:  Samantha Roop

2    sustained injuries to her head, including a concussion, hip,

3    neck, and left shoulder in the accident.  She also aggravated

4    a pre-existing lower back condition that she had.

5        MS. COHN:  Thank you, Your Honor.

6    BY MS. COHN:

7    Q    Did emergency personnel arrive on the scene?

8    A    Yes.

9    Q    Were you offered transport to a hospital?

10   A    Yes.

11   Q    And did you, in fact, take them up on their offer to

12   transport you?

13   A    No.

14   Q    And why was that?

15   A    My children is my number one concern.

16   Q    What does that mean?

17   A    My kids have never been in an accident before; they were

18   distraught.  My youngest daughter was sitting up front.  She

19   had bruising all down her side.  (Crying.)  All of my children

20   were just scared, never been in an accident.  All I cared

21   about was getting them back to safety and not leaving them to

22   worry about me.

23   Q    And when did you eventually head home?

24   A    The next day.  We had to arrange -- again, my entire

25   family, with two dogs and luggage from the weekend, we had to

1  have a friend that had a vehicle that was big enough to come

2  pick us up and take us home.

3         THE COURT:  Where did you go that night, though,

4  after the accident?

5         THE WITNESS:  Back to our camper at Gray's Point.  It

6  was closer than -- and it was the fire department that took me

7  back.

8         MS. COHN:  Your Honor, at this point I would ask for

9  the Court to read in Stipulations 4, 5, and 6.

10        THE COURT:  All right.  Surely.

11        Stipulation Number 4 says as follows:  The

12 plaintiff's medical treatment at St. Francis Medical Center on

13 July the 8th of 2019 was medically necessary to treat her

14 for injuries from the accident.

15        Number 5 says that the plaintiff's medical treatment

16 from the Richmond Emergency Physicians on July the 8th of

17 2019 was also medically necessary to treat her for injuries

18 from the accident.

19        Number 6 provides that the plaintiff's medical

20 treatment from the Commonwealth Radiology, PC, on July the

21 8th of 2019 was also medically necessary to treat her for

22 injuries from the accident.

23        Okay.

24        MS. COHN:  Thank you very much, Your Honor.

25

1    BY MS. COHN:

2    Q    When did you eventually seek medical attention?

3    A    The next evening when we arrived back home.

4    Q    So that would be the 8th?

5    A    Yes.

6    Q    And how were you feeling on the 8th?

7    A    I was obviously sore, my head hurt, almost like I had --

8    I felt I had just gotten beat up.

9    Q    Were you having any vomiting at that time?

10   A    I can't 100 percent say if it was right after -- I know I

11   was vomiting.  I'd say from my head, when I would stand up and

12   I would get the throbbing in my head, it would cause me to

13   become dizzy and vomit, but I can't 100 percent tell you if it

14   was right after.

15   Q    But did you have dizziness the next day?

16   A    Yes.

17   Q    Migraine or headache?

18   A    Yes.

19   Q    Any light sensitivity?

20   A    Yes.

21   Q    Did you have any of those issues prior to the crash?

22   A    No.

23   Q    Were you feeling any pelvic concerns after the accident

24   happened?

25   A    No.  My -- the head injury was the main -- that was a lot

1  too.  I couldn't stand.  I couldn't -- the constant headache.

2  So if I -- I didn't have any pelvic, and, if I did, it

3  wasn't -- I didn't notice it.  My concern was my head.

4  Q    Did you have an occasion to check the InterStim with the

5  monitoring system you used upon your arrival back home?

6  A    I know I had checked it prior because of the alarms.

7  The --

8       THE COURT:  When you say "prior," you mean before the

9  accident?

10       THE WITNESS:  Yes.

11       THE COURT:  Do you know how long before the accident?

12       THE WITNESS:  The way I had my alarm set up on my

13  phone, it would generate normally the end of the month.  So it

14  was -- I'd say maybe a week or two prior.

15       THE COURT:  So sometime at the end of June?

16       THE WITNESS:  Yes.  Correct.

17       THE COURT:  And when you looked at, what did you see?

18       THE WITNESS:  When I checked it prior?

19       THE COURT:  Yes.

20       THE WITNESS:  I checked the programming and the

21  intensity that it is on, and I also check battery life for the

22  implanted unit.

23       THE COURT:  Go ahead.

24  BY MS. COHN:

25  Q    Was everything functioning properly when you checked it

1  at the end of June?

2  A    Yes.

3  Q    Was there battery life left on the InterStim?

4  A    Yes.

5  Q    And the programming was working properly?

6  A    Yes.

7  Q    You were able to change the programming?

8  A    Yes.

9  Q    So you stated you went to the ER on 7/8.  And do you

10 remember what your complaints were?

11 A    I don't remember what my complaints were, but I'm pretty

12 sure probably just my head and the bruising and soreness

13 across my body.

14       MS. COHN:  Your Honor, I would now ask the jury to

15 refer to Exhibit 3.

16       THE COURT:  Okay.  So Exhibit 3 -- again, these

17 exhibits are all admitted -- these are the St. Francis Medical

18 Center medical records.  Is that what you're talking about?

19       MS. COHN:  Yes, Your Honor.

20       THE COURT:  Well, they're already admitted.  What do

21 you want them to do?  I mean, there's a big stack there.  Is

22 there something in particular you want me to direct their

23 attention to?

24       MS. COHN:  No, Your Honor.  They can peruse at their

25 leisure.

1    THE COURT:  Well, that's not leisurely reading.

2  There's 100 pages there.  Look, you get that she went to the

3  ER; that's the point.  How does that sound, okay?  Let's move

4  on.

5    MS. COHN:  Here, Your Honor, I would have them refer

6  specifically to --

7    THE COURT:  Because none of these injuries are in

8  dispute, right?  The defense is not disputing these injuries.

9  It's all about the pelvic issue.

10    MS. COHN:  I would have them specifically refer to

11  page 10, then, Your Honor, please.

12    THE COURT:  All right.  What portion of page 10 do

13  you want me to -- I'll read it.  Tell me what portion.

14    MS. COHN:  Your Honor, there are two separate

15  paragraphs.  There's the paragraph in the middle section,

16  under "ED Triage Notes," and then's another one underneath --

17  that's the last paragraph on the bottom of the page.

18    THE COURT:  Okay.  So you want me to read from the --

19  the author is Elizabeth Edwards, the nurse, said, "Patient

20  arrived via walk-in for a complaint of left hip pain, left

21  shoulder pain, left neck pain, left-sided head pain, secondary

22  to MCV" [sic] -- I guess which is a motor vehicle accident, I

23  guess -- "that occurred last night at 2030.  Patient was the

24  restrained driver of a large-sized SUV that was struck on

25  front-door side by a compact vehicle traveling at an estimated

1  rate of speed of 70 miles an hour.  Air bags deployed, no

2  starbursts noted, no LOC.  Self extricated.  Patient refused

3  EMS transport at the scene."

4        Is that what you wanted me to read there?

5        MS. COHN:  Thank you, Your Honor.

6        THE COURT:  All right.  And then I've got -- is it

7  Dr. Gill?  (Reading) Hx: Got some arthritis, chronic pain, on

8  chronic opioids, interstitial cystitis, RA; presents

9  accompanied by her children who are also being evaluated; they

10  were all involved in a MCV last evening; she was the

11  restrained driver in a Suburban that was struck on the front

12  driver's side; both vehicles involved in the crash were

13  totaled per patient; and the air bag deployed.

14        She complains of head pain, head injury with

15  suspected LOC, neck pain, left shoulder pain, left hip pain.

16  Pain is moderate and worse with movement.  She took her normal

17  oxycodone early today.  No CP, abdomen pain; she has some

18  bruising on her left neck, left buttock.

19        MS. COHN:  Thank you, Your Honor.

20        And while you are reading, if you do not mind reading

21  Stipulation 8 into the record, please.

22        THE COURT:  Sure.  What about 7?  Do you want me to

23  do that one too?  I didn't read that one yet, or do you just

24  want to go to 8?

25        MS. COHN:  I believe it's out of date order, so I

**JA452**

1  would want 8 first, please, Your Honor.

2        THE COURT:  Okay.  Stipulation 8 provides that the

3  plaintiff's medical treatment at the Powhatan Medical

4  Associates on July 10th of 2019 was medically necessary to

5  treat her for injuries from the accident.

6        MS. COHN:  Thank you, Your Honor.

7  BY MS. COHN:

8  Q    After you left St. Francis, did you seek any follow-up

9  medical care after that visit to the ER?

10 A    Yes.

11 Q    And where did you seek that care from?

12 A    I don't remember the exact order.  The effects of the

13 head injury got worse, and I don't remember who advised, but I

14 believe it was Johnston-Willis was better with head trauma.

15 And I believe Johnston-Willis is where I went next.  I don't

16 remember the exact order.

17 Q    Okay.  Did you ever happen to go to your primary care

18 physician at any point for an appointment?

19 A    Yes.

20       MS. COHN:  Your Honor, I would simply like to make

21 the jury aware that Exhibit 4 is from the primary care

22 physician records of that visit.

23       THE COURT:  Exhibit 4 is in.  It's just more records.

24 Same thing.  Okay.

25       MS. COHN:  Your Honor, at this point, I would ask

**JA453**

1  that the Court please read Stipulations 7 and 9.

2       THE COURT:  All right.  Stipulation 7 reads that the

3  plaintiff's medical treatment from the Emergency Coverage Corp

4  on July the 15th of 2019 was medically necessary to treat

5  her for injuries from the accident.

6       And then Number 9 reads that the plaintiff's medical

7  treatment at the Chippenham Johnston-Willis Medical Center on

8  July the 15th of 2019 was medically necessary to treat her

9  for injuries from the subject accident.

10       MS. COHN:  Your Honor, I would ask now that the jury

11  refer to Exhibit 5.  And, specifically, if Your Honor will

12  read the second page, there is a large paragraph towards the

13  bottom, the Free Text HPI Notes.

14       THE COURT:  Okay.  From Exhibit 5, it says, "Page 1

15  of 9 at the bottom."

16       (Reading) 34-year-old female with reported history of

17  chronic back pain, which she sees pain specialist for and

18  takes oxycodone several times daily, to the emergency

19  department for evaluation of back pain, worse than normal

20  since having -- it's the motor vehicle accident, eight days

21  ago.

22       Patient was restrained driver on divided highway who

23  was struck in the driver front bumper and spun.  The patient

24  states that it was an air bag deployment and she struck her

25  head, causing her to lose consciousness for an unknown amount

1  of time.  Had to be assisted at the vehicle by the other

2  driver.

3      Patient was never evaluated postaccident because she

4  had her animal and children in the car with her.  In the past

5  8 days, patient has not been evaluated for back pain or head

6  injury or neck pain status post the motor vehicle accident.

7      She denies chest pain, abdominal pain, nausea,

8  vomiting or diarrhea, bowel or bladder dysfunction or

9  retention, saddle anesthesia, extremity discomfort, vision

10 changes.  Is complaining of nausea, vomiting, frontal headache

11 with photophobia.  Denies phonophobia.

12 BY MS. COHN:

13 Q    Did you mention any bladder issues to anybody at

14 Johnston-Willis?

15 A    Probably not.

16 Q    And why was that?

17 A    Again, years ago, when trying to find out what was going

18 on initially with OB, and then Dr. Guerette, IC a/k/a painful

19 bladder syndrome isn't a well-known issue.  If you discuss it,

20 they kind of look at you like you have three heads.  And I

21 don't know how else to explain this.  I was put (crying)

22 through hell trying to get to that diagnosis, that I didn't

23 want anybody else to touch me and have to start from square

24 one again.

25 Q    Were you prioritizing the treatment of your injuries at

1 that point?

2 A    Yes.

3 Q    And what was your priority at that time?

4 A    My head.

5 Q    And why was that?

6 A    It's hard to function when you can't stand and you're

7 dizzy, and when you do stand, you throw up.  Just normal

8 functioning, being able to wake up and sit up in bed.

9 Q    But you were, in fact, experiencing bladder issues at

10 that point?

11 A    Yes.

12 Q    Can you describe those issues for me, what you were

13 feeling?

14 A    It's a constant heaviness and pain in the lower stomach,

15 tenderness to any type of pressure on the lower stomach.

16 Depending on how aggravated it gets, incontinence can be an

17 issue.  That can come and go depending on how aggravated the

18 bladder gets.

19 Q    Was that heaviness a new feeling from 2013?

20 A    Can you repeat that?

21 Q    You just described feeling heaviness.  Did you have that

22 symptom of heaviness in 2013?

23 A    Yes.

24 Q    What you were feeling in 2019, after this accident,

25 regarding your pelvic region, was it any different than what

1  you had felt in 2013?

2  A    In the beginning, it reminded me a lot of what I had

3  experienced previously, and then it progressively just got

4  worse.

5       THE COURT:  Let's focus, ma'am, on the dates, though.

6  That's really what I think we need to get to here.

7       Your lawyer spoke of when you went to

8  Johnston-Willis.  The date that we've agreed to is July the

9  15th.  Were you feeling these -- there's no mention of these

10  symptoms in what I just read.  But were you feeling those

11  symptoms, then, on July the 15th?

12       THE WITNESS:  Yes.  Yes.

13  BY MS. COHN:

14  Q    Did you seek any treatment after Johnston-Willis with any

15  type of provider?

16  A    I know I did physical therapy.

17  Q    And where did you do physical therapy?

18  A    Alliance.

19  Q    And do you know approximately when you started there?

20  A    Datewise July, August.  I'm not sure, not 100 percent

21  sure.

22  Q    Was it relatively quickly after the accident?

23  A    Yes.

24  Q    And what were you going to Alliance for?

25  A    The head injury and I guess it's considered soft tissue,

1   my neck, my shoulder.

2   Q   What were they treating you for while you were there?

3   A   Concussion.  I know they treated my neck, my shoulder,

4   some strengthening of the lower back or lower hip, back.

5   Q   Had you ever had a concussion prior to this accident?

6   A   No.

7   Q   Does Alliance treat for bladder or pelvic issues, to your

8   knowledge?

9   A   No.

10  Q   Did they treat you for that during this visit to them?

11  A   No.  And I wouldn't ask them to.

12  Q   So is it fair to say that you wouldn't discuss those

13  symptoms with them?

14  A   No, I would not.

15      MR. KEENEY:  Objection.  Leading, Your Honor.

16      THE COURT:  Overruled.  That's fine.  Go ahead.

17      MS. COHN:   Thank you, Your Honor.

18  BY MS. COHN:

19  Q   So you didn't discuss your bladder with them at all?

20  A   No.

21  Q   Do you know approximately how long you attended Alliance

22  Physical Therapy?

23  A   A month or so, two months.

24  Q   And the problems that you had addressed at Alliance,

25  aside from the back issue, were those all new problems from

1  this accident?

2  A    Yes.

3  Q    Had you had any of those prior problems prior?

4  A    No.

5  Q    During this time period while you were treating with

6  Alliance, did you have an occasion to go horseback riding?

7  A    We went on our normal family vacation to Hatteras where

8  previously I would go on a commercial trail ride.  My intent

9  was not to go that year.

10          THE COURT:  When was this, ma'am?

11          THE WITNESS:  This was August of 2019.

12          THE COURT:  So a little over a month afterwards, you

13  went on a family vacation?

14          THE WITNESS:  Yes.

15          THE COURT:  To Cape Hatteras?

16          THE WITNESS:  Either August or September, yes.

17          THE COURT:  Okay.  So a month or two afterwards.

18          THE WITNESS:  Yes.

19          THE COURT:  Did you ride a horse?

20          THE WITNESS:  Yes.

21          THE COURT:  Go ahead.

22          MS. COHN:  Thank you, Your Honor.

23  BY MS. COHN:

24  Q    How long has your family been going on this vacation?

25  A    Years.  Five, six years.

**JA459**

1  Q    Now, you said it was a commercial trail ride entity.

2  What do you mean by that?

3  A    It's a place you can call and get to experience riding a

4  horse on the beach.  It's kind of plug-and-play, the horses.

5  Q    Were you having pelvic pain at this point?

6  A    Yes.

7  Q    Given that pelvic pain, why did you choose to go riding?

8  A    That was my daughter's first year she could go due to age

9  and experience.  (Crying.)  And even though I didn't want to

10  go and I was secretly hoping she didn't want to go, she'd been

11  looking forward to it for years.  And I could have been

12  bleeding to death and I still would have gotten on that horse,

13  because it was for her.

14  Q    Can you describe the type of ride this is?

15  A    It's a very slow, just walk through the woods, and then

16  you would merge on the beach.  It's a short walk down the

17  beach, you turn around and you come back.

18       For somebody with horse experience, it's like putting a

19  quarter in the horse thing out front of a grocery store.  It's

20  commercial.  Those horses take the same -- they travel the

21  same path every day.  You could blindfold them and they would

22  still know where to go.

23  Q    Were there other groups or individuals on this ride with

24  you and your daughter?

25  A    Yes.

1   Q    About how many were there?

2   A    I believe there was anywhere between 10 to 15.

3   Q    Did you fall during this ride?

4   A    No.

5   Q    Did you get dragged through a field?

6   A    No.

7   Q    Did you get pulled in any way?

8   A    Other than the horse that I rode, funny, we nicknamed

9   Hannibal, because he always comes out with what they call a

10  grazing mask, it's kind of muzzle, because he tries to eat

11  everything.  When he walks past a tree, he tries to eat the

12  tree.  So he's pulling me, walking down the trail.  He's doing

13  this (indicating) because he's trying to eat every leaf he

14  passes.  That's the only pulling that I got from a horse, was

15  him just pulling on my -- pulling on me, my arms, by trying to

16  eat everything he walked past.

17  Q    Like pulling on the reins?

18  A    Yes.

19       THE COURT:  Ma'am, let me just ask you:  Using this

20  trip as a landmark in time -- I know you can't remember

21  precisely whether it was August or September.  But from the

22  date of the accident until you went on this horseback trip,

23  did you report any pelvic injuries to any medical provider,

24  and, if so, who?

25       THE WITNESS:  I don't remember if I've -- I know I

 1  didn't see Dr. Guerette before then, and it's pretty much the

 2  only one that I would have discussed medically any bladder

 3  issues with is Dr. Guerette.  So, honestly, probably not.

 4          THE COURT:  Okay.  Thank you.

 5          Go ahead.

 6          MS. COHN:  Thank you, Your Honor.

 7  BY MS. COHN:

 8  Q    Did you go horseback riding in September?

 9  A    On the beach?  Yes.

10          THE COURT:  I think she said she can't remember.  It

11  was either August or September.

12  A    Yeah, it was either August or September.

13  BY MS. COHN:

14  Q    Did you go on any other rides in September, aside from

15  possibly this trail ride?

16  A    No.

17  Q    Do you, in fact, own a horse?

18  A    I do.

19  Q    And can you ride that horse?

20  A    No.

21  Q    Why not?

22  A    She is lame and geriatric; she's old.

23  Q    How long has she been lame?

24  A    Five or six years.

25  Q    Can you please explain what lame means?

1    A    She has a neurological issue that she cannot carry and

2    support weight other than her own, and sometimes she can't

3    even support her own weight.  She's -- for safety of her,

4    she's not rideable.

5    Q    Now, after this accident, did you have an occasion to

6    visit Dr. Guerette again?

7    A    I did.

8    Q    And do you know approximately when that took place?

9    A    Off the top of my head, no.

10   Q    Could it have been in October?

11   A    Yes.

12   Q    And so, forgive me, I'm not good at math, but this isn't

13   too terribly long.  The accident was in July, the visit to

14   Guerette was in October.  What was the delay in you seeing

15   Dr. Guerette?

16   A    Dealing with the injuries that were more present.  My

17   father also got sick (crying) around the same time and had a

18   stroke, and I was also dealing with my children's injuries

19   from the car accident.  I always put myself last; my kids are

20   first.

21   Q    Did you have a vehicle after this accident?

22   A    Can you repeat that, please?

23   Q    Did you have a vehicle after this accident to replace

24   your vehicle?

25   A    Not for -- I was without a vehicle for a while.

**JA463**

1  Q    Did that hinder your ability to seek medical care?

2  A    It made it difficult, yes.

3          THE COURT:  Ma'am, we're going to use that trip to

4  North Carolina, or to Cape Hatteras, again, as the landmark in

5  time.  Again, I know you don't remember dates; it's been a

6  couple years.  Did you have a car by the time you went on that

7  vacation to Cape Hatteras?

8          THE WITNESS:  Yes.

9          THE COURT:  Okay.  Had you called to try to make an

10  appointment with Dr. Guerette?  Whether or not you saw him or

11  not, had you called at least to try to make an appointment to

12  see him by the time you went to Cape Hatteras?

13         THE WITNESS:  Yes.

14         THE COURT:  What was the earliest appointment that

15  you could get?

16         THE WITNESS:  I remember it being drug out.  It was

17  like three to four weeks before they had any opening.  I don't

18  know why.

19         THE COURT:  Okay.  That's fine.  All right.

20         Do you have a ways to go yet?

21         MS. COHN:  Just really wrapping up with the direct

22  questioning, which --

23         THE COURT:  That's it?

24         MS. COHN:  Yes.

25         THE COURT:  Okay.  Go ahead.  We'll wrap it up and

1  then we'll take our morning break.

2        MS. COHN:  Thank you, Your Honor.

3  BY MS. COHN:

4  Q    Do you like Dr. Guerette?

5  A    Honestly, no.

6  Q    Why is that?

7  A    It sounds awful.  (Crying.)  He's a great guy and I'm

8  very thankful for him helping me, but, again, and forgive me

9  because I don't know another way to word it, I went through

10  hell trying to figure out what was wrong, and I don't wake up

11  in the morning excited to go see that man.  Every appointment

12  I had with him was painful, humiliating, and there was a lot

13  of times I walked out of there with no answers.  I'm thankful

14  that he finally helped me, but I just don't get excited about

15  going to him.

16        MS. COHN:  Your Honor, I would like to now direct the

17  jury's attention to Exhibit 7, which are some of the records

18  from the Female Pelvic Medicine Institute of Virginia.

19        THE COURT:  They're all admitted.  Is there any

20  particular provision you want me to read?

21        MS. COHN:  Your Honor, if you could, please, read

22  under "Chief Complaint."

23        THE COURT:  Okay.  Which page is it?

24        MS. COHN:  I'm sorry, page 1.

25        THE COURT:  Okay.

1          MS. COHN:  It's too easy.  And if you could just read

2    that whole subjective section, please, Your Honor.

3          THE COURT:  You're talking about -- it's starting off

4    with Samantha Roop is a 34-year-old white female complaining

5    of InterStim F/U: see HPI?

6          MS. COHN:  Yes, Your Honor.

7          THE COURT:  (Reading) Referring physician:

8    Dr. Joseph.  Had InterStim for OAB and pelvic pain seven years

9    ago.  Recent MVA with worsening symptoms.  How far do you want

10   me to go?

11         MS. COHN:  Please continue, Your Honor, down to

12   the --

13         THE COURT:  (Reading) The patient reports having

14   stress incontinence.  Urge incontinence:  Yes.  The patient

15   denies having mixed incontinence.  Stress looks greater than

16   urge incontinence:  Yes.  Urge incontinence greater than

17   stress incontinence:  No.  Patient denies having continuous

18   urine loss.  Patient reports having urgency/frequency.  What

19   is that? Hematuria:  No.  Post void dribble:  No.  Abdominal

20   voiding/retention:  No.  Recurrent UTIs:  No.

21         Do you want me to continue going on?

22         MS. COHN:  Please, Your Honor.

23         THE COURT:  (Reading) Symptom severity.  Incontinent

24   events per day:  1 to 2.  Pads per day:  1 to 2.  Voids per

25   day:  11 plus.  Voids per night:  3.  Enuresis:  No.  Bladder

1   emptying:  Normal flow.

2          How far do you want me to go?

3          MS. COHN:  I want you to go all the way down, Your

4   Honor, to social history, please.

5          THE COURT:  To social history.  Okay.  Got it.

6          "Vaginal pain:  No.  Pelvic pain:  Yes, pelvic

7   pressure worse since MVA.  Bladder pain:  Yes.  For Prolapse.

8   Heaviness:  Yes.  Exteriorized tissue:  No.  Pain:  No.

9          "Bowel symptoms.  Constipation:  No.  Obstructed

10  defection:  No.  Rectal prolapse:  No.  Fecal incontinence:

11  No.  No.  No.

12         "Sexual symptoms.  Yes.  Numbness:  No.  Inability to

13  orgasm:  No.  Dyspareunia:  Yes.  Vaginal dryness:  No.

14  Partner:  Normal."

15         MS. COHN:  Thank you very much, Your Honor.

16         THE COURT:  And these are the records from October

17  the 8th.

18         MS. COHN:  Thank you, Your Honor.

19  BY MS. COHN:

20  Q    Do you know the name of the facility that Dr. Guerette

21  practices at?

22  A    (Inaudible.)

23         THE REPORTER:  I'm sorry, repeat that.

24  A    Female Pelvic Institute.

25  BY MS. COHN:

**JA467**

1  Q    And the summary that the Judge just read, is that an

2  accurate description of the issues that brought you back to

3  Dr. Guerette?

4  A    Yes.

5  Q    Were you having any of those issues prior to the 2019

6  accident?

7  A    No.

8  Q    So from 2013 to 2019, none of those were bothering you?

9  A    No.

10         THE COURT:  To your knowledge, is this medical report

11  the first time you told a medical reporter of any pelvic

12  issues?

13         THE WITNESS:  Yes, to my knowledge.  Dr. Guerette

14  would have been the only one -- I mean, what you just read

15  wasn't -- I mean, it's humiliating.  You wouldn't discuss it

16  with --

17         THE COURT:  I understand.  I'm just asking you why --

18  you know, when it happened.  That's all.  Okay.

19  BY MS. COHN:

20  Q    Did the pain that you were experiencing in 2019 affect

21  your ability to go to the bathroom?

22  A    Yes.

23  Q    Particularly to have a bowel movement?

24  A    It made it painful.

25  Q    Was that a new and different symptom from 2013?

1  A    Yes.

2  Q    Had you ever had pain during intercourse before?

3  A    (Crying.)  No.

4  Q    What finally brought you in to seeing Dr. Guerette?

5  A    I tried to ignore the symptoms, kind of thought something

6  just got aggravated.  The InterStim unit was no longer

7  working.  I couldn't -- I could connect, but I couldn't change

8  anything.  I could normally change the intensity or the

9  programming.

10       MR. KEENEY:  Your Honor, to preserve the record,

11  objection.  The last part is hearsay.

12       THE COURT:  I'm sorry, say that again.

13       MR. KEENEY:  To preserve the record --

14       THE COURT:  First of all, you need to stand up.

15       MR. KEENEY:  Hearsay as to the last part as to what

16  she read from the InterStim.

17       THE COURT:  You're telling me now, so before the

18  accident, you said you could look at it, check the functioning

19  and such, right?

20       THE WITNESS:  Yes.  Correct.

21       THE COURT:  When was the next time after the accident

22  that you checked it and it wasn't operating, if you remember?

23       THE WITNESS:  I can't tell you if I had checked it

24  before the monthly alarm, but the monthly alarm would have

25  gone off at the end of July.

**JA469**

1          THE COURT:  Okay.  So do you recall -- let's assume
2  that you had the monthly alarm at the end of July.  Do you
3  remember what you saw at the end of July or not?  I only want
4  to talk about what you visibly observed.
5          THE WITNESS:  I could see the programming and the
6  intensity of the programming and that it had battery life
7  left.
8          THE COURT:  Okay.  So it was functioning at the end
9  of July?
10          THE WITNESS:  Yes.
11          THE COURT:  Go ahead.
12          MS. COHN:  Thank you, Your Honor.
13  BY MS. COHN:
14  Q    Did you have to have more than one appointment with
15  Dr. Guerette?
16  A    Yes.
17  Q    And, to your knowledge, were you eventually diagnosed
18  with any conditions or any illnesses or anything of that
19  nature as a result of those appointments?
20  A    The vaginal prolapse.
21  Q    Had you ever been diagnosed with that before?
22  A    No.
23  Q    Was the InterStim, in fact, replaced during these
24  treatments?
25  A    Yes.

1  Q    And did that offer you any relief?

2  A    No.

3        THE COURT:  Do you know when it was replaced?

4        THE WITNESS:  I believe it was January.  I know it

5  was around the holidays or after the holidays.  I think it was

6  January or February of the next year.

7        THE COURT:  January, February of 2020?

8        THE WITNESS:  Correct.

9        THE COURT:  But even then, you still didn't relief?

10       THE WITNESS:  I got the relief from, like, the

11 incontinence and some of the bladder symptoms, but I didn't

12 get relief from the intense pain, the pain during intercourse,

13 the other intensity of it.  I got some relief from the other

14 issues, but not the other ones.

15       THE COURT:  Okay.

16 BY MS. COHN:

17 Q    And what is your understanding of what the prolapse is

18 that you were diagnosed with?

19 A    That the pelvic floor muscle became damaged and it wasn't

20 able to keep everything in place, which allows the pelvic

21 organs to become dislodged, moved around, jumbled.

22       THE COURT:  I'm not sure so sure she's qualified.  I

23 think this is hearsay and she's not qualified.

24       THE WITNESS:  I don't know.

25       THE COURT:  Do you have anything else from her?

1  You're going to have Dr. Guerette.  We can hear from him.

2       MS. COHN:  Yes.  Thank you, Your Honor.  Briefly,

3  Your Honor.

4  BY MS. COHN:

5  Q   Was there ever a gap during your treatment with

6  Dr. Guerette in 2020?

7  A   Yes.

8  Q   And why was that?

9  A   Dr. Guerette's way was give it time, let things calm

10 down.  We replaced the InterStim; it could have aggravated

11 things.  Just let everything calm down and give it time, and

12 then I -- I wasn't getting better, and, again, I was avoiding

13 Dr. Guerette like the plague because I didn't want to go back.

14 I was petrified to go back.

15 Q   Are you still a patient of Dr. Guerette's?

16 A   Yes.

17 Q   Are you still in active treatment with him?

18 A   Yes.

19 Q   And these appointments from Dr. Guerette from October

20 through present, are they as a result of the injuries you

21 received in the accident?

22 A   Yes.

23       THE COURT:  She can't say that.

24       MS. COHN:  I apologize.

25       THE COURT:  That's stricken.

1          So go ahead.  Do you have anything else?

2    BY MS. COHN:

3    Q    Would you have gone to Dr. Guerette but for this

4    accident?

5          MR. KEENEY:  Your Honor --

6    A    No.

7          THE COURT:  That's totally inappropriate.  That's

8    stricken.

9          MS. COHN:  Thank you, Your Honor.

10   BY MS. COHN:

11   Q    Did you have any plans to see Dr. Guerette prior to this

12   accident?

13   A    No.

14   Q    Have you had any car accidents or falls or anything of

15   that nature since the July 7th accident with Mr. Desousa?

16   A    No.

17   Q    Had anything else in your life changed in July of 2019

18   but this car accident?

19   A    No.

20         MS. COHN:  Thank you, Your Honor.  I have no further

21   questions.

22         THE COURT:  Here's what we're going to do:  We're

23   going to take our morning recess now before we start

24   cross-examination.  Okay?

25         So, folks, I'll tell you what, it's about 11:11.

1  We're going to reconvene, let's just say, 11:30.  That will

2  give you enough time to take a break, okay?

3          Officer, you want to take them out.

4      (Jury out at 11:11 a.m.)

5          THE COURT:  We're going to break, then.  Why don't

6  you-all be in place by 11:27, okay?

7          MR. KEENEY:  Yes, sir.

8          THE COURT:  Were you going to say something?

9          MR. KEENEY:  I just said, "yes, sir."

10          THE COURT:  Okay.  Well, at least now you're standing

11  when you address the Court.

12          Ms. Roop, you're still on the witness stand.  That

13  means you cannot talk about your testimony with anybody at all

14  from this point going forward.  Do you understand that?

15          THE WITNESS:  Yes.

16          THE COURT:  You can go to the restroom, you can go do

17  whatever you want, but you may not speak to anybody about your

18  testimony.  Do you understand, ma'am?

19          THE WITNESS:  I understand.

20          THE COURT:  All right.

21      (Recess taken from 11:11 a.m. until 11:32 a.m.)

22          THE COURT:  Ms. Roop, you can return to the witness

23  stand, and we'll bring in the jury.

24          Mr. Keeney, you can go up.

25          MR. KEENEY:  Thank you, Your Honor.

1    (Jury in at 11:33 a.m.)

2         THE COURT:  Do we have everybody?  Everybody doing

3   okay?

4         JURY MEMBER:  Yes.

5         THE COURT:  Everybody abiding by my kryptonite rule

6   and still pure as the driven snow?

7         JURY MEMBER:  Yes.

8         THE COURT:  Good.  You're never going to forget

9   Superman after this trial, will you?

10        Mr. Keeney, it's your opportunity to cross-examine

11  the witness.  Go ahead.

12        MR. KEENEY:  Thank you, Your Honor.

13                    CROSS-EXAMINATION

14  BY MR. KEENEY:

15  Q   Ma'am, a couple questions for you.  First of all, you

16  tell all your doctors the truth, correct?

17  A   Yeah.

18  Q   Okay.  Because it's important, if they're going to treat

19  you, they need to know what's going on with you, correct?

20  A   Yeah.

21  Q   And you told Ms. Cohn that you don't work; is that

22  correct?

23  A   Correct.

24  Q   And you haven't worked since your youngest daughter was

25  born in 2008, 2009?

1    A    Correct.

2    Q    Is your Instagram name sickntwisted06?

3    A    Instagram, I haven't touched Instagram -- sure.  I don't

4    know.

5    Q    Let me show you something.

6         MR. KEENEY:  Deputy or marshal, I should say, in

7    federal court.

8         THE COURT:  Hold on a second.  We need to mark that.

9    Is that Defense Exhibit Number 1?

10        MR. KEENEY:  I believe, since I already have a number

11   in --

12        THE COURT:  Is it already in the exhibit binder?

13        MR. KEENEY:  No, Your Honor.  This is all going to be

14   impeachment exhibits.

15        THE COURT:  So in the exhibit list -- you-all already

16   agreed that all the exhibits are in.  So you have D1 through

17   14.  So is this going to be D15?

18        MR. KEENEY:  Yes, Your Honor.

19        THE COURT:  D15.  I need to see it first.

20        We're going to show the witness D15.

21        (Defendant's Exhibit Number 15 was marked for

22   identification.)

23   BY MR. KEENEY:

24   Q    Ma'am, taking a look at that, that's a picture of you in

25   there, correct?

1   A      Correct.

2   Q      So your Instagram name is sickntwisted06, correct?

3   A      Yes.

4   Q      And under your profile, I know it's private, but it says,

5   "Blue-eyed country girl.  Automotive and diesel mechanic.

6   Dirt and grease never scared me.  Never mistake my kindness

7   for weakness;" is that correct?

8   A      Yes.

9   Q      And you wrote that, correct?

10  A      Yes.

11         MR. KEENEY:  Your Honor, I would move that into

12  evidence as Defendant's Exhibit -- I believe we're at Number

13  15.

14         THE COURT:  Any objection?  Any objection?

15         MS. COHN:  No objection, Your Honor.

16         THE COURT:  It's admitted.

17      (Defendant's Exhibit Number 15 was admitted.)

18  BY MR. KEENEY:

19  Q      Do you know when that was created, ma'am?

20  A      The account, no.  I don't even know the last time it's

21  been logged into or even when the description was written.

22  I'm not a --

23  Q      And, ma'am, your husband's company is East Coast Repair

24  Center, correct?

25  A      Correct.

1          MR. KEENEY:  And I'm going to show you another

2   photograph in there that, Your Honor, we'll mark as D Exhibit

3   Number 16.

4       (Defendant's Exhibit Number 16 was marked for

5   identification.)

6          THE COURT:  All right.  Do you want to circulate

7   these exhibits?

8          MR. KEENEY:  I've got copies for the jury as well,

9   Your Honor.  I didn't know if you wanted me to publish them

10  now or --

11         THE COURT:  How many more do you have?

12         Show her D16 while he's answering my question.

13         MR. KEENEY:  I already gave him -- hold on one

14  second.  Roughly five, Your Honor.

15         THE COURT:  We'll wait to circulate them all at one

16  time.  Okay?

17         Do you recognize D16?

18         THE WITNESS:  I do.

19         THE COURT:  Is that a picture of you?

20         THE WITNESS:  It is.

21         THE COURT:  Okay.  Go ahead.

22  BY MR. KEENEY:

23  Q   Ma'am, that's from April 6th, 2014, correct?  That's

24  what it says on there.

25  A   Yes.

 1    Q    And you're holding, it looks like, a welding machine?

 2    A    Yes.

 3    Q    So you were, in fact, working?

 4    A    No.

 5    Q    Oh, you were just doing that?

 6    A    When they handed me the picture, that's why I smiled.

 7    That's when he bought his new welder and was so proud of this

 8    machine and tried to teach me to, quote, unquote, "weld,"

 9    which all I did successfully was nothing.

10    Q    Okay.

11    A    It turned into a big --

12         THE COURT:  Do you want D16 admitted?

13         MR. KEENEY:  Yes, please, Your Honor.

14         THE COURT:  It's admitted.

15    (Defendant's Exhibit Number 16 was admitted.)

16         THE COURT:  Go ahead.  What's your next one?

17         MR. KEENEY:  D17.

18    BY MR. KEENEY

19    Q    Ma'am, let me ask you a question:  You're familiar with

20    DiSavino Racing Team, aren't you?

21    A    I think that's -- I think so.  The name --

22    Q    Ma'am, let me hand you another exhibit.

23         MR. KEENEY:  Your Honor, I believe this would be D17.

24         THE COURT:  Okay.  Do you want to show her D17?

25    (Defendant's Exhibit Number 17 was marked for

1   identification.)

2   BY MR. KEENEY:

3   Q    All right.  Ma,am, can you just read that to yourself for

4   me?

5   A    (Witness complies.)

6   Q    Yes, ma'am.

7        And that's from November 5th, 2018, correct?

8   A    Yes.

9   Q    And does that refresh your recollection that in November

10  of 2018 DiSavino Racing Team brought a Chevy Silverado 3500

11  Duramax Diesel into the shop and that you diagnosed it, the

12  truck, as having a hose leak and saved them a bunch of money

13  over a competitor?

14  A    Yes, I do.

15  Q    Okay.

16  A    And it was a talk out loud with Gerard about what could

17  possibly be the problem.  Just because I don't work doesn't

18  mean I still don't have knowledge, and I guided Gerard in what

19  could be the issue.

20       MR. KEENEY:  Your Honor, I would introduce that into

21  evidence.

22       THE COURT:  Any objection?

23       MS. COHN:  No objection, Your Honor.

24       THE COURT:  Admitted.

25       (Defendant's Exhibit Number 17 was admitted.)

1    MR. KEENEY:  Thank you.

2  BY MR. KEENEY:

3  Q    Ma'am, so let's go back to 2011, okay?  That is when you

4  first saw Dr. Guerette, correct?

5  A    Yes.

6  Q    And back then you were having pelvic pain and overactive

7  bladder, correct?

8  A    Yes.

9  Q    And they did bunch of tests, and you also, I believe, had

10  some lesions, some bowel adhesions; is that correct?

11  A    I don't remember those, but --

12  Q    Okay.  And they implanted an InterStim at that time,

13  2012.  Does that sound about right?

14  A    Yes.

15  Q    And they had to calibrate it a couple times, correct?

16  A    I guess.

17  Q    Okay.  And they also -- you also had a bladder sling at

18  that time, didn't you?

19  A    Yes.

20  Q    Do you remember that?  You did?

21  A    Yeah.

22  Q    And then you were just able to live with it up until you

23  returned to Dr. Guerette in October after this accident,

24  correct?

25  A    Yes.  It had --

1    Q    Okay.  And you testified a little while ago that the

2    first time you remember checking your InterStim was at the end

3    of July of 2019, meaning after the accident; is that correct?

4    A    I have an alarm on my phone, and it goes off at the end

5    of the month.  So I would have checked it at the end of June,

6    at the end of July, the end of August, and the years prior.

7    Q    Well, let me make sure we're on the same page.  Do you

8    have an actual recollection of checking it at the end of July

9    of 2019 or not, or are you just assuming you did that?

10   A    No, I'm not assuming.  I know I check it -- I know I

11   check it when those alarms go off because I want everything to

12   be fine because I don't want to see Dr. Guerette.

13   Q    And you were referred to Alliance Physical Therapy by

14   your attorney, correct?

15   A    Yes.

16   Q    And so you had retained an attorney within two weeks

17   after this accident, correct?

18   A    Yes.

19   Q    And the InterStim was essentially -- the old one was

20   eventually taken out of your person, correct?

21   A    Yes.

22   Q    And you discarded that, correct?  You don't have it

23   anymore?

24   A    Well, I don't have the unit that was in implanted in me.

25   Q    Okay.

1  A    No.  That's -- they don't hand you an organ after they

2  take it out.  I don't have that.  I had the external unit.

3  Q    All right.  And you testified that you first noticed

4  pelvic issues within a week after the accident?  Is that what

5  you testified?  I can't recall so just remind me.

6  A    Yes.

7  Q    Okay.  Do you remember when I took your deposition back

8  in January of this year?  Let me hand you a copy of your

9  deposition and ask --

10           THE COURT:  No.

11           MR. KEENEY:  Okay.

12           THE COURT:  Hold on.  The way to do this is, you read

13  the question and then the answer and ask if she gave the

14  answer.  That's the way you do it.

15           MR. KEENEY:  Yes, Your Honor.

16           And, Ms. Cohn, it's page 52.

17  BY MR. KEENEY:

18  Q    "Question," I said:  "All right.  Let's talk about the

19  pelvic issues, okay?  Tell me when you first noticed pelvic

20  issues."

21       And this is talking about after the accident.

22       "Answer:  I don't know the exact time frame.  It was

23  after the accident."

24       Do you remember answering that?

25  A    Yes.

1 Q    Yes.  And then I go:

2      "Was it" -- "Question:  Was it a month?  A year?  A

3 week?"

4      "Answer:  I don't know.  A month.  I don't -- until it

5 got so bad, the pain got bad.  I, again, can't give you exact

6 time frame."

7      So I take it from your deposition you remember saying

8 that?

9 A    (Nods head affirmatively.)

10 Q    Is that a "yes"?

11 A    Yes.

12 Q    And so that's true, you don't recall when the pelvic

13 issues started after the accident?

14 A    Just, like I said, either a week, a month.  My PCP was

15 told about it and that wasn't long after the accident, but --

16 Q    Okay.  Ma'am, the trip to North Carolina was actually in

17 August, wasn't it?

18 A    I said it was either August or September.  That's

19 normally the time that we go.

20 Q    Okay.  If your attorney filed a document in this case

21 saying it was in August, do you have any reason to dispute

22 that?

23 A    I don't have a reason to dispute it.

24 Q    And as we talked about, the record from Dr. Camden at

25 Alliance Physical Therapy states you were dragged on

**JA484**

1  September 8th, 2019, through a field by a horse.  Have you

2  seen that record?

3          THE COURT:  Do you have the exhibit?

4          MR. KEENEY:  Yes, Your Honor.

5  BY MR. KEENEY:

6  Q   Ma'am, it's going to be Exhibit 9 in front of that binder

7  in front of you.

8          THE COURT:  Hold on a second.  We have plaintiff's

9  exhibits, defense exhibit.

10         MR. KEENEY:  Plaintiff's Exhibit 9.  I'll use the

11 plaintiff's exhibits, Your Honor.

12         THE COURT:  Plaintiff's Exhibit Number 9.  Hold on a

13 second.

14         MR. KEENEY:  And it is towards the back.  Your Honor,

15 if you look at the top, there are Bates stamps there.  It's

16 Roop and then it's 54.

17         THE COURT:  Okay.  First of all, does everybody have

18 Plaintiff's Exhibit Number 9?  I think it's in the back.

19 They're out of order.

20         MR. KEENEY:  6.  6, Your Honor.

21         THE COURT:  It's 6.

22         MR. KEENEY:  Plaintiff's Exhibit 6.

23         THE COURT:  Let's just slow down here and make sure

24 we get this right.

25         Plaintiff's Exhibit Number 6, Alliance Physical

1    Therapy.  What page are we looking at?

2         MR. KEENEY:  Your Honor, if you go towards the back

3    of them, the physician notes are separate, and up at the top

4    there are those Bates stamp numbers, and the September --

5         THE COURT:  What Bates stamp number is it?

6         MR. KEENEY:  54.

7         THE COURT:  54.

8         All right.  So it says, "11/20/2019," is that right,

9    next to Bates stamp 54?

10        MR. KEENEY:  Yes, Your Honor.

11        THE COURT:  So, folks, if you look -- so we're in P6.

12   If you look in the upper left-hand corner and you'll see

13   11/20/2019, and you'll see Roop P60000 ending in 54.  That's

14   the page.  That's all right.  I want you to find the page.

15        JURY MEMBER:  Say that again.

16        THE COURT:  Okay.  It also says 3 of 6 at the bottom,

17   but the Bates stamp in the upper left-hand corner.  Well,

18   first of all, the date is -- in the upper left-hand corner is

19   11/20 of 2019, and then it ends -- the Bates stamp ends with a

20   54.

21        Okay.  Everybody got it?  If you don't have it, raise

22   your hand.  Okay.  Can one of you guys help your fellow juror

23   there?  This is what happens when I give you binders of stuff,

24   right?

25        Are we good now?  Everybody good?

1          Okay.  Now, what do you want me to read?

2          MR. KEENEY:  Your Honor, under "Subjective."

3          THE COURT:  Subjective.  Do you want me to read that

4    paragraph?

5          MR. KEENEY:  Sure, Your Honor, we can read the whole

6    paragraph.

7          THE COURT:  "Patient presents to the office for a

8    follow-up on head, neck, and left shoulder pain.  She reports

9    80 percent improvement.  Headaches are improving.  They are

10   not as intense or as frequent.  Patient has had a total of two

11   headaches in the past week lasting about 1 to 2 hours.

12   Patient's last headache was four days ago.  Pain is at the

13   base of her neck and across her forehead.  Neck and shoulder

14   pain is no longer daily.  She complains of discomfort if she

15   does too much activity.  Patient states her shoulder was pain

16   free until yesterday.  While riding her horse, she states that

17   her horse dragged her across the field, causing pain."

18         Is that what you wanted me to get across?

19         MR. KEENEY:  Yes, Your Honor.  Thank you.

20   BY MR. KEENEY:

21   Q    Ma'am, so you're saying that record is incorrect?

22   A    That record is incorrect, because my horse can't drag

23   anything across a field, and other than using a figure of

24   speech to them, I do not understand and I cannot be in their

25   head as to why they wrote it like that.

1  Q    And, ma'am, you're suing my client for $5 million,

2  correct?

3  A    Correct.

4        MR. KEENEY:  And, Your Honor, if you could flip to

5  the page prior to that.

6        THE COURT:  Hold on one second.  I'm making a note

7  here.

8        Okay.  So the page prior.

9        MR. KEENEY:  Which is the July 22nd, 2019, visit to

10  Alliance, her first visit with Dr. Camden.

11        THE COURT:  The page prior I have -- are you talking

12  about, is it Bates stamp 51?

13        MR. KEENEY:  Yes, sir.

14        THE COURT:  Okay.  It still says "11/20/19" on top.

15  Is that just the Bates stamp date?

16        MR. KEENEY:  That's when it was Bates stamped.

17        THE COURT:  Hold on.  So the date of this visit that

18  I just read on 54, what's the date of that on there?

19        MR. KEENEY:  September 9th of 2019.

20        THE COURT:  September 9th of 2019.  So she's

21  saying, according to the records, she reported to the

22  treatment provider that it was the date before, September the

23  8th, she fell off the horse, right?

24        Okay.  What's the day before?

25        MR. KEENEY:  That is the prior visit of July 22nd,

1  2019.

2        THE COURT:  Does everybody got Bates stamp 51, the

3  previous page?  What do you want me to read?

4        MR. KEENEY:  Your Honor, the fifth paragraph down and

5  just the first --

6        THE COURT:  "Patient complains of"?

7        MR. KEENEY:  Yes, Your Honor.  Just through the word

8  "Tylenol" is fine.

9        THE COURT:  All right.  "Patient complains of

10 headaches, neck and left shoulder pain.  Her pain is 1 to 2

11 out of 10 at rest, 3 to 4 out of 10 with activity.  Her pain

12 is intermittent and worse in the evening.  Headaches are

13 present a couple times daily, each lasting 3 to 4 hours at a

14 time, resolved with OTC," which I gather is over the counter,

15 "Ibuprofen or OTC Tylenol."

16        MR. KEENEY:  And then, Your Honor, if you could also

17 please read the last paragraph on that page.

18        THE COURT:  "Patient did not miss any days of work

19 after her accident.  She helps her husband work in his

20 mechanic shop.  She has a lifting requirement of 100 pounds

21 with working on tractor trailers and large vehicles."

22 BY MR. KEENEY:

23 Q    So, ma'am, that last photograph in that record is also

24 just wrong?

25 A    My statement to them when I first went there is, "What do

1  you do?"

2      "I'm a stay-at-home mom."

3      "You carry babies?"

4      It sounded so bland.  I'm like, "No, I have teenagers so

5  my at-home duties is, basically, I'm a maid," and told them

6  that my plan is to eventually go back to work.

7      I will soon have two children that are going to be 18.

8  My youngest will be older where I can go back to work and help

9  Gerard.  I've never been able to lift 100 pounds; I wish I

10 could.  I don't know where that came from.  Again, I don't

11 know why they put it like that.  I can't answer that.

12          THE COURT:  Well, let's step back.  Hold on.  I think

13 his question is simply, is it accurate?

14          So the first sentence, though, is, "Patient did not

15 miss any days of work after her accident."  Did you say that?

16          THE WITNESS:  Other than saying, I don't work so how

17 could I miss work?

18          THE COURT:  So that's not accurate?

19          THE WITNESS:  Yeah.  I don't know why it was written

20 like that.

21          THE COURT:  Okay.  She helps her husband work in his

22 mechanic shop, is that not accurate?

23          THE WITNESS:  No.  That would have been my plan to.

24          THE COURT:  Okay.  And, "She has a lifting

25 requirement of 100 pounds with working on tractor trailers and

1  large vehicles," is that accurate?

2          THE WITNESS:  That I said?  No.

3          THE COURT:  Okay.  So whoever wrote it down, wrote it

4  wrong, is what you're saying?

5          THE WITNESS:  Yeah.

6          THE COURT:  Okay.  Go ahead.  Do you want to move on?

7          MR. KEENEY:  Yes, Your Honor.

8  BY MR. KEENEY:

9  Q    Ma'am, you testified that you wanted to get your

10  headaches under control first.

11  A    Correct.

12  Q    They were under control by the time y'all went to

13  Hatteras, correct?

14  A    They were more under control than they were previously,

15  yes.

16  Q    You've completely recovered from your headaches, right?

17  A    No, I still suffer from headaches and migraines.

18  Q    You still do?

19  A    Yes.

20  Q    And it wasn't mentioned, you went and saw a neurologist

21  after this accident, didn't you?

22  A    Correct.

23  Q    Okay.  But you didn't introduce any of his records into

24  evidence, did you?

25  A    No.

1  Q    Ma'am, I'm going to show you one more photograph.

2       Well, let me back up and ask you a couple other

3  questions.  Outside of that trail ride in Hatteras in August

4  of 2019, have you been on a horse since this accident?

5  A    No.

6  Q    All right.

7            MR. KEENEY:  Your Honor, I believe I'm on Defendant's

8  18.

9            THE COURT:  D18.

10      (Defendant's Exhibit Number 18 was marked for

11  identification.)

12  BY MR. KEENEY:

13  Q    Ma'am, I'm going to show --

14           THE COURT:  Hold on.  Let me see it first.

15           Okay.

16  BY MR. KEENEY:

17  Q    Do you recognize that, ma'am?

18  A    I do.

19  Q    That's your Facebook account, correct?

20  A    Correct.

21  Q    And that's a picture of, I take it, you took on the back

22  of a horse at the beach, correct?

23  A    Not in February.

24  Q    Not in February of 2020 when that's dated?

25  A    No.

1  Q    When did you take that?

2  A    That's not even the horse I rode in 2019.  That's -- so I

3  don't know exactly when I took it, but I wasn't down there in

4  February.

5          THE COURT:  Okay.  Hold on.  Let's take this one step

6  at a time.

7          First of all, that is one of your Facebook postings;

8  is that right?

9          THE WITNESS:  Correct.

10         THE COURT:  What is the date that you posted on

11  Facebook?

12         THE WITNESS:  It says February 17th, 2020.

13         THE COURT:  Where you posting in February of 2020?

14         THE WITNESS:  I mean, I guess I did.

15         THE COURT:  Okay.

16         THE WITNESS:  I think I made it a cover photo --

17         THE COURT:  Okay.

18         THE WITNESS:  -- which is just like the background.

19         THE COURT:  That's fine.

20         So there's a picture of -- it's basically the back of

21  a horse's head, right?

22         THE WITNESS:  Uh-huh.

23         THE COURT:  Is that a "yes"?

24         THE WITNESS:  Yes.

25         THE COURT:  And are you the person that took that

1 picture?

2          THE WITNESS:  Yes.

3          THE COURT:  Okay.  And is that a photo that you took

4 while on top -- riding on a horse?

5          THE WITNESS:  Yes.

6          THE COURT:  Do you know when the photo was taken?

7          THE WITNESS:  I cannot tell you exactly when the

8 photo was taken.  I do know that the ride that he was

9 referring to in 2019, that's not even the right color of the

10 horse that I was on, so that's not the horse from 2019.

11          THE COURT:  No.  I think the inference is, is that

12 you -- I think the suggestion is, because that's dated in

13 2020, was a horse that you were riding in 2020.

14          THE WITNESS:  Oh, no.  No.  No, it's not a horse I

15 was riding in 2020.

16          THE COURT:  Okay.

17          MR. KEENEY:  Your Honor, if she says it's not from

18 2020, I don't need to introduce it.

19          THE COURT:  Well, that's up to you.  If you don't

20 want to admit it, that's fine.

21 BY MR. KEENEY:

22 Q    Ma'am --

23          THE COURT:  Hold on.  I need to make a record.

24          So D18 is not admitted into evidence.

25          Do you have any more or do you want to circulate

1  these other ones now?

2       MR. KEENEY:  I have one more, and then I will

3  circulate.

4       THE COURT:  Go ahead.

5       We're going to mark this one D19.

6       Okay.  D19.

7    (Defendant's Exhibit Number 19 was marked for

8  identification.)

9  BY MR. KEENEY:

10 Q    Ma'am, is that a photograph you posted on Facebook from

11 your account on March 3rd, 2021?

12 A    Yes.

13 Q    And the caption under that, it reads, "The world doesn't

14 seem as scary when viewed like this," correct?

15 A    Correct.

16 Q    And you were riding the horse in March of 2021?

17 A    No.

18 Q    All right.  And do you see under there -- GJ Barton is

19 your fiancé/husband?

20 A    Correct.

21 Q    And he wrote, "Please don't overdo it"?  Do you see that?

22 A    Yes.

23 Q    Okay.  And you responded, "GJ Barton, I'm not.  Trust me,

24 it didn't take much doing to become covered head to toe in

25 spring hair," correct?

1  A    Correct.

2  Q    All right.  So when was this taken?

3  A    March -- it says March 2021.  I'm not on the horse.

4  Becoming covered in spring hair, this picture was viewed down

5  her neck, standing next to her, and I brushed her down.

6  That's why I was covered in hair.  I cannot ride my horse.

7  This is my horse.

8         MR. KEENEY:  Your Honor, I'll admit that into

9  evidence as -- I believe we were D19.

10         THE COURT:  Any objection to D19?

11         MS. COHN:  No objection.

12         THE COURT:  Admitted.

13      (Defendant's Exhibit Number 19 was admitted.)

14  BY MR. KEENEY:

15  Q    Ma'am, back to the bladder and pelvic issues.

16         THE COURT:  Hold on one second.  So are all these

17  exhibits in now?

18         MR. KEENEY:  Yes, Your Honor, for now.

19         THE COURT:  Do you want to circulate them to the jury

20  so the jury can actually see what these things are?

21         MR. KEENEY:  Yes, Your Honor, that's fine.

22         THE COURT:  So what we're doing is, we're going to

23  circulate to the jury -- why don't we just do it one at a time

24  instead of the whole packet.  So let's start with -- was it

25  D15, was the first one?

1          MR. KEENEY:  Yes, Your Honor.

2          THE COURT:  All right.  Here's what we're going to

3     do:  D15 to the first juror, and then you're going to pass it

4     around, and then when you're done, we'll give you D16, pass it

5     around, and we're going to do it that way.

6          MR. KEENEY:  Your Honor, I should have enough copies,

7     one for everyone.

8          THE COURT:  We're just going to do it this way, okay?

9          D15 first, okay.  Just D15.

10         COURT SECURITY OFFICER:  Yes, sir.

11         THE COURT:  Are you circulating multiple copies of

12     D15?  We're just going to circulate one picture of D15.

13         That's okay.  How many copies of D15 are there?

14         COURT SECURITY OFFICER:  He gave me a stack, Your

15     Honor.

16         THE COURT:  Why don't you pass them around.

17     Everybody has their own D15.

18         Do we have enough copies of D16?

19         MR. KEENEY:  Yes, Your Honor.

20         THE COURT:  Hand them D16.  I'm sorry.  You're going

21     to do the same, then, Wayne.  I'm sorry.  That's my fault.  I

22     misunderstood what he was saying.

23         COURT SECURITY OFFICER:  No problem.

24         THE COURT:  So you have D15, then D16, then D17, and

25     then we're going to skip to D19.

**JA497**

1        Are we good?  Okay.  Everybody has them?

2        COURT SECURITY OFFICER:  They're still making their

3   way around.

4        THE COURT:  They're still passing them around.  I got

5   it.  I got it.  Okay.

6        All right.  Folks, here's what I'm going to ask you

7   to do:  I want you to look at these exhibits and when you're

8   done, I want you to take your time, give me a thumbs up so I

9   know you're done, had enough time to do it, okay?

10       I have two thumbs up.  I have three thumbs up.  Now

11  I'm up to five.  You can put it down.  Six.  Everybody has a

12  thumbs up.

13       Now, Mr. Keeney, you can move on.

14       MR. KEENEY:  Thank you, Your Honor.

15  BY MR. KEENEY:

16  Q    So, ma'am, your testimony is that it took you three

17  months to get to Dr. Guerette because you wanted to get the

18  headaches under control, correct?

19  A    Correct.  My testimony was also dealing with my children

20  and their issues and --

21  Q    I take it your children went on vacation with you to

22  Hatteras, correct?

23  A    Yes.

24  Q    And did y'all rent a house down there, camp down there,

25  or what?

1  A    Camp.

2  Q    On the beach?

3  A    No, in a campground.

4  Q    Your took your camper?

5  A    Yes.

6  Q    And your lower back, you had prior lower back issues,

7  correct?

8  A    Correct.

9  Q    And your lower back had returned to how it was before the

10 accident within two weeks of this accident, correct?

11 A    Yeah.  It was just aggravated.

12 Q    Okay.  And you also injured your neck and your shoulder

13 in this accident, correct?

14 A    Correct.

15 Q    And they were also both better within a few weeks; is

16 that fair?

17         MS. COHN:  Your Honor, I would have to object.  These

18 go to phase 2 damages and not phase 1 causation.

19         THE COURT:  I think she's right about that.  I'm

20 going to sustain that.  The extent of it is a damage issue.

21         MR. KEENEY:  Yes, Your Honor.  They're just date for

22 Alliance is the -- in phase 1.

23         THE COURT:  I mean, you've conceded those injuries.

24 How far do you want to go?

25         MR. KEENEY:  Fair enough, Your Honor.

1    Thank you, ma'am.  I don't have any other questions

2  for you.

3    THE COURT:  Ms. Cohn, do you have any redirect?

4    MS. COHN:  I'll try to be brief, Your Honor.

5    THE COURT:  I'm just asking, do you have any

6  redirect?

7    MS. COHN:  Yes, Your Honor, I do.  Thank you.

8                    REDIRECT EXAMINATION

9  BY MS. COHN:

10  Q    Ms. Roop, what did you do prior to being a stay-at-home

11  mom?

12  A    I was in the automotive field.

13  Q    And how long did you work in that field?

14  A    On and off.  My daddy was a mechanic, and I grew up side

15  by side with him, so.  I was daddy's little girl, helping him

16  on and off since '04ish.

17    THE REPORTER:  I'm sorry?

18    THE WITNESS:  '04.  Sorry.

19  BY MS. COHN:

20  Q    So would it be fair to say that sometimes you spitballed

21  with Mr. Barton regarding projects in his shop?

22  A    Yes.

23  Q    So you briefly touched on it, but you might go over how

24  to fix cars or an idea of how he could look into something

25  without actually necessarily doing the work yourself?

**JA500**

1          MR. KEENEY:  Objection.

2          THE COURT:  Hold on a second.  You're not testifying;

3     she is.  I'm sustaining the objection.

4          MS. COHN:  Thank you.

5          THE COURT:  Ask her who, what, where, how, and why,

6     if you have any more questions.

7          MS. COHN:  Thank you, Your Honor.

8     BY MS. COHN:

9     Q    So did you do anything beyond talk with Gerard regarding

10    how to possibly fix these vehicles?

11    A    No.  We do a lot of what we call talking out loud.

12    Gerard is great, and thank God he can't hear me, but he lacks

13    in being able to take a step back and put steps in order to

14    what could be the problem.  And we do -- we call it just

15    talking out loud, and we go through what could be wrong, what

16    did you do, what could you do.  Unfortunately, that's a lot of

17    our dinner talk when he has an issue.

18    Q    Even though you're not currently working, do you still

19    consider yourself a mechanic?

20    A    Yeah.  I mean, I --

21    Q    Mr. Keeney discussed your earlier treatment with Guerette

22    from 2011 to 2013 and the InterStim and the sling.  Did you

23    have any ongoing discomfort from those procedures from 2013

24    until this accident with Mr. Desousa?

25    A    No.

1  Q    Mr. Keeney also brought up that you were referred by your

2  attorney to physical therapy.  Any particular reason why?

3  A    I didn't know where to go.  The only physical therapy

4  I've ever dealt with was for my kid, my daughter, and I didn't

5  think VCU Children's Hospital wanted me.  So I just -- I

6  didn't know where to go and who was better.  It was basically

7  asking for a recommendation.

8  Q    After you had the procedure to explant the InterStim,

9  were you ever offered to keep it?

10 A    No.

11 Q    Did you ever see it?

12 A    No.

13 Q    Mr. Keeney brought up that you are here suing his client

14 for $5 million.  Is that a pie-in-the-sky number?

15         MR. KEENEY:  Your Honor --

16         THE COURT:  That objection is sustained.  That's not

17 relevant.  This only goes to bias.  You'll get to discuss that

18 down the road.  This is all about causation.

19         Do you have any other evidence from her on causation?

20 BY MS. COHN:

21 Q    This D19 picture that Mr. Keeney presented you with, you

22 said that's your horse, Sassy?

23 A    It is.

24 Q    Can you explain what a bridle is?

25 A    A bridle is a device that goes over the head, with a

**JA502**

1 metal bit that goes in the mouth, that you would use for

2 riding.  It has reins that you would control which pulls on

3 the horse's mouth to direct them left, right.

4 Q    Is Sassy wearing a bridle in this picture?

5 A    No.  She doesn't even have a halter on.

6 Q    Do you ride without bridles?

7 A    No.

8 Q    How many appointments did you go to for a neurologist?

9 A    I can't give an exact number.  A couple.  A few.

10 Q    Did that neurologist do anything for you?

11 A    It was a lot of bouncing with medication, and I don't

12 like to do that.

13 Q    I apologize.  I'm going to go back.

14      (Mr. Keeney sneezes.)

15          THE COURT:  God bless you.

16          MS. COHN:  Bless you, Mr. Keeney.

17 BY MS. COHN:

18 Q    I'm going to go back to one more question with Sassy.

19 Even though you can't ride Sassy, do you still take care of

20 her?

21 A    I do.

22 Q    Do you still groom her?

23 A    I do.

24 Q    Do you still feed her?

25 A    I do.

Roop - Redirect

1  Q    So you brush her regularly?

2  A    I do.

3          MS. COHN:  I have no further questions, Your Honor.

4          THE COURT:  Ma'am, thank you for your testimony.  You

5  can step down, back to the table.  I'm going to remind you

6  now, until this trial over, you're not to talk about your

7  testimony with anybody.  Do you understand that?

8          THE WITNESS:  I understand.

9          THE COURT:  You can have a seat.

10          Do you want to call your next witness?

11          MS. COHN:  Your Honor, the plaintiff's next witness

12  would be Dr. Nathan Guerette.

13          He's out in the hallway.

14          THE COURT:  Okay.  Everybody doing okay?

15          While we're waiting for him, there's a whole lot of

16  other stipulations it seems to me that we could just read into

17  the record right now.  Do you want me to get 10 through 14 in

18  the record?

19          MR. KEENEY:  That's fine with me, Your Honor.

20          MS. COHN:  Your Honor, that --

21          THE COURT:  He's coming now.  I'm just trying to save

22  time.

23          MS. COHN:  10, to me, just seems like phase 2, which

24  is why I haven't requested it, Your Honor.

25          THE COURT:  That's fine.

1    NATHAN GUERETTE, M.D., PLAINTIFF'S WITNESS, SWORN

2                   DIRECT EXAMINATION

3         THE COURT:  Sir, in a loud, clear voice, could you

4    identify yourself for everyone, spelling your first and last

5    names?

6         THE WITNESS:  Yes.  Nathan, N-A-T-H-A-N.  And the

7    last name is Guerette, G-U-E-R-E-T-T-E.

8         THE COURT:  Go ahead, Ms. Cohn.

9         MS. COHN:  Thank you, Your Honor.

10        Your Honor, I would, based on your recommendation, if

11   you would read in Stipulation 11 and 12, please.

12        THE COURT:  Stipulation 11 says that the medical

13   records and bills from St. Francis Medical Center, Bon Secours

14   Powhatan Medical Associates, Chippenham Johnston-Willis

15   Medical Center, Richmond Emergency Physicians, Emergency

16   Coverage Corp, Commonwealth Radiology, P.C., Alliance Physical

17   Therapy, LLC, and Intimate Wellness Institute of Virginia,

18   that were produced in discovery, were all kept in the ordinary

19   course of business and are authenticate.

20        The parties stipulate that the redacted records

21   identified in Defendant's Exhibit List, copies of which

22   plaintiff has been provided, are admissible.  Neither side

23   will require the testimony of a custodian of records or other

24   person to authenticate these records.  Neither party is

25   stipulating to the admissibility of any other part of these

**JA505**

1   records.  That's 11.

2           What did you say, 12 too?

3           MS. COHN:  Yes, Your Honor.

4           THE COURT:  The vehicle photographs identified in

5   Plaintiff's Exhibit List and provided to counsel are

6   admissible.

7           What else?  Anything else?

8           MS. COHN:  That's it.

9           THE COURT:  Go ahead.

10          MS. COHN:  Thank you, Your Honor.

11  BY MS. COHN:

12  Q    Good afternoon.

13  A    Afternoon.

14  Q    Thank you for being here today.

15       You've already stated your name for the Court.  Can you

16  please tell us what you do, sir?

17  A    I'm a urogynecologist and pelvic reconstructive surgeon.

18  Q    What is a urogynecologist?

19  A    It's a subspecialty of either obstetrics and gynecology

20  or urology.  We specialize in fixing functional issues of the

21  female pelvis.

22  Q    And are you board certified in anything?

23  A    I'm board certified in -- the technical term is female

24  pelvic medicine and reconstructive surgery as well as

25  obstetrics and gynecology.

1  Q    And --

2         THE COURT:  We're going to go through your background

3  real quick.

4         Where did you go to school?

5         THE WITNESS:  I'm originally from New York, so I did

6  my medical school through New York, and then I did my

7  residency here.

8         THE COURT:  Okay.  At MCV?

9         THE WITNESS:  Yeah, a program at MCV.  And then did

10  my fellowship at the Cleveland Clinic.

11         THE COURT:  How long have you been a doctor?

12         THE WITNESS:  I've been a doctor -- I graduated

13  medical school in -- when did I?  That's a long time ago,

14  1997.

15         THE COURT:  So you've been doing this for a while,

16  right?

17         THE WITNESS:  Yeah, I've been doing this a while.

18         THE COURT:  Remember, he's not offered as an expert.

19  He's just here as the treating physician, so I think everybody

20  knows he kind of knows what he's doing here.

21         MS. COHN:  Okay.

22         THE COURT:  So let's talk about how he treated

23  Ms. Roop.

24         MS. COHN:  Thank you, Your Honor.  Will do.

25

1  BY MS. COHN:

2  Q    Dr. Guerette, what is the Intimate Wellness Institute?

3  A    Intimate Wellness Institute is my practice.  It's a

4  comprehensive pelvic floor center, so we focus on

5  urogynecology, pelvic reconstructive surgery, as well as other

6  issues associated with female pelvic function.

7  Q    And, Dr. Guerette, have you ever had an occasion to treat

8  the plaintiff, Samantha Roop?

9  A    Yes.

10 Q    And when did she first become a patient of yours?

11 A    2011.

12 Q    And what were her complaints to you in 2011?

13 A    At that time, primarily she was complaining of urinary

14 urgency, frequency, pain, which centralized to her bladder, as

15 well as pain with sex.

16 Q    And did you ever diagnose her in 2011?

17 A    Yes.  She was -- after an extensive workup, she was

18 diagnosed with a condition called interstitial cystitis as

19 well as overactive bladder.

20 Q    Did you ever diagnose her with prolapse in 2011?

21 A    No.

22 Q    Did you ever see any indication of prolapse during your

23 treatment of her in 2011?

24 A    No.  Her pelvic exam at that time was negative for pelvic

25 organ prolapse.

1  Q    And did you, in fact, treat her regularly from 2011 to

2  2013?

3  A    Yes.

4  Q    Was there any indication of prolapse during that period?

5  A    No.

6  Q    Of any kind?

7  A    No.

8  Q    During your treatment of her between 2011 and 2013, did

9  you ever perform a procedure where you implanted a type of

10 machinery in her?

11 A    We did a sacral nerve stimulator, yes.

12 Q    What's another name for that?

13 A    So the general term is called sacral nerve simulation.

14      THE COURT:  Is that the same thing as an InterStim

15 device?

16      THE WITNESS:  InterStim is the brand name.

17      THE COURT:  Okay.  Go ahead.

18 BY MS. COHN:

19 Q    And what was the purpose of that?

20 A    The purpose of that was to control her overactive bladder

21 symptoms as well as her bladder pain.

22 Q    And are patients sent home with an in-home monitoring

23 system for this?

24 A    They do have a remote that can communicate with the unit.

25 Q    And what do you mean communicate with it?

1  A   It communicates wirelessly, just like -- it's very

2  similar to a pacemaker in other parts of the body.  People

3  might be more familiar with, like, a cardiac pacemaker.  So we

4  have a device that can be placed up against it and read the

5  battery readings of the unit to tell how it's functioning, the

6  power, the settings, and be able to alter the settings, if

7  necessary, and turn it on and off.

8  Q   And during this treatment from 2011 to 2013, when you

9  implanted this InterStim in her, to your knowledge, did it

10 alleviate her complaints of overactive bladder?

11 A   Yes.  She did substantially better for quite a long

12 period of time.

13 Q   What do you mean "quite a long period of time"?

14 A   Well, she was doing substantially better with me during

15 the last portion of her seeing me in 2013, and then based on

16 her report --

17         THE COURT:  Well, we're not going to go on her

18 report.

19         THE WITNESS:  Okay.

20         THE COURT:  So you treated her in 2013, right?

21         THE WITNESS:  Correct.

22         THE COURT:  The next time you saw her was in October

23 of 2019?

24         THE WITNESS:  That's correct.

25         THE COURT:  Okay.  We're going to talk -- Ms. Cohn is

1  going to ask you questions about what you observed when you

2  came into contact with her in October of 2019.

3  BY MS. COHN:

4  Q    So you had no appointments with her between 2013 and

5  2019?

6  A    That's correct.

7  Q    So you had no indication that things weren't working

8  properly?

9  A    No, I would have no way of knowing it.

10 Q    But she wasn't at your office?

11 A    No.

12 Q    Do you have any indication she went for treatment at any

13 other office?

14 A    No.

15 Q    The next time you saw Ms. Roop was October 2019?

16 A    That's correct.

17 Q    And what were her complaints in 2019?

18 A    When she returned, she reported worsening of her urinary

19 incontinence symptoms, as well as significant urgency and

20 frequency.  Do I have those the notes here in this, for more

21 detail?

22        THE COURT:  Do you want to direct him to his --

23        MS. COHN:  Thank you, Your Honor.

24        THE COURT:  Do you have his medical records?  What

25 exhibit are they?

**JA511**

1  MS. COHN:  Exhibit 7.

2  THE COURT:  P7?

3  MS. COHN:  P7.

4  THE COURT:  Doctor, do you have the book there?  Do

5  you want to go to P7?  Are those yours?  Those are your

6  records?

7  THE WITNESS:  These are my notes, yes.

8  THE COURT:  Are you associated with St. Mary's, then?

9  Is that where you are?

10  THE WITNESS:  I'm in private practice.  I use

11  St. Mary's -- well, I don't any longer, but I used St. Mary's

12  for surgery.

13  THE COURT:  Okay.  That's fine.

14  A    Okay.  Yeah, so she reported worsening of her urinary

15  urgency/frequency.  Incontinence:  Primarily urge

16  incontinence.  She was having one to two incontinent episodes

17  per day, voiding more than 11 times during the day and more

18  than three times at night.  And, in addition, when I evaluated

19  her pelvic support, she was noted to have apical and anterior

20  pelvic organ prolapse, so her bladder and the top of the

21  vagina were coming down at that time.

22  Q    Did she indicate to you when these complaints had

23  started?

24  A    She correlated the complaints with a car accident.  I

25  wrote here, "MVA," motor vehicle accident, "in July of 2019."

1  Q    And were any of these symptoms -- well, actually, I

2  apologize.  Let me back up for a second.

3       In 2011 to 2013, I know I asked you if you diagnosed her

4  with prolapse.  Did you observe any prolapse issues?

5  A    When we evaluate somebody in this field, we actually do

6  an objective assessment with a pelvic exam.  It's not just

7  like getting a Pap smear.  We actually look at pelvic support

8  and have the patient strain to look for any pelvic support

9  defects.  So she was actually officially checked for that

10 during that period of time and did not have it.

11 Q    And during your treatment observations of her, was there

12 any indication that these symptoms that she complained about

13 in October of 2019 arose from any other period other than what

14 she relayed to you?

15       MR. KEENEY:  Objection, Your Honor.

16       THE COURT:  That's sustained.  All he can testify to

17 is what -- did you perform an examination of her when she came

18 to you in October?

19       THE WITNESS:  I did.

20       THE COURT:  Okay.  Putting aside what she told you,

21 because that's not relevant here, what is relevant is simply

22 what did you see.  Was there anything different from 2013,

23 when you last saw her, until 2019?

24       THE WITNESS:  Yes.  So in specific regard to her

25 pelvic support, she had developed apical vaginal prolapse, so

1 the top of the vagina coming down, and a cystocele, which is

2 the bladder coming down.  Those were new findings.

3         THE COURT:  Okay.  I think that's the extent of his

4 testimony.

5         MS. COHN:  Your Honor, I would state for the Court

6 that there were several other appointments and treatments, and

7 that has already come up --

8         THE COURT:  Listen, you can't testify.  The question

9 is simply this:  His testimony at this stage is simply what

10 did he see in October.  And he just said -- now the question

11 is, it's your burden to establish why that happened.

12         MS. COHN:  Correct.

13         THE COURT:  He's not in a position to talk about

14 that.  Do you have anything else?

15 BY MS. COHN:

16 Q    I just simply wanted to ask, during the treatment with

17 you in October of 2019, what was the ultimate diagnosis of

18 Ms. Roop that you observed?

19 A    So there were two factors.  One was that her InterStim

20 was no longer functioning correctly.  And, again, just like a

21 pacemaker for the heart, when we're looking at it, we inquire

22 how the unit is working by communicating it with a remote.

23 And when we do that, we evaluate both the -- what's called the

24 IPG, which is the battery itself, as well as the lead, which

25 is the wire connecting from the battery into the nerve, next

1  to the nerve.  And based on that evaluation, there were

2  impedances noted in the wire which indirectly is indicative of

3  damage to the wire.

4        THE COURT:  Hold on.  Hold on.  Did you observe the

5  damage to the wire?

6        THE WITNESS:  We observed the impedances.  So that

7  that is indicative that the energy is not getting from the

8  battery to the nerve.  That is all I can say.

9        THE COURT:  When you said you saw the impedances,

10  what are you looking at?

11        THE WITNESS:  We're looking at ohms, which is the

12  amount of resistance.  It's a measure of resistance in the

13  wire itself.  So the wire -- the lead has multiple wires

14  within it, because there's multiple connection points into the

15  nerve in a patient, and that allows us to create fairly

16  sophisticated magnetic, electromagnetic fields to stimulate

17  the nerve to get better outcomes in terms of bladder control.

18        And so when we are trying to figure out why

19  somebody's symptoms have recurred when they have one of these

20  units in place, we do an inquiry into the system, and one of

21  the things we're looking at is whether the electricity is

22  getting where it's supposed to be, and if it's not, that's

23  measured by an increase in resistance in the wire.  Most of

24  the time the reason why is the wire is damaged.  That's just

25  simply the most common reason.

1          THE COURT:  Are you able to observe, though, the

2     damage?

3          THE WITNESS:  I cannot physically see --

4          THE COURT:  Can't physically see.

5          THE WITNESS:  -- damage, no.

6          THE COURT:  So you just draw an inference from it?

7     Is that what you're saying?

8          THE WITNESS:  That is an inference from the readings

9     on the unit.

10          THE COURT:  All right.

11          MR. KEENEY:  Your Honor, I would object and move to

12     strike the inference because that's not an observation.

13          THE COURT:  All right.

14          MR. KEENEY:  That goes back to our underlying issue.

15          THE COURT:  I am going to strike the inference.  The

16     doctor is only permitted to testify to what he observed.  So

17     you're only to consider what his observations are, not any

18     inferences that he drew, folks.

19          But there is a second thing -- that was the first

20     thing.  You said there were two things that you observed.

21          THE WITNESS:  Yes.  So the unit was not functioning

22     appropriately and, therefore, would have been one indication

23     as to why her symptoms recurred, and then the other one was a

24     loss of pelvic support.

25          THE COURT:  Okay.

 1          MS. COHN:  Thank you.

 2    BY MS. COHN:

 3    Q    Dr. Guerette, you have stated that it ceased to function

 4    properly.  Was the unit still functioning?

 5    A    Yes.  So, again, one reason it can stop, and the amount

 6    of time that she had the unit in place, it was certainly

 7    possible that it had run out of battery, run out of juice, as

 8    what like to say.  It's a battery like any other battery;

 9    although, it does have a long life span.  It was low in its

10    battery life and near it's end of life, but it was still

11    functioning and so we were able to inquire it.  If the battery

12    is completely at the end of life, you can't -- you can't read

13    it at all.  It's like any dead battery, it doesn't read

14    anything.  So it did have some life left in it.

15    Q    So it was simply just malfunctioning?

16    A    It was not functioning correctly, yes.

17          MS. COHN:  Thank you.  I have no further questions

18    Your Honor.

19          THE COURT:  Mr. Keeney.

20          MR. KEENEY:  Thank you, Your Honor.

21                    CROSS-EXAMINATION

22    BY MR. KEENEY:

23    Q    Doctor, my name is Carter Keeney.  I'm representing the

24    defendant in this lawsuit.

25          Ms. Roop first came back to you in 2011, 2012, correct?

1 A    2011, yes.

2 Q    Okay.  And at that time, I take it, you conducted an exam

3 just like you did when she came back to you in 2019, correct?

4 A    Yes.

5 Q    And one of the things I think you testified when Ms. Cohn

6 was asking you questions, and I'm sorry, I'm going to butcher

7 the pronunciation, when she back to you, she had cystocele.

8 Am I saying that right?

9 A    Cystocele.

10 Q    That's the beginning of vaginal prolapse, correct?

11 A    That's a type of vaginal prolapse.

12 Q    Okay.

13 A    That's when the bladder is falling down into the vagina.

14 Q    Got you.

15      Sir, if I could ask the marshal to hand you --

16      THE COURT:  Hold on a second.  Is this another

17 exhibit now?

18      MR. KEENEY:  I'm not going to make it an exhibit.  I

19 just want to ask him about it, Your Honor.  It's one of his

20 old records.

21      THE COURT:  Listen, if you're going to -- whether you

22 introduce it or not, it's a different duck.  You have to mark

23 it.  So now we're up to D --

24      MR. KEENEY:  20, I believe.

25      THE COURT:  D20.  And I need to take a look at it

1  first.

2      (Defendant's Exhibit Number 20 was marked for

3  identification.)

4          THE COURT:  Okay.  You can show him D20.

5  BY MR. KEENEY:

6  Q    Do you recognize that document?

7  A    I do.

8  Q    Doctor, is that your record of January 7th, 2020 [sic]?

9  A    That is.

10 Q    And it looks like it's titled, "Initial Consultation

11 Report."  So I take it that's the first time Ms. Roop ever

12 came under your care?

13 A    That is correct.

14         THE COURT:  In 2020?

15         MR. KEENEY:  Excuse me, 2011.

16         THE COURT:  2011.

17         MR. KEENEY:  I'm sorry.  January 7th, 2011.

18         Thank you, Your Honor.

19 BY MR. KEENEY:

20 Q    Doctor, if you flip to the second page there, you see you

21 did a pelvic exam, correct?

22 A    Yes.

23 Q    And at that point, under "prolapse," you found a first

24 degree -- say it for me.

25 A    First degree cystocele.

1  Q    Okay.  Thank you, Doctor.

2      And then back when she came to you in 2019, she had

3  previously had the InterStim implanted.  And I want to make

4  sure I understand what an InterStim does.  It's a sacral nerve

5  stimulator, correct?

6  A    Yeah.  If I could clarify on the cystocele, the

7  measurement was substantially different than it was when she

8  back in 2019.  So she was noted to have first degree cystocele

9  when he initially saw me, which we don't consider clinically

10  significant.  When she saw later, it was a significantly

11  larger cystocele.  So it's apples and oranges.

12  Q    Thank you, Doctor.

13      THE COURT:  Let me ask you, though:  The initial one

14  that you saw her, is that, like, the first stage of this?

15      THE WITNESS:  That's a very early stage and not

16  associated with clinical symptoms.

17      THE COURT:  Does it, though, progress, then?  Is that

18  what happens?

19      THE WITNESS:  Yes, it can progress.

20      THE COURT:  So in the eight years since you, then,

21  saw her, again, it had progressed; is that right?

22      THE WITNESS:  It had -- absolutely, it had

23  progressed.

24      THE COURT:  Okay.

25      MR. KEENEY:  Thank you.

1  BY MR. KEENEY:

2  Q    Doctor, for the InterStim, originally when it's

3  implanted, that's for overactive bladder and associated

4  bladder spasm, correct?

5  A    The InterStim, yes.

6  Q    And for pelvic floor muscle dysfunction, correct?

7  A    That is a less common use, but yes.  We use it for pelvic

8  pain associated with either bladder pain or muscular pain, and

9  the pelvis as well.

10  Q    And, in fact, that's why you put it in Ms. Roop back in

11  2012, was for the overactive bladder, bladder spasm, and

12  pelvic floor muscle dysfunction, correct?

13  A    And her interstitial cystitis, which is associated with

14  bladder pain, yes.

15  Q    And help me understand the pelvic muscles.  My

16  understanding, and I'm not a doctor, is the pelvic muscles

17  operate to help keep the pelvic organs in place and

18  functioning properly; is that fair?

19  A    That's one of their purposes.

20  Q    Okay.  And when you first saw her after this accident,

21  one of the things you prescribed was pelvic floor therapy,

22  correct?

23  A    Yes.

24  Q    And pelvic floor therapy is essentially physical therapy

25  for the muscles of the pelvic region; is that fair?

1          MS. COHN:  Your Honor, I have to object.  This seems

2   to be more of phase 2, treatment and damages versus causation.

3          THE COURT:  Yeah.  What's the relevance now?

4          MR. KEENEY:  Your Honor, because in phase 1, there's

5   a jury instruction about aggravation.  She wasn't told to do

6   the pelvic floor therapy which would have strengthened the

7   muscles.

8          THE COURT:  That's fine.  That's appropriate.  Go

9   ahead.

10  BY MR. KEENEY:

11  Q    So, Doctor, the pelvic muscle therapy, that's essentially

12  physical therapy for the pelvic muscles, correct?

13  A    That is correct.

14  Q    Designed to strengthen the muscles, correct?

15  A    One of the reasons, yes.

16  Q    And then that helps prevalent further prolapse, correct?

17  A    Possibly.

18  Q    Okay.  And you prescribed that to Ms. Roop after this,

19  when he came back to you in 2019, correct?

20  A    Yes.

21  Q    And she did not do that, correct?

22  A    In 2019?

23  Q    Yes.  Do you have any record -- you would have gotten the

24  record of it, and you've got the records in front of you.

25  2019, early 2020, she didn't do that, did she?

1 A    No.  I'm not aware that she did that, but she already had

2 the prolapse at that stage.  So prolapse is a connective

3 tissue issue, and once you have prolapse, it's not going to go

4 back up by doing pelvic floor exercises.  You can lesson the

5 symptoms, but you can't change a defect in connective tissue.

6 Q    Okay.  And then initially you replaced the InterStim in

7 January of 2020, correct?

8 A    That's correct.

9 Q    And your -- you have operative diagnoses when you

10 actually perform a surgery, correct?

11 A    I do.

12 Q    And for Ms. Roop, in January of 2020, you had two

13 operative diagnoses, same for preop and postop.  The first one

14 was overactive bladder, unresponsive to conservative therapy,

15 correct?

16 A    I'm looking for the operative report.

17 Q    I've got it, if that would help speed up things.

18        THE COURT:  Let's point to an exhibit.

19        MR. KEENEY:  Well, Your Honor, it's in the phase 2

20 exhibits.

21        THE COURT:  All right.  Look, we have to mark stuff

22 and introduce stuff.  Let's just move on.

23        Do you have anything else on causation?

24 BY MR. KEENEY:

25 Q    Doctor, your initial diagnosis when you replaced the

 1  InterStim was expired InterStim, correct?

 2  A    For that portion of her procedure, yes.

 3  Q    Okay.  And then you did not see her between February of

 4  2020 and December of 2020, correct?

 5  A    Yes.  But when I do an operative report, it's

 6  specifically for the indication that the surgery is being

 7  done.  So I wouldn't talk about a prolapse when I'm doing a

 8  surgery for an InterStim.  I think that --

 9  Q    Right.  But my --

10  A    -- clarification.

11  Q    Doctor, my question is, you didn't see her for 10 months

12  in 2020, correct?

13  A    I would have to specifically go through the records, but

14  I'll take your word for it.

15  Q    And when she came back, she said she was doing worse,

16  correct, in December of 2020?

17  A    That, I believe, is correct.

18  Q    And, I take it, it's fair you don't know how she was

19  doing in that 10-month gap other than what she told you?

20  A    Well, I believe her.

21  Q    Okay.  And, I take it, you also don't know how she was

22  doing before the accident other than what she told you; is

23  that fair?

24  A    Of course.

25       MR. KEENEY:  Thank you, Doctor.

1    THE COURT:  Any redirect?  Remember, he's here for a

2  very narrow issue.

3                REDIRECT EXAMINATION

4  BY MS. COHN:

5  Q    Dr. Guerette, in that 2011 note that Mr. Keeney brought

6  up, how many prolapses did you discuss in that note?

7  A    Sorry.  I keep putting my glasses away.

8       Well, whenever we do a report, you talk about all the

9  potential areas of prolapse in the pelvis.  So we talk about

10  the uterus; she had zero degree uterine prolapse.  And her

11  enterocele and rectocele, which are posterior aspects of the

12  vagina with the bowel, those were all zero degree.  And then

13  she had the cystocele, which is an anterior prolapse or where

14  the bladder is, and that was a first degree.

15  Q    And how was that different than when you saw her in 2019?

16  A    At that time she had a second- to third-degree cystocele,

17  which is the tissue nearly getting to the opening of the

18  vagina, as well as a mild uterine and apical, or top of the

19  vagina, prolapse.  The back wall where the rectum is was still

20  fine.

21  Q    But your ultimate diagnosis of her was three different

22  prolapses, correct?

23  A    Correct.

24  Q    Does an InterStim treat prolapses?

25  A    No.

**JA525**

1  Q    During that 10-month gap in treatment, was there any

2  indication that she sought medical care elsewhere for these

3  prolapse issues?

4  A    No.

5           MS. COHN:  I have no further questions, Your Honor.

6           THE COURT:  Doctor, thank you for your testimony.

7  We're going to let you be excused.

8           There's a possibility he might be needed again; is

9  that correct?

10          MS. COHN:  Your Honor, it depends on phase 2.

11          THE COURT:  Okay.  So I'm going to ask you not to

12 talk about your testimony with anybody else.  You can step

13 outside, and we'll kind of play it by ear, okay?

14          THE WITNESS:  Thanks.

15          THE COURT:  But thank you again for being here.

16          Ms. Cohn, your next witness, is it a long witness, a

17 short witness?  Remembering hearsay is not going to be

18 admissible here, so if it's Mr. Barton, he can only testify

19 about what he sees, not what she says.

20          MS. COHN:  Of course, Your Honor.

21          THE COURT:  Okay.

22          MS. COHN:  And it is Mr. Barton.

23          THE COURT:  Is that a long one or short one?  The

24 jury's lunch is here.  The question is, do we try to finish

25 your evidence before they eat, or how long are we talking

**JA526**

1  about?

2      MS. COHN:  I can make it brief, Your Honor.

3      THE COURT:  Well, it's your case.  I'm not pushing

4  you.  I'm just asking you to tell me, how long do you need?

5  Is it a 10-, 15-minute witness, or is it longer?  Just tell

6  me.

7      MS. COHN:  Probably 20 minutes, Your Honor.

8      THE COURT:  I'll tell you what, I'm going to let them

9  eat, then.

10     Here's what we're going to do:  We're going to break

11  until 1:35.  That will give you an hour for lunch.  That

12  super-duper free government lunch is here.  As I said, I

13  think, yesterday, it always tastes better when it's free,

14  right?  So I hope that you enjoy that.

15     Remember you're kryptonite.  You can't talk about the

16  case until the end, okay?

17  (Jury out at 12:37 p.m.)

18     THE COURT:  Is there anything else I need to address

19  from the plaintiff?

20     MS. COHN:  No, Your Honor.

21     MR. KEENEY:  No, Your Honor.

22     THE COURT:  So that's your last witness, then.  I

23  need to read these other stipulations in because I'm going to

24  give the stipulations to the jury.  I already told them that.

25  Even Number 10 about the $30,000, I mean, I think we should

1 just read those in, unless you're going to give me a redacted

2 version.  Why don't I just read them all in and they can have

3 them?

4 　　　　MS. COHN:  That's fine, Your Honor.  I simply didn't

5 want to run afoul of your bifurcation.

6 　　　　THE COURT:  I'm not worried about that.

7 　　　　MS. COHN:  If you're comfortable with that, then

8 that's fine with the plaintiff.

9 　　　　THE COURT:  Mr. Keeney, do you have any problem with

10 that?

11 　　　　MR. KEENEY:  No, Your Honor.

12 　　　　THE COURT:  So you're going to have Mr. Barton.  Do

13 you have any other evidence after that?

14 　　　　MS. COHN:  No, Your Honor.

15 　　　　THE COURT:  I have to tell you something:  This is

16 about causation and I haven't heard it yet.  So you'd better

17 have something good coming here, or you'd better maybe have

18 some discussions with Mr. Keeney.  You could still resolve

19 this case.  Because I think I have yet to hear a causation

20 issue.

21 　　　　There's no question that this woman suffers.  The

22 question is, did it come from the accident?  I have zero

23 evidence yet.  Zero.  And I'm completely sympathetic.  You'd

24 better start hitting something, or if I were you, I would

25 start having discussions with him over lunch and see if you

**JA528**

1 could resolve it beforehand, because this is not heading the

2 way I think you want it to head.

3        So you-all be back by 1:30.

4        MR. KEENEY:  Thank you, Your Honor.

5        MS. COHN:  Thank you, Your Honor.

6    (Recess at 12:39 p.m. until 1:34 p.m.)

7    (Jury out.)

8        THE COURT:  You couldn't resolve the case?

9        Okay.  So you have Mr. Barton, and then I'll publish

10 the stipulations?  Or do you want me to publish them first?

11        MS. COHN:  If Your Honor would like to publish them

12 first.

13        THE COURT:  I'll publish them first, then we'll call

14 Mr. Barton, and then you're done, right?

15        MS. COHN:  Yes, Your Honor.

16        THE COURT:  Do you anticipate any evidence?

17        MR. KEENEY:  No, Your Honor.

18        THE COURT:  Okay.  So what I'll do is, after you

19 rest, I'm going to send the jury out.  I gather you're going

20 to have a Rule 50 motion; we'll address that.

21        Do you want to bring the jury in?

22        COURT SECURITY OFFICER:  Yes, sir.

23    (Jury in at 1:34 p.m.)

24        THE COURT:  Everybody doing okay?

25        JURY MEMBER:  (Inaudible.)

1     THE COURT:  What's that?

2     JURY MEMBER:  I said I feel like I'm in a different

3  world.  We've been in there for a long period of time.

4     THE COURT:  I wanted to give you enough time to enjoy

5  that free sandwich.

6     JURY MEMBER:  Oh, yeah.  It was good.

7     THE COURT:  I told you it always tastes better.  Did

8  it live up to the hype, then?

9     JURY MEMBER:  It did.

10    THE COURT:  Okay.  Well, that's good.  Were you-all

11 mindful of the instructions about behaving yourselves?

12    JURY MEMBER:  Yes.

13    THE COURT:  I'm going to read you a couple more

14 stipulations here.

15    Stipulation Number 10.  The cost of the treatment of

16 the visits referenced in Stipulations 2 through 9 are $30,031.

17 The parties stipulate the plaintiff is entitled to recover for

18 those bills.  So that $30,031 is not in dispute.

19    Number 13.  At the time of the accident, the

20 plaintiff had an active prescription for opiates for her

21 chronic back pain.

22    Number 14.  All the plaintiff's medical bills were

23 reasonable in cost.  All of the medical bills are authentic.

24    Ms. Cohn, do you want to call Mr. Barton in?

25    MS. COHN:  Yes, Your Honor.

**JA530**

1    THE COURT:  Do you want to retrieve Mr. Barton, then?

2    GERARD O. BARTON, JR., PLAINTIFF'S WITNESS, SWORN

3                    DIRECT EXAMINATION

4    THE COURT:  Sir, in a loud, clear voice, can you tell

5  us all your full name -- why don't you scoot up there a little

6  bit.  No, you can sit down.  Just scoot close to the

7  microphone, that's all.  That's what he's trying to do.  You

8  got it?

9        In a loud, clear voice, tell us your full name,

10  spelling both your first and your last names.

11        THE WITNESS:  Gerard, G-E-R-A-R-D, O'Donnell, Barton,

12  B-A-R-T-O-N, Jr.

13        THE COURT:  Go ahead, Ms. Cohn.

14        MS. COHN:  Thank you very much, Your Honor.

15  BY MS. COHN:

16  Q    Thank you for stating your name for the Court.

17        Mr. Barton, do you know the plaintiff, Samantha Roop?

18  A    Yes, I do.

19  Q    And how do you know Ms. Roop?

20  A    We've been together for -- since 2007.

21  Q    So about 15 years?

22  A    Yes.

23  Q    And how would you describe your relationship with her?

24  You said you've been together.  What does that mean?

25  A    We moved in together since February 27, 2007.  So

**JA531**

1   we've -- dating and engaged and --

2   Q    Would it be fair to essentially say you're husband and

3   wife?

4   A    Yes.

5   Q    Do you see her pretty much on a daily basis?

6   A    Every day.

7   Q    So are you aware of this July 7th, 2019, accident,

8   motor vehicle accident that she was involved in with

9   Mr. Desousa?

10  A    Yes, I am.

11  Q    Can you please do me a favor?  There's a binder in front

12  of you.  Can you please look at Exhibits 1 and 2?

13         THE COURT:  P1 and 2.

14         MS. COHN:  P1 and 2.  Thank you, Your Honor.

15  BY MS. COHN:

16  Q    Let's just start with P1.  Do you recognize those photos?

17  A    Yes, I do.

18  Q    What's in those photos?

19  A    A picture of Ms. Roop's Suburban and the Toyota that was

20  in the accident.

21  Q    So were you actually at the scene of the accident after

22  it occurred?

23  A    Yes, I was.

24  Q    And did you witness both vehicles?

25  A    Yes, I did.

1  Q    Are those accurate pictures of the damages both vehicles

2  occurred in the accident?

3  A    Yes, it is.

4  Q    So I want to talk to you about Samantha before this

5  accident.  You said that you see her every.  So you observe

6  her on a daily basis?

7  A    Yes.

8  Q    So those observations, you can notice pain levels,

9  bathroom usage, things of that nature?

10 A    Yes.

11 Q    So prior to the 7/7/2019 accident, are you aware of

12 Samantha attending any appointments with a Dr. Guerette?

13 A    Just normal, routine visits.

14 Q    But -- I'm sorry, let me drill down a little bit further.

15     Do you know what Samantha went to see Dr. Guerette for

16 prior to this 2019 accident?

17        THE COURT:  Wouldn't this all be hearsay?  I mean,

18 he's not -- he's not the treating person.  I think you need to

19 focus on what was she like before the accident, what was she

20 like -- that's what your point is, right?

21        MS. COHN:  Thank you, Your Honor.

22        THE COURT:  How did she act, what did he observe,

23 okay?

24        MS. COHN:  Will do.

25 BY MS. COHN:

1  Q    Prior to the 2019 accident with Mr. Desousa, did you

2  observe Ms. Roop in any kind of pain whatsoever regarding her

3  pelvic area?

4  A    Prior to the accident, no.  She has -- she does have an

5  InterStim in her system, and she's had that for several years.

6  But there was never any issues with it other than normal,

7  routine checkups after it was installed, inserted.

8  Q    And do you know when that was?

9  A    No, I do not.

10 Q    Was it more than five years before the accident?

11 A    Between five and seven.

12 Q    What did you observe of Ms. Roop prior to the

13 implantation of that InterStim?

14 A    There was bladder pains.  There was frequent use of the

15 bathroom.  There was multiple things that had led up to the

16 fact of her even going to the doctor to see what was wrong.

17 And when they determined what was wrong and installed the

18 InterStim, that's what he said would fix it at the time.

19 Q    And from your observations, did the installation and the

20 implantation of that InterStim, in fact, alleviate her bladder

21 pain and frequent use of the restroom?

22 A    Yes, it did.

23 Q    Was she having any of those concerns in 2014?

24 A    No.

25 Q    2015?

1   A    Not that I recall, no.

2   Q    2016?

3   A    No.  The only time she went back to the doctor after the

4   InterStim was installed was for routine maintenance of it.

5   Q    So in 2018, she didn't have any of the bladder pain or

6   frequent urination?

7   A    No.

8   Q    2019, prior to the accident, did she have any bladder

9   pain or frequent urination?

10  A    No.

11  Q    Did you attend any of the appointments with

12  Samantha regarding -- with Ms. Roop regarding the InterStim

13  prior to 2019?

14  A    Yes.  I attended all of Samantha's doctor's appointments.

15  Q    After 2013, after attending the appointments, was it ever

16  demonstrated to you how to use an at-home monitor for the

17  InterStim?

18  A    Yes, it was.

19  Q    And did you, in fact, use that monitor on Ms. Roop?

20  A    Yes, I have.

21  Q    And how often?

22  A    We check her InterStim once a month.

23  Q    And approximately what time of the month do you check it?

24  A    Normally towards the end of the month.

25  Q    So, to your recollection, did you check it in June of

**JA535**

1  2019?

2  A    Yes, we did.

3  Q    And when you check the monitor on the InterStim, what

4  does it show you?  What did you see in June of 2019?

5  A    It shows you the battery life of it, it shows you what

6  setting it's set at, and it shows different programs that you

7  can change it to.

8  Q    In June of 2019, was the InterStim monitor, when you used

9  it, functioning properly?

10  A    Yes, it was.

11  Q    Did it show you what the battery life was of the

12  InterStim at that point?

13  A    Yes.

14  Q    And what was that?

15  A    Somewhere in 50 percent.  I don't remember the exact

16  number.

17  Q    Did it allow you to change the programming?

18  A    Yes.

19  Q    Were you allowed to change the functions and the

20  settings?

21  A    I did not change the functions.  I was able to change the

22  settings of what function it was set at.  I don't change the

23  functions unless there's an absolute reason to.

24  Q    So in June of 2019, was the monitor hooking up to the

25  InterStim normally as it had in the past?

1    A    Yes.

2    Q    And if you had checked it -- well, let's say you checked

3    it -- sorry.  Rephrase.

4         Had you checked it monthly since 2013?

5    A    Yes, we tried to check it every single month, and

6    normally we check it towards the end of the month.

7    Q    And was it functioning in June of 2019 as it had since

8    2013?

9    A    Yes.

10   Q    The monitor connected the same way it always had?

11   A    Yes.

12   Q    What do you do for a living, Mr. Barton?

13   A    I own an automotive repair shop.

14   Q    And does Samantha work for you, Ms. Roop?

15   A    No.

16   Q    Does she work with you?

17   A    No.

18   Q    Has she ever?

19   A    Not worked with me, not for the shop, no.

20   Q    How long have you had that shop?

21   A    2010.

22   Q    Prior to the accident in 2019, from your observations,

23   did Ms. Roop have any pain during intercourse?

24   A    No.

25   Q    From your observations, prior to June of 2019, did she

1  have any pelvic pain prior to -- my apologies.  Prior to the

2  accident in July of 2019, did she have any pelvic pain from

3  your observations?

4  A    No.

5  Q    Did you have an occasion to check the InterStim device

6  with the monitor after this accident happened?

7  A    Yes, we did.

8  Q    And when did you do that?

9  A    It was either the night of the 8th or the 9th.

10  Q    And for what reason did you check the monitor?

11  A    Because I witnessed her having pelvic pain every time she

12  urinated.  So I wanted to check and see what the setting was

13  at, to see if I could adjust it up or down so it would help

14  alleviate some pain.

15  Q    When you observed her having pain, what do you mean?

16  A    Holding her lower stomach, not being able to urinate the

17  way she had urinated before.  Said she had to go really bad

18  and it would basically just trickle out.

19  Q    What did you observe when you used the monitor on the

20  InterStim device on the 8th or the 9th after the accident?

21  A    I was able to get the unit to turn on and connect to the

22  Interstim, but I was -- and when it turns on, it connects, it

23  shows you battery life, and I was able to see battery, but I

24  was not able to change any settings or functions.

25  Q    And do you recall what that battery life was?

1  A    In the 50 percent.

2  Q    So what would you describe as different when you

3  monitored the InterStim in the -- at the end of June of 2019

4  and when you monitored the InterStim again after the accident

5  on the 8th or 9th of July?

6  A    Prior to July, I was able to change settings, and after

7  July, I was not able to change settings.  It wouldn't do

8  anything with the InterStim.

9  Q    Are you aware of any other event during that period aside

10 from the car accident?

11 A    No.

12 Q    Have you ever observed Samantha lift 100 pounds?

13 A    No.

14 Q    Could you please describe what changes you saw in

15 Ms. Roop after the July 7th, 2019, accident, particularly

16 regarding her pelvic area?

17 A    Frequent pains of grabbing her stomach while she was

18 urinating; just walking in general from living room to kitchen

19 and she'd buckle over in pain.

20 Q    Was she going to the bathroom more?

21 A    Yes.

22 Q    Was the amount of times that she was going to the

23 bathroom impacting her daily activities?

24 A    I would say yes, because every time she thought she had

25 to go to the bathroom where it felt frequent, it would be just

1  a -- I don't know.  I wasn't in there to watch every speck of

2  it come out, but it would trickle out from what I heard,

3  because I did watch over her very closely after the accident.

4  Q    Has Ms. Roop been in any other motor vehicle accidents

5  since you two have been together?

6  A    No.

7  Q    Has Ms. Roop ever fallen off a horse since you've been

8  together?

9  A    No.

10 Q    Were you with Ms. Roop during that 2019 -- during a 2019

11 ride in Hatteras?

12 A    Yes.

13 Q    Were you, in fact, able to witness her riding a horse in

14 2019 in Hatteras?

15 A    Yes.

16 Q    And did you witness her fall at all?

17 A    No.

18 Q    And how were you able to witness this ride?  Were you

19 riding with her?

20 A    No.  I was on the vehicle -- in our car on the beach.

21 Q    How many other people were on this ride with Ms. Roop?

22 A    I don't recall.  I want to say anywhere from 8 to 12.

23 Q    Has Ms. Roop fallen since you two have been together, in

24 any significant manner?

25 A    No.

1  Q    Did you observe or witness any other traumatic or

2  significant events take place regarding Ms. Roop in July of

3  2019?

4  A    No.

5  Q    In June of 2019?

6  A    No.

7  Q    May of 2019?

8  A    No.

9  Q    April?

10 A    No.

11 Q    Back to January of 2019?

12 A    No.

13 Q    Any significant or traumatic events since that July 7th

14 of 2019, accident?

15 A    No.

16 Q    When did you observe these changes in pelvic pain and

17 urination take place?

18 A    Once -- after the accident, once she was able to get up

19 and not be as dizzy and light-headed, and she got up and would

20 move a little bit more frequently, I have noticed -- I noticed

21 her grabbing her lower stomach more frequently.

22 Q    Was that within a week after the accident?

23 A    Within a week, maybe two weeks.

24 Q    Based on your observations, after the July 7th of 2019

25 accident with Mr. Desousa, did that monitor for the InterStim

 1  ever hook up properly again prior to its replacement?

 2          THE COURT:  I think we've been over this.  This has

 3  been asked and answered.  Do you have anything else?  I think

 4  you've covered what is appropriate here.

 5          MS. COHN:  Thank you, Your Honor.  No more questions.

 6          THE COURT:  Mr. Keeney.

 7          MR. KEENEY:  Thank you, Your Honor.

 8                      CROSS-EXAMINATION

 9  BY MR. KEENEY:

10  Q    Sir, my name is Carter Keeney.  I'm defending this

11  lawsuit.

12       You and Ms. Roop are not technically married, but y'all

13  essentially hold yourselves as being married, correct?

14  A    Yes.

15  Q    Y'all have been together a long time, correct?

16  A    Yes.

17  Q    So you're aware she's suing my client for $5 million,

18  correct?

19  A    Yes.

20  Q    Okay.  And y'all have children together and raise a

21  family together, correct?

22  A    Yes.

23  Q    And you own East Coast Repair, correct?

24  A    Yes.

25  Q    And it's your testimony that she never does anything with

1  the company?

2  A    She does no work for the company, no.

3  Q    Okay.  And she doesn't help out at all, correct?

4  A    She has occasionally answered the phone, bringing me

5  lunch.

6  Q    I want to talk about the trip to Hatteras.  That was in

7  the first part of August of 2019, correct?

8  A    Yes.

9  Q    And when this happened, y'all had a camper in Middlesex,

10 when the accident happened, right?

11 A    Yes.

12 Q    Is that the one y'all took to Hatteras?

13 A    Yes.

14 Q    Okay.  And y'all stayed in the camper?

15 A    Yes.

16 Q    In Hatteras?

17       Where did you and Ms. Roop sleep in the camper?

18 A    In the master bedroom.

19 Q    Is that a double bed?  Queen bed?  King bed?

20 A    Queen bed.

21 Q    Queen bed.

22       What campground was it?

23 A    That we stayed at --

24 Q    In Hatteras.

25 A    -- in Hatteras?

1    Q    Yes, sir.

2    A    Cape Woods.

3    Q    Cape Woods.

4         And you just told Ms. Cohn you observed Ms. Roop use the

5    restroom, go to the bathroom.  You were watching that?

6    A    I watched very closely over Ms. Roop every time -- after

7    the accident, only because I noticed her in more pain than she

8    portrayed to be in.

9    Q    And another thing, at the time of this accident, how many

10   motor vehicles were in your household?

11   A    In my household?

12   Q    Yeah.

13   A    I don't know.

14   Q    Well, let me back up.  I don't want to assume things.  So

15   you had a driver's license, Ms. Roop had a driver's license.

16   Did any of the kids have cars at that point?

17   A    No.

18        MS. COHN:  Your Honor, I have to object to the

19   relevance of this.

20        THE COURT:  What's the relevance?

21        MR. KEENEY:  One of the reasons she said she couldn't

22   get to Dr. Guerette was she didn't have a car to drive.

23        THE COURT:  That's fine.  Go ahead.

24   BY MR. KEENEY:

25   Q    Were there more than two cars at the house?

**JA544**

Barton - Redirect

1  A    No, not at the time we came back from the accident,

2  because I had to arrange for us to have rides home from the

3  campground with family members and friends.

4  Q    Okay.  And then -- but in Powhatan, was there another

5  car?

6  A    No.  Not that was on the road, no.

7  Q    Where's the InterStim?  Like, physically, the one that

8  got removed, where is it?

9  A    The InterStim on her body?

10 Q    No.  Like, where's the actual device that you said wasn't

11 working after the accident?

12 A    It's in her -- I don't understand the question.

13 Q    Okay.

14 A    The InterStim is mounted -- is located in her left

15 buttocks.

16 Q    Well, you would agree with me after this accident the

17 InterStim was taken out and a new one was put in, right?

18 A    Correct.

19 Q    Where's the old one?

20 A    I don't know.

21      MR. KEENEY:  Thank you, sir.  I don't have any other

22 questions for you.

23      THE COURT:  Do you have any redirect?

24      MS. COHN:  Yes, Your Honor.  Thank you.

25                   REDIRECT EXAMINATION

1  BY MS. COHN:

2  Q    Mr. Barton, why are you not married?

3        MR. KEENEY:  Objection.

4        THE COURT:  That's not relevant.  Nobody cares.

5        MS. COHN:  Thank you.

6  BY MS. COHN:

7  Q    Mr. Barton, you stated previously that Ms. Roop suffered

8  from painful intercourse after the accident.  Was that an

9  issue before the accident?

10        MR. KEENEY:  Objection.  Beyond the scope of my

11  cross, Your Honor.  I didn't touch that.

12        THE COURT:  I think you've achieved what you needed

13  to achieve.  Do you have anything else on causation?

14        MS. COHN:  Just one more question.

15  BY MS. COHN

16  Q    Were you ever offered the InterStim device after it was

17  taken out of Ms. Roop?

18  A    No.

19        MS. COHN:  Thank you.

20        THE COURT:  Thank you.

21        Mr. Barton, thank you for your testimony.  You can

22  step down.  Because there's a possibility you might have to

23  testify again, I'm going to instruct you you're not allowed to

24  talk about your testimony with anybody, including Ms. Roop or

25  her lawyers, until this case is over.  Do you understand that?

1        THE WITNESS:  Yes, sir.

2        THE COURT:  You may step outside.  Thank you for your

3  testimony.

4        Any other evidence from the plaintiff?

5        MS. COHN:  No more evidence from the plaintiff.

6        THE COURT:  So does the plaintiff rest its case?

7        MS. COHN:  Yes, Your Honor, as to phase 1.

8                    PLAINTIFF RESTS

9        THE COURT:  The defense?

10        MR. KEENEY:  I have a Rule 50 motion, Your Honor.

11        THE COURT:  I'm sorry, say that --

12        MR. KEENEY:  I have a motion.

13        THE COURT:  Yeah, you have a motion.  That's fine.

14        So, folks, here's what we're going to do:  I'm going

15  to give you a bonus break because they want to put me to work

16  for something I have to do outside of your presence.  So what

17  I'm going to do is I'm going to excuse you for about 15

18  minutes to go back and just relax.

19        Remember, kryptonite, can't talk about the case.  You

20  can talk about anything else, about how incredibly funny I am,

21  but you can't talk about the case, okay?  We'll call you back

22  then.  Okay?

23     (Jury out at 2:01 p.m.)

24        THE COURT:  Mr. Keeney, do you want to come up to the

25  lectern?  You have a motion under Rule 50?

1    MR. KEENEY:  Yes, Your Honor.  I have a motion under

2  Rule 50, and specifically under Rule 50(a), for, essentially,

3  a directed verdict on the issue of whether or not the pelvic

4  prolapse was caused by the subject accident.

5    THE COURT:  I've been thinking about this over the

6  lunch break and while I was hearing the testimony, and,

7  actually, something that Ms. Cohn did with Dr. Guerette I

8  think is incredibly important here.

9    I have been led to believe, until now, that there is

10  a nexus between the InterStim and a pelvic prolapse.

11  Dr. Guerette said there is no nexus between the two.  They are

12  separate issues in my mind.

13    On the issue of causation, it seems to me, although I

14  think they're hanging by a gnat's eyelash on the InterStim

15  device being from the accident, I think there's enough for

16  that to go to the jury.  I have seen no evidence about the

17  pelvic prolapse.  To me, the evidence -- clearly she's

18  struggling; I mean, there's no question about that.  But the

19  issue is what the accident had to do with it, which I think is

20  what your point is, right?

21    MR. KEENEY:  Yes, Your Honor.  The jury instruction,

22  as framed, is whether or not she's proven the pelvic prolapse

23  was caused by the accident.

24    THE COURT:  Well, actually, so I just read the jury

25  instructions while he was testifying, okay?  The verdict form,

 1  which you had the occasion of reading to the jury, talks about

 2  the pelvic prolapse.  The jury instructions do not.  It only

 3  talks generally about her meeting the damages.

 4          So here's what I think the question is, and I'm going

 5  to give Ms. Cohn a chance to respond, of course:  I think I

 6  have to sever those issues.  I think you have a winning motion

 7  on Rule 50 on the pelvic prolapse.  But I think we should

 8  modify the verdict form instead to say -- and I'll just tell

 9  the jury they don't have to decide the pelvic prolapse.

10  Because you opened on that, I'm going to have to explain to

11  them what the deal is.

12          So the verdict form, if you have it there in front of

13  you, both of you, for causation is, Number 2:  The plaintiff

14  has, and it's either proven or not proven, by a preponderance

15  of the evidence -- it currently says that she has suffered

16  from a pelvic prolapse as a result of the subject accident.

17          I think what we should do is send it to the jury on

18  she has proven or not proven by the preponderance of the

19  evidence that her InterStim device was damaged as a result of

20  the accident.  If they find yes, they can put the damages only

21  on about InterStim.  If they answer no, the InterStim is done

22  and we'll just do the standard -- I'm going to have to change

23  the instructions for the damages part.

24          But that's kind of where I'm thinking at.  I don't

25  think it's close on pelvic prolapse.  I'm going to give her a

1  chance to discuss that, but I think there's a difference now

2  between the InterStim.

3      MR. KEENEY:  Your Honor, the one thing I would say in

4  response to that is in discovery, when I asked about the

5  injuries that are being claimed, they never claimed any point

6  in discovery or at any point that the InterStim was damaged as

7  a result of this accident.  The claim was that it was a pelvic

8  prolapse from the accident.

9      So that's -- my position is they picked a horse.  The

10  horse was there was a pelvic prolapse, and really what they

11  were saying is the fixing of the InterStim was in an effort to

12  alleviate these symptoms that were actually the pelvic

13  prolapse.

14      THE COURT:  Right.

15      MR. KEENEY:  But then they can't jump now and say,

16  "No.  No.  No.  The accident damaged the InterStim."

17      THE COURT:  Well, look, I don't have all the

18  discovery in front of me, you know.  Frankly, I don't like how

19  this case has been lawyered.  I think I've made that pretty

20  clear.

21      I think the answer is I ought to let this case go to

22  the jury on the InterStim, see what their answer is, and then

23  you can file another Rule 50 or a motion for a new trial

24  afterwards attacking that, and I'll look at that, right?

25      Look, I have to tell you, I'm not so sure the jury is

1  going to find that the accident caused the InterStim problem.

2  I think it's -- I think you have -- it's more likely you're

3  going to prevail on that, frankly, than she is, but I think I

4  should let that go to the jury.

5          But my issue is, I have yet to hear any evidence

6  about the accident causing pelvic prolapse, which I think I

7  need to hear from Ms. Cohn on that.

8          Ms. Cohn, tell me what the evidence is on the pelvic

9  prolapse, because you brought out they're two different

10 issues.

11         MS. COHN:  Correct, Your Honor, I did, and rightfully

12 so.  I wanted to make sure it was clear that they are not

13 linked to one another.

14         THE COURT:  Right.

15         MS. COHN:  So, Your Honor, you heard the testimony

16 from Ms. Roop where she said directly it was a different pain,

17 there was pressure.  She said specifically, "I was diagnosed

18 with prolapse.  I didn't have these issues prior to the

19 accident.  I didn't have this pressure.  I didn't have any of

20 these other subsequent pain, aside from the bladder issues

21 that had been previously present."  So she made it very clear

22 that the pain was different in her testimony from the previous

23 bladder issues that caused her to require the InterStim.

24         Subsequent to that, Your Honor, Dr. Guerette

25 testified, and he said, prior to this accident in 2013, she

1  had no prolapse issues, specifically insignificant --

2       THE COURT:  Actually, no, that's not what he said.

3  He said first stage.  And what I think is important about it

4  is, his testimony was that when he saw her in 2011, she was in

5  first stage of pelvic lapse, which is not a significant thing,

6  but it's the first stage.  But he describes pelvic prolapse --

7  I'm going to paraphrase it -- as, essentially, a muscle

8  degeneration.  Over eight years, that, it seems to me, is what

9  occurred.

10      There is no doubt in my mind that this woman is

11  suffering from a pelvic prolapse, and I'm incredibly

12  sympathetic on that.  The issue here is whether he caused

13  that, Mr. Desousa.

14      Now, he's driving like a lunatic and he ought not to

15  be proud of that, for what he did that day, but I don't think

16  that there's any evidence at all.  And I've given you your

17  shot here.  You know, I've been suspect about your case, but I

18  don't see any evidence.

19      The other thing is this:  Mr. Keeney made this point

20  before.  Remember, he cites *McMunn* every time he opens his

21  mouth, right?  And what I said to you on the issue of

22  causation, based on some of the cases you cited, there are

23  situations where lay testimony can overcome it because it's

24  not a complex situation.  My arm was not broken today;

25  tomorrow it is broken, right?  I can observe that.

1        A nexus to show that an act -- an accident caused

2   pelvic prolapse is way different than whether the accident

3   caused the InterStim to no longer function, which, by the way,

4   you have contrary testimony.

5        Ms. Roop said in July that when they looked at it, it

6   was functioning fine.  Her husband, fiancé, whatever, has a

7   different take on it.  Now, the jury sorts that out.  I'm not

8   here to judge credibility, right?

9        I do think the jury should be able to decide the

10  InterStim.  I see no evidence, none, on pelvic prolapse, and

11  I'm going to grant the Rule 50 motion as to pelvic prolapse.

12       Here's what I think we ought to do here:  Now, first

13  of all, I think you ought to settle this case, both of you.

14  And if you want to take another couple minutes to do this,

15  because if they come back on the InterStim, she still had to

16  go do a surgery for the InterStim, and she suffered as a

17  result of this.

18       And I go back to the fact that he was driving like a

19  lunatic, and I'm sure they're going to be as ticked off about

20  this as I was in terms of returning damages.  It's not the

21  home run that you want.  But, you know, it's like the Rolling

22  Stones' song:  You get what you need -- you don't always get

23  what you want, you get what you need.  That's what I think you

24  ought to be thinking about.

25       But I think what we should do, because I have a jury

 1  waiting to go, the instructions, to me, do not need to be

 2  changed, but the verdict form needs to be changed.  And what I

 3  propose to do is change it to say by a preponderance of the

 4  evidence, that her InterStim device was damaged as a result of

 5  the accident, but not have Question Number 3.

 6          So if they find proven, okay, I'll let you put in the

 7  InterStim stuff in the second part.  I don't know if you want

 8  to start that this afternoon or you want to start that

 9  tomorrow, because I have to change the instructions again.

10          You have Dr. Guerette.  Do you want to put him on for

11  that?

12          MS. COHN:  Correct, Your Honor.

13          THE COURT:  So we would let you open on that, and I

14  would make clear to the jury, both here at closing and, again,

15  opening for phase 2, it's the soft tissue issues, which are

16  not in dispute, and just the InterStim, nothing else.

17          Does that make sense to you?  I know you disagree

18  with my Rule 50 motion -- order.  I can get that, okay?  But

19  I've moved past that now.  I'm trying to figure out what to do

20  now, because I thought they were connected.  You made clear --

21  I think you were right.  I mean, I wish you had told me that

22  before, but I think you're right, I don't think they are

23  connected.

24          MS. COHN:  Your Honor, I would have to object to

25  that.  I think there was enough evidence presented between the

1  time that her symptoms, her different symptoms arose and

2  Dr. Guerette's testimony about how there was an insignificant

3  bladder prolapse when he saw her in 2011 versus the three

4  significant prolapses that he then diagnosed in 2019 when he

5  saw her post motor vehicle accident, which is when she relayed

6  the worsening of the symptoms to him as starting.

7         I think there's more than enough circumstantial

8  evidence for it to be a question for the jury to handle as to

9  whether or not putting the different pieces of the testimony

10 together leads them down that path or not.  I do not think it

11 is appropriate for the Court to take it in its own hands to

12 strike it.  I think it's a question for the jury.  As Your

13 Honor said back in one of our first pretrial conferences, she

14 said that felt great for six years, and then the accident

15 happened, and she felt crappier and crappier, I think were

16 Your Honor's exact words.

17        THE COURT:  Yeah, but that's the InterStim.  That's

18 your argument on the InterStim.  I'm saying you're taking it

19 to another level on the prolapse.

20        Look, it was your questioning of Dr. Guerette that

21 made this point that they're separate and distinct.  In fact,

22 he then said he put the new InterStim in and her condition

23 didn't get any better, right?

24        MS. COHN:  Correct, which is why it's exactly back to

25 the prolapse and not the InterStim.  And the exact

1 differentiation of the symptoms that she was displaying, that

2 she testified to and that Dr. Guerette testified to, is the

3 difference between the InterStim and the prolapse and how the

4 prolapse wasn't present in 2011, and then there were three

5 prolapses present in 2019.

6 Again, Your Honor, I think there's enough -- more

7 than enough circumstantial evidence for the jury to hear it

8 and make a decision on their own based on the testimony of all

9 the parties. It's the pelvic heaviness, and he described the

10 drop of her organs, that is not related to the InterStim; that

11 is a prolapse issue. The InterStim was simply --

12 THE COURT: Yeah. But the question is, why did it

13 prolapse? There's no evidence about why. There's an

14 eight-year gap from first stage to end stage, and there's no

15 filler in between for something that he essentially described

16 as muscle deterioration. Again, I'm incredibly sympathetic to

17 her. The issue is not whether she's in pain; I'm totally with

18 her on that. The issue is why. And you haven't put that

19 evidence in.

20 MS. COHN: Your Honor, I am bound by the rules of

21 this Court. And he is not an expert. And, again, this was

22 circumstantial. Lay people can lay causation. And the doctor

23 said, between 2013 and 2019, he never saw her, there's no

24 indication she went anywhere else, there's no indication of

25 any of these issues prior to the accident. Ms. Roop testified

1  to the same.  Mr. Barton testified to the same.

2        I'm not disagreeing with you, Your Honor, that it's

3  not the strongest case; however, under the Virginia cases that

4  I cited, *Todt v. Shaw* and *Sumner v. Smith*, this is definitely

5  a question for the jury.  And if they find it too tenuous,

6  then so be it.

7        But there's definitely enough here with the lay

8  testimony to lay a circumstantial, reasonable inference that

9  the prolapse was caused by the accident because none of those

10 symptoms were present prior to, per Gerard and per Ms. Roop.

11       THE COURT:  Well, I've ruled against you, with all

12 due respect.

13       So I'm granting in part and denying in part the

14 motion, to be clear.  So I'm granting the motion as to pelvic

15 prolapse.  I'm denying it as to the InterStim.

16       So I need to know what to do.  I have a jury sitting

17 out there, and I need to know what to do next.

18       So what I propose, though, is to make that change but

19 not -- to take out number 3 from the verdict form.  So change

20 it as to the InterStim, tell them they no longer have to

21 decide the issue of pelvic prolapse, only the issue of the

22 InterStim, but not have Dr. Guerette's care.

23       And if they find that the accident caused the

24 InterStim, you can put Dr. Guerette on right away, talk about

25 the malfunctioned InterStim when he saw her, what happened to

**JA557**

1  treat that.  You know what I'm saying to you?  You can't go

2  into pelvic prolapse treatment.  You're going to have to

3  segregate that.

4        So it's going to take me -- first of all, do you

5  agree?  I know you disagree with my ruling, but now with my

6  ruling, I need to know where to go from here.  Are you in

7  agreement with how I intend to handle this, or do you have a

8  different way?

9        MS. COHN:  No, Your Honor, I think that's the

10  smartest way.  They've heard the case.  If Your Honor would

11  simply like to strike that one argument by the plaintiff and

12  proceed that way, and that way we can have Dr. Guerette come

13  today.

14        THE COURT:  Well, if they find that the InterStim

15  came from the accident.

16        MS. COHN:  Correct, if they find.

17        THE COURT:  But I would take what is, essentially,

18  the damage part out, the Number 3 question, and leave that for

19  the next phase.  You know what I'm saying to you?  And then I

20  would have to redo -- I'll have to redo the instructions.

21        What I'll do is, we'll do the openings.  If they rule

22  for you on InterStim, what we'll do is, we'll let you-all

23  open.  I'm going to make it crystal clear:  Pelvic prolapse no

24  longer at issue, only InterStim device.  You put on

25  Dr. Guerette, because I know he's charging you an arm and a

1   leg to be here, whatever other evidence you want to put on

2   about that, and then I would redo the instructions tonight

3   consistent with whatever's found.  Does that make sense?

4        MS. COHN:  So I would still be able to put Guerette

5   to finish today?

6        THE COURT:  Yeah.  I'm going to let you get that

7   down.  But about InterStim, not beyond that, okay?  I mean,

8   it's going to be very narrow.

9        First of all, Mr. Keeney, are you in agreement with

10  that?

11       MR. KEENEY:  Yes, Your Honor.

12       THE COURT:  Okay.  So here's what I'm going to do:

13  It's going to take me a couple minutes to do a little bit of

14  typing here.  Why don't you go outside and see if -- now that

15  you know my ruling, okay, see if you can reach some type of

16  agreement on this.

17       Because, look, I think you're in trouble still on the

18  InterStim.  But if they're right -- because there is a problem

19  on the InterStim; the question is, why? -- she still could get

20  a pretty big damage.  But no matter what, your guy acted like

21  a knucklehead, and she's going to get pain and suffering from

22  all the other injuries that she clearly endured.

23       So there's a middle ground here, which is what I

24  think -- why don't you take 15 minutes while I do the typing,

25  and then we'll reconvene.  And if you don't settle it then,

1 we're just going to go forward and get this thing done.  Okay?

2          MS. COHN:  Thank you, Your Honor.

3          MR. KEENEY:  Thank you.

4          THE CLERK:  Court is in recess until 2:30.

5      (Recess taken at 2:17 p.m. until 2:29 p.m.)

6      (Jury out.)

7          THE COURT:  Any luck resolving it, or no?

8          MS. COHN:  No, Your Honor.

9          MR. KEENEY:  No, Your Honor.

10          THE COURT:  So we've given you a draft of the jury

11 instructions with the new verdict form.  I would like you to

12 look first at the verdict form and tell me if you have any

13 objections to that.

14          Starting with you, Ms. --

15          MS. COHN:  No objections.

16          THE COURT:  Mr. Keeney?

17          MR. KEENEY:  Your Honor, it's not really an

18 objection.  I guess it's more of an inquiry.  To me, say the

19 jury finds that it was damaged in the accident, okay?

20          THE COURT:  Right.

21          MR. KEENEY:  So then would the phase 2 be whether or

22 not it was medically necessary to have it replaced in phase 2?

23          THE COURT:  Yeah.  I think they'll have to put

24 testimony on that.

25          MR. KEENEY:  Because, to me, damaged and needing the

 1  surgery because it was damaged are two different --

 2        THE COURT:  I think she's going to have to establish

 3  that with Dr. Guerette, and I think what he's going to testify

 4  to today, though.  I want to try and get that done.

 5        Here's the other thing, though:  I went through the

 6  instructions again.  I would like you to look at Instruction

 7  Number 3.  I'm not going to change -- type something

 8  different, but when it says, the questions -- "The issue in

 9  this first phase of the case is:  Did the defendant's

10  negligence cause the plaintiff's injuries?  And, if yes, which

11  injuries did the defendant's negligence cause?"

12        And I'm going to add the following:  "Specifically,"

13  consistent with the verdict form, "did the accident damage the

14  plaintiff's InterStim device?"  That is the question that

15  they're going to have to answer.  The pelvic prolapse is no

16  longer at issue, and I'm going to make that clear.

17        Do you have any objection to that change, Ms. Roop?

18  I know you disagree with my ruling, but putting aside that

19  now, and you've preserved your objection to that, do you have

20  any objection to me handling it in that fashion?

21        MS. COHN:  No, Your Honor.

22        THE COURT:  Okay.  Mr. Keeney?

23        MR. KEENEY:  No, Your Honor.

24        THE COURT:  Let's bring the jury back in.

25        Are you going to rest, then?

1              MR. KEENEY:  Yes, Your Honor.

2              THE COURT:  Okay.  So I'll call on you first to rest.

3              After you rest, Katie, you're going to distribute the

4    jury instructions to each of the jurors, okay?

5              THE LAW CLERK:  Okay.

6              THE COURT:  I'll tell you when to do that.

7              THE LAW CLERK:  Okay.

8         (Jury in at 2:32 p.m.)

9              THE COURT:  Everybody doing okay?

10             JURY MEMBER:  Yes.

11             THE COURT:  I know that took a little longer than I

12   promised you, and I take serious my responsibilities as your

13   guardian.  There's a reason why; I'm going to discuss it with

14   you in a few moments.  We've got a little twist going on here.

15             But before we get to that, I just want to -- the

16   plaintiff has rested.

17             Mr. Keeney, do you have any evidence?

18             MR. KEENEY:  No, Your Honor.

19             THE COURT:  Does the defendant rest?

20             MR. KEENEY:  Yes, Your Honor.

21                           DEFENSE RESTS

22             THE COURT:  So the case now, ladies and gentlemen,

23   turns to you-all.  And actually, first of all, what I'm going

24   to do is I'm going to ask my law clerk to hand out to you the

25   jury instructions, then I'm going to talk to you about the

1  little twist that we have here.

2      All right.  Now, you'll recall that this phase of the

3  case is what we refer to as the causation issue, which is what

4  injuries were a result of the accident.  Some the defendant

5  has agreed to, right?

6      If you look at the verdict form, which is the last

7  page, you'll recall during opening arguments that Mr. Keeney

8  indicated to you, because our version of the verdict form then

9  was what he said, which was, "Did the accident cause the

10  pelvic prolapse issue with the plaintiff?"

11      It turns out, I believe, from the evidence that it

12  showed there are two different issues going on.  One was, was

13  the InterStim device damaged.  And then separately, according

14  to Dr. Guerette's testimony, was there a pelvic prolapse?  You

15  know longer have to decide the pelvic prolapse issue.  For

16  legal reasons that you're not to concern yourself with, you

17  don't have to decide the pelvic prolapse.

18      So you'll see the verdict form is different.  It

19  simply asks you, first, about the question:  "Has the

20  plaintiff proven by a preponderance of the evidence that her

21  treatment with the Alliance Physical Therapy through,"

22  whatever date it was that you think that her treatment was

23  necessary, "was reasonable and medically necessary to treat

24  the injuries that she sustained in the accident to her head,

25  neck, shoulder, and hip, as well as the aggravation of her

1    previous back injury?"  That's the same as what we originally
2    started with.
3            Two is what is different.  We've focusing now, on
4    Number 2, simply on the InterStim device:  Whether or not the
5    plaintiff has proven or not proven by a preponderance of the
6    evidence that her InterStim device was damaged as a result of
7    the accident.  That's the reason we took a little bit of extra
8    time, and that's the twist.
9            So now what I'm going to do with that change in
10   mind -- so you're to put out of your mind completely any
11   issues about the pelvic prolapse.  Is everybody with me on
12   that?  Really, your issue now is twofold.  One is how long she
13   needed the therapy physical therapy; but two, this InterStim
14   device.  Okay?  That's it.  That's all you're deciding right
15   now.
16           I'm about to give you the instructions about that,
17   and I'm going to ask you to read along with me as I orally
18   read to you my instructions to you as all the evidence has
19   come into the case.
20           So I'm going to begin with Instruction Number 1, the
21   opening instruction.
22           Ladies and gentleman of the jury, you have now heard
23   all of the evidence in this case as it relates to the first
24   phase, that is, the liability phase, or, really, the causation
25   phase, of the case.  The Court will now give you the

1 instructions of law that you are to apply in deciding this

2 case.

3       You'll be able to take these written instructions

4 into the jury room with you when you deliberate; nevertheless,

5 I would appreciate your full attention as I read them to you.

6       Instruction Number 2, province of the Court and the

7 jury.  It is your duty to follow the law as I state it and to

8 apply it to the facts as you find them from the evidence in

9 the case.  Do not single out one instruction as stating the

10 law, but consider the instructions as a whole.  You are not to

11 be concerned about the wisdom of any rule of law stated by me.

12 You must follow and apply the law, the law that I'm going to

13 give to you now.

14       Counsel may properly refer to some of the applicable

15 rules of law in their closing arguments.  That's going to

16 follow after I give you these instructions.  If, however, any

17 difference appears to you between the law as stated by counsel

18 and that as stated by the Court in these instructions, you, of

19 course, are to be governed by the instructions given to you by

20 the Court, me.

21       No statement or ruling or remark that I may make

22 during the course of the trial is intended to indicate my

23 opinion as to what the facts are.  It is the function of the

24 jury to consider the evidence and determine the facts in this

25 case.  You, not I, have the duty to determine the facts.

1       The evidence which you are to consider consists of

2   testimony of witnesses, any exhibits admitted into evidence,

3   and any facts agreed upon between the parties and presented to

4   you in the form of a stipulation.  The admission of evidence

5   in court is governed by rules of law; and from time to time,

6   it may be the duty of the attorneys to make objections, and my

7   duty as a judge to rule on these objections and to decide

8   whether or not you can consider certain evidence.  You must

9   not consider testimony or exhibits to which an objection was

10  sustained, or which I have ordered stricken.  If an objection

11  was overruled, then you may consider that evidence together

12  with all the other evidence in the case.  The opening

13  statements and closing arguments of the attorneys are intended

14  to help you in understanding the evidence and in applying the

15  law, but their statements are not in evidence.

16      Now, you have been chosen and sworn as jurors in this

17  case to try the issues of fact.  You must perform your duties

18  as jurors without bias or prejudice to any party.  The law

19  does not permit you to be controlled by sympathy, prejudice or

20  public opinion.  All parties expect that you will carefully

21  and impartially consider all the evidence, follow the law as

22  it is now being given to you, and reach a just verdict,

23  regardless of the consequences.

24      Now, Instruction Number 3, folks, I'm going to add

25  something to it.  And if you have a pen, I would suggest maybe

1  you write it down, and I'll tell you when to write it down,

2  okay?  It's going near the end.  This is because we've had to

3  make a slight change.

4        Outline of instructions.  Before I begin going

5  through the instructions with you, I want to describe for you

6  how they will set up and how you should generally approach

7  your duties.  As I just noted, you are the finders of the

8  fact.  The first part of these instructions provide you with

9  the tools to determine the facts.  The instructions that

10 follow pertain to the substance of the dispute.  The final

11 instructions will inform you about the mechanics of carrying

12 out your responsibilities.

13       Again, the issue in this first phase of the case is

14 did the defendant's negligence cause the plaintiff's injuries?

15 And, if yes, which injuries did the plaintiff's negligence

16 cause?  Here's what I'm going to add:  Specifically, did the

17 accident damage the plaintiff's InterStim device?  That's the

18 question on the verdict form.  I'll say it again.  Did the

19 accident damage the plaintiff's InterStim device?

20       The pelvic prolapse is no longer at issue.  That

21 should not be part of your discussions.  Everybody got that?

22 So that Question Number 2 is simply this -- so you've got the

23 physical therapy, how long did she need the treatment.  But

24 Question Number 2 is:  Specifically, did the accident damage

25 the plaintiff's InterStim device?

1    Your decision on this issue must be governed by these

2    instructions that I'm giving you.

3    Instruction Number 4, evidence received in this case.

4    The evidence in the case consisted of the following:  One, the

5    sworn testimony of the witnesses, no matter who called them as

6    a witness.  Number two, all exhibits received in evidence

7    regardless of who may have produced the exhibits.  Three, all

8    facts that have been agreed to through stipulation.

9    Statements and arguments of the lawyers are not

10   evidence in the case unless made as an admission or

11   stipulation of fact.  A "stipulation" is an agreement between

12   both sides that certain facts are true.  When the lawyers on

13   both sides stipulate or agree to the existence of a fact, you

14   must, unless otherwise instructed, accept the stipulation as

15   evidence and regard that fact as proved.  However, it is for

16   you to determine the effect, if any, to be given that

17   stipulation.

18   Now, if I sustain an objection to any evidence or if

19   I order evidence stricken, that evidence must be entirely

20   ignored.  Some evidence is admitted for a limited purpose

21   only.  When I instruct you that an item of evidence has been

22   admitted for a limited purpose, you must consider it only for

23   that limited purpose and for no other purpose.

24   You are to consider only the evidence in the case.

25   But in your consideration of the evidence, you are not limited

1    to the statements of the witness.  In other words, you are not

2    limited solely to what you see and hear as the witnesses

3    testified.

4         You may draw from the facts that you find have been

5    proved such reasonable inferences or conclusions as you feel

6    are justified in light of your experience and common sense.

7         Number 5, judging the evidence.  There is nothing

8    particularly different in the way that a juror should consider

9    the evidence in a trial from that in which any reasonable and

10   careful person would treat any very important question that

11   must be resolved by examining facts, opinions and evidence.

12   You are expected to use your good sense, your common sense, in

13   considering and evaluating the evidence in the case for only

14   those purposes for which it is has been received and to give

15   such evidence a reasonable and fair construction in light of

16   your common knowledge of the natural tendencies and

17   inclination of human beings.

18        Number 6, objections and rulings.  It is the sworn

19   duty of the attorneys on each side of a case to object when

20   the other side offers testimony or exhibits which that

21   attorney believes is not properly admissible.  Only by raising

22   an objection can a lawyer request and obtain a ruling from the

23   Court on the admissibility of the evidence being offered by

24   the other side.  You should not be influenced against an

25   attorney or his client because the attorney has made

1  objections.

2       Do not attempt, moreover, to interpret my rulings on

3  objections as somehow indicating to you what I believe the

4  outcome of the case should be.

5       As I said before, my verdict is your verdict.

6  Whatever you decide is what I believe is appropriate.

7       Instruction Number 7, the Court's questions to the

8  witnesses.  Now, during the course of the trial, I've

9  occasionally asked a few questions of the witnesses.  Do not

10 assume that I hold any opinion on the matters to which my

11 question is related.  The Court may ask the question simply to

12 clarify a matter, not to help one side of the case or to hurt

13 another side.

14       Number 8, the jury's recollection controls.  If any

15 reference by the Court or by counsel to matters of evidence

16 does not coincide with your own recollection of that evidence,

17 it is your recollection which should control during your

18 deliberations and not the statements of the Court or of

19 counsel.

20       You are the sole judges of the evidence in this case.

21       Instruction Number 9, direct and circumstantial

22 evidence.  Generally, there are two types of evidence that are

23 presented during a trial, direct evidence and circumstantial

24 evidence.  "Direct evidence" is the testimony of a person who

25 asserts or claims to have actual knowledge of a fact such as

1 an eyewitness.  An "indirect" or "circumstantial" evidence is

2 proof of facts and circumstances indicating the existence or

3 the nonexistence of a fact.

4      The law makes no distinction between the weight or

5 the value to be given to either direct or circumstantial

6 evidence.  Nor is a greater degree of certainty required of

7 circumstantial evidence.  You are simply required to weigh all

8 the evidence in the case.

9      Number 10, inferences from the evidence.  Inferences

10 are simply deductions or conclusions which reason and common

11 sense -- there's those important words, common sense -- lead

12 the jury to draw from the evidence received in this case.

13      Number 11, the question is not evidence.  The

14 questions asked by a lawyer for either party to this case are

15 not evidence.  If a lawyer asks a question of a witness which

16 contains an assertion of fact, therefore, you may not consider

17 the assertion by the lawyer as any evidence of that fact.

18 Only the answers are evidence.

19      Instruction Number 12, credibility of witnesses.

20 You, again, are the judges of the facts, the credibility of

21 the witnesses, and the weight of the evidence.  You may

22 consider the appearance and manner of the witnesses on the

23 stand, their intelligence, their opportunity for knowing the

24 truth and for having observed the things about which they

25 testified, their interest in the outcome of the case, their

1 bias, and, if any have been shown, their prior inconsistent

2 statements, or whether they have knowingly testified

3 untruthfully as to any material fact in the case.

4     You may not arbitrarily disregard believable

5 testimony of a witness.  However, after you have considered

6 all the evidence in the case, then you may accept or discard

7 all or part of the testimony of a witness as you think proper.

8     You are entitled to use your common sense in judging

9 any testimony.  From these things and all the other

10 circumstances of the case, you may determine which witnesses

11 are more believable and weigh their testimony accordingly.

12     Number 13, parties' testimony to facts within their

13 own knowledge.  When one of the parties testifies

14 unequivocally to facts within his or her own knowledge, those

15 statements of fact and the necessary inferences from them are

16 binding upon him or her.  He or she cannot rely on other

17 evidence in conflict with his or her testimony to strengthen

18 their case.

19     However, you must consider his or her testimony as a

20 whole and you must consider a statement made in one part of

21 his or her testimony in the light of any explanation or

22 clarification made elsewhere in his testimony.

23     Instruction Number 14, impeachment, inconsistent

24 statement or conduct.  A witness may be discredited or

25 impeached by contradictory evidence or by evidence that at

1 some other time the witness has said or done something, or

2 failed to say or do something, that is inconsistent with the

3 witness's present testimony.

4      If you believe any witness has been impeached and

5 thus discredited, you may give the testimony of that witness

6 such credibility, if any, you think it deserves.

7      If a witness is shown knowingly to have testified

8 falsely about any material matter, you have a right to

9 distrust such witness's other testimony and you may reject all

10 the testimony of that witness or give it such credibility as

11 you may think it deserves.

12      Any act or omission is "knowingly" done, if the act

13 is done voluntarily and intentionally, and not because of

14 mistake or accident or other innocent reason.

15      Instruction Number 15, the effect of prior

16 inconsistent statements or conduct.  If you believe from the

17 evidence that a witness previously made a statement

18 inconsistent with their testimony at this trial, the only

19 purpose for which the statement may be considered by you is

20 for its bearing on the witness's credibility.  It is not

21 evidence that what the witness previously said is true.

22      When a witness is a party to this case, and you

23 believe from the evidence that the witness previously made a

24 statement inconsistent with their testimony at this trial,

25 that previous statement may be considered by you as evidence

1 that what the witness previously said was true.

2      Number 16, what is not evidence. In deciding the

3 facts of this case, you are not to consider the following as

4 evidence: statements and arguments of the lawyers, questions

5 and objections of the lawyers, testimony that I instructed you

6 to disregard, and anything that you may see or hear when the

7 Court is not in session even if what you see or hear is done

8 or said by one of the parties or by one of the witnesses.

9      Number 17, defendant's admission of liability. Here

10 the defendant has admitted that he's liable for any injury

11 that the plaintiff received from the accident. Therefore, the

12 only issue that you have to decide is what injuries the

13 plaintiff sustained as a result of the subject accident.

14      An admission of liability should not influence you in

15 any way in considering the issue of the damages or what

16 injuries plaintiff sustained in the accident.

17      Instruction Number 18, burden of proof. Now, you've

18 heard about the preponderance of evidence. I'm going to

19 explain this now to you, okay?

20      The preponderance of the evidence is sometimes called

21 the greater weight of the evidence. It is the evidence which

22 you find more persuasive. The burden is on the plaintiff,

23 Samantha Roop, to prove by the greater weight of the evidence

24 each injury that she claims and to prove each injury was

25 caused by the negligence of the defendant, Nicholas Desousa.

1   If the plaintiff fails to do so, then she cannot recover for

2   that item.

3          "The preponderance of the evidence" means evidence,

4   which as a whole, shows that the fact to be proved is more

5   probable than not.  In other words, a preponderance of the

6   evidence means such evidence as, when considered and compared

7   with the evidence opposed to it, has more convincing force,

8   and produces in your mind a belief that what is sought to be

9   proved is more likely true than not true.  This standard does

10  not require proof to an absolute certainty, given that proof

11  to an absolute certainty is seldom possible in any case.

12  Furthermore, the testimony of one witness whom you believe can

13  alone constitute -- I'm sorry.  Let me read that again.

14  Furthermore, the testimony of one witness whom you believe can

15  alone constitute the greater weight of the evidence.

16          In determining whether any fact at issue has been

17  proved by a preponderance of the evidence, unless otherwise

18  instructed, you may consider the testimony of all witnesses,

19  regardless of who may have called them, and all exhibits

20  received in evidence regardless of who may have produced them.

21          Let's talk about proximate cause because this is the

22  issue.  It's all about causation here.

23          A proximate cause of an injury is a cause that, in

24  natural and continuous sequence, produces injury.  It is a

25  cause without which the injury would not have occurred.

1      Instruction Number 20, the injury must have been

2  reasonably foreseeable. The defendant is not required to have

3  anticipated or foreseen the precise injury that occurred, but

4  is sufficient that a reasonably prudent person would have

5  anticipated or foreseen that some injury might result from the

6  negligent act.

7      Number 21, pre-existing condition. If you find that

8  the defendant had a condition before the accident that was

9  aggravated as a result of the accident or that the

10  pre-existing condition made the injury that she received in

11  the accident more severe or more difficult to treat, then, if

12  you find your verdict for the plaintiff, she may recover for

13  the aggravation and for the increased severity or difficulty

14  of treatment, but she is not entitled to recover for the

15  pre-existing condition.

16      Number 22, the mitigation of damages. Plaintiff has

17  a duty to minimize her injuries. If you find that the

18  defendant did not act reasonably to minimize her injuries and,

19  as a result, they increased, then she cannot recover the

20  amount by which they increased.

21      Instruction Number 23, this is where I talk about

22  being pure as the driven know again, okay? You're going to

23  hear this ad nauseam.

24      Juror use of electronic communication technologies.

25  During your deliberations, you must not communicate with or

1 provide any information to anyone by any means about this

2 case. You may not use any electronic device or media, such as

3 the telephone, a cell phone, Smartphone, iPhone, tablet,

4 Blackberry or computer, the Internet, any Internet service,

5 any text or instant messaging service, any Internet chat room,

6 blogs, or websites such as Facebook, Instagram, MySpace,

7 Linkedin, YouTube or Twitter to communicate to anyone any

8 information about the case or to conduct any research about

9 this case until I accept your verdict. In other words, you

10 cannot talk to anyone on the phone, correspond with anyone or

11 electronically communicate with anyone about this case. You

12 can only discuss the case in the jury room with your fellow

13 jurors during deliberations. I expect you will inform me as

14 soon as you become aware of another juror's violation of these

15 instructions. Although, I don't expect that to occur.

16 You may not use these electronics mean to investigate

17 or communicate about the case, because it's important that you

18 decide this case solely on the evidence presented in this

19 courtroom. Information on the Internet or available through

20 social medica might be wrong, incomplete, or inaccurate.

21 You're only permitted to discuss the case with your fellow

22 jurors during deliberations, because they have seen and heard

23 the same evidence you have. In our judicial system, it is

24 important that you are not influenced by anything or anyone

25 outside of this courtroom. Otherwise, your decision may be

1  based on information known only by you and not your fellow

2  jurors or the parties in the case.  This would unfairly and

3  adversely impact the judicial process.

4       Number 24, the election of the foreperson.  Now, upon

5  retiring to the jury room, you will select one of you to act

6  as your foreperson.  The foreperson will preside over your

7  deliberations, and will be your spokesperson here in court.

8       Again, I've prepared a verdict form for you.  We're

9  going to go over that again in a second for your convenience.

10      You're going to take these forms, both the

11  instructions and the verdict form, into the jury room, and

12  when you have reached a unanimous -- I'm emphasizing,

13  unanimous agreement as to your verdict, you'll have the

14  foreperson fill it in, date and sign the form that sets forth

15  the verdict upon which you unanimously agree.  You'll then

16  return with your verdict to the courtroom.

17      Number 25, the duty to deliberate.  The verdict must

18  represent the considered judgment of each of you.  In order to

19  return a verdict, it is necessary that each juror agree.

20  Again, your verdict must be unanimous.

21      It is your duty, as jurors, to consult with one

22  another and to deliberate with a view of reaching an

23  agreement, even if you can do so -- if you can do so without

24  disregard of your individual judgment.  You must each decide

25  the case for yourselves, but only after an impartial

1 consideration of the evidence in the case with your fellow

2 jurors. In the course of your deliberations, do not hesitate

3 to reexamine your own views and change your opinion, if

4 convinced it is erroneous. But do not surrender your honest

5 conviction as to the weight or effect of evidence solely

6 because the opinion of your fellow jurors, or for the mere

7 purpose of returning a verdict. Remember at all times you are

8 not partisans. You are judges, judges of the facts. Your

9 sole interest is to seek the truth from the evidence in the

10 case. And I again remind you that you must not base your

11 verdict in any way upon sympathy, bias, guesswork or

12 speculation. Your verdict must be based solely on the

13 evidence and the instructions given by the Court.

14 Again, Instruction Number 26, jury's responsibility.

15 Nothing said in these instructions and nothing in any verdict

16 form prepared for your convenience is meant to suggest or

17 convey in any manner any suggestion or hint as to what the

18 verdict I think should be. What the verdict shall be is your

19 sole and exclusive duty and responsibility.

20 Instruction Number 27, communications between the

21 Court and the jury. If it becomes necessary during your

22 deliberations to communicate with me, you may send a note by a

23 court security officer, signed by your foreperson or by one or

24 more of the members of the jury. Frankly, it works better if

25 the foreperson does any notes. No member of the jury should

 1  ever attempt to communicate with me by any means other than a

 2  signed writing.  I will never communicate with any member of

 3  the jury on any subject touching the merits of the case

 4  otherwise in writing or here orally in open court.

 5          The court security officers, as well as all other

 6  persons, are forbidden to communicate in any way or manner

 7  with any member of the jury on any subject touching the merits

 8  of the case.

 9          Bear in mind also that you are never to reveal any

10  person -- to any person, not even me, how the jury stands,

11  numerically or otherwise, on the questions before you, until

12  after you have reached a unanimous verdict.

13          And what I'm saying to you there is simply this:  If

14  you have a need to ask a question -- first of all, if you're

15  unclear, always start with the instructions, okay?  Because

16  I'm basically going to point you back.  That's the law in the

17  case, okay?  But if that doesn't answer your question and you

18  need to send a note to me, you have the foreperson write out

19  the question, date it, and sign it.  Under no circumstance can

20  you ever reveal how the voting is going.

21          So you can't say, "Hey, Judge Novak, there's five of

22  us vote this way and two of us vote that way."  The only vote

23  that we are allowed to know about is the final vote when you

24  are unanimous.  That's important.  Do you-all understand that?

25  So under no circumstances can you ever reflect any kind of

1  division.  The only count that matters is seven to nothing at

2  the end.  You got that?  Can't say 5 to 2, 4 to 3, something

3  like that.  You got that?

4       Now, I gave you the verdict form.  Let's go over this

5  again.  So what you're going to do is you're going to go back,

6  select your foreperson, you're going to discuss the evidence,

7  and then you're going to ask yourselves these questions:

8       "Number 1.  The plaintiff has proven by a

9  preponderance of the evidence that her treatment with the

10 Alliance Physical Therapy through," insert date -- you have to

11 put in the date that when you think that the evidence is

12 proved by a preponderance of the evidence that she needed the

13 therapy, okay?  And I gather they're going to argue about this

14 to you in a second -- "was reasonable and medically necessary

15 to treat the injuries that the plaintiff sustained in the

16 accident to her head, neck, shoulder, and hip as well as the

17 aggravation of her previous back injury," all right?

18      Then Number 2, you're going to decide the question

19 about the InterStim device.  The plaintiff -- you're going to

20 put in there simply "proved" or "not proved" by a

21 preponderance of the evidence that her InterStim device was

22 damaged as a result of the accident, okay?

23      When you answer those, both of them completely, to a

24 unanimous satisfaction, the foreperson will sign it, date it,

25 and let the security officer know and we'll bring you back

1  here for your verdict.  Everybody got that?

2       Now, here's my question:  We're about to hear closing

3  arguments from the lawyers.  Do you-all need another break or

4  should we go forward with the arguments?  Does anybody need a

5  break?  Everybody good?

6       So we're going to start with the plaintiff.

7       We'll turn the podium around.

8       MS. COHN:  Thank you.

9       Good afternoon, again, ladies and gentlemen.  You've

10 sat here so patiently and attentively listening to all the

11 evidence you heard from the plaintiff and the plaintiff's

12 witnesses.

13      Let me remind you of just that.  That's all you've

14 heard from today.  The plaintiff, Ms. Roop; her husband,

15 Gerard Barton; and her doctor, Dr. Guerette.

16      Once again, you've heard from nobody on the defense

17 side, not the defendant, not a doctor.

18      You heard evidence that Ms. Roop went on this

19 commercial trail ride, several other people were with her,

20 this alleged fall took place.  None of them are here, because

21 the fall didn't happen.  It's just an excuse.  You heard

22 Ms. Roop testify and Gerard no fall from a horse in the past

23 15 years.

24      Let's go over specifically what you've heard and seen

25 in evidence today.

1    Again, this case is based on a grievous, horrific

2  accident that occurred on 7/7/2019.  The defendant, driving

3  approximately 70 miles an hour in the rain, no lights, after

4  dark, gave Ms. Roop no chance.  There's nothing she could do.

5  She was struck on the driver's side where she was sitting,

6  absorbing the main impact.  You heard her discuss how her body

7  moved in the car, what parts of her body hit the car.  Her

8  head hit the window and the pillar, the right side hit the

9  console, she had bruising on her shoulder, the seat belt

10  locked, the air bags went off, high-force impact.

11    You heard from her that from 2011 to 2013 she sought

12  the treatment of Dr. Guerette, who was here.  You heard from

13  him.  You heard what he treated her for.  She had an

14  overactive bladder, interstitial cystitis, painful bladder,

15  frequency, urgency, those type of bladder issues.

16    You heard from both of them that during his treatment

17  of her from 2011 to 2013, he implanted an InterStim device in

18  her to help with those problems.  They were relieved.  They

19  were no longer an issue.  2013, after that InterStim was

20  programmed properly, she had no concerns, no frequency, no

21  urgency, wasn't disrupting her daily life.  That's why she

22  didn't see Dr. Guerette until after this accident.  She had no

23  need to.  Why would you go to a doctor if you feel fine?  If

24  he's just going there to look at the InterStim and there's

25  nothing wrong with the InterStim, why would you go?

Cosing Argument by Ms. Cohn

1    You also heard from Ms. Roop that she checked the

2  InterStim like clockwork.  She didn't want to have to go back

3  to Guerette.  He's a nice guy, but, man, she hates going to

4  those appointments with him.  They're invasive, they're

5  embarrassing, they're painful.  You heard her say she fought

6  like hell to get that diagnosis and get that InterStim.  She

7  doesn't want to go back there.

8    You heard that when she checked that InterStim, that

9  she had a home monitor.  That monitor would indicate to her

10  the battery life, she could adjust the programming, adjust the

11  settings.  From 2013 until after this accident, that monitor

12  worked fine, that InterStim worked fine, connected, did what

13  it was supposed to do per her and her husband, Mr. Barton.

14    You heard that as a result of this accident,

15  stipulations from the Court, she had a concussion, which

16  included vomiting, dizziness, light sensitivity from hitting

17  her head.  Part of the reason why it was a delay for her to

18  get to Dr. Guerette, she couldn't physically stand up without

19  being sick.  You can't drive like that, can't ride in a car.

20    You also heard that that delay in getting to

21  Dr. Guerette was because her kids were injured and upset after

22  this accident.  You heard that numerous times.  It was the

23  theme of her testimony:  My kids are first.  Yeah, I went to

24  horseback riding in 2019 after this accident.  Why?  Because

25  it was my daughter's first year she could go.  No matter what,

**JA584**

1  I was going to get on that horse.  I could have been bleeding

2  out and I was going to get on that horse for her.  I didn't

3  want to, but I did.

4       Same reason she didn't go with emergency personnel

5  the night of the accident:  She didn't want to leave her kids.

6  Her kids were traumatized, her kids were upset, her kids were

7  hurt.  She wouldn't leave them.  Sacrificed her own well-being

8  in order to make sure that they were safe.

9       You heard about a previous back injury that was

10 aggravated, and injuries to her shoulder, hip, and neck as a

11 result of this accident.

12      The testimony that you heard demonstrated that she

13 started to have the bladder issues almost immediately after

14 the accident, which is why, when they got home, Gerard took

15 that InterStim monitor and he checked the machine, because he

16 wanted to help her.  He watched her double over in pain

17 holding her bladder, holding her stomach area, having trouble

18 going to bathroom.  Felt like she had to go, couldn't go.

19 Would go, it would only be a little bit.  Discomfort.  Pain.

20 He said he was watching her like a hawk after this accident,

21 saw all this.

22      So he hooked up that InterStim monitor.  What

23 happened?  It connected, showed 50 percent battery life.  But

24 he couldn't change any of the functionality.  He couldn't

25 change any of the programming.  He couldn't do anything with

 1 it.  It was just there, just connected.  So it was working,

 2 but not working properly.

 3      You also heard from Mr. Barton that none of these

 4 issues with her bladder had been present since the 2013

 5 appointments with Dr. Guerette, not the frequency, not the

 6 urgency, not the disruption of daily life.

 7      Then you have Dr. Guerette -- oh, my apologies.  Let

 8 me go back.

 9      And you heard from Ms. Roop and Mr. Barton that there

10 was nothing else significant that happened.  It was just the

11 car accident, not a fall, whether from a horse or otherwise,

12 no other accidents.  She hasn't been in other accidents.  No

13 other traumatic event, no other significant event, nothing but

14 that car accident.  And they checked that InterStim at the end

15 of June, and it was fine, just like it had been since 2013.

16 And then a day or two after the accident, when she's

17 exhibiting the same or similar symptoms she was prior to when

18 the InterStim was first implanted in her, it wasn't working.

19      This eventually led her back to Dr. Guerette.  He

20 stated that he hadn't seen her between 2013 and 2019; no

21 indication she went to any other doctors, no indication she

22 was any having problems, nothing of that nature.  She came in

23 and she directly related it to a motor vehicle accident when

24 these symptoms started to worsen.  There wasn't any indication

25 of anything else during his treatment of her.  He ultimately

1   diagnosed her with stress urinary incontinence, which had

2   previously been resolved.

3           You heard from Dr. Guerette directly as well that he

4   had an occasion to examine the InterStim machine, and he

5   confirmed it had battery life, it was working, it was just

6   malfunctioning, impedances to the signals.  It wasn't working

7   properly but was still operable.  Again, nothing else related

8   to it but that car accident and that timing, coincidentally, a

9   day or two later, after it had been working fine.

10          Now, what you heard from the defense side, since you

11  didn't hear from any witnesses for them, you heard excuses.

12  It was a fall from a horse.  She's working in her husband's

13  shop.  Again, I don't work.  I'm a stay-at-home mom.  I didn't

14  have a mom.  I wanted to be there for my kids.  I don't work.

15  I take care of them.  They both confirmed that she doesn't

16  work.  Lifting 100 pounds, you heard them both scoff at that.

17  It would be like me lifting 100 pounds.

18          All you heard was them trying to poke holes in what

19  Mr. Barton, Ms. Roop, and Dr. Guerette said.  Nobody to say it

20  wasn't the accident.  Nobody to say it started a different

21  time other than the accident.  Just literally them throwing

22  things at a wall, hoping something sticks.

23          It's clear from the evidence, which you can see in

24  the records of Exhibit Number 6, I believe, which are the

25  physical therapy records from Ms. Roop, that she was

1  discharged at the appropriate time.  She was discharged once

2  her problems had alleviated themselves and become better with

3  the treatment.

4         Even on 9/9, she's having headaches still, having

5  pain in her neck, across her forehead, still complaining of

6  pain.  She was only discharged a month later.  It improved.

7  She was still dealing with it.

8         Ladies and gentlemen, the evidence is clear in this

9  case.  And, again, you heard the Judge say it's the

10  preponderance of the evidence.  Take the two scales and put a

11  feather on one side; that's all you're looking for today.

12         Again, directly from Ms. Roop, Mr. Barton, and

13  Dr. Guerette, who is the actual treating physician for

14  Ms. Roop, that's who you heard from today, people directly

15  involved with this accident and with Ms. Roop's injuries.

16  There was nothing but the car accident.

17         Use your common sense; you don't check it at the door

18  when you get here.  There is nothing else but the car

19  accident.  It's clear that that car accident and how

20  significant it was and how she was shaken around in the car

21  and the impact that she took resulted in the injuries that she

22  received, which included damaging that InterStim, leading to

23  the reemergence of her bladder issues that caused her so much

24  distress and pain and discomfort.  Thank you for your time.

25         THE COURT:  Everybody still doing okay?

**JA588**

1          Mr. Keeney?

2          MR. KEENEY:  Thank you, Your Honor.

3          The plaintiff's InterStim was not damaged in this

4   accident.  That's why we're here, right?  That's what y'all

5   need to figure out.

6          First, I want to thank y'all for your time and

7   attention today, and I want to talk to you about the evidence.

8   The first thing I want to do is go through some of the jury

9   instructions that Judge Novak just read to you.  And the first

10  one I want to point out to you is the bottom of Instruction

11  Number 18, which talks about the burden of proof, because

12  Ms. Cohn made a big deal about the fact that I didn't call any

13  witnesses.  Well, I have exhibits in there.  I cross-examined

14  these people.  How am I supposed to know who she was on a

15  trail ride with in North Carolina in 2019 and somehow get them

16  to a courthouse in Richmond, Virginia?  It's ridiculous.

17         But what the bottom of that instruction says, "In

18  determining whether any fact in issue has been proved by a

19  preponderance of the evidence, unless otherwise instructed,

20  you may consider the testimony of all witnesses, regardless of

21  who may called them, and all exhibits received in evidence,

22  regardless of who may have produced them."

23         The plaintiff wants you to believe that the InterStim

24  was damaged in this accident even though her own doctor didn't

25  say that.  Do you know what was conveniently absent from

1  Dr. Guerette's testimony?  Him saying, "Hey, I'm a doctor.

2  This was damaged in this accident."  He didn't say that.  Why

3  not?

4        Even though she made no complaints of pelvic pain to

5  any healthcare provider for three months after the accident

6  until she saw Dr. Guerette.  Even though she says, "I couldn't

7  leave the house, I couldn't do all this stuff," she went on

8  vacation in Hatteras and slept in a camper for a week with her

9  family.  She claims she went on a trail ride and wasn't

10 hurt -- or didn't fall off, I should say.  That's fine.

11       Even though, then, on September 8th -- this is not

12 the August trail ride; this is September -- she goes to

13 Dr. Camden, her doctor, the doctor she was referred to by her

14 lawyers on September 9th and says, "Hey, yesterday I got

15 dragged through a field by my horse."  She has no excuse for

16 how that's in the record.  Ms. Cohn acts like I just created

17 this out of thin air.  It's in her records from the doctor

18 that her lawyer sent her to.

19       She wants you to believe that the InterStim was

20 damaged in this accident, even though she was working as a

21 mechanic.  She says, "No, I haven't worked."  Again, same

22 thing:  It's in the records, I didn't make this up, and I'll

23 show them to you in second.

24       So you have a lot of exhibits and evidence there.

25 So, first, let me go through a couple more jury instructions.

**JA590**

1  First of all, talking about using your common sense.  You can

2  use your common sense and do that and think about any bias

3  that has been shown.  For instance, in this case, the only

4  folks that are talking about the InterStim being damaged in

5  this accident are Ms. Roop and her husband, Mr. Barton, who

6  are suing for $5 million.  The doctor didn't say it, they

7  didn't bring any other witnesses, just these folks who

8  certainly have a big interest in this case.

9         One of the things, and this is Instruction Number 25,

10  that Judge Novak says at the bottom, it says, "I, again,

11  remind you that you must not base your verdict in any way upon

12  sympathy, bias, guesswork, or speculation.  Your verdict must

13  be based solely on the evidence and the instructions of this

14  court."

15         Why is that important here?  What Ms. Cohn just asked

16  you to do is, without doctor, without any medical evidence to

17  relate that the InterStim was damaged in this accident, for

18  y'all to speculate and guess.  And the law says you can't do

19  that.

20         And, again, going back to the burden of proof, the

21  plaintiff has the burden of proof beyond a preponderance of

22  the evidence.  What that means is, if you're not sure she

23  hasn't proven it, she can't recover for it.

24         So let's talk about the actual evidence.  Ms. Cohn

25  talks about how I didn't produce anything or didn't call any

 1  witnesses, but there is plenty of evidence in this case.

 2      If I can plug this thing in, I can get y'all to

 3  follow along with me because, certainly, there is a lot there.

 4      So this is the record, and I've highlighted it.  And

 5  just so y'all know and can follow along, and I'll use my

 6  exhibit numbers that are in the back, this is Defense Exhibit

 7  Number 1.  This is the first time she goes to the doctor.  And

 8  you can see at that point she's complaining of the head

 9  injury, neck pain, left shoulder, left hip pain.  We're not

10  disputing that she had a head injury.  We're not disputing

11  that she had a neck injury, made her back injury worse or that

12  she had a shoulder.  This is really about the pelvic issues.

13      If you see right here, down on the last sentence, "No

14  chest pain.  No abdominal pain."  Okay?  And then I will go

15  to -- this is my Exhibit Number 2.  July 15th, 2019, she

16  goes to Johnston-Willis.  And y'all flip in your books as

17  well, but what you will see is they do an exam of her abdomen.

18  Okay?  No abdominal pain.  This is a week after the accident.

19  No discharge.  No dysuria.  No hematuria.  The abdomen: soft,

20  nontender, no distension.  It's all normal.  They did an exam.

21  They looked at it.  This is when Mr. Barton is in here saying

22  she's keeled over in pain with those parts of her body.  But

23  she goes to the emergency room and doesn't mention it?

24      Ms. Roop, by the way, said she can't recall when the

25  pain actually started.  Mr. Barton says it happened

1  immediately.  Ms. Roop said, "I'm not sure if it was a week, a

2  month, a couple of months after the accident."  If you

3  remember, I talked to her about her deposition.  Again, these

4  are in her records.

5      Ms. Roop then goes and starts at Alliance Physical

6  Therapy, okay?  And July 22nd is the first time she goes and

7  sees Dr. Camden, who's the in-house doctor at Alliance.  This

8  is -- give me one second -- my Defense Exhibit Number 4.  It's

9  also in the plaintiff's exhibits as well.  I've highlighted

10 again.  It talks about her pain management for chronic low

11 back pain.  This is where she's saying the severity of her

12 pain, the pain, mind you, she says that she can't do anything.

13 It's 1 to 2 out of 10 at rest; 3 to 4 with activity.

14     One of the things she talked about was she was

15 vomiting, and that's why she couldn't leave the house.  This

16 is, again, July 22nd.  She tells Dr. Camden she had not

17 vomited for one week and that she normally takes hydrocodone

18 twice daily.

19     Now, the last sentence on that page, "Patient did not

20 miss any days of work after her accident.  She helps her

21 husband work in his mechanic shop.  She has a lifting

22 requirement of 100 pounds with working on tractor trailers and

23 large vehicles."  I'm not making this up, guys.  It's in her

24 records, and she wants you to believe that that didn't happen.

25     She sort of has an explanation for everything.  For

**JA593**

1 instance, I showed her the welding picture. She's like, "Well

2 I was just posing with it." If you look at all of her

3 records, it says she works at East Coast Repair.

4     Then shortly before the accident, I asked about the

5 racing team, when she diagnosed the Chevy 3500 with a problem.

6 Ms. Roop says, "Well, you know, Mr. Barton is not the best at

7 diagnosing, so I just bounce my ideas off him, and he talks to

8 me." What did Mr. Barton say when I asked if she ever helped?

9 He said, "No. Maybe she brings me lunch." He didn't say

10 that. It's because it's not really what's going on. She is

11 working as a mechanic.

12     Then you will see in the records there is no visit to

13 physical therapy between August 6th and I believe it is

14 August 20th or the 22nd. That is when they are in Hatteras.

15 Again, she's claiming she's so debilitated, can't do all this,

16 they go on vacation to Hatteras for a week at the beach, and

17 she's sleeping in a camper. It's not the most comfortable

18 thing in the world to sleep in a camper.

19     She comes back, she goes back to physical therapy.

20 See, here's the 8/6 note. At that point you can see her

21 headaches had already decreased at that point and she has two

22 headaches a week, and then she says she's returned to work at

23 that point, and it's highlighted.

24     Here's 8/20. She reports she's feeling much better

25 than when she initially began therapy. She still has things

1  that bother her, such as bright lights when she's driving, but

2  it is tolerable.  Remember, she said she couldn't in to

3  Dr. Guerette because it took her a while to get back driving.

4  Well, here she is in August telling Alliance Physical Therapy

5  she's driving.

6        August 22nd, continuing to feel improved, pain levels

7  down, states no current headache symptoms.  It's roughly six

8  weeks after the accident.

9        So y'all get the point.

10        Now, here's the important one:  September 9th.

11  Okay?  This is the visit to Dr. Camden.  And this is, so

12  you'll know, Defense Exhibit Number 8.  It is also in the

13  plaintiff's exhibits.  Mine are broken down by date.  The

14  plaintiff just kind of put them all in there.  She said she

15  had two headaches in the last week.  Patient states her

16  shoulder was pain free until yesterday while riding her horse.

17  She states her horse dragged her across the field, causing

18  pain.

19        Again, I'm not making this up.  She had not been to

20  Dr. Guerette at that point.

21        Then, again, you see all the records.  She reports --

22  and I'll speed this up.  It says, no headaches, getting

23  better.

24        Her last visit to Dr. Camden, which is October --

25  excuse me.  Let me find it here.  Bear with me.  Here it is,

1 October 16th, 2019. I've highlighted the date there. Since
2 last visit, patient notes the headaches, neck, and left
3 shoulder pain are 100 percent improved. She has not needed
4 any medication in over two weeks and is able to complete all
5 home and work activities without pain. She has not had any
6 other concussion symptoms in a month.

7 So, first, let's knock out the Alliance Physical
8 Therapy stuff. The first thing you have to do is to decide
9 when she recovered from those injuries for which they treated
10 her. In my mind, and y'all can do whatever you want, but
11 there's sort of two options. Do you think she was all better
12 when she fell off the horse September 9th? If so, put
13 September 9th, 2019, there. If you think it was when she
14 got discharged from Alliance, October 16th, 2019. To me,
15 you know, you could say about when she's going to the beach
16 and stuff, but just to make it simple, those are kind of the
17 two dates. When she fell off the horse, she was pretty much
18 all better and then had more shoulder pain.

19 Let's talk about Dr. Guerette. That's why we're
20 really here. Again, he didn't say anything about this
21 accident causing the InterStim to break.

22 MS. COHN: Your Honor, I have to object. That was
23 part of the testimony that was not to be given as causation.

24 THE COURT: There's no evidence about it. The point
25 is not why. The point is that there's no evidence from him.

**JA596**

Closing Argument by Mr. Keeney

1  That's what the point is.  That's the appropriate point.

2       Go ahead.  Let's move on.

3       MR. KEENEY:  Thank you.

4       And so if you look -- and these all in plaintiff's

5  records Number 7, okay?  I didn't put them in the exhibits,

6  but they're in there for y'all.

7       The second visit with Dr. Guerette was

8  December 3rd, 2019.  And once you're in that visit, if you

9  go to the fifth page, the last page, that's where he talks

10 about what his plan is and what he's going to do.  And I've

11 got it highlighted up here.  Surgery, they're going to replace

12 the InterStim.  We know he did that.  The question is, why?

13 Why did it need to be replaced?

14      "Patient is noted to have severe overactive bladder

15 and dyssynergic voiding.  After a comprehensive discussion of

16 options, she will replace her InterStim, as it is at end of

17 life, and proceed with pelvic floor therapy."  Not that it's

18 broken from an accident, not that it's malfunctioning, but the

19 thing is six, seven years old, and it's at its end of life.

20 Again, that is not me saying it.  That is in the plaintiff's

21 own medical records.

22      And, again, when you flip to Exhibit 7, and you go to

23 the next one -- and I apologize, I didn't put this on my

24 computer -- it talks about it on page 4 of 4 for that next

25 visit.  It says, under "Description:"  "Overactive bladder.

 1  Plan: InterStim at end of life for many years," and then talks
 2  about it being replaced.

 3      Again, the plaintiff has the burden of proof.  If
 4  y'all aren't sure if it's just worn out, it was the horse
 5  fall, or if it was this accident, you have to find for the
 6  defendant.

 7      But I submit to y'all what is in these records I did
 8  not make up.  The only people who are saying this is from this
 9  accident are Ms. Roop and her husband.  But what the medical
10  evidence actually shows in her own medical records is that she
11  didn't make the complaints, she tells folks she's not having
12  problems, she gets dragged through a field by the horse, then
13  she goes to Dr. Guerette.  She doesn't tell Dr. Guerette about
14  the horse, and even Dr. Guerette's own diagnosis is not
15  damaged, it's expired.  That's what the medical evidence is.

16      So I thank y'all for your time and attention and ask
17  that you find that the InterStim -- that the plaintiff, I
18  should say, has not proven by a preponderance of the evidence
19  that the InterStim was damaged in this accident.  Thank you.

20      THE COURT:  All right.  Go ahead, Katie.

21      Ms. Cohn, do you have a brief rebuttal?

22      MS. COHN:  Thank you, Your Honor.

23      So, again, what you've heard is from the defense
24  attorney making argument.  You heard from Ms. Roop directly
25  that there are discrepancies and inconsistencies with the

1  physical therapy records.  She has no reason for them.  She

2  didn't write them, but she clearly said that's not correct.  I

3  don't lift 100 pounds.  I don't work.

4      The defense wants rely on the fact that it said that

5  she didn't miss any work.  Yet, when she went to her primary

6  care physician appointment not long after the accident, she

7  was so sick throwing up they prescribed Zofran.  That's in the

8  notes.  How would she be functioning at work if she's so sick

9  and throwing up she needs to be prescribed Zofran?  She wasn't

10  working.  You heard her testimony.  It was an extended period

11  of time where every time she stood up, she was sick and dizzy.

12      Defense wants to rely on part of the physical therapy

13  records but not other ones.  That 9/9 visit where she said

14  that her shoulder was damaged in this alleged horse fall that

15  never happened and there's no proof of it other than this

16  misconstrued note that Ms. Roop explained, that she's still

17  having neck pain, she's still having head pain, she's still

18  having other pain, he just glossed over that.  "Don't pay

19  attention to that.  Just look at the fall that never

20  happened."

21      Now, you heard from Dr. Guerette that he said that

22  she related the timing of the change in her bladder function

23  issues to the motor vehicle accident, and there wasn't any

24  indication of anything else.

25      THE COURT:  I struck that evidence.

**JA599**

1          Jury, you're not to consider that evidence.

2          MS. COHN:  All the records that you have in your

3     hands say, "Motor vehicle accident on 7/7."  All of them,

4     consistent throughout, throughout all the providers:  Motor

5     vehicle accident on 7/7/2019.

6          There's no medical evidence in there that it wasn't a

7     car accident.  You didn't hear from any doctor who said it

8     wasn't the car accident.  Those records don't say it wasn't

9     the car accident.  No medical evidence that you have heard or

10    not heard disputes that it was the car accident.

11         You heard Ms. Roop's very valid reasons why there's

12    not any demonstrable evidence in any of the records prior to

13    Guerette about her pelvis.  She walks in and she starts

14    talking about interstitial cystitis, as we butcher it here

15    trying to even say it, and they look at her like she has three

16    heads.  Again, she went through hell to get that diagnosis and

17    to get help.  She wasn't letting anybody else touch her.  She

18    wasn't going to talk about it with anybody else.  She didn't

19    want to start over with anybody else.  The only person that

20    she was going to see was Dr. Guerette, and there was a delay

21    in getting to him.  She couldn't drive, taking care of her

22    kids, her father became seriously ill.  She waited to see the

23    doctor who had helped her in the first place.

24         Now, you heard defense counsel say that in the

25    records it says that the InterStim was expired.  You also

1  heard Dr. Guerette explain that.  Again, I'll repeat:  It was

2  malfunctioning.  The impedances were improper.  It was still

3  functioning, though.  Because at end of life, it didn't

4  function anymore, there wouldn't be any more battery.  He sat

5  up on the stand and said that.  That wasn't the case here.  It

6  wasn't end of life.  It was still functioning.  There was

7  still battery.  It was just malfunctioning.

8        The defense wants to keep pointing to these notes

9  that Dr. Camden made, and Ms. Roop is here to answer to them

10 but Dr. Camden is not.  The defense could have brought her,

11 could have had her testify, "Yeah, Ms. Roop came into my

12 office, we had a conversation, and that's what she said."

13 She's not here to say that.  But the person who made those

14 statements is here.  She's telling you that that's not what

15 was said.

16        Again, all of the medical evidence that you have in

17 front of you points to the 7/7/19 motor vehicle accident with

18 Mr. Desousa as when Ms. Roop's bladder issues reemerged.

19 Motor vehicle accident, all of those records.  Not anything

20 else.  Not anybody else here to say that it wasn't.  Again,

21 use your common sense.

22        Thank you very much.  We appreciate your time.

23        THE COURT:  Folks, it's time for me to put you to

24 work.  You have to earn that free government lunch, right?

25        So let's go back to the instructions just real quick.

1 I'm going to just highlight a couple things again about how
2 you're to do your job.

3        Number 1.  I'm just going to reinforce, pure as the
4 driven snow.  I'm not going to read that whole instruction,
5 but you know don't go on the Internet, don't call anybody,
6 don't text anybody, don't post anything.  You already know
7 that, right?

8        Number 2.  Remember, you're like Superman.
9 Kryptonite occurs when one of you is not present.  So when you
10 go back into the jury room, if one of has got to use the
11 restroom, everything stops until that person comes back.  You
12 got that?  It's seven or nobody, right?

13        First thing you're going to do is you're going to
14 select a foreperson who is simply going to serve as your
15 spokesperson here in the courtroom.

16        Now, you're going to be sent back these instructions,
17 which attached to it at the end, of course, is the verdict
18 form, right?  We're going to give what I refer to as the
19 master verdict form, right?  That, it should be in the hands
20 of the foreperson.  Ms. Garner will give that to you.  When
21 you are unanimous, the foreperson will complete that.

22        So you're answering to two questions.  Question
23 Number 1 is about how long was the treatment necessary for the
24 Alliance Physical Therapy.  Question Number 2, proven or not
25 proven that the accident caused damage to the InterStim

1 device?

2        When you are unanimous -- I cannot stress that

3 enough, you do not come back until you're unanimous.  When

4 you're unanimous, the foreperson signs the verdict form, dates

5 it, lets the court security officer know.  We'll bring

6 everybody into the courtroom and I'll go over your verdict

7 form with you.

8        We are going to send the following back with you:

9 First of all, the instructions that you have, you can take

10 those with you, okay?  The copy you have, take those with you

11 back into the room.  Of course, we'll give you the master

12 verdict form, and then whoever you select as the foreperson

13 will be in charge of that.  You can take your notebooks with

14 you back there.  We will give you the stipulations that I read

15 to you, and we're also going to send back to you the exhibits,

16 one set of the exhibits that was introduced during this phase.

17        And the reason I'm saying that is this:  Because we

18 were trying to save time and make your job as easy as possible

19 for you, your book has more than just this phase, right?  You

20 may only use the exhibits from this phase.  So Ms. Garner is

21 in the process of putting together the exhibits for just this

22 phase, and those are the only exhibits that you may review

23 during your deliberations.  Does everybody understand that?

24 Everybody with me so far?

25        Remember, if you need to communicate with me -- and

1   I'm going to read that instruction one more time.  It's

2   Instruction Number 27.

3          If it becomes necessary during your deliberations to

4   communicate with me, you may send a note via the court

5   security officer, signed by your foreperson or by one or more

6   members of the jury.  It's preferred if the foreperson does

7   this.  No member of the jury should ever attempt to

8   communicate with me by any means other than a signed writing.

9   I will never communicate with any member of the jury on any

10  subject touching the merits of the case otherwise than in

11  writing, or orally here in open court.

12         The court security officers, as well as other

13  persons, are forbidden to communicate in any way or any manner

14  with any member of the jury on any subject touching the merits

15  of the case.

16         Bear in mind, this is what I want to emphasize, you

17  are never to reveal to any person, not even me, how the jury

18  stands, numerically or otherwise, on the questions before you,

19  until you have reached a unanimous verdict.

20         In other words, the only numbers we should know is 7

21  to 0.  You got that?  You can never say under any

22  circumstances how you stand as you go forward.  Does anybody

23  have any questions about that?  No?

24         Okay.  I'm going to ask you to leave your exhibit

25  book at your chair, take your notebooks with you, and we're

1  going to get the other stuff back to you here in a few

2  moments, okay?

3         THE LAW CLERK:  Judge, the binders are already split

4  by phase, so their binders are in phases.

5         THE COURT:  That's true?

6         THE LAW CLERK:  Yes.

7         MR. KEENEY:  Yes, Your Honor, that's just phase 1.

8         THE COURT:  Just to make clear, I'll tell you what,

9  let me just make clear.

10         So in phase 1, we have -- here's the exhibits I have

11  going back.  Folks, you can have a seat just for a second.  I

12  just want to make sure we're on the same page before we make a

13  mistake.

14         I've got P1 through P7, D1 through 17, and then D19.

15  Now, you add today 15, 16, 17, and 19, so those are not in the

16  book, right?  Or they added them?  They were handed those, I

17  guess.

18         MR. KEENEY:  They should have each copies of the

19  social media.

20         THE COURT:  Okay.  What I'm saying is, is there any

21  other exhibits in those books?

22         MR. KEENEY:  No, Your Honor.

23         MS. COHN:  No, Your Honor.  We specifically packaged

24  them one in phase 1 and then another set for phase 2.

25         THE COURT:  Perfect.  You guys did a great job.

1          Okay.  So, again, the lawyers are doing a better job

2    than me here, right?

3          So you can now take your exhibit books with you.  We

4    don't have to worry about it.

5          We have the stipulations, right?  We'll give them to

6    Cheryl.

7          You have to give them the master verdict form.

8          THE CLERK:  I have that.

9          THE COURT:  And the stipulations.

10         THE CLERK:  And I have that.

11         THE COURT:  They have their exhibits, take their

12   notebooks, and take the instructions.

13         Is there anything else that counsel believes needs to

14   go to the jury room, Ms. Cohn?

15         MS. COHN:  No, Your Honor.

16         THE COURT:  Mr. Keeney?

17         MR. KEENEY:  No, Your Honor.

18         THE COURT:  All right.  We are going to wait for you

19   as long as it takes, as long as we're here, okay?

20         Officer, you can take them back to the jury room.

21         COURT SECURITY OFFICER:  Yes, sir.

22      (Jury out at 3:42 p.m.)

23         THE COURT:  First of all, you-all have to stay on

24   this floor until we get the jury so we can track you down

25   right away.  Number 2, because I don't believe in wasting

 1 time, we have two situations that can occur.  Whether they

 2 agree on the date or not about the Alliance thing, nobody

 3 cares about that right now.  But on the InterStim thing, one

 4 of two things is going to happen, okay?  Regardless of how

 5 they find, it does not affect the opening instructions I give

 6 for phase 2.  I just looked at it, but I want to make sure you

 7 agree with that.

 8         Ms. Cohn, do you agree?

 9         MS. COHN:  Yes, Your Honor.

10         THE COURT:  Mr. Keeney?

11         MR. KEENEY:  I would -- I think that's right, Your

12 Honor.

13         THE COURT:  Okay.  So I'm going to go immediately to

14 instructing them on phase 2.

15         Were you going to call Dr. Guerette right away?

16         MS. COHN:  Yes, Your Honor.

17         THE COURT:  And then who else would you have?  Would

18 you have Ms. Roop, then, or just Dr. Guerette?

19         MS. COHN:  Ms. Roop as well.

20         THE COURT:  Okay.  Anybody else?  Is Mr. Barton

21 coming back or not?

22         MS. COHN:  I would prefer to also have Mr. Barton.

23         THE COURT:  Well, that's up to you, right?

24         MS. COHN:  Yes, I would have all three again, Your

25 Honor.

1        THE COURT:  You'll be guided by whatever the verdict

2    is on the InterStim, right?

3        Then I'll see how late it goes in terms of that.  I'm

4    really trying to get Dr. Guerette in for you today.

5        MS. COHN:  I appreciate that.

6        THE COURT:  No matter what, we're not charging the

7    jury tonight and you're not arguing tonight.  So if we get all

8    the witnesses in, I'm going to stop.  I don't care what time

9    it is, we're going to stop, right?  If it's 5:00 o'clock and

10   I've only got Dr. Guerette, we are going to stop and pick up

11   with Ms. Roop and Mr. Barton tomorrow.  Everybody with me on

12   that?  Do you understand what I'm saying?

13       Now, in terms of the instructions for tomorrow, if

14   they say no on the InterStim, it's just my alternative

15   instructions that I already prepared.  So that's not an issue.

16   If they come back, yes, proven on the InterStim, I think we

17   need to make two changes.

18       On Instruction Number 2, types of compensatory

19   damages, I think what I should add is, "As to the disputed

20   injuries," and I'll just put a hyphen there, "those associated

21   with the InterStim device," and then just continue, just so

22   I'm making clear what the disputed injuries are is the

23   InterStim.

24       Do you have any problem with that, Ms. Cohn?

25       MS. COHN:  No, Your Honor.

 1          THE COURT:  Mr. Keeney?

 2          MR. KEENEY:  Just one second, Your Honor.  I'm trying

 3  to read it.

 4          THE COURT:  That's fine.  "As to disputed injuries,"

 5  and then I'm just going to add hyphen, "those associated with

 6  the InterStim device."

 7          MR. KEENEY:  That's fine, Your Honor.

 8          THE COURT:  And then on the verdict form, I would

 9  change -- I would just add the following:  "InterStim device,"

10  and then I'll just put in a hyphen, "regarding the" -- sorry,

11  "disputed injuries, hyphen, regarding the InterStim device."

12          Here's what I want to make clear is, I want there to

13  be a division by the jury on the verdict form as the -- what

14  they're returning for, like, pain and suffering and stuff

15  about the undisputed injuries, because that could be a

16  substantial number even without the InterStim, and I want to

17  have a separate number for the InterStim, because I don't know

18  about this discovery issue, and if I have to look at that and

19  I'd have to take it away, I would want to know exactly what

20  the number is.  So that's what I'm setting it up for.

21          Do you have any problem with that, Ms. Cohn?

22          MS. COHN:  No, Your Honor.

23          THE COURT:  Mr. Keeney?

24          MR. KEENEY:  I don't believe so.  I was looking for

25  the verdict form, but that's fine.

1          THE COURT:  Well, what we do is we'd make those

2    changes tonight and e-mail you a copy anyhow.  But that's the

3    only changes I see that would be necessary.

4          Again, if they find against the plaintiff on the

5    InterStim, I'm just going to go to the alternative version.

6    There's no reason to change that.

7          We'll be in recess until we heard from the jury.

8    Make sure everybody stays on the floor so we can track you

9    down right away.

10          THE CLERK:  All rise.  This court is in recess.

11      (Recess taken from 3:47 p.m. until 5:21 p.m.)

12          THE COURT:  I understand that we have a jury [sic].

13          I'll tell you, if they find in favor of the plaintiff

14    on the InterStim, I'm going to go straight to the next phase

15    to get Dr. Guerette in.  I'm going to ask the jury, though, if

16    they're willing to stay a little bit longer.  If the answer is

17    against the plaintiff, we're going to adjourn until tomorrow.

18          Do you want to get the jury?

19          COURT SECURITY OFFICER:  Yes, sir.

20      (Jury in at 5:22 p.m.)

21          THE COURT:  I understand the jury has reached a

22    verdict.  Is that true?

23          THE FOREPERSON:  Yes, we have.

24          THE COURT:  First of all, does everybody agree with

25    the verdict?

1          THE JURY:  (Nods head up and down.)

2          THE COURT:  Do you want to pass up the verdict slip

3    to the officer?

4          Officer, do you want to hand it to me, please?

5          We, the jury, find that the plaintiff:

6          (1)  The plaintiff has proven by a preponderance of

7    the evidence that her treatment with the Alliance Physical

8    Therapy was through October the 16th of 2019 -- it's written

9    "10/16/19" -- was reasonable and medically necessary to treat

10   the injuries plaintiff sustained in the accident to her head,

11   neck, shoulder, and hip as well the aggravation of her

12   previous back injury.

13         As to question 2:  The plaintiff has circled "not

14   proven" by a preponderance of the evidence that her InterStim

15   device was damaged as a result of the accident.

16         Madam foreperson, you are?  What's your juror number?

17         THE FOREPERSON:  Seven.

18         THE COURT:  Number 7.  So you're Ms. Jackson?

19         THE FOREPERSON:  Yes.

20         THE COURT:  And is that the verdict of the unanimous

21   jury?

22         THE FOREPERSON:  Seven.

23         THE COURT:  Ms. Cohn, would you like the jury polled?

24         MS. COHN:  No, Your Honor.

25         THE COURT:  Mr. Keeney, do you want the jury polled?

1    MR. KEENEY:  No, Your Honor.

2    THE COURT:  So, folks, here's what we're going to do:

3  I worked you a little bit over time.  Got to get my money's

4  worth out of that sandwich.  I'm going to let you go home for

5  the rest of the night.  We're going to start first thing in

6  the morning.

7    There's still a damage section as to the undisputed

8  injuries, and we'll start with that tomorrow morning, and you

9  should have that case pretty promptly tomorrow morning,

10  certainly before lunchtime.  However, we'll still take your

11  lunch order when you check in.  Get it while it's free.

12    It is incredibly important that you-all continue to

13  comply with my orders, right?  Just no talking about the case,

14  no listening, no research, none of that stuff.  Everybody got

15  that?

16    I look forward to seeing you bright and early.

17  You'll report at 9:00 o'clock.  We'll promptly start at 9:30,

18  and we'll wrap the case up then.

19    Thank you-all for your service.  You can adjourn for

20  tonight.

21    Everybody stay in place until the jury steps out.

22    (Jury out at 5:25.)

23    THE COURT:  I find that the jury verdict as to this

24  phase is unanimous and I'm going to record the jury verdict as

25  demonstrated.  I'll give the verdict form to Ms. Garner.

1       All right.  So we're going to go with the alternate

2  version.  Unless y'all want to try to work it out tonight,

3  we'll start tomorrow morning promptly at 9:30.  You-all be in

4  place by 9:15 and I'm going to read the alternate jury

5  instructions then, okay.

6       Anything else I need to deal with?  Ms. Cohn?

7       MS. COHN:  No, Your Honor.

8       THE COURT:  Mr. Keeney?

9       MR. KEENEY:  No, Your Honor.

10      THE COURT:  Have a good night.

11      MR. KEENEY:  Thank you, Your Honor.

12      THE CLERK:  All rise.  This court is in recess until

13  tomorrow.

14    (Court recessed at 5:26 p.m.)

15                    CERTIFICATE

16  I, Melissa H. Custis, certify that the foregoing is

17  a correct transcript from the record of proceedings

18  in the above-entitled matter.

19

20  /s/  Melissa H. Custis, RPR          Date:  09/28/2022

21

22

23

24

25



ST. FRANCIS MEDICAL CENTER
13710 ST FRANCIS BOULEVARD
MIDLOTHIAN VA 23114-3267

Roop, Samantha J
MRN: 760144779, DOB: 1985, Sex: F
Acct #: 13191890547
Arrived 7/8/2019, D/C: 7/9/2019

## Patient Demographics

| Patient Name | HAR | Sex | DOB | Address | Phone |
|---|---|---|---|---|---|
| Roop, Samantha J | 131918 90547 | Female | /198 5 | | |
| | | | | | *Preferred* |

## Admission Information

| | | | |
|---|---|---|---|
| Arrival Date/Time: | 07/08/2019 2220 | Admit Date/Time: 07/08/2019 2220 | IP Adm. Date/Time: |
| Admission Type: | Emergency | Point of Origin: Non-health Care Facility/self | Admit Category: |
| Means of Arrival: | Car | Primary Service: Emergency | Secondary Service: |
| Transfer Source: | | Service Area: BON SECOURS HEALTH SYSTEM | Unit: WTC EMERGENCY DEPT |
| Admit Provider: | | Attending Provider: Gill, Richard R, MD | Referring Provider: |

## Events

ED Arrival at 7/8/2019 2220
  Unit: WTC EMERGENCY DEPT

Admission at 7/8/2019 2230
  Unit: WTC EMERGENCY DEPT    Room: WER16    Bed: 16
  Patient class: EMERGENCY    Service: EMERGENCY

ED Roomed at 7/8/2019 2230
  Unit: WTC EMERGENCY DEPT    Room: WER16    Bed: 16
  Patient class: EMERGENCY    Service: EMERGENCY

Discharge at 7/9/2019 0008
  Unit: WTC EMERGENCY DEPT    Room: WER16    Bed: 16
  Patient class: EMERGENCY    Service: EMERGENCY

Discharge at 7/9/2019 0008
  Unit: WTC EMERGENCY DEPT    Room: WER16    Bed: 16
  Patient class: EMERGENCY    Service: EMERGENCY

## Guarantor Information

**Name:**      **SSN:**
**Address:**
**City:**    **State:**    **Zip:**    **Phone:**

**Employer:**
**Address:**
**City:**    **State:**    **Zip:**    **Phone:**
**Guar DOB:**

## Contact Information

| Name | Relation | Home | Work | Mobile |
|---|---|---|---|---|
| | | | | |

**JA614**



ST. FRANCIS MEDICAL CENTER
13710 ST FRANCIS BOULEVARD
MIDLOTHIAN VA 23114-3267

Roop, Samantha J
MRN: 760144779, DOB:     '1985, Sex: F
Acct #: 13191890547
Arrived 7/8/2019, D/C: 7/9/2019

## Primary Visit Coverage

| Payer | Plan | Sponsor Code | Group Number | Group Name |
|-------|------|--------------|--------------|------------|
|       |      |              |              |            |

## Primary Visit Coverage Subscriber

| Subscriber Name | Subscriber ID | Subscriber Address |
|-----------------|---------------|--------------------|
|                 |               |                    |

## Insurance Information

|                  |                     |
|------------------|---------------------|
|                  | **Phone:**          |
| **Subscriber:**  | **Subscriber#:**    |
| **Group#:**      | **Precert#:**       |

## PCP INFO

| Primary Care Provider | Phone | Center |
|-----------------------|-------|--------|
| Madeline R Klim, NP   |       | ST. MARY'S HOSPITAL |

## CHIEF COMPLAINT

| Complaint | Comment |
|-----------|---------|
| **Motor Vehicle Crash** | |

## Diagnosis Information

Primary Visit Diagnosis:   Injury of head, initial encounter [S09.90XA]
Principal Problem:           None found

| Visit Diagnoses | Problem List | ADT Coded Diagnoses | ADT Free Text Diagnoses |
|-----------------|--------------|---------------------|-------------------------|
| Injury of head, initial encounter [S09.90XA] Strain of neck muscle, initial encounter [S16.1XXA] Injury of left shoulder, initial encounter [S49.92XA] Multiple contusions [T07.XXXA] | None found | None found | None found |

## Discharge Information

| Discharge Date/Time | Discharge Disposition | Discharge Destination | Discharge Provider | Unit |
|---------------------|-----------------------|-----------------------|--------------------|------|
| 07/09/2019 0008 | Home Or Self Care | Home | None | WTC EMERGENCY DEPT |

Review status set to Review Complete on 7/8/2019

## Allergies as of 7/9/2019

|            | Noted | Reaction Type | Reactions |
|------------|-------|---------------|-----------|
| **Latex** | 02/05/2010 | | Hives |
| **Bee Sting [sting, Bee]** | **10/19/2016** | **Systemic** | **Anaphylaxis** |
| **Pcn [penicillins]** | **12/08/2011** | **Side Effect** | **Other (comments)** |
| **Hair falls out** | | | |
| **Metoprolol** | 01/25/2013 | | Other (comments) |
| Syncope | | | |

## Immunizations Administered as of 7/9/2019

Never Reviewed

**JA615**


BON SECOURS HEALTH SYSTEM, INC.

ST. FRANCIS MEDICAL CENTER
13710 ST FRANCIS BOULEVARD
MIDLOTHIAN VA 23114-3267

Roop, Samantha J
MRN: 760144779, DOB: '1985, Sex: F
Acct #: 13191890547
Arrived 7/8/2019, D/C: 7/9/2019

## Immunizations Administered as of 7/9/2019 (continued)                                    Never Reviewed

| Name | Date | Dose | VIS Date | Route |
|---|---|---|---|---|
| **Influenza Vaccine (Quad) PF** <br> Manufacturer: Sanofi Pasteur <br> Lot: U1503AB | 12/2/2015 | 0.5 mL | 8/7/2015 | IntraMUSCular |
| **Pneumococcal Polysaccharide (PPSV-23)** <br> Manufacturer: Merck & Co. Inc <br> Lot: H014653 | 4/29/2013 | 0.5 mL | 4/19/2014 | IntraMUSCular |
| **TDAP Vaccine** <br> Manufacturer: Sanofi Pasteur <br> Lot: C4247AA | 8/28/2012 | 0.5 ml | 1/24/2012 | IntraMUSCular |

## Implants

### Bone

Biofactor Human Amnion Allograft - Implanted                                              Spine Lumbar

| | | | | |
|---|---|---|---|---|
| Model/Cat number: | BF00040853 | Serial number: | BF-010125 |
| Lot number: | N/A | | |
| As of 2/20/2012 | | | |
| Status: | **Implanted** | | |

### Implant

Graft Crsh Chps20ml - Sn/A - Implanted                                                    Spine Lumbar

| | | | |
|---|---|---|---|
| Inventory item: | GRAFT BNE CRSH CHPS 20ML -- READIGRAFT | Model/Cat number: | CAN20-14BP |
| Serial number: | N/A | Manufacturer: | LIFENET VIRGINIA TISSUE BANK |
| Lot number: | 1114999-0025 | | |
| As of 2/20/2012 | | | |
| Status: | **Implanted** | | |

Graft Matrix Duragn + 2x2in - Sn/A - Implanted                                            Spine Lumbar

| | | | |
|---|---|---|---|
| Inventory item: | GRAFT DURA REGEN TMPLT 2X2IN -- DURAGEN | Model/Cat number: | DURS2291 |
| Serial number: | N/A | Manufacturer: | INTEGRA LIFESCIENCES CORP |
| Lot number: | 1115993 | | |
| As of 2/20/2012 | | | |
| Status: | **Implanted** | | |

Putty Osteostrux 10ml - Sn/A - Implanted                                                  Spine Lumbar

| | | | |
|---|---|---|---|
| Inventory item: | PUTTY MATRX CER CLLGN BNE 10ML -- OSTEOSTRUX | Model/Cat number: | 56070100 |
| Serial number: | N/A | Manufacturer: | INTEGRA LIFESCIENCES CORP |
| Lot number: | 105NB0235595 | | |
| As of 2/20/2012 | | | |
| Status: | **Implanted** | | |

Scr Set Pdcl Blocker Std Hf - Sn/A - Implanted                                            Spine Lumbar

**JA616**


BON SECOURS HEALTH SYSTEM, INC.

ST. FRANCIS MEDICAL CENTER
13710 ST FRANCIS BOULEVARD
MIDLOTHIAN VA 23114-3267

Roop, Samantha J
MRN: 760144779, DOB:    /1985, Sex: F
Acct #: 13191890547
Arrived 7/8/2019, D/C: 7/9/2019

**Implants (continued)**

| | | | |
|---|---|---|---|
| Inventory item: | SCR SET PDCL BLOCKER STD HF -- | Model/Cat number: | 20-2500-001 |
| Serial number: | N/A | Manufacturer: | AMEDICA US SPINE |
| Lot number: | N/A | | |
| As of 2/20/2012 | | | |
| Status: | **Implanted** | | |

Rod Spne Curved 5.5x40mm - Sn/A - Implanted                                                                 Spine Lumbar

| | | | |
|---|---|---|---|
| Inventory item: | ROD SPNE CURVED 5.5X40MM -- | Model/Cat number: | 25-2000-040 |
| Serial number: | N/A | Manufacturer: | AMEDICA US SPINE |
| Lot number: | N/A | | |
| As of 2/20/2012 | | | |
| Status: | **Implanted** | | |

Scr Spne Triple Lead 6.5x45mm - Sn/A - Implanted                                                            Spine Lumbar

| | | | |
|---|---|---|---|
| Inventory item: | SCR SPNE TRPL LD 6.5X45MM -- DK BLU | Model/Cat number: | 28-6550-045 |
| Serial number: | N/A | Manufacturer: | AMEDICA US SPINE |
| Lot number: | N/A | | |
| As of 2/20/2012 | | | |
| Status: | **Implanted** | | |

Scr Triple Lead 6.5x40mm - Sn/A - Implanted                                                                  Spine Lumbar

| | | | |
|---|---|---|---|
| Inventory item: | SCR SPNE TRPL LD 6.5X40MM -- DK BLU | Model/Cat number: | 28-6550-040 |
| Serial number: | N/A | Manufacturer: | AMEDICA US SPINE |
| Lot number: | N/A | | |
| As of 2/20/2012 | | | |
| Status: | **Implanted** | | |

13 Mm Amedica Cage - Implanted                                                                               Spine Lumbar

| | | | |
|---|---|---|---|
| Model/Cat number: | 30-0822-013 | Serial number: | N/A |
| Lot number: | N/A | | |
| As of 2/20/2012 | | | |
| Status: | **Implanted** | | |

**First Recorded BMI**

BMI (calculated): 26.5

| | | | Class | Noted - Resolved | Last Modified |
|---|---|---|---|---|---|
| **Problem List** as of 7/9/2019 | | | | Reviewed: **5/31/2019 9:24 AM by Klim, Madeline R, NP** | |

Active Problems

**JA617**



ST. FRANCIS MEDICAL CENTER
13710 ST FRANCIS BOULEVARD
MIDLOTHIAN VA 23114-3267

Roop, Samantha J
MRN: 760144779, DOB:    /1985, Sex: F
Acct #: 13191890547
Arrived 7/8/2019, D/C: 7/9/2019

**Problem List (continued)** as of 7/9/2019

Reviewed: **5/31/2019  9:24 AM by Klim, Madeline R, NP**

|  |  | Class | Noted - Resolved | Last Modified |
|---|---|---|---|---|
| • |  |  | Present | Dodd, Jeffrey D |
|  |  |  | Entered by Dodd, Jeffrey D |  |
| • |  |  |  |  |
| • |  |  |  |  |
| • | Rheumatoid arthritis(714.0) |  | 4/5/2010 - Present | 4/5/2010 by Dodd, Jeffrey D |
|  |  |  | Entered by Dodd, Jeffrey D |  |
| • | Lumbago |  | 4/5/2010 - Present | 4/5/2010 by Dodd, Jeffrey D |
|  |  |  | Entered by Dodd, Jeffrey D |  |
| • |  |  |  |  |
| • |  |  |  |  |
| • | Endometriosis |  | 12/14/2010 - Present | 12/14/2010 by Dodd, Jeffrey D |
|  |  |  | Entered by Dodd, Jeffrey D |  |
| • |  |  |  |  |
| • | Interstitial cystitis |  | Unknown - Present | 8/9/2011 by Dodd, Jeffrey D |
|  |  |  | Entered by Dodd, Jeffrey D |  |
| • | Lumbar spondylosis |  | 8/9/2011 - Present | 8/9/2011 by Dodd, Jeffrey D |
|  |  |  | Entered by Dodd, Jeffrey D |  |
| • | Tobacco use disorder |  | 8/9/2011 - Present | 8/9/2011 by Dodd, Jeffrey D |
|  |  |  | Entered by Dodd, Jeffrey D |  |
| • |  |  |  |  |
| • |  |  |  |  |
| • |  |  |  |  |

MD

**JA618**


BON SECOURS HEALTH SYSTEM, INC.

ST. FRANCIS MEDICAL
CENTER
13710 ST FRANCIS
BOULEVARD
MIDLOTHIAN VA 23114-3267

Roop, Samantha J
MRN: 760144779, DOB:    /1985, Sex: F
Acct #: 13191890547
Arrived 7/8/2019, D/C: 7/9/2019

**Problem List (continued)** as of 7/9/2019

Reviewed: **5/31/2019  9:24 AM by Klim, Madeline R, NP**

| | | | Class | Noted - Resolved | Last Modified |
|---|---|---|---|---|---|
| | | | | | |

## ER RECORD

### ED Arrival Information

| Expected | Arrival | Acuity | Means of Arrival | Escorted By | Service | Admission Type |
|---|---|---|---|---|---|---|
| - | 7/8/2019 22:20 | ESI 3 | Car | Family Member | EMERGENCY | EMERGENCY |

| Arrival Complaint |
|---|
| - |

### ED Events

| Date/Time | Event | User | Comments |
|---|---|---|---|
| 07/08/19 2220 | Patient arrived in ED | JONES, NICHELLE M | |
| 07/08/19 2224 | Assign Midlevel or Attending | GILL, RICHARD R | Patient Seen/Provider Contact |
| 07/08/19 2230 | Patient roomed in ED | EDWARDS, ELIZABETH A | To room WER16 |
| 07/08/19 2231 | Triage Started | EDWARDS, ELIZABETH A | |
| 07/08/19 2236 | Triage Completed | EDWARDS, ELIZABETH A | |
| 07/08/19 2357 | Discharge Disposition Selected | GILL, RICHARD R | ED Disposition set to Discharged |
| 07/09/19 0008 | Patient discharged | EDWARDS, ELIZABETH A | |

### Tx Prior to Arrival

| Date and Time | Treatment given by: | Medications | Interventions | User |
|---|---|---|---|---|
| 07/08/19 2236 | Self | -- | -- | EAE |

### CLINICAL IMPRESSIONS

| Diagnosis | Comment | Added By | Time Added | Team Role | Provider Specialty |
|---|---|---|---|---|---|
| **Injury of head, initial encounter** | | Gill, Richard R, MD | 7/8/2019 11:56 PM | Attending Provider | Emergency Medicine |
| **Strain of neck muscle, initial encounter** | | Gill, Richard R, MD | 7/8/2019 11:56 PM | Attending Provider | Emergency Medicine |

**JA619**



ST. FRANCIS MEDICAL    Roop, Samantha J
CENTER    MRN: 760144779, DOB:    '1985, Sex: F
13710 ST FRANCIS    Acct #: 13191890547
BOULEVARD    Arrived 7/8/2019, D/C: 7/9/2019
MIDLOTHIAN VA 23114-3267

## ER RECORD (continued)

### CLINICAL IMPRESSIONS (continued)

| Diagnosis | Comment | Added By | Time Added | Team Role | Provider Specialty |
|---|---|---|---|---|---|
| **Injury of left shoulder, initial encounter** | | Gill, Richard R, MD | 7/8/2019 11:56 PM | Attending Provider | Emergency Medicine |
| **Multiple contusions** | | Gill, Richard R, MD | 7/8/2019 11:56 PM | Attending Provider | Emergency Medicine |

### ED Disposition

| ED Disposition | Condition | Comment |
|---|---|---|
| **Discharged** | | |

### Medical as of 7/9/2019

**Medical last reviewed by Edwards, Elizabeth A, RN on 7/8/2019**

Past Medical History

| Diagnosis | Date | Comments | Source |
|---|---|---|---|
| Anemia | — | — | Provider |
| Arthritis | — | lower back, left elbow, right hand | Provider |
| Back problem | — | lumbar | Provider |
| Chronic pain | — | lower back, painful bladder syndrome | Provider |
| | | | |
| Endometriosis | — | — | Provider |
| Interstitial cystitis | — | — | Provider |
| Pneumonia | — | — | Provider |
| Rheumatoid arthritis(714.0) | 4/5/2010 | — | Provider |

### Surgical as of 7/9/2019

**Surgical last reviewed by Edwards, Elizabeth A, RN on 7/8/2019**

Past Surgical History

| Procedure | Laterality | Date | Comments | Source |
|---|---|---|---|---|
| HX UROLOGICAL | — | 5/2011 | implant for interstitial cystitis, neurostimulator | Provider |
| HX GYN | — | — | endometriosis | Provider |
| HX CHOLECYSTECTOMY | — | 2010 | — | Provider |

**JA620**



ST. FRANCIS MEDICAL CENTER
13710 ST FRANCIS BOULEVARD
MIDLOTHIAN VA 23114-3267

Roop, Samantha J
MRN: 760144779, DOB:      /1985, Sex: F
Acct #: 13191890547
Arrived 7/8/2019, D/C: 7/9/2019

## ER RECORD (continued)

### Surgical as of 7/9/2019 (continued)

### Family as of 7/9/2019

**Family last reviewed by Edwards, Elizabeth A, RN on 7/8/2019**

| Problem | Relation | Name | Age of Onset | Comments | Source |
|---|---|---|---|---|---|
| Breast Cancer | Mother | — | 39 | — | Provider |
| Hypertension | Father | — | — | — | Provider |
| Heart Disease | Father | — | — | — | Provider |
| Stroke | Father | — | — | — | Provider |
| Breast Cancer | Sister | — | 18 | — | Provider |

### Family Status as of 7/9/2019

**Family Status last reviewed by Edwards, Elizabeth A, RN on 7/8/2019**

| Relation | Name | Status | Comments | Sex (Gender) | Father | Mother | Source |
|---|---|---|---|---|---|---|---|
| Mother | — | Deceased | — | U | — | — | Provider |
| Father | — | Alive | seizures | U | — | — | Provider |
| Sister | — | Alive | CP | U | — | — | Provider |
| Brother | — | Alive | — | U | — | — | Provider |
| Brother | — | Alive | — | U | — | — | Provider |
| Daughter | — | Alive | — | U | — | — | Provider |
| Daughter | — | Alive | — | U | — | — | Provider |
| Sister | — | — | — | U | — | — | Provider |

### Tobacco Use as of 7/9/2019

**Tobacco Use last reviewed by Edwards, Elizabeth A, RN on 7/8/2019**

| Smoking Status | Smoking Start Date | Smoking Quit Date | Packs/Day | Years Used |
|---|---|---|---|---|
| Former Smoker | — | 10/2017 | 1.00 | 15.00 |

| Types | Comments | Smokeless Tobacco Status | Smokeless Tobacco Quit Date | Source |
|---|---|---|---|---|
| — | — | Never Used | — | Provider |

### Alcohol Use as of 7/9/2019

**Alcohol Use last reviewed by Edwards, Elizabeth A, RN on 7/8/2019**

| Alcohol Use | Drinks/Week | Alcohol/Week | Comments | Source |
|---|---|---|---|---|
| No | — | — | — | Provider |

| Frequency | Standard Drinks | Binge Drinking |
|---|---|---|
| — | — | — |

### Drug Use as of 7/9/2019

**Drug Use last reviewed by Edwards, Elizabeth A, RN on 7/8/2019**

**JA621**



ST. FRANCIS MEDICAL          Roop, Samantha J
CENTER                       MRN: 760144779, DOB:     /1985, Sex: F
13710 ST FRANCIS             Acct #: 13191890547
BOULEVARD                    Arrived 7/8/2019, D/C: 7/9/2019
MIDLOTHIAN VA 23114-3267

## ER RECORD (continued)

### Drug Use as of 7/9/2019 (continued)

| Drug Use | Types | Frequency | Comments | Source |
|----------|-------|-----------|----------|--------|
| No | — | — | — | Provider |

### Sexual Activity as of 7/9/2019

**Sexual Activity last reviewed by Edwards, Elizabeth A, RN on 7/8/2019**

| Sexually Active | Birth Control | Partners | Comments | Source |
|-----------------|---------------|----------|----------|--------|
| Yes | None | Male | — | Provider |

### Activities of Daily Living as of 7/9/2019

**Activities of Daily Living never marked as reviewed**
None

### Social Documentation as of 7/9/2019

**Social Documentation never marked as reviewed**
None

### Occupational as of 7/9/2019

**Occupational never marked as reviewed**
None

### Socioeconomic as of 7/9/2019

**Socioeconomic never marked as reviewed**

| Marital Status | Spouse Name | Number of Children | Years Education | Education Level | Preferred Language | Ethnicity | Race | Source |
|----------------|-------------|--------------------|-----------------|-----------------|--------------------|-----------|------|--------|
| SINGLE | — | — | — | — | ENGLISH | NON-HISPANIC | WHITE OR CAUCASIAN | — |

| Financial Resource Strain | Food Insecurity: Worry | Food Insecurity: Inability | Transportation Needs: Medical | Transportation Needs: Non-medical |
|---------------------------|------------------------|----------------------------|-------------------------------|-----------------------------------|
| — | — | — | — | — |

### Birth as of 7/9/2019

**Birth never marked as reviewed**
None

## ED Notes

### ED Notes by Edwards, Elizabeth A, RN at 07/09/19 0007

| Author: Edwards, Elizabeth A, RN | Service: EMERGENCY | Author Type: Registered Nurse |
|---|---|---|
| Filed: 07/09/19 0008 | Date of Service: 07/09/19 0007 | Status: Signed |
| Editor: Edwards, Elizabeth A, RN (Registered Nurse) | | |

The patient was discharged home by Dr.Gill in stable condition. The patient is alert and oriented, in no respiratory distress and discharge vital signs obtained. The patient's diagnosis, condition and treatment were explained. The patient expressed understanding. No prescriptions given. A work/school note was given. A discharge plan has been developed. A case manager was not involved in the process. Aftercare instructions were given.  Pt ambulatory out of the ED.

**JA622**



ST. FRANCIS MEDICAL
CENTER
13710 ST FRANCIS
BOULEVARD
MIDLOTHIAN VA 23114-3267

Roop, Samantha J
MRN: 760144779, DOB: ███ 1985, Sex: F
Acct #: 13191890547
Arrived 7/8/2019, D/C: 7/9/2019

## ED Notes (continued)

### ED Notes by Edwards, Elizabeth A, RN at 07/09/19 0007 (continued)

Electronically signed by Edwards, Elizabeth A, RN at 07/09/19 0008

### ED Notes by Edwards, Elizabeth A, RN at 07/08/19 2245

| Author: Edwards, Elizabeth A, RN | Service: EMERGENCY | Author Type: Registered Nurse |
|---|---|---|
| Filed: 07/08/19 2245 | Date of Service: 07/08/19 2245 | Status: Signed |
| Editor: Edwards, Elizabeth A, RN (Registered Nurse) | | |

Dr.Gill at bedside assessing patient at this time. Pt tearful but in no distress.

Electronically signed by Edwards, Elizabeth A, RN at 07/08/19 2245

### ED Triage Notes by Edwards, Elizabeth A, RN at 07/08/19 2231

| Author: Edwards, Elizabeth A, RN | Service: EMERGENCY | Author Type: Registered Nurse |
|---|---|---|
| Filed: 07/08/19 2236 | Date of Service: 07/08/19 2231 | Status: Signed |
| Editor: Edwards, Elizabeth A, RN (Registered Nurse) | | |

Pt arrived via walk in for complaint of left hip pain, left shoulder pain, left neck pain, and left sided head pain secondary to MVC that occurred last night at 2030. Pt was the restrained driver of large sized SUV, that was struck on front driver side by a compact vehicle traveling at an estimated rate of speed of 70mph. Airbags deployed, no starbursts noted, no LOC. Self extricated. Pt refused EMS transport at scene.

Electronically signed by Edwards, Elizabeth A, RN at 07/08/19 2236

---

## Physical Diagram

No physical diagram documentation exists for this encounter

## ED Provider Notes

### ED Provider Notes by Gill, Richard R, MD at 07/08/19 2310

| Author: Gill, Richard R, MD | Service: — | Author Type: Physician |
|---|---|---|
| Filed: 07/08/19 2356 | Date of Service: 07/08/19 2310 | Status: Signed |
| Editor: Gill, Richard R, MD (Physician) | | |

Hx                                    arthritis,                          chronic pain (on chronic opiates), interstitial cystitis, RA; presents accompanied by her children who are also being evaluated; they were all involved in an MVC last evening; she was the restrained driver in a Suburban that was struck on the front driver's side; both vehicles involved in the crash were totaled per pt; + airbag deployment.
She c/o head pain/head injury with suspected LOC, neck pain, left shoulder pain, left hip pain. Pain is moderate and worse with movement. She took her normal oxycodone earlier today. No CP, abd pain; she has some bruising on her left neck, left buttock.

---

JA623


BON SECOURS HEALTH SYSTEM, INC.

ST. FRANCIS MEDICAL
CENTER
13710 ST FRANCIS
BOULEVARD
MIDLOTHIAN VA 23114-3267

Roop, Samantha J
MRN: 760144779, DOB: ███1985, Sex: F
Acct #: 13191890547
Arrived 7/8/2019, D/C: 7/9/2019

## ED Provider Notes (continued)

### ED Provider Notes by Gill, Richard R, MD at 07/08/19 2310 (continued)

- Arthritis
  *lower back, left elbow, right hand*
- Back problem
  *lumbar*

- Chronic pain
  *lower back, painful bladder syndrome*

- Endometriosis                                          11/25/2009

- Interstitial cystitis                                  8/6/2010

- Rheumatoid arthritis(714.0)                            4/5/2010
- Unspecified adverse effect of anesthesia
  *pt states she has problems waking up/ takes her a long time to hold eyes open*

Past Surgical History:

| Procedure | Laterality | Date |
|-----------|-----------|------|
|  |  | 2010 |
| • HX GYN<br>*endometriosis* |  |  |
| • HX LUMBAR DISKECTOMY |  |  |
| • HX ORTHOPAEDIC |  |  |
| • HX OTHER SURGICAL<br>*"5-6 exploratory surgeries"* |  |  |
| • HX OTHER SURGICAL<br>*"bladder su x 2"* |  |  |
| • HX OTHER SURGICAL<br>*"pain stimulator"* |  |  |
| • HX UROLOGICAL<br>*implant for interstitial cystitis, neurostimulator* |  | 5/2011 |

**JA624**



ST. FRANCIS MEDICAL
CENTER
13710 ST FRANCIS
BOULEVARD
MIDLOTHIAN VA 23114-3267

Roop, Samantha J
MRN: 760144779, DOB: '1985, Sex: F
Acct #: 13191890547
Arrived 7/8/2019, D/C: 7/9/2019

## ED Provider Notes (continued)

### ED Provider Notes by Gill, Richard R, MD at 07/08/19 2310 (continued)

**Social History**

**Socioeconomic History**
- Marital status: SINGLE
  - Spouse name: Not on file
- Number of children: Not on file
- Years of education: Not on file
- Highest education level: Not on file

**Occupational History**
- Not on file

**Social Needs**
- Financial resource strain: Not on file
- Food insecurity:
  - Worry: Not on file
  - Inability: Not on file
- Transportation needs:
  - Medical: Not on file
  - Non-medical: Not on file

**Tobacco Use**
- Smoking status: Former Smoker
  - Packs/day: 1.00
  - Years: 15.00
  - Pack years: 15.00
  - Last attempt to quit: 10/2017
  - Years since quitting: 1.7
- Smokeless tobacco: Never Used

**Substance and Sexual Activity**
- Alcohol use: No
- Drug use: No
- Sexual activity: Yes
  - Partners: Male
  - Birth control/protection: None

**Lifestyle**
- Physical activity:
  - Days per week: Not on file
  - Minutes per session: Not on file
- Stress: Not on file

**Relationships**
- Social connections:
  - Talks on phone: Not on file
  - Gets together: Not on file
  - Attends religious service: Not on file
  - Active member of club or organization: Not on file
  - Attends meetings of clubs or organizations: Not on file
  - Relationship status: Not on file

**JA625**



ST. FRANCIS MEDICAL
CENTER
13710 ST FRANCIS
BOULEVARD
MIDLOTHIAN VA 23114-3267

Roop, Samantha J
MRN: 760144779, DOB: ███/1985, Sex: F
Acct #: 13191890547
Arrived 7/8/2019, D/C: 7/9/2019

**ED Provider Notes (continued)**

| Other Topics | Concern |
| --- | --- |
| • Not on file | |
| Social History Narrative | |
| • Not on file | |

ALLERGIES: Latex; Bee sting [sting, bee]; Pcn [penicillins]; and Metoprolol

Review of Systems
All other systems reviewed and are negative.

**JA626**



ST. FRANCIS MEDICAL    Roop, Samantha J
CENTER    MRN: 760144779, DOB:    /1985, Sex: F
13710 ST FRANCIS    Acct #: 13191890547
BOULEVARD    Arrived 7/8/2019, D/C: 7/9/2019
MIDLOTHIAN VA 23114-3267

## ED Provider Notes (continued)

### ED Provider Notes by Gill, Richard R, MD at 07/08/19 2310 (continued)

Psychiatric: She has a normal mood and affect.
Nursing note and vitals reviewed.


MDM


Procedures


Progress Note:
Results, treatment, and follow up plan have been discussed with patient. Questions were answered.
Richard R Gill, MD
11:54 PM

A/P: MVC last might; presents with head injury/HA, neck pain, left shoulder pain, left hip pain - suspect mild concussion, abrasions, bruises, sprains, strains; reassuring appearance and exam; VSS; head CT, XR's ok; rest, ice, ibuprofen; PCP f/u.  Richard R Gill, MD
11:56 PM


Electronically signed by Gill, Richard R, MD at 07/08/19 2356


## Hospital Encounter Notes

### Discharge Summaries
No notes of this type exist for this encounter.

### History & Physical
No notes of this type exist for this encounter.

### Initial Assessments
No notes of this type exist for this encounter.

### Progress Notes
No notes of this type exist for this encounter.

### Medical Student Notes
No notes of this type exist for this encounter.

**JA627**



ST. FRANCIS MEDICAL          Roop, Samantha J
CENTER                       MRN: 760144779, DOB:    '1985, Sex: F
13710 ST FRANCIS             Acct #: 13191890547
BOULEVARD                    Arrived 7/8/2019, D/C: 7/9/2019
MIDLOTHIAN VA 23114-3267

## Hospital Encounter Notes (continued)

### Consult Notes
No notes of this type exist for this encounter.

### Behavioral Health Notes
No notes of this type exist for this encounter.

### BSMART Notes
No notes of this type exist for this encounter.

### Procedure Notes
No notes of this type exist for this encounter.

### Interdisciplinary Rounds/Specialty Nurses' Notes
No notes of this type exist for this encounter.

## Anesthesia Information

**Discharge Instructions**                                    Roop, Samantha J (MR # 760144779)

| Date | Status | User | User Type | Discharge Note |
|------|--------|------|-----------|----------------|
| 07/08/19 2357 | Pended | Gill, Richard R, MD | Physician | Original |
| Note: | | | | |

Patient Education

# Neck Strain: Care Instructions
## Your Care Instructions



You have strained the muscles and ligaments in your neck. A sudden, awkward movement can strain the neck. This often occurs with falls or car accidents or during certain sports. Everyday activities like working on a computer or sleeping can also cause neck strain if they force you to hold your neck in an awkward position for a long time.

It is common for neck pain to get worse for a day or two after an injury, but it should start to feel better

**JA628**



ST. FRANCIS MEDICAL      Roop, Samantha J
CENTER                   MRN: 760144779, DOB:      '1985, Sex: F
13710 ST FRANCIS         Acct #: 13191890547
BOULEVARD                Arrived 7/8/2019, D/C: 7/9/2019
MIDLOTHIAN VA 23114-3267

**Anesthesia Information (continued)**

after that. You may have more pain and stiffness for several days before it gets better. This is expected. It may take a few weeks or longer for it to heal completely. Good home treatment can help you get better faster and avoid future neck problems.

**Follow-up care is a key part of your treatment and safety.** Be sure to make and go to all appointments, and call your doctor if you are having problems. It's also a good idea to know your test results and keep a list of the medicines you take.

## How can you care for yourself at home?

- If you were given a neck brace (cervical collar) to limit neck motion, wear it as instructed for as many days as your doctor tells you to. Do not wear it longer than you were told to. Wearing a brace for too long can make neck stiffness worse and weaken the neck muscles.
- You can try using heat or ice to see if it helps.
  - Try using a heating pad on a low or medium setting for 15 to 20 minutes every 2 to 3 hours. Try a warm shower in place of one session with the heating pad. You can also buy single-use heat wraps that last up to 8 hours.
  - You can also try an ice pack for 10 to 15 minutes every 2 to 3 hours.
- Take pain medicines exactly as directed.
  - If the doctor gave you a prescription medicine for pain, take it as prescribed.
  - If you are not taking a prescription pain medicine, ask your doctor if you can take an over-the-counter medicine.
- Gently rub the area to relieve pain and help with blood flow. Do not massage the area if it hurts to do so.
- Do not do anything that makes the pain worse. Take it easy for a couple of days. You can do your usual activities if they do not hurt your neck or put it at risk for more stress or injury.
- Try sleeping on a special neck pillow. Place it under your neck, not under your head. Placing a tightly rolled-up towel under your neck while you sleep will also work. If you use a neck pillow or rolled towel, do not use your regular pillow at the same time.
- To prevent future neck pain, do exercises to stretch and strengthen your neck and back. Learn how to use good posture, safe lifting techniques, and proper body mechanics.

## When should you call for help?



**Call 911** anytime you think you may need emergency care. For example, call if:

- You are unable to move an arm or a leg at all.

**Call your doctor now** or seek immediate medical care if:

- You have new or worse symptoms in your arms, legs, chest, belly, or buttocks. Symptoms may include:
  - Numbness or tingling.
  - Weakness.
  - Pain.
- You lose bladder or bowel control.

Watch closely for changes in your health, and be sure to contact your doctor if:

**JA629**



| ST. FRANCIS MEDICAL | Roop, Samantha J |
| CENTER | MRN: 760144779, DOB:  /1985, Sex: F |
| 13710 ST FRANCIS | Acct #: 13191890547 |
| BOULEVARD | Arrived 7/8/2019, D/C: 7/9/2019 |
| MIDLOTHIAN VA 23114-3267 | |

**Anesthesia Information (continued)**

- You are not getting better as expected.

## Where can you learn more?

Go to http://www.healthwise.net/GoodHelpConnections.

Enter **M253** in the search box to learn more about "**Neck Strain: Care Instructions**."

Current as of: September 20, 2018

Content Version: 11.9

© 2006-2018 Healthwise, Incorporated. Care instructions adapted under license by Good Help Connections (which disclaims liability or warranty for this information). If you have questions about a medical condition or this instruction, always ask your healthcare professional. Healthwise, Incorporated disclaims any warranty or liability for your use of this information.

Patient Education

# Learning About a Closed Head Injury
## What is a closed head injury?



A closed head injury happens when your head gets hit hard. The strong force of the blow causes your brain to shake in your skull. This movement can cause the brain to bruise, swell, or tear. Sometimes nerves or blood vessels also get damaged. This can cause bleeding in or around the brain.

A concussion is a type of closed head injury.

## What are the symptoms?

If you have a mild concussion, you may have a mild headache or feel "not quite right." These symptoms are common. They usually go away over a few days to 4 weeks.

**JA630**



ST. FRANCIS MEDICAL CENTER
13710 ST FRANCIS BOULEVARD
MIDLOTHIAN VA 23114-3267

Roop, Samantha J
MRN: 760144779, DOB:    /1985, Sex: F
Acct #: 13191890547
Arrived 7/8/2019, D/C: 7/9/2019

**Anesthesia Information (continued)**

But sometimes after a concussion, you feel like you can't function as well as before the injury. And you have new symptoms. This is called postconcussive syndrome. You may:

- Find it harder to solve problems, think, concentrate, or remember.
- Have headaches.
- Have changes in your sleep patterns, such as not being able to sleep or sleeping all the time.
- Have changes in your personality.
- Not be interested in your usual activities.
- Feel angry or anxious without a clear reason.
- Lose your sense of taste or smell.
- Be dizzy, lightheaded, or unsteady. It may be hard to stand or walk.

## How is a closed head injury treated?

Any person who may have a concussion needs to see a doctor. Some people have to stay in the hospital to be watched. Others can go home safely. If you go home, follow your doctor's instructions. He or she will tell you if you need someone to watch you closely for the next 24 hours or longer.

Rest is the best treatment. Get plenty of sleep at night. And try to rest during the day.

- Avoid activities that are physically or mentally demanding. These include housework, exercise, and schoolwork. And don't play video games, send text messages, or use the computer. You may need to change your school or work schedule to be able to avoid these activities.
- Ask your doctor when it's okay to drive, ride a bike, or operate machinery.
- Take an over-the-counter pain medicine, such as acetaminophen (Tylenol), ibuprofen (Advil, Motrin), or naproxen (Aleve). Be safe with medicines. Read and follow all instructions on the label.
- Check with your doctor before you use any other medicines for pain.
- Do not drink alcohol or use illegal drugs. They can slow recovery. They can also increase your risk of getting a second head injury.

**Follow-up care is a key part of your treatment and safety.** Be sure to make and go to all appointments, and call your doctor if you are having problems. It's also a good idea to know your test results and keep a list of the medicines you take.

## Where can you learn more?

Go to http://www.healthwise.net/GoodHelpConnections.

Enter **E235** in the search box to learn more about "**Learning About a Closed Head Injury.**"

Current as of: June 3, 2018

Content Version: 11.9

© 2006-2018 Healthwise, Incorporated. Care instructions adapted under license by Good Help Connections (which disclaims liability or warranty for this information). If you have questions about a medical condition or this instruction, always ask your healthcare professional. Healthwise, Incorporated disclaims any warranty or liability for your use of this information.

JA631



ST. FRANCIS MEDICAL
CENTER
13710 ST FRANCIS
BOULEVARD
MIDLOTHIAN VA 23114-3267

Roop, Samantha J
MRN: 760144779, DOB:      /1985, Sex: F
Acct #: 13191890547
Arrived 7/8/2019, D/C: 7/9/2019

**Anesthesia Information (continued)**

**JA632**



ST. FRANCIS MEDICAL
CENTER
13710 ST FRANCIS
BOULEVARD
MIDLOTHIAN VA 23114-3267

Roop, Samantha J
MRN: 760144779, DOB:  /1985, Sex: F
Acct #: 13191890547
Arrived 7/8/2019, D/C: 7/9/2019

## All Orders

### CT HEAD WO CONT [553302427]

| | | |
|---|---|---|
| Electronically signed by: **Gill, Richard R, MD on 07/08/19 2251** | | Status: **Completed** |
| Ordering user: Gill, Richard R, MD 07/08/19 2251 | Ordering provider: Gill, Richard R, MD | |
| Authorized by: Gill, Richard R, MD | Ordering mode: Standard | |
| Frequency: ONE TIME 07/08/19 2300 - 1 occurrence | | |

Questionnaire

| Question | Answer |
|---|---|
| Transport | Stretcher |
| Is Patient Pregnant? | Unknown |
| Is Patient Allergic to Contrast Dye? | Unknown |

### CT HEAD WO CONT [553302433]

| | | |
|---|---|---|
| Electronically signed by: **Gill, Richard R, MD on 07/08/19 2251** | | Status: **Completed** |
| This order may be acted on in another encounter. | | |
| Ordering user: Gill, Richard R, MD 07/08/19 2251 | Ordering provider: Gill, Richard R, MD | |
| Authorized by: Gill, Richard R, MD | Ordering mode: Standard | |

Questionnaire

| Question | Answer |
|---|---|
| Transport | Stretcher |
| Is Patient Pregnant? | Unknown |
| Is Patient Allergic to Contrast Dye? | Unknown |

### XR SPINE CERV 4 OR 5 V [553302428]

| | | |
|---|---|---|
| Electronically signed by: **Gill, Richard R, MD on 07/08/19 2251** | | Status: **Completed** |
| Ordering user: Gill, Richard R, MD 07/08/19 2251 | Ordering provider: Gill, Richard R, MD | |
| Authorized by: Gill, Richard R, MD | Ordering mode: Standard | |
| Frequency: ONE TIME 07/08/19 2300 - 1 occurrence | | |

Questionnaire

| Question | Answer |
|---|---|
| Transport | Stretcher |
| Reason for Exam | MVC/pain |
| Is Patient Pregnant? | Unknown |

### XR SPINE CERV 4 OR 5 V [553302434]

| | | |
|---|---|---|
| Electronically signed by: **Gill, Richard R, MD on 07/08/19 2251** | | Status: **Completed** |
| This order may be acted on in another encounter. | | |
| Ordering user: Gill, Richard R, MD 07/08/19 2251 | Ordering provider: Gill, Richard R, MD | |
| Authorized by: Gill, Richard R, MD | Ordering mode: Standard | |

Questionnaire

| Question | Answer |
|---|---|
| Transport | Stretcher |
| Reason for Exam | MVC/pain |
| Is Patient Pregnant? | Unknown |

### XR SHOULDER LT AP/LAT MIN 2 V [553302429]

| | | |
|---|---|---|
| Electronically signed by: **Gill, Richard R, MD on 07/08/19 2251** | | Status: **Completed** |
| Ordering user: Gill, Richard R, MD 07/08/19 2251 | Ordering provider: Gill, Richard R, MD | |
| Authorized by: Gill, Richard R, MD | Ordering mode: Standard | |
| Frequency: ONE TIME 07/08/19 2300 - 1 occurrence | | |

**JA633**



ST. FRANCIS MEDICAL
CENTER
13710 ST FRANCIS
BOULEVARD
MIDLOTHIAN VA 23114-3267

Roop, Samantha J
MRN: 760144779, DOB:     '1985, Sex: F
Acct #: 13191890547
Arrived 7/8/2019, D/C: 7/9/2019

## All Orders (continued)

### XR SHOULDER LT AP/LAT MIN 2 V [553302429] (continued)

Questionnaire

| Question | Answer |
| --- | --- |
| Transport | Stretcher |
| Reason for Exam | MVC/pain |
| Is Patient Pregnant? | Unknown |

### XR SHOULDER LT AP/LAT MIN 2 V [553302435]

Electronically signed by: **Gill, Richard R, MD on 07/08/19 2251**          Status: **Completed**
This order may be acted on in another encounter.
Ordering user: Gill, Richard R, MD 07/08/19 2251          Ordering provider: Gill, Richard R, MD
Authorized by: Gill, Richard R, MD          Ordering mode: Standard

Questionnaire

| Question | Answer |
| --- | --- |
| Transport | Stretcher |
| Reason for Exam | MVC/pain |
| Is Patient Pregnant? | Unknown |

### XR HIP LT W OR WO PELV 2-3 VWS [553302430]

Electronically signed by: **Gill, Richard R, MD on 07/08/19 2251**          Status: **Completed**
Ordering user: Gill, Richard R, MD 07/08/19 2251          Ordering provider: Gill, Richard R, MD
Authorized by: Gill, Richard R, MD          Ordering mode: Standard
Frequency: ONE TIME 07/08/19 2300 - 1 occurrence

Questionnaire

| Question | Answer |
| --- | --- |
| Transport | Stretcher |
| Reason for Exam | MVC, pain |
| Is Patient Pregnant? | Unknown |

### XR HIP LT W OR WO PELV 2-3 VWS [553302436]

Electronically signed by: **Gill, Richard R, MD on 07/08/19 2251**          Status: **Completed**
This order may be acted on in another encounter.
Ordering user: Gill, Richard R, MD 07/08/19 2251          Ordering provider: Gill, Richard R, MD
Authorized by: Gill, Richard R, MD          Ordering mode: Standard

Questionnaire

| Question | Answer |
| --- | --- |
| Transport | Stretcher |
| Reason for Exam | MVC, pain |
| Is Patient Pregnant? | Unknown |

## CLINICAL LAB RESULTS

### Lab Results

   **None**

## Radiology Results

**JA634**



ST. FRANCIS MEDICAL
CENTER
13710 ST FRANCIS
BOULEVARD
MIDLOTHIAN VA 23114-3267

Roop, Samantha J
MRN: 760144779, DOB: '1985, Sex: F
Acct #: 13191890547
Arrived 7/8/2019, D/C: 7/9/2019

## Radiology Results (continued)

Resulted: 07/08/19 2336, Result status: Final
result

### XR SHOULDER LT AP/LAT MIN 2 V [553302435]

| Ordering provider: Gill, Richard R, MD 07/08/19 2251 | Resulted by: Lewis, Turner M, MD |
|---|---|
| Performed: 07/08/19 2317 - 07/08/19 2330 | Accession number: 106603990 |
| Resulting lab: RICHMD SFM WTC RADIANT | |

Narrative:
INDICATION:   MVC/pain

EXAMINATION:   SHOULDER RADIOGRAPHS

COMPARISON:   None

FINDINGS:
3 views of the left shoulder demonstrate no acute fracture or subluxation.   The
acromioclavicular joint is intact.

Impression:
IMPRESSION:
No acute process.

Resulted: 07/08/19 2336, Result status: Final
result

### XR HIP LT W OR WO PELV 2-3 VWS [553302436]

| Ordering provider: Gill, Richard R, MD 07/08/19 2251 | Resulted by: Lewis, Turner M, MD |
|---|---|
| Performed: 07/08/19 2317 - 07/08/19 2330 | Accession number: 106603991 |
| Resulting lab: RICHMD SFM WTC RADIANT | |

Narrative:
INDICATION: MVC, pain

EXAMINATION:   HIP RADIOGRAPHS

COMPARISON: None

FINDINGS:

Single AP view of the pelvis and frogleg lateral view of the left hip
demonstrate no acute fracture or dislocation. The pubic symphysis is intact. The
sacroiliac joints are intact. Postoperative changes lower lumbar spine. Sacral
stimulator.

Impression:
IMPRESSION:
No acute process.

Resulted: 07/08/19 2340, Result status: Final
result

### XR SPINE CERV 4 OR 5 V [553302434]

| Ordering provider: Gill, Richard R, MD 07/08/19 2251 | Resulted by: Lewis, Turner M, MD |
|---|---|
| Performed: 07/08/19 2317 - 07/08/19 2330 | Accession number: 106603988 |
| Resulting lab: RICHMD SFM WTC RADIANT | |

Narrative:
INDICATION: MVC/pain

COMPARISON: None

JA635



ST. FRANCIS MEDICAL CENTER
13710 ST FRANCIS BOULEVARD
MIDLOTHIAN VA 23114-3267

Roop, Samantha J
MRN: 760144779, DOB:     /1985, Sex: F
Acct #: 13191890547
Arrived 7/8/2019, D/C: 7/9/2019

## Radiology Results (continued)

Resulted: 07/08/19 2340, Result status: Final
result

### XR SPINE CERV 4 OR 5 V [553302434] (continued)

FINDINGS: 5 view cervical spine series demonstrates normal alignment. There is
no prevertebral soft tissue swelling. There is no acute fracture or
subluxation. There are no significant degenerative changes. There is no
significant foraminal stenosis. The C1-2 relationship is maintained.

Impression:
IMPRESSION:

No acute fracture.

Resulted: 07/08/19 2349, Result status: Final
result

### CT HEAD WO CONT [553302433]

| Ordering provider: Gill, Richard R, MD 07/08/19 2251 | Resulted by: Lewis, Turner M, MD |
| Performed: 07/08/19 2330 - 07/08/19 2342 | Accession number: 106603987 |
| Resulting lab: RICHMD SFM WTC RADIANT | |

Narrative:
INDICATION:   MVC/HA/head injury

EXAMINATION:  CT HEAD WO CONTRAST

COMPARISON:  October 14, 2011

TECHNIQUE:  Routine noncontrast axial head CT was performed.  Sagittal and
coronal reconstructions were generated. CT dose reduction was achieved through
use of a standardized protocol tailored for this examination and automatic
exposure control for dose modulation. .

FINDINGS:

Ventricles:  Midline, no hydrocephalus.
Intracranial Hemorrhage:  None.
Brain Parenchyma/Brainstem:  Normal for age.
Basal Cisterns:  Normal.
Paranasal Sinuses:  Small amount of fluid/secretion right maxillary sinus and
right sphenoid sinus.
Soft Tissues:  No significant soft tissue swelling.
Osseous Structures:  No acute fracture.
Additional Comments:  N/A.

Impression:
IMPRESSION:

No acute traumatic injury.

### Testing Performed By

| Lab - Abbreviation | Name | Director | Address | Valid Date Range |
|---|---|---|---|---|
| **106 - SFM Watkins** | RICHMD SFM WTC RADIANT | Unknown | Unknown | 02/11/16 0943 - Present |

**JA636**



ST. FRANCIS MEDICAL          Roop, Samantha J
CENTER                       MRN: 760144779, DOB:    /1985, Sex: F
13710 ST FRANCIS             Acct #: 13191890547
BOULEVARD                    Arrived 7/8/2019, D/C: 7/9/2019
MIDLOTHIAN VA 23114-3267

## EEG/EMG RESULTS

### EKG Results
   None

## Medications

### Prior to Admission Medications Reviewed

Reviewed by Edwards, Elizabeth A, RN (Registered Nurse) on 07/08/19 at 2238

| Medication | Order | Taking? | Sig | Documenting Provider | Last Dose | Status |
|---|---|---|---|---|---|---|
| oxyCODONE IR (OXY-IR) 15 mg immediate release tablet | 2123828 58 | Yes | Take 15 mg by mouth three (3) times daily as needed. | Provider, Historical | 7/8/2019 0900 | Active |

### Discharge Medication List

#### Unreviewed

**JA637**



ST. FRANCIS MEDICAL                Roop, Samantha J
CENTER                             MRN: 760144779, DOB:    /1985, Sex: F
13710 ST FRANCIS                   Acct #: 13191890547
BOULEVARD                          Arrived 7/8/2019, D/C: 7/9/2019
MIDLOTHIAN VA 23114-3267

## Discharge Medication List (continued)

### Unreviewed (continued)

—

—

—

---

**oxyCODONE IR** 15 mg immediate release tablet
Refills:  0
Commonly known as:  OXY-IR
Take 15 mg by mouth three (3) times daily as needed.

⊕ **This list has 4 medication(s) that are the same as other medications prescribed for you. Read the directions carefully, and ask your doctor or other care provider to review them with you.**

---

### Patient Education

#### PATIENT EDUCATION

Title: Falls - Risk of (Pediatrics) (Not Started)

Points For This Title

Point: Assistive device safety precautions (eg: Avoid loose rugs; monitor for flooring changes; appropriate fitting clothing) (Not Started)

Description:
Assistive device safety precautions (eg: Avoid loose rugs; monitor for flooring changes; appropriate fitting clothing)

---

**JA638**



ST. FRANCIS MEDICAL          Roop, Samantha J
CENTER                      MRN: 760144779, DOB:    /1985, Sex: F
13710 ST FRANCIS            Acct #: 13191890547
BOULEVARD                   Arrived 7/8/2019, D/C: 7/9/2019
MIDLOTHIAN VA 23114-3267

## Patient Education (continued)

### PATIENT EDUCATION (continued)

Learner Not documented in this visit.
Progres
s:

Point: Assistive devices (eg: Cane or crutches use on stairs; maintenance of weight-bearing status; safety precautions) (Not Started)

Description:
Assistive devices (eg: Cane or crutches use on stairs; maintenance of weight-bearing status; safety precautions)

Learner Not documented in this visit.
Progres
s:

Point: Fall prevention (eg: Bedside table in reach; call light placement; nonskid footwear; regular toileting schedule; wheelchair lock position; call for help; crib/side rails up) (Not Started)

Description:
Fall prevention (eg: Bedside table in reach; call light placement; nonskid footwear; regular toileting schedule; wheelchair lock position; call for help; crib/side rails up)

Learner Not documented in this visit.
Progres
s:

Title: Anticoagulation Education (low molecular weight heparin eg: Lovenox) (Not Started)

Patient Handouts:
Self Injection of Low Molecular Weight Heparin: https://ghc-cc-web/GHCFiles/HyperspaceContent/ClinDoc/Self%20Injection%20of%20Low%20Molecular%20Weight%20Heparin.pdf

Points For This Title

Point: Knowledge about low molecular weight heparin (Not Started)

Description:
Describe low molecular weight heparin - an anticoagulant that diminishes blood clotting. Ask the patient to describe why they are taking low molecular weight heparin (eg: treatment of acute deep vein thrombosis and acute ST elevation myocardiacl infarction, prophylaxis of heart tissue injury related to unstable angina or non-Q wave myocardial infarction and deep vein thrombosis).

Learner Not documented in this visit.
Progres
s:

Point: Low molecular weight medication drug interactions (Not Started)

Description:
Teach the patient that taking low molecular weight heparin interacts with many other medications to include prescription and over-the counter medications and may increase bleeding risk. Do not take nonsteroidal anti-inflammatory drugs (NSAIDS), salicylates, aspirin containing medications, other platelet inhibitors, and cold, allergy or pain products that contain any of these drugs without talking to your physician first.

JA639


BON SECOURS HEALTH SYSTEM, INC.

ST. FRANCIS MEDICAL          Roop, Samantha J
CENTER                       MRN: 760144779, DOB:      1985, Sex: F
13710 ST FRANCIS             Acct #: 13191890547
BOULEVARD                    Arrived 7/8/2019, D/C: 7/9/2019
MIDLOTHIAN VA 23114-3267

## Patient Education (continued)

### PATIENT EDUCATION (continued)

Learner Not documented in this visit.
Progres
s:

Point: Self injection of low molecular weight heparin (Not Started)
Description:
Instruct patient/responsible family member the steps to self inject this medication. It is also possible to print a copy of the instructions to give to the patient/family for reference when they are discharged. This can be printed from the patient reference seciton of this activity.

Patient Handouts:
Self Injection of low molecular weight heparin: https://ghc-cc-web/GHCFiles/HyperspaceContent/ClinDoc/Self%20Injection%20of%20Low%20Molecular%20Weight%20Heparin.pdf

Learner Not documented in this visit.
Progres
s:

Point: Appropriate injection site for low molecular weight heparin (Not Started)
Description:
Teach the patient/family that low molecular weight heparin should be injected into the fatty tissue only, which is why the abdomen is the recommended injection site. It is important not to inject this medication into the muscle, as it can cause the patient to bruise, which can be uncomfortable.

Learner Not documented in this visit.
Progres
s:

Point: Storage of low molecular weight heparin (Not Started)
Description:
Teach the patient/family that they should store their prefilled syringes at a room temperature of about 59°-86°F, away from light and moisture, and out of the reach of children.Teach the patient/family that they must use the medicine within 28 days after the first shot. Throw away the unused medicine in the bottle after 28 days.

Learner Not documented in this visit.
Progres
s:

Point: Reportable information related to this medication along with signs and symptoms (Not Started)
Description:
Teach the patient/family to call their doctor immediately if they notice any of the following: unusual bleeding or bleeding that lasts a long time, unusual bruising, signs of thrombocytopenia (such as a rash or dark spots under the skin), tingling or numbness (especially in the lower limbs), and muscular weakness. Teach the patient that the most common side effects are mild pain, irritation, bruising, or redness of the skin at the site of injection. Other common side effects include bleeding, anemia, diarrhea, and nausea. Make sure any doctor or dentist who treats the patient knows that they are using this medicine. They may need to stop taking this medicine several days before having surgery or medical tests.

**JA640**



ST. FRANCIS MEDICAL CENTER
13710 ST FRANCIS BOULEVARD
MIDLOTHIAN VA 23114-3267

Roop, Samantha J
MRN: 760144779, DOB: /1985, Sex: F
Acct #: 13191890547
Arrived 7/8/2019, D/C: 7/9/2019

## Patient Education (continued)

### PATIENT EDUCATION (continued)

Learner Progres s:   Not documented in this visit.

Point: Low molecular weight heparin compliance (Not Started)

Description:
Teach the patient/family that this medicine needs to be given on a fixed schedule. If they miss a dose or forget to inject their medicine, they should call their doctor or pharmacist for instructions as soon as possible.

Learner Progres s:   Not documented in this visit.

Title: Respiratory Education (Not Started)

Topic: Aerosolized Medication (Not Started)

Point: Device (Not Started)

Description:
(eg. breathing technique, medication administration device, breath activated style, proper use of device)

Learner Progres s:   Not documented in this visit.

Point: Indications (Not Started)

Description:
(eg. abnormal breath sounds, Increased work of breathing, disease association)

Learner Progres s:   Not documented in this visit.

Point: Medication (Not Started)

Description:
(side effects, frequency, dosage)

Learner Progres s:   Not documented in this visit.

Point: Precautions (Not Started)

Description:
(increased HR, chest pain)

Learner Progres s:   Not documented in this visit.

Title: General Patient/Family Education (Not Started)

**JA641**



ST. FRANCIS MEDICAL CENTER
13710 ST FRANCIS BOULEVARD
MIDLOTHIAN VA 23114-3267

Roop, Samantha J
MRN: 760144779, DOB:    '1985, Sex: F
Acct #: 13191890547
Arrived 7/8/2019, D/C: 7/9/2019

## Patient Education (continued)

### PATIENT EDUCATION (continued)

Topic: CARING THEORY EDUCATION (Not Started)

Point: Discuss use of patient/family's preferred name (Not Started)

Learner Progres s:    Not documented in this visit.

Point: Explain role as a member of the care team and introduce yourself (Not Started)

Learner Progres s:    Not documented in this visit.

Point: Discuss purposeful rounding to include sitting with patient/family for five minutes to plan care (Not Started)

Learner Progres s:    Not documented in this visit.

Point: Discuss use of appropriate touch as defined by the patient (Not Started)

Learner Progres s:    Not documented in this visit.

Point: Connecting the organization's mission to patient's plan of care (Not Started)

Learner Progres s:    Not documented in this visit.

Point: Explain proactive rounding for the assessment of the patient/family's needs (Not Started)

Learner Progres s:    Not documented in this visit.

Topic: PAIN MANAGEMENT EDUCATION (Not Started)

Point: Explanation of pain scales (Not Started)

Description:
Explanation of pain scales

Learner Progres s:    Not documented in this visit.

Point: Frequency of pain assessments and reassessments (Not Started)

Description:
Frequency of pain assessments and reassessments

Learner Progres s:    Not documented in this visit.

Point: Review plan of care for pain management (eg: orders, non-medication treatments) (Not Started)

Description:
Review plan of care for pain management (eg: orders, non-medication treatments)

**JA642**



ST. FRANCIS MEDICAL          Roop, Samantha J
CENTER                       MRN: 760144779, DOB:     /1985, Sex: F
13710 ST FRANCIS             Acct #: 13191890547
BOULEVARD                    Arrived 7/8/2019, D/C: 7/9/2019
MIDLOTHIAN VA 23114-3267

## Patient Education (continued)

### PATIENT EDUCATION (continued)

Learner     Not documented in this visit.
Progres
s:

Point: Instruct patient to alert nurse for continued pain despite treatment (Not Started)
    Description:
    Instruct patient to alert nurse for continued pain despite treatment

Learner     Not documented in this visit.
Progres
s:

Point: Facility specific handout given as applicable (Not Started)
    Description:
    Facility specific handout given as applicable

Learner     Not documented in this visit.
Progres
s:

Point: Use of white erase board to note last pain administration time if applicable (Not Started)
    Description:
    Use of white erase board to note last pain administration time if applicable

Learner     Not documented in this visit.
Progres
s:

Topic: GENERAL EDUCATION (Not Started)
    Point: Fall prevention (eg: Bedside table in reach; call light placement; nonskid footwear; regular toileting
    schedule; wheelchair lock position; call for help; crib/side rails up) (Not Started)
        Description:
        Fall prevention (eg: Bedside table in reach; call light placement; nonskid footwear; regular toileting
        schedule; wheelchair lock position; call for help; crib/side rails up)

Learner     Not documented in this visit.
Progres
s:

Point: Medications, side effects and food/drug interactions, compliance (Not Started)
    Description:
    Medications, side effects and food/drug interactions, compliance

Learner     Not documented in this visit.
Progres
s:

Point: Orient to room/unit (eg: Visiting guidelines; critical care environment) (Not Started)
    Description:
    Orient to room/unit (eg: Visiting guidelines; critical care environment)

**JA643**



ST. FRANCIS MEDICAL
CENTER
13710 ST FRANCIS
BOULEVARD
MIDLOTHIAN VA 23114-3267

Roop, Samantha J
MRN: 760144779, DOB:    '1985, Sex: F
Acct #: 13191890547
Arrived 7/8/2019, D/C: 7/9/2019

## Patient Education (continued)

### PATIENT EDUCATION (continued)

Learner
Progres
s:    Not documented in this visit.

Point: Pain management (Not Started)
Description:
Pain management

Learner
Progres
s:    Not documented in this visit.

Point: Tobacco-use cessation benefits (eg: cessation of smokers cough; decreased cancer/heart
attack/pulmonary disease/stroke/second hand smoke risk; longer life expectancy) (Not Started)
Description:
Tobacco-use cessation benefits

Learner
Progres
s:    Not documented in this visit.

Point: Access to the Rapid Response Team (Not Started)
Learner
Progres
s:    Not documented in this visit.

Point: Review discharge plans and follow-up appointments  (Not Started)
Learner
Progres
s:    Not documented in this visit.

Point: Bedside discharge medication counseling (eg: Delivery and counseling on discharge prescriptions by a
pharmacist, provider, and/or nurse) (Not Started)
Learner
Progres
s:    Not documented in this visit.

Point: Review plan of care, tests and procedures (Not Started)
Learner
Progres
s:    Not documented in this visit.

Topic: CHF EDUCATION (Not Started)
Point: CHF planner given and explained (eg: activity, diet, smoking cessation, weight monitoring and
worsening of symptoms (Not Started)
Learner
Progres
s:    Not documented in this visit.

Topic: Infection Prevention (Not Started)

**JA644**



ST. FRANCIS MEDICAL         Roop, Samantha J
CENTER                     MRN: 760144779, DOB: _ /1985, Sex: F
13710 ST FRANCIS           Acct #: 13191890547
BOULEVARD                  Arrived 7/8/2019, D/C: 7/9/2019
MIDLOTHIAN VA 23114-3267

## Patient Education (continued)

### PATIENT EDUCATION (continued)

Point: MDRO prevention (eg: MRSA; VRE; C-diff) (Not Started)

Learner    Not documented in this visit.
Progres
s:

Point: Ventilator Associated Pneumonia prevention (Not Started)

Learner    Not documented in this visit.
Progres
s:

Point: Surgical Site infection prevention (Not Started)

Learner    Not documented in this visit.
Progres
s:

Point: Central Line infection prevention (Not Started)

Learner    Not documented in this visit.
Progres
s:

Point: Infection prevention at home (Not Started)

Learner    Not documented in this visit.
Progres
s:

Point: Influenza (eg: Disease process; prevention; vaccine; vaccine information sheet) (Not Started)

Learner    Not documented in this visit.
Progres
s:

Point: Pneumonia (eg: Disease process; prevention; vaccine; vaccine information sheet) (Not Started)

Learner    Not documented in this visit.
Progres
s:

Point: Isolation precaution education (Not Started)

Description:
Isolation precaution education

Learner    Not documented in this visit.
Progres
s:

Point: Hand hygiene (Not Started)

Learner    Not documented in this visit.
Progres
s:

Topic: DEEP VEIN THROMBOSIS EDUCATION (Not Started)

Point: Bleeding complication (eg: Bleeding gums; bruises easily; dizziness; blood in sputum/stool/urine) (Not
Started)

**JA645**



ST. FRANCIS MEDICAL          Roop, Samantha J
CENTER                       MRN: 760144779, DOB:    '1985, Sex: F
13710 ST FRANCIS             Acct #: 13191890547
BOULEVARD                    Arrived 7/8/2019, D/C: 7/9/2019
MIDLOTHIAN VA 23114-3267

## Patient Education (continued)

**PATIENT EDUCATION (continued)**

Description:
Bleeding complication (eg: Bleeding gums; bruises easily; dizziness; blood in sputum/stool/urine)

Learner      Not documented in this visit.
Progres
s:

Point: Bleeding precaution (eg: Use electric shaver; avoid nonsteroidal anti-inflammatory drug use; avoid salicylates use; use soft toothbrush; avoid physical injury) (Not Started)

Description:
Bleeding precaution (eg: Use electric shaver; avoid nonsteroidal anti-inflammatory drug use; avoid salicylates use; use soft toothbrush; avoid physical injury)

Learner      Not documented in this visit.
Progres
s:

Point: Changes in condition (eg: Recognition and reporting of signs and symptoms of altered coagulation; altered mental status) (Not Started)

Description:
Changes in condition (eg: Recognition and reporting of signs and symptoms of altered coagulation; altered mental status)

Learner      Not documented in this visit.
Progres
s:

Point: Deep venous thrombosis (Not Started)

Description:
e.g.: Risk factors; signs and symptoms; prevention

Learner      Not documented in this visit.
Progres
s:

Point: Nonpharmacologic deep venous thrombosis prevention (eg: Ankle; foot and knee exercises; early ambulation; elastic stocking use; intermittent pneumatic compression device use) (Not Started)

Description:
Nonpharmacologic deep venous thrombosis prevention (eg: Ankle; foot and knee exercises; early ambulation; elastic stocking use; intermittent pneumatic compression device use)

Learner      Not documented in this visit.
Progres
s:

Point: Prescribed medication (eg: Known medication allergies; contraindication, dose, frequency, indication, interaction, side effects; consistent vitamin K diet; monitor appropriate labs) (Not Started)

Description:
Prescribed medication (eg: Known medication allergies; contraindication, dose, frequency, indication, interaction, side effects; consistent vitamin K diet; monitor appropriate labs)

**JA646**



ST. FRANCIS MEDICAL CENTER
13710 ST FRANCIS BOULEVARD
MIDLOTHIAN VA 23114-3267

Roop, Samantha J
MRN: 760144779, DOB:    /1985, Sex: F
Acct #: 13191890547
Arrived 7/8/2019, D/C: 7/9/2019

## Patient Education (continued)

### PATIENT EDUCATION (continued)

Learner Progress:   Not documented in this visit.

Point: Prescribed activity and tolerance (Not Started)

Description:
Prescribed activity and tolerance

Learner Progress:   Not documented in this visit.

Point: Lifestyle modifications (eg: weight loss, smoking cessation, regular exercise) (Not Started)

Description:
Lifestyle modifications (eg: weight loss, smoking cessation, regular exercise)

Learner Progress:   Not documented in this visit.

Title: Suicide/Homicide (Adult) (Not Started)

Points For This Title

Point: Fall prevention and safety precautions (Not Started)

Description:
Fall prevention and safety precautions

Learner Progress:   Not documented in this visit.

Point: Illness and management (Not Started)

Description:
Nurse will review with the patient and family interventions to prevent delirium.  Ensure patients have their eye glasses, hearing aids, dentures. Encourage family to bring in patient's familiar items. Encourage family/familiar person to stay with patient.

Learner Progress:   Not documented in this visit.

Point: Medications, side effects and food/drug interactions, compliance (Not Started)

Description:
Medications, side effects and food/drug interactions, compliance

Learner Progress:   Not documented in this visit.

Point: Positive coping methods (eg: Emotional release; humor use; religion use; social support use; problem acceptance; problem focus) (Not Started)

**JA647**



ST. FRANCIS MEDICAL          Roop, Samantha J
CENTER                       MRN: 760144779, DOB:    /1985, Sex: F
13710 ST FRANCIS             Acct #: 13191890547
BOULEVARD                    Arrived 7/8/2019, D/C: 7/9/2019
MIDLOTHIAN VA 23114-3267

## Patient Education (continued)

### PATIENT EDUCATION (continued)

Description:
Positive coping methods (eg: Emotional release; humor use; religion use; social support use; problem
acceptance; problem focus)

Learner        Not documented in this visit.
Progres
s:

Point: Life skills (Not Started)

Description:
Life skills

Learner        Not documented in this visit.
Progres
s:

Point: Relapse prevention and symptom recognition (Not Started)

Description:
Relapse prevention and symptom recognition

Learner        Not documented in this visit.
Progres
s:

---

**Learning Assessment**                                                              View More

04/23/2013 0338 SFM 5M1 MED SURG 1 (4/22/2013 - 4/29/2013)
Created by Bruckner, Albert R, RN - RN (Interdisciplinary)                    Status: Complete

BARRIERS/FACTORS IMPACTING LEARNING
Who is the primary learner?: **Patient**                                      AB - 04/23/2013 0338
What is the highest level of education that the primary learner has completed?:  AB - 04/23/2013 0338
**Graduated High School**
Are there any barriers/factors that could impact their learning?: **None**    AB - 04/23/2013 0338
Will there be a co-learner/caregiver?: **No**                                AB - 04/23/2013 0338

LANGUAGE
What is the primary language of the primary learner?: **English**             AB - 04/23/2013 0338
What is the primary language of the co-learner/caregiver?: **English**        AB - 04/23/2013 0338
Is an interpreter required?: **No**                                          AB - 04/23/2013 0338

LEARNING PREFERENCE
How does the primary learner prefer to learn new concepts?: **Demonstration**  AB - 04/23/2013 0338

SPECIAL TOPICS
**No question answered**

ANSWERED BY:
Relationship: **Patient**                                                    AB - 04/23/2013 0338

Edit History

---

**JA648**



ST. FRANCIS MEDICAL
CENTER
13710 ST FRANCIS
BOULEVARD
MIDLOTHIAN VA 23114-3267

Roop, Samantha J
MRN: 760144779, DOB:    /1985, Sex: F
Acct #: 13191890547
Arrived 7/8/2019, D/C: 7/9/2019

## Patient Education (continued)

### Learning Assessment (continued)                                    View More

Bruckner, Albert R, RN - RN (Interdisciplinary)   04/23/2013 0338

**FLOWSHEETS**

**JA649**



ST. FRANCIS MEDICAL CENTER
13710 ST FRANCIS BOULEVARD
MIDLOTHIAN VA 23114-3267

Roop, Samantha J
MRN: 760144779, DOB: '1985, Sex: F
Acct #: 13191890547
Arrived 7/8/2019, D/C: 7/9/2019

## Flowsheets (all recorded)

### Vital Signs Complex

| Row Name | 07/09/19 0005 | 07/08/19 2322 | | |
|---|---|---|---|---|
| Vitals | | | | |
| Pulse | 72 -EE | — | | |
| Heart Rate Source | Monitor -EE | — | | |
| Resp | 18 -EE | — | | |
| SpO2 | 99 % -EE | — | | |
| Level of Consciousness | Alert -EE | — | | |
| BP | 105/71 -EE | — | | |
| MAP (Calculated) | 82 -EE | — | | |
| BP 1 Location | Right arm -EE | — | | |
| BP 1 Method | Automatic -EE | — | | |
| BP Patient Position | At rest -EE | — | | |
| Recorded by | [EE] Edwards, Elizabeth A, RN 07/09/19 0007 | | | |

| Pain 1 | | | | |
|---|---|---|---|---|
| Pain Scale 1 | Numeric (0 - 10) -EE | Numeric (0 - 10) -EE | | |
| Pain Intensity 1 | 5 -EE | 8 -EE | | |
| Patient Stated Pain Goal | 0 -EE | 0 -EE | | |
| Pain Reassessment 1 | Yes -EE | Yes -EE | | |
| Pain Onset 1 | 2000 last night -EE | 2000 last night -EE | | |
| Pain Location 1 | Hip -EE | Hip -EE | | |
| Pain Orientation 1 | Left -EE | Left -EE | | |
| Pain Description 1 | Sharp -EE | Sharp -EE | | |
| Pain Intervention(s) 1 | Rest -EE | Rest -EE | | |
| Recorded by | [EE] Edwards, Elizabeth A, RN 07/09/19 0007 | [EE] Edwards, Elizabeth A, RN 07/08/19 2322 | | |

### Screening Questions

| Row Name | 07/08/19 2238 | | | |
|---|---|---|---|---|
| Communication barriers | | | | |
| Auditory Impairment | None -EE | | | |
| Visual | Blind in both eyes -EE | | | |

**JA650**



ST. FRANCIS MEDICAL
CENTER
13710 ST FRANCIS
BOULEVARD
MIDLOTHIAN VA 23114-3267

Roop, Samantha J
MRN: 760144779, DOB:    /1985, Sex: F
Acct #: 13191890547
Arrived 7/8/2019, D/C: 7/9/2019

## Flowsheets (all recorded) (continued)

### Screening Questions (continued)

| Row Name | 07/08/19 2238 | | | | |
|---|---|---|---|---|---|
| Impairment | | | | | |
| Visual Aid | Contacts -EE | | | | |
| Primary Language | English -EE | | | | |
| Preferred Language for Healthcare Related Communication | English -EE | | | | |
| Recorded by | [EE] Edwards, Elizabeth A, RN 07/08/19 2239 | | | | |

Learning Assessment

| | | |
|---|---|---|
| Who is the Primary Learner? | Patient -EE | |
| What is the highest level of education that the primary learner has completed? | Graduated High School -EE | |
| Are there any barriers/factors that could impact their learning? | None -EE | |
| Will there be a co-learner/caregiver? | No -EE | |
| What is the primary language of the primary learner? | English -EE | |
| Is an Interpreter Required? | No -EE | |
| How does the primary learner prefer to learn new concepts? | Listening -EE | |
| Recorded by | [EE] Edwards, Elizabeth A, RN 07/08/19 2239 | |

Schmid Fall Risk

| Mobility | 0 -EE |
|---|---|

**JA651**


BON SECOURS HEALTH SYSTEM, INC.

ST. FRANCIS MEDICAL
CENTER
13710 ST FRANCIS
BOULEVARD
MIDLOTHIAN VA 23114-3267

Roop, Samantha J
MRN: 760144779, DOB:    /1985, Sex: F
Acct #: 13191890547
Arrived 7/8/2019, D/C: 7/9/2019

## Flowsheets (all recorded) (continued)

### Screening Questions (continued)

| Row Name | 07/08/19 2238 | | | | |
|---|---|---|---|---|---|
| Mentation | 0 -EE | | | | |
| Medication | 0 -EE | | | | |
| Elimination | 0 -EE | | | | |
| Prior Fall History | 0 -EE | | | | |
| Total Score | 0 -EE | | | | |
| Standard Fall Precautions | Yes -EE | | | | |
| Recorded by | [EE] Edwards, Elizabeth A, RN 07/08/19 2239 | | | | |

### TB Screen

| | | |
|---|---|---|
| Unplanned Weight Loss in Last 3 Months | 0 -EE | |
| Exposure to TB | 0 -EE | |
| Previous Positive PPD Test | 0 -EE | |
| Persistent Cough Greater Than 2 Weeks | 0 -EE | |
| Night Sweats | 0 -EE | |
| Hemoptysis | 0 -EE | |
| Travel Outside of the U.S. | 0 -EE | |
| TB Screen Score | 0 -EE | |
| Recorded by | [EE] Edwards, Elizabeth A, RN 07/08/19 2239 | |

### Abuse/Neglect Screening

| | | |
|---|---|---|
| Physical Abuse/Neglect | Denies -EE | |
| Sexual Abuse | Denies -EE | |
| Verbal Abuse | Denies -EE | |
| Other Abuse/Issues | Denies -EE | |
| Recorded by | [EE] Edwards, Elizabeth A, RN 07/08/19 2239 | |

### Blood Refusal

| | | |
|---|---|---|
| Patient Objects to Receiving Blood | No -EE | |

**JA652**



ST. FRANCIS MEDICAL CENTER
13710 ST FRANCIS BOULEVARD
MIDLOTHIAN VA 23114-3267

Roop, Samantha J
MRN: 760144779, DOB:      /1985, Sex: F
Acct #: 13191890547
Arrived 7/8/2019, D/C: 7/9/2019

## Flowsheets (all recorded) (continued)

### Screening Questions (continued)

| Row Name | 07/08/19 2238 | | | |
|---|---|---|---|---|
| Recorded by | [EE] Edwards, Elizabeth A, RN 07/08/19 2239 | | | |

### Prehospital Treatment

| Row Name | 07/08/19 2236 | | | |
|---|---|---|---|---|
| Prehospital Treatment | | | | |
| Treatment given by: | Self -EE | | | |
| Recorded by | [EE] Edwards, Elizabeth A, RN 07/08/19 2236 | | | |

**JA653**



ST. FRANCIS MEDICAL
CENTER
13710 ST FRANCIS
BOULEVARD
MIDLOTHIAN VA 23114-3267

Roop, Samantha J
MRN: 760144779, DOB:      '1985, Sex: F
Acct #: 13191890547
Arrived 7/8/2019, D/C: 7/9/2019

## Flowsheets (all recorded)

### Triage Plan

| Row Name | 07/08/19 2236 | | | | |
|---|---|---|---|---|---|

Triage Plan

| Patient Acuity | 3 -EE |
|---|---|
| ED Destination | ED Beds -EE |
| Recorded by | [EE] Edwards, Elizabeth A, RN 07/08/19 2236 |

### Triage Start

| Row Name | 07/08/19 2231 | | | | |
|---|---|---|---|---|---|

Triage Start

| Triage Start | Triage Start -EE |
|---|---|
| Recorded by | [EE] Edwards, Elizabeth A, RN 07/08/19 2231 |

### Immunizations

| Row Name | 07/08/19 2238 | | | | |
|---|---|---|---|---|---|

Immunizations

| Immunizations Up-To-Date | Yes -EE |
|---|---|
| Recorded by | [EE] Edwards, Elizabeth A, RN 07/08/19 2238 |

**JA654**



ST. FRANCIS MEDICAL CENTER
13710 ST FRANCIS BOULEVARD
MIDLOTHIAN VA 23114-3267

Roop, Samantha J
MRN: 760144779, DOB:    '1985, Sex: F
Acct #: 13191890547
Arrived 7/8/2019, D/C: 7/9/2019

## Flowsheets (all recorded)

### Procedure Verification

| Row Name | 07/08/19 2330 | 07/08/19 2317 | | |
|---|---|---|---|---|
| Procedure Verification | | | | |
| Patient ID Verified | Verbal and Armband -KG | Verbal and Armband -KG | | |
| Procedure Verified | Yes -KG | Yes -KG | | |
| Laterality Verified | Yes -KG | Yes -KG | | |
| Recorded by | [KG] Godett, Kieron K 07/08/19 2330 | [KG] Godett, Kieron K 07/08/19 2317 | | |

### Sepsis CheckList

| Row Name | 07/08/19 2236 | | | |
|---|---|---|---|---|
| Severe SepsisScreen | | | | |
| Is the pt's history suggestive of a new infection? | No -EE | | | |
| Are two or more SIRS criteria present | No -EE | | | |
| Recorded by | [EE] Edwards, Elizabeth A, RN 07/08/19 2236 | | | |

### Suicide Assessment

| Row Name | 07/08/19 2238 | | | |
|---|---|---|---|---|
| Suicide/Psychosocial Screening | | | | |
| Primary Diagnosis or Primary Complaint of an Emotional Behavior Disorder | No -EE | | | |
| Patient is Currently Experiencing Depression | No -EE | | | |
| Suicidal Ideation/Attempts | No -EE | | | |
| Homicidal Ideation/Attempts | No -EE | | | |
| Alcohol/Drug Intoxication | No -EE | | | |
| Hallucinations/ Delusions | No -EE | | | |

JA655



ST. FRANCIS MEDICAL
CENTER
13710 ST FRANCIS
BOULEVARD
MIDLOTHIAN VA 23114-3267

Roop, Samantha J
MRN: 760144779, DOB:    /1985, Sex: F
Acct #: 13191890547
Arrived 7/8/2019, D/C: 7/9/2019

## Flowsheets (all recorded) (continued)

### Suicide Assessment (continued)

| Row Name | 07/08/19 2238 | | | | |
|---|---|---|---|---|---|
| Pending, Active, or Temporary Detention Orders | No -EE | | | | |
| Aggressive/Inappropriate Behavior | No -EE | | | | |
| Recorded by | [EE] Edwards, Elizabeth A, RN 07/08/19 2238 | | | | |

**JA656**



ST. FRANCIS MEDICAL CENTER
13710 ST FRANCIS BOULEVARD
MIDLOTHIAN VA 23114-3267

Roop, Samantha J
MRN: 760144779, DOB:    /1985, Sex: F
Acct #: 13191890547
Arrived 7/8/2019, D/C: 7/9/2019

## Flowsheets (all recorded)

### ED Resp Assessment

| Row Name | 07/08/19 22:45:40 | | | |
|---|---|---|---|---|

**Oxygen Therapy**

| | |
|---|---|
| SpO2 | 98 % -EE |
| O2 Device | Room air -EE |
| Recorded by | [EE] Edwards, Elizabeth A, RN 07/08/19 2245 |

**Respiratory**

| | |
|---|---|
| Respiratory (WDL) | WDL -EE |
| Recorded by | [EE] Edwards, Elizabeth A, RN 07/08/19 2245 |

### ED Musculoskeletal Assessment

| Row Name | 07/08/19 22:46:01 | | | |
|---|---|---|---|---|

**Musculoskeletal**

| | |
|---|---|
| Musculoskeletal (WDL) | X -EE |
| Neck | Limited ROM -EE |
| Recorded by | [EE] Edwards, Elizabeth A, RN 07/08/19 2246 |

**Functional Assessment**

| | |
|---|---|
| Fall in Past 12 Months | No -EE |
| Fall With Injury | No -EE |
| Decline in Gait/Transfer/Balance | No -EE |
| Decline in Capacity to Feed/Dress/Bathe | No -EE |
| Developmental Delay | No -EE |
| Chewing/Swallowing Problems | No -EE |
| Difficulty with Secretions | No -EE |
| Speech Slurred/Thick/Garbled | No -EE |
| Recorded by | [EE] Edwards, Elizabeth A, RN 07/08/19 2246 |

**JA657**



ST. FRANCIS MEDICAL
CENTER
13710 ST FRANCIS
BOULEVARD
MIDLOTHIAN VA 23114-3267

Roop, Samantha J
MRN: 760144779, DOB:    /1985, Sex: F
Acct #: 13191890547
Arrived 7/8/2019, D/C: 7/9/2019

## Flowsheets (all recorded) (continued)

**Adult GCS**

| Row Name | 07/08/19 2231 | | | |
|---|---|---|---|---|
| Glasgow Coma Scale | | | | |
| Eye Opening | 4 -EE | | | |
| Best Verbal Response | 5 -EE | | | |
| Best Motor Response | 6 -EE | | | |
| Glasgow Coma Scale Score | 15 -EE | | | |
| Recorded by | [EE] Edwards, Elizabeth A, RN 07/08/19 2231 | | | |

**JA658**



ST. FRANCIS MEDICAL CENTER
13710 ST FRANCIS BOULEVARD
MIDLOTHIAN VA 23114-3267

Roop, Samantha J
MRN: 760144779, DOB:    /1985, Sex: F
Acct #: 13191890547
Arrived 7/8/2019, D/C: 7/9/2019

## Flowsheets (all recorded)

### ED Nar Vitals

| Row Name | 07/08/19 2240 | | | | | |
|---|---|---|---|---|---|---|

**Vital Signs**

| | |
|---|---|
| Level of Consciousness | Alert -MB |
| Temp | 98 °F (36.7 °C) -MB |
| Temp Source | Oral -MB |
| Pulse | 84 -MB |
| Resp | 16 -MB |
| BP | 117/80 -MB |
| MAP (Calculated) | 92 -MB |
| BP 1 Location | Right arm -MB |
| BP 1 Method | Automatic -MB |
| BP Patient Position | At rest;Sitting -MB |
| MEWS Score | 1 -MB |
| Recorded by | [MB] Bassham, Michael 07/08/19 2242 |

**Oxygen Therapy**

| | |
|---|---|
| SpO2 | 98 % -MB |
| O2 Device | Room air -MB |
| Recorded by | [MB] Bassham, Michael 07/08/19 2242 |

**Height/Weight/Head Circumference**

| | |
|---|---|
| Height | 5' 4" (1.626 m) -MB |
| Weight | 70.1 kg (154 lb 8.7 oz) -MB |
| Weight Source | Standing scale (comment) -MB |
| BSA (calculated - sq m) | 1.78 sq meters -MB |
| BMI (calculated) | 26.5 -MB |
| Recorded by | [MB] Bassham, Michael 07/08/19 2242 |

### Vital Signs

| Row Name | 07/08/19 2242 | | | | | |
|---|---|---|---|---|---|---|

**Pain 1**

| | |
|---|---|
| Pain Scale 1 | Numeric (0 - 10) -MB |
| Pain Intensity 1 | 8 -MB |

**JA659**



ST. FRANCIS MEDICAL
CENTER
13710 ST FRANCIS
BOULEVARD
MIDLOTHIAN VA 23114-3267

Roop, Samantha J
MRN: 760144779, DOB:    /1985, Sex: F
Acct #: 13191890547
Arrived 7/8/2019, D/C: 7/9/2019

## Flowsheets (all recorded) (continued)

### Vital Signs (continued)

| Row Name | 07/08/19 2242 | | | |
|---|---|---|---|---|
| Patient Stated Pain Goal | 0 -MB | | | |
| Pain Onset 1 | 2000 last PM -MB | | | |
| Pain Location 1 | Hip -MB | | | |
| Pain Orientation 1 | Left -MB | | | |
| Pain Description 1 | Sharp -MB | | | |
| Pain Intervention(s) 1 | Nurse notified -MB | | | |
| Recorded by | [MB] Bassham, Michael 07/08/19 2242 | | | |

### ED Cardiac/PVS Assessment

| Row Name | 07/08/19 22:45:34 | | | |
|---|---|---|---|---|
| Cardiac | | | | |
| Cardiac (WDL) | WDL -EE | | | |
| Recorded by | [EE] Edwards, Elizabeth A, RN 07/08/19 2245 | | | |

**JA660**



ST. FRANCIS MEDICAL
CENTER
13710 ST FRANCIS
BOULEVARD
MIDLOTHIAN VA 23114-3267

Roop, Samantha J
MRN: 760144779, DOB:      '1985, Sex: F
Acct #: 13191890547
Arrived 7/8/2019, D/C: 7/9/2019

## Flowsheets (all recorded)

### ED Cardiac/PVS Assessment

| Row Name | 07/08/19 22:45:36 | | | | |
|---|---|---|---|---|---|

**VTE Prophylaxis (Shift Required Documentation)**

| | |
|---|---|
| Mechanical VTE Orders | No -EE |
| Recorded by | [EE] Edwards, Elizabeth A, RN 07/08/19 2245 |

**Peripheral Vascular**

| | |
|---|---|
| Peripheral Vascular (WDL) | WDL -EE |
| Recorded by | [EE] Edwards, Elizabeth A, RN 07/08/19 2245 |

### ED Neuro/Psychosocial Assessment

| Row Name | 07/08/19 22:45:30 | | | | |
|---|---|---|---|---|---|

**Neuro**

| | |
|---|---|
| Neuro (WDL) | WDL -EE |
| Recorded by | [EE] Edwards, Elizabeth A, RN 07/08/19 2245 |

### ED Neuro/Psychosocial Assessment

| Row Name | 07/08/19 22:46:21 | | | | |
|---|---|---|---|---|---|

**Psychosocial**

| | |
|---|---|
| Psychosocial (WDL) | WDL -EE |
| Recorded by | [EE] Edwards, Elizabeth A, RN 07/08/19 2246 |

**JA661**



ST. FRANCIS MEDICAL          Roop, Samantha J
CENTER                       MRN: 760144779, DOB:     /1985, Sex: F
13710 ST FRANCIS             Acct #: 13191890547
BOULEVARD                    Arrived 7/8/2019, D/C: 7/9/2019
MIDLOTHIAN VA 23114-3267

## Flowsheets (all recorded)

### ED EENT/skin Assessment

| Row Name | 07/08/19 22:45:49 | | | | |
|---|---|---|---|---|---|
| EENT | | | | | |
| EENT (WDL) | WDL -EE | | | | |
| Recorded by | [EE] Edwards, Elizabeth A, RN 07/08/19 2245 | | | | |

### ED EENT/skin Assessment

| Row Name | 07/08/19 22:45:47 | | | | |
|---|---|---|---|---|---|
| Skin Integumentary | | | | | |
| Skin Integumentary (WDL) | WDL -EE | | | | |
| Recorded by | [EE] Edwards, Elizabeth A, RN 07/08/19 2245 | | | | |

### ED Abdominal/GU Assessment

| Row Name | 07/08/19 22:45:53 | | | | |
|---|---|---|---|---|---|
| Abdominal | | | | | |
| Abdominal (WDL) | WDL -EE | | | | |
| Recorded by | [EE] Edwards, Elizabeth A, RN 07/08/19 2245 | | | | |

**JA662**



ST. FRANCIS MEDICAL CENTER
13710 ST FRANCIS BOULEVARD
MIDLOTHIAN VA 23114-3267

Roop, Samantha J
MRN: 760144779, DOB: /1985, Sex: F
Acct #: 13191890547
Arrived 7/8/2019, D/C: 7/9/2019

## Flowsheets (all recorded)

### ED Abdominal/GU Assessment

| Row Name | 07/08/19 22:45:57 | | | |
|---|---|---|---|---|
| Genitourinary | | | | |
| Genitourinary (WDL) | WDL -EE | | | |
| Recorded by | [EE] Edwards, Elizabeth A, RN 07/08/19 2246 | | | |

### User Key

(r) = Recorded By, (t) = Taken By, (c) = Cosigned By

| Initials | Name |
|---|---|
| KG | Godett, Kieron K |
| MB | Bassham, Michael |
| EE | Edwards, Elizabeth A, RN |

**JA663**

ST. FRANCIS MEDICAL CENTER
13710 ST FRANCIS BOULEVARD
MIDLOTHIAN VA 23114-3267

Roop, Samantha J
MRN: 760144779, DOB: /1985, Sex: F
Acct #: 13191890547
Arrived 7/8/2019, D/C: 7/9/2019



**Encounter-Level Documents - 07/08/2019:**

After Visit Summary - Document on 7/8/2019 2357: Medication List (below)

Page 1 of 2                                                                    1 Roop, Samantha J (760144779)

**BON SECOURS HEALTH SYSTEM**

601 Watkins Centre Parkway
Ste 100
Midlothian VA 23114-4412
804-594-2100

Patient: Samantha J Roop
MRN: XXXXX4779
DOB: 2/1/1985

A check mark ✓ indicates which time of day the medication should be taken.

My Medications
Ask

| | Morning | Noon | Evening | Bedtime | As Needed |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |

**JA664**



ST. FRANCIS MEDICAL
CENTER
13710 ST FRANCIS
BOULEVARD
MIDLOTHIAN VA 23114-3267

Roop, Samantha J
MRN: 760144779, DOB:        1985, Sex: F
Acct #: 13191890547
Arrived 7/8/2019, D/C: 7/9/2019

---

**Encounter-Level Documents - 07/08/2019: (continued)**

1 Roop, Samantha J (760144779)

My Medications (continued)

Ask (continued)

| Each Dose to | Morni ng | Noon | Eveni ng | Bedti me | As Need ed |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| oxyCODONE IR 15 mg immediate release tablet Commonly known as: oxy-fr | Take 15 mg by mouth three (3) times daily as needed. | 15 mg | | | | |

Your last dose was:

Your next dose is:

◆ * This list has 4 medication(s) that are the same as other medications prescribed for you. Read the directions carefully, and ask your doctor or other care provider to review them with you.

After Visit Summary - Document on 7/8/2019 2357: ED After Visit Summary (below)

---

**JA665**

ST. FRANCIS MEDICAL
CENTER
13710 ST FRANCIS
BOULEVARD
MIDLOTHIAN VA 23114-3267

Roop, Samantha J
MRN: 760144779, DOB:    /1985, Sex: F
Acct #: 13191890547
Arrived 7/8/2019, D/C: 7/9/2019

**Encounter-Level Documents - 07/08/2019: (continued)**



Samantha J. Roop CSN 700157035438 DoB 2/ /1985   7/8/2019  WTC EMERGENCY DEPT-804-594-2100

You were seen by Richard R Gill, MD

Reason for Visit
Motor Vehicle Crash

Diagnoses
- Injury of head, initial encounter
- Strain of neck muscle, initial encounter
- Injury of left shoulder, initial encounter
- Multiple contusions

**oxyCODONE IR** 15 mg immediate release tablet (OXY-IR)

Review your updated medication list below.

Additional instructions

(Jerome A/10/2019)
Specialty: Nurse Practitioner
Contact: 3452 Anderson Hwy
           Suite D
           Powhatan VA 23139
           804-265-6050

Who: If symptoms worsen; rest, ice, ibuprofen.
Specialty: Emergency Medicine
Contact: 601 Watkins Centre Parkway
           Ste 100
           Midlothian Virginia 23114-4412
           804-594-2100

You currently have no upcoming appointments scheduled.

CT HEAD WO CONT
XR HIP LT W OR WO PELV 2-3 VWS
XR SHOULDER LT AP/LAT MIN 2 V
XR SPINE CERV 4 OR 5 V

| Blood Pressure | Temperature |
|---|---|
| 117/80 | 98 °F |
| Pulse | Respiration |
| 84 | 16 |
| Oxygen Saturation | |
| 98% | |

**Prescription Opioids: What You Need to Know:**

Samantha J. Roop (CSN: 700157035438) • Printed at 7/8/19 11:57 PM          Page 1 of 13  *Epic*

**JA666**



ST. FRANCIS MEDICAL    Roop, Samantha J
CENTER    MRN: 760144779, DOB:   1985, Sex: F
13710 ST FRANCIS    Acct #: 13191890547
BOULEVARD    Arrived 7/8/2019, D/C: 7/9/2019
MIDLOTHIAN VA 23114-3267

**Encounter-Level Documents - 07/08/2019: (continued)**

Prescription opioids can be used to help relieve moderate-to-severe pain and are often prescribed following a surgery or injury, or for certain health conditions. These medications can be an important part of treatment but also come with serious risks. **Opioids are strong pain medicines. Examples include hydrocodone, oxycodone, fentanyl, and morphine. Heroin is an example of an illegal opioid.** It is important to work with your health care provider to make sure you are getting the safest, most effective care.

### WHAT ARE THE RISKS AND SIDE EFFECTS OF OPIOID USE?
Prescription opioids carry serious risks of addiction and overdose, especially with prolonged use. An opioid overdose, often marked by slow breathing, can cause sudden death. The use of prescription opioids can have a number of side effects as well, even when taken as directed.

- Tolerance-meaning you might need to take more of a medication for the same pain relief
- Physical dependence-meaning you have symptoms of withdrawal when the medication is stopped. **Withdrawal symptoms can include nausea, sweating, chills, diarrhea, stomach cramps, and muscle aches.** Withdrawal can last up to several weeks, depending on which drug you took and how long you took it.
- Increased sensitivity to pain
- Constipation
- Nausea, vomiting, and dry mouth
- Sleepiness and dizziness
- Confusion
- Depression
- Low levels of testosterone that can result in lower sex drive, energy, and strength
- Itching and sweating

### RISKS ARE GREATER WITH:
- History of drug misuse, substance use disorder, or overdose
- Mental health conditions (such as depression or anxiety)
- Sleep apnea
- Older age (65 years or older)
- Pregnancy

**Avoid alcohol while taking prescription opioids. Also, unless specifically advised by your health care provider, medications to avoid include:**
- Benzodiazepines (such as Xanax or Valium)
- Muscle relaxants (such as Soma or Flexeril)
- Hypnotics (such as Ambien or Lunesta)
- Other prescription opioids

### KNOW YOUR OPTIONS
Talk to your health care provider about ways to manage your pain that don't involve prescription opioids. Some of these options **may actually work better** and have fewer risks and side effects. **Consult your physician before adding or stopping any medications, treatments, or physical activity.**
Options may include:
- Pain relievers such as acetaminophen, ibuprofen, and naproxen
- Some medications that are also used for depression or seizures
- Physical therapy and exercise
- Counseling to help patients learn how to cope better with triggers of pain and stress.
- Application of heat or cold compress
- Massage therapy
- Relaxation techniques

Samantha J. Roop (CSN: 700157035438) • Printed at 7/8/19 11:57 PM    Page 2 of 13   *Epic*

**JA667**



ST. FRANCIS MEDICAL
CENTER
13710 ST FRANCIS
BOULEVARD
MIDLOTHIAN VA 23114-3267

Roop, Samantha J
MRN: 760144779, DOB:     /1985, Sex: F
Acct #: 13191890547
Arrived 7/8/2019, D/C: 7/9/2019

**Encounter-Level Documents - 07/08/2019: (continued)**

**Be Informed**
Make sure you know the name of your medication, how much and how often to take it, and its potential risks & side effects.

**IF YOU ARE PRESCRIBED OPIOIDS FOR PAIN:**
- Never take opioids in greater amounts or more often than prescribed. **Remember the goal is not to be pain-free but to manage your pain at a tolerable level.**
- Follow up with your primary care provider to:
  - Work together to create a plan on how to manage your pain.
  - Talk about ways to help manage your pain that don't involve prescription opioids.
  - Talk about any and all concerns and side effects.
- Help prevent misuse and abuse.
  - Never sell or share prescription opioids
  - Help prevent misuse and abuse.
- Store prescription opioids in a secure place and out of reach of others (this may include visitors, children, friends, and family).
- Safely dispose of unused/unwanted prescription opioids: Find your community drug take-back program or your pharmacy mail-back program, or flush them down the toilet, following guidance from the Food and Drug Administration (www.fda.gov/Drugs/ResourcesForYou).
- Visit www.cdc.gov/drugoverdose to learn about the risks of opioid abuse and overdose.
- If you believe you may be struggling with addiction, tell your health care provider and ask for guidance or call SAMHSA's National Helpline at 1-800-662-HELP.

A check mark

✓ indicates which time of day the medication should be taken.

**JA668**



ST. FRANCIS MEDICAL
CENTER
13710 ST FRANCIS
BOULEVARD
MIDLOTHIAN VA 23114-3267

Roop, Samantha J
MRN: 760144779, DOB:       '1985, Sex: F
Acct #: 13191890547
Arrived 7/8/2019, D/C: 7/9/2019

**Encounter-Level Documents - 07/08/2019: (continued)**

## My Medications

As
Morning  Noon  Evening Bedtime Needed

**JA669**



| ST. FRANCIS MEDICAL CENTER | Roop, Samantha J |
| 13710 ST FRANCIS | MRN: 760144779, DOB:   /1985, Sex: F |
| BOULEVARD | Acct #: 13191890547 |
| MIDLOTHIAN VA 23114-3267 | Arrived 7/8/2019, D/C: 7/9/2019 |

**Encounter-Level Documents - 07/08/2019: (continued)**

### My Medications (continued)



Morning Noon Evening Bedtime As needed

✢ * This list has 4 medication(s) that are the same as other medications prescribed for you. Read the directions carefully, and ask your doctor or other care provider to review them with you.

**chart**

Dear Samantha:

Thank you for requesting a MyChart account. Our records indicate that you already have an active MyChart account. You can access your account anytime at https://mychart.mybonsecours.com/mychart

Did you know that you can access your hospital and ER discharge instructions at any time in MyChart? You can also review all of your test results from your hospital stay or ER visit.

**Additional Information**

If you have questions, please visit the Frequently Asked Questions section of the MyChart website at https://mychart.mybonsecours.com/mychart/. Remember, MyChart is NOT to be used for urgent needs. For medical emergencies, dial **911**.

**Now available from your iPhone and Android!**

As a Bon Secours patient, I wanted to make you aware of our electronic visit tool called Bon Secours 24/7.

Bon Secours 24/7 allows you to connect within minutes with a medical provider 24 hours a day, seven days a week via a mobile device or tablet or logging into a secure website from your computer. You can access Bon Secours 24/7 from anywhere in the United States.

Samantha J. Roop (CSN: 700157035438) • Printed at 7/8/19 11:57 PM        Page 5 of 13    *Epic*

**JA670**



ST. FRANCIS MEDICAL          Roop, Samantha J
CENTER                      MRN: 760144779, DOB:    /1985, Sex: F
13710 ST FRANCIS            Acct #: 13191890547
BOULEVARD                   Arrived 7/8/2019, D/C: 7/9/2019
MIDLOTHIAN VA 23114-3267

**Encounter-Level Documents - 07/08/2019: (continued)**

A virtual visit might be right for you when you have a simple condition and feel like you just don't want to get out of bed, or can't get away from work for an appointment, when your regular Bon Secours provider is not available (evenings, weekends or holidays), or when you're out of town and need minor care. Electronic visits cost only $49 and if the Bon Secours 24/7 provider determines a prescription is needed to treat your condition, one can be electronically transmitted to a nearby pharmacy*.

Please take a moment to enroll today if you have not already done so. The enrollment process is free and takes just a few minutes. To enroll, please download the Bon Secours 24/7 app to your tablet or phone, or visit www.bonsecours247.org to enroll on your computer.

And, as an existing Bon Secours patient with a *Bon Secours MyChart* account, the results of your visits will be scanned into your electronic medical record and your primary care provider will be able to view the scanned results.

We urge you to continue to see your regular Bon Secours provider for your ongoing medical care. And while your primary care provider may not be the one available when you seek a Bon Secours 24/7 virtual visit, the peace of mind you get from getting a real diagnosis real time can be priceless.

For more information on Bon Secours 24/7, view our Frequently Asked Questions (FAQs) at www.bonsecours247.org

*: certain medications cannot be prescribed via Bon Secours 24/7



RICHMOND
EMERGENCY
PHYSICIANS
INC.

We hope that we have addressed all of your medical concerns. The examination and treatment you received in the Emergency Department were for an emergent problem and were not intended as complete care. It is important that you follow up with your healthcare provider(s) for ongoing care. If your symptoms worsen or do not improve as expected, and you are unable to reach your usual health care provider(s), you should return to the Emergency Department.

Today's healthcare is undergoing tremendous change, and patient satisfaction surveys are one of the many tools to assess the quality of medical care. You may receive a survey from the Press-Ganey organization regarding your experience in the Emergency Department. I hope that your experience has been completely positive, particularly the medical care that I provided. As such, please participate in the survey; anything less than excellent does not meet my expectations or intentions.

Richmond Emergency Physicians, Inc and Bon Secours Health Systems participate in nationally recognized quality of care measures. **If your blood pressure is greater than 120/80, as reported below, we urge that you seek medical care to address the potential of high blood pressure, commonly known as hypertension.** Hypertension can be hereditary or can be caused by certain medical conditions, pain, stress, or "white coat syndrome."

Please make an appointment with your health care provider(s) for follow up of your Emergency Department visit. Thank you for allowing us to provide you with medical care today. We realize that you have many choices for your emergency care needs. Please choose us in the future for any continued health care.

Samantha J. Roop (CSN: 700157035438) • Printed at 7/8/19 11:57 PM          Page 6 of 13   *Epic*

**JA671**



ST. FRANCIS MEDICAL
CENTER
13710 ST FRANCIS
BOULEVARD
MIDLOTHIAN VA 23114-3267

Roop, Samantha J
MRN: 760144779, DOB:     '1985, Sex: F
Acct #: 13191890547
Arrived 7/8/2019, D/C: 7/9/2019

**Encounter-Level Documents - 07/08/2019: (continued)**

**VITALS:**

Vitals:

| | 07/08/19 2240 | 07/08/19 2245 |
|---|---|---|
| BP: | 117/80 | |
| Pulse: | 84 | |
| Resp: | 16 | |
| Temp: | 98 °F (36.7 °C) | |
| SpO2: | 96% | 96% |
| Weight: | 70.1 kg (154 lb 8.7 oz) | |
| Height: | 5' 4" (1.626 m) | |

**Today's Results:**
No results found for this visit on 07/08/19.
Radiology Results Xr Spine Cerv 4 Or 5 V

Result Date: 7/8/2019
IMPRESSION: No acute fracture.

Radiology Results Xr Shoulder Lt Ap/lat Min 2 V

Result Date: 7/8/2019
IMPRESSION: No acute process.

Radiology Results Xr Hip Lt W Or Wo Pelv 2-3 Vws

Result Date: 7/8/2019
IMPRESSION: No acute process.

Radiology Results Ct Head Wo Cont

Result Date: 7/8/2019
IMPRESSION: No acute traumatic injury.

Recognize signs and symptoms of **STROKE**:

**F**-face looks uneven

**A**-arms unable to move or move unevenly

**S**-speech slurred or non-existent

**T**-time-call 911 as soon as signs and symptoms begin-DO NOT go

Samantha J. Roop (CSN: 700157035438) • Printed at 7/8/19 11:57 PM          Page 7 of 13   *Epic*

**JA672**



ST. FRANCIS MEDICAL
CENTER
13710 ST FRANCIS
BOULEVARD
MIDLOTHIAN VA 23114-3267

Roop, Samantha J
MRN: 760144779, DOB: '1985, Sex: F
Acct #: 13191890547
Arrived 7/8/2019, D/C: 7/9/2019

Encounter-Level Documents - 07/08/2019: (continued)

Back to bed or wait to see if you get better-**TIME IS BRAIN.**

### Warning Signs of HEART ATTACK

**Call 911 if you have these symptoms:**
- **Chest discomfort.** Most heart attacks involve discomfort in the center of the chest that lasts more than a few minutes, or that goes away and comes back. It can feel like uncomfortable pressure, squeezing, fullness, or pain.
- **Discomfort in other areas of the upper body.** Symptoms can include pain or discomfort in one or both arms, the back, neck, jaw, or stomach.
- **Shortness of breath** with or without chest discomfort.
- **Other signs** may include breaking out in a cold sweat, nausea, or lightheadedness.

**Don't wait more than five minutes to call 911 – MINUTES MATTER!** Fast action can save your life. Calling 911 is almost always the fastest way to get lifesaving treatment. Emergency Medical Services staff can begin treatment when they arrive — up to an hour sooner than if someone gets to the hospital by car.

| Provider | Role | Specialty |
|---|---|---|
| Gill, Richard R, MD | Attending Provider | Emergency Medicine |

| Name | Date |
|---|---|
| Influenza Vaccine (Quad) PF | 12/2/2015 |
| Pneumococcal Polysaccharide (PPSV-23) | 4/29/2013 |
| TDAP Vaccine | 8/28/2012 |

## Your Primary Care Physician (PCP)

| Primary Care Physician | Office Phone | Office Fax |
|---|---|---|
| KLIM, MADELINE R | | |

| Allergen | Reactions |
|---|---|
| Latex | Hives |
| Bee Sting (Sting, Bee) | Anaphylaxis |

Samantha J. Roop (CSN: 700157035438) • Printed at 7/8/19 11:57 PM          Page 8 of 13  *Epic*

**JA673**


ST. FRANCIS MEDICAL CENTER
13710 ST FRANCIS BOULEVARD
MIDLOTHIAN VA 23114-3267

Roop, Samantha J
MRN: 760144779, DOB:    '1985, Sex: F
Acct #: 13191890547
Arrived 7/8/2019, D/C: 7/9/2019

**Encounter-Level Documents - 07/08/2019: (continued)**

| Allergen | Reactions |
|---|---|
| Pen (Penicillins) | Other (comments) |
|   Hair falls out | |
| Metoprolol | Other (comments) |
|   Syncope | |

## Emergency Contacts

| Name | Distance Info | Relation | Home | Work | Mobile |
|---|---|---|---|---|---|

The following personal items are in your possession at time of discharge:
  Visual Aid: Contacts

JA674



ST. FRANCIS MEDICAL      Roop, Samantha J
CENTER                   MRN: 760144779, DOB:      /1985, Sex: F
13710 ST FRANCIS         Acct #: 13191890547
BOULEVARD                Arrived 7/8/2019, D/C: 7/9/2019
MIDLOTHIAN VA 23114-3267

Encounter-Level Documents - 07/08/2019: (continued)

Additional Information

### Neck Strain: Care Instructions

### Your Care Instructions



You have strained the muscles and ligaments in your neck. A sudden, awkward movement can strain the neck. This often occurs in falls or car accidents or during certain sports. Everyday activities like working on a computer or sleeping can also cause neck strain if they force you to hold your neck in an awkward position for a long time.

It is common for neck pain to get worse for a day or two after an injury, but it should start to feel better after that. You may have more pain and stiffness for several days before it gets better. This is expected. It may take a few weeks or longer for it to heal completely. Good home treatment can help you get better faster and avoid future neck problems.

**Follow-up care is a key part of your treatment and safety.** Be sure to make and go to all appointments, and call your doctor if you are having problems. It's also a good idea to know your test results and keep a list of the medicines you take.

### How can you care for yourself at home?

- If you were given a neck brace (cervical collar) to limit neck motion, wear it as instructed for as many days as your doctor tells you to. Do not wear it longer than you were told to. Wearing a brace for too long can make neck stiffness worse and weaken the neck muscles.
- You can try using heat or ice to see if it helps.
    - Try using a heating pad on a low or medium setting for 15 to 20 minutes every 2 to 3 hours. Try a warm shower in place of one session with the heating pad. You can also buy single-use heat wraps that last up to 8 hours.
    - You can also try an ice pack for 10 to 15 minutes every 2 to 3 hours.
- Take pain medicines exactly as directed.
    - If the doctor gave you a prescription medicine for pain, take it as prescribed.
    - If you are not taking a prescription pain medicine, ask your doctor if you can take an over-the-counter medicine.
- Gently rub the area to relieve pain and help with blood flow. Do not massage the area if it hurts to do so.
- Do not do anything that makes the pain worse. Take it easy for a couple of days. You can do your usual activities if they do not hurt your neck or put it at risk for more stress or injury.

Samantha J. Roop (CSN: 700157035438) • Printed at 7/8/19 11:57 PM                    Page 10 of 13    *Epic*

**JA675**



| ST. FRANCIS MEDICAL CENTER | Roop, Samantha J |
| --- | --- |
| 13710 ST FRANCIS BOULEVARD | MRN: 760144779, DOB:    /1985, Sex: F |
| MIDLOTHIAN VA 23114-3267 | Acct #: 13191890547 |
| | Arrived 7/8/2019, D/C: 7/9/2019 |

**Encounter-Level Documents - 07/08/2019: (continued)**

- Try sleeping on a special neck pillow. Place it under your neck, not under your head. Placing a tightly rolled-up towel under your neck while you sleep will also work. If you use a neck pillow or rolled towel, do not use your regular pillow at the same time.
- To prevent future neck pain, do exercises to stretch and strengthen your neck and back. Learn how to use good posture, safe lifting techniques, and proper body mechanics.

**When should you call for help?**



**Call 911** anytime you think you may need emergency care. For example, call if:

- You are unable to move an arm or a leg at all.

**Call your doctor now** or seek immediate medical care if:

- You have new or worse symptoms in your arms, legs, chest, belly, or buttocks. Symptoms may include:
  - Numbness or tingling.
  - Weakness.
  - Pain.
- You lose bladder or bowel control.

Watch closely for changes in your health, and be sure to contact your doctor if:

- You are not getting better as expected.

**Where can you learn more?**

Go to http://www.healthwise.net/GoodHelpConnections.

Enter **M253** in the search box to learn more about **"Neck Strain: Care Instructions."**

Current as of: September 20, 2018

Content Version: 11.9

© 2006-2018 Healthwise, Incorporated. Care instructions adapted under license by Good Help Connections (which disclaims liability or warranty for this information). If you have questions about a medical condition or this instruction, always ask your healthcare professional. Healthwise, Incorporated disclaims any warranty or liability for your use of this information.

**Learning About a Closed Head Injury**

**What is a closed head injury?**

**JA676**



ST. FRANCIS MEDICAL
CENTER
13710 ST FRANCIS
BOULEVARD
MIDLOTHIAN VA 23114-3267

Roop, Samantha J
MRN: 760144779, DOB:    /1985, Sex: F
Acct #: 13191890547
Arrived 7/8/2019, D/C: 7/9/2019

**Encounter-Level Documents - 07/08/2019: (continued)**



A closed head injury happens when your head gets hit hard. The strong force of the blow causes your brain to shake in your skull. This movement can cause the brain to bruise, swell, or tear. Sometimes nerves or blood vessels also get damaged. This can cause bleeding in or around the brain.

A concussion is a type of closed head injury.

### What are the symptoms?

If you have a mild concussion, you may have a mild headache or feel "not quite right." These symptoms are common. They usually go away over a few days to 4 weeks.

But sometimes after a concussion, you feel like you can't function as well as before the injury. And you have new symptoms. This is called postconcussive syndrome. You may:

- Find it harder to solve problems, think, concentrate, or remember.
- Have headaches.
- Have changes in your sleep patterns, such as not being able to sleep or sleeping all the time.
- Have changes in your personality.
- Not be interested in your usual activities.
- Feel angry or anxious without a clear reason.
- Lose your sense of taste or smell
- Be dizzy, lightheaded, or unsteady. It may be hard to stand or walk.

### How is a closed head injury treated?

Any person who may have a concussion needs to see a doctor. Some people have to stay in the hospital to be watched. Others can go home safely. If you go home, follow your doctor's instructions. He or she will tell you if you need someone to watch you closely for the next 24 hours or longer.

Rest is the best treatment. Get plenty of sleep at night. And try to rest during the day.

- Avoid activities that are physically or mentally demanding. These include housework, exercise, and schoolwork. And don't play video games, send text messages, or use the computer. You may need to change your school or work schedule to be able to avoid these activities.
- Ask your doctor when it's okay to drive, ride a bike, or operate machinery.
- Take an over-the-counter pain medicine, such as acetaminophen (Tylenol), ibuprofen (Advil, Motrin), or naproxen (Aleve). Be safe with medicines. Read and follow all instructions on the label.
- Check with your doctor before you use any other medicines for pain.
- Do not drink alcohol or use illegal drugs. They can slow recovery. They can also increase your risk of getting a second head injury.

Samantha J. Roop (CSN: 700157035438) • Printed at 7/8/19 11:57 PM          Page 12 of 13   *Epic*

**JA677**



ST. FRANCIS MEDICAL
CENTER
13710 ST FRANCIS
BOULEVARD
MIDLOTHIAN VA 23114-3267

Roop, Samantha J
MRN: 760144779, DOB:     /1985, Sex: F
Acct #: 13191890547
Arrived 7/8/2019, D/C: 7/9/2019

**Encounter-Level Documents - 07/08/2019: (continued)**

**Follow-up care is a key part of your treatment and safety.** Be sure to make and go to all appointments, and call your doctor if you are having problems. It's also a good idea to know your test results and keep a list of the medicines you take.

**Where can you learn more?**

Go to http://www.healthwise.net/GoodHelpConnections

Enter **E235** in the search box to learn more about "**Learning About a Closed Head Injury.**"

Current as of: June 3, 2018

Content Version: 11.9

© 2006-2018 Healthwise, Incorporated. Care instructions adapted under license by Good Help Connections (which disclaims liability or warranty for this information). If you have questions about a medical condition or this instruction, always ask your healthcare professional. Healthwise, Incorporated disclaims any warranty or liability for your use of this information.

**Please provide this summary of care documentation to your next provider.**

## Signatures-by signing, you are acknowledging that this After Visit Summary has been reviewed with you and you have received a copy.

Patient Signature: _____     Date/Time: _____

Provider Signature: _____
Date/Time: _____

Radiology - Scan on 7/8/2019 2342: CC-CT History and Screen (below)

**JA678**

**Encounter-Level Documents - 07/08/2019: (continued)**



☐ Short Pump Imaging Center
☐ Innsbrook Imaging Center
☐ Westchester Imaging Center
☐ Memorial Regional Medical Center
☐ Richmond Community Hospital
☐ St. Francis Medical Center
☐ St. Mary's Hospital
☐ Rappahannock General Hospital
☐ Reynolds Crossing Imaging Center

ST. FRANCIS MEDICAL CENTER
Roop, Samantha J CSN:700157035438
Arr:7/8/2019 F
Dv: MRN:760144779

**PATIENT HISTORY & IV CONTRAST QUESTIONNAIRE**

BUN_____ CREAT_____
eGFR_____ DATE DRAWN_____

REASON FOR EXAM (DIAGNOSIS OR SYMPTOMS): MVC, Head, Neck Shoulder Pa

| CONTRAST HISTORY | NO | YES | SPECIFY | SURGICAL HISTORY | NO | YES |
|---|---|---|---|---|---|---|
| Previous IV contrast? | | | | Lung Surgery | | |
| Contrast reaction? | | | | Appendectomy (Appendix) | | |
| Allergies to Medication or food? | | | Bee Sting, Motrin | Colon Resection | | |
| Are you allergic to latex? | ✓ | | | Hysterectomy (Uterus) | | |
| Asthma | ✓ | | | Oophorectomy (Ovaries) | | |
| Diabetes | ✓ | | | Cholecystectomy (Gallbladder) | | ✓ |
| • Using Metformin (Glucophage, Glucovance, or Avandamet) | | | | Nephrectomy (Kidney) | | |
| • Using Insulin | | | ⁵⁵ | Mastectomy (Breast) L or R | | |
| Kidney Disease | ✓ | | ⁵⁵ | Prostate Surgery | | |
| Multiple Myeloma | ✓ | | | Other Surgeries: | | |
| Heart Disease | ✓ | | | Lumbar Surgery | | |
| High Blood Pressure? | ✓ | | | | | |
| Are you Pregnant? | ✓ | | | | | |

| MEDICAL HISTORY | NO | YES | SPECIFY | | | |
|---|---|---|---|---|---|---|
| Are you Bleeding? Where? | ✓ | | | Specify any Abnormal blood tests: | | |
| Are you having pain? Where? | | ✓ | Head Neck | | | |
| Do you have fever? | ✓ | | | | | |
| Stroke or Head Injury? | ✓ | | | | | |
| Known Cancer (Type & Date Diagnosed) | ✓ | | | Other pertinent information: | | |
| • Treated with surgery? | | | | | | |
| • Treated with Chemotherapy? | | | | | | |
| • Treated with Radiation? | | | | | | |

Previous CT Exam? ☐ Yes ☐ No  When _____  Where _____  Type_____

**••••Patients – PLEASE CONTINUE TO THE BACK OF THIS FORM••••**

TECHNICAL PERSONNEL — COMPLETE THIS SECTION

Protocol #: Head          Radiologist:_____
Completed With / Without_____  ML_____  IV Contrast
Oral contrast_____
IV: gauge_____ site_____  # of attempts_____
Premedication Given_____
Contrast Reaction or Infiltration? ☐ Yes ☐ No  Treatment indicated_____
Technologist Notes:_____
Technologist Initial: HW /KG_____

RAD-3105C (8/16)          Page 1 of 2

Administrative - Scan on 7/9/2019 0902: Triage Sign-In Sheet (below)

**JA679**



ST. FRANCIS MEDICAL
CENTER
13710 ST FRANCIS
BOULEVARD
MIDLOTHIAN VA 23114-3267

Roop, Samantha J
MRN: 760144779, DOB: /1985, Sex: F
Acct #: 13191890547
Arrived 7/8/2019, D/C: 7/9/2019

**Encounter-Level Documents - 07/08/2019: (continued)**



Discharge Form - Scan on 7/9/2019 0927: Discharge Instructions (below)

**JA680**



ST. FRANCIS MEDICAL
CENTER
13710 ST FRANCIS
BOULEVARD
MIDLOTHIAN VA 23114-3267

Roop, Samantha J
MRN: 760144779, DOB:      1985, Sex: F
Acct #: 13191890547
Arrived 7/8/2019, D/C: 7/9/2019

---

**Encounter-Level Documents - 07/08/2019: (continued)**

You are allergic to the following (continued)

| Allergen | Reactions |
|---|---|
| Pcn (Penicillins) | Other (comments) |
| Hair falls out | |
| Metoprolol | Other (comments) |
| Syncope | |

## Emergency Contacts

| Name | Discharge Info | Relation | Home | Work | Mobile |
|---|---|---|---|---|---|

Patient Belongings

The following personal items are in your possession at time of discharge:
Visual Aid: Contacts

Please provide this summary of care documentation to your next provider.

## Signatures-by signing, you are acknowledging that this After Visit Summary has been reviewed with you and you have received a copy.

Patient Signature: _____  Date/Time: _7-9-19_ _0005_

Provider Signature: _H. Adams RN_
Date/Time: _7.9.19  0005_

Samantha J. Roop (CSN: 700157035438) • Printed at 7/8/19 11:57 PM                Page 9 of 9  **Epic**

---

**Hospital Account-Level E-Signatures:**

VA-Admission Consent/HIPAA - Received on 7/8/2019

---

**JA681**



ST. FRANCIS MEDICAL     Roop, Samantha J
CENTER     MRN: 760144779, DOB:    /1985, Sex: F
13710 ST FRANCIS     Acct #: 13191890547
BOULEVARD     Arrived 7/8/2019, D/C: 7/9/2019
MIDLOTHIAN VA 23114-3267

**Hospital Account-Level E-Signatures: (continued)**

### Conditions Of Admission/Registration

CONSENT FOR TREATMENT
I have a condition requiring emergency, inpatient or outpatient health care, and I voluntarily consent to
such care, including diagnostic procedures, laboratory testing, toxicology screening and medical treatment
by my physician and hospital personnel. I acknowledge that no guarantees have been made to me as a result of such care.

HIV, SYPHILIS, HEPATITIS TESTING
I understand that Virginia Code § 32.1-45.1 provides that in the event of any health care provider's exposure
to my blood and/or body fluids, I shall be deemed to have consented to laboratory testing for human immunodeficiency virus (HIV) or
hepatitis B or C viruses, with release of the test results to the person(s) exposed.

RESPONSIBILITY FOR VALUABLES
I waive any cause of action that I now have or may have in the future against Bon Secours Health System, Inc., their officers, agents
or employees arising from the loss of or damage to any personal property.

ASSIGNMENT OF INSURANCE BENEFITS/FINANCIAL AGREEMENT
I assign and direct all insurance benefits available to me, be paid directly to the hospital
and hospital-based physicians, and agree to be financially responsible for any required co-payments or deductibles and all other
charges not covered by my insurance plan. I understand that financial assistance applications are available to me should I be
uninsured or otherwise anticipate difficulty concerning payment
of all or part of my bill for health care services rendered by Bon Secours Health System Inc., their hospitals and hospital-based
physicians. I understand that I am responsible for any services not covered by my insurance benefits as well as any unpaid
balance plus the reasonable costs of collections, including any attorney fees or court costs associated with attempts to collect
the unpaid portion of my bill.

RECORDKEEPING
I understand that medical records will be retained for five years after the date of the last visit or five years
following a patient's death. In the case of a minor, the medical record will be retained for 10 years after the last visit or five years
after age 18, whichever comes later.

CONSENT TO PHOTOGRAPHY FOR IDENTIFICATION PURPOSES
I consent to have my photograph taken at any Bon Secours Health System Inc. affiliated hospital. I understand that the images from
such photography will be included in my electronic medical record and are considered Protected Health Information under the Health
Insurance Portability and Accountability Act of 1996 (HIPAA). Such images will be used for identification purposes only. The images will not
be further used or disclosed without my written authorization except as may be required by law.

CONSENT TO RECEIVE TELEPHONE CALLS
PLEASE CAREFULLY READ THE FOLLOWING INFORMATION ABOUT HOW WE MAY USE YOUR
PHONE NUMBER(S). IT AFFECTS YOUR LEGAL RIGHTS.

CONSENT
I hereby consent Bon Secours Health System, Inc., including its employees, agents, assigns, affiliates,
or independent contractors (including but not limited to debt collection agencies), to contact me
by voice call, at the phone number(s) associated with my account. I understand that by giving this consent, BSHSI may contact me about
any and all matters related to me, my medical care, my account, appointments, billing issues, and the repayment or collection of amounts
due. I understand that these calls may be placed using automatic dialers or pre-recorded voice messages. I further understand and
agree that, if the phone number(s)provided are for a cellular telephone or other service that charges me in any way for calls or
messages received (for example, per minute, per message, per unit of data received or otherwise), I am solely responsible for any
charges incurred under my agreement with my cellular telephone or other service provider.

RELEASE
In consideration for BSHSI's provision of products and/or services and my request to receive calls or messages
at the phone number(s) provided, I hereby release BSHSI from any and all claims, causes of action, lawsuits, injuries, damages,
losses, liabilities or other harms resulting from or relating to the calls or messages, including but not limited to any claims, causes of
action, or lawsuits based on any asserted violations of the law (including without limitation the Telephone Consumer Protection Act,
the Truth in Caller ID Act, the CAN-SPAM Act, the Fair Debt Collection Practices Act, the Fair Credit Reporting Act, the Health
Insurance Portability and Accountability Act, any similar state and local acts or statutes, and any federal or state tort or consumer
protection laws).

Financial Agreements / Assignment of Benefits / Authorized Representative / Agent

1. I assign Bon Secours Health System, Inc., all rights to benefits, insurance payments, insurance reimbursements or other
   payments or judgements to which I may be entitled for services provided to me at Bon Secours facilities. I authorize Bon Secours
   to bill my insurance and assign the payment of these benefits directly to Bon Secours Health System, Inc.
2. I assign all rights to benefits, insurance payments, insurance reimbursements or other payments or judgments to which I may be
   entitled for hospital-based physician services (pathology, radiology, cardiology, etc.) and/or emergency department services to
   the physician or organization providing the professional service. I also authorize submission of a bill for professional services to
   my insurance for payment.
3. I authorize and designate Bon Secours Health System, Inc., as my authorized agent and representative with the power to act on
   my behalf with respect to all matters related to all of my rights, benefits, privileges, protections, claims, causes of action, interests
   or recovery arising out of any coverage source, including but not limited to the ability to request reconsideration and/or appeal

**JA682**



ST. FRANCIS MEDICAL CENTER
13710 ST FRANCIS BOULEVARD
MIDLOTHIAN VA 23114-3267

Roop, Samantha J
MRN: 760144779, DOB: '1985, Sex: F
Acct #: 13191890547
Arrived 7/8/2019, D/C: 7/9/2019

**Hospital Account-Level E-Signatures: (continued)**

payment decisions made by any group health plan, employee benefits plan, health insurance plan , any other insurance plan or utilization review entity for coverage or grievance review (the "plan") . This includes, without limitation, the authority and right to: file medical claims with the plan; file appeals and grievances with the plan; request verification of coverage or pre-certification or authorization; file pre-service and post-service claims; request any and all information and documents under which the plan is established or operated; request any and all policies, procedures and guidelines and protocols considered by the plan in connection with the benefit claim determination, and to institute any litigation and/or complaints against the plan naming me as the plaintiff in such litigation if necessary

4. I designate, authorize and convey to Bon Secours Health System, Inc., to the fullest extent permissible under law under any applicable plan the right and ability to act as my Authorized Representative with respect to benefit plan governed by the provisions of ERISA as provided in 29 C.F.R. §2560.503-1(b)(4) with respect to any healthcare expense incurred as a result of the services I received from Mercy Health  This includes, without limitation, the right and ability to act on my behalf in connection with any claim, appeal right, cause of action, including without limitation, any claim that may be brought pursuant to ERISA, that I may have under the plan; and the right and ability to act on my behalf in connection with any claim, right, or cause of action including litigation against the plan (even to name me as a plaintiff in such action) that I may have under such plan, I understand I can revoke this authorization in writing at any time.

Language Interpreters

Mercy Health provides free aids and services to people with disabilities to communicate effectively with us such as:

- Qualified sign language interpreters
- Written information in other formats (large print, Braille, audio, accessible electronic formats, other formats)

You can contact the person at the registration desk to receive information on how to obtain the free aids and services for persons with disabilities or access the interpretation services.

All patients have access to interpretation services 24/7 at no personal cost to them

- ¿Habla español? Le proporcionaremos un interprete sin costo alguno para usted   (Spanish)

- 您讲国语吗？我们寻免费为您提供 翻译   (Mandarin)

- Sprechen Sie Deutsch? Wir stellen Ihnen unentgeltlich einen Dolmetscher zur Verfügung   (German)

- هل تتحدث اللغة العربية؟ سوف نوفر لك مترجمًا فوريًا بدون أي تكلفة عليك   (Arabic)

- Вы говорите по-русски? Мы абсолютно бесплатно предоставим вам переводчика   (Russian)

- Parlez-vous français ? Nous vous fournirons gratuitement un interprete   (French)

- Quý vị nói được tiếng Việt không? Chúng tôi sẽ cung cấp một thông dịch viên miễn phí cho quý vị. (Vietnamese)

- 한국어를 사용하십니까? 무료로 통역 서비스를 제공해 드립니다.   (Korean)

- Parla italiano? Le forniremo gratuitamente un interprete.   (Italian)

- 日本語を話しますか? 個人の負担なしに、通訳を提供致します.   (Japanese)

- Ви розмовляєте українською? Ми абсолютно безкоштовно надамо вам перекладача   (Ukrainian)

- Vorbiți românește? Vă vom asigura gratis un interpret   (Romanian)

Bon Secours Health System, Inc.
Financial Assistance Summary Sheet

The Mission of Bon Secours Health System Inc., (BSHSI) is to provide compassionate, quality healthcare services to those in need, regardless of their ability to pay.  BSHSI provides financial assistance for both the insured and uninsured patient who receives emergency or other medically necessary care from any of our hospital facilities.

**Who qualifies for financial assistance?**

BSHSI Financial Assistance Policy ("FAP") provides 100% financial assistance for emergency or other medically necessary care to uninsured and insured patients with an annual gross family income at or below 200% of the current Federal Poverty Guidelines (FPG). BSHSI also offers a discounted rate to patients whose family gross income is between 201% and 400% of the FPG.  An FAP eligible individual or an uninsured individual that does not qualify for financial assistance will not be charged more than the amounts generally billed (AGB) for emergency or other medically necessary care to patients who have insurance for such care.

**How to apply for financial assistance?**

Individuals who have concerns about their ability to pay for emergency and medically necessary care may request financial assistance.  To apply for financial assistance, a patient (or their family or other provider) should fill out our Financial Assistance Application.  Copies of the Financial Assistance Application and the FAP may be obtained for free by calling our customer service department at (Local) 804-342-1500 or (Toll Free) 877-342-1500 The Financial Assistance Application and FAP may also be obtained for free by mail by sending a request to Bon Secours Financial Assistance Program P.O. Box 742431 Atlanta GA, 30374-2431. The Financial Assistance Application and FAP may be obtained for free by downloading a copy from our website at www.fa.bonsecours.com  For a complete list of our facilities and addresses see our Financial Assistance Policy.

**JA683**



ST. FRANCIS MEDICAL          Roop, Samantha J
CENTER                       MRN: 760144779, DOB:      '1985, Sex: F
13710 ST FRANCIS             Acct #: 13191890547
BOULEVARD                    Arrived 7/8/2019, D/C: 7/9/2019
MIDLOTHIAN VA 23114-3267

**Hospital Account-Level E-Signatures: (continued)**

**Where can I receive help in filling out the Financial Assistance Application?**
Individuals who need assistance in completing the Financial Assistance Application may call the customer service department at the
telephone numbers listed above.

**What services are covered?**
All emergency medically necessary services are covered under the FAP, including outpatient services, inpatient care, and emergency room
services. Non-eligible services such as elective non-medically necessary procedures, cosmetic and flat rate procedures, patients who
choose not to use their insurance, durable medical equipment, home care, services provided as a result of an accident, and prescription
drugs are not covered by the financial assistance program. If services provided as a result of an accident are not covered by a third party,
patients may apply for financial assistance. Charges from doctors and specialists who are not employed by BSHSI and who provide
services in the hospital may not honor the BSHSI financial assistance program.  You should discuss with your doctor or visit our web site
at www.fa.bonsecours.com to determine if your doctor participates in the BSHSI financial assistance program.

**What if I have questions or need assistance completing the application?**
If you need assistance you may contact a financial counselor or cashier located at our hospitals or call our customer service department at
(Local) 804-342-1500 or (Toll Free) 877-342-1500.  Assistance may also be obtained by visiting any of our hospital registration areas as
well as meeting with any of our financial counselors or cashiers located at our hospitals.  For non-English speaking patients, translations of
this document, the FAP and the Financial Assistance Application are available in several languages, including English and Spanish  Please
call the above numbers or visit our website at www.fa.bonsecours.com  to download translations of this plain language summary, the
BSHSI FAP and the Financial Assistance Application.

I HAVE READ THE ABOVE AND ALL MY QUESTIONS HAVE BEEN ANSWERED
I have received information on the following topics: Conditions of Admission/Registration, Good Help
Commitment, Sign Language, Patient Rights and Responsibilities, Pain Control, Virginia Prescription Drug
Monitoring Program, Advance Directives, Tobacco-Free Campus, How You Can Prevent A Fall, How You Can
Prevent Medical Errors, CarePages.com, Discharge Instructions, and Billing Information

I certify that I have read and received a copy of the foregoing information and certify that I am the patient
or person duly authorized by the patient or Virginia law to execute this Conditions of Admission/Registration and accept its
terms.



| Signed (patient or patient representative) | Relationship to Patient |
|---|---|
|  |  |
| Initials: | Patient unable to sign reason |
|  |  |

PHARMACY LIMITED POWER OF ATTORNEY
If you cannot afford your medication, or if your medication is not covered by your insurance plan, Bon Secours Health System Inc. may
be able to obtain reimbursement for some of your medications through Patient Assistance Programs sponsored by drug manufacturers.
To qualify for these programs, it may be necessary to provide information regarding your financial status, illness, and/or treatment to the
drug manufacturer sponsoring the program(s). All information associated with the patient assistance programs will remain confidential
and will only be provided to drug manufacturers in compliance with the Health Insurance Portability and Accountability Act of 1996
(HIPAA) and state law.

My signature on this form authorizes Bon Secours Health System Inc., their hospitals, and hospital personnel to complete any
necessary application forms. I release any claim to the medication I may receive as a result of my participation in the patient assistance
programs and give my permission for any medication to be repackaged. This authorization shall remain in full force from the date signed
until I cancel it or no longer belong to the patient assistance programs.



| Signature of patient | Signature of patient representative |
|---|---|

---

**JA684**



ST. FRANCIS MEDICAL
CENTER
13710 ST FRANCIS
BOULEVARD
MIDLOTHIAN VA 23114-3267

Roop, Samantha J
MRN: 760144779, DOB:     /1985, Sex: F
Acct #: 13191890547
Arrived 7/8/2019, D/C: 7/9/2019

**Hospital Account-Level E-Signatures: (continued)**

**Bon Secours Virginia Health System**
Bon Secours Health System, Inc.

Samantha J Roop
760144779
985

**JA685**



ST. FRANCIS MEDICAL
CENTER
13710 ST FRANCIS
BOULEVARD
MIDLOTHIAN VA 23114-3267

Roop, Samantha J
MRN: 760144779, DOB:     1985, Sex: F
Acct #: 13191890547
Arrived 7/8/2019, D/C: 7/9/2019

**Hospital Account-Level E-Signatures: (continued)**

## DELETED NOTES

**Deleted Notes**

No notes exist for this encounter.

## END OF REPORT

**JA686**

MED ASSOC   Roop, Samantha J
n Highway   MRN: 198532, DOB:   Sex: F
23139   Acct #: AR32061902
Visit date: 7/10/2019

---

/Time:     IP Adm.
     Date/Time:
gin:     Admit Category:
rvice:     Secondary
     Service:
ea:     Unit:
     Referring
     Provider:

HATAN MED ASSOC

**IENT INFORMATION**



| | |
|---|---|
| **Patient MRN:** | 198532 |
| **Patient CSN:** | 700157193875 |
| **Religion:** | NO PREFERENCE |
| **Marital Status:** | SINGLE |
| **Age:** | 34 yrs |
| **Mobile Phone:** | |
| **Employer:** | East Coast Repair |
| **Admitted/Arrived From:** | |

**SSION INFORMATION**

| | |
|---|---|
| **Admit Time:** | N/A |
| **Service:** | |
| **Admit Type:** | |
| **Attending Provider:** | |
| **Room/Bed:** | Room/bed info not found |

**Discharge Time:**

**ANTOR INFORMATION**

Address:     Rel:
,     DOB:

PLAINTIFF'S EXHIBIT
**P4**

**JA687**

POWHATAN MED ASSOC    Roop, Samantha J
3452 Anderson Highway    MRN: 198532, DOB:     , Sex: F
Powhatan VA 23139    Acct #: AR32061902
                              Visit date: 7/10/2019

## PROVIDER INFORMATION

| | | | |
|---|---|---|---|
| **PCP:** | Klim, Madeline R, NP | **PCP Phone:** | 804-285-6050 |
| **Referring Prov:** | No ref. provider found | **Referring Phone:** | N/A |
| **Advanced Directive:** | No Doesnt Have | **Research:** | |
| **Lab Client:** | | **Enrollment Status:** | |

**Encounter Information**

| | Provider | Department | Encounter # | Center |
|---|---|---|---|---|
| 7/10/2019 2:15 PM | Madeline R Klim, NP | Powhatan Med Assoc | 700157193875 | ATHENA SCHED |

**Level of Service**

Level of Service
**PR OFFICE OUTPATIENT VISIT 15 MINUTES [99213]**

**Previous Visit**

| Date & Time | Provider | Department | Encounter # |
|---|---|---|---|
| 7/8/2019 11:25 PM | WTC XR 1 | Westchester Imaging Center Department of Radiology | 700157035975 |

**Allergies as of 7/10/2019**       Review status set to Review Complete on 7/10/2019

| | Noted | Reaction Type | Reactions |
|---|---|---|---|
| **Latex** | 02/05/2010 | | Hives |
| **Bee Sting [sting, Bee]** | **10/19/2016** | **Systemic** | **Anaphylaxis** |
| **Pcn [penicillins]** | **12/08/2011** | **Side Effect** | **Other (comments)** |
|    **Hair falls out** | | | |
| **Metoprolol** | 01/25/2013 | | Other (comments) |
|    Syncope | | | |

**Immunizations**

| Name | Date |
|---|---|
| **Influenza Vaccine (Quad) PF** | 12/02/15 |
| **Pneumococcal Polysaccharide (PPSV-23)** | 04/29/13 |
| **TDAP Vaccine** | 08/28/12 |

**Problem List**

| | Noted | Resolved |
|---|---|---|
| | | |

**JA688**

Roop_P4000003

POWHATAN MED ASSOC    Roop, Samantha J
3452 Anderson Highway    MRN: 198532, DOB:      , Sex: F
Powhatan VA 23139    Acct #: AR32061902
     Visit date: 7/10/2019

---

## Problem List (continued)

| | Noted | Resolved | |
|---|---|---|---|
| Rheumatoid arthritis(714.0) [M06.9] | 4/5/2010 by Dodd, Jeffrey D | No | |
| Bee sting-induced anaphylaxis [T63.441A] | 4/19/2010 by Dodd, Jeffrey D | No | |
| | LPN | | |
| Overview Signed 8/6/2010 4:13 PM by Egbert, Elizabeth C | | | |
|     Cervix; cryotherapy | | | |
| Endometriosis [N80.9] | 12/14/2010 by Dodd, Jeffrey D | No | |
| Interstitial cystitis [N30.10] | by Dodd, Jeffrey D | No | |
| Lumbar spondylosis [M47.816] | 8/9/2011 by Dodd, Jeffrey D | No | |
| Tobacco use disorder [F17.200] | 8/9/2011 by Dodd, Jeffrey D | No | |
| Tachycardia [R00.0] | 2/21/2012 by Reyes, Jose S, MD | No | |

---

## Reason for Visit

| | |
|---|---|
| Motor Vehicle Crash | 07/08/2019 |
| Hospital Follow Up | head, neck and shoulder injury from MVA . WTC |

## Current Vitals

Most recent update: 7/10/2019 2:25 PM

| BP | Pulse | Temp | Resp | Ht |
|---|---|---|---|---|
| 129/87 (BP 1 Location: Left arm, BP Patient Position: Sitting) | **105** ! | 99.5 °F (37.5 °C) (Oral) | 18 | 5' 4'' (1.626 m) |

| Wt | LMP | SpO2 |
|---|---|---|
| 147 lb 3.2 oz (66.8 kg) | 06/30/2019 | 98% |

## First Recorded BMI

---

**JA689**

Roop_P4000004

POWHATAN MED ASSOC          Roop, Samantha J
3452 Anderson Highway       MRN: 198532, DOB:          Sex: F
Powhatan VA 23139           Acct #: AR32061902
                            Visit date: 7/10/2019

| Problem List as of 7/10/2019 | | Reviewed: **7/10/2019  2:43 PM by Klim, Madeline R, NP** | |
|---|---|---|---|
| | Class | Noted - Resolved | Last Modified |
| Active Problems | | | |
| • **Rheumatoid arthritis(714.0)** | | 4/5/2010 - Present Entered by Dodd, Jeffrey D | 4/5/2010 by Dodd, Jeffrey D |
| • **Lumbago** | | 4/5/2010 - Present Entered by Dodd, Jeffrey D | 4/5/2010 by Dodd, Jeffrey D |
| • **Bee sting-induced anaphylaxis** | | 4/19/2010 - Present Entered by Dodd, Jeffrey D | 4/19/2010 by Dodd, Jeffrey D |
| • **Endometriosis** | | 12/14/2010 - Present Entered by Dodd, Jeffrey D | 12/14/2010 by Dodd, Jeffrey D |
| • **Interstitial cystitis** | | Unknown - Present Entered by Dodd, Jeffrey D | 8/9/2011 by Dodd, Jeffrey D |
| • **Lumbar spondylosis** | | 8/9/2011 - Present Entered by Dodd, Jeffrey D | 8/9/2011 by Dodd, Jeffrey D |
| • **Tobacco use disorder** | | 8/9/2011 - Present Entered by Dodd, Jeffrey D | 8/9/2011 by Dodd, Jeffrey D |

**JA690**

Roop_P4000005

POWHATAN MED ASSOC    Roop, Samantha J
3452 Anderson Highway    MRN: 198532, DOB:    , Sex: F
Powhatan VA 23139    Acct #: AR32061902
    Visit date: 7/10/2019

**Problem List (continued)** as of 7/10/2019

Reviewed: **7/10/2019  2:43 PM by Klim, Madeline R, NP**

| | Class | Noted - Resolved | Last Modified |
|---|---|---|---|
| | | Present | Joseph, Sharon E, MD |
| | | Entered by Joseph, Sharon E, MD | |

**All Notes**

**Progress Notes by Klim, Madeline R, NP at 07/10/19 1415**

| | | |
|---|---|---|
| Author:  Klim, Madeline R, NP | Service:  — | Author Type:  Nurse Practitioner |
| Filed:  07/10/19 1452 | Encounter Date:  7/10/2019 | Status:  Signed |
| Editor:  Klim, Madeline R, NP (Nurse Practitioner) | | |

### HISTORY OF PRESENT ILLNESS

Samantha J Roop is a 34 y.o. female.

HPI[MK.1]

Pt presents with "MVA follow up, headache, nausea"

Pt was the restrained driver of an MVA on 7/8.  She was driving her suburban, and was in the Urbanna area.

She was at a stop sign, and looked both ways, she pulled out onto the divided highway and was hit by a car on her drivers side.

She was wearing a seat belt, and air bags did deploy.

Both cars were totalled, per patient.

JA691

POWHATAN MED ASSOC
3452 Anderson Highway
Powhatan VA 23139

Roop, Samantha J
MRN: 198532, DOB:          , Sex: F
Acct #: AR32061902
Visit date: 7/10/2019

---

## All Notes (continued)

### Progress Notes by Klim, Madeline R, NP at 07/10/19 1415 (continued)

She did hit her head in the accident, and is uncertain if she lost consciousness or not.

Pt went to Watkins ER on 7/8, and had head CT and x-rays of left hip, left shoulder and cervical spine, due to pain in those areas.

All were within normal limits, and

At this time, she continues to have headache in back of head, that at times, is in frontal region.
She has nausea and light sensitivity with the headaches.
Left side of her body is tender.
Her head is tender to touch on left side, and she believes that this is where she hit her head.
She has been taking Excedrin, which will help for an hour or so.

She is going to follow up with her orthopedic for her chronic back issues, to ensure all is ok in that area.
She does not have a neurologist at this time.[MK.2]
Review of Systems
Constitutional: Negative for[MK.1] fever[MK.2].
HENT: Negative for[MK.1] congestion[MK.2].
Gastrointestinal: Positive for[MK.1] nausea[MK.2]. Negative for[MK.1] diarrhea[MK.2] and[MK.1] vomiting[MK.2].
Musculoskeletal: Positive for[MK.1] joint pain[MK.2].
Neurological: Positive for[MK.1] headaches[MK.2].


Physical Exam

---

**JA692**

Roop_P4000007

POWHATAN MED ASSOC
3452 Anderson Highway
Powhatan VA 23139

Roop, Samantha J
MRN: 198532, DOB:      , Sex: F
Acct #: AR32061902
Visit date: 7/10/2019

## All Notes (continued)

### Progress Notes by Klim, Madeline R, NP at 07/10/19 1415 (continued)



### ASSESSMENT and PLAN[MK.1]

| | ICD-10-CM | ICD-9-CM | |
|---|---|---|---|
| 1. | S06.0X9A | 850.5 | **REFERRAL TO NEUROLOGY** |
| 2. | V89.2XXA | E819.9 | |
| 3. | R11.0 | 787.02 | ondansetron (ZOFRAN ODT) 8 mg disintegrating tablet[MK.3] |

Electronically signed by Klim, Madeline R, NP at 07/10/19 1452
Attribution Key
MK.1 - Klim, Madeline R, NP on 07/10/19 1426
MK.2 - Klim, Madeline R, NP on 07/10/19 1443
MK.3 - Klim, Madeline R, NP on 07/10/19 1451

### Progress Notes by Bethea, Rasheedah K at 07/10/19 1415

**JA693**

Roop_P4000008

POWHATAN MED ASSOC    Roop, Samantha J
3452 Anderson Highway    MRN: 198532, DOB:    , Sex: F
Powhatan VA 23139    Acct #: AR32061902
   Visit date: 7/10/2019

---

## All Notes (continued)

### Progress Notes by Bethea, Rasheedah K at 07/10/19 1415 (continued)

Author: Bethea, Rasheedah K    Service: —    Author Type: Licensed Nurse
Filed: 07/10/19 1452    Encounter Date: 7/10/2019    Status: Signed
Editor: Bethea, Rasheedah K (Licensed Nurse)

Samantha J Roop[RB.1] is a[RB.2] 34 y.o. female

**Chief Complaint**
Patient presents with
- Motor Vehicle Crash
     07/08/2019
- Hospital Follow Up
     head, neck and shoulder injury from MVA . WTC[RB.1]


1. Have you been to the ER, urgent care clinic since your last visit? Hospitalized since your last visit?
07/08/2019 WTC MVA
M
2. Have you seen or consulted any other health care providers outside of the Bon Secours Health System
since your last visit? Include any pap smears or colon screening. No[RB.2]


**Visit Vitals**


**Health Maintenance Due**

| Topic | Date Due |
| --- | --- |
| • | |


Medication Reconciliation completed, changes noted. Please Update medication list.[RB.2]

---

JA694

Roop_P4000009

POWHATAN MED ASSOC
3452 Anderson Highway
Powhatan VA 23139

Roop, Samantha J
MRN: 198532, DOB:        , Sex: F
Acct #: AR32061902
Visit date: 7/10/2019

---

## All Notes (continued)
### Progress Notes by Bethea, Rasheedah K at 07/10/19 1415 (continued)

Electronically signed by Bethea, Rasheedah K at 07/10/19 1452
Attribution Key

RB.1 - Bethea, Rasheedah K on 07/10/19 1425
RB.2 - Bethea, Rasheedah K on 07/10/19 1422

---

**Diagnoses**

**JA695**

Roop_P4000010

POWHATAN MED ASSOC    Roop, Samantha J
3452 Anderson Highway    MRN: 198532, DOB:      , Sex: F
Powhatan VA 23139    Acct #: AR32061902
        Visit date: 7/10/2019

**All Orders**

## CLINICAL LAB RESULTS

### Lab Results

   None

### Patient Reported Taking

| | Dosage |
|---|---|
| **ondansetron (ZOFRAN ODT) 8 mg disintegrating tablet (Taking)** | Take 1 Tab by mouth every eight (8) hours as needed for Nausea. |
| **oxyCODONE IR (OXY-IR) 15 mg immediate release tablet (Taking)** | Take 15 mg by mouth three (3) times daily as needed. |

### Meds At Start of Encounter

| | Disp | Refills | Start | End |
|---|---|---|---|---|

---

**JA696**

Roop_P4000011

POWHATAN MED ASSOC    Roop, Samantha J
3452 Anderson Highway    MRN: 198532, DOB:    , Sex: F
Powhatan VA 23139    Acct #: AR32061902
    Visit date: 7/10/2019

## CLINICAL LAB RESULTS (continued)

### Meds At Start of Encounter (continued)

| | Disp | Refills | Start | End |
|---|---|---|---|---|
| Class: Historical Med | | | | |

| | Disp | Refills | Start | End |
|---|---|---|---|---|
| **oxyCODONE IR (OXY-IR) 15 mg immediate release tablet (Taking)** | | | 9/7/2014 | |
| Sig - Route: Take 15 mg by mouth three (3) times daily as needed. - Oral | | | | |
| Class: Historical Med | | | | |
| Earliest Fill Date: 9/7/2014 | | | | |
| **dextroamphetamine-amphetamine (ADDERALL) 20 mg tablet** | 60 Tab | 0 | 5/31/2019 | |
| Sig - Route: Take 1 Tab by mouth two (2) times a day. Max Daily Amount: 40 mg. Do not fill before 6/30/19 - Oral | | | | |
| Class: Print | | | | |
| Earliest Fill Date: 5/31/2019 | | | | |

### Ordered Medications

| | Disp | Refills | Start | End |
|---|---|---|---|---|
| **ondansetron (ZOFRAN ODT) 8 mg disintegrating tablet** | 15 Tab | 0 | 7/10/2019 | |
| Take 1 Tab by mouth every eight (8) hours as needed for Nausea. - Oral | | | | |

**JA697**

Roop_P4000012

POWHATAN MED ASSOC    Roop, Samantha J
3452 Anderson Highway    MRN: 198532, DOB:      , Sex: F
Powhatan VA 23139    Acct #: AR32061902
                      Visit date: 7/10/2019

---

**Encounter-Level Documents - 07/10/2019: (continued)**

---

Reviewed on 8/28/2012

| Name | Date |
|------|------|
| TDAP Vaccine | 8/28/2012 |

Not reviewed this visit

🔔 **Upcoming Health Maintenance** ⌖        Hx History

| | |
|---|---|
| PAP AKA CERVICAL CYTOLOGY (Every 3 Years) | Overdue since 5/1/2016 |
| Influenza Age 9 to Adult (Every 9 Months - August to March) | Next due on 8/1/2019 |
| DTaP/Tdap/Td series (2 - Td) | Next due on 8/28/2022 |

| Referral ID | Referred By | Referred To: |
|-------------|-------------|--------------|
| 9389918 | KLIM, MADELINE R | Epps, Stacey L, MD |
| | | 601 Watkins Centre Parkway |
| | | Ste 250 |
| | | NEUROLOGY CLINIC BSMG |
| | | Midlothian, VA 23114 |
| | | Phone: 804-325-8750 |
| | | Fax: 804-794-3172 |

| Visits | Status | Start Date | End Date |
|--------|--------|------------|----------|
| 1 | New Request | 7/10/19 | 7/9/20 |

If your referral has a status of pending review or denied, additional information will be sent to support the outcome of this decision.

Dear Samantha;

Thank you for requesting a MyChart account. Our records indicate that you already have an active MyChart account. You can access your account anytime at https://mychart.mybonsecours.com/mychart

Did you know that you can access your hospital and ER discharge instructions at any time in MyChart? You can also review all of your test results from your hospital stay or ER visit.

**Additional Information**

If you have questions, please visit the Frequently Asked Questions section of the MyChart website at https://mychart.mybonsecours.com/mychart/. Remember, MyChart is NOT to be used for urgent care needs. For medical emergencies, dial 911.

**Now available from your iPhone and Android!**

Samantha J. Roop (CSN: 700157193875) • Printed at 7/10/19 2:43 PM               Page 2 of 7   **Epic**

---

**JA698**

n and Consent for Outpatient Care

son receiving treatment. **"Patient Representative"** means
d signing as the Patient's representative.  Use of the word
nclude both the Patient and the Patient Representative. With
may also, depending on the context, mean financial guarantor

lude healthcare professionals on the hospital's staff
lude but are not limited to: Emergency Department Physicians,
, Hospitalists, certain other licensed independent practitioners
iates, successors or assignees acting on their behalf.

**d Physicians and Advanced Practice Professionals.**
icians and advanced practice professionals providing services
ctors and not agents or employees of the hospital. **"Advanced**
t limited to, my treating physicians/ surgeons, radiologists,
icians, anesthesiologists, contract physicians, hospital-based
urses, advanced practice registered nurses, certified nurse
tists, clinical psychologists, clinical nurse specialists, doctors of
nesthesiology assistants. Independent physicians and Advanced
eir own actions and the hospital shall not be liable for the acts
cians and/or Advanced Practice Professionals.

cedures that may be performed during this hospitalization
uding, but not limited to, emergency treatment or services,
s, x-ray examination, diagnostic procedures, medical,
anesthesia, or hospital services rendered as ordered by the
d other individuals enrolled in a healthcare professional
n health care education to participate in the delivery of my
while I receive medical care and treatment at the Hospital,
rs and/or hospital staff.  I further consent to the hospital
sting, including but not limited to, testing for hepatitis,
**AIDS")**, and Human Immunodeficiency Virus  **("HIV")**
by protocol.

t is hereby informed in accordance with Section 32.1-45.1
hat if the provision of health care services to the patient at the
employed by or under the direction and control of the facility
ent's body fluids in a manner which may transmit
B or C Viruses, and to the release of such test results to the

d complications of this testing are generally minor and are
d specimens, including discomfort from the needle stick
t the puncture site.  The results of this test will become part of



**JA699**

**CJW MEDICAL CENTER**

ROOP, SAMANTHA JEAN
35059321545          ER
07/15/2019     John A Bantle  MD
DOB:                      34 y        Г
MR#:     D001782628

3. **Consent to Treatment Using Telemedicine.**  I consent to treatment involving the use of electronic communications **("Telemedicine")** to enable health care providers at different locations to share my individual patient medical information for diagnosis, therapy, follow-up, and/or education purposes. I consent to forwarding my information to a third party as needed to receive Telemedicine services, and I understand that existing confidentiality protections apply. I acknowledge that while Telemedicine can be used to provide improved access to care, as with any medical procedure, there are potential risks and no results can be guaranteed or assured. These risks include, but are not limited to: technical problems with the information transmission or equipment failures that could result in lost information or delays in treatment. I understand that I have a right to withhold or withdraw my consent to the use of Telemedicine in the course of my care at any time, without affecting my right to future treatment and without risking the loss or withdrawal of any program benefit to which I would otherwise be entitled.

4. **Use of Biological Samples.**  During your care at the facility, biological samples (such as blood and tissue samples) might be collected from you for purposes of your care. Sometimes, after your visit there might be excess or leftover biological samples no longer needed for your care. These samples are usually discarded. However, sometimes these samples might be used for research within our hospitals and occasionally made available to researchers at external groups such as universities, private companies, advocacy groups, and government agencies. The research can help answer questions about the causes of diseases, how to prevent them, or even how to treat them. Please note that for this kind of research, (i) there might be no practical way to inform you about the details or results of the research (even if it involves genetic research), (ii) generally, no results on tests performed on your samples during the research can be returned to you or entered into your health record, (iii) it is not likely that you will directly benefit from the research, and (iv) there are no plans to compensate or recognize you for use of your samples or any discoveries made during the research. When these samples are used in this manner, your privacy is safeguarded consistent with applicable federal and state privacy laws.

5. **Consent to Medication Not Yet FDA Approved and/or Medication Prepared/Repackaged by Outsourcing or Compounding Pharmacy.**  As part of the services provided, you may be treated with a medication that has not received FDA approval. You may also receive a medication that has been prepared or repackaged by an outsourcing facility or compounding pharmacy. Certain medications for which there are no alternatives or which your physician recommends may be necessary for potentially life-saving treatment.

6. **Consent to Product Patient Assistance Programs Limited Power of Attorney ("LPOA").**  The Provider may be able to get free replacement or reimbursement for the cost of your drugs or medical products from the companies that make them through a patient assistance program sponsored by the companies that make your drugs or medical products and through charity foundations. If the hospital obtains replacement or reimbursement of cost of your drug or medical product from the manufacturer through such programs, the charge for the product or drug will be removed from your bill. Patient assistance programs require you to sign an application form in order for the hospital to obtain replacement or credits of certain drugs administered or devices implanted to qualifying patients. This LPOA allows the Provider and its claims processor to complete and sign your patient assistance program applications for you for so long as this program may be available to you.

I hereby appoint hospital and/or its claims processor, my attorney-in-fact for the sole and exclusive purpose of signing patient assistance program application forms on my behalf, so that hospital may attempt to obtain replacement or credits of certain drugs administered or devices implanted from the companies that make them. I understand that the final decision as to my acceptance in a patient assistance

**JA700**

**CJW MEDICAL CENTER**

program lies with each pharmaceutical or medical device company and that submission by hospital provides no guarantee or assurance that any application will be approved. I will provide reasonable assistance and additional information and documentation as necessary to support each application. I further understand that: 1) signing this is voluntary; 2) some patient assistance programs may not accept applications via power of attorney and I agree not to hold hospital responsible for such denial; 3) my treatment, payment enrollment, or eligibility for benefits may not be conditioned upon signing this authorization; and 4) I may revoke this authorization at any time by notifying the Provider in writing at

7101 JAHNKE ROAD

RICHMOND, VA 23225-4017

, however, such revocation will not affect any actions taken prior to facility receiving the revocation.

This LPOA shall be in full force from the date signed and continue for so long as these programs may be available to you.

| | | |
|---|---|---|
| ☐ | Yes, I consent to Product Patient Assistance Programs Limited Power of Attorney | ☑ No, I do not consent to Product Patient Assistance Programs Limited Power of Attorney |

7. **Consent to Photographs, and Video, Digital and Audio Recordings.** I consent to photographs, video, digital or audio recordings, and/or images of me being recorded for patient care, healthcare operations, security purposes and/or the hospital's quality improvement and/or risk management activities. I understand that the facility retains the ownership rights to the images and/or recordings. I will be allowed to request access to or copies of the images and/or recordings when technologically feasible unless otherwise prohibited by law. I understand that these images and/or recordings will be securely stored and protected. Images and/or recordings in which I am identified will not be released and/or used outside of the facility without a specific written authorization from me or my legal representative unless otherwise required by law.

8. **Financial Agreement.** In consideration of the services to be rendered to Patient, Patient or Guarantor individually promises to pay the Patient's account at the rates stated in the hospital's price list (known as the **"Charge Master"** ) effective on the date the charge is processed for the service provided, which rates are hereby expressly incorporated by reference as the price term of this agreement to pay the Patient's account. Some special items will be priced separately if there is no price listed on the Charge Master. An estimate of the anticipated charges for services to be provided to the Patient is available upon request from the hospital. Estimates may vary significantly from the final charges based on a variety of factors, including, but not limited to, the course of treatment, intensity of care, physician practices, and the necessity of providing additional goods and services.

**JA701**

**CJW MEDICAL CENTER**

The hospital will provide a medical screening examination as required to all Patients who are seeking medical services to determine if there is an emergency medical condition without regard to the Patient's ability to pay. If there is an emergency medical condition, the hospital will provide stabilizing treatment within its capacity. However, Patient and Guarantor understand that if Patient does not qualify under the hospital's charity care policy or other applicable policy, Patient or Guarantor is not relieved of his/her obligation to pay for these services.

If supplies and services are provided to Patient who has coverage through a governmental program or through certain private health insurance plans, the hospital may accept a discounted payment for those supplies and services. In this event any payment required from the Patient or Guarantor will be determined by the terms of the governmental program or private health insurance plan. If the Patient is uninsured and not covered by a governmental program, the Patient may be eligible to have his or her account discounted or forgiven under the hospital's uninsured discount or charity care programs in effect at the time of treatment. I understand that I may request information about these programs from the hospital.

I also understand that, as a courtesy to me, the hospital may bill an insurance company offering coverage, but may not be obligated to do so. Regardless, I agree that, except where prohibited by law, the financial responsibility for the services rendered belongs to me, the Patient or Guarantor. I agree to pay for services that are not covered and covered charges not paid in full by insurance coverage including, but not limited to, coinsurance, deductibles, non-covered benefits due to policy limits or policy exclusions, or failure to comply with insurance plan requirements.

9. **Professional services rendered by independent contractors and Advanced Practice Professionals are not part of the hospital bill.** I understand that physicians and other Advanced Practice Professionals may be called upon to provide care or services to me or on my behalf, but that I may not actually see, or be examined by all physicians or other Advanced Practice Professionals participating in my care; for example, I may not see physicians, including but not limited to, my treating physicians/ surgeons, radiologists, pathologists, cardiologists, emergency physicians, anesthesiologists, staff physicians, contract physicians, physician assistants and other Advanced Practice Professionals including those providing radiology, pathology, EKG interpretation, anesthesiology services or telemedicine. I understand that, in most instances, there will be a separate charge for professional services rendered by these providers and that I will receive a bill for these professional services that is separate from the bill for hospital services.

10. **Third Party Collection.** I acknowledge that the Providers may utilize the services of a third party Business Associate or affiliated entity as an extended business office ( **"EBO Servicer"** ) for medical account billing and servicing. During the time that the medical account is being serviced by the EBO Servicer, the account shall not be considered delinquent, past due or in default, and shall not be reported to a credit bureau or subject to collection legal proceedings. When the EBO Servicer's efforts to obtain payment have been exhausted due to a number of factors (for e.g., Patient or Guarantor's failure to pay or make a payment arrangement after insurance adjustments and payments have been credited, and/or the insurer's denial of claim(s) or benefits is received), the EBO Servicer will send a final notice letter which will include the date that the medical account may be returned from the EBO Servicer to the Provider.

**JA702**

**CJW MEDICAL CENTER**

Upon return to the Provider by the EBO Servicer, the Provider may place the account back with the EBO Servicer, or, at the option of the Provider, may determine the account to be delinquent, past due and in default. Once the medical account is determined to be delinquent it may be subject to late fees, interest as stated, referral to a collection agency for collection as a delinquent account, credit bureau reporting and enforcement by legal proceedings.

I also agree that if the Provider initiates collection efforts to recover amounts owed by me or my Guarantor, then, in addition to amounts incurred for the services rendered, Patient or Guarantor will pay, to the extent permitted by law: (a) any and all costs incurred by the Provider in pursuing collection, including, but not limited to, reasonable attorneys' fees, and (b) any court costs or other costs of litigation incurred by the Provider.

11.  **Assignment of Benefits.**    Patient assigns all of his/her rights and benefits under existing policies of insurance providing coverage and payment for any and all expenses incurred as a result of services and treatment rendered by the Provider and authorizes direct payment to the Provider of any insurance benefits otherwise payable to or on behalf of Patient for the hospitalization or for outpatient services, including emergency services, if rendered.  Patient understands that any payment received from these policies and/or plans will be applied to the amount that Patient or Guarantor has agreed to pay for services rendered during this admission and, that Provider will not retain benefits in excess of the amount owed to the Provider for the care and treatment rendered during the admission.

I understand that any health insurance policies under which I am covered may be in addition to other coverage or benefits or recovery to which I may be entitled, and that Provider, by initially accepting health insurance coverage, does not waive its rights to collect or accept, as payment in full, any payment made under different coverage or benefits or any other sources of payment that may or will cover expenses incurred for services and treatment.

I hereby  **irrevocably appoint**  the Provider as my authorized representative to pursue any claims, penalties, and administrative and/or legal remedies for any and all benefits due me for the payment of charges associated with services and treatment rendered by the Provider. These authorized actions include administrative and non-administrative appeals of any denial or underpayment of benefits or coverage, litigation, other forms of dispute resolution in any forum or for any type of relief (including monetary and equitable) available under applicable laws, including without limitation all provisions of the Employee Retirement Income Security Act of 1974, on my behalf against any responsible payer, employer-sponsored medical benefit plans, third party liability carrier or, any other responsible third party ( **"Responsible Party"** ). I also transfer and assign to the Provider all of my rights to demand and receive the production of or access to any documents or information, including without limitation, copies of health plan documents and materials, from any entity or person to the fullest extent of my rights to do so under my health plan and applicable laws. The foregoing rights are assigned in their entirety without limitation and without reservation of any part or aspect thereof. This assignment shall not be construed as an obligation of the Providers to pursue any such right of recovery.  I acknowledge and understand that I maintain my right of recovery against my insurer or health benefit plan and the foregoing assignment does not divest me of such right.

**JA703**

ROOP_P5000008

**CJW MEDICAL CENTER**

ROOP, SAMANTHA JEAN
35059321545        ER
07/15/2019    John A Bantle  MD
DOB:                                34 y      Γ
MR#:    D001782628

I agree to take all actions necessary to assist the Provider in collecting payment from any such Responsible Party should the Provider(s) elect to collect such payment, including allowing the Provider(s) to bring suit against the Responsible Party in my name.  If I receive payment directly from any source for the medical charges associated with my treatment acknowledge that it is my duty and responsibility to immediately pay any such payments to the Provider(s).

12. **Medicare Patient Certification and Assignment of Benefit.**  I certify that any information I provide in applying for payment under Title XVIII ( **"Medicare"** ) or Title XIX ( **"Medicaid"** ) of the Social Security Act is correct.  I request payment of authorized benefits to be made on my behalf to the hospital or hospital-based physician by the Medicare or Medicaid program.

13. **Private Room.**  I understand and agree that I am (or Guarantor is) responsible for any additional charges associated with the request and/or use of a private room.

14. **Outpatient Medicare Patients.**    Medicare does not provide coverage for "self-administered drugs" or drugs that you normally take on your own, with only a few limited exceptions.  If you get self-administered drugs that aren't covered by Medicare Part B, we may bill you for the drug.  However, if you are enrolled in a Medicare Part D Drug Plan, these drugs may be covered in accordance with Medicare Part D Drug Plan enrollment materials. If you pay for these self-administered drugs, you can submit a claim to your Medicare Part D Drug Plan for a possible refund.

15. **Communications About My Healthcare.**   I authorize my healthcare information to be disclosed for purposes of communicating results, findings, and care decisions to my family members and others I designate to be responsible for my care.  I will provide those individuals with a password or other verification means specified by the hospital. I agree I may be contacted by the Provider or an agent of the Provider or an independent physician's office for the purposes of scheduling necessary follow-up visits recommended by the treating physician.

16. **Consent to Telephone Calls, Email or Text Message for Financial Communications.**   I authorize the use of any email address or cellular telephone number I provide for receiving information relating to my financial obligations, including, but not limited to, payment reminders, delinquent notifications, instructions and, links to hospital Patient billing information. I agree that, in order for you, or your EBO Servicers and collection agents to service my account or to collect any amounts I may owe, I expressly agree and consent that you or your EBO Servicer and collection agents may contact me by telephone, on a recorded line, at any telephone number I have provided or you or your EBO Servicer and collection agents have obtained or, at any number forwarded or transferred from that number, regarding the hospitalization, the services rendered, or my related financial obligations. Methods of contact may include using pre-recorded/artificial voice messages and/or use of an automatic dialing device, as applicable.

By my consent below, I authorize the use of any email address or cellular telephone number I provide for receiving information relating to my financial obligations, including, but not limited to, payment reminders, delinquent notifications, instructions and links to hospital Patient billing information.  I understand and acknowledge that my patient account number may appear in the email or text.

**CJW MEDICAL CENTER**

ROOP, SAMANTHA JEAN
35059321545    ER
07/15/2019    John A Bantle  MD
DOB:              34 y   Γ
MR#:   D001782628

17. **Consent to Email, Telephone Calls or Text Message for Healthcare Information, Discharge Instructions and Other Communications.**   If at any time I provide an email address or telephone number (whether wireless or a landline) to a Provider or EBO Servicer, I consent to receive messages from Providers and EBO Servicers regarding discharge instructions and other healthcare communications (including without limitation information about programs or services that might be of interest to me) at the email or telephone number (whether wireless or landline) that  I have provided or you or your EBO Servicer have obtained or, at any text number forwarded or transferred from that number.  These discharge instructions may include, but not be limited to: post-operative instructions, physician follow-up instructions, dietary information, and prescription information. The other healthcare communications may include, but are not limited to communications to family or designated representatives regarding my treatment or condition, or reminder messages to me regarding appointments for medical care, information about insurance coverage/eligibility, referrals, available treatment options and capabilities, health insurance plans and programs and services that might be of interest to me. I understand that providing my consent to receive such communications is not a condition of receiving services or care from Providers.

18. **Release of Information.**   I consent to Providers using and disclosing healthcare information about me for purposes of treatment, payment and healthcare operations. I also consent to my health information being used and disclosed for public health and other purposes permitted by applicable law. Information covered by this consent includes, without limitation, history and physical records, emergency records, laboratory reports, operative reports, physician progress notes, nurse notes, consultations, psychological and/or psychiatric reports, drug and alcohol treatment records and discharge summaries. This consent specifically applies to genetic information and information concerning psychological conditions, psychiatric conditions, intellectual disability conditions, substance abuse disorder and chemical dependency conditions and/or infectious diseases including, but not limited to, blood borne diseases, such as HIV and AIDS. Uses and disclosures covered by this consent include, but are not limited to (i) exchanging healthcare information about me regarding a prior admission(s) and encounters to other healthcare providers and entities to coordinate Patient care or for case management purposes; (ii) releasing health care information about me to any person or entity liable for or involved in payment on the Patient's behalf including to verify coverage, address payment questions, or for any other purpose related to benefit payment; (iii) releasing healthcare information about me to my employer's designee when the services delivered are related to a claim under worker's compensation. If I am covered by Medicare or Medicaid, I authorize the release of my healthcare information to the Social Security Administration or its intermediaries or carriers for payment of a Medicare claim or to the appropriate state agency for payment of a Medicaid claim. Provider participates, or may in the future participate, in Health Information Exchanges (HIEs) or other organizations with healthcare providers, insurers, and/or other health care industry participants and their subcontractors in order for these individuals and entities to share health information for treatment, payment, health care operations and other purposes permitted by law, to accomplish goals that may include but not be limited to: improving the accuracy and increasing the availability of patient health records and aggregating and comparing patient information for quality improvement purposes information concerning psychological conditions, psychiatric conditions, intellectual disability conditions, chemical dependency conditions and/or infectious diseases including, but not limited to, blood borne diseases, such as HIV and AIDS. Unless I notify Provider in writing that I desire to opt out of participation, I consent to health information about me being shared with participants in HIEs and other organizations as described above.

**JA705**

## CJW MEDICAL CENTER

## 19. Other Acknowledgements.

**Personal Valuables.**  I understand that the hospital maintains a safe for the safekeeping of money and valuables, and the hospital shall not be liable for the loss of or damage to any money, jewelry, documents, furs, fur coats and fur garments, or other articles of unusual value and small size, unless placed in the safe, and shall not be liable for the loss or damage to any other personal property, unless deposited with the hospital for safekeeping.  The liability of the hospital for loss of any personal property that is deposited with the hospital for safekeeping is limited to the greater of five hundred dollars ($500.00) or the maximum required by law, unless a written receipt for a greater amount has been obtained from the hospital by the Patient.  The hospital is not responsible for the loss or damage of cell phones, glasses or dentures or personal valuables unless they are placed in the hospital safe in accordance with the terms as stated above.

**Weapons/Explosives/Drugs.**  I understand and agree that if the hospital at any time believes there may be a weapon, explosive device, illegal substance or drug, or any alcoholic beverage in my room or with my belongings, the hospital may search my room and my belongings located anywhere on hospital property, confiscate any of the above items that are found, and dispose of them as appropriate, including delivery of any item to law enforcement authorities.

**Patient Visitation Rights.**  I understand that I have the right to receive the visitors whom I or my Patient Representative designates, without regard to my relationship to these visitors.  I also have the right to withdraw or deny such consent at any time.  I will not be denied visitation privileges on the basis of age, race, color, national origin, religion, gender, gender identity and gender expression, and sexual orientation or disability.  All visitors I designate will enjoy full and equal visitation privileges that are no more restrictive than those that my immediate family members would enjoy.  Further, I understand that the hospital may need to place clinically necessary or reasonable restrictions or limitations on my visitors to protect my health and safety in addition to the health and safety of other Patients.  The hospital will clearly explain the reason for any restrictions or limitations if imposed.  If I believe that my visitation rights have been violated, I or my representative has the right to utilize the hospital's complaint resolution system.

**Additional Provision for Admission of Minors/ Incapacitated Patient.**  If I am signing as legal guardian, I acknowledge and verify that I am the legal guardian or custodian of the minor/incapacitated patient.

## JA706

## CJW MEDICAL CENTER

**20. Patient Self Determination Act.** I have been furnished information regarding Advance Directives (such as healthcare or medical power of attorney and, living wills). Please check the box next to **one** of the following applicable statements:

| ☐ | I executed Advance Directive(s) and have been requested to supply a copy to the hospital | ☐ | I have not executed Advance Directive(s), wish to execute one or more and have received information on how to execute an Advance Directive | ☑ | I have not executed an Advance Directive and do not wish to execute one at this time |
|---|---|---|---|---|---|

**21. Notice of Privacy Practices.** I acknowledge that I have received the hospital's Notice of Privacy Practices, which describes the ways in which the hospital may use and disclose my healthcare information for its treatment, payment, healthcare operations and other prescribed and permitted uses and disclosures. I understand that this information may be disclosed electronically by the Provider and/or the Provider's business associates. I understand that I may contact the hospital Privacy Officer designated on the notice if I have a question or complaint.

Acknowledge:

(Initial)



Initials Required

**22. Acknowledgement of Notice of Patient Rights and Responsibilities.** I have been furnished with a Statement of Patient Rights and Responsibilities ensuring that I am treated with respect and dignity and without discrimination or distinction based on age, gender, disability, race, color, ancestry, citizenship, religion, pregnancy, sexual orientation, gender identity or expression, national origin, medical condition, marital status, veteran status, payment source or ability, or any other basis prohibited by federal, state, or local law.

Acknowledge:

(Initial)

Initials Required

## JA707

**JA708**

ROOP_P5000011

NAME:  ROOP,SAMANTHA JEAN                    ACCT#:      D35059321545
                                            FORM:

    ADM DATE: 07/15/19  1825
 ATTEND PHYS: Bantle,John A  MD             UNIT#:      D001782628
   DIS DT/TM: 07/15/19  2023                SEX:        F
   DIS DISP: ROUTINE HOME/SELF CARE         AGE:        34
       LOS:  :          1                   DOB:
   PT CLASS: OP.OTH                         FIN CLASS:  09
                                            ABS STATUS: FINAL


DIAGNOSES                                                          POA INDICATOR  CODESET


REASON FOR VISIT DX
         M54.9     DORSALGIA, UNSPECIFIED                                         ICD10
         R51       HEADACHE                                                       ICD10
         M54.2     CERVICALGIA                                                    ICD10

PRIMARY CODESET
PRINC DX   S06.0X9A   CONCUSSION W LOSS OF CONSCIOUSNESS OF UNSP DURATION, INIT   ICD10
OTHER DX   M62.838   OTHER MUSCLE SPASM                                           ICD10
         M54.5     LOW BACK PAIN                                                  ICD10
         V49.40XA  DRIVER INJURED IN COLLISION W UNSP MV IN TRAF, INIT            ICD10
         Y92.410   UNSP STREET AND HIGHWAY AS PLACE                               ICD10

OTHER CODESET
PRINC DX
OTHER DX

PROCEDURE
PRIMARY CODESET
DATE        PROC CODE & NAME                    SURGEON        ANESTHESIOLOGIST
OTHER CODESET

PRIMARY CODESET
DRG I-10
 OTHER CODESET
DRG I-9


STATUS       $REIMB   MIN-LOS   STD-LOS    COST WT    GRP VERS   GRP FC
                                                      36         09


DRG STATUS DATE:                            ABS STATUS DATE: 07/23/19
CODER: INTERFACE                            ABSTRACTOR: CACUSER


  **This form will be maintained as a permanent part of the medical record**

**JA709**

ROOP_P5000012

# CJW Medical Center · Johnston-Willis Campus
1401 Johnston-Willis Drive  Richmond. Va  23235

**ER**

| ROOP,SAMANTHA JEAN | Serv | FC | Loc | Room | Status | Admit Date Time | Unit # |
|---|---|---|---|---|---|---|---|
| Account No: D35059321545 | | 09 | D.JERFT | | DEP ER | 07/15/19 1825 | D001782628 |

PATIENT

**PATIENT**
Soc Sec No   DOB      Age      Sex  MS  Race  Religion
xxx-xx-               34       F    S   W     NONE
Address:

Home Ph:                      County:
Language: ENG                 Country: USA

**PATIENT EMPLOYER**
UNEMPLOYED
SAME AS PATIENT
SAME AS PATIENT,VA SAP
Work Phone: SAP
Occupation: NE

**GUARANTOR**
ROOP,SAMANTHA JEAN            SS#: xxx-xx-
Address:

Home Ph:                      County:
Relationship to Patient: SELF

**GUARANTOR EMPLOYER**
UNEMPLOYED
SAME AS PATIENT
SAME AS PATIENT,VA SAP
Work Phone: SAP
Occupation: NE

**OTHER GUARANTOR**
                             SS#:
Address

Home Ph:
Relationship to Patient:

**OTHER GUARANTOR EMPLOYER**

Work Phone:
Occupation:

**PERSON TO NOTIFY**

Home Phone:              Work Phone:
Relationship to Patient:

**NEXT OF KIN**

Home Phone:              Work Phone:
Relationship to Patient: OT

**INSURANCE#1**
                Policy #
                Coverage #
                Subscriber
                Rel to Pt          DOB
Phone:          Group

**AUTHORIZATION**
Treat/Precert  -
Ins Verif
Pro Review      TO

**INSURANCE#2**
                Policy #
                Coverage #
                Subscriber
                Rel to Pt          DOB
Phone           Group

**AUTHORIZATION**
Treat/Precert
Ins Verif
Pro Review

**INSURANCE#3**
                Policy #
                Coverage #
                Subscriber
                Rel to Pt          DOB
Phone           Group

**AUTHORIZATION**
Treat/Precert
Ins Verif
Pro Review

| Attending Physician | HCIS | Admitting Physician | HCIS | Emergency Room Physician | HCIS |
|---|---|---|---|---|---|
| | | | | Bantle,John A  MD | 1610 |
| Prim Care Physician | HCIS | Family Physician | HCIS | Other Physician | HCIS |
| Joseph,Sharon E  MD | 2980 | | | | |

| Admit Source | Priority | Arrival | Admitted By | REASON FOR VISIT: |
|---|---|---|---|---|
| NON HEALTHCARE FAC R | EM | WI | RSC.D.TE | INJURY - ACCIDENT |

**DIAGNOSIS**

**OPERATION / PROCEDURE**

Printed By: RSC.D.SAD  07/16/19 0125

*EDF*

Acct#D35059321545    PACS # D731784

---

**JA710**

ROOP_P5000013

```
CJW MEDICAL CENTER (COCCC)
EMERGENCY PROVIDER REPORT
REPORT#:0715-1869   REPORT STATUS: Signed
DATE:07/15/19 TIME: 2014

PATIENT: ROOP,SAMANTHA JEAN          UNIT #: D001782628
ACCOUNT#: D35059321545               ROOM/BED:
DOB:                                 LOCATION: D.JERFT
AGE: 34     SEX: F                   PCP: Joseph,Sharon E  MD
SERVICE DT: 07/15/19                 AUTHOR: Gardella,Karen J
NP
REP SRV DT: 07/15/19                 REP SRV TM: 2014
* ALL edits or amendments must be made on the electronic/computer
document *
```

### Gardella,Karen J 07/15/19 2014:
### HPI-MVC

## General
**Confirmed Patient** Yes
**Patient Type** New patient

## Presentation
**Chief Complaint** Head pain, Back pain, Neck pain
**Hx Obtained From** Patient

## Free Text HPI Notes
**Free Text HPI Notes**
***HPI: 34-year-old female with reported history of chronic back pain which she sees pain
specialist for and takes oxycodone several times daily to the emergency department for
evaluation of back pain worse than normal since having MVC 8 days ago.  Patient was
restrained driver on divided highway who was struck in the driver front bumper and spun.
Patient states it was airbag deployment and she struck her head causing her to lose
consciousness for unknown amount of time.  Had to be assisted at the vehicle by the other
driver.  Patient was never evaluated post accident because she had her animal and children
in the car with her.  In the past 8 days patient has not been evaluated for back pain or head
injury or neck pain status post MVC.  Denies chest pain, abdominal pain, nausea, vomiting
or diarrhea, bowel or bladder dysfunction or retention, saddle anesthesia, extremity
discomfort, vision changes.  Is complaining of nausea, vomiting, frontal headache with
photophobia.  Denies phonophobia.

--Review of Systems--
The following systems  have been reviewed.  Pertinent positive and negative review systems
have been documented in the HPI section. If not documented as positive in the HPI section,
and the following symptoms have been reported as negative.

----REVIEW OF SYSTEMS----
  --all systems reviewed and negative except as marked--
Constitutional: -fevers, chills

Page 1 of 9

**JA711**

Patient: ROOP,SAMANTHA JEAN
Unit#:D001782628
Date: 07/15/19
Acct#:D35059321545

Eyes: +photophobia//-visual changes
ENT: -sore throat, congestion, ear pain
Respiratory: -cough, shortness of breath, wheezing
Cardiovascular: -chest pain, edema, palpitations
Abdominal: +nausea, vomiting//-abdominal pain, diarrhea
GU: -discharge; -dysuria, hematuria
Musculoskeletal: +neck pain, back pain//extremity pain
Skin: -rash, pruritus
Neurologic: +change in LOC, headache, dizziness

-PHYSICAL EXAM----
General/Constitutional: Awake, alert, no acute distress, nontoxic-appearing
Head: Atraumatic, normocephalic. No obvious trauma/deformity.
Eyes: PERRLA, EOMI, conjunctiva normal. +photophobic.
Ear/Nose/Throat: Airway patent, mucous membranes moist
Neck: Supple, +midline TTP low and mid. No crepitus, swelling, stepoffs.
Respiratory/chest: Breath sounds normal, breath sounds equal bilateral, no respiratory distress
Cardiovascular: Heart rate normal, regular rhythm, heart sounds normal
Abdomen/GI: Soft, nontender, no distention
GU: deferred
Back: low back pain paraspinal TTP lumbar. No midline TTP/stepoffs/crepitus/swelling.
Dec ROM d/t pain.
Skin: Color normal, warm, intact
Neurologic: Oriented x3, speech normal, no motor deficits

## Risk-MVC

### Risk Stratification
**Nexus C-Spine Criteria**
Post midline tenderness. No: Intoxicated, Altered LOC/alertness, Focal neuro deficit pres, Distracting injury pres.
**Glasgow Coma Score > Age 5**

| Glasgow Coma Score > Age 5 | Response | | Value |
|---|---|---|---|
| Eye Opening | Open spontaneously | (4) | 4 |
| Verbal Response | Oriented | (5) | 5 |
| Motor Response | Obeys commands | (6) | 6 |
| Total | | | 15 |

**JA712**

```
Patient: ROOP,SAMANTHA JEAN
Unit#:D001782628
Date: 07/15/19
Acct#:D35059321545
```

## Review of Systems

### ROS Statements
**All systems rev & neg** except as marked.

### Past Medical History - Adult
**Stated Complaint** INJURY - ACCIDENT
**Allergies**
**Coded Allergies:**
latex (Mild, HIVES 10/15/11)
Penicillins (HAIR LOSS 07/30/12)
metoprolol (PASSED OUT 01/14/13)

**Home Medications**
**Reported Medications**

**Smoking status for patients 13 years old or older:** Unknown,if ever smoked
**Ambulatory Status** Independent

## Physical Exam

### Vital Signs
**Vital Signs**
First Documented:

|  | Result | Date Time |
|---|---|---|
| Pulse Ox | 99 | 07/15 1850 |
| B/P | 120/84 | 07/15 1850 |
| B/P Mean | 96 | 07/15 1850 |
| O2 Delivery | Room air | 07/15 1850 |
| Temp | 99.1 | 07/15 1850 |
| Pulse | 80 | 07/15 1850 |
| Resp | 14 | 07/15 1850 |

**JA713**

Patient: ROOP,SAMANTHA JEAN
Unit#:D001782628
Date: 07/15/19
Acct#:D35059321545

Last Documented:

|  | Result | Date Time |
|---|---|---|
| Pulse Ox | 99 | 07/15 1850 |
| B/P | 120/84 | 07/15 1850 |
| B/P Mean | 96 | 07/15 1850 |
| O2 Delivery | Room air | 07/15 1850 |
| Temp | 99.1 | 07/15 1850 |
| Pulse | 80 | 07/15 1850 |
| Resp | 14 | 07/15 1850 |

**Review of Vital Signs** Reviewed, Vital signs normal

## Interpretation & Diagnostics

## Lab Results Interpretation
**Considerations** Reviewed prior records
**Results**
Recent Impressions:
**COMPUTED TOMOGRAPHY - CT L-SPINE WO IV CON 07/15 1856**
*** Report Impression - Status: SIGNED  Entered: 07/15/2019 1954

IMPRESSION:
1. The patient status post a bilateral laminectomy procedure at her
L4-5 level. She is also status post a posterior as well as an
interbody fusion. The bone plug is not incorporated into the adjacent
L5 and S1 vertebrae. There may have been a pre-existing of the L5
vertebra.
2. This examination is negative for an acute fracture of the
lumbosacral spine.
3. Not mentioned above there are several nonobstructing renal
calculi.
Impression By: DR.ROWCA - Craig Rowell, MD
**COMPUTED TOMOGRAPHY - CT T-SPINE WO IV CON 07/15 1856**
*** Report Impression - Status: SIGNED  Entered: 07/15/2019 2004

IMPRESSION: This examination is negative for an acute fracture of the
thoracic spinal region.
Impression By: DR.ROWCA - Craig Rowell, MD
**COMPUTED TOMOGRAPHY - CT C-SPINE WO IV CON 07/15 1856**
*** Report Impression - Status: SIGNED  Entered: 07/15/2019 1932

**JA714**

Patient: ROOP,SAMANTHA JEAN
Unit#:D001782628
Date: 07/15/19
Acct#:D35059321545

Impression:

1. No evidence of acute intracranial trauma.
2. No cervical fractures. If unexplained symptoms persist and/or there is significant clinical concern for acute disc, ligamentous, or soft tissue injury, followup with MRI may be of benefit if and when clinically indicated.

Impression By: DR.SMIJA3 - James C Smith, MD
**COMPUTED TOMOGRAPHY - CT HEAD WO IV CON 07/15 1856**
*** Report Impression - Status: SIGNED  Entered: 07/15/2019 1932

Impression:

1. No evidence of acute intracranial trauma.
2. No cervical fractures. If unexplained symptoms persist and/or there is significant clinical concern for acute disc, ligamentous, or soft tissue injury, followup with MRI may be of benefit if and when clinically indicated.

Impression By: DR.SMIJA3 - James C Smith, MD

**Imaging Statement**
Radiographic studies reviewed and considered in the medical decision-making.

## Re-Evaluation & MDM

### Re-Evaluation/Progress #1
**Text/Dict Note**
Since receiving medications pain as relieved mildly.  ROM improved.  Amb with slow gait. Will discharge with Fioricet, muscle relaxers.  Encouraged patient to see a pain specialist at 1st available appointment for further evaluation of possible changing of medications/frequency to help with new injuries.  Strict return precautions reiterated. Encouraged to take medications as directed and drink plenty of fluids.  Discussed had a

Patient: ROOP,SAMANTHA JEAN
Unit#:D001782628
Date: 07/15/19
Acct#:D35059321545

take-home medications safely. Patient agreement with treatment plan, states verbal
understanding all instructions.

## ED Course
### Medication(s) Ordered
Medication(s) Ordered:
### Autonomic Drugs

| Medication | Dose | Sig/Sch Route | Start time Stop Time | Status | Last Admin |
|---|---|---|---|---|---|
| Methocarbamol | 750 MG | X1 (ED) STA PO | 07/15 1859 07/15 1900 | DC | 07/15 1922 |

### Central Nervous System Agents

| Medication | Dose | Sig/Sch Route | Start time Stop Time | Status | Last Admin |
|---|---|---|---|---|---|
| Acetaminophen/ Butalbital/Caffeine | 2 UDTAB | X1 (ED) STA PO | 07/15 2006 07/15 2007 | DC | 07/15 2009 |
| Hydromorphone HCl | 2 MG | X1 (ED) STA IM | 07/15 1924 07/15 1925 | DC | 07/15 1925 |
| Hydromorphone HCl | 2 MG | X1 (ED) STA IV | 07/15 1858 07/15 1859 | CAN | |
| Ketorolac Tromethamine | 60 MG | X1 (ED) STA IM | 07/15 1858 07/15 1859 | DC | 07/15 1923 |

### Hormones And Synthetic Substit

| Medication | Dose | Sig/Sch Route | Start time Stop Time | Status | Last Admin |
|---|---|---|---|---|---|
| Prednisone | 60 MG | X1 (ED) STA PO | 07/15 1858 07/15 1859 | DC | 07/15 1923 |

## Differential Diagnosis
**Differential Diagnosis** Closed head injury, Concussion, Contusion, C-spine fracture,
Fracture(s), Spine injury, Sprain, Strain

## Patient Discharge & Departure

## Vital Signs/Condition
### Vital Signs
First Documented:

| | Result | Date Time |
|---|---|---|

Patient: ROOP,SAMANTHA JEAN
Unit#:D001782628
Date: 07/15/19
Acct#:D35059321545

| Pulse Ox | 99 | 07/15 1850 |
|---|---|---|
| B/P | 120/84 | 07/15 1850 |
| B/P Mean | 96 | 07/15 1850 |
| O2 Delivery | Room air | 07/15 1850 |
| Temp | 99.1 | 07/15 1850 |
| Pulse | 80 | 07/15 1850 |
| Resp | 14 | 07/15 1850 |

Last Documented:

| | Result | Date Time |
|---|---|---|
| Pulse Ox | 99 | 07/15 1850 |
| B/P | 120/84 | 07/15 1850 |
| B/P Mean | 96 | 07/15 1850 |
| O2 Delivery | Room air | 07/15 1850 |
| Temp | 99.1 | 07/15 1850 |
| Pulse | 80 | 07/15 1850 |
| Resp | 14 | 07/15 1850 |

All vital signs available at the time of this entry have been reviewed.

**Condition** Stable

## Clinical Impression
**Clinical Impression**
**Primary Impression:** Back pain
**Secondary Impressions:** Concussion, Headache, Neck muscle spasm

## Disposition Decision
**Discharge**
   )( **Discharged to Home** Yes
   )( **Time** 2017
   )( **Date** 07/15/19

## Discharge/Care Plan
**Counseled Regarding** Diagnosis, Imaging studies, Prescriptions, Need for follow-up, When to return to ED
 **Discharge Note**
I have spoken with the patient and/or caregivers. I have explained the patient's condition, diagnoses and treatment plan based on the information available to me at this time. I have answered the patient's and/or caregiver's questions and addressed any concerns. The patient and/or caregivers have as good an understanding of the patient's diagnosis, condition and treatment plan as can be expected at this point. The vital signs have been stable. The patient's

**JA717**

condition is stable and appropriate for discharge from the emergency department.

The patient will pursue further outpatient evaluation with the primary care physician or other designated or consulting physician as outlined in the discharge instructions. The patient and/or caregivers are agreeable to this plan of care and follow-up instructions have been explained in detail. The patient and/or caregivers have received these instructions in written format and have expressed an understanding of the discharge instructions. The patient and/or caregivers are aware that any significant change in condition or worsening of symptoms should prompt an immediate return to this or the closest emergency department or a call to 911.

## Bantle,John Albert 07/20/19 2107:
## HPI-MVC

### General
**Initial Greet Date/Time** 07/15/19 1831

### Physical Exam

### Vital Signs
Vital Signs

### Interpretation & Diagnostics

### Lab Results Interpretation
Results

### Patient Discharge & Departure

### Vital Signs/Condition
Vital Signs

### Supervising Physician Note
MidLv Saw Pt Alone
I have reviewed the PA/NP's note and plan of care. I was available for consultation as needed at all times during the patient's visit in the emergency department. I agree with the clinical impression, plan and disposition.

**JA718**

Patient: ROOP,SAMANTHA JEAN
Unit#:D001782628
Date: 07/15/19
Acct#:D35059321545

Electronically Signed by Gardella,Karen J  NP on 07/20/19 at 1435
Electronically Signed by Bantle,John A  MD on 07/20/19 at 2109

RPT #: 0715-1869
***END OF REPORT***

**JA719**

ROOP_P5000022

Patient: ROOP,SAMANTHA JEAN          Age/Sex: 34/F           Acct No: D35059321545
ED Provider: Bantle,John A  MD, 2hcaActive                   Unit No: D001782628

## MODE OF ARRIVAL

WALK IN

## GENERAL DATA

ED Physician: Bantle,John A  MD, 2hcaActive       Arrival Date/Time: 07/15/19 - 1825
Practitioner: Gardella,Karen J, 2hcaPrvNoM        Triage Date/Time:  07/15/19 - 1850
Nurse: PRATHER,ALISSA, RN                         Date of Birth:

Stated Complaint: INJURY - ACCIDENT
Chief Complaint: Neck Pain/Injury                 Priority: 3
Chief Complaint History:
     07/15/19  1825 Recept-Chg Chief c/o
               1850 Neck Pain/Injury
               1854 Neck Pain/Injury
Status Event History:
     07/15/19  1825 Reception
               1854 Triaged
               2023 Departed
               2037 Off Tracker
Staff History:
     ED Physician:
     07/15/19  1859 Bantle,John A  MD, 2hcaActive
     Practitioner:
     07/15/19  1831 Gardella,Karen J, 2hcaPrvNoM
     Nurse:
     07/15/19  1855 PRATHER,ALISSA, RN

## ROOM HISTORY

     1      1839  J.RTAW      DNURDBR     ROSS,DAVID B.
     2      1855  J.RTA2      DNURAP11    PRATHER,ALISSA
     3      2037              DNURAP11    PRATHER,ALISSA
     4      2037              DNURAP11    PRATHER,ALISSA

## ALLERGIES

| Allergy/Adverse Reaction | Type/Category | Severity | Date | Ver |
|---|---|---|---|---|
| Penicillins | Allergy/Drug | Unknown | 07/30/12 | Y |
| Reaction: HAIR LOSS | | | | |
| metoprolol | Allergy/Drug | Unknown | 01/14/13 | Y |
| Reaction: PASSED OUT | | | | |
| latex | Allergy/Drug | Mild | 10/15/11 | Y |
| Reaction: HIVES | | | | |

## ASSESSMENTS

Rapid Initial Assessment

Occurred                                Recorded
Date    Time User                       Date    Time User
07/15/19 1850 PRATHER,ALISSA, RN        07/15/19 1854 PRATHER,ALISSA, RN

          - - RAPID INITIAL ASSESSMENT - -
 First Point of Contact: No

ROOP_P5000023

```
Patient: ROOP,SAMANTHA JEAN              Age/Sex: 34/F          Acct No: D35059321545
ED Provider: Bantle,John A  MD, 2hcaActive                      Unit No: D001782628
```

Enter/Edit Allergies: Yes
Arrived by: WI
Subjective assessment:
PT STATES SHE WAS IN A MVC X8 DAYS AGO. PT STATES SHE WAS
THE DRIVER IN THE CAR WAS HIT IN THE FRONT BUMPER. AIRBAGS
WERE DEPLOYED AND THERE WAS A POSITIVE LOC FOR AN UNKNOWN
AMOUNT OF TIME. PT DENIES CARE FROM EMS WHEN ARRIVED AT
SCENE. PT STATES SHE IS CURRENTLY HAVING MIDLINE UPPER BACK
PAIN AND NECK PAIN. PT STATES SHE BEGAN VOMITING THIS
MORNING. PT IS CURRENTLY ON A PAIN REGIME FOR CHRONIC LOWER
BACK PAIN.
PMH: CHRONIC BACK PAIN
POSTIVE SEATBELTS PER PATIENT
Objective assessment:
A/OX4 RESPIRATIONS EVEN AND UNLABORED SKIN WARM AND DRY
NO DEFORMITY NOTED IN TRIAGE. PT HAS EQUAL STRENGTH IN
UE. PT IS AMBULATORY WITH A STEADY GAIT
Smoking status for patients 13 years old or older: Unknown,if ever smoked
Flowsheet: Yes
Chief Complaint: Neck Pain/Injury
Priority: ESI 3 / Urgent
ESP? N
Facility ESP status:
Not ESP Enabled
                -
- RAPID FLOWSHEET - -
        -
- VITAL SIGNS - -
Temperature F: 99.1
Temperature source: Oral
Pulse: 80
Pulse source: Monitor
Respiratory rate: 14
Blood pressure: 120/84
Blood pressure source: Monitor
Mean arterial pressure: 96
Vital signs position: Sitting
SPO2 %: 99
Oxygen delivery devices: Room air
                -
- HEIGHT/WEIGHT - -
Height ft: 5
Height in: 5
Height source: Stated/Reported
Weight kg: 65.909
Weight source: Stated/Reported
BMI calculated: 24.2
                -
- BILATERAL BLOOD PRESSURES - -
                -
- SEVERE SEPSIS SCREENING - -
Temperature: No
Heart rate: No
Respirations: No
WBC results:
No results past 48 hrs
Band results:

**JA721**

ROOP_P5000024

```
Patient: ROOP,SAMANTHA JEAN              Age/Sex: 34/F           Acct No: D35059321545
ED Provider: Bantle,John A  MD, 2hcaActive                      Unit No: D001782628
```

No results past 48 hrs
 WBC/Bands: No
 If yes to 2 or more of above, proceed to next section: 0

Neck Pain/Injury

| Occurred | | | Recorded | | |
|---|---|---|---|---|---|
| Date | Time | User | Date | Time | User |
| 07/15/19 | 1854 | PRATHER,ALISSA, RN | 07/15/19 | 1854 | PRATHER,ALISSA, RN |

          - - NECK PAIN INJURY - -
 Mechanism of injury: History of MVC
 Presenting signs/symptoms: Nausea, BACK PAIN, NECK PAIN
 Patient qualifies for Acute Coronary Syndrome (ACS) warning: No
 Initial onset of signs/symptoms: 1-2 weeks ago
 Symptoms frequency: Constant
 Description of injury:
MVC DRIVER AIRBAGS DEPLOED POTISITVE LOC.
 Pain/injury location: Neck posterior
 Upper extremities equal and strong bilaterally: Yes
 Lower extremities equal and strong bilaterally: Yes
 Gait, strength, balance: Appropriate

Physical Findings

| Occurred | | | Recorded | | |
|---|---|---|---|---|---|
| Date | Time | User | Date | Time | User |
| 07/15/19 | 1854 | PRATHER,ALISSA, RN | 07/15/19 | 1855 | PRATHER,ALISSA, RN |

          - - PHYSICAL FINDINGS - -
 Musculoskeletal WDP: No
 Musculoskeletal documented via chief complaint: Yes

Severe Sepsis Screening

| Occurred | | | Recorded | | |
|---|---|---|---|---|---|
| Date | Time | User | Date | Time | User |
| 07/15/19 | 1855 | PRATHER,ALISSA, RN | 07/15/19 | 1855 | PRATHER,ALISSA, RN |

          - - SEVERE SEPSIS SCREENING - -
 Temperature: No
 WBC results:
No results past 48 hrs
 Heart rate: No
 Band results:
No results past 48 hrs
 Respirations: No
 WBC/Bands: No
 If yes to 2 or more of above, proceed to next section: 0

Disposition-DC,TX,ADM,LPT

| Occurred | | | Recorded | | |
|---|---|---|---|---|---|
| Date | Time | User | Date | Time | User |
| 07/15/19 | 2023 | PRATHER,ALISSA, RN | 07/15/19 | 2023 | PRATHER,ALISSA, RN |

          - - DISPOSITION - -

ROOP_P5000025

RUN DATE: 07/17/19        CHIPPENHAM/JOHNSTON-WILLIS EDM **LIVE**              PAGE 4
RUN TIME: 1254                    EMERGENCY PATIENT RECORD
RUN USER: HPF.FEED

Patient: ROOP,SAMANTHA JEAN              Age/Sex: 34/F              Acct No: D35059321545
ED Provider: Bantle,John A  MD, 2hcaActive                          Unit No: D001782628

Patient disposition: Discharge
Disposition Category: Discharged
Chief Complaint: Neck Pain/Injury
Patient will remain injury free while patient is in restraint or seclusion: Yes
Expected outcome of chief complaint: Stabilized/maintained
Actual outcome of chief complaint: Stabilized/maintained
- - DISCHARGE ASSESSMENT - -
Discharge information provided: Instructions/prescription
Discharge instructions given to and verbalized understanding by:
PATIENT
Patient discharged from ED by provider and not seen by RN: No
Patient left to: Home
Patient left with: Companion
Mode patient left: Ambulatory
Patient left via: Private vehicle
===INFECTION===
===NEW ORGAN DYSFUNCTION within past 48 hours===
        -
- PATIENT/FAMILY TEACHING - -
Primary learners preferred spoken language: ENG
Primary learners preferred written language: ENG

================================ TREATMENTS ================================

First Point of Contact

Occurred                              Recorded
Date     Time User                   Date     Time User
07/15/19 1827 STRICKLAND,KATLYN      07/15/19 1829 STRICKLAND,KATLYN

        - - FIRST POINT OF CONTACT - -
Is patient present and able to complete the screening for infection: Yes
Have you or a close contact traveled outside the US in the last 3 weeks: No
Risk factors for C.diff: None
Have you ever had TB or a positive TB skin test: No
Recent close contact with a person who has TB or influenza like illness: No
Fever greater than 100.4 F or 38.0 C: Not in the last 7 days
Cough not related to allergy or COPD: Not in the last 7 days
Sore throat: Not in the last 7 days
Night sweats: Yes - in the last 7 days
Unexplained weight loss: Not in the last 7 days
Fatigue: Yes - in the last 7 days
Body aches: Not in the last 7 days
Rash: Not in the last 7 days
Nasal congestion unrelated to allergies/sinus infections: Not in the last 7 days
Point of entry screening status:
Negative TB Risk
Negative Respiratory Risk
Negative C difficile Risk


Teaching Education

Occurred                              Recorded
Date     Time User                   Date     Time User
07/15/19 2020 PRATHER,ALISSA, RN     07/15/19 2021 PRATHER,ALISSA, RN

**JA723**

ROOP_P5000026

Patient: ROOP,SAMANTHA JEAN               Age/Sex: 34/F              Acct No: D35059321545
ED Provider: Bantle,John A  MD, 2hcaActive                           Unit No: D001782628

- - Patient/Family Teaching - -
Primary learner: Patient
Other learner: Family
Readiness to learn: Asks questions, Cooperative
Barriers to communication/learning: None
Primary learners preferred spoken language: ENG
Primary learners preferred written language: ENG
Method of education: Verbal discussion
Patient rating of current knowledge level: Good
Patient/Family education subject items: Medications, Safety, ED after care/follow up
Learner(s) verbalized understanding and/or return demonstration of items: Yes
Pt/Family encouraged verbalize anxieties and reassurance given: Yes
Pt/Family/Significant other informed of condition and treatment plan: Yes
Pt/Family/Significant other encouraged give input and participate in tx: Yes

### DEPARTURE INFORMATION

Primary Impression: MVC (motor vehicle collision)
Secondary Impressions:
Neck muscle spasm
Concussion
Back pain
Headache
Disposition: ROUTINE HOME/SELF CARE                Departure Date/Time: 07/15/19 - 2023
Comment:
Condition: Stable

Referrals:

Pt Instructions:

Departure Forms:

Reminder: Neck Pain/Injury                         Status: Pending
Based on Date: 07/15/19
Contact Information:        Home Phone:
                           Other Phone:
                             E-mail: DECLINED
                           Alternate:

### ADDITIONAL INSTRUCTIONS

### WITHIN DEFINED PARAMETERS

~~  ASSESSMENT PARAMETERS  ~~

These are the definitions of Within Defined Parameters by Body System

NEUROLOGICAL                           EENT
 - Alert & Oriented X 4                 - Eyes - Clear, no tearing or redness
 - Pupils equal                         - Ears - No complaint of hearing difficulty,
 - Speech clear and appropriate for age          loss of hearing, or change in
 - Moves all extremities                          hearing, pain free, no drainage
 - No paralysis                         - Nasal - Breathes freely through both nares

**JA724**

ROOP_P5000027

```
Patient: ROOP,SAMANTHA JEAN            Age/Sex: 34/F            Acct No: D35059321545
ED Provider: Bantle,John A  MD, 2hcaActive                     Unit No: D001782628
```

- Steady gait
- Ambulates independently

RESPIRATORY
- No respiratory distress
- No cough
- No O2 or assistive devices
- No nasal flaring or pursed lip
  breathing
- Respirations even & unlabored
- Skin pink & warm to touch

CIRCULATORY
- Oral mucosa pink and moist
- Skin color appropriate to ethnic color
- Denies sensory complaints
- No edema noted

GASTROINTESTINAL
- Denies GI complaints

INTEGUMENTARY
- Skin warm, dry & intact
- No complaints of lesions, rash, wounds,
  bruises, petechiae or abrasions

- Throat - No hoarseness or stated soreness,
  no cough

CARDIAC
- No stated calf tenderness
- No history of pacemaker or implanted
  defibrillator
- Denies current cardiac complaint
- Skin pink & warm to touch - no cyanosis,
  mottling, diaphoresis or flushing of skin

MUSCULOSKELETAL
- Moves all extremities
- Ambulates independently

GENITO-URINARY
- Denies GU complaints

PSYCHOSOCIAL
- With regards to cultural influences:
  mood/affect is appropriate
- Patient demonstrates effective coping
  skills/patterns for situation

These are the definitions of Within Defined Parameters for the Nutritional and Functional
Screenings:

NUTRITIONAL
- No swallowing/chewing impairments
- No nausea and/or vomiting and/or
  diarrhea for 5 or more days
- No reported unintentional weight loss
  > 15 lbs in last 3 months
- No reported decrease in intake > 25%
  of usual in last two weeks

FUNCTIONAL
- No unexplained alteration in
  movement/mobility in last four weeks
- No recent limitation performance of ADLs
- No recent alteration in ADLs that require
  assistance

This is the definition for the evidence of Physical and/or Psychological Abuse question:

                    ABUSE HISTORY TO INCLUDE, BUT NOT LIMITED TO:
PT DOES NOT REPORT/NO EVIDENCE OF ANY OF THE FOLLOWING: abuse/neglect, Hx. of abuse/neglect,
withdrawn/fearful behavior, Unexplained or suspicious bruises/wounds, Patient/Caregiver
story changes, Defensive about injuries, Undernourished despite good appetite,
Recurrent/Suspicious injuries, Fear of return to previous arrangements, Injuries do not
match event history.

```
                                        MAR
```

ROOP_P5000028

Patient: ROOP,SAMANTHA JEAN              Age/Sex: 34/F              Acct No: D35059321545
ED Provider: Bantle,John A  MD, 2hcaActive                          Unit No: D001782628

Medication
              Sch Date-Time  Ordered Dose  Admin Dose
              Doc Date-Time  Given - Reason          Site      User
              Override Comment
KETOROLAC TROMETHAMINE 60 MG/2 ML SYR (TORADOL) IM/X1 (ED)/STA
              07/15/19-1858  60 MG          60 MG
              07/15/19-1923  Y                       LUD       PRIMEAU,RYAN
              Difference between amount dispensed
              and amount administered was discarded.
                         Administering for pain: Yes
                                                                 (End)
                  Pain details:

                  Pain scale utilized:: Verbal numeric
                  Numeric pain scale:: Severe pain-8
                  Pain intensity::     8
                  Most common side effects reviewed with patient, family, or caregiver?
                  :: TORAID302:nausea/diarrhea, headache, increased BP

predniSONE 20 MG UDTAB (predniSONE) PO/X1 (ED)/STA
              07/15/19-1858  60 MG          60 MG
              07/15/19-1923  Y                                 PRIMEAU,RYAN

METHOCARBAMOL 750 MG UDTAB (METHOCARBAMOL) PO/X1 (ED)/STA
              07/15/19-1859  750 MG         750 MG
              07/15/19-1922  Y                                 PRIMEAU,RYAN
                         Administering for pain: Yes
                                                                 (End)
                  Pain details:

                  Pain scale utilized:: Verbal numeric
                  Numeric pain scale:: Severe pain-8
                  Pain intensity::     8
                  Most common side effects reviewed with patient, family, or caregiver?
                  :: METHOT7504:dizziness, headache, drowsiness

HYDROmorphone HCL 2 MG/ML SYR (HYDROmorphone 2MG/ML) IM/X1 (ED)/STA
              07/15/19-1924  2 MG           2 MG
              07/15/19-1925  Y                       RUD       PRIMEAU,RYAN
              Difference between amount dispensed
              and amount administered was discarded.
                         Administering for pain: Yes
                                                                 (End)
                  Pain details:

                  Pain scale utilized:: Verbal numeric
                  Numeric pain scale:: Severe pain-8
                  Pain intensity::     8
                  Most common side effects reviewed with patient, family, or caregiver?
                  :: HYDRID21 1:Dizziness, Sedation, nausea/vomiting, Constipation

APAP/CAFFEIN/BUTALBITAL 1 UDTAB UDTAB (FIORICET TABLET) PO/X1 (ED)/STA
              07/15/19-2006  2 UDTAB        2 UDTAB
              07/15/19-2009  Y                                 LANGLEY,LELAND K
                         Administering for pain: Yes
                                                                 (End)
                  Pain details:

## JA726

```
RUN DATE: 07/17/19        CHIPPENHAM/JOHNSTON-WILLIS EDM **LIVE**              PAGE 8
RUN TIME: 1254                EMERGENCY PATIENT RECORD
RUN USER: HPF.FEED
```

```
Patient: ROOP,SAMANTHA JEAN              Age/Sex: 34/F              Acct No: D35059321545
ED Provider: Bantle,John A  MD, 2hcaActive                          Unit No: D001782628
```

Medication
```
        Sch Date-Time  Ordered Dose  Admin Dose
        Override Comment
              Pain scale utilized:: Verbal numeric
              Numeric pain scale:: Moderate pain-5
              Pain intensity::   5
              Most common side effects reviewed with patient, family, or caregiver?
              :: ACETCT1002:Dizziness, Drowsiness,nausea/vomiting, Constipation
```

### ED Dashboard Snapshot

```
Arrival Date:  07/15/19     Triage Date:  07/15/19    In bed Date:  07/15/19
     Time:  1825                  Time:  1850               Time:  1839
                           Triage level:  3

   Mid-Level Practitioner:  GARKA
              MD greet Date:  07/15/19
                      Time:  1831
            Disposition Date:  07/15/19
                      Time:  2017
     Physically leave Date:  07/15/19
                      Time:  2023
               Elapse time:  0:06
                     Reason:
     Disposition Category:  1
           Primary Nurse:  DNURAP11
```

### Snapshot of ALL ORDERS-not CNC

| Ordered | | Order | Ordering Provider | | E-Signed |
|---------|---|-------|-------------------|---|----------|
| 07/15/19 | 1856 | CT HEAD WO IV CON | Gardella,Karen J | NP | Yes |
| 07/15/19 | 1856 | CT C-SPINE WO IV CON | Gardella,Karen J | NP | Yes |
| 07/15/19 | 1856 | CT T-SPINE WO IV CON | Gardella,Karen J | NP | Yes |
| 07/15/19 | 1856 | CT L-SPINE WO IV CON | Gardella,Karen J | NP | Yes |
| 07/15/19 | 1859 | TORADOL | Gardella,Karen J | NP | Yes |
| 07/15/19 | 1859 | predniSONE | Gardella,Karen J | NP | Yes |
| 07/15/19 | 1859 | METHOCARBAMOL | Gardella,Karen J | NP | Yes |
| 07/15/19 | 1924 | HYDROmorphone 2MG/ML | Gardella,Karen J | NP | Yes |
| 07/15/19 | 2006 | FIORICET TABLET | Gardella,Karen J | NP | Yes |

**JA727**

ROOP_P500030

PATIENT:   ROOP,SAMANTHA JEAN          A/S: 34 F        ADMIT:     07/15/19
ACCOUNT NO: D35059321545               LOC: D.JERFT     DISCH/DEP: 07/15/19
                                       RM:              STATUS:    ER
ATTEND DR: Bantle,John A  MD            BD:              UNIT NO:   D001782628
REPORT STATUS: FINAL

---

Order Date: 07/15/19                        ──Service──
Category   Procedure Name              Order Number  Date     Time Pri Qty Ord Source Status  Ordered By
CT         CT HEAD WO IV CON           20190715-0221 07/15/19 1856 S        E             CMP     GARKA
Other Provider :            Sig Lvl Provider :

  .
  Is Patient Pregnant:                 NO
  Reason for Exam:                     MVC, struck head, + LOC
  Comment:                             RmJ.RTA2
  Cont.:
  Cont2:

  Order's Audit Trail of Events
1   07/15/19 1856 NP.GARKA    Order ENTER in EDM/POM
2   07/15/19 1856 NP.GARKA    Ordering Doctor: Gardella,Karen J  NP
3   07/15/19 1856 NP.GARKA    Order Source: EPOM
4   07/15/19 1856 NP.GARKA    Signed by Gardella,Karen J  NP
5   07/15/19 1857 interface   order's status changed from TRANS to LOGGED by RAD
6   07/15/19 1911 interface   order's status changed from LOGGED to IN PRO by RAD
7   07/15/19 1932 interface   order's status changed from IN PRO to COMP by RAD

        Electronically signed by Gardella,Karen J  NP on 07/15/19 at 1856

---

Order Date: 07/15/19                        ──Service──
Category   Procedure Name              Order Number  Date     Time Pri Qty Ord Source Status  Ordered By
CT         CT C-SPINE WO IV CON        20190715-0222 07/15/19 1856 S        E             CMP     GARKA
Other Provider :            Sig Lvl Provider :

  .
  Is Patient Pregnant:                 NO
  Reason for Exam:                     MVC, torticollis, low CSP pain
  Comment:                             RmJ.RTA2
  Cont.:
  Cont2:

  Order's Audit Trail of Events
1   07/15/19 1856 NP.GARKA    Order ENTER in EDM/POM
2   07/15/19 1856 NP.GARKA    Ordering Doctor: Gardella,Karen J  NP
3   07/15/19 1856 NP.GARKA    Order Source: EPOM
4   07/15/19 1856 NP.GARKA    Signed by Gardella,Karen J  NP
5   07/15/19 1857 interface   order's status changed from TRANS to LOGGED by RAD
6   07/15/19 1911 interface   order's status changed from LOGGED to IN PRO by RAD
7   07/15/19 1932 interface   order's status changed from IN PRO to COMP by RAD

        Electronically signed by Gardella,Karen J  NP on 07/15/19 at 1856

---

Order Date: 07/15/19                        ──Service──
Category   Procedure Name              Order Number  Date     Time Pri Qty Ord Source Status  Ordered By
CT         CT T-SPINE WO IV CON        20190715-0223 07/15/19 1856 S        E             CMP     GARKA
Other Provider :            Sig Lvl Provider :

PERMANENT MEDICAL RECORD COPY

**JA728**

```
RUN DATE: 07/17/19                    MEDITECH FACILITY: COCCC                      PAGE 2
RUN TIME: 0100                        IDEV - Discharge Report
RUN USER: HPF.FEED
```

```
PATIENT:  ROOP,SAMANTHA JEAN          A/S: 34 F        ADMIT:    07/15/19
ACCOUNT NO: D35059321545              LOC: D.JERFT     DISCH/DEP: 07/15/19
                                      RM:              STATUS:   ER
ATTEND DR: Bantle,John A  MD          BD:              UNIT NO:  D001782628
REPORT STATUS: FINAL
```

Is Patient Pregnant:              NO
Reason for Exam:                  MVC, midline back pain
Comment:                          RmJ.RTA2
Cont.:
Cont2:

Order's Audit Trail of Events
1   07/15/19 1856 NP.GARKA   Order ENTER in EDM/POM
2   07/15/19 1856 NP.GARKA   Ordering Doctor: Gardella,Karen J  NP
3   07/15/19 1856 NP.GARKA   Order Source: EPOM
4   07/15/19 1856 NP.GARKA   Signed by Gardella,Karen J  NP
5   07/15/19 1857 interface  order's status changed from TRANS to LOGGED by RAD
6   07/15/19 1911 interface  order's status changed from LOGGED to IN PRO by RAD
7   07/15/19 2004 interface  order's status changed from IN PRO to COMP by RAD

          Electronically signed by Gardella,Karen J  NP on 07/15/19 at 1856

---

Order Date: 07/15/19                        ──Service──
Category   Procedure Name          Order Number  Date     Time Pri Qty Ord Source Status  Ordered By
CT         CT L-SPINE WO IV CON    20190715-0224 07/15/19 1856 S       E           CMP     GARKA
Other Provider :          Sig Lvl Provider :

Is Patient Pregnant:              NO
Reason for Exam:                  MVC, midline back pain
Comment:                          RmJ.RTA2
Cont.:
Cont2:

Order's Audit Trail of Events
1   07/15/19 1856 NP.GARKA   Order ENTER in EDM/POM
2   07/15/19 1856 NP.GARKA   Ordering Doctor: Gardella,Karen J  NP
3   07/15/19 1856 NP.GARKA   Order Source: EPOM
4   07/15/19 1856 NP.GARKA   Signed by Gardella,Karen J  NP
5   07/15/19 1857 interface  order's status changed from TRANS to LOGGED by RAD
6   07/15/19 1912 interface  order's status changed from LOGGED to IN PRO by RAD
7   07/15/19 1954 interface  order's status changed from IN PRO to COMP by RAD

          Electronically signed by Gardella,Karen J  NP on 07/15/19 at 1856

---

Order Date: 07/15/19                        ──Service──
Category   Procedure Name          Order Number  Date     Time Pri Qty Ord Source Status  Ordered By
MED        MEDICATION              20190715-6533 07/15/19 1858 S       E           CNC     GARKA
Other Provider :          Sig Lvl Provider :
RX: J14473713                       Start: 07/15/19 1858    STA CNC
                                    Stop:  07/15/19 1859

      HYDROmorphone Inj (Dilaudid Inj)
      Dose: 2 MG
      Route: IV                 Direction: X1 (ED)
```

PERMANENT MEDICAL RECORD COPY

**JA729**

ROOP_P5000032

RUN DATE: 07/17/19
RUN TIME: 0100
RUN USER: HPF.FEED

MEDITECH FACILITY: COCCC
IDEV - Discharge Report

PAGE 3

```
PATIENT:   ROOP.SAMANTHA JEAN        A/S: 34 F      ADMIT:     07/15/19
ACCOUNT NO: D35059321545             LOC: D.JERFT   DISCH/DEP: 07/15/19
                                     RM:            STATUS:    ER
ATTEND DR: Bantle,John A  MD         BD:            UNIT NO:   D001782628
REPORT STATUS: FINAL
```

Order's Audit Trail of Events
```
1   07/15/19 1859 NP.GARKA    Order ENTER in EDM/POM
2   07/15/19 1859 NP.GARKA    Ordering Doctor: Gardella.Karen J  NP
3   07/15/19 1859 NP.GARKA    Order Source: EPOM
4   07/15/19 1859 NP.GARKA    Signed by Gardella.Karen J  NP
5   07/15/19 1859 SCHEDULER   DISCONTINUE in PHA
6   07/15/19 1910 DNURAP11    order acknowledged
7   07/15/19 1924 NP.GARKA    Order DC in EDM/POM
8   07/15/19 1924 NP.GARKA    Ordering Doctor: Gardella.Karen J  NP
9   07/15/19 1924 NP.GARKA    Order Source: EPOM
10  07/15/19 1924 NP.GARKA    Order's Rx has been cancelled.
11  07/15/19 1924 NP.GARKA    Signed by Gardella.Karen J  NP
12  07/15/19 1924 interface   Order cancelled by PHA
13  07/15/19 1924 NP.GARKA    CANCEL
14  07/15/19 1924 NP.GARKA    For: 07/15/19 - 1858
```

Cancel comment: Cancelled by Pharmacy
Electronically signed by Gardella.Karen J  NP on 07/15/19 at 1924

---

```
Order Date: 07/15/19                              —Service—
Category  Procedure Name       Order Number  Date      Time Pri Qty Ord Source Status  Ordered By
MED       MEDICATION           20190715-6534 07/15/19 1858 S       E          CMP     GARKA
Other Provider :              Sig Lvl Provider :
RX: J14473714                          Start: 07/15/19  1858    STA CMP
                                       Stop:  07/15/19  1859
```

Ketorolac Inj (Toradol Inj)
Dose: 60 MG
Route: IM                  Direction: X1 (ED)

Order's Audit Trail of Events
```
1   07/15/19 1859 NP.GARKA    Order ENTER in EDM/POM
2   07/15/19 1859 NP.GARKA    Ordering Doctor: Gardella.Karen J  NP
3   07/15/19 1859 NP.GARKA    Order Source: EPOM
4   07/15/19 1859 NP.GARKA    Signed by Gardella.Karen J  NP
5   07/15/19 1859 NP.GARKA    VIEWED LAB TEST RESULTS
6   07/15/19 1859 NP.GARKA    Test Group PHA
7   07/15/19 1859 NP.GARKA    No results available.
8   07/15/19 1859 SCHEDULER   DISCONTINUE in PHA
9   07/15/19 1910 DNURAP11    order acknowledged
```

Electronically signed by Gardella.Karen J  NP on 07/15/19 at 1859

---

```
Order Date: 07/15/19                              —Service—
Category  Procedure Name       Order Number  Date      Time Pri Qty Ord Source Status  Ordered By
MED       MEDICATION           20190715-6535 07/15/19 1858 S       E          CMP     GARKA
Other Provider :              Sig Lvl Provider :
RX: J14473715                          Start: 07/15/19  1858    STA CMP
                                       Stop:  07/15/19  1859
```

predniSONE  Tab (Deltasone  Tab)
Dose: 60 MG
Route: PO                  Direction: X1 (ED)

PERMANENT MEDICAL RECORD COPY

JA730

ROOP_P5000033

```
PATIENT:   ROOP.SAMANTHA JEAN        A/S: 34 F        ADMIT:     07/15/19
ACCOUNT NO: D35059321545             LOC: D.JERFT     DISCH/DEP: 07/15/19
                                     RM:              STATUS:    ER
ATTEND DR: Bantle,John A  MD         BD:              UNIT NO:   D001782628
REPORT STATUS: FINAL
```

Order's Audit Trail of Events
```
1   07/15/19 1859 NP.GARKA   Order ENTER in EDM/POM
2   07/15/19 1859 NP.GARKA   Ordering Doctor: Gardella,Karen J  NP
3   07/15/19 1859 NP.GARKA   Order Source: EPOM
4   07/15/19 1859 NP.GARKA   Signed by Gardella,Karen J  NP
5   07/15/19 1859 SCHEDULER  DISCONTINUE in PHA
6   07/15/19 1910 DNURAP11   order acknowledged
```

            Electronically signed by Gardella,Karen J  NP on 07/15/19 at 1859

---

```
Order Date: 07/15/19                    ──Service──
Category   Procedure Name            Order Number   Date      Time Pri Qty Ord Source Status  Ordered By
MED        MEDICATION                20190715-6536 07/15/19 1859 S      E       CMP    GARKA
Other Provider :              Sig Lvl Provider :
RX: J14473716                          Start: 07/15/19  1859     STA CMP
                                       Stop: 07/15/19  1900

    Methocarbamol  Tab (Robaxin  Tab)
    Dose: 750 MG
    Route: PO                 Direction: X1 (ED)
```

Order's Audit Trail of Events
```
1   07/15/19 1859 NP.GARKA   Order ENTER in EDM/POM
2   07/15/19 1859 NP.GARKA   Ordering Doctor: Gardella,Karen J  NP
3   07/15/19 1859 NP.GARKA   Order Source: EPOM
4   07/15/19 1859 NP.GARKA   Signed by Gardella,Karen J  NP
5   07/15/19 1900 SCHEDULER  DISCONTINUE in PHA
6   07/15/19 1910 DNURAP11   order acknowledged
```

            Electronically signed by Gardella,Karen J  NP on 07/15/19 at 1859

---

```
Order Date: 07/15/19                    ──Service──
Category   Procedure Name            Order Number   Date      Time Pri Qty Ord Source Status  Ordered By
MED        MEDICATION                20190715-6638 07/15/19 1924 S      E       CMP    GARKA
Other Provider :              Sig Lvl Provider :
RX: J14473746                          Start: 07/15/19  1924     STA CMP
                                       Stop: 07/15/19  1925

    HYDROmorphone Inj (Dilaudid Inj)
    Dose: 2 MG
    Route: IM                 Direction: X1 (ED)
```

Order's Audit Trail of Events
```
1   07/15/19 1924 NP.GARKA   Order ENTER in EDM/POM
2   07/15/19 1924 NP.GARKA   Ordering Doctor: Gardella,Karen J  NP
3   07/15/19 1924 NP.GARKA   Order Source: EPOM
4   07/15/19 1924 NP.GARKA   Signed by Gardella,Karen J  NP
5   07/15/19 1925 SCHEDULER  DISCONTINUE in PHA
6   07/15/19 1925 DNURRP6    order acknowledged
```

            Electronically signed by Gardella,Karen J  NP on 07/15/19 at 1924

---

PERMANENT MEDICAL RECORD COPY

## JA731

ROOP_PS000034

```
PATIENT:   ROOP,SAMANTHA JEAN         A/S: 34 F          ADMIT:      07/15/19
ACCOUNT NO: D35059321545              LOC: D.JERFT       DISCH/DEP: 07/15/19
                                      RM:                STATUS:     ER
ATTEND DR: Bantle,John A  MD          BD:                UNIT NO:    D001782628
REPORT STATUS: FINAL
```

Order Date: 07/15/19                        ——Service——
  Category    Procedure Name              Order Number  Date    Time Pri Qty Ord Source Status  Ordered By
MED        MEDICATION                    20190715-6803 07/15/19 2006 S      E         CMP    GARKA
  Other Provider :            Sig Lvl Provider :
RX: J14473843                              Start: 07/15/19  2006     STA CMP
                                           Stop: 07/15/19  2007

    APAP/Caff/Butal Tab (FIORICET) (Fioricet Tab)
    Dose: 2 UDTAB
    Route: PO                    Direction: X1 (ED)

  Order's Audit Trail of Events
1   07/15/19 2006 NP.GARKA    Order ENTER in EDM/POM
2   07/15/19 2006 NP.GARKA    Ordering Doctor: Gardella,Karen J  NP
3   07/15/19 2006 NP.GARKA    Order Source: EPOM
4   07/15/19 2006 NP.GARKA    Signed by Gardella,Karen J  NP
5   07/15/19 2007 SCHEDULER   DISCONTINUE in PHA
6   07/15/19 2008 DNURAP11    order acknowledged

              Electronically signed by Gardella,Karen J  NP on 07/15/19 at 2006


** IDEV END OF REPORT **




                        PERMANENT MEDICAL RECORD COPY

## JA732

ROOP_PS000035

Johnston-Willis Hospital
1401 Johnston-Willis Drive
Richmond, Va. 23235
    (804) 483-5172
Phone #: (804) 483-5172
 FAX #: (804) 483-5171

Name: ROOP,SAMANTHA JEAN
Phys: Gardella,Karen J  NP
DOB:              Age: 34    Sex: F
Acct: D35059321545  Loc: D.JERFT
Exam Date: 07/15/2019 Status: PRE ER
Rad No:              URN: D731784
Unit No: D001782628

EXAMS:
006227592 CT HEAD WO IV CON, 006227593 CT C-SPINE WO IV CON

Reason for Visit: INJURY - ACCIDENT
Reason for Exam: MVC, struck head, + LOC
 - CT HEAD WO IV CON,  - CT C-SPINE WO IV CON
7/15/2019 7:12 PM; CJWC

Indication: 34 years old;  Female; MVC, struck head, + LOC; INJURY -
ACCIDENT

Technique: Noncontrast CT examinations of the head and cervical spine
were obtained according to standard protocol. Multiplanar
reconstructions were provided for review.

Dose reduction: All CT scans at this facility are performed using dose
reduction optimization techniques as appropriate including the
following: Automated exposure control, adjustment of the MA and/or KV
according to patient size, or use of reconstruction techniques.

Comparison: None

Findings:


CT Head without contrast:

The ventricles, cisterns, and cortical sulcal pattern are within
normal limits of size and configuration for age. Gray-white
differentiation is maintained. There is no hemorrhage, mass, edema,
hydrocephalus, or midline shift. Midline sagittal anatomic morphology
is normal.

The imaged globes and orbits are unremarkable. The imaged paranasal
sinuses are well-aerated. The mastoid air cells are well-aerated. The
calvarium is intact. No osseous abnormalities are evident. The patient
is edentulous.


CT C-Spine without contrast:

The lateral masses of C1 are well aligned. The base of the dens is
intact. No gross or displaced cervical fractures.


Heights of the vertebral bodies and intervertebral disc spaces are
otherwise preserved. There is no malalignment.

The prevertebral soft tissues are unremarkable. The partially imaged

PAGE  1                    Signed Report                  (CONTINUED)

JA733

Johnston-Willis Hospital              Name: ROOP,SAMANTHA JEAN
1401 Johnston-Willis Drive      Phys: Gardella,Karen J  NP
Richmond, Va. 23235             DOB:           Age: 34        Sex: F
     (804) 483-5172             Acct: D35059321545  Loc: D.JERFT
Phone #: (804) 483-5172         Exam Date: 07/15/2019 Status: PRE ER
  FAX #: (804) 483-5171         Rad No:               URN: D731784
                                Unit No: D001782628

EXAMS:
 006227592 CT HEAD WO IV CON, 006227593 CT C-SPINE WO IV CON
 <Continued>

     lung apices are clear.


     Impression:

     1.  No evidence of acute intracranial trauma.
     2.  No cervical fractures. If unexplained symptoms persist and/or
     there is significant clinical concern for acute disc, ligamentous, or
     soft tissue injury, followup with MRI may be of benefit if and when
     clinically indicated.




** Electronically Signed by James C Smith MD on 07/15/2019 at 1930 **
                Reported and signed by: James C Smith, MD








CC:

Dictated Date/Time: 07/15/2019 (1924)
Techs: Betsy L. Arnold, RT-R; JOHN FERGUSON, RT(R)(CT); ...
Transcribed Date/Time: 07/15/2019 (1924)
Transcriptionist: DR.SMIJA3
Orig Print D/T: S: 07/15/2019 (1932)
                                BATCH NO: N/A


PAGE  2                      Signed Report

Johnston-Willis Hospital
1401 Johnston-Willis Drive
Richmond, Va. 23235
   (804) 483-5172
Phone #: (804) 483-5172
  FAX #: (804) 483-5171

Name: ROOP,SAMANTHA JEAN
Phys: Gardella,Karen J  NP
DOB:                 Age: 34    Sex: F
Acct: D35059321545  Loc: D.JERFT
Exam Date: 07/15/2019 Status: PRE ER
Rad No:                    URN: D731784
Unit No: D001782628

EXAMS:
006227592 CT HEAD WO IV CON, 006227593 CT C-SPINE WO IV CON

Reason for Visit: INJURY - ACCIDENT
Reason for Exam: MVC, struck head, + LOC
 - CT HEAD WO IV CON,  - CT C-SPINE WO IV CON
7/15/2019 7:12 PM; CJWC

Indication: 34 years old;  Female; MVC, struck head, + LOC; INJURY -
ACCIDENT

Technique: Noncontrast CT examinations of the head and cervical spine
were obtained according to standard protocol. Multiplanar
reconstructions were provided for review.

Dose reduction: All CT scans at this facility are performed using dose
reduction optimization techniques as appropriate including the
following: Automated exposure control, adjustment of the MA and/or KV
according to patient size, or use of reconstruction techniques.

Comparison: None

Findings:


CT Head without contrast:

The ventricles, cisterns, and cortical sulcal pattern are within
normal limits of size and configuration for age. Gray-white
differentiation is maintained. There is no hemorrhage, mass, edema,
hydrocephalus, or midline shift. Midline sagittal anatomic morphology
is normal.

The imaged globes and orbits are unremarkable. The imaged paranasal
sinuses are well-aerated. The mastoid air cells are well-aerated. The
calvarium is intact. No osseous abnormalities are evident. The patient
is edentulous.


CT C-Spine without contrast:

The lateral masses of C1 are well aligned. The base of the dens is
intact. No gross or displaced cervical fractures.


Heights of the vertebral bodies and intervertebral disc spaces are
otherwise preserved. There is no malalignment.

The prevertebral soft tissues are unremarkable. The partially imaged

PAGE  1                    Signed Report                    (CONTINUED)

**JA735**

ROOP_P5000038

Johnston-Willis Hospital
1401 Johnston-Willis Drive
Richmond, Va. 23235
   (804) 483-5172
Phone #: (804) 483-5172
  FAX #: (804) 483-5171

Name: ROOP,SAMANTHA JEAN
Phys: Gardella,Karen J  NP
DOB:            Age: 34      Sex: F
Acct: D35059321545  Loc: D.JERFT
Exam Date: 07/15/2019 Status: PRE ER
Rad No:             URN: D731784
Unit No: D001782628

EXAMS:
006227592 CT HEAD WO IV CON, 006227593 CT C-SPINE WO IV CON
<Continued>

    lung apices are clear.


    Impression:

    1.  No evidence of acute intracranial trauma.
    2.  No cervical fractures. If unexplained symptoms persist and/or
    there is significant clinical concern for acute disc, ligamentous, or
    soft tissue injury, followup with MRI may be of benefit if and when
    clinically indicated.



** Electronically Signed by James C Smith MD on 07/15/2019 at 1930 **
           Reported and signed by: James C Smith, MD



CC:

Dictated Date/Time: 07/15/2019 (1924)
Techs: Betsy L. Arnold, RT-R; JOHN FERGUSON, RT(R)(CT); ...
Transcribed Date/Time: 07/15/2019 (1924)
Transcriptionist: DR.SMIJA3
Orig Print D/T: S: 07/15/2019 (1932)
                              BATCH NO: N/A


PAGE  2                   Signed Report

ROOP_P5000039

Johnston-Willis Hospital
1401 Johnston-Willis Drive
Richmond, Va. 23235
    (804) 483-5172
Phone #: (804) 483-5172
 FAX #: (804) 483-5171

Name: ROOP,SAMANTHA JEAN
Phys: Gardella.Karen J  NP
DOB:                Age: 34    Sex: F
Acct: D35059321545  Loc: D.JERFT
Exam Date: 07/15/2019 Status: PRE ER
Rad No:              URN: D731784
Unit No: D001782628

EXAMS:
006227595 CT L-SPINE WO IV CON

Reason for Visit: INJURY - ACCIDENT
Reason for Exam: MVC, midline back pain
The study is a CT evaluation of the lumbosacral spine dated 7/15/2019.

REASON FOR THE EXAM: Recent trauma.

TECHNIQUE: 2 mm axial imaging was acquired through the lumbosacral
spine. From the axial imaging sequence sagittal and coronal
reconstructed imaging is submitted for interpretation.

Dose Reduction Technique was employed to reduce radiation exposure -
This includes reduction optimization techniques as appropriate to a
performed exam with automated exposure control adjustments of the mA
and/or Kv according to patient size, or use of iterative
reconstruction technique.

FINDINGS: There are 5 nonrib-bearing lumbar vertebrae. There is a
normal height and a normal morphology to the lumbar vertebral bodies.
The articular masses are intact without spondylolysis. This
examination is negative for acute fractures. The patient is status
post a previous laminectomy procedure at her L5 level. She has
undergone a posterior spinal fusion from the L5 through the S1 levels
through the placement of paired fusion rods and 2 pairs of pedicular
fixation screws. There is apparent spondylolysis of the pars
interarticularis of the L5 vertebra. The patient has also undergone
interbody fusion through the L5-S1 disc space without solid
incorporation of the bone plug into the adjacent vertebral endplates.

    IMPRESSION:
    1.   The patient status post a bilateral laminectomy procedure at her
    L4-5 level. She is also status post a posterior as well as an
    interbody fusion. The bone plug is not incorporated into the adjacent
    L5 and S1 vertebrae. There may have been a pre-existing of the L5
    vertebra.
    2.   This examination is negative for an acute fracture of the
    lumbosacral spine.
    3.   Not mentioned above there are several nonobstructing renal
    calculi.


** Electronically Signed by Craig Rowell MD on 07/15/2019 at 1953 **
         Reported and signed by: Craig Rowell, MD


PAGE  1              Signed Report              (CONTINUED)

**JA737**

ROOP_P5000040

Johnston-Willis Hospital
1401 Johnston-Willis Drive
Richmond, Va. 23235
      (804) 483-5172
Phone #: (804) 483-5172
  FAX #: (804) 483-5171

Name: ROOP,SAMANTHA JEAN
Phys: Gardella,Karen J   NP
DOB:                Age: 34        Sex: F
Acct: D35059321545  Loc: D.JERFT
Exam Date: 07/15/2019 Status: PRE ER
Rad No:              URN: D731784
Unit No: D001782628

EXAMS:
006227595 CT L-SPINE WO IV CON
 <Continued>

CC:

Dictated Date/Time: 07/15/2019 (1949)
Techs: Betsy L. Arnold, RT-R; JOHN FERGUSON, RT(R)(CT); ...
Transcribed Date/Time: 07/15/2019 (1949)
Transcriptionist: DR.ROWCA
Orig Print D/T: S: 07/15/2019 (1954)
                              BATCH NO: N/A


PAGE  2                    Signed Report

**JA738**

ROOP_P5000041

Johnston-Willis Hospital
1401 Johnston-Willis Drive
Richmond, Va. 23235
    (804) 483-5172
Phone #: (804) 483-5172
  FAX #: (804) 483-5171

Name: ROOP,SAMANTHA JEAN
Phys: Gardella.Karen J  NP
DOB:         Age: 34   Sex: F
Acct: D35059321545  Loc: D.JERFT
Exam Date: 07/15/2019 Status: PRE ER
Rad No:         URN: D731784
Unit No: D001782628

**EXAMS:**
006227594 CT T-SPINE WO IV CON

Reason for Visit: INJURY - ACCIDENT
Reason for Exam: MVC, midline back pain
The study is a CT evaluation of the thoracic spine dated 7/15/2019.

HISTORY: A recent motor vehicle accident.

TECHNIQUE: 2.5 mm axial imaging was acquired through the thoracic
spine. From the axial imaging sequence sagittal and coronal
reconstructed imaging is submitted for interpretation.

Dose Reduction Technique was employed to reduce radiation exposure -
This includes reduction optimization techniques as appropriate to a
performed exam with automated exposure control adjustments of the mA
and/or Kv according to patient size, or use of iterative
reconstruction technique..

FINDINGS: This examination is negative for an acute fracture or acute
osseous abnormalities. There is a small accessory ossification located
between the spinous processes of the T11 and T12 vertebrae which is
apparently a developmental variant. The spinal canal is relatively
patent without osseous encroachment upon the spinal canal or upon the
neural foramina. The alignment is anatomical. There is minimal disc
space narrowing along the mid to lower thoracic spine. This
examination is negative for a discrete disc herniation into the spinal
canal.

  IMPRESSION: This examination is negative for an acute fracture of the
thoracic spinal region.

** Electronically Signed by Craig Rowell MD on 07/15/2019 at 2003 **
         Reported and signed by: Craig Rowell, MD


CC:

Dictated Date/Time: 07/15/2019 (2001)
Techs: Betsy L. Arnold, RT-R; JOHN FERGUSON, RT(R)(CT); ...
Transcribed Date/Time: 07/15/2019 (2001)

Transcriptionist: DR.ROWCA
Orig Print D/T: S: 07/15/2019 (2004)
                BATCH NO: N/A


PAGE  1             Signed Report

**JA739**

Patient:ROOP, SAMANTHA JEAN    MRN:D001782628    Encounter:D35059321545    Page 1 of 6

ROOP_P900042

| 07/16/19 0253 | MEDICATION DISCHARGE SUMMARY | PAGE: 1 |
|---|---|---|

NAME: ROOP,SAMANTHA JEAN     ADMIT DATE:           AGE: 34
UNIT #: D001782628          DISCHARGE DATE:     SEX: F
ACCT #: D35059321545      STATUS: DEP ER
CODED ALLERGIES    Penicillins, metoprolol, latex
CODED ADRs
UNCODED ALLERGIES
UNCODED ADRs

| ADMINISTRATION PERIOD:<br>0000 07/15/19 to 2359 07/15/19 | START/<br>STOP | |
|---|---|---|

| HYDROmorphone 2MG/ML (HYDROmorphone HCL 2 MG/ML SYR)<br>2 MG IV ONCE IN ED/STA<br>RX #: J14473713 | 07/15/19<br>07/15/19 | 1859 Order Entry NP.GARKA<br>1859 Pharmacy Discontinue SCHEDULER<br>1910 Nursing Acknowledged Order  DNURAP11<br>1924 Canceled Order NP.GARKA<br>1924 Pharmacy Edit or Verification System |
|---|---|---|
| TORADOL 60MG INJ (KETOROLAC TROMETHAMINE 60 MG/2 ML SYR)<br>60 MG IM ONCE IN ED/STA<br>RX #: J14473714 | 07/15/19<br>07/15/19 | 1858 DNURAP6 at 1923  SITE: LUD - LEFT UPPER DELTOID GAVE: 60 MG<br>    NDC/DIN: (SOURCE: eMAR)<br>    6332316202        TORAID302 - Ketorolac Tromethamine 60 MG/...<br>    Administering for pain: Yes<br>                          (End)<br><br>Pain details:<br><br>Pain scale utilized:: Verbal numeric<br>Numeric pain scale:: Severe pain-8<br>Pain intensity::   8<br>Most common side effects reviewed with patient, family, or caregiver?: Yes<br>:: TORAID302:nausea/diarrhea, headache, increased BP<br>    Difference between amount dispensed<br>    and amount administered was discarded.<br>    07/15/19-1924 File Document by DNURRP6<br>1859 Order Entry NP.GARKA<br>1859 Pharmacy Discontinue SCHEDULER<br>1910 Nursing Acknowledged Order  DNURAP11 |
| predniSONE (predniSONE 20 MG UDTAB)<br>60 MG PO ONCE IN ED/STA<br>RX #: J14473715 | 07/15/19<br>07/15/19 | 1858 DNURRP6 at 1923 GAVE: 60 MG<br>    NDC/DIN: (SOURCE: eMAR)<br>    0054001820        PREDOT20 3 - predniSONE 20 MG UDTAB<br>Most common side effects reviewed with patient, family, or caregiver?: Yes<br>:: PREDOT20 3:muscle/bone weakness, increased blood glucose, increased BP<br>    07/15/19-1924 File Document by DNURRP6<br>1859 Order Entry NP.GARKA<br>1859 Pharmacy Discontinue SCHEDULER<br>1910 Nursing Acknowledged Order  DNURAP11 |

*** CONTINUED ON PAGE 2 ***
This document is part of the legal medical record.

JA740

Patient:ROOP, SAMANTHA JEAN    MRN:D001782628    Encounter:D35059321545    Page 2 of 6

ROOP_P900043

| 07/16/19 0253 | MEDICATION DISCHARGE SUMMARY | PAGE: 2 |
|---|---|---|
| NAME: ROOP,SAMANTHA JEAN    UNIT #: D001782628 | ACCT #: D35059321545 | |

| ADMINISTRATION PERIOD:<br>0000 07/15/19 to 2359 07/15/19 (Continued) | START/<br>STOP | |
|---|---|---|
| METHOCARBAMOL (METHOCARBAMOL 750 MG UDTAB)<br>750 MG PO ONCE IN ED/STA<br>RX #: J14473716 | 07/15/19<br>07/15/19 | 1859 DNURRP6 at 1922 GAVE: 750 MG<br>   NDC/DIN: (SOURCE: eMAR)<br>   3172253405         METHOT7504 - Methocarbamol 750 MG Udtab<br>   Administering for pain: Yes<br>                         (End)<br><br>Pain details:<br><br>Pain scale utilized:: Verbal numeric<br>Numeric pain scale:: Severe pain-8<br>Pain intensity::   8<br>Most common side effects reviewed with patient, family, or caregiver?: Yes<br>:: METHOT7504:dizziness, headache, drowsiness<br>   07/15/19:1924 File Document by DNURRP6<br>1859 Order Entry NP,GARKA<br>1900 Pharmacy Discontinue SCHEDULER<br>1910 Nursing Acknowledged Order  DNURRAP11 |
| HYDROmorphone 2MG/ML (HYDROmorphone HCL 2 MG/ML SYR)<br>2 MG IM ONCE IN ED/STA<br>RX #: J14473746 | 07/15/19<br>07/15/19 | 1924 DNURRP6 at 1925  SITE: RUD - RIGHT UPPER DELTOID GAVE: 2 MG<br>   NDC/DIN: (SOURCE: eMAR)<br>   0409336511        HYDRID21 1 - HYDROmorphone HCL 2 MG/ML SYR<br>   Administering for pain: Yes<br>                         (End)<br>Pain details:<br><br>Pain scale utilized:: Verbal numeric<br>Numeric pain scale:: Severe pain-8<br>Pain intensity::   8<br>Most common side effects reviewed with patient, family, or caregiver?: Yes<br>:: HYDRID21 1:Dizziness, Sedation, nausea/vomiting, Constipation<br>   Difference between amount dispensed<br>   and amount administered was discarded.<br>   07/15/19-1926 File Document by DNURRP6<br>1924 Order Entry NP,GARKA<br>1925 Nursing Acknowledged Order  DNURRP6<br>1925 Pharmacy Discontinue SCHEDULER |

*** CONTINUED ON PAGE 3 ***
This document is part of the legal medical record.

JA741

| 07/16/19 0253 | MEDICATION DISCHARGE SUMMARY | PAGE: 3 |
|---|---|---|

NAME: ROOP,SAMANTHA JEAN            UNIT #: D001782628                    ACCT #: D35059321545

| ADMINISTRATION PERIOD:<br>0000 07/15/19 to 2359 07/15/19 (Continued) | START/<br>STOP | |
|---|---|---|

```
FIORICET TABLET (APAP/CAFFEIN/BUTALBITAL 1 UDTAB UDTAB)    |07/15/19| 2006 DNURLKL at 2009 GAVE: 2 UDTAB
2 UDTAB PO ONCE IN ED/STA                                  |07/15/19|      NDC/DIN: (SOURCE: eMAR)
RX #: J14473843                                            |        |      0591336905            ACETOTI002 - Apap/Caffein/Butalbital 1 Udt...
                                                           |        |      Administering for pain: Yes
                                                           |        |                                    (End)
                                                           |        | Pain details:
                                                           |        |
                                                           |        | Pain scale utilized:: Verbal numeric
                                                           |        | Numeric pain scale:: Moderate pain-5
                                                           |        | Pain intensity::   5
                                                           |        | Most common side effects reviewed with patient, family, or caregiver?: Yes
                                                           |        | :: ACETOTI002:Dizziness, Drowsiness,nausea/vomiting, Constipation
                                                           |        |      07/15/19:2009 File Document by DNURLKL
                                                           |        | 2006 Order Entry NP.GARKA
                                                           |        | 2007 Pharmacy Discontinue SCHEDULER
                                                           |        | 2008 Nursing Acknowledged Order  DNURAP11
```

*** CONTINUED ON PAGE 4 ***
This document is part of the legal medical record.

JA742

ROOP_P000045

| 07/16/19 0253 | MEDICATION DISCHARGE SUMMARY | | PAGE: 4 |
|---|---|---|---|
| NAME: ROOP,SAMANTHA JEAN | UNIT #: D001782628 | ACCT #: D35059321545 | |

## LEGENDS

REASON CODES

SITE CODES
LUD - LEFT UPPER DELTOID
RUD - RIGHT UPPER DELTOID

### ELECTRONICALLY SIGNED BY

| USER | USER NAME/TYPE | USER | USER NAME/TYPE | USER | USER NAME/TYPE | USER | USER NAME/TYPE |
|---|---|---|---|---|---|---|---|
| DNURAP11 | FRATHER,ALISSA RN | DNURLKL | LANGLEY,LELAND K PARAM | DNURRP6 | PRIMEAU,RYAN PARAM | | |

### OTHER USERS

| USER | USER NAME | USER | USER NAME | USER | USER NAME | USER | USER NAME |
|---|---|---|---|---|---|---|---|
| NP.GARKA | Gardella,Karen J | | | | | | |

### PHA ALLERGY HISTORY

| DATE | PHA | USER | ALLERGY DETAILS |
|---|---|---|---|
| 07/11/08 1942 | MRI | D.NUR.ALGI - GRAVES,ANGELA L | ADDED                                              by D.NUR.ALGI<br>NKDA - No Known Drug Allergies |
| 05/15/09 0718 | N | CONV - | UCONV                                              by CONV<br>No Known Contrast Allergies<br>OLD:<br>NEW: Converted from Custom No Known Contrast Allergies<br>UCONV                                              by CONV<br>.PICKLES<br>OLD:<br>NEW: Converted from Custom .PICKLES<br>UCONV                                              by CONV<br>MUSTARD<br>OLD:<br>NEW: Converted from Custom MUSTARD<br>UCONV                                              by CONV<br>No Known Drug Allergies<br>OLD:<br>NEW: Converted from Custom No Known Drug Allergies<br>UCONV                                              by CONV<br>LATEX<br>OLD:<br>NEW: Converted from Custom LATEX |
| 01/25/11 1420 | N | D.NUR.KKW - WRENN,KAREN K | ADDED                                              by D.NUR.KKW<br>Latex<br>OLD:<br>NEW: Latex added. LATEX<br>DELETED                                            by D.NUR.KKW<br>.PICKLES<br>OLD: .PICKLES deleted.<br>NEW: |

*** CONTINUED ON PAGE 5 ***
This document is part of the legal medical record.

JA743

Patient:ROOP, SAMANTHA JEAN     MRN:D001782628     Encounter:D35059321545     Page 5 of 6

ROOP_P900046

```
                                        TEXT:
                                        Type: Allergy
                                        Severity: Unknown
                                        Date: 07/11/08
                                        DELETED                    by D.NUR.KKW
                                        LATEX
                                        OLD: LATEX deleted.
                                        NEW:
                                        TEXT:
                                        Type: Allergy
                                        Severity: Unknown
                                        Date: 07/11/08
                                        DELETED                    by D.NUR.KKW
                                        MUSTARD
                                        OLD: MUSTARD deleted.
                                        NEW:
                                        TEXT:
                                        Type: Allergy
                                        Severity: Unknown
                                        Date: 07/11/08
                                        DELETED                    by D.NUR.KKW
                                        No Known Contrast Allergies
                                        OLD: No Known Contrast Allergies deleted.
                                        NEW:
                                        TEXT:
                                        Type: Allergy
                                        Severity: Unknown
                                        Date: 07/11/08
                                        DELETED                    by D.NUR.KKW
                                        No Known Drug Allergies
                                        OLD: No Known Drug Allergies deleted.
                                        NEW:
                                        TEXT:
                                        Type: Allergy
                                        Severity: Unknown
                                        Date: 07/11/08
01/25/11 1423  N   D.NUR.KKW - WRENN,KAREN K       FILED                      by D.NUR.KKW

                                        TEXT:
                                        User filed without changing allergy record.
01/26/11 1119  Y   D.PHA.FJL - LUCAS,FRANCIS J     FILED                      by D.PHA.FJL

                                        TEXT:
                                        User filed without changing allergy record.
01/31/11 1539  N   D.NUR.DPT - TALBOT,DONNA P*     FILED                      by D.NUR.DPT

                                        TEXT:
                                        User filed without changing allergy record.
01/31/11 1828  N   D.RAD.SJM - MATHEWS,SANDRA J*   FILED                      by D.RAD.SJM

                                        TEXT:
                                        User filed without changing allergy record.
03/02/11 0057  N   D.NUR.LNS1 - STICKEL,LESLIE N*  FILED                      by D.NUR.LNS1
```

*** CONTINUED ON PAGE 6 ***
This document is part of the legal medical record.

JA744

ROOP_PROD047

| 07/16/19 0253 | MEDICATION DISCHARGE SUMMARY | PAGE: 6 |
|---|---|---|
| NAME: ROOP,SAMANTHA JEAN | UNIT #: D001782628 | ACCT #: D35059321545 |

```
                                        TEXT:
                                        User filed without changing allergy record.
05/17/11 1032  N   D.NUR.BDS - SPIVEY,BEVERLY D*    EDITED                    by D.NUR.BDS
                                        Latex
                                        OLD: Patient Reaction:
                                        NEW: Patient Reaction: HIVES
10/15/11 1529  N   D.NUR.ALWI - WOOD,AMY L*         EDITED                    by D.NUR.ALWI

                                        OLD:
                                        NEW: Allergy List Confirmed: Date: 10/15/11 - Time: 1529
                                        TEXT:
                                        List Confirmed:
                                        Latex
07/30/12 1338  N   D.NUR.BDS - SPIVEY,BEVERLY D*    ADDED                     by D.NUR.BDS
                                        Penicillins
                                        OLD:
                                        NEW: Penicillins added. PENICILLINS
01/14/13 0939  N   D.NUR.BDS - SPIVEY,BEVERLY D*    ADDED                     by D.NUR.BDS
                                        metoprolol
                                        OLD:
                                        NEW: metoprolol added. METOPROLOL
07/15/19 1850  N   DNURAP11 - PRATHER,ALISSA        FILED                     by DNURAP11

                                        TEXT:
                                        User filed without changing allergy record.
```

JA745

ROOP_P5000048

PATIENT NAME: ROOP,SAMANTHA JEAN          LOCATION: D.JERFT
ACCOUNT NO: D35059321545                  AGE: 34
MEDICAL RECORD NO: D001782628             SEX: F


OUTPATIENT SERVICE DATE: 07/15/19

EMERGENCY ROOM PHYSICIAN: Bantle,John A  MD
ATTENDING PHYSICIAN: Bantle,John A  MD
PRIMARY CARE PHYSICIAN: Joseph,Sharon E  MD


ScriptRx Emergency Room Visit Report
CJW Medical Center-Johnston-Willis Hospital
1401 Johnston-Willis Drive , Richmond, VA 23235  (804)483-6000
07/15/2019 2020
--------------
Patient: ROOP, SAMANTHA
Attending Provider: John Bantle, MD
Discharging Provider: Karen Gardella, NP
MRN: D001782628
Acct: D35059321545
Age: 34


---------------------------DISCHARGE INSTRUCTIONS---------------------------
CONCUSSION * MOTOR VEHICLE ACCIDENT * NECK   BACK PAIN

CONCUSSION
Concussion is a head injury that causes a transient loss of consciousness,
without any serious brain lesion, injury, or complications. Most head
injuries do not cause any serious problems and get better within several
days. A concussion may cause a moderate headache and loss of memory
surrounding the head injury event. You may experience weakness, dizziness,
nausea, concentration difficulties, and depression for up to a week
or more after the injury. This post-injury state is called a post-concussion
syndrome and usually gets better with bed rest and mild pain medicine.
If any of these symptoms last for more than a week, you will need further
medical attention. See your doctor or return to the Emergency Room
if symptoms last longer than one week.

Please follow these instructions carefully:
During the first 24 hours:
- Have an adult relative or friend stay with you. You should not be
left alone.
- If you were knocked out, someone should wake you every 2 hours and
check for confusion.
- Eat and drink very little. Clear liquids are best if your stomach
is upset. A clear liquid is one you can see through (water, weak tea,
broth or bouillon, ginger ale, jello, Kool-Aid, Gatorade, apple juice,
popsicles or ice chips).
- Do not drink alcoholic beverages, including beer and wine.
- Get plenty of rest over the next 2-3 days.

ROOP,SAMANTHA JEAN          DISCHARGE INSTRUCTIONS          LOCATION: D.JERFT

ROOP,SAMANTHA JEAN                                ACCOUNT NO:  D35059321545

- Do not take sedatives, tranquilizers or other medicine that makes
you sleepy unless told to by your doctor.
- Avoid medicine containing aspirin, ibuprofen (Motrin, Advil), naprosyn
(Alleve) and Ketoprfen (Orudis). Use acetaminophen (Tylenol) or the
medicine your doctor has recommended instead
- Do not drive or operate machinery.
- No heavy lifting or straining.
- No contact sports for two weeks and only then if you have no symptoms
and the activity is approved by your doctor.
- For Children: Expect some increased sleepiness after a head injury.
This is normal. Your child may fall asleep as soon as you leave the
emergency department. If your child was unconscious or knocked out,
wake and check your child at least every 2 hours or often as directed
to by the doctor.

Return to the Emergency Department or see your own doctor right away
if any problems develop, including the following:
- Throwing up.
- Confusion, drowsiness or any change in alertness.
- Loss of memory.
- Dizziness or fainting.
- Trouble walking or staggering. Trouble speaking or slurred speech.
- Your headache gets worse or feels different.
- Convulsions or seizures. These are twitching or jerking movements
of the eyes, arms, legs or body.
- A change in the size of one pupil (black part of your eye) as compared
to the other eye.
- Weakness or numbness of an arm or leg.
- Stiff neck or fever.
- Blurry vision, double vision or other problems with your eyesight.
- Bleeding or clear liquid drainage from your ears or nose.
- Very sleepy (more than expected) or hard to wake up.
- Anything else that worries you.
- Your or your child's condition worsens in any other way.

MOTOR VEHICLE ACCIDENT
Because of the strong forces that may be involved in a car accident,
it is important that you watch for any new symptoms that might be a
sign of hidden injury.

Follow these instructions carefully:
1. A car accident can be emotionally upsetting, even if you were not
injured. Take time to rest and adjust to what has happened. Talking
to others about your experience can help reduce anxiety and fear.
2. You may feel sore and tight in your muscles the following day; however,
severe pain should be reported.
3. You may take acetaminophen (Tylenol) or ibuprofen (Advil, Motrin)
for pain, unless another pain medicine was prescribed.

Follow up with your doctor or this facility as advised by our staff.
[NOTE: If X-rays were taken, a radiologist will review them. You will

JA747

ROOP_P5000050

be notified of any other findings that may affect your care.]

Return to this facility immediately or contact your doctor if you experience
any of the following:
- Headache or visual problems.
- New or worsening neck and back or abdominal pain.
- Shortness of breath or increasing chest pain.
- Repeated vomiting, dizziness or fainting.
- Excessive drowsiness or unable to awaken as usual.
- Confusion or change in behavior or speech.
- A worsening of your condition in any other way.

NECK and BACK PAIN
Your exam shows you have strained the muscles and ligaments in your
neck. Both neck and back pain are usually caused by injury to the muscles
or ligaments of the spine. Sometimes, the disks that separate each
bone of the spine may cause pain by putting pressure on a nearby nerve.
Back and neck pain may appear after a sudden twisting/bending force
(such as in a car accident), or sometimes after a simple awkward movement.
In either case, muscle spasm is often present and adds to the pain.

Follow These Instructions Carefully:
1. For Neck Pain: Use a comfortable pillow that supports the head and
keeps the spine in a neutral position. The position of the head should
not be tilted forward or backward.
2. For Back Pain: Find a position of comfort. Try lying flat on your
back on a firm surface with pillows under your knees. Or, try lying
on your side with your knees drawn up towards your chest and a pillow
between your knees. (You may need to place a piece of plywood under
your mattress if your bed is too soft.)
- For severe back pain, stay in this position until the pain improves,
getting up only to go to the bathroom or for meals.
- For less severe back pain, strict bed rest is not necessary; however,
don't do anything that worsens the pain. Avoid prolonged sitting
or lifting anything over 15 pounds until the pain is gone. Practice
safe lifting and bending habits.
3. Ice packs (crushed or cubed ice in a plastic bag, wrapped in a towel)
are best for 20 minutes every 2 to 4 hours during the first 2 days
after a new injury. Local heat (hot shower, hot bath, or heating pad)
and massage will help reduce muscle spasm. You can start with ice packs
then switch to heat after 2 days. Some patients feel best alternating
treatments. Use the method that feels best to you.
4. You may take acetaminophen (Tylenol) or ibuprofen (Advil, Motrin)
for pain, unless another pain medicine has been prescribed.

Follow up with your doctor as advised by our staff if your symptoms
do not start to improve after 1 week. Physical therapy may be needed.

[NOTE: If X-rays were taken, a radiologist will review them. You will

JA748

ROOP_PS000051

be notified of any new findings that may affect your care.]

Return to this facility immediately or contact your doctor if you experience
any of the following:
- Pain that becomes worse or spreads into your arms or legs.
- Weakness, numbness or pain in one or both arms or legs.
- Loss of bowel or bladder control.
- Numbness in the groin area.
- A worsening of your condition in any other way.

PRESCRIPTION MEDICATIONS:
Robaxin-750 750 Milligram # 30 Tablets 1 TABLET EVERY 4 HOURS FOR MUSCLE
SPASMS (0 Refills). Printed
Zofran ODT 4 Milligram # 30 Tablets 1-2 TABLETS Q 6 HRS PRN NAUSEA
/ VOMITING (0 Refills). Printed
Fioricet 50-325-40 Milligram # 20 Package 1-2 TABLETS EVERY 4 TO 6
HOURS AS NEEDED FOR PAIN FOR HEADACHE (0 Refills). Printed

FOLLOW-UP:
Physician: Primary Care Physician,
Follow-up When: in 2 days
Follow-up Diagnosis: Refer to Discharge Instruction List
Specialty: Primary Care/Family Practice
Address: NOT AVAILABLE
Phone:
Follow-up Notes: Take medications as directed. It is common to be more
sore 2-3 days after the accident. No driving or drinking alcohol while
taking pain medicine. Apply ice to painful joints, back and/or neck
for 20 min at a time, several times daily to help with pain and swelling.
Follow up with your primary care provider for re-evaluation this week.
Return to the emergency department for any worsening symptoms or new
concerns.

JA749

ROOP,SAMANTHA JEAN          DISCHARGE INSTRUCTIONS      LOCATION: D.JERFT

**JA750**

**Johnston-Willis Hospital**
HCAM A CAMPUS OF CJW MEDICAL CENTER

CJW Medical Center-Johnston-Willis Hospital
1401 Johnston-Willis Drive
Richmond, VA 23235
(804)483-6000

# Discharge Summary
# (Chart Copy)

Date: 07/15/2019
Time: 8:20 p.m.

| | | | |
|---|---|---|---|
| Treating Provider: | Karen Gardella NP | Phone: | Fax: |
| Provider Signature: | <Electronically signed by Karen Gardella,NP.> | | |

| | | | |
|---|---|---|---|
| Patient Name: | SAMANTHA ROOP | MR#: D001782628 | Account: D35059321545 |
| Patient Address: | | Phone: | |

Supervising Provider: Karen Gardella, NP

**Your Discharge Instructions:**

CONCUSSION

MOTOR VEHICLE ACCIDENT

NECK & BACK PAIN

**Your Prescriptions:**

Robaxin-750 750 Milligram # 30 Tablets
1 TABLET EVERY 4 HOURS FOR MUSCLE
SPASMS (0 Refills).Printed.

Zofran ODT 4 Milligram # 30 Tablets
1-2 TABLETS Q 6 HRS PRN NAUSEA / VOMITING
(0 Refills).Printed.

Fioricet 50-325-40 Milligram # 20 Package
1-2 TABLETS EVERY 4 TO 6 HOURS AS NEEDED

You should follow up with the following physician in 2 days:

| | | | |
|---|---|---|---|
| Physician Name: | Primary Care Physician | Specialty: | Primary Care/Family |
| Address: | | Phone: | |

Follow-up Notes: On 07/15/2019 this patient was treated at CJW Medical Center-Johnston-Willis Hospital
for Refer to Discharge Instruction List.
Additional Notes: Take medications as directed. It is common to be more sore 2-3 days after the accident. No
driving or drinking alcohol while taking pain medicine. Apply ice to painful joints, back and/or neck for 20 min
at a time, several times daily to help with pain and swelling. Follow up with your primary care provider for re-
evaluation this week. Return to the emergency department for any worsening symptoms or new concerns.

If you have been referred to a specialist in Cardiology, Gastroenterology, Neurology, or Orthopedics, you will be contacted by ER Follow up Appointment Services
within 24 hours to schedule your appointment. If you would like to schedule an appointment and have not received a call, please call us at 804-591-4038

My Health One
Through MyHealthOne you can view your health information and details from your stay.
MyHealthOne consolidates many common tasks into one secure easy-to-use online portal.
You may use the portal on Visit www.myhealthone.com to start managing your health today.

I understand that the emergency care I received is not intended to be complete and definitive medical care and treatment. I acknowledge that I
have been instructed to contact the above physician(s) as indicated for continued and complete medical diagnosis, care, and treatment. EKG's,
X-rays, and lab studies will be reviewed by appropriate specialists and I will be notified of significant discrepancies. I also understand that my
signature authorizes this Medical Center to release all or any part of my medical record including, if applicable, information pertaining to AIDS
and/or HIV testing, mental health records, and drug and/or alcohol treatment) to the follow-up physician indicated above.
I have read and understand the above, received a copy of applicable instruction sheets, and will contact for follow-up care.

| | | | |
|---|---|---|---|
| Signature | Patient/Parent/Guardian Date/Time | Signature | Instructed By Date/Time |

I certify that I have received a list of new medications, and changes to continued home medications that I should take after I am discharged from
the Emergency Department, that these changes and additions have been explained to me, and I understand the reasons for the changes and
new medications.

| | | | |
|---|---|---|---|
| Signature | Patient/Parent/Guardian Date/Time | Signature | Instructed By Date/Time |

*PINS*

Page 1 of 2

**JA751**

## FEMALE PELVIC MEDICINE INSTITUTE OF VIRGINIA PC

10/08/2019

| | | |
|---|---|---|
| Patient: ROOP, SAMANTHA J (Female) | **DOB:** 1985 (34) | **Encounter ID:** 100819-88096707 |
| POWHATAN, VA 23139 | **Previous First Name:** | **Primary Ins:** Blue Cross Blue Shield Virginia (Anthem BCBS VA) |
| | **Previous Last Name:** | |
| | **Race:** White | |
| | **Language:** English | |
| | **Ethnicity:** Not Hispanic or Latino | |
| | **Sexual Orientation:** | |
| | **Gender Identity:** | |

| | | |
|---|---|---|
| **Location:** St Marys Office | **Provider:** NATHAN GUERETTE, MD | **Referring:** |
| 5875 Bremo Rd Suite 701 | | |
| Richmond,VA 23226-1900 | | |
| (804)523-2533 Ext:0 | | |

# Subjective

### Chief Complaint:

Samantha Roop is a 34 year old White female complaining of interstim f/u: see HPI.

**Initial Consult : FPMIV**
Referring Physician: Dr. Joseph, Had interstim for OAB and pelvic pain 7 years ago. Recent MVA with worsening symptoms.

**History of Present Illness: Bladder Symptoms**
The patient reports having stress incontinence. Urge Incontinence: Yes. The patient denies having mixed incontinence. Stress> Urge Incontinence: Yes. Urge Incontinence >Stress Incontinence : No. The patient denies having continuous urine loss. The patient reports having urgency/frequency. Hematuria: No. Post Void Dribble: No. Abnormal Voiding/Retention: No. Recurrent UTIs: No.

**Symptom Severity**
Incontinent Events/Day: 1-2. Pads/Day: 1-2. Voids/Day: 11+. Voids/Night: 3. Enuresis: No. Bladder Emptying: Normal Flow.

**Vaginal/Bladder/Pelvic Pain**
Vaginal Pain:No. Pelvic Pain: Yes, Pelvic pressure, worse since MVA. Bladder Pain: Yes.

**Prolapse**
Heaviness. Yes. Exteriorized Tissue: No. Pain: No.

**Bowel Symptoms**
Constipation: No. Obstructed Defection: No. Rectal Prolapse: No. Fecal Incontinence: No. No. No.

**Sexual Symptoms**
Yes. Numbness: No. Inability to Orgasm: No. Dyspareunia: Yes. Vaginal Dryness: No. Partner: Normal.

### Social History:

| Tobacco | Usage Status | Last Used | Daily Usage | Packaging | Years | Life History | Cessation Attempts | Last Cessation Rx |
|---|---|---|---|---|---|---|---|---|
| Cigarettes | Never smoked | | | Packs | | | | |

| Alcohol | Usage Status | Last Used | Usage Number | Packaging | | Measurement Time | |
|---|---|---|---|---|---|---|---|
| Wine | Social | | | | | | |

### Medical History:

### Positive History

| Condition | Physician | Hospitalization | Hosp Date | Hospital |
|---|---|---|---|---|

**JA752**

---

**Back Problem**

**GERD**

Past Medical Hx : Gynecologic History
Gravity:3. Parity: 2. Hysterectomy:None. Ovaries:Intact.

## Surgical History:

**Positive History**

| Condition | Physician | Hospitalization | Hosp Date | Hospital |
|-----------|-----------|-----------------|-----------|----------|
| Cholecystectomy | | | | |

Operative procedure on lumbosacral spinal structure

## Family History:

| Type | Sex | Status | Age | Name | Negative History | Positive History | Onset Date | Positive Comment | Negative Comment |
|------|-----|--------|-----|------|------------------|------------------|------------|------------------|------------------|
| Mother | F | Alive | | | | Breast Ca | | | |

## Review of Systems:

**ROS : FPMI**

**Constitutional**
Patient denies chills, fever, fatigue, unexplained weakness, unexplained weight gain or loss.

**Eyes**
Patient denies visual changes, excessive tearing, eye pain, infection or vision loss.

**ENT**
Patient denies frequent sore throats, lumps, enlarged tonsils, horseness, changes in dentition, ear pain or discharge, changes in hearing, nosebleeds or nasal obstruction.

**Integumentary**
Patient denies changes in hair texture, changes in appearance of nail structure, hives, unexplained rashes or change in appearance of moles.

**Cardiovascular**
Patient denies chest pain, palpitations, recent heart attack or thromboembolic events.

**Respiratory**
Patient denies positive TB test, unexplained shortness of breath, coughing blood or bloody sputum.

**Endocrine**
Patient denies heat or cold intolerance, goiter, increased thirst, sweats or neck pain.

**Hematologic/Lymphatic**
Patient denies lumps, radiation exposure, swollen glands, transfusion reaction or chronic anemia.

**Psychiatric**
Patient denies behavioral changes, disorientation, disturbing thoughts, hallucinations or cognitive impairment.

**Neurologic**
Patient denies loss of consciousness, blackouts, recent head injury or paralysis.

# Objective

**Vital Signs:**

**Respirations**

**JA753**

| Rate | Quality | Rhythm | Pulse Ox | Air | Inhaled O$_2$ Concentration | Method | Peak Flow | Flag |
|------|---------|--------|----------|-----|------------------------------|--------|-----------|------|
| 18/min | Normal | NORMAL | | | | | | Normal |

**Height, Weight, BMI and Measurements**

| Height | Weight | BMI | Flag | | | Head | Neck | Waist |
|--------|--------|-----|------|---|---|------|------|-------|
| 5' 5" | 145 (lb) | 24.1 | Normal | | | | | |

## Physical Exam:

**Level 4/5 : Physical Examination**

**Constitutional**
Well nourished, Well groomed, Appears to be in generally good health.

**Neck**
No Masses, Symmetrical in appearance, Trachea midline, Thyroid without enlargement.

**Respiratory**
Relaxed and breathes without effort, No use of accessory muscles, Chest expands symmetrically upon inspiration, Lungs clear to auscultation.

**Cardiovascular**
Heart rate regular, No murmurs noted, No swelling of extremities, Pulses palpable.

**Breast**
symmetrical.

**Gastrointestinal: Abdomen**
Soft, No guarding, No rigidity, No hernia, No hepatosplenomgaly.

**Lymphatic**
No cervical lymphadenopathy noted, No axillary lymphadenopathy noted, No Inguinal lymphadenopathy noted.

**Skin**
No lesions, No ulcerations, No rashes.

**Neurological/Psychiatric**
Pt oriented to person, place and time, Speech fluent, Mood neutral, Affect appropriate.

**Pelvic : Examination**

**External Genitalia**
External Genitalia: Normal.

**Urethral Meatus**
The urethral meatus is without erythema, edema, prolapse or lesions.

**Urethra**
The urethra is without masses, tenderness or scarring.

**Sensation**
Sensation: Intact.

**Supine Cough Test**
Supine Cough Test:Negative.

**Bulbocavernous**
Bulbocavernous:Negative.

**Bladder**
non-tender.

**Adenexa**
Adenexa:Normal.

**Pain**
Pain: Nontender.

**Vagina**
Vagina: Normal. Vagina Atrophy:None. Vagina Caliber:normal. Vagina Tone: Normal. Vagina Ulcerations: Negative.

**POP-Q**
Aa:-1. Ba:-1. Ap:-3. Bp:-3. C:-8. D:-9. TVL:10. GH:4. PB:3.

**Kegal**
Strength: weak. Duration:Normal. Lift: present.

**JA754**

**Rectal**
Rectal Masses: Negative. Anal Wink: Positive. Tone: Normal. Squeeze: Normal. Prolapse: Negative.

**Urinalysis : Results**

**Glucose**
neg.

**Ketones**
neg.

**Specific Gravity**
1.015.

**pH**
8.5.

**Blood**
negative.

**Nitrates**
Negative.

**Leukocytes**
Negative.

**Protein**
neg.

**Creatinine**
100.

**PC Ratio**
Normal.

**Assessment of Post Void Residual**
Ultrasound.

**Post Void Residual (cc)**
0cc.

**Bladder Wall Thickness**
within normal limits.

## Assessment

Diagnosis:

| Description | Code | Problem | Comment |
| --- | --- | --- | --- |
| Unspecified Urinary Incontinence | R32 | | Plan: urodynamics, cystoscopy, ua, uc, pvr |
| Cystocele, Unspecified | N8110 | | PLan: extensively discussed finding and will determine appropriate treatment at the conclusion of the evaluation |
| Pelvic And Perineal Pain | R102 | | PLan: extensively discussed finding and will determine appropriate treatment at the conclusion of the evaluation |

## Plan

Procedure Coding:

| Description | Code | Units | Modifiers | Comments |
| --- | --- | --- | --- | --- |
| US Exam Pelvic Limited | 76857 | 1 UN | | |
| Cytopath C/v Thin Layer | 88142 | 1 UN | QW | |
| Assay Of Urine Creatinine | 82570 | 1 UN | QW | |
| Office Consultation | 99245 | 1 UN | 25 | |

**JA755**

Urinalysis Auto W/o Scope              81003        1 UN        QW

**JA756**

**FEMALE PELVIC MEDICINE INSTITUTE OF VIRGINIA PC**                    12/03/2019

| | | | |
|---|---|---|---|
| Patient: ROOP, SAMANTHA J (Female) | **DOB:** | 1985 (34) | **Encounter ID:** 120319-91072923 |
| | **Previous First** | | **Primary Ins:** Blue Cross Blue Shield |
| POWHATAN, VA 23139 | **Name:** | | Virginia (Anthem BCBS |
| | **Previous Last** | | VA) |
| | **Name:** | | |
| | **Race:** | White | |
| | **Language:** | English | |
| | **Ethnicity:** | Not Hispanic or Latino | |
| | **Sexual** | | |
| | **Orientation:** | | |
| | **Gender** | | |
| | **Identity:** | | |

| | | | |
|---|---|---|---|
| Location: St Marys Office | **Provider:** NATHAN GUERETTE, MD | **Referring:** Joseph, Sharon |
| 5875 Bremo Rd Suite 701 | | |
| Richmond,VA 23226-1900 | | |
| (804)523-2533 Ext:0 | | |

## Subjective

**Chief Complaint:**

Samantha Roop is a 34 year old White female complaining of URINARY INCONTINENCE-SEE HPI.

**Initial Consult : FPMIV**
Referring Physician: Dr. Joseph, Had interstim for OAB and pelvic pain 7 years ago. Recent MVA with worsening symptoms.

**History of Present Illness: Bladder Symptoms**
The patient reports having stress incontinence. Urge Incontinence: Yes. The patient denies having mixed incontinence. Stress> Urge Incontinence: Yes. Urge Incontinence >Stress Incontinence : No. The patient denies having continuous urine loss. The patient reports having urgency/frequency. Hematuria: No. Post Void Dribble: No. Abnormal Voiding/Retention: No. Recurrent UTIs: No.

**Symptom Severity**
Incontinent Events/Day: 1-2. Pads/Day: 1-2. Voids/Day: 11+. Voids/Night: 3. Enuresis: No. Bladder Emptying: Normal Flow.

**Vaginal/Bladder/Pelvic Pain**
Vaginal Pain:No. Pelvic Pain: Yes, Pelvic pressure, worse since MVA. Bladder Pain: Yes.

**Prolapse**
Heaviness: Yes. Exteriorized Tissue: No. Pain: No.

**Bowel Symptoms**
Constipation: No. Obstructed Defection: No. Rectal Prolapse: No. Fecal Incontinence: No. No. No.

**Sexual Symptoms**
Yes. Numbness: No. Inability to Orgasm: No. Dyspareunia: Yes. Vaginal Dryness: No. Partner: Normal.

**Social History:**

| Tobacco | Usage Status | Last Used | Daily Usage | Packaging | Years | Life History | Cessation Attempts | Last Cessation Rx |
|---|---|---|---|---|---|---|---|---|
| Cigarettes | Never smoked | | | Packs | | | | |

| Alcohol | Usage Status | Last Used | Usage Number | Packaging | | Measurement Time | |
|---|---|---|---|---|---|---|---|
| Wine | Social | | | | | | |

**Medical History:**

**Positive History**

| Condition | Physician | Hospitalization | Hosp Date | Hospital |
|---|---|---|---|---|

**JA758**

Back Problem

GERD

Surgical History:

**Positive History**

| Condition | Physician | Hospitalization | Hosp Date | Hospital |
|-----------|-----------|-----------------|-----------|----------|
| Cholecystectomy | | | | |

Operative procedure on lumbosacral spinal structure

Family History:

| Type | Sex | Status | Age | Name | Negative History | Positive History | Onset Date | Positive Comment | Negative Comment |
|------|-----|--------|-----|------|------------------|------------------|------------|------------------|------------------|
| Mother | F | Alive | | | | Breast Ca | | | |

Review of Systems:

**ROS : FPMI**

**Constitutional**
Patient denies chills, fever, fatigue, unexplained weakness, unexplained weight gain or loss.

**Eyes**
Patient denies visual changes, excessive tearing, eye pain, infection or vision loss.

**ENT**
Patient denies frequent sore throats, lumps, enlarged tonsils, horseness, changes in dentition, ear pain or discharge, changes in hearing, nosebleeds or nasal obstruction.

**Integumentary**
Patient denies changes in hair texture, changes in appearance of nail structure, hives, unexplained rashes or change in appearance of moles.

**Cardiovascular**
Patient denies chest pain, palpitations, recent heart attack or thromboembolic events.

**Respiratory**
Patient denies positive TB test, unexplained shortness of breath, coughing blood or bloody sputum.

**Endocrine**
Patient denies heat or cold intolerance, goiter, increased thirst, sweats or neck pain.

**Hematologic/Lymphatic**
Patient denies lumps, radiation exposure, swollen glands, transfusion reaction or chronic anemia.

**Psychiatric**
Patient denies behavioral changes, disorientation, disturbing thoughts, hallucinations or cognitive impairment.

**Neurologic**
Patient denies loss of consciousness, blackouts, recent head injury or paralysis.

# Objective

Vital Signs:

**Respirations**

| Rate | Quality | Rhythm | Pulse Ox | Air | Inhaled $O_2$ | Method | Peak Flow | Flag |
|------|---------|--------|----------|-----|----------------|--------|-----------|------|

**JA759**

| | | | Concentration | | | | |
|---|---|---|---|---|---|---|---|
| 14/min | Normal | NORMAL | | | | | Normal |

### Height, Weight, BMI and Measurements

| Height | Weight | BMI | Flag | | Head | Neck | Waist |
|---|---|---|---|---|---|---|---|
| 5' 5" | 144 (lb) | 24.0 | Normal | | | | |

## Physical Exam:

**Cystoscopy : Cystoscopy Report**

| Question | Comments |
|---|---|
| Procedure: | |
| Description of Procedure | Procedure: Patient was taken to the cystoscopy suite, placed in the lithotomy position and sterilely prepped in the usual fashion. A post-void residual was obtained with a 16 fr straight catheter, a dipstick urinalysis was performed, and the urine was sent for culture. 2% xylocaine gel was applied to the urethra and the urethral was gently dilated to allow passage of the cystourethroscope. The 25?? flexible cystourethroscope was then inserted into the bladder and the bladder was filled to approximately 300 cc visualizing the bladder structures well. The bladder and urethra were thoroughly inspected. The scope was withdrawn and the patient was returned to the supine position having tolerated the procedure well. She was, then, instructed to void. The findings were as follows: |
| Reason Procedure Performed: | Urinary retention and OAB |
| Place Where Procedure Was Performed: | Office |
| Urethra | |
| Urethra | Normal |
| Bladder Neck | |
| Bladder Neck | Normal Mobility |
| Bladder | Normal |
| Ureters | |
| Ureters | Normal |
| Procedures | |
| Procedures | Urethral dilation |
| Interpretation | Urinary Retention |
| Plan of Care | Correlate with Clinical Symptoms |

**Level 4/5 : Physical Examination**
**Constitutional**
Well nourished, Well groomed, Appears to be in generally good health.

Neck

**JA760**

No Masses, Symmetrical in appearance, Trachea midline, Thyroid without enlargement.

**Respiratory**
Relaxed and breathes without effort, No use of accessory muscles, Chest expands symmetrically upon inspiration, Lungs clear to auscultation.

**Cardiovascular**
Heart rate regular, No murmurs noted, No swelling of extremities, Pulses palpable.

**Breast**
symmetrical.

**Gastrointestinal: Abdomen**
Soft, No guarding, No rigidity, No hernia, No hepatosplenomgaly.

**Lymphatic**
No cervical lymphadenopathy noted, No axillary lymphadenopathy noted, No Inguinal lymphadenopathy noted.

**Skin**
No lesions, No ulcerations, No rashes.

**Neurological/Psychiatric**
Pt oriented to person, place and time, Speech fluent, Mood neutral, Affect appropriate.

**Urinalysis : Results**

**Glucose**
neg.

**Ketones**
neg.

**Specific Gravity**
1.015.

**pH**
6.5.

**Blood**
negative.

**Nitrates**
Negative.

**Leukocytes**
Negative.

**Protein**
neg.

**Creatinine**
200.

**PC Ratio**
Normal.

**Assessment of Post Void Residual**
Catheter.

**Post Void Residual (cc)**
590 cc.

**Bladder Wall Thickness**
within normal limits.

# Assessment

**Diagnosis:**

| Description | Code | Problem | Comment |
|---|---|---|---|
| Cystocele, Unspecified | N8110 | | PLan: extensively discussed finding and will monitor |
| Pelvic And Perineal Pain | R102 | | PLan: see treatment plan |
| Overactive Bladder | N3281 | | PLan: see treatment plan |

**JA761**

Retention Of Urine, Unspecified          R339              PLan: see treatment plan

# Plan

Procedure Coding:

| Description | Code | Units | Modifiers | Comments |
|---|---|---|---|---|
| Assay Of Urine Creatinine | 82570 | 1 UN | QW | |
| Office/outpatient Visit Est | 99214 | 1 UN | 25 | |
| Urinalysis Auto W/o Scope | 81003 | 1 UN | QW | |
| Cystoscopy And Treatment | 52285 | 1 UN | | |

Care Plan:

**Urogynecology : Plan of Care**

**Evaluation Plan**
Surgery: Replace Interstim , Following the procedure I reviewed the results and spent an additional 25 minutes reviewing all findings and treatment options. Patient is noted to have severe overactive bladder and dyssynergic voiding. After a comprehensive discussion of options she will replace her interstim as it is at end-of-life and proceed with pelvic floor therapy. The risks , benefits and alternatives fully discussed. She acknowledged understanding..

**JA762**

JA763

## FEMALE PELVIC MEDICINE INSTITUTE OF VIRGINIA PC      12/19/2019

| | | | |
|---|---|---|---|
| **Patient:** ROOP, SAMANTHA J (Female) | **DOB:** | 1985 (34) | **Encounter ID:** 121919-92095589 |
| POWHATAN, VA 23139 | **Previous First Name:** | | **Primary Ins:** Blue Cross Blue Shield Virginia (Anthem BCBS VA) |
| | **Previous Last Name:** | | |
| | **Race:** White | | |
| | **Language:** English | | |
| | **Ethnicity:** Not Hispanic or Latino | | |
| | **Sexual Orientation:** | | |
| | **Gender Identity:** | | |

| | | |
|---|---|---|
| **Location:** St Marys Office | **Provider:** NATHAN GUERETTE, MD | **Referring:** Joseph, Sharon |
| 5875 Bremo Rd Suite 701 | | |
| Richmond, VA 23226-1900 | | |
| (804)523-2533 Ext:0 | | |

# Subjective

### Chief Complaint:

Samantha Roop is a 34 year old White female complaining of overactive bladder/urinary retention: see HPI.

**Initial Consult : FPMIV**
Referring Physician: Dr. Joseph, Had interstim for OAB and pelvic pain 7 years ago. Recent MVA with worsening symptoms.

**History of Present Illness: Bladder Symptoms**
The patient reports having stress incontinence. Urge Incontinence: Yes. The patient denies having mixed incontinence. Stress> Urge Incontinence: Yes. Urge Incontinence >Stress Incontinence : No. The patient denies having continuous urine loss. The patient reports having urgency/frequency. Hematuria: No. Post Void Dribble: No. Abnormal Voiding/Retention: No. Recurrent UTIs: No.

**Symptom Severity**
Incontinent Events/Day: 1-2. Pads/Day: 1-2. Voids/Day: 11+. Voids/Night: 3. Enuresis: No. Bladder Emptying: Normal Flow.

**Vaginal/Bladder/Pelvic Pain**
Vaginal Pain:No. Pelvic Pain: Yes, Pelvic pressure, worse since MVA. Bladder Pain: Yes.

**Prolapse**
Heaviness: Yes. Exteriorized Tissue: No. Pain: No.

**Bowel Symptoms**
Constipation: No. Obstructed Defection: No. Rectal Prolapse: No. Fecal Incontinence: No. No. No.

**Sexual Symptoms**
Yes. Numbness: No. Inability to Orgasm: No. Dyspareunia: Yes. Vaginal Dryness: No. Partner: Normal.

### Social History:

| Tobacco | Usage Status | Last Used | Daily Usage | Packaging | Years | Life History | Cessation Attempts | Last Cessation Rx |
|---|---|---|---|---|---|---|---|---|
| Cigarettes | Never smoked | | | Packs | | | | |

| Alcohol | Usage Status | Last Used | Usage Number | Packaging | Measurement Time | | | |
|---|---|---|---|---|---|---|---|---|
| Wine | Social | | | | | | | |

### Medical History:

**Positive History**

| Condition | Physician | Hospitalization | Hosp Date | Hospital |
|---|---|---|---|---|

**JA764**

**Back Problem**

**GERD**

## Surgical History:

**Positive History**

| Condition | Physician | Hospitalization Hosp Date | Hospital |
|-----------|-----------|---------------------------|----------|
| Cholecystectomy | | | |

**Operative procedure on lumbosacral spinal structure**

## Family History:

| Type | Sex | Status | Age | Name | Negative History | Positive History | Onset Date | Positive Comment | Negative Comment |
|------|-----|--------|-----|------|------------------|------------------|------------|------------------|------------------|
| Mother | F | Alive | | | | Breast Ca | | | |

## Review of Systems:

**ROS : FPMI**

**Constitutional**
Patient denies chills, fever, fatigue, unexplained weakness, unexplained weight gain or loss.

**Eyes**
Patient denies visual changes, excessive tearing, eye pain, infection or vision loss.

**ENT**
Patient denies frequent sore throats, lumps, enlarged tonsils, horseness, changes in dentition, ear pain or discharge, changes in hearing, nosebleeds or nasal obstruction.

**Integumentary**
Patient denies changes in hair texture, changes in appearance of nail structure, hives, unexplained rashes or change in appearance of moles.

**Cardiovascular**
Patient denies chest pain, palpitations, recent heart attack or thromboembolic events.

**Respiratory**
Patient denies positive TB test, unexplained shortness of breath, coughing blood or bloody sputum.

**Endocrine**
Patient denies heat or cold intolerance, goiter, increased thirst, sweats or neck pain.

**Hematologic/Lymphatic**
Patient denies lumps, radiation exposure, swollen glands, transfusion reaction or chronic anemia.

**Psychiatric**
Patient denies behavioral changes, disorientation, disturbing thoughts, hallucinations or cognitive impairment.

**Neurologic**
Patient denies loss of consciousness, blackouts, recent head injury or paralysis.

# Objective

## Vital Signs:

**Respirations**

| | | | | | Inhaled $O_2$ | | | |
|--|--|--|--|--|--|--|--|--|
| Rate | Quality | Rhythm | Pulse Ox | Air | | Method | Peak Flow | Flag |

## Concentration

| 18/min | Normal | NORMAL | | | | | Normal |

### Height, Weight, BMI and Measurements

| Height | Weight | BMI | Flag | | Head | Neck | Waist |
|--------|--------|-----|------|--|------|------|-------|
| 5' 5"  | 145 (lb) | 24.1 | Normal | | | | |

## Physical Exam:

**Level 4/5 : Physical Examination**

**Constitutional**
Well nourished, Well groomed, Appears to be in generally good health.

**Neck**
No Masses, Symmetrical in appearance, Trachea midline, Thyroid without enlargement.

**Respiratory**
Relaxed and breathes without effort, No use of accessory muscles, Chest expands symmetrically upon inspiration, Lungs clear to auscultation.

**Cardiovascular**
Heart rate regular, No murmurs noted, No swelling of extremities, Pulses palpable.

**Breast**
symmetrical.

**Gastrointestinal: Abdomen**
Soft, No guarding, No rigidity, No hernia, No hepatosplenomgaly.

**Lymphatic**
No cervical lymphadenopathy noted, No axillary lymphadenopathy noted, No Inguinal lymphadenopathy noted.

**Skin**
No lesions, No ulcerations, No rashes.

**Neurological/Psychiatric**
Pt oriented to person, place and time, Speech fluent, Mood neutral, Affect appropriate.

**Urinalysis : Results**

**Glucose**
neg.

**Ketones**
neg.

**Specific Gravity**
1.020.

**pH**
6.0.

**Blood**
negative.

**Nitrates**
Negative.

**Leukocytes**
Negative.

**Protein**
neg.

**Creatinine**
10.

**PC Ratio**
Normal.

**Assessment of Post Void Residual**
Ultrasound.

**Post Void Residual (cc)**
40.

**Bladder Wall Thickness**

**JA766**

within normal limits.

# Assessment

### Diagnosis:

| Description | Code | Problem | Comment |
|---|---|---|---|
| Cystocele, Unspecified | N8110 | | PLan: extensively discussed finding and will monitor, ua, uc, pvr |
| Pelvic And Perineal Pain | R102 | | PLan: PNE for interstim revision performed today |
| Overactive Bladder | N3281 | | PLan: Inerstim at end of life for many years. PNE performed today to consider replacement |
| Retention Of Urine, Unspecified | R339 | | PLan: see above |

# Plan

### Office Procedures:

#### PNE

Pre-op diagnosis: OAB unresponsive to conservative therapy and urinary retention
Post-op diagnosis: same
The patient was taken to the procedure suite, placed in the prone position, and steriley prepped in the usual fashion. After post-void residual was obtained, she was prepped with the buttock cheeks taped apart and toes allowed to dangle freely over the edge of the table. The S3 foramen was then identified using superficial landmarks measuring 9 cm from the tip of the coccyx and the 2 cm lateral to the midline. The area overlying the S3 foramen was infiltrated 1 % lidocaine with epinephrine and the 0.5% Marcaine until the adequate anesthesia was achieved.
The test needles were then placed into the S3 foramen and stimulated. Thare was noted to be good anal bellows and great toe deflection consistent with good localization of the S3 nerve root. The stylet of the needle was withdrawn. The peripheral leads were placed to their proper depth and the needles were withdrawn ensuring stable position of the peripheral leads. The lead were then secured and placed. The grounding pads were applied and the external leads were applied. The patient was returned to the sitting position having tolerated the procedure well.
Following the procedure, the post-operatvie programming was performed. The unit was noted to be functioning properly. The patient acknowledged understanding of the peripheral nerve evaluation. She is to follow up in one week and call with any problems in the interim.

### Procedure Coding:

| Description | Code | Units | Modifiers | Comments |
|---|---|---|---|---|
| Implant Neuroelectrodes | 64561 | 1 UN | 50 | |
| Assay Of Urine Creatinine | 82570 | 1 UN | | |
| Office/outpatient Visit Est | 99214 | 1 UN | 25 | |
| US Urine Capacity Measure | 51798 | 1 UN | | |
| Urinalysis Auto W/o Scope | 81003 | 1 UN | QW | |

### Follow Up:

| Type | Recall Date | Provider Name | Notes |
|---|---|---|---|
| Follow-Up | 1 Weeks | GUERETTE, NATHAN | |

**JA767**

**FEMALE PELVIC MEDICINE INSTITUTE OF VIRGINIA PC**                              **12/26/2019**

| | | |
|---|---|---|
| Patient: ROOP, SAMANTHA J (Female) | **DOB:** 1985 (34) | **Encounter ID:** 122619-92305032 |
| POWHATAN, VA 23139 | **Previous First Name:** | **Primary Ins:** Blue Cross Blue Shield Virginia (Anthem BCBS VA) |
| | **Previous Last Name:** | |
| | **Race:** White | |
| | **Language:** English | |
| | **Ethnicity:** Not Hispanic or Latino | |
| | **Sexual Orientation:** | |
| | **Gender Identity:** | |

| | | |
|---|---|---|
| Location: St Marys Office | **Provider:** NATHAN GUERETTE, MD | Referring: Joseph, Sharon |
| 5875 Bremo Rd Suite 701 | | |
| Richmond, VA 23226-1900 | | |
| (804)523-2533 Ext:0 | | |

## Subjective

### Chief Complaint:

Samantha Roop is a 34 year old White female complaining of overactive bladder/urinary retention-see HPI.

**Initial Consult : FPMIV**
Referring Physician. Dr. Joseph, Had interstim for OAB and pelvic pain 7 years ago. Recent MVA with worsening symptoms. Here for follow up on pne. Had good response. L> R. 70% improvement in symptoms on left.

**History of Present Illness: Bladder Symptoms**
The patient reports having stress incontinence.. Urge Incontinence: Yes. The patient denies having mixed incontinence.. Stress> Urge Incontinence: Yes. Urge Incontinence >Stress Incontinence : No. The patient denies having continuous urine loss.. The patient reports having urgency/frequency.. Hematuria: No. Post Void Dribble: No. Abnormal Voiding/Retention: No. Recurrent UTIs: No.

**Symptom Severity**
Incontinent Events/Day: 1-2. Pads/Day: 1-2. Voids/Day: 4-6. Voids/Night: 0-1. Enuresis: No. Bladder Emptying: Normal Flow.

**Vaginal/Bladder/Pelvic Pain**
Vaginal Pain:No. Pelvic Pain: Yes, Pelvic pressure, worse since MVA. Bladder Pain: Yes.

**Prolapse**
Heaviness: Yes. Exteriorized Tissue: No. Pain: No.

**Bowel Symptoms**
Constipation: No. Obstructed Defection: No. Rectal Prolapse: No. Fecal Incontinence: No. No. No.

**Sexual Symptoms**
Yes. Numbness: No. Inability to Orgasm. No. Dyspareunia: Yes. Vaginal Dryness: No. Partner: Normal.

**Previous Therapy**
Interstim.

### Social History:

| Tobacco | Usage Status | Last Used | Daily Usage | Packaging | Years | Life History | Cessation Attempts | Last Cessation Rx |
|---|---|---|---|---|---|---|---|---|
| Cigarettes | Never smoked | | | Packs | | | | |

| Alcohol | Usage Status | Last Used | Usage Number | Packaging | | Measurement Time | | |
|---|---|---|---|---|---|---|---|---|
| Wine | Social | | | | | | | |

### Medical History:

**JA768**

Positive History

| Condition | Physician | Hospitalization | Hosp Date | Hospital |
|-----------|-----------|-----------------|-----------|----------|
| Back Problem | | | | |
| GERD | | | | |

Surgical History:

Positive History

| Condition | Physician | Hospitalization | Hosp Date | Hospital |
|-----------|-----------|-----------------|-----------|----------|
| Cholecystectomy | | | | |

Operative procedure on lumbosacral spinal structure

Family History:

| Type | Sex | Status | Age | Name | Negative History | Positive History | Onset Date | Positive Comment | Negative Comment |
|------|-----|--------|-----|------|------------------|------------------|------------|------------------|------------------|
| Mother | F | Alive | | | | Breast Ca | | | |

Review of Systems:

**ROS : FPMI**

**Constitutional**
Patient denies chills, fever, fatigue, unexplained weakness, unexplained weight gain or loss.

**Eyes**
Patient denies visual changes, excessive tearing, eye pain, infection or vision loss.

**ENT**
Patient denies frequent sore throats, lumps, enlarged tonsils, horseness, changes in dentition, ear pain or discharge, changes in hearing, nosebleeds or nasal obstruction.

**Integumentary**
Patient denies changes in hair texture, changes in appearance of nail structure, hives, unexplained rashes or change in appearance of moles.

**Cardiovascular**
Patient denies chest pain, palpitations, recent heart attack or thromboembolic events.

**Respiratory**
Patient denies positive TB test, unexplained shortness of breath, coughing blood or bloody sputum.

**Endocrine**
Patient denies heat or cold intolerance, goiter, increased thirst, sweats or neck pain.

**Hematologic/Lymphatic**
Patient denies lumps, radiation exposure, swollen glands, transfusion reaction or chronic anemia.

**Psychiatric**
Patient denies behavioral changes, disorientation, disturbing thoughts, hallucinations or cognitive impairment.

**Neurologic**
Patient denies loss of consciousness, blackouts, recent head injury or paralysis.

# Objective

Vital Signs:

**JA769**

## Respirations

| Rate | Quality | Rhythm | Pulse Ox | Air | Inhaled O$_2$ Concentration | Method | Peak Flow | Flag |
|------|---------|--------|----------|-----|------------------------------|--------|-----------|------|
| 12/min | Normal | NORMAL | | | | | | Normal |

### Height, Weight, BMI and Measurements

| Height | Weight | BMI | Flag | | | Head | Neck | Waist |
|--------|--------|-----|------|--|--|------|------|-------|
| 5' 5" | 145 (lb) | 24.1 | Normal | | | | | |

## Physical Exam:

#### Interstim : Interstim Programming

| Question | | Comments |
|----------|--|----------|
| Post operative week or Year | 1 | Pne |
| Lead Location | Left<br>Right | |
| Reprogramming | | |
| Impedences | No | |

#### Level 4/5 : Physical Examination

**Constitutional**
Well nourished, Well groomed, Appears to be in generally good health.

**Neck**
No Masses, Symmetrical in appearance, Trachea midline, Thyroid without enlargement.

**Respiratory**
Relaxed and breathes without effort, No use of accessory muscles, Chest expands symmetrically upon inspiration, Lungs clear to auscultation.

**Cardiovascular**
Heart rate regular, No murmurs noted, No swelling of extremities, Pulses palpable.

**Breast**
symmetrical.

**Gastrointestinal: Abdomen**
Soft, No guarding, No rigidity, No hernia, No hepatosplenomgaly.

**Lymphatic**
No cervical lymphadenopathy noted, No axillary lymphadenopathy noted, No Inguinal lymphadenopathy noted.

**Skin**
No lesions, No ulcerations, No rashes.

**Neurological/Psychiatric**
Pt oriented to person, place and time., Speech fluent, Mood neutral, Affect appropriate.

**Urinalysis : Results**

**Glucose**
neg.

**Ketones**
neg.

**Specific Gravity**
1.020.

**pH**
6.5.

**Blood**
+.

**Nitrates**
Negative.

**Leukocytes**

**JA770**

Negative.

**Protein**
neg.

**Creatinine**
100.

**PC Ratio**
Normal.

**Assessment of Post Void Residual**
Ultrasound.

**Post Void Residual (cc)**
0.

**Bladder Wall Thickness**
within normal limits.

## Assessment

Diagnosis:

| Description | Code | Problem | Comment |
|---|---|---|---|
| Cystocele, Unspecified | N8110 | | PLan: extensively discussed finding and will monitor, ua, uc, pvr |
| Pelvic And Perineal Pain | R102 | | PLan: Improved with pne. See treatment plan |
| Overactive Bladder | N3281 | | PLan: Inerstim at end of life for many years. PNE performed. See treatment plan |
| Retention Of Urine, Unspecified | R339 | | PLan: see above |

## Plan

Procedure Coding:

| Description | Code | Units | Modifiers | Comments |
|---|---|---|---|---|
| US Urine Capacity Measure | 51798 | 1 UN | | |
| Assay Of Urine Creatinine | 82570 | 1 UN | QW | |
| Office/outpatient Visit Est | 99214 | 1 UN | 25 | |
| Urinalysis Auto W/o Scope | 81003 | 1 UN | QW | |

Care Plan:

**Urogynecology : Plan of Care**

**Evaluation Plan**
Surgery: Explant InterStim and InterStim complete to left side, Following the exam I spent >25 minutes discussing symptoms and treatment options. After comprehensive discussion she elects the above procedure. The risks benefits and alternatives fully discussed. She acknowledged understanding.

**JA771**

## FEMALE PELVIC MEDICINE INSTITUTE OF VIRGINIA PC                    01/22/2020

Patient: ROOP, SAMANTHA J (Female)      **DOB:**   1985 (34)        **Encounter ID:** 012220-93742685
                                   **Previous First**                **Primary Ins:** Blue Cross Blue Shield
        POWHATAN, VA 23139          **Name:**                                     Virginia (Anthem BCBS
                                   **Previous Last**                              VA)
                                     **Name:**
                                     **Race:** White
                               **Language:** English
                              **Ethnicity:** Not Hispanic or Latino
                                   **Sexual**
                              **Orientation:**
                                   **Gender**
                                 **Identity:**

Location: St Marys Office               **Provider:** NATHAN GUERETTE, MD        **Referring:** Joseph, Sharon
        5875 Bremo Rd Suite 701                                        **Servicing Provider:** Connelly, Jennifer
        Richmond, VA 23226-1900
        (804)523-2533 Ext:0

# Subjective

### Chief Complaint:

Samantha Roop is a 34 year old White female complaining of 2 week postop/ Interstim revision.

**Medical F/U : FPMIV**

**History of Present Illness**
Diagnosis:Interstitial Cystitis, Diagnosis:Overactive Bladder.

**Self Assessment**
Greatly Improved.

**Interim Therapy**
Interstim.

**New Symptoms**
Palpable Prolapse.

**Pain**
Vaginal. Incontinent Events / Day: 0. Dysuria: No. Voids/Day: 4-6. Voids/Night: 0-1. Constipation: No. Obstructed Defecation: No. Fecal Incontinence: No,
No. Sexually Active: No.

### Social History:

| Tobacco | Usage Status | Last Used | Daily Usage | Packaging | Years | Life History | Cessation Attempts | Last Cessation Rx |
|---|---|---|---|---|---|---|---|---|
| Cigarettes | Never used tobacco | | | Packs | | | | |

| Alcohol | Usage Status | Last Used | Usage Number | Packaging | | Measurement Time | | |
|---|---|---|---|---|---|---|---|---|
| Wine | Social | | | | | | | |

### Medical History:

**Positive History**

| Condition | Physician | Hospitalization | Hosp Date | Hospital |
|---|---|---|---|---|
| Back Problem | | | | |

**GERD**

**JA772**

## Surgical History:

**Positive History**

| Condition | Physician | Hospitalization | Hosp Date | Hospital |
|-----------|-----------|-----------------|-----------|----------|
| Cholecystectomy | | | | |

**Operative procedure on lumbosacral spinal structure**

## Family History:

| Type | Sex | Status | Age | Name | Negative History | Positive History | Onset Date | Positive Comment | Negative Comment |
|------|-----|--------|-----|------|------------------|------------------|------------|------------------|------------------|
| Mother | F | Alive | | | | Breast Ca | | | |

## Review of Systems:

**ROS : FPMI**

**Constitutional**
Patient denies chills, fever, fatigue, unexplained weakness, unexplained weight gain or loss.

**Eyes**
Patient denies visual changes, excessive tearing, eye pain, infection or vision loss..

**ENT**
Patient denies frequent sore throats, lumps, enlarged tonsils, horseness, changes in dentition, ear pain or discharge, changes in hearing, nosebleeds or nasal obstruction..

**Integumentary**
Patient denies changes in hair texture, changes in appearance of nail structure, hives, unexplained rashes or change in appearance of moles..

**Cardiovascular**
Patient denies chest pain, palpitations, recent heart attack or thromboembolic events.

**Respiratory**
Patient denies positive TB test, unexplained shortness of breath, coughing blood or bloody sputum.

**Endocrine**
Patient denies heat or cold intolerance, goiter, increased thirst, sweats or neck pain.

**Hematologic/Lymphatic**
Patient denies lumps, radiation exposure, swollen glands, transfusion reaction or chronic anemia.

**Psychiatric**
Patient denies behavioral changes, disorientation, disturbing thoughts, hallucinations or cognitive impairment..

**Neurologic**
Patient denies loss of consciousness, blackouts, recent head injury or paralysis.

# Objective

**Vital Signs:**

**Physical Exam:**

**Interstim : Interstim Programming**

| Question | Comments |
|----------|----------|
| Post operative week or Year | 2 weeks |

ROOP, SAMANTHA J    1985)

2/9/22, 10:15 AM

| Lead Location | Left |
|---|---|

**Reprogramming**

| Location of Stimulation | Vaginal |
|---|---|
| Impedences | No |
| Reconfigurations | Na |
| New Setting | Pg 2 1.9 |

**Level 4/5 : Physical Examination**

**Constitutional**
Well nourished, Well grcomed, Appears to be in generally good health.

**Neck**
No Masses, Symmetrical in appearance, Trachea midline, Thyroid without enlargement.

**Respiratory**
Relaxed and breathes without effort, No use of accessory muscles, Chest expands symmetrically upon inspiration, Lungs clear to auscultation.

**Cardiovascular**
Heart rate regular, No murmurs noted, No swelling of extremities, Pulses palpable.

**Breast**
symmetrical.

**Gastrointestinal: Abdomen**
Soft, No guarding, No rigidity, No hernia, No hepatosplenomgaly.

**Lymphatic**
No cervical lymphadenopathy noted, No axillary lymphadenopathy noted, No Inguinal lymphadenopathy noted.

**Skin**
No lesions, No ulcerations, No rashes.

**Neurological/Psychiatric**
Pt oriented to person, place and time., Speech fluent, Mood neutral, Affect appropriate.

**Urinalysis : Results**

**Glucose**
neg.

**Ketones**
neg.

**Specific Gravity**
1.025.

**pH**
7.0.

**Blood**
+.

**Nitrates**
Negative.

**Leukocytes**
Negative.

**Protein**
neg.

**Creatinine**
100.

**PC Ratio**
Normal.

**Assessment of Post Void Residual**
Ultrasound.

**Post Void Residual (cc)**
10.

**JA774**

**Bladder Wall Thickness**
within normal limits.

## Assessment

### Diagnosis:

| Description | Code | Problem | Comment |
|---|---|---|---|
| Overactive Bladder | N3281 | | stable at this time. Interstim evaluated and no impedences noted |
| Cystocele, Unspecified | N8110 | | will monitor |
| Pelvic And Perineal Pain | R102 | | will monitor |
| Retention Of Urine, Unspecified | R339 | | stable at this time UACS PVR |
| Interstitial Cystitis (chronic) With Hematuria | N3011 | | stable with interstim and diet |

## Plan

### Procedure Coding:

| Description | Code | Units | Modifiers | Comments |
|---|---|---|---|---|
| Alys Cplx Sp/pn Npgt W/prgrm | 95972 | 1 UN | | |
| Assay Of Urine Creatinine | 82570 | 1 UN | QW | |
| US Urine Capacity Measure | 51798 | 1 UN | | |
| Postop Follow-up Visit | 99024 | 1 UN | | |
| Urinalysis Auto W/o Scope | 81003 | 1 UN | QW | |

### Follow Up:

| Type | Recall Date | Provider Name | Notes |
|---|---|---|---|
| Follow-Up | 1 Months | GUERETTE, NATHAN | |

**JA775**

## FEMALE PELVIC MEDICINE INSTITUTE OF VIRGINIA PC 02/19/2020

| | | | |
|---|---|---|---|
| Patient: ROOP, SAMANTHA J (Female) | **DOB:** | 1985 (35) | **Encounter ID:** 021920-95199022 |
| | **Previous First** | | **Primary Ins:** Blue Cross Blue Shield |
| POWHATAN, VA 23139 | **Name:** | | Virginia (Anthem BCBS |
| | **Previous Last** | | VA) |
| | **Name:** | | |
| | **Race:** White | | |
| | **Language:** English | | |
| | **Ethnicity:** Not Hispanic or Latino | | |
| | **Sexual** | | |
| | **Orientation:** | | |
| | **Gender** | | |
| | **Identity:** | | |

| | | |
|---|---|---|
| Location: St Marys Office | **Provider:** JENNIFER CONNELLY | **Referring:** Joseph, Sharon |
| 5875 Bremo Rd Suite 701 | | **Servicing Provider:** Connelly, Jennifer |
| Richmond, VA 23226-1900 | | |
| (804)523-2533 Ext:0 | | |

# Subjective

## Chief Complaint:

Samantha Roop is a 35 year old White female complaining of 2 week postop/ Interstim revision.

**Medical F/U : FPMIV**

**History of Present Illness**
Diagnosis:Interstitial Cystitis, Diagnosis:Overactive Bladder.

**Self Assessment**
Not Improved.

**Interim Therapy**
Interstim.

**New Symptoms**
Urgency/Frequency.

**Pain**
Bladder. Incontinent Events / Day: 0. Dysuria: No. Voids/Day: 7-10. Voids/Night: 0-1. Constipation: No. Obstructed Defecation: No. Fecal Incontinence: No, No. Sexually Active: No.

## Social History:

| Tobacco | Usage Status | Last Used | Daily Usage | Packaging | Years | Life History | Cessation Attempts | Last Cessation Rx |
|---|---|---|---|---|---|---|---|---|
| Cigarettes | Never used tobacco | | | Packs | | | | |

| Alcohol | Usage Status | Last Used | Usage Number | Packaging | | Measurement Time | |
|---|---|---|---|---|---|---|---|
| Wine | Social | | | | | | |

## Medical History:

**Positive History**

| Condition | Physician | Hospitalization | Hosp Date | Hospital |
|---|---|---|---|---|
| **Back Problem** | | | | |

**GERD**

**JA776**

## Surgical History:

**Positive History**

| Condition | Physician | Hospitalization | Hosp Date | Hospital |
|-----------|-----------|-----------------|-----------|----------|
| Cholecystectomy | | | | |

Operative procedure on lumbosacral spinal structure

## Family History:

| Type | Sex | Status | Age | Name | Negative History | Positive History | Onset Date | Positive Comment | Negative Comment |
|------|-----|--------|-----|------|------------------|------------------|------------|------------------|------------------|
| Mother | F | Alive | | | | Breast Ca | | | |

### Review of Systems:

**ROS : FPMI**

**Constitutional**
Patient denies chills, fever, fatigue, unexplained weakness, unexplained weight gain or loss.

**Eyes**
Patient denies visual changes, excessive tearing, eye pain, infection or vision loss..

**ENT**
Patient denies frequent sore throats, lumps, enlarged tonsils, horseness, changes in dentition, ear pain or discharge, changes in hearing, nosebleeds or nasal obstruction..

**Integumentary**
Patient denies changes in hair texture, changes in appearance of nail structure, hives, unexplained rashes or change in appearance of moles.

**Cardiovascular**
Patient denies chest pain, palpitations, recent heart attack or thromboembolic events.

**Respiratory**
Patient denies positive TB test, unexplained shortness of breath, coughing blood or bloody sputum.

**Endocrine**
Patient denies heat or cold intolerance, goiter, increased thirst, sweats or neck pain.

**Hematologic/Lymphatic**
Patient denies lumps, radiation exposure, swollen glands, transfusion reaction or chronic anemia.

**Psychiatric**
Patient denies behavioral changes, disorientation, disturbing thoughts, hallucinations or cognitive impairment..

**Neurologic**
Patient denies loss of consciousness, blackouts, recent head injury or paralysis.

# Objective

## Vital Signs:

## Physical Exam:

**Interstim : Interstim Programming**

| Question | Comments |
|----------|----------|
| Post operative week or Year | 6 weeks |

**JA777**

ROOP, SAMANTHA J    1985)                                   2/9/22, 10:15 AM

| | |
|---|---|
| Lead Location | Right |
| Current Setting | Pg 2 1.4 |

**Reprogramming**

| | |
|---|---|
| Location of Stimulation | Vaginal |
| Impedences | No |
| New Setting | Pg 5. 1.6 |

**Level 4/5 : Physical Examination**

**Constitutional**
Well nourished, Well groomed, Appears to be in generally good health.

**Neck**
No Masses, Symmetrical in appearance, Trachea midline, Thyroid without enlargement.

**Respiratory**
Relaxed and breathes without effort, No use of accessory muscles, Chest expands symmetrically upon inspiration, Lungs clear to auscultation.

**Cardiovascular**
Heart rate regular, No murmurs noted, No swelling of extremities, Pulses palpable.

**Breast**
symmetrical.

**Gastrointestinal: Abdomen**
Soft, No guarding, No rigidity, No hernia, No hepatosplenomgaly.

**Lymphatic**
No cervical lymphadenopathy noted, No axillary lymphadenopathy noted, No Inguinal lymphadenopathy noted.

**Skin**
No lesions, No ulcerations, No rashes.

**Neurological/Psychiatric**
Pt oriented to person, place and time., Speech fluent, Mood neutral, Affect appropriate.

**Urinalysis : Results**

**Glucose**
neg.

**Ketones**
neg.

**Specific Gravity**
1.010.

**pH**
7.0.

**Blood**
+.

**Nitrates**
Negative.

**Leukocytes**
Negative.

**Protein**
neg.

**Creatinine**
200.

**PC Ratio**
Normal.

**Assessment of Post Void Residual**
Ultrasound.

**Post Void Residual (cc)**
64.

**JA778**

**Bladder Wall Thickness**
within normal limits.

# Assessment

Diagnosis:

| Description | Code | Problem | Comment |
|---|---|---|---|
| Overactive Bladder | N3281 | | Interstim evaluated and no impedences noted, advanced programming performed |
| Cystocele, Unspecified | N8110 | | will monitor |
| Pelvic And Perineal Pain | R102 | | will monitor |
| Retention Of Urine, Unspecified | R339 | | stable at this time UACS PVR |
| Interstitial Cystitis (chronic) With Hematuria | N3011 | | stable with interstim and diet |

# Plan

Procedure Coding:

| Description | Code | Units | Modifiers | Comments |
|---|---|---|---|---|
| Alys Cplx Sp/pn Npgt W/prgrm | 95972 | 1 UN | | |
| Assay Of Urine Creatinine | 82570 | 1 UN | QW | |
| US Urine Capacity Measure | 51798 | 1 UN | | |
| Postop Follow-up Visit | 99024 | 1 UN | | |
| Urinalysis Auto W/o Scope | 81003 | 1 UN | QW | |

Follow Up:

| Type | Recall Date | Provider Name | Notes |
|---|---|---|---|
| Follow-Up | 2 Weeks | GUERETTE, NATHAN | |

**JA779**

**FEMALE PELVIC MEDICINE INSTITUTE OF VIRGINIA PC**                    **12/04/2020**

| | | |
|---|---|---|
| Patient: ROOP, SAMANTHA J (Female) | **DOB:** 1985 (35) | **Encounter ID:** 120420-109751614 |
| | **Previous First** | **Primary Ins:** Anthem Healthkeepers |
| POWHATAN, VA 23139 | **Name:** | Plus |
| | **Previous Last** | |
| | **Name:** | |
| | **Race:** White | |
| | **Language:** English | |
| | **Ethnicity:** Not Hispanic or Latino | |
| | **Sexual** | |
| | **Orientation:** | |
| | **Gender** | |
| | **Identity:** | |

Location: Polo Parkway          **Provider:** NATHAN GUERETTE, MD          Referring: Joseph, Sharon
         2931 Polo Parkway
         Midlothian,VA 23113-1453
         (804)523-2533 Ext:0

## Subjective

**Chief Complaint:**

Samantha Roop is a 35 year old White female complaining of Interstim problem: see HPI.

**Medical F/U : FPMIV**

**Self Assessment**
Worsened.

**Interim Therapy**
Interstim.

**New Symptoms**
Urgency/Frequency.

**Pain**
Bladder. Incontinent Events / Day: 0. Type: Urge. Dysuria: No. Voids/Day: 11+. Voids/Night: 4+. Constipation: No. Obstructed Defecation: No. Fecal Incontinence: No, No. Sexually Active: Yes. Dyspareunia: Yes, Anterior Wall, same as IC pain.

**Social History:**

| Tobacco | Usage Status | Last Used | Daily Usage | Packaging | Years | Life History | Cessation Attempts | Last Cessation Rx |
|---|---|---|---|---|---|---|---|---|
| Cigarettes | Never smoked | | | Packs | | | | |

| Alcohol | Usage Status | Last Used | Usage Number | Packaging | | Measurement Time | | |
|---|---|---|---|---|---|---|---|---|
| Wine | Social | | | | | | | |

**Medical History:**

**Positive History**

| Condition | Physician | Hospitalization | Hosp Date | Hospital |
|---|---|---|---|---|
| Back Problem | | | | |
| | | | | |
| GERD | | | | |

**JA780**

## Surgical History:

**Positive History**

| Condition | Physician | Hospitalization Hosp Date | Hospital |
|---|---|---|---|
| Cholecystectomy | | | |

Operative procedure on lumbosacral spinal structure

## Family History:

| Type | Sex | Status | Age | Name | Negative History | Positive History | Onset Date | Positive Comment | Negative Comment |
|---|---|---|---|---|---|---|---|---|---|
| Mother | F | Alive | | | | Breast Ca | | | |

## Review of Systems:

**ROS : FPMI**

**Constitutional**
Patient denies chills, fever, fatigue, unexplained weakness, unexplained weight gain or loss.

**Eyes**
Patient denies visual changes, excessive tearing, eye pain, infection or vision loss..

**ENT**
Patient denies frequent sore throats, lumps, enlarged tonsils, horseness, changes in dentition, ear pain or discharge, changes in hearing, nosebleeds or nasal obstruction..

**Integumentary**
Patient denies changes in hair texture, changes in appearance of nail structure, hives, unexplained rashes or change in appearance of moles..

**Cardiovascular**
Patient denies chest pain, palpitations, recent heart attack or thromboembolic events.

**Respiratory**
Patient denies positive TB test, unexplained shortness of breath, coughing blood or bloody sputum.

**Endocrine**
Patient denies heat or cold intolerance, goiter, increased thirst, sweats or neck pain.

**Hematologic/Lymphatic**
Patient denies lumps, radiation exposure, swollen glands, transfusion reaction or chronic anemia.

**Psychiatric**
Patient denies behavioral changes, disorientation, disturbing thoughts, hallucinations or cognitive impairment..

**Neurologic**
Patient denies loss of consciousness, blackouts, recent head injury or paralysis.

# Objective

**Vital Signs:**

**Respirations**

| Rate | Quality | Rhythm | Pulse Ox | Air | Inhaled $O_2$ Concentration | Method | Peak Flow | Flag |
|---|---|---|---|---|---|---|---|---|
| 14/min | Normal | NORMAL | | | | | | Normal |

**Height, Weight, BMI and Measurements**

| Height | Weight | BMI | Flag | | | Head | Neck | Waist |
|---|---|---|---|---|---|---|---|---|
| 5' 5" | 136 (lb) | 22.6 | Normal | | | | | |

**JA781**

## Physical Exam:

**Interstim : Interstim Programming**

| Question | | Comments |
|---|---|---|
| Post operative week or Year | 10 months | |
| Lead Location | Right | |
| Current Setting | Pg 5 2.4 | |
| Reprogramming | | |
| New Setting | Pg 5.5.6 | rapidly loses feeling |
| Cycling | No | |

**Level 4/5 : Physical Examination**

**Constitutional**
Well nourished, Well groomed, Appears to be in generally good health.

**Neck**
No Masses, Symmetrical in appearance, Trachea midline, Thyroid without enlargement.

**Respiratory**
Relaxed and breathes without effort, No use of accessory muscles, Chest expands symmetrically upon inspiration, Lungs clear to auscultation.

**Cardiovascular**
Heart rate regular, No murmurs noted, No swelling of extremities, Pulses palpable.

**Breast**
symmetrical.

**Gastrointestinal: Abdomen**
Soft, No guarding, No rigidity, No hernia, No hepatosplenomgaly.

**Lymphatic**
No cervical lymphadenopathy noted, No axillary lymphadenopathy noted, No Inguinal lymphadenopathy noted.

**Skin**
No lesions, No ulcerations, No rashes.

**Neurological/Psychiatric**
Pt oriented to person, place and time., Speech fluent, Mood neutral, Affect appropriate.

**Pelvic : Examination**

**PAP obtained this visit?**
No.

**External Genitalia**
External Genitalia: Normal.

**Urethral Meatus**
The urethral meatus is without erythema, edema, prolapse or lesions.

**Urethra**
The urethra is without masses, tenderness or scarring.

**Sensation**
Sensation: Intact.

**Supine Cough Test**
Supine Cough Test:Negative.

**Bulbocavernous**
Bulbocavernous:Negative.

**Bladder**
tenderness, Bladder pain.

**Adenexa**
Adenexa:Normal.

**JA782**

**Pain**
Pain: Nontender.

**Vagina**
Vagina: Normal. Vagina Atrophy:None. Vagina Caliber:normal. Vagina Tone: Normal. Vagina Ulcerations: Negative.

**POP-Q**
Aa:0. Ba:0. Ap:-1. Bp:-1. C:-5. D:-6. TVL:10. GH:4. PB:3. Stage 3.

**Kegal**
Strength: moderate. Duration:Normal. Lift: present.

**Rectal**
Rectal Masses: Negative. Anal Wink: Positive. Tone: Normal. Squeeze: Normal. Prolapse: Negative.

**Urinalysis : Results**

**Glucose**
neg.

**Ketones**
neg.

**Specific Gravity**
1.010.

**pH**
7.0.

**Blood**
+.

**Nitrates**
Negative.

**Leukocytes**
Negative.

**Protein**
neg.

**Creatinine**
200.

**PC Ratio**
Normal.

**Assessment of Post Void Residual**
Ultrasound.

**Post Void Residual (cc)**
0cc.

**Bladder Wall Thickness**
within normal limits.

# Assessment

Diagnosis:

| Description | Code | Problem | Comment |
|---|---|---|---|
| Overactive Bladder | N3281 | | Interstim evaluated and no impedences noted, advanced programming performed ,ua, uc, pvr |
| Pelvic And Perineal Pain | R102 | | will monitor with interstim changes |
| Retention Of Urine, Unspecified | R339 | | stable at this time UACS PVR |
| Interstitial Cystitis (chronic) With Hematuria | N3011 | | diet, interstim not working - medtronic evaluation |
| Complete Uterovaginal Prolapse | N813 | | Plan: monitor |

**JA783**

# Plan

## Procedure Coding:

| Description | Code | Units | Modifiers | Comments |
|---|---|---|---|---|
| US Urine Capacity Measure | 51798 | 1 UN | | |
| Urinalysis Auto W/o Scope | 81003 | 1 UN | QW | |
| Assay Of Urine Creatinine | 82570 | 1 UN | QW | |
| Alys Cplx Sp/pn Npgt W/prgrm | 95972 | 1 UN | | |
| Office/outpatient Visit Est | 99214 | 1 UN | 25 | |

## Follow Up:

| Type | Recall Date | Provider Name | Notes |
|---|---|---|---|
| Follow-Up | 2 Weeks | GUERETTE, NATHAN | Interstim programming appointment |

**JA784**

## FEMALE PELVIC MEDICINE INSTITUTE OF VIRGINIA PC                    **12/15/2020**

| | | |
|---|---|---|
| Patient: ROOP, SAMANTHA J (Female) | **DOB:** 1985 (35) | **Encounter ID:** 121520-110409694 |
| POWHATAN, VA 23139 | **Previous First Name:** | **Primary Ins:** Blue Cross Blue Shield Virginia (Anthem BCBS VA) |
| | **Previous Last Name:** | |
| | **Race:** White | |
| | **Language:** English | |
| | **Ethnicity:** Not Hispanic or Latino | |
| | **Sexual Orientation:** | |
| | **Gender Identity:** | |

| | | |
|---|---|---|
| Location: Polo Parkway | **Provider:** NATHAN GUERETTE, MD | **Referring:** Joseph, Sharon |
| 2931 Polo Parkway | | |
| Midlothian, VA 23113-1453 | | |
| (804)523-2533 Ext:0 | | |

# Subjective

### Chief Complaint:

Samantha Roop is a 35 year old White female complaining of 2 week postop/ Interstim revision.

**Medical F/U : FPMIV**

**Self Assessment**
Not Improved.

**New Symptoms**
Urgency/Frequency.

**Pain**
Bladder. Incontinent Events / Day: 0. Dysuria: No. Voids/Day: 7-10. Voids/Night: 0-1. Constipation: No. Obstructed Defecation: No. Fecal Incontinence: No, No. Sexually Active: No.

### Social History:

| Tobacco | Usage Status | Last Used | Daily Usage | Packaging | Years | Life History | Cessation Attempts | Last Cessation Rx |
|---|---|---|---|---|---|---|---|---|
| Cigarettes | Never smoked | | | Packs | | | | |

| Alcohol | Usage Status | Last Used | Usage Number | Packaging | | Measurement Time | |
|---|---|---|---|---|---|---|---|
| Wine | Social | | | | | | |

### Medical History:

**Positive History**

| Condition | Physician | Hospitalization | Hosp Date | Hospital |
|---|---|---|---|---|
| Back Problem | | | | |
| | | | | |
| GERD | | | | |

### Surgical History:

**JA786**

**Positive History**

| Condition | Physician | Hospitalization | Hosp Date | Hospital |
|-----------|-----------|-----------------|-----------|----------|
| Cholecystectomy | | | | |

**Operative procedure on lumbosacral spinal structure**

**Family History:**

| Type | Sex | Status | Age | Name | Negative History | Positive History | Onset Date | Positive Comment | Negative Comment |
|------|-----|--------|-----|------|------------------|------------------|------------|------------------|------------------|
| Mother | F | Alive | | | | Breast Ca | | | |

**Review of Systems:**

**ROS : FPMI**

**Constitutional**
Patient denies chills, fever, fatigue, unexplained weakness, unexplained weight gain or loss.

**Eyes**
Patient denies visual changes, excessive tearing, eye pain, infection or vision loss..

**ENT**
Patient denies frequent sore throats, lumps, enlarged tonsils, horseness, changes in dentition, ear pain or discharge, changes in hearing, nosebleeds or nasal obstruction..

**Integumentary**
Patient denies changes in hair texture, changes in appearance of nail structure, hives, unexplained rashes or change in appearance of moles..

**Cardiovascular**
Patient denies chest pain, palpitations, recent heart attack or thromboembolic events.

**Respiratory**
Patient denies positive TB test, unexplained shortness of breath, coughing blood or bloody sputum.

**Endocrine**
Patient denies heat or cold intolerance, goiter, increased thirst, sweats or neck pain.

**Hematologic/Lymphatic**
Patient denies lumps, radiation exposure, swollen glands, transfusion reaction or chronic anemia.

**Psychiatric**
Patient denies behavioral changes, disorientation, disturbing thoughts, hallucinations or cognitive impairment..

**Neurologic**
Patient denies loss of consciousness, blackouts, recent head injury or paralysis.

# Objective

**Vital Signs:**

**Physical Exam:**

**Interstim : Interstim Programming**

| Question | | Comments |
|----------|--|----------|
| Post operative week or Year | 6 weeks | |
| Lead Location | Right | |
| Current Setting | Pg 5 1.6 | |

**JA787**

### Reprogramming

| | |
|---|---|
| Location of Stimulation | Vaginal |
| Impedences | No |
| Reconfigurations | No |
| New Setting | Pg 7 1.7 |
| Cycling | No |

**Level 4/5 : Physical Examination**

**Constitutional**
Well nourished, Well groomed, Appears to be in generally good health.

**Neck**
No Masses, Symmetrical in appearance, Trachea midline, Thyroid without enlargement.

**Respiratory**
Relaxed and breathes without effort, No use of accessory muscles, Chest expands symmetrically upon inspiration, Lungs clear to auscultation.

**Cardiovascular**
Heart rate regular, No murmurs noted, No swelling of extremities, Pulses palpable.

**Breast**
symmetrical.

**Gastrointestinal: Abdomen**
Soft, No guarding, No rigidity, No hernia, No hepatosplenomgaly.

**Lymphatic**
No cervical lymphadenopathy noted, No axillary lymphadenopathy noted, No Inguinal lymphadenopathy noted.

**Skin**
No lesions, No ulcerations, No rashes.

**Neurological/Psychiatric**
Pt oriented to person, place and time., Speech fluent, Mood neutral, Affect appropriate.

**Pelvic : Examination**
**External Genitalia**
External Genitalia: Normal.

**Urethral Meatus**
The urethral meatus is without erythema, edema, prolapse or lesions.

**Urethra**
The urethra is without masses, tenderness or scarring.

**Sensation**
Sensation: Intact.

**Supine Cough Test**
Supine Cough Test:Negative.

**Bulbocavernous**
Bulbocavernous:Negative.

**Bladder**
non-tender.

**Adenexa**
Adenexa:Normal.

**Pain**
Pain: Nontender.

**Vagina**
Vagina: Normal. Vagina Atrophy:None. Vagina Caliber:normal. Vagina Tone: Normal. Vagina Ulcerations: Negative.

**Kegal**
Duration:Normal. Lift: present.

**Rectal**
Rectal Masses: Negative. Anal Wink: Positive. Tone: Normal. Squeeze: Normal. Prolapse: Negative.

**JA788**

**Urinalysis : Results**

**Glucose**
neg.

**Ketones**
neg.

**Specific Gravity**
1.010.

**pH**
7.0.

**Blood**
negative.

**Nitrates**
Negative.

**Leukocytes**
Negative.

**Protein**
neg.

**Creatinine**
100.

**PC Ratio**
Normal.

**Assessment of Post Void Residual**
Ultrasound.

**Post Void Residual (cc)**
32.

**Bladder Wall Thickness**
within normal limits.

# Assessment

Diagnosis:

| Description | Code | Problem | Comment |
|---|---|---|---|
| Overactive Bladder | N3281 | | Interstim evaluated and no impedences noted, advanced programming performed ,ua, uc, pvr |
| Cystocele, Unspecified | N8110 | | will monitor |
| Pelvic And Perineal Pain | R102 | | will monitor |
| Retention Of Urine, Unspecified | R339 | | stable at this time UACS PVR |
| Interstitial Cystitis (chronic) With Hematuria | N3011 | | stable with interstim and diet |

# Plan

Procedure Coding:

| Description | Code | Units | Modifiers | Comments |
|---|---|---|---|---|
| US Urine Capacity Measure | 51798 | 1 UN | | |
| Urinalysis Auto W/o Scope | 81003 | 1 UN | QW | |
| Assay Of Urine Creatinine | 82570 | 1 UN | QW | |
| Alys Cplx Sp/pn Npgt W/prgrm | 95972 | 1 UN | | |
| Office O/p Est Mod | 99214 | 1 UN | 25 | |

**JA789**

## Follow Up:

| Type | Recall Date | Provider Name | Notes |
|------|-------------|---------------|-------|
| Follow-Up | 1 Weeks | GUERETTE, NATHAN | |

**JA790**

## FEMALE PELVIC MEDICINE INSTITUTE OF VIRGINIA PC                          01/05/2021

| | | |
|---|---|---|
| **Patient:** ROOP, SAMANTHA J (Female) | **DOB:** 1985 (35) | **Encounter ID:** 010521-111471980 |
| POWHATAN, VA 23139 | **Previous First Name:** | **Primary Ins:** Blue Cross Blue Shield Virginia (Anthem BCBS VA) |
| | **Previous Last Name:** | |
| | **Race:** White | |
| | **Language:** English | |
| | **Ethnicity:** Not Hispanic or Latino | |
| | **Sexual Orientation:** | |
| | **Gender Identity:** | |

**Location:** Polo Parkway
2931 Polo Parkway
Midlothian,VA 23113-1453
(804)523-2533 Ext:0

**Provider:** NATHAN GUERETTE, MD          **Referring:** Joseph, Sharon

# Subjective

### Chief Complaint:

Samantha Roop is a 35 year old White female complaining of interstim programming : see HPI.

**Medical F/U : FPMIV**

**History of Present Illness**
Diagnosis:Interstitial Cystitis, Diagnosis:Overactive Bladder, Diagnosis.Pelvic Pain.

**Self Assessment**
Worsened.

**Interim Therapy**
Interstim.

**New Symptoms**
Urgency/Frequency, Having a bit too much pulsating .

**Pain**
Bladder, Ic flare symptoms . Incontinent Events / Day: 0. Dysuria: No. Voids/Day: 7-10. Voids/Night: 0-1. Constipation: No. Obstructed Defecation: No. Fecal Incontinence: No, No. Sexually Active: Yes. Dyspareunia: Yes, Anterior Wall, same as IC pain.

### Social History:

| Tobacco | Usage Status | Last Used | Daily Usage | Packaging | Years | Life History | Cessation Attempts | Last Cessation Rx |
|---|---|---|---|---|---|---|---|---|
| Cigarettes | Never smoked | | | Packs | | | | |

| Alcohol | Usage Status | Last Used | Usage Number | Packaging | Measurement Time | |
|---|---|---|---|---|---|---|
| Wine | Social | | | | | |

### Medical History:

**Positive History**

| Condition | Physician | Hospitalization | Hosp Date | Hospital |
|---|---|---|---|---|
| Back Problem | | | | |

GERD

**JA792**

## Surgical History:

**Positive History**

| Condition | Physician | Hospitalization | Hosp Date | Hospital |
|-----------|-----------|-----------------|-----------|----------|
| Cholecystectomy | | | | |

**Operative procedure on lumbosacral spinal structure**

## Family History:

| Type | Sex | Status | Age | Name | Negative History | Positive History | Onset Date | Positive Comment | Negative Comment |
|------|-----|--------|-----|------|------------------|------------------|------------|------------------|------------------|
| Mother | F | Alive | | | | Breast Ca | | | |

## Review of Systems:

**ROS : FPMI**

**Constitutional**
Patient denies chills, fever, fatigue, unexplained weakness, unexplained weight gain or loss.

**Eyes**
Patient denies visual changes, excessive tearing, eye pain, infection or vision loss..

**ENT**
Patient denies frequent sore throats, lumps, enlarged tonsils, horseness, changes in dentition, ear pain or discharge, changes in hearing, nosebleeds or nasal obstruction..

**Integumentary**
Patient denies changes in hair texture, changes in appearance of nail structure, hives, unexplained rashes or change in appearance of moles..

**Cardiovascular**
Patient denies chest pain, palpitations, recent heart attack or thromboembolic events.

**Respiratory**
Patient denies positive TB test, unexplained shortness of breath, coughing blood or bloody sputum.

**Endocrine**
Patient denies heat or cold intolerance, goiter, increased thirst, sweats or neck pain.

**Hematologic/Lymphatic**
Patient denies lumps, radiation exposure, swollen glands, transfusion reaction or chronic anemia.

**Psychiatric**
Patient denies behavioral changes, disorientation, disturbing thoughts, hallucinations or cognitive impairment..

**Neurologic**
Patient denies loss of consciousness, blackouts, recent head injury or paralysis.

# Objective

**Vital Signs:**

**Physical Exam:**

**Interstim : Interstim Programming**

| Question | Comments |
|----------|----------|
| Post operative week or Year | 10 months |

**JA793**

| | |
|---|---|
| Lead Location | Right |
| Current Setting | Pg 5 5.6 |

### Reprogramming

| | |
|---|---|
| New Setting | Pg 5 5.1 |
| Cycling | No |

**Level 4/5 : Physical Examination**

**Constitutional**
Well nourished, Well groomed, Appears to be in generally good health.

**Neck**
No Masses, Symmetrical in appearance, Trachea midline, Thyroid without enlargement.

**Respiratory**
Relaxed and breathes without effort, No use of accessory muscles, Chest expands symmetrically upon inspiration, Lungs clear to auscultation.

**Cardiovascular**
Heart rate regular, No murmurs noted. No swelling of extremities, Pulses palpable.

**Breast**
symmetrical.

**Gastrointestinal: Abdomen**
Soft, No guarding, No rigidity, No hernia, No hepatosplenomgaly.

**Lymphatic**
No cervical lymphadenopathy noted, No axillary lymphadenopathy noted, No Inguinal lymphadenopathy noted.

**Skin**
No lesions, No ulcerations, No rashes.

**Neurological/Psychiatric**
Pt oriented to person, place and time., Speech fluent, Mood neutral, Affect appropriate.

**Pelvic : Examination**
**PAP obtained this visit?**
No.

**External Genitalia**
External Genitalia. Normal.

**Urethral Meatus**
The urethral meatus is without erythema, edema, prolapse or lesions.

**Urethra**
The urethra is without masses, tenderness or scarring.

**Sensation**
Sensation: Intact.

**Supine Cough Test**
Supine Cough Test:Negative.

**Bulbocavernous**
Bulbocavernous:Negative.

**Bladder**
non-tender.

**Adenexa**
Adenexa:Normal.

**Pain**
Pain: Nontender, Bladder and uterus.

**Vagina**
Vagina: Normal. Vagina Atrophy:None. Vagina Caliber:normal. Vagina Tone: Normal. Vagina Ulcerations: Negative.

**POP-Q**
Aa:0. Ba:0. Ap:-3. Bp:-3. C:-4. D:-5. TVL:10. GH:4. PB:3.

**Kegal**
Strength: weak. Duration:Normal. Lift: present.

**JA794**

**Rectal**
Rectal Masses: Negative. Anal Wink: Positive. Tone: Normal. Squeeze: Normal. Prolapse: Negative.

**Urinalysis : Results**

**Glucose**
neg.

**Ketones**
neg.

**Specific Gravity**
1.030.

**pH**
6.0.

**Blood**
+.

**Nitrates**
Negative.

**Leukocytes**
Negative.

**Protein**
neg.

**Creatinine**
100.

**PC Ratio**
Normal.

**Assessment of Post Void Residual**
Ultrasound.

**Post Void Residual (cc)**
0cc.

**Bladder Wall Thickness**
within normal limits.

# Assessment

Diagnosis:

| Description | Code | Problem | Comment |
|---|---|---|---|
| Overactive Bladder | N3281 | | Interstim evaluated and no impedences noted, advanced programming performed ,ua, uc, pvr |
| Pelvic And Perineal Pain | R102 | | will monitor with interstim changes, may be prolapse |
| Retention Of Urine, Unspecified | R339 | | stable at this time UACS PVR |
| Interstitial Cystitis (chronic) With Hematuria | N3011 | | diet, interstim , evaluate proalspe and bladder |
| Complete Uterovaginal Prolapse | N813 | | Plan: monitor as causee of symptoms |

# Plan

Procedure Coding:

| Description | Code | Units | Modifiers | Comments |
|---|---|---|---|---|
| US Urine Capacity Measure | 51798 | 1 UN | | |
| Urinalysis Auto W/o Scope | 81003 | 1 UN | QW | |
| Assay Of Urine Creatinine | 82570 | 1 UN | QW | |

**JA795**

ROOP, SAMANTHA J       985)                                         2/9/22, 10:19 AM

| | | | |
|---|---|---|---|
| Alys Cplx Sp/pn Npgt W/prgrm | 95972 | 1 UN | |
| Office O/p Est Mod | 99214 | 1 UN | 25 |

Follow Up:

| Type | Recall Date | Provider Name | Notes |
|---|---|---|---|
| Follow-Up | 1 Weeks | GUERETTE, NATHAN | testing |

Care Plan:

Urogynecology : Plan of Care

Evaluation Plan
Surgery: Prolapse repair work-up.

**JA796**

JA797

**FEMALE PELVIC MEDICINE INSTITUTE OF VIRGINIA PC**                    01/12/2021

| | | | |
|---|---|---|---|
| **Patient:** ROOP, SAMANTHA J (Female) | **DOB:** | 1985 (35) | **Encounter ID:** 011221-111917350 |
| POWHATAN, VA 23139 | **Previous First Name:** | | **Primary Ins:** Blue Cross Blue Shield Virginia (Anthem BCBS VA) |
| | **Previous Last Name:** | | |
| | **Race:** White | | |
| | **Language:** English | | |
| | **Ethnicity:** Not Hispanic or Latino | | |
| | **Sexual Orientation:** | | |
| | **Gender Identity:** | | |

| | | |
|---|---|---|
| **Location:** Polo Parkway 2931 Polo Parkway Midlothian,VA 23113-1453 (804)523-2533 Ext:0 | **Provider:** NATHAN GUERETTE, MD | **Referring:** Joseph, Sharon |

## Subjective

### Chief Complaint:

Samantha Roop is a 35 year old White female complaining of Cysto w/ consult: see HPI.

**Medical F/U : FPMIV**

**History of Present Illness**
Diagnosis:Interstitial Cystitis, Diagnosis:Urge Incontinence, Diagnosis:Stress Incontinence, Diagnosis:Retention of urine, Diagnosis:Dyspareunia, Diagnosis:Pelvic Pain, Diagnosis:Uterovaginal prolapse.

**Self Assessment**
Not Improved.

**Interim Therapy**
Interstim, 1/8/20 (1yr).

**New Symptoms**
Urgency/Frequency.

**Pain**
Bladder. Incontinent Events / Day: 1-2. Type: MI (S&gt;U). Dysuria: No. Voids/Day: 7-10. Voids/Night: 0-1. Constipation: No. Obstructed Defecation: No. Fecal Incontinence: No, No. Sexually Active: No.

### Social History:

| Tobacco | Usage Status | Last Used | Daily Usage | Packaging | Years | Life History | Cessation Attempts | Last Cessation Rx |
|---|---|---|---|---|---|---|---|---|
| Cigarettes | Never smoked | | | Packs | | | | |

| Alcohol | Usage Status | Last Used | Usage Number | Packaging | | Measurement Time | | |
|---|---|---|---|---|---|---|---|---|
| Wine | Social | | | | | | | |

### Medical History:

**Positive History**

| Condition | Physician | Hospitalization | Hosp Date | Hospital |
|---|---|---|---|---|
| **Back Problem** | | | | |
| | | | | |
| **GERD** | | | | |

**JA798**

## Surgical History:

**Positive History**

| Condition | Physician | Hospitalization | Hosp Date | Hospital |
|-----------|-----------|-----------------|-----------|----------|
| Cholecystectomy | | | | |

**Operative procedure on lumbosacral spinal structure**

## Family History:

| Type | Sex | Status | Age | Name | Negative History | Positive History | Onset Date | Positive Comment | Negative Comment |
|------|-----|--------|-----|------|-----------------|------------------|------------|------------------|------------------|
| Mother | F | Alive | | | | Breast Ca | | | |

## Review of Systems:

**ROS : FPMI**

**Constitutional**
Patient denies chills, fever, fatigue, unexplained weakness, unexplained weight gain or loss.

**Eyes**
Patient denies visual changes, excessive tearing, eye pain, infection or vision loss..

**ENT**
Patient denies frequent sore throats, lumps, enlarged tonsils, horseness, changes in dentition, ear pain or discharge, changes in hearing, nosebleeds or nasal obstruction..

**Integumentary**
Patient denies changes in hair texture, changes in appearance of nail structure, hives, unexplained rashes or change in appearance of moles..

**Cardiovascular**
Patient denies chest pain, palpitations, recent heart attack or thromboembolic events.

**Respiratory**
Patient denies positive TB test, unexplained shortness of breath, coughing blood or bloody sputum.

**Endocrine**
Patient denies heat or cold intolerance, goiter, increased thirst, sweats or neck pain.

**Hematologic/Lymphatic**
Patient denies lumps, radiation exposure, swollen glands, transfusion reaction or chronic anemia.

**Psychiatric**
Patient denies behavioral changes, disorientation, disturbing thoughts, hallucinations or cognitive impairment..

**Neurologic**
Patient denies loss of consciousness, blackouts, recent head injury or paralysis.

# Objective

**Vital Signs:**

**Physical Exam:**

**Cystoscopy : Cystoscopy Report**

| Question | Comments |
|----------|----------|

**Procedure:**

| | |
|---|---|
| Description of Procedure | Procedure: Patient was taken to the cystoscopy suite, placed in the lithotomy position and sterilely prepped in the usual fashion. A post-void residual was obtained with a 16 fr straight catheter, a dipstick urinalysis was performed, and the urine was sent for culture. 2% xylocaine gel was applied to the urethra and the urethral was gently dilated to allow passage of the cystourethroscope. The 25?? flexible cystourethroscope was then inserted into the bladder and the bladder was filled to approximately 300 cc visualizing the bladder structures well. The bladder and urethra were thoroughly inspected. The scope was withdrawn and the patient was returned to the supine position having tolerated the procedure well. She was, then, instructed to void. The findings were as follows: |
| Reason Procedure Performed: | Incontience, IC, prolapse |
| Place Where Procedure Was Performed: | Office |

**Urethra**

| | |
|---|---|
| Urethra | Patulous |

**Bladder Neck**

| | |
|---|---|
| Bladder Neck | Hypermobile |
| Bladder | Normal<br>Squamous Metaplasia 2+ |

**Ureters**

| | |
|---|---|
| Ureters | Normal |

**Procedures**

| | |
|---|---|
| Procedures | Urethral dilation |
| Interpretation | Stress Urinary Incontinence<br>Urinary Retention |
| Plan of Care | Correlate with Clinical Symptoms |

**Level 4/5 : Physical Examination**

**Constitutional**
Well nourished, Well groomed, Appears to be in generally good health.

**Neck**
No Masses, Symmetrical in appearance, Trachea midline, Thyroid without enlargement.

**Respiratory**
Relaxed and breathes without effort, No use of accessory muscles, Chest expands symmetrically upon inspiration, Lungs clear to auscultation.

**Cardiovascular**
Heart rate regular, No murmurs noted, No swelling of extremities, Pulses palpable.

**Breast**
symmetrical.

**Gastrointestinal: Abdomen**
Soft, No guarding, No rigidity, No hernia, No hepatosplenomgaly.

**Lymphatic**
No cervical lymphadenopathy noted, No axillary lymphadenopathy noted, No Inguinal lymphadenopathy noted.

**JA800**

**Skin**
No lesions, No ulcerations, No rashes.

**Neurological/Psychiatric**
Pt oriented to person, place and time. Speech fluent, Mood neutral, Affect aporopriate.

**Urinalysis : Results**

**Glucose**
neg.

**Ketones**
neg.

**Specific Gravity**
1.030.

**pH**
5.5.

**Blood**
+.

**Nitrates**
Negative.

**Leukocytes**
+.

**Protein**
neg.

**Creatinine**
200.

**PC Ratio**
Normal.

**Assessment of Post Void Residual**
Catheter.

**Post Void Residual (cc)**
320.

# Assessment

### Diagnosis:

| Description | Code | Problem | Comment |
|---|---|---|---|
| Overactive Bladder | N3281 | | Interstim evaluated and no impedences noted, advanced programming performed ,ua, uc, pvr |
| Cystocele, Unspecified | N8110 | | Plan: see treatment plan |
| Pelvic And Perineal Pain | R102 | | Plan: see treatment plan |
| Retention Of Urine, Unspecified | R339 | | Plan: see treatment plan, ua, uc, pvr, monitor post-op |
| Interstitial Cystitis (chronic) With Hematuria | N3011 | | stable with interstim and diet |
| Stress Incontinence (female) (male) | N393 | | Plan: see treatment plan,ua, uc, pvr |

# Plan

### Procedure Coding:

| Description | Code | Units | Modifiers | Comments |
|---|---|---|---|---|
| Urinalysis Auto W/o Scope | 81003 | 1 UN | QW | |
| Assay Of Urine Creatinine | 82570 | 1 UN | QW | |

**JA801**

| Office O/p Est Mod       | 99214 | 1 UN | 25 |
|--------------------------|-------|------|----|
| Cystoscopy And Treatment | 52285 | 1 UN |    |

## Care Plan:

**Urogynecology : Plan of Care**

**Evaluation Plan**

Surgery: Bilateral sacrospinous fixation vault and uterine suspension with biograft/ cystocele repair with biograft/ enterocele repair and rectocele repair with biograft/ transobturator sling , Following the procedure I reviewed the results and spent >50 % of the 30 minute visit reviewing all findings and treatment options. After a comprehensive discussion she elects the above procedure. The risks, benefits and alternatives were fully discussed including the use of biologic and synthetic grafts. She acknowledged understanding.

**JA802**

JA803

## FEMALE PELVIC MEDICINE INSTITUTE OF VIRGINIA PC                          01/27/2021

| Patient: ROOP, SAMANTHA J (Female) | **DOB:** | 1985 (35) | **Encounter ID:** 012721-112659769 |
|---|---|---|---|
| POWHATAN, VA 23139 | **Previous First Name:** | | **Primary Ins:** Blue Cross Blue Shield Virginia (Anthem BCBS VA) |
| | **Previous Last Name:** | | |
| | **Race:** | White | |
| | **Language:** | English | |
| | **Ethnicity:** | Not Hispanic or Latino | |
| | **Sexual Orientation:** | | |
| | **Gender Identity:** | | |

| Location: Polo Parkway | **Provider:** NATHAN GUERETTE, MD | **Referring:** Joseph, Sharon |
|---|---|---|
| 2931 Polo Parkway | | **Servicing Provider:** Reilly, Jennifer |
| Midlothian, VA 23113-1453 | | |
| (804)523-2533 Ext:0 | | |

## Subjective

### Chief Complaint:

Samantha Roop is a 35 year old White female complaining of PAT and surgical counseling: see HPI.

### Medication History:

| Date | Medication | Sig | # | Refill | Status |
|---|---|---|---|---|---|
| 01/27/2021 | Adderall 20 mg tablet | 1 tablet by mouth twice a day | | 0 | Active |
| 01/12/2021 | baclofen 10 mg tablet | 1 tablet by mouth three times a day | 90 | 0 | Active |

### Social History:

| Tobacco | Usage Status | Last Used | Daily Usage | Packaging | Years | Life History | Cessation Attempts | Last Cessation Rx |
|---|---|---|---|---|---|---|---|---|
| Cigarettes | Never smoked | | | Packs | | | | |

| Alcohol | Usage Status | Last Used | Usage Number | Packaging | Measurement Time |
|---|---|---|---|---|---|
| Wine | Social | | | | |

### Medical History:

**Positive History**

| Condition | Physician | Hospitalization | Hosp Date | Hospital |
|---|---|---|---|---|
| **Back Problem** | | | | |
| **GERD** | | | | |

### Surgical History:

**Positive History**

**JA804**

| Condition | Physician | | Hospitalization | Hosp Date | Hospital |
|---|---|---|---|---|---|
| Cholecystectomy | | | | | |

**Operative procedure on lumbosacral spinal structure**

**Laparoscopy**

**Neurostimulator**

### Family History:

| Type | Sex | Status | Age | Name | Negative History | Positive History | Onset Date | Positive Comment | Negative Comment |
|---|---|---|---|---|---|---|---|---|---|
| Mother | F | Alive | | | | Breast Ca | | | |

### Review of Systems:

**ROS : FPMI**

**Constitutional**
Patient denies chills, fever, fatigue, unexplained weakness, unexplained weight gain or loss.

**Eyes**
Patient denies visual changes, excessive tearing, eye pain, infection or vision loss.

**ENT**
Patient denies frequent sore throats, lumps, enlarged tonsils, horseness, changes in dentition, ear pain or discharge, changes in hearing, nosebleeds or nasal obstruction.

**Integumentary**
Patient denies changes in hair texture, changes in appearance of nail structure, hives, unexplained rashes or change in appearance of moles.

**Cardiovascular**
Patient denies chest pain, palpitations, recent heart attack or thromboembolic events.

**Respiratory**
Patient denies positive TB test, unexplained shortness of breath, coughing blood or bloody sputum.

**Endocrine**
Patient denies heat or cold intolerance, goiter, increased thirst, sweats or neck pain.

**Hematologic/Lymphatic**
Patient denies lumps, radiation exposure, swollen glands, transfusion reaction or chronic anemia.

**Psychiatric**
Patient denies behavioral changes, disorientation, disturbing thoughts, hallucinations or cognitive impairment.

**Neurologic**
Patient denies loss of consciousness, blackouts, recent head injury or paralysis.

## Objective

### Vital Signs:

**Blood Pressure**

| Artery | Body Side | Position | Pressure | Flag |
|---|---|---|---|---|
| Brachial | Left | Sitting | 112/70 | Normal |

**Pulse**

| Artery | Body Side | Rhythm | Quality | Pulse Rate | Flag |
|---|---|---|---|---|---|
| Brachial | Left | Regular | Normal | 80 | Normal |

**JA805**

ROOP, SAMANTHA J    1985)                                            2/9/22, 11:09 AM

### Respirations

| Rate | Quality | Rhythm | Pulse Ox | Air | Inhaled O$_2$ Concentration | Method | Peak Flow | Flag |
|------|---------|--------|----------|-----|------------------------------|--------|-----------|------|
| 12/min | Normal | NORMAL | | | | | | Normal |

### Temperature

| Method | Temperature F | Flag |
|--------|---------------|------|
| Right Tympanic Membrane | 97.9 | Normal |

### Height, Weight, BMI and Measurements

| Height | Weight | BMI | Flag | | Head | Neck | Waist |
|--------|--------|-----|------|--|------|------|-------|
| 5' 5" | 145 (lb) | 24.1 | Normal | | | | |

## Physical Exam:

**Level 4/5 : Physical Examination**

**Constitutional**
Well nourished, Well groomed, Appears to be in generally good health.

**Neck**
No Masses, Symmetrical in appearance, Trachea midline, Thyroid without enlargement.

**Respiratory**
Relaxed and breathes without effort, No use of accessory muscles, Chest expands symmetrically upon inspiration, Lungs clear to auscultation.

**Cardiovascular**
Heart rate regular, No murmurs noted, No swelling of extremities, Pulses palpable.

**Breast**
symmetrical.

**Gastrointestinal: Abdomen**
Soft, No guarding, No rigidity, No hernia, No hepatosplenomgaly.

**Lymphatic**
No cervical lymphadenopathy noted, No axillary lymphadenopathy noted, No Inguinal lymphadenopathy noted.

**Skin**
No lesions, No ulcerations, No rashes.

**Neurological/Psychiatric**
Pt oriented to person, place and time. Speech fluent, Mood neutral, Affect appropriate.

## Assessment

Diagnosis:

| Description | Code | Problem | Comment |
|-------------|------|---------|---------|
| Complete Uterovaginal Prolapse | N813 | | |

## Plan

Office Procedures:

### Pre- Admission Testing

Plan: B/L SSF, VV and UT Susp w/ Biog, Cysto, Ent and Rect reps w/ Biog, TOS. Cysto w/ Cali. Visit time totaled 35 minutes. Greater than 50% spent on counseling re: surgery, surgery preparation, post operative care, restrictions and expectations. Pre-operative labs drawn in office for evaluation as well as urinalysis and culture obtained. The risks, benefits and alternatives were fully discussed including the use of biologic and synthetic grafts. She acknowledged

**JA806**

    


**sickntwisted06** Follow ...

**295 posts**   **131 followers**   **588 following**

**Samantha**
Blue eyed Country girl
Automotive & Diesel Mechanic
Dirt and Grease never scared me
Never mistake my kindness for weakness

**This Account is Private**

Follow to see their photos and videos.

Suggestions For You




**mgundlach76**
Michael
Follow




**the_andrew_agency**
Ryan Andrew
Follow




**sammymac922**
sammymac922
Follow




**megbrannan**
Megan Brannan
Follow




**bairdbee**
Baird Bee
Follow



EXHIBIT
D-15

Meta   About   Blog   Jobs   Help   API   Privacy   Terms   Top Accounts   Hashtags   Locations   Instagram Lite   Contact Uploading & Non-Users

English ∨   © 2022 Instagram from Meta

**JA807**

 



 This photo is from a post.

View pos

 **East Coast Repair Center**
April 6, 2014 · 🌐

👍 Like          💬 Comment          ↪ Share

Write a comment...

EXHIBIT
D-16



**DiSavino Racing Team** is with **Samantha Barton** and **2 others**.
5 hrs · 🌐

A BIG THANK YOU to East Coast Repair Center in Powhatan for figuring out the problem we were having with our Chevy Silverado 3500 Duramax Diesel. We had an issue with the "reduced engine power" mode coming on under heavy load and took the truck to a large Chevrolet Dealership in town. I am overlooking mentioning their name because they are an embarrassment to the diesel mechanic community. I called upon GJ & Samantha Barton at East Coast Repair Center and they fixed the truck within a few days. The dealership wanted to replace all of our fuel injector system at a cost of about $12,000 and Samantha diagnosed the truck issue as a hose leak in our system and faulty PPE value and we got it done for about $500. They are fair, honest, and very talented mechanics. Thank you for taking the time to help us out. We are off to the Myrtle Beach 400 in less than 2

Write a comment...



 **East Coast Repair Center**
November 5, 2018 · 🌐

Very proud of Samantha. Love you babe.

👍 6

 👍 Like          💬 Comment          ↗ Share

Write a comment...


EXHIBIT
D-17



**Samantha Barton**
March 3, 2021 · 🌐

The world doesn't seem as scary when viewed like this 💙

👍❤️ 28                                                    10 Comment

👍 Like                                    ↗ Share

Most relevant ▾

**GJ Barton**
Please don't over do it...
Like   1y   👍

> **Samantha Barton**
> GJ Barton I'm not trust me it didn't take much doing to become covered head to toe in spring hair 😂😂
> Like   1y

**David Adams**
Beautiful picture
Like   1y   👍



EXHIBIT
D-19

**JA810**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

SAMANTHA ROOP,
    Plaintiff,

    v.                                                        Civil Action No.: 3:21-cv-00675

NICHOLAS JAMES DESOUSA,
    Defendant.

## VERDICT FORM – CAUSATION

We, the jury, find that the Plaintiff:

1.    The Plaintiff has proven by a preponderance of the evidence that her treatment with Alliance Physical Therapy through __10·16·19__ (insert date) was reasonable and medically necessary to treat the injuries Plaintiff sustained in the accident to her head, neck, shoulder, and hip as well as the aggravation of her previous back injury.

2.    The Plaintiff has Not Proven by a preponderance of the evidence that her Interstim device was damaged as a result of the accident.

**PROVEN**                    **NOT PROVEN**

(Please circle the appropriate response)

Date: 9 - 13 - 2022

/s/__
Fore  REDACTED

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

SAMANTHA ROOP,

     v.                                           Civil No. 3-21cv675 (DJN)

NICHOLAS JAMES DESOUSA,
          Defendants.

**ORDER**
**(Granting in Part and Denying in Part Defendant's Rule 50 Motion)**

      This matter comes before the Court on Defendant's oral motion for judgment as a matter

of law under Federal Rule of Civil Procedure 50.  A court may enter a judgment as a matter of

law only if there is no legally sufficient evidentiary basis for a reasonable jury to find for a party

on an issue.  In its consideration of a motion for judgment as a matter of law, a court should

review all of the evidence in the record, but, in doing so, must draw all reasonable inferences in

favor of the nonmoving party and may not make credibility determinations or weigh the

evidence.

      For reasons set forth during the trial, the Court hereby GRANTS IN PART and DENIES

IN PART Defendant's motion for judgment as a matter of law.  The Court GRANTS

Defendant's motion with regard to the issue of causation regarding Plaintiff's pelvic prolapse,

due to an insufficient evidentiary basis for a reasonable jury to find for Plaintiff on that issue and

as a matter of law as the causation issue relating to Plaintiff's pelvic prolapse was too complex

for lay testimony only. *See Taylor v. Shreeji Swami, Inc.*, 820 Fed. App'x 174 (4th Cir. 2020).

The Court DENIES Defendant's motion with regard to the issue of causation regarding

Plaintiff's Interstim device, of which the jury returned a verdict of not proven.

Let the Clerk file a copy of this Order electronically and notify all counsel of record.

It is so ORDERED.

                                                    _____/s/_____
                                                    David J. Novak
                                                    United States District Judge

Richmond, Virginia
Dated:  September 13, 2022

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

SAMANTHA ROOP,
     Plaintiff,
         v.                             Civil No. 3:21cv675 (DJN)

NICHOLAS JAMES DESOUSA,
     Defendant.

**VERDICT FORM**

We, the jury, find in favor of the Plaintiff and award damages to her as follows:

Undisputed Injuries:

Past Medical Expenses:     $35,216.00

Other Damages based on categories 1-4 in Instruction 2:   $ 70,000

Pre-judgment Interest:

We award pre-judgment interest (circle one):   **Yes**  or  (**No**)

If you circled yes, the date on which the prejudgment interest should begin:

_____

If you circled no, you should not write in a date.

/s/
F_____

REDACTED

Date: 9/14/2022

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

SAMANTHA ROOP,
    Plaintiff,

v.
                                  Civil No. 3-21cv675 (DJN)

NICHOLAS JAMES DESOUSA,
    Defendant.

**ORDER**
**(Giving Parties Thirty Days to File Post-Trial Motions)**

This matter comes before the Court following a jury trial in which the jury returned a

verdict as to Phase One on September 13, 2022, and as to Phase Two on September 14, 2022.

As stated on the record after the Court discharged the jury, the Court ORDERS that a party shall

have thirty (30) days, measured from September 14, 2022, within which to file any post-verdict

motions. The non-moving party shall have fourteen (14) days to file a response, and the moving

party shall have six (6) days to reply.

Let the Clerk file a copy of this Order electronically and notify all counsel of record.

It is so ORDERED.

_____/s/_____
David J. Novak
United States District Judge

Richmond, Virginia
Dated: September 14, 2022

**JA815**

**IN THE**
**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| SAMANTHA ROOP | ) | Plaintiff, |
| | ) | |
| | ) | |
| v. | ) | Civil Action No.: 3:21-cv-00675 |
| | ) | |
| | ) | |
| NICHOLAS JAMES DESOUSA | ) | Defendant. |

## PLAINTIFF'S MOTION FOR NEW TRIAL UNDER FED. R. CIV. P. 59(a) OR, IN THE ALTERNATIVE, TO ALTER OR AMEND THE DISTRICT COURT'S JUDGMENT UNDER FED. R. CIV. P. 59(e)

COMES NOW, the Plaintiff, through undersigned Counsel, who submits the following Motion for a New Trial under Federal Rule of Civil Procedure 59(a) or, in the alternative, Motion to Alter or Amend the District Court's Judgment under Rule 59(e). In support of her Motions, Plaintiff argues as follows:

## I.     INTRODUCTION

In its role as the moderator of a lawsuit, a Federal District Court is charged with the responsibility of administering justice and ensuring that all parties involved have fair opportunities to establish their claims and defenses. So that it can execute this responsibility, the Court possesses a significant amount of discretion through which it exercises its equitable powers to make evidentiary rulings and conduct the trial in an effective and efficient, yet fair, manner. In so doing, though, the Court is nonetheless constrained by the bounds of applicable state and federal law when exercising jurisdiction through diversity of citizenship of the parties.

Here, at trial, the District Court abused its discretion, failed to adhere to Virginia substantive law, and misapplied the Federal Rules of Evidence. The Court's decision to grant Defendant's Rule 50 Motion for Judgment as a Matter of Law utilized inapposite North Carolina state law about causation of injuries and under which circumstances expert testimony is necessary for the jury to find such an issue; this was a clear error of law. Additionally, the Court's order granting the motion was arbitrary because it lacked any reasoning as to why proving causation of Plaintiff's pelvic prolapse injuries required expert testimony, but the damage to her InterStim sacral stimulation device did not require the same. Furthermore, the Court failed to explain its reasoning when hearing Defendant's oral motion on the same. Moreover, the Court exceeded its province as the governor of the trial assuming the roles of witness and counsel for both Plaintiff and Defendant. It also contradicted its pre-trial rulings concerning the scope of admissible evidence and examinations of the witnesses, and it made clear that it favored the Defense's position during and leading up to trial.

At a pre-trial hearing, the Court stated, "Particularly focusing on the pelvic prolapse. They could find for you [(the Defense)]. Okay. And the only issue—and to me, this is, at best for them, a 50/50 chance on that." Doc. 56, p. 6. Additionally, court explained, "Even if she prevails in the first phase [(concerning causation)] and the jury then awards the damages, I'm going to allow you to file a motion under Rule 50. Okay? And I'm going to look at it again as a matter of law whether or not it's sufficient, right?" Doc. 56, p. 8. Further, "You know, I don't know if she's [(Plaintiff)] going to sustain her burden in front of the jury. But if she does, I want to look at what that evidence looks like in relation to the law." Doc. 56, p. 13. Again, "I don't know if she's going to meet her burden on liability, but even if she does, I could set it aside, because I think there's significant legal issues that I'm going to have to look at." Doc. 84, p. 23–24. "And I'm going to tell you

2

**JA817**

[(Plaintiff's counsel)], I think I've stretched the limit here on this, because of the issues that we've already addressed, to the point that I may—I'm not saying I would—if you win, I could still reverse this. I just want to see how everything plays out first." Doc. 84, p. 40.

Then, at trial, as the jury contemporaneously exited, and after the examinations of Plaintiff and Dr. Guerette—but before the examination of Gerard Barton—the Court told Defendant's counsel, "I think you have a winning motion on Rule 50 on the pelvic prolapse" and "I think the answer is I ought to let this case go to the jury on the InterStim, see what their answer is, and then you can file another Rule 50 or a motion for a new trial afterwards attacking that . . . ." Doc. 85, p. 149–50. The court continued, "I don't think there's any evidence at all [(about Plaintiff's pelvic prolapses)]. And I've given you your shot here. You know, I've been suspect about your case, but I don't see any evidence." Doc. 85, p. 152. Instead of deciding whether there was sufficient evidence for the issue of Plaintiff's pelvic prolapse to go to the jury, like it did with the InterStim, the Court found facts itself before Plaintiff had even rested her case, and it based its ruling on North Carolina state precedent. This was a clear error of law, and the court demonstrated from its statements before and at trial that it believed Defendant should win the issue of causation of Plaintiff's pelvic prolapses.

On these grounds, the court should grant Plaintiff a new trial or, at the very least, reverse its grant of Defendant's Rule 50 Motion and order a new trial on the issue of Plaintiff's pelvic prolapses.

## II.     STANDARD OF REVIEW

### A.  MOTION FOR NEW TRIAL UNDER FED. R. CIV. P. 59(a)(1)(A).

Under Federal Rule of Civil Procedure 59(a), a Federal District Court may, on motion, "grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . ." Fed. R. Civ. P.

59(a)(1)(A). Ordinarily, a motion for a new trial must be filed no later than 28 days after the court enters judgment, but this court has granted the parties 30 days measured from September 14, 2022, to file post-trial motions. Doc. 83, Order; *see* Fed. R. Civ. P. 59(b).

The Fourth Circuit Court of Appeals has held that a District Court—when hearing a motion under Rule 59(a)—must "set aside the verdict and grant a new trial if . . . (1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Knussman v. Maryland*, 272 F.3d 625, 639 (4th Cir. 2001) (quoting *Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc.*, 99 F.3d 587, 594 (4th Cir. 1996)). This Court has full discretion over the decision to grant or deny a motion for a new trial, and, significantly, it may weigh the evidence presented and assess its credibility when deciding such a motion. *See Dennis v. Columbia Colleton Med. Ctr. Inc.*, 290 F.3d 639, 650 (4th Cir. 2002) (explaining that a district court is permitted to weigh evidence when hearing a motion for a new trial under Rule 59(e)); *see also Bristol Steel & Iron Works v. Bethlehem Steel Corp.*, 41 F.3d 182, 186 (4th Cir. 1994) (stating that the "decision to grant or deny a new trial rests with the sound discretion of the district court" and the district court "may . . . assess credibility in ruling on a motion for a new trial" (citing *Wilhelm v. Blue Bell, Inc.*, 773 F.2d 1429, 1433 (4th Cir. 1985)).

Of the three prongs providing grounds for a new trial, Plaintiff only contends that the verdict rendered by the jury is a severe miscarriage of justice based on the Court's commission of critical procedural errors during the course of the trial. Thus, in reviewing this motion, this Court must determine, "whether an error occurred in the conduct of the trial that was so grievous as to have rendered the trial unfair." *Bristol Steel*, 41 F.3d at 186 (citing *DMI, Inc. v. Deere & Co.*, 802 F.2d 421, 427 (Fed. Cir. 1986).

**B. MOTION TO ALTER OR AMEND JUDGMENT UNDER FED. R. CIV. P. 59(e).**

A Federal District Court hearing a motion to alter or amend judgment under Rule 59(e) occupies a similar position to one hearing a motion for a new trial because it may assess and weigh the credibility of evidence, and it likewise retains full discretion over the matter. *See Dennis*, 290 F.3d at 650; *see also Bristol Steel*, 41 F.3d at 186. However, under Rule 59(e), a District Court may alter or amend the judgment in only three situations, which are different from those justifying a new trial. A motion under Rule 59(e) may be granted only "(1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." *Zinkland v. Brown*, 478 F.3d 634, 637 (4th Cir. 2007) (citing *Ingle v. Yelton*, 439 Fe.3d 191, 197 (4th Cir. 2006)). "Rule 59(e), in essence, gives the district court a chance to correct its own mistake if it believes one has been made." *Zinkland*, 478 F.3d at 637.

As with Plaintiff's motion for a new trial, Plaintiff seeks to amend this Court's judgment partially granting Defendant's Motion for Judgment as a Matter of Law because clear errors of law were rendered by the Court during the trial.

### III.    ARGUMENT

**A. A NEW TRIAL SHOULD BE GRANTED UNDER FED. R. CIV. P. 59(a) AS THE JURY'S VERDICT IS BASED ON PROCEDURAL INCONSISTENCIES FROM THE COURT AND ITS DISCRIMINATORY MANAGEMENT OF THE TRIAL.**

The basis of Plaintiff's Motion for a New Trial under Federal Rule of Civil Procedure 59(a) is that the Court's management of Phase 1 of the trial, which only concerned causation of Plaintiff's injuries from the July 7, 2019 motor vehicle collision, was prejudicial to Plaintiff in three specific ways.

First, the Court permitted Defendant's counsel to refer to Plaintiff's claim for $5 million against Defendant throughout his case from opening, to crosses, and in closing; however, the Court

sustained the Defense's objections to Plaintiff's counsel discussing Plaintiff's claim for damages, disabling her from providing any sort of context or basis for the jury to consider what was seemingly an arbitrary demand for compensation. Furthermore, the Court sustained this objection despite the Court explicitly advising Plaintiff's counsel at the September 1 pre-trial hearing that she may clarify the claim for damages if brought up by Defendant's counsel.  The Court even went a step further stating that, if need be, it would also instruct the jury during the discussion of the same to ensure the discussion of the ad damnum was not misleading. Doc. 84, p. 42 lines 13-14.

Second, the Court also contradicted its pre-trial rulings about the nature and extent of Dr. Guerette's testimony. Specifically, at trial, the Court prohibited Plaintiff's counsel from examining Dr. Guerette regarding his treatment, observations, and diagnoses of Plaintiff beyond Plaintiff's October 8, 2019 appointment with him despite the fact there were several substantial subsequent appointments Plaintiff had with Guerette.  Furthermore, Plaintiff is still, to present day, under Guerette's active care. The Court also represented in pre-trial hearings that Dr. Guerette may testify as an expert witness if Defendant's counsel asks him questions in the realm of expert testimony. Yet, when the court itself opened the door to expert testimony by asking expert opinion questions of Dr. Guerette, he was never qualified as an expert and the jury was told to disregard the same.

Finally, the Court effectively examined not only Dr. Guerette, but all of Plaintiff's witnesses in the presence of the jury, subsequently summarized their testimony, and throughout the trial implied its opinion of causation in favor of the Defense. Instead of acting as a neutral administrator of the trial, the court commandeered Plaintiff's case-in-chief, disrupting Plaintiff from putting on her case and presenting the same based on the trial strategy of her counsel who was well-versed with the totality of evidence and facts.

**JA821**

**a. In Phase 1 of the trial, the Court permitted Defendant's counsel to discuss damages during opening statements, cross-examinations, and closing arguments but unfairly prohibited Plaintiff's counsel from doing so resulting in a lack of context for the damages thereby significantly prejudicing the jury against Plaintiff.**

On May 3, 2022, the District Court held a pre-trial hearing with counsel for both parties to identify the issues to be tried, establish trial procedures, and create a case management plan leading up to trial. *See generally* Doc. 31, Court Transcript of May 3, 2022. At this hearing, the Court instructed the parties that it was going to bifurcate the trial into two phases—Phase 1 would concern causation only, and Phase 2 would concern damages if the jury found causation for Plaintiff. Doc. 31, p. 11–12. In describing Phase 1, the Court stated that "[t]he jury is going to decide simply whether these particular injuries are from the car accident, okay? *No evidence of damages during that . . . ."* Doc. 31, p. 11 (emphasis added). Repeatedly, the Court stated, "there's no evidence about damages, there's no introduction of bills or anything like that in phase 1," and, "there will be no evidence about damages during phase 1." *See* Doc. 31, p. 12, 13, 18. Near the end of the hearing, the Court asked, "You know the limitation now on the damages? There's not going to be any discussion whatsoever, 'Hey, I've had to pay $500,000.00 in medical bills,' or none of that." Doc. 31, p. 24. Clearly, the Court's position at the time of this hearing was firmly against any reference to damages during Phase 1 of the trial.

Then, at the subsequent pre-trial hearing on September 1, Plaintiff's counsel requested that the Defense be prohibited from discussing Plaintiff's ad damnum for $5 million at any point in Phase 1. Doc. 84, p. 39. Contrary to its position on May 3, the court ruled that Defendant's counsel may cross-examine Plaintiff and Mr. Barton in an attempt to demonstrate alleged bias or a financial motive for their testimony. Doc. 84, p. 40. Plaintiff's counsel contended that if the Defense is allowed to discuss Plaintiff's damages in Phase 1, then Plaintiff's counsel should be similarly permitted discuss the damages to give clarity and context for the jury; otherwise, Plaintiff would

7

be prejudiced without an opportunity to defend herself. This was a request for basic fairness regarding the presentation of evidence over which the court had full discretion. *See General Electric v. Joiner*, 522 U.S. 136, 141–42 (1997) (holding that a district court's evidentiary rulings are reviewed for an abuse of discretion). An illustrative example of analogous reasoning can be found in Federal Rule of Evidence 106, which provides that when a party introduces part of a writing or recorded statement, an adverse party may introduce other parts of the writing or recording to avoid prejudice to the adverse party. Fed. R. Evid. 106.

To its credit, the Court told Plaintiff's counsel that she may, on re-direct examination of Plaintiff or Mr. Barton, ask them, "That number [($5 million)] is based upon your medical treatment and expenses and such, right? It's not just—it's not a lottery number made up." Doc. 84, p. 42. The court further clarified that Plaintiff's counsel, "can bring out that it's not just a magical number. It's based upon medical stuff that we would deal with in phase 2, if we get there." Doc. 84, p. 42.

At trial, based on the court's rulings at the September 1 pre-trial hearing, counsel for Defendant said in the first sentence of his opening statement, "I represent Nicholas DeSousa in this $5 million lawsuit filed." Doc. 85, p. 24. He also asked Plaintiff on cross-examination, "And, ma'am, you're suing my client for $5 million, correct?" Doc. 85, p. 88. However, on re-direct examination of Plaintiff, her attorney asked her, "Mr. Keeney brought up that you are here suing his client for $5 million. Is that a pie-in-the-sky number?" Doc. 85, p. 102. Without even allowing Defendant's counsel to fully set forth an objection, the court immediately sustained it and stated, "That's not relevant. This only goes to bias. You'll get to discuss that down the road. This is all about causation." Doc. 85, p. 102. This conduct of the court is a blatant contradiction of its pre-trial position that if Defendant's counsel discusses damages to establish potential bias, then

Plaintiff's counsel can rehabilitate the witness to reduce the weight of any bias. Moreover, Plaintiff's counsel asked Plaintiff the question almost *exactly* as the court instructed at the September 1 pre-trial hearing—except instead of "lottery number," she stated "pie-in-the-sky number." Despite the comparable approach similar to that given by the Court in Plaintiff's counsel's attempt to rehabilitate her client on re-direct as previously determined acceptable by the Court, the Court allowed no such question of said previously authorized nature whatsoever.

And, notwithstanding the Court's statement that, "this is all about causation," it permitted Defendant's counsel to repeatedly reference damages in Phase 1 of the trial. In addition to examples above, Defendant's counsel asked Mr. Barton on cross-examination, "So you're aware that she's suing my client for $5 million, correct?" Doc. 85, p. 142. In closing, Defendant's counsel alleged that no witnesses at the trial, "are talking about the InterStim being damaged in the accident" except "Ms. Roop and her husband, Mr. Barton, who are suing for $5 million. The doctor didn't say it, they didn't bring any other witnesses, just these folks who certainly have a big interest in this case." Doc. 85, p. 191. Plaintiff's counsel objected to said statements as bound by the rules of the Court and Guerette's limitations on his testimony but the Court permitted the jury to consider them. The Court was aware that Guerette indeed could state that the motor vehicle accident between Plaintiff and Defendant caused her her Interstim to malfunction as well as caused the pelvic prolapses but Guerette was bound by limitations as a lay treating physician witness. It was fundamentally unfair that Plaintiff's counsel was not allowed a single mention of the $5 million demand in order to give the jury *some* context as to how that number came about. Instead, the jurors were left with an arbitrary $5 million figure in their heads, potentially thinking that Plaintiff—and Mr. Barton, who is not even a party to the case—was greedy and motivated by money. Little did the jury know that $5 million figure was resting on a foundation of nearly

**JA824**

$600,000 in medical bills and enormous pain and suffering as Plaintiff was barred from indicating or explaining any context or rationale for the figure requested in the ad damnum.

To conclude, the Court should not have permitted Defendant's counsel to discuss damages during Phase 1 of the trial whatsoever because of its total irrelevance as to causation, but, when it was ultimately permitted, Plaintiff's counsel was denied any opportunity to cure the prejudice that the discussion of such caused. This is a clear injustice that the Court condoned and which arguably altered the jury's verdict in favor of the Defense.

> **b. In Phase 1 of the trial, the Court both permitted and prohibited the admission of evidence inconsistent with its previous instructions to counsel prior to trial which prejudiced the presentation of Plaintiff's case.**

The initial inconsistency arose during the pre-trial hearing on May 3, 2022, at which the parties argued a motion in limine filed by Defendant regarding whether Dr. Guerette, Plaintiff's treating physician, could testify as a lay witness and, if so, what would be the limitations of his lay testimony. *See generally* Doc. 31. Naturally, these arguments involved whether Defendant's counsel could "open the door" to expert testimony if he asked Dr. Guerette for opinions that would be qualified as such since Guerette has not been disclosed as an expert witness. The Court held that, in Phase 1 of the trial, (1) Dr. Guerette could testify as a lay witness, (2) his testimony may include his observations and Plaintiff's need for treatment from 2011 through October 2019, and (3) Defendant's counsel could open the door to expert testimony from Dr. Guerette. Doc. 31, p. 4–11, 20. Then, at the pre-trial hearing on July 12, these issues were again discussed with the Court, which affirmed its prior rulings from the hearing on May 3. Doc. 56, p. 32–39. Notwithstanding, at trial, when Plaintiff's counsel inquired of Dr. Guerette if, during his treatment and observations of Plaintiff, there was any indication that the, "symptoms that she complained about in October of 2019 arose from any other period other than what she relayed to [him]," the Court immediately sustained Defendant's objection. Doc. 85, pg. 113.  Not only should that testimony have been

10

permitted in accordance with the court's pre-trial rulings, the Federal Rules of Evidence also permit it as it constitutes fact or lay opinion testimony based on the doctor's own treatment and observation of Plaintiff.   The question does not elicit expert opinion about causation but merely inquires as to whether the doctor did or did not find that her complaints originated at a time different from what Plaintiff had conveyed to him.   The Court's ruling at trial prejudiced Plaintiff by preventing her counsel from fully drawing out Dr. Guerette's treatment, observations, and diagnoses of Plaintiff, depriving Plaintiff of an adequate rebuttal to Defendant's Rule 50 motion that it filed at the conclusion of Phase 1.   Such question elicited factual testimony based on Guerette's observations and treatment of Plaintiff purposefully avoiding responses based on opinion.

The second major inconsistency was highlighted at the pre-trial hearing on September 1 at which arguments with the Court continued concerning the boundaries of expert testimony and lay testimony from Dr. Guerette. Specifically, Defendant's counsel asked whether Dr. Guerette testifying that Plaintiff's InterStim was "expired" would require expert testimony. Doc. 84, p. 34. The Court had previously stated, at the July 12 hearing, that asking whether the InterStim was "expired" would open the door to expert testimony; however, the Court decided on September 1 to the contrary. Doc. 84, p. 34. As detailed below, the Court's inconsistent rulings did not make it clear as to what would qualify as expert testimony and what wouldn't because, in a clear contradiction to earlier opinions it has expressed, it discussed that expired is a broad term that could mean, for example, that it was functioning properly but its battery died naturally, or that it ceased to properly function. The Court's permission of the use of the specific word "expire" when examining Dr. Guerette without further clarification caused an unfair presentation of Plaintiff's injuries for the jury's consideration.

**i. At pre-trial hearings, the Court instructed that Dr. Guerette could testify generally as a lay witness and treating physician regarding his treatment, diagnoses, and observations of Plaintiff's physical condition, but, at trial, the court prevented Dr. Guerette from fully describing Plaintiff's statements to him in 2019.**

As laid out in Plaintiff's response to Defendant's motion in limine prior to the trial, it's clear under the Federal Rules of Evidence, Fourth Circuit precedent, and other Federal Court rulings that a treating physician can testify as a lay fact witness about his or her perceptions. *See generally* Doc. 22. First, Federal Rule of Evidence 701 sets for the standard for lay witnesses, stating that a lay witness may testify and give an opinion that is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701 (referencing Federal Rule of Evidence 702, which defines the scope of expert testimony).

Further, the Fourth Circuit has held that a fact witness, such as a medical examiner or treating physician, may give "opinions or inferences which are rationally based on his perception of the facts if it is helpful to a clear understanding of a fact in issue and not based on scientific, technical or specialized knowledge."[1] *Brown v. Ryan's Family Steak House Mgmt., Inc.*, 113 Fed. Appx. 512, 515 (4th Cir. 2004).[2] In *Brown*, an issue before the court was whether the Appellee's legal guardian, Gassaway, had the mental capacity to sign a contract on behalf of the Appellee, who was a minor at the time of signing. *Id.* at 513. To prove her lack of mental capacity,

---

[1] Since 2011, Federal Rule of Evidence 701 does not include references to an "inference" made by a lay witness, but the legislative Committee, when passing the 2011 amendment to the rule, noted that the change was "stylistic only" and not intended to "change any result in any ruling on evidence admissibility."

[2] Although *Brown* is unpublished, under the Fourth Circuit's Local Rule of Appellate Procedure 32.1, use of an unpublished decision is permitted "for the purpose of establishing *res judicata*, estoppel, or the law of the case." 4th Cir. Loc. R. 32.1 (July 2022).

**JA827**

Gassaway's treating physician, Dr. Sanders, of sixteen years testified about Gassaway's deteriorating mental and physical conditions. *Id.* at 515–16. The Court held that it was permissible for Dr. Sanders to testify about the condition of his patient and render his opinion as to whether Gassaway could have understood the terms of the agreement because his opinion was based on "his perception of Gassaway and her ailments . . . [and] Dr. Sanders [was] the most qualified person available to testify to Gassaway's mental capacity." *Id.* at 516.

Clearly, under *Brown*, Dr. Guerette was more than able to testify about his observations, treatment, and diagnoses of Plaintiff both prior and subsequent to the 2019 motor vehicle collision regarding her injuries, anatomy, procedures, etc. The District Court generally agreed that Dr. Guerette could testify in this manner, suggesting, for example, at the May 3 pre-trial hearing that Dr. Guerette could say, "The last time I saw her was in 2013; the [InterStim] worked. Now, six years later, she comes to me *making these complaints* that she's not feeling well. I examine her and I can see that the reason is the device is no longer working." Doc. 31, p. 10 (*emphasis* added). This instruction from the Court explicitly provided that Dr. Guerette could testify about statements made to him by Plaintiff. At the July 12 hearing, the Court even recognized that Federal Rule of Evidence 803(4) permits, as an exception to the rule against hearsay, statements, "from the treated person to the doctor," that are made for medical diagnosis or treatment and "describes medical history; past or present symptoms or sensations; their inception; or their general cause." *See* (Doc. 56, p. 32); Fed. R. Civ. P. 803(4).

Despite the clarity of the Federal Rules of Evidence, Fourth Circuit precedent, and the Court's own recognition of the permissible scope of Dr. Guerette's testimony, the Court failed to adhere to the law at trial. When Plaintiff's counsel asked Dr. Guerette on direct examination whether, during his treatment of Plaintiff, there was "any indication that these symptoms that she

13

**JA828**

complained about in October of 2019 arose from any other period other than what she relayed to you," the Court prohibited Dr. Guerette from answering the question and stated in front of the jury:

> "Putting aside what [Plaintiff] told you, because that's not relevant here, what is relevant is simply what did you see. Was there anything different from 2013, when you last saw her, until 2019?" Doc. 85, p. 113.

The Court's conduct here was inconsistent with its pre-trial rulings, as well as applicable law and precedent, that Dr. Guerette was able to testify regarding what Plaintiff had complained of to him.  Instead, the Court significantly restricted Dr. Guerette's testimony from the full scope and extent of his observations, diagnosis, and treatment of her, which includes but is not confined to her October 8, 2019 appointment, disallowing testimony as to subsequent appointments that continue through 2021. The Court did however allow counsel for the Defense to discuss subsequent appointments that occurred beyond the October 8, 2019, during his redirect of Guerette and his closing argument.  Not only was the Court inconsistent, the Court failed to adhere to Federal Rule of Evidence 803(4) by prohibiting Dr. Guerette from testifying as to any statements Plaintiff may have made to him related to the cause or inception of her symptoms. The Court's decision harmed Plaintiff's case by preventing her from being able to introduce evidence that could have altered the jury's verdict and blocked Defendant's motion under Rule 50.

> **ii. At trial, the court failed to allow Dr. Guerette to testify as an expert witness once Defendant's counsel and the Court itself "opened the door" to such testimony despite expressly providing such an opportunity would be available at pre-trial hearings.**

In the pre-trial hearings on May 1 and July 12, the Court clearly stated to the parties that, while Dr. Guerette was disclosed as a lay witness and treating physician for Plaintiff, counsel for Defendant could open the door to expert testimony on cross-examination if he asked him questions that required answers and expertise based on technical, scientific, or other specialized knowledge. *See generally* Doc. 31 and Doc. 56. Specifically, the Court explained that any questions that sought

14

**JA829**

Dr. Guerette's opinion regarding the causation of Plaintiff's injuries would be expert opinion and would consequently allow Plaintiff's counsel to examine him as an expert on re-direct. Doc. 31, p. 20. The Court also stated on July 12 that if Defendant's counsel asks if the InterStim was "expired," then that will likewise open the door to expert testimony. Doc. 56, p. 39. The Court then altered its position at the September 1 pre-trial hearing regarding the use of the term "expired." Counsel for Defendant literally read his question to Court from July 12, asking the question again, to which the court responded "[i]t will open the door." Doc. 84, p. 34. The Court then said that Defendant's counsel *could* say "expired" despite Plaintiff's counsel objecting to the broadness of the term because "expired" could mean either no longer functioning properly or ceasing to function entirely, creating confusing testimony for the jury. Doc. 84, p. 34.

Despite the uncertainty of whether the use of "expired" would dive into the realm of expert testimony, the Court did consistently hold that an opinion expressly explaining the causation of Plaintiff's injuries and why the InterStim was no longer functioning would require expert opinion. Doc. 31, p.20; Doc. 56, p. 38–39; Doc. 84, p. 34–35. But, unsurprisingly, counsel for Defendant asked Dr. Guerette at trial whether his diagnosis was that the InterStim "expired" and argued in closing that, "even Dr. Guerette's own diagnosis is not damaged, it's expired." Doc. 85, p. 123 & 198. This was a misleading interpretation of the evidence because of the multiple meanings of "expired," and Dr. Guerette should have been able to render an expert opinion about what he meant by "expired" in order for the evidence to be clearly presented to the jury.

The Court itself also effectively opened the door to expert testimony at trial by asking Dr. Guerette about the impedances in the wire that connected the battery of the InterStim to the nerve. Doc. 85, p. 114–16. When asked how Dr. Guerette saw impedances in the wire, he explained how the InterStim functions and the methodology for diagnosing why a person's symptoms would

15

**JA830**

recur after getting an InterStim implanted. Doc. 85, p. 114–16. Only once Dr. Guerette explained that he could only note impedances in the wire through an inference established from readings on the unit did the court decide to strike the answers he had given. Doc. 85, p. 116. While the Court never explained whether the expert door would be opened based on inquiries from the Court itself, the same reasoning from the Court's pre-trial rulings should have applied because the jury was then privy to his expert opinion and the parties should have had a fair opportunity to flesh out Dr. Guerette's testimony. Nevertheless, the Court failed to allow the parties to examine him as an expert after opening the door itself depriving Plaintiff from a fair and equal opportunity to examine him on re-direct to clarify the testimony he had proffered thusfar.

      **c.  The Court invaded the provinces of both the jury and counsel for the parties by examining the witnesses itself, summarizing testimony, and implying an opinion of causation of Plaintiff's injuries before the jury thus heavily influencing the jury's verdict.**

In addition to the prejudicial inconsistencies in the Court's rulings at trial, the Court also indirectly influenced the jury by asking questions of Plaintiff and Dr. Guerette subsequently summarizing their testimony. The Defense didn't present a single witness at trial, so the court effectively commandeered Plaintiff's case-in-chief and implicitly indicated its opinion of causation, or lack thereof, in front of the jury.

Beginning with the direct examination of Plaintiff, the Court asked an uninterrupted series of key questions about her injuries and the mechanism of her injuries from the accident. For example, the court asked Plaintiff:

1)  "He ran into you at the intersection, right?" Doc. 85, p. 42.

2)  "What kind of injuries did you suffer?" Doc. 85, p. 42

3)  "What side of the car—you were driving?" Doc. 85, p.42

4)  "What side of the car did he [(the Defendant)] hit?" Doc. 85, p. 42

5) "So you were the one that was predominantly injured; is that right?" Doc. 85, p. 42

6) "And you hit your head on what?" Doc. 85, p. 42

The Court further asked whether she reported any pelvic injuries between the date of the collision and her vacation with her family in August of 2019 and whether she had tried to make an appointment with Dr. Guerette's office prior to that vacation. Doc. 85, p. 61–62, 64. After reading a medical record from October 8, 2019, the Court asked Plaintiff if that visit was the first instance at which she told a medical provider about her pelvic injuries. Doc. 85, p. 68. Near the end of Plaintiff's testimony, the Court asked Plaintiff about her observations of the InterStim after the collision and what happened when it was replaced. Doc. 85, p. 69–71. As for her cross-examination, the Court likewise asked multiple questions regarding the accuracy of the medical records and her statements to her medical providers. Doc. 85, 90–91.

Lastly, with regard to Dr. Guerette, the Court asked him questions concerning his education and background, when he treated Plaintiff, and then the Court stated, "Ms. Cohn [(Plaintiff's counsel)] is going to ask you questions about what you observed when you came into contact with her [(Plaintiff)] in October of 2019." Doc. 85, p. 107, 110–11. As the examination proceeded, the Court then asked Dr. Guerette the question (highlighted above as a block quotation), "was there anything different from 2013, when you last saw her, until 2019?" Doc. 85, p. 113. After he answered, the Court stated, "Okay. I think that's the extent of his testimony." Doc. 85, p. 114. When Plaintiff's counsel attempted to asked about Plaintiff's other appointments and treatment with him, the Court stated, "His testimony at this stage is simply what did he see in October. And he just said—now the question, it's your burden to establish why that happened." Doc. 85, p. 114.

The Court, in its conduct at trial, played the roles of both Plaintiff's counsel and Defendant's counsel. Counsel for the parties have strategized how to most effectively and

zealously advocate for their clients but, when the court examined witnesses itself, it disrupted Plaintiff's counsel—and potentially Defendant's counsel—from introducing evidence and testimony in the manner they saw fit. The court's questioning of witnesses on cross-examination also assisted the Defense by eliciting testimony that the Defense may not have otherwise sought. The Court even acknowledged that it's the parties who put on their cases, not the court. After the Court asked Plaintiff about her injuries, Plaintiff's counsel explained she was attempting to introduce photographs of the vehicles when the court interrupted her to say, "It's your case. Go ahead." Doc. 85, p. 42–43.

Moreover, while a Federal District Court judge may comment upon evidence when necessary to assist the jury, "[t]his privilege of the judge to comment on the facts has its inherent limitations." *Quercia v. United States*, 289 U.S. 466, 469 (1933). The trial court must avoid "deductions and theories not warranted by the evidence" and may not "distort" or "add" to the evidence. *Id*. However, the Court in the instant case didn't merely comment upon evidence—it added to it and implied to the jury a deduction about causation. Necessarily, it added to it by asking Dr. Guerette and Plaintiff substantive questions about her treatment and injuries, eliciting evidence instead of seeking to simply clarify testimony. And when the court itself limited the extent of Dr. Guerette's testimony and stated to Plaintiff's counsel, "it's your burden to establish why that happened," the Court effectively implied that Plaintiff had failed to prove causation, planting a seed of doubt in the jury. Doc. 85, p. 114. In so doing, the Court, "practically deprived [Roop] of the benefit of his [Guerette's] testimony." *Quercia*, 289 U.S. at 471.

* * *

The Court should grant Plaintiff's Motion for a New Trial under Federal Rule of Civil Procedure 59(a) because the trial, specifically Phase 1 of the trial, wasn't moderated and governed

18

**JA833**

in accordance with the Court's pre-trial decisions, the Federal Rules of Evidence, precedent, and principles of fairness in the admission of evidence. The errors the Court committed prejudiced the jury against Plaintiff and denied her a full and fair opportunity to establish her case-in-chief, amounting to a miscarriage of justice. On these grounds, a new trial is warranted.

**B. THIS COURT SHOULD AMEND AND REVERSE ITS GRANT OF DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW UNDER FED. R. CIV. P. 50 BECAUSE IT COMMITTED CLEAR ERRORS OF LAW WHEN IT RULED THAT LAY TESTIMONY WAS INSUFFICIENT FOR THE JURY TO FIND FOR THE ISSUE OF CAUSATION ON PLAINTIFF'S PELVIC PROLAPSE INJURIES**

Under Federal Rule of Evidence 701, lay witnesses may give opinions regarding their perceptions and observations so long as they don't entail technical, scientific, or other specialized experience. Further, lay witnesses are sufficient to establish causation in most cases, including the instant one. However, despite several lay witnesses—the Plaintiff herself, her significant other, and her treating physician of over ten years—giving testimony in this case about their observations of Plaintiff before and after the subject motor vehicle collision, the Court partially granted Defendant's Motion for Judgment as a Matter of Law, ruling that there was insufficient evidence for the jury to find causation regarding Plaintiff's pelvic prolapse injuries without an expert. However, the Court's ruling was a clear error of law because it wasn't in accordance with Fourth Circuit precedent concerning the necessity of expert witnesses, contravened the Federal Rules of Evidence, and disregarded Virginia substantive tort law regarding causation.

Plaintiff has already set forth in this motion the exact language from Federal Rule of Evidence 701, but subsection (b) is particularly helpful: a lay witness can give opinions that are "helpful to clearly understanding witness's testimony or to determining a fact in issue." Fed. R. Civ. Evid. 701. Prevailing precedent in the Fourth Circuit dictates that a treating physician may, as a lay witness, testify to their, "individual observations and treatment of [a party] . . . In other

19

words, the treating physicians will be permitted to testify to their observations, course of treatment, and diagnosis of [the party] at the time they treated," them. *Springs v. Waffle House, Inc.,* Civil Action No. 3:18-cv-03516-JMC, 2021 U.S. Dist. LEXIS 6031, at *8 (D.S.C. Jan. 13, 2021). This precedent clearly delineates that Dr. Guerette's testimony was permitted to encompass *all* of his observations, treatments, and diagnosis from *all* of his appointments with Plaintiff from 2011 to present as she is still under his active care only excluding future care and the treatments and prognosis associated with it.

Based on the plain language of Rule 701(b) a jury may use lay witness testimony to determine a fact in issue—e.g., whether a motor vehicle collision caused a particular injury. This means that so long as a lay witness's testimony is based upon their own perceptions, the jury may draw inferences and conclusions from it. Furthermore, Federal Rule of Evidence 401 states that evidence is relevant if it, "(a) . . . has a tendency to make any fact more or less probably than it would be without the evidence; and (b) the fact is of consequence in determining the action." Dr. Guerette, as a lay witness treating physician, and his testimonial evidence as to his treatment, observations, and diagnosis of Plaintiff cannot only be used by the jury to draw inferences from under Rule 701 but are also facts of consequence in determining whether or not the accident did in fact cause Plaintiff's injuries under Rule 401.

Indeed, this Court agreed at the pre-trial hearing on May 3 that, "the [Virginia] case law is also clear that lay testimony can establish causation" and "through lay testimony, they [(the jury)] can establish causation." Doc 31, p. 5, 13. Plaintiff had explained in her response to Defendant's Motion in Limine that, "Virginia tort law does not mandate expert testimony to show proof of causation." *McCauley v. Purdue Pharma, L.P.*, 331 F. Supp. 2d 499, 450 (W.D. Va. 2004). The Virginia Supreme Court has held:

> "[D]irect medical evidence to establish a causal connection between an accident and injury is *not* a prerequisite to recovery. Here, the testimony of the plaintiff alone, with all reasonable inferences which could be drawn therefrom, coupled with the medical evidence offered, was sufficient to present a jury issue as to causation." *Sumner v. Smith*, 257 S.E.2d 825, 825 (Va. 1979) (*emphasis added*).

The Virginia Supreme Court has additionally held that lay testimony of a causal connection between a motor vehicle collision and an injury is admissible for whatever weight the *fact finder* may choose to give it, even when medical testimony fails to establish a causal connection expressly. *Todt v. Shaw*, 286 S.E.2d 211, 212 (Va. 1982).

Having clearly established that both Federal Law and Virginia state law permit juries to find causation of injuries based only on lay witness testimony, we must turn to causation of the injuries at issue in the case before this Court and the evidence admitted in support thereof. In this trial, there were two primary injuries to Plaintiff that were in dispute: (1) several prolapses in her pelvic region, and (2) damage to her implanted InterStim device that assisted her bladder functions. The lay witnesses who testified about both of these injuries were (a) Plaintiff, (b) Gerard Barton (Plaintiff's significant other), and (c) Dr. Guerette. As detailed below, the testimony of these witnesses provided a sufficient basis for the issue of causation of the pelvic prolapses to go to the jury:

### a. Plaintiff's testimony

In direct, cross, and re-direct examination, Plaintiff testified as follows:

1. Plaintiff visited Dr. Guerette years prior to July 7, 2019, namely 2011 through 2013, for bladder issues. Doc. 85, p. 35–36.
2. Dr. Guerette implanted an InterStim device in Plaintiff prior to July 7, 2019. Doc. 85, p. 36.
3. Dr. Guerette did not diagnose her with any prolapses during his initial treatment of her prior to the collision. Doc. 85, p. 36.
4. Plaintiff was not experiencing any bladder symptoms or pelvic pain between the installation of the InterStim in 2012-2013 and July 7, 2019. Doc. 85, p. 36–37.
5. Plaintiff has never been in another motor vehicle collision. Doc. 85, p. 38.

**JA836**

6. Plaintiff has not fallen since July 7, 2019. Doc. 85, p. 39.
7. The InterStim was functioning properly at the end of June 2019. Doc. 85, p. 49–50.
8. Plaintiff initially prioritized treating her head injury from the collision. Doc. 85, p. 56.
9. She reported bladder pain and pelvic pain to Dr. Guerette on October 8, 2019. Doc. 85, p. 68.
10. After the collision, Dr. Guerette diagnosed her with a vaginal prolapse. Doc. 85, p. 70.
11. Plaintiff's pelvic issues started after the collision. Doc. 85, p. 85.
12. Plaintiff had no ongoing discomfort from her procedures with Dr. Guerette since 2013 until the July 7, 2019 motor vehicle accident in July 2019. Doc. 85, p. 102.

### b. Gerard Barton's testimony

In direct, cross, and re-direct examination, Mr. Barton testified as follows:

1. Mr. Barton has been together with Plaintiff since 2007. Doc. 85, p. 132.
2. Mr. Barton observed that prior to July 2019, he observed that Plaintiff had no pelvic pain. Doc. 85, p. 138.
3. Mr. Barton witnessed Plaintiff having pelvic pain on July 8 or July 9, 2019. Doc. 85, p. 138.
4. Mr. Barton said that Plaintiff had not been in any other collisions or fallen off a horse, and that he had not witnessed any other traumatic events regarding Plaintiff since they've been together. Doc. 85, p. 140–41.

### c. Dr. Guerette's testimony

In direct, cross, and re-direct examination, Dr. Guerette testified as follows:

1. Dr. Guerette is a urogynecologist and pelvic reconstructive surgeon. Doc. 85, p. 106.
2. Dr. Guerette first treated Plaintiff in 2011, who was complaining of bladder issues, and he diagnosed her with interstitial cystitis and an overactive bladder. Doc. 85, p. 108.
3. Dr. Guerette did not diagnose her with a prolapse in 2011 or see any indication of a prolapse during his treatment of her from 2011 to 2013 when he perfoemdd a full pelvic exam. Doc. 85, p. 108–09.
4. Dr. Guerette didn't treat Plaintiff between 2013 and October 2019 and there is no indication Plaintiff sought treatment from any other providers for pelvic issues during that time period. Doc. 85, p. 111.
5. In October of 2019, Dr. Guerette observed apical and anterior pelvic organ prolapses and noted that Plaintiff correlated the complaints with the collision from July 2019. Doc. 85, 112.

22

**JA837**

6. Dr. Guerette examined Plaintiff for a pelvic prolapse between 2011 to 2013. Doc. 85, p. 113.
7. Dr. Guerette's findings of an apical vaginal prolapse and cystocele were new findings in 2019. Doc. 85, p. 113.
8. Dr. Guerette found a first-degree pelvic cystocele in 2011 at Plaintiff's initial visit with him, which Dr. Guerette stated is clinically insignificant and like comparing apples and oranges with Plaintiff's current diagnosis. Doc. 85, p. 119–20.
9. Dr. Guerette stated that the cystocele could progress and that it had since 2011. Doc. 85, p. 120.
10. Dr. Guerette diagnosed Plaintiff with three prolapses in 2019. Doc. 85, p. 125.

Thus, as the testimony of the witnesses demonstrates, there was an abundance of consistent evidence supporting that Plaintiff was not experiencing any major pelvic pain or bladder issues prior to the accident and that her symptoms arose after the July 7, 2019 collision. Dr. Guerette himself stated that any prolapse she had in 2011 was clinically insignificant, and Plaintiff testified that she had not experienced any pelvic pain until after the subject collision. She also explained that she hadn't been involved in any major traumatic events since 2011 to the present day. That Dr. Guerette diagnosed Plaintiff with a first-degree pelvic cystocele in 2011 and that Plaintiff didn't treat her pelvic injuries until three months after the collision only created disputes over material facts and credibility questions for the jury as fact finder, not an insufficient evidentiary basis for the jury on which to find facts. The testimony from the trial was sufficient for the jury to decide whether Plaintiff's pelvic injuries were caused by the collision because, like in many personal injury cases, the evidence was largely testimonial about her symptoms before and after the traumatic event. In other words, there was enough evidence for the jury to have identified a causal relationship between the traumatic event and Plaintiff's injuries and said decision was up to the jury as fact finder based on Virginia substantive law.

Furthermore, the Court in its order partially granting Defendant's Rule 50 motion stated that, in addition to an insufficient evidentiary basis, the pelvic prolapse issue was "too complex for lay testimony only" and cited to *Taylor v. Shreeji Swami, Inc.*, 820 Fed. Appx. 174 (4th Cir.

23

**JA838**

2020). Doc. 80, p. 1. However, *Taylor* discusses when expert testimony is necessary for a jury to find causation of a particular injury under North Carolina law, and it cites ***only*** to North Carolina state court opinions regarding that specific legal question. Doc. 80, p. 1. North Carolina state precedent regarding questions of causation of injuries are neither binding nor controlling in the instant matter because the subject collision occurred in Virginia and is before the Court as a result of diversity jurisdiction and removal from Virginia state court. The United States Supreme Court has concretely established that a Federal District Court exercising diversity jurisdiction must apply substantive state law and decide the issue in the same manner as a state court. *See Erie R.R. v. Tompkins*, 304 U.S. 64, 79–80 (1938). Furthermore, the Court offered no explanation as to why the issue of damage to the InterStim didn't require expert testimony but Plaintiff's pelvic prolapses did in either its order or when hearing Defendant's oral motion at trial. *See* Doc. 80 and Doc. 85, 147–57. Even under the holdings used in *Taylor*, the court would not be able to justify why one was less complex than the other—*Taylor* quotes cases stating, "Where . . . the subject matter . . . is so far removed from the usual and ordinary experience of the average man that expert knowledge is essential to the formation of an intelligent opinion, only and expert can competently give opinion evidence as to the cause of death, disease, or a physical condition." *Gillikin v. Burbage*, 139 S.E.2d 753, 760 (N.C. 1965). Surely, then, it could not be reasonably adjudicated that the sacral stimulation device to control and aid bladder function is not "so far removed from the usual and ordinary experience of the average man." *See id.* Both groups of injuries are based on the same facts, the same accident, the same testimony, and occurred to the same region of the Plaintiff's body.  The Court stated its opinion when hearing Defendant's oral Rule 50 motion that it believes the pelvic prolapse was a muscle degeneration issue instead of a traumatic injury despite saying that the Court is not there "to judge credibility". Doc. 85, p. 152.

Based on the lay testimony given at trial, there was a sufficient basis for the question of causation regarding Plaintiff's pelvic prolapse injuries to go to the jury. There is no discernable factual or legal reason why the pelvic prolapse injuries were too complex for the jury to decide when the issue of the InterStim damage wasn't. At the very least, the evidence presented at trial created disputes of material fact regarding Plaintiff's injuries that were for the jury, as fact finder, to consider and decide, not the Court. Accordingly, this Court should amend its judgment granting Defendant's Rule 50 Motion for Judgment as a Matter of Law, granting relief in the form of a reversal and ordering a new trial on the specific questions of (1) causation of Plaintiff's prolapse injuries and (2) the damages resulting therefrom.

## IV.   CONCLUSION

This Court should GRANT Plaintiff's Motion for a New Trial under Rule 59(a) because the court's administration of the trial, examination of the witnesses, and evidentiary rulings caused a miscarriage of justice. There is ample evidence that the jury could have been influenced by the Court's conduct which prejudiced the Plaintiff, resulting in a verdict for Defendant.

However, should this Court deny Plaintiff's Motion under Rule 59(a), it should GRANT Plaintiff's Motion under 59(e) to Amend or Alter its judgment granting Defendant's Rule 50 Motion for Judgment as a Matter of Law because the Court committed clear errors of law. The Court found facts—a job for the jury—and arbitrarily decided that the issue of causation of Plaintiff's damaged InterStim didn't require expert testimony but that causation of her pelvic prolapses did despite the two being based on the same evidence, witnesses, testimony, and timeline. Additionally, this decision was based on the improper limitation of Dr. Guerette's testimony to the initial October 8, 2019 appointment after the July 2019 motor vehicle accident that is the basis for the instant matter occurred. More importantly, the Court's order erroneously applied North Carolina state law regarding causation, which is a substantive issue. As a Federal

25

**JA840**

Court having jurisdiction through diversity of citizenship of the parties, this court was required to apply Virginia law regarding causation and decide the issue in the same manner as a Virginia state court.

**SAMANTHA ROOP**

By Counsel

_____/s/_____
Samantha Cohn (VSB# 89081)
Geoff McDonald & Associates, P.C.
8720 Stony Point Parkway, Suite 250
Richmond, VA 23235
Phone: (804) 888-8888
Facsimile: (804) 359-5426
Email: scohn@mcdonaldinjurylaw.com
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 14th day of October, 2022, I electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

Carter T. Keeney, Esq. (VSB # 82275)
Carter & Shands, P.C.
9030 Stony Point Parkway, Suite 530
Richmond, VA 23235
Phone: (804) 747-7470
Facsimile: (804) 747-7977
Email: ckeeney@carterandshands.com
*Counsel for Defendant*

_____/s/_____
Samantha Cohn, Esquire

26

**JA841**

IN THE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| SAMANTHA ROOP | ) | Plaintiff, |
| | ) | |
| v. | ) | Civil Action No.: 3:21-cv-00675 |
| | ) | |
| NICHOLAS JAMES DESOUSA | ) | Defendant. |

**MEMORANDUM OF FACT AND LAW IN OPPOSITION TO PLAINTIFF'S MOTION
FOR NEW TRIAL UNDER FED. R. CIV. P. 59(a) OR, IN THE ALTERNATIVE, TO
ALTER OR AMEND THE DISTRICT COURT'S JUDGMENT UNDER FED. R. CIV. P.
59(e)**

COMES NOW, the Defendant, by counsel, and for his Opposition to Plaintiff's Motion

for New Trial Under Fed. R. Civ. P. 59(a) or, in the alternative, to alter or amend the District

Court's Judgment Under Fed. R. Civ. P. 59(e) states as follows:

**PROCEDURAL AND FACTUAL BACKGROUND**

Plaintiff had a full and fair jury trial.  After the close of the Plaintiff's evidence in phase 1

(the Causation phase), this Court struck Plaintiff's claim that her pelvic prolapse was

proximately caused by the motor vehicle accident of July 7, 2019.  Then the jury was properly

instructed by the Court on the law and the jury found that the Plaintiff had not proven by a

preponderance of the evidence that her Interstim was damaged in the subject accident.  After the

verdict was rendered, but before entry of the final judgment Plaintiff filed the motion now before

the Court.  The Plaintiff essentially seeks two things: 1. A new trial under Rule 59 (a)(1)(A) on

all issues because of allegedly erroneous evidentiary rulings by this Court and 2. A new trial

pursuant to Rule 59(e) on the issue of whether or not the pelvic prolapse was caused by the

subject accident because it was error to grant Defendant's Rule 50 Motion for judgment as a

matter of law at trial.

**JA842**

The Plaintiff's request for a new trial under Rule 59(a)(1)(A) is based off the following claims: First, it was error to allow the defense to impeach the Plaintiff by eliciting testimony that the Plaintiff was seeking $5 million in damages; Second, Plaintiff was confused by this Court's pretrial rulings and the rulings at trial and therefore the Plaintiff was prejudiced.

The request under Rule 59(e) is based on the argument that Plaintiff submitted sufficient evidence to allow the jury to determine if the pelvic prolapse was caused by the subject accident.

The Defense will not rehash all of the evidence that was presented at trial as the exhibits and transcript are already in the record.  However, it is important to note, that Plaintiff failed to point to any citation in the record that states the pelvic prolapse was caused by the subject accident.  Instead, Plaintiff's argument is that Plaintiff and her husband claimed that she was not in pain before the accident and was in pain after the accident.  Plaintiff further insinuates that because and that Dr. Guerette diagnosed her with prolapse after the accident, that is enough to create a jury issue on whether or not the pelvic prolapse was caused by the accident.  This contention is incorrect as speculation would have been required to find causation. Secondly, back in 2011 Plaintiff had first degree cystocele and Dr. Guerette testified that a first degree cystocele can progress.  *See*, ECF No.: 87-6 P. 119-120.

Lastly, it is important to note that Dr. Guerette could not testify as an expert because Plaintiff failed to identify him as an expert in accordance with this Court's pretrial orders.

## DISCUSSION OF LAW AND ARGUMENT

I.    *Standard of Review:*

Federal Rule of Civil Procedure 59(a) provides that "[t]he court may, on motion, grant a new trial. . . after a jury trial for any reason for which a new trial has heretofore been granted in an action at law in federal court." A new trial is granted pursuant to Rule 59(a) if "(1) the verdict

is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998) (quoting *Atlas Food Systems & Services, Inc. v. Crane Nat'l Vendors, Inc.*, 99 F.3d 587, 594 (4th Cir. 1996)).  The decision to grant or deny a Rule 59(a) motion for a new trial rests "in the sound discretion of the trial judge."  *Scott v. Watsontown Trucking Co.*, 920 F. Supp. 644, 650-51 (E.D.Va. 2013) (citing, *Wadsworth v. Clindon*, 846 F. 2d 265, 266 (4th Cir. 1988)).  It is further established that, such decision will not be disturbed absent a clear showing of abuse of discretion.  *Chesapeake Paper Prods. Co. v. Stone & Webster Eng'g Corp.*, 51 F.3d 1229, 1237 (4th Cir. 1995).

Plaintiff's claim for a new trial is based on the allegation that a miscarriage of justice would occur if Plaintiff were not awarded a new trial.

A Rule 59(e) motion may only be granted in three situations: "(1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." *Zinkand v. Brown*, 478 F.3d 634, 637 (4th Cir. 2007) (citations omitted).  "It is an extraordinary remedy that should be applied sparingly." *Mayfield v. NASCAR*, 674 F.3d 369, 379 (4th Cir. 2012) (citing *EEOC v. Lockheed Martin Corp.*, 116 F.3d 110, 112 (4th Cir. 1997)).

II.     *No error was committed by allowing Defendant to illicit bias from Plaintiff.*

Defendant was properly allowed to illicit evidence that Plaintiff was suing for $5 million. This goes to Plaintiff's bias.  Plaintiff claims that her inability to explain what that specific number chosen was so patently unfair that a new trial should be granted.  Counsel's question about how the number was calculated was not relevant and beyond the scope of phase one.

Secondly, even if it was error to not allow the question, it did not result in a miscarriage of justice. Plaintiff points to no case on the subject. Plaintiff also failed to properly proffer for the record what the answer to her question would have been. As such, ruling that a miscarriage of justice occurred is next to impossible.

     III.    *Dr. Guerette's testimony was properly limited in accordance with this Court's ruling and the applicable law.*

The Court properly sustained Defendant's objection to the question, "And during your treatment observations of her, was there any indication that these symptoms that she complained about in October of 2019 arose from any other period other than what she relayed to you?" This objection was well founded because Plaintiff was seeking a medical opinion as to whether or not there was evidence of any other item that caused Plaintiff's condition. Counsel's question was not asking for Dr. Guerette's observations, treatment plan or diagnosis and she was not asking for statements made to him for purposes of medical treatment. The causation of a complicated medical opinion certainly requires scientific or specialized knowledge. Dr. Guerette was not identified as an expert witness and this question clearly seeks information beyond his observations, the results of his examinations, and what the Plaintiff told him for purposes of medical treatment.

Plaintiff claims this Court erroneously prevented Dr. Guerette from stating his observations, diagnosis and treatment and relaying what she reported to him. This is patently false. Dr. Guerette recited Plaintiff's subjective complaints on direct examination and even said Plaintiff correlated the symptoms with the "MVA in July of 2019." *See*, ECF No.: 87-6 p. 111-112. Further, Plaintiff's exhibit number seven was all of Plaintiff's medical records with Dr. Guerette and includes her subjective complaints as well as his diagnosis. Dr. Guerrete also testified as to his observations of the Plaintiff and his diagnosis. *See*, ECF No.: 87-6 p. 112-117.

**JA845**

Dr. Guerette testified as to his examination and his diagnoses including that the Interstim was not functioning properly and that there was a prolapse.  And again, all of Dr. Guerette's medical records were introduced into evidence.

The Court's ruling was consistent with its prior rulings and most importantly comported with the applicable rules of evidence and the law of the case.

IV.   *Defendant did not open the door to allowing Dr. Guerette to testify as an expert witness and Plaintiff failed to ask for a ruling on this issue.*

Defendant did not open the door to allow Dr. Guerette to testify as an expert witness. Further, Plaintiff never sought a ruling on the issue.  On cross examination, defense counsel had the Dr. Guerete testify as to what his diagnoses, all of which were in his records, were.

At the September 1, 2022 hearing, this Court held that the entirety of Dr. Guerette's unredacted records were admissible and that either all of the records or none of the records were coming into evidence.  Thereafter, Plaintiff introduced all of Dr. Guerette's medical records as exhibit number seven.  These records contained the notation that the Interstim was expired.  This Court also stated that Plaintiff could have Dr. Guerette explain what he means by expired.

On cross examination, Dr. Guerette was asked: "Q:  Doctor, your initial diagnosis when you replaced the Interstim was expired Interstim, correct?"  Dr. Guerette answered: "For that portion of her procedure, yes."

Defense counsel did not use the word "expired" any other time during cross examination. The only purpose was simply to have Dr. Guerette state his diagnosis as reflected in the records. This in no way opened the door to allowing Dr. Guerette to offer opinion testimony on causation.

More importantly, Plaintiff's counsel only asked four questions on redirect examination. None of those questions concerned causation or the issue with the Interstim.  If Plaintiff felt the door had been opened, counsel should have asked the Court for a ruling or asked the question

about causation.  Plaintiff did not ask such question and therefore has waived any argument on the position.  Plaintiff's redirect of Dr. Guerette contains no objections, so there is nothing for this Court to reconsider or to rule upon that justifies as new trial.

Additionally, in regard to the impedances in the Interstim wire, the Court did not open the door.  The Court simply elicited additional information to allow the Court to rule on an objection raised by defense counsel.  The objection was sustained.  The testimony referenced by Plaintiff was struck.

V.   *The Court did not invade the provinces of both the jury and counsel.*

The Court did not invade the province of the jury nor counsel.  The Court asked several questions throughout trial.  The Court is permitted to do so.  Further, Instruction number seven instructs the jury on how to handle questions asked by the Court.  Instruction number one also instructs the court that "No statement or ruling or remark that I may make during the course of the trial is intended to indicate my opinion as to what the facts are.  It is the function of the jury to consider the evidence and determine the facts in this case."

There is no evidence and no argument that the jury disregarded the instructions.  Plaintiff also fails to cite any analogous case to support her position.  This is not grounds for a new trial.

VI.   *This Court did not err in granting Defendant's Rule 50 Motion for Judgment as a matter of law as to causation of Plaintiff's pelvic prolapse.*

Plaintiff failed to produce any evidence regarding the causation of her pelvic prolapse conditions and therefore, the Court correctly granted Defendant's Rule 50 motion regarding the same.  As a preliminary matter, it should be noted that the jury found that Plaintiff did not prove that the Interstim was damaged in the subject accident.

A court may grant a motion for judgment as a matter of law if "during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury

**JA847**

to find for that party on that issue." Fed. R. Civ. P. 50(a). Judgment as a matter of law is proper only if "there can be but one reasonable conclusion as to the verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party. *Id.* at 251.   The court is directed to "review all of the evidence in the record" and "draw all reasonable inferences in favor of the nonmoving party." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000).

"When sitting in diversity, district courts must apply the federal standard in ruling on motions for a directed verdict." *DeMaine v. Bank One, Akron, N.A.*, 904 F.2d 219, 220 (4th Cir. 1990).   "Under this standard, a district court should direct a verdict for the defendant if the plaintiff has failed to adduce substantial evidence in support of his claim." *Id.* (citations omitted).  Federal Rule of Civil Procedure 50(a)(1) allows the court to enter judgment as a matter of law on any issue when "there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue." *Godfrey v. Boddie-Noell Enters.* 843 F. Supp. 114 (E.D. Va. 1994).

This Court's Order Granting in Part and Denying in Part Defendant's Rule 50 Motion states: "The Court GRANTS Defendant's motion with regard to the issue of causation regarding Plaintiff's pelvic prolapse, due to an insufficient evidentiary basis for a reasonable jury to find for Plaintiff on that issue and as a matter of law as causation relating to Plaintiff's pelvic prolapse was too complex for lay testimony only.  *See*, *Taylor v. Shreeji Swami*, Inc. 820 Fed. App'x 174 (4th Cir. 2020).

Plaintiff's reliance on *Sumner v. Smith*, 220 Va. 222, 257 S.E.2d 825 (1979) and *Todt v. Shaw*, 223 Va. 123, 286 S.E.2d 211 (1982) is misguided.  Those cases stand for the proposition that a party can testify about their injuries absent an expert.  The issue in this case is whether or

not the Plaintiff presented sufficient evidence for a jury to find that the pelvic prolapse injury

was caused by the subject accident without speculating.  Proof of 'possibility' of causal

connection is not sufficient.  *Wilkins v. Sibley*, 205 Va. 171, 175, 135 S.E.2d 765, 767 (1964).

Plaintiff points to a number of pieces of testimony, but essentially Plaintiff's argument is

she did not have pain before the accident, was diagnosed with prolapse after the accident and the

2011 diagnosis of first-degree cystocele (which can progress) is irrelevant.  The Plaintiff herself

cannot even say the pain started right after the accident.  It is also undisputed from the records

submitted in evidence that the first time she mentioned any pelvic issues to a doctor was three

months after the accident.  Further, there was no testimony or evidence to differentiate the pain

caused from the malfunctioning Interstim versus prolapse.  Virginia tort law does not mandate

expert testimony to show proof of causation in every case. However, in some cases expert

testimony must be provided because of the complexity of the causation facts.  *McCauley v.*

*Purdue Pharma L.P.*, 331 F. Supp. 2d 449 (W.D. Va. 2004)(Citing, *Rohrbough v. Wyeth Labs.*,

Inc., 916 F.2d 970, 972 (4th Cir. 1990)).

In this case, Plaintiff failed to produce substantial evidence in support of her claim that

the pelvic prolapse was caused by the subject accident and as a result there is no legally

sufficient evidentiary basis for a reasonable jury to have found for the Plaintiff on the issue of

whether or not the pelvic prolapse was caused by the subject accident.

Plaintiff has a complex medical condition and failed to introduce the requisite evidence to

allow a reasonable jury to find in her favor without speculating. Therefore, this Court correctly

granted Defendant's Rule 50 motion as to Plaintiff's pelvic prolapse.

## <u>CONCLUSION</u>

Plaintiff had a full and fair jury trial.  She failed to introduce sufficient evidence to allow

a reasonable jury to find that her pelvic prolapse was caused by the subject accident and this

Court properly granted Defendant's Rule 50 motion regarding the same.  Further, this Court

properly instructed the jury and the jury properly found that Plaintiff did not prove that the

Interstim was damaged by the subject accident.  The Defendant respectfully requests that this

honorable Court deny Plaintiff's and enter judgment upon the verdict and for such other relief as

justice may require.

<div align="center">NICHOLAS JAMES DESOUSA,

By Counsel</div>

_____/s/_____, p.d.
Carter T. Keeney, Esquire (VSB# 82275)
Carter & Shands, P.C.
9030 Stony Point Parkway, Suite 530
Richmond, VA 23235
Telephone:     (804) 747-7470
Facsimile:      (804) 747-7977
ckeeney@carterandshands.com
*Counsel for Defendant*

CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT on the 20th day of October, 2022, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Samantha Cohn, Esquire (VSB# 89091)
Geoff McDonald & Associates, P.C.
8720 Stony Point Parkway, Suite 250
Richmond, VA  23235
Telephone:     (804) 888-8888
Facsimile:     (804) 355-9988
Scohn@mcdonaldinjurylaw.com
*Counsel for Plaintiff*

                              /s/                        , p.d.
Carter T. Keeney, Esquire (VSB# 82275)
Carter & Shands, P.C.
9030 Stony Point Parkway, Suite 530
Richmond, VA 23235
Telephone:     (804) 747-7470
Facsimile:     (804) 747-7977
ckeeney@carterandshands.com
*Counsel for Defendant*

**JA851**

IN THE
UNITED STATES DISTRICT
COURT EASTERN DISTRICT
OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| SAMANTHA ROOP | ) | Plaintiff, |
| | ) | |
| v. | ) | Civil Action No.: 3:21-cv-00675 |
| | ) | |
| NICHOLAS JAMES DESOUSA | ) | Defendant. |

## PLAINTIFF'S PROFFER OF EXCLUDED EVIDENCE

COMES NOW the Plaintiff, by Counsel, and submits this proffer on excluded evidence, and in support thereof states as follows:

I.    Dr. Guerette Lay Witness Testimony

If Plaintiff had been allowed to fully present evidence under Federal Rules of Evidence 401 and 701 as well as <u>Springs v. Waffle House, Inc.</u>, Civil Action No. 3:18-cv-03516-JMC, 2021 U.S. Dist. LEXIS 6031 (D.S.C. Jan. 13, 2021), evidence would have been presented, by means of further testimony of Dr. Nathan Guerette, beyond the scope permitted at trial, which consists of the following:

1.  Dr. Guerette is a medical professional who personally treated Samantha Roop preceding the motor vehicle accident that is the basis for the instant matter as well as subsequent thereto.  Presently, Ms. Roop is still a patient under his active care.

2.  At trial, Dr. Guerette's testimony was limited his treatment of Roop from 2011 to 2013 as well as a singular appointment on October 8, 2019 which was the first appointment Ms. Roop had with Dr. Guerette subsequent to the motor vehicle accident that is the basis for the instant matter despite the fact that there were numerous appointments that occurred beyond the October 2019 appointment.  Said appointments, those subsequent to October 8, 2019 and the motor vehicle accident, occurred regularly through June 2021. *See* Doc. 85, p. 113.

3.  Dr. Guerette was not permitted to testify that during his treatment and observations of Ms. Roop in October 2019 that there was any indication that the complaints she sought his care for after a six (6) year gap arose from any other period than she had relayed to him.  This testimony is based on statements made by Ms. Roop for medical treatment and diagnosis in addition to being based on his own observations as Ms. Roop directly correlated the onset of her complaints with the motor vehicle accident of July 2019 that is the basis for the instant matter. *See* Doc. 85, p. 113–14.

4.  Ms. Roop presented to Dr. Guerette's office on December 3, 2019. Per the records, Ms. Roop reported bladder symptoms of urge incontinence, stress > urge incontinence. She also complained of pelvic pain and pressure having worsened since a motor vehicle accident. At this appointment, Dr. Guerette, through his observations and treatment, tested the InterStim device he had previously implanted in Ms. Roop in 2012/2013 and determined it was no longer functioning properly. More specifically, that through sending electrical impulses to the device and its leads, he could detect that there were impedances in the wires demonstrating a malfunction indicative of damage. Upon concluding the appointment, he diagnosed Ms. Roop with cystocele, pelvic and perineal pain, and overactive bladder. After reviewing his findings with Ms. Roop, his plan of care was to replace the InterStim device, to which she agreed.

5.  She had another appointment with Dr. Guerette on December 19, 2019. At this appointment, Dr. Guerette performed a peripheral nerve evaluation ("PNE"), a procedure in which two simulation electrodes were placed inside of Ms. Roop to simulate as if her currently implanted InterStim device were working as it was supposed to in order to stimulate her sacral nerve and assist with her overactive bladder syndrome. She was required to maintain this PNE for one week and advised to follow up at that time.

6.  As instructed, Ms. Roop followed up with Dr. Guerette on December 26, 2019, where it was determined that the PNE was successful, and that Ms. Roop would benefit from the InterStim device being replaced. She was scheduled for surgery.

7.  Ms. Roop continued to have appointments with Dr. Guerette post-surgery, at which she continued to complain pelvic pain. Dr. Guerette continued to monitor her pain and symptoms and attempted to alleviate them with revisions of her InterStim programming.

8.  After about one (1) year post surgery, Ms. Roop was still complaining of pelvic and perineal pain at her January 5, 2021 appointment, at which point Dr. Guerette again tested the InterStim device and found no impedances. At this point his diagnosis was that the continued pelvic and perineal pain was due to her significantly worsened prolapses and decided to monitor those as the cause of her symptoms. She was told to follow up in one (1) week.

9.  On January 12, 2021, Ms. Roop presented for her scheduled follow up, at which Dr. Guerette and the Plaintiff decided that surgical intervention was necessary for her prolapses, namely a cystocele, enterocele, and rectocele repair.

10. Dr. Guerette was only permitted to testify as a lay witness treating physician

The Plaintiff objects to the exclusion of this relevant evidence as it further speaks to causation of Ms. Roop's injuries, the delineation between the pelvic prolapses and the Interstim malfunction. Under current District precedent, Dr. Guerette is able to testify to all previous appointments Ms. Roop had with him prior to trial and his observations, treatment, and diagnosis during the same. Plaintiff was arbitrarily and improperly limited in scope during her direct examination to a singular appointment with no rationale or basis. The testimony that should have been permitted is extremely relevant to Ms. Roop's injuries and their causation. Dr. Guerette was only allowed to testify as a lay witness treating physician, yet, during Defendant's closing, Defense Counsel was permitted to

argue, over Plaintiff's objection, that, "not even Guerette could point to the accident and say it caused Roop's injuries." That statement significantly prejudiced the Plaintiff as Plaintiff was unable to present direct causation due to Guerette's testimonial limitations, which Defendant exploited and which were not sustained, clarified, or explained.

II.    Testimony Regarding Plaintiff's ad damnum

Defense Counsel was allowed to mention, ad nauseum, and did so throughout his case, the amount of money that the Plaintiff had sued for, attempting to use it to demonstrate bias and/or motive for Ms. Roop and Barton. Defense asked both Ms. Roop and Mr. Barton if the ad damnum was $5 million dollars, to which they responded yes. If Plaintiff or her significant other, Mr. Gerard Barton, had been allowed on redirect to respond to Plaintiff's Counsel's question regarding the basis or reasoning for said figure, they would have stated the following:

1.    The ad damnum was based on Ms. Roop's medical bills and her extensive pain and suffering. Those things would have been more fully testified to and elaborated on in Phase Two (2) by Plaintiff and Mr. Barton. *See* Doc. 85, p. 102.

The Plaintiff objects to the exclusion of this relevant evidence as it one-sidedly allowed the Defense to insinuate bias or motive while Plaintiff was left with no ability during redirect to rehabilitate Roop or Barton despite previous rulings by the Court that such redirect could not only take place but that the Court would interject and present a jury instruction just to ensure clarity and dispel confusion. Plaintiff was barred from relating the ad damnum in any way to any reasoning or justification based on what she has gone through whether it be medical treatment or her pain and suffering. The barring of the entry of this testimony, which was extremely relevant, was prejudicial to the Plaintiff and her case.

III.    Plaintiff's Testimony

If Plaintiff had been allowed to fully present her testimony under Federal Rules of Evidence 401 and 701 as well as <u>Todt v. Shaw</u>, 223 Va. 123, 124, 286 S.E.2d (1982) and <u>Sumner v. Smith</u>, 220 Va. 222, 223, 257 S.E.2d 825 (1979), the testimony would have presented further evidence related to the issue of causation and whether or not Ms. Roop's pelvic prolapses and malfunctioning InterStim were a result of the July 7, 2019 motor vehicle accident with the Defendant. The excluded evidence would have consisted of the following:

1.    Plaintiff was not permitted to testify that she had no plans or intentions to set up any appointments with Dr. Guerette subsequent to her 2013 treatment with him and only made an appointment with him in October 2018 as a result of the complaints she experienced after the accident. *See* Doc. 85, p. 73.

The Plaintiff objects to the exclusion of this relevant evidence as both the Federal Rules of Evidence regarding relevance and lay witness evidence in conjunction with Virginia Supreme Court precedent, given that this is a diversity case, allow for a lay witness to testify to causation and that

said causation is a matter for the jury.  In the instant matter, Ms. Roop would have testified that she experienced a host of complaints after the accident and those complaints prompted her to seek medical treatment from Dr. Guerette and that prior to the accident, she had no appointments scheduled with him or any intentions to do the same.  Barring such evidence was prejudicial to Plaintiff's case.

     IV. Conclusion

     The Court's aforementioned rulings regarding the exclusion of evidence during the pre-trial hearings and Day two (2) of the trial itself unfairly prejudiced the Plaintiff. Said exclusions resulted in improper judgments both by the Court regarding the Rule 50 Motion made by Defense Counsel as well as by the jury.  Had Plaintiff been allowed to present the aforementioned evidence to the jury or to this Court, it may have altered the Court's ruling on Defense's Rule 50 Motion as to the pelvic prolapses or may have influenced the jury as to causation regarding the damage to the InterStim device.  Had Plaintiff been allowed to present this evidence to the Court and to the jury, she would have been able to substantiate the above-described evidence.

Respectfully submitted,

**SAMANTHA ROOP**,

By Counsel

_____/s/_____,
Samantha Cohn, Esquire (VSB# 89091)
Geoff McDonald & Associates, P.C.
8720 Stony Point Parkway, Suite 250
Richmond, VA  23235
T (804) 888-8888
F (804) 355-9988
Scohn@mcdonaldinjurylaw.com
_Counsel for Plaintiff_

CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT on the 27th day of October, 2022, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Carter T. Keeney, Esquire (VSB# 82275)
Carter & Shands, P.C.
9030 Stony Point Parkway, Suite 530
Richmond, VA 23235
T  (804) 747-7470
F  (804) 747-7977
ckeeney@carterandshands.com
*Counsel for Defendant*

/s/                    ,
p.d. Samantha Cohn, Esquire (VSB# 89091)
Geoff McDonald & Associates, P.C.
8720 Stony Point Parkway, Suite 250
Richmond, VA  23235
Telephone:     (804) 888-8888
Facsimile:      (804) 355-9988
Scohn@mcdonaldinjurylaw.com
*Counsel for Plaintiff*

**JA856**

**IN THE**
**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| SAMANTHA ROOP | ) | Plaintiff, |
| | ) | |
| | ) | |
| v. | ) | Civil Action No.: 3:21-cv-00675 |
| | ) | |
| | ) | |
| NICHOLAS JAMES DESOUSA | ) | Defendant. |

**PLAINTIFF'S REPLY TO DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION**
**FOR NEW TRIAL UNDER FED. R. CIV. P. 59(a) OR, IN THE ALTERNATIVE, TO**
**ALTER OR AMEND THE DISTRICT COURT'S JUDGMENT**
**UNDER FED. R. CIV. P. 59(e)**

COMES NOW, the Plaintiff, through undersigned Counsel, who submits the following

Reply to Defendant's Response to Plaintiff's Motion for a New Trial under Federal Rule of Civil

Procedure 59(a) or, in the alternative, Motion to Alter or Amend the District Court's Judgment

under Rule 59(e). In continued support of her Motions, Plaintiff argues as follows:

## I.      INTRODUCTION

In his Response to Plaintiff's Motion, Defendant acknowledges Plaintiff's arguments but

hardly engages with them and fails to provide any meaningful discussions of the law, contrary to

the heading in his brief. Defendant doesn't cite or refer to a single Federal Rule of Evidence despite

Plaintiff's explanations of their applicability to testimony at trial, and he doesn't cite to any case

law beyond the standard of review until his arguments concerning his Rule 50 Motion. And even

at that point, he misses the mark by misidentifying the issue set forth by Plaintiff—his argument

is a square peg if Plaintiff's was a round hole. His entire brief is nearly devoid of any citations to

the record as well. Plaintiff therefore maintains her Motion for a New Trial under Rule 59(a) and

Motion to Alter or Amend the Judgment under Rule 59(e), and respectfully requests that this court grant Plaintiff's requested relief.

## II.     ARGUMENT

### A.  PLAINTIFF DOES NOT DISPUTE DEFENDANT'S STANDARD OF REVIEW.

Defendant's statements of the law in his Response regarding the standard of review for motions under Federal Rule 59(a) and (e) are nearly identical to the statements in Plaintiff's Motion. Accordingly, Plaintiff has no disagreement with Defendant's explanation of the applicable standards of review.

### B.  THE COURT'S ERROR WAS NOT THAT IT ALLOWED DEFENDANT TO ELICIT BIAS FROM PLAINTIFF, BUT THAT IT PROHIBITED PLAINTIFF'S COUNSEL FROM REHABILTATING THE WITNESS IN ACCORDANCE WITH ITS PRE-TRIAL RULINGS.

At the pre-trial hearing on September 1, 2022, the Court ruled that Defendant's counsel could elicit testimony from Plaintiff and Mr. Barton about the amount of damages Plaintiff was claiming to demonstrate their potential bias. Doc. 84, p. 39–40. Plaintiff's counsel objected to this at the hearing—and maintains that Defendant should not have been permitted to discuss damages at all during Phase 1—so the Court decided that Plaintiff's counsel could ask Plaintiff, for example, "That number is based upon your medical treatment and expenses and such, right?" Doc. 84, p. 42. However, when Plaintiff's counsel attempted to do this at trial exactly as the Court instructed, the Court sustained an objection effectively *sua sponte*, ruling that Plaintiff's counsel could not ask her that question. Doc. 85, p. 102. Further, the Court, at the September 1 hearing, stated that it would provide a limiting instruction to the jury once Plaintiff's counsel asked that question, but the Court neglected to do so at trial. Doc. 84, p. 42.

Ironically, Defendant claims that Plaintiff's failure to proffer the answer to the question at trial means that Plaintiff has waived this argument. Surely, though, Plaintiff's counsel should not

2

**JA859**

have proffered that evidence in front of the jury, or else the Defense would be claiming a mistrial. But, despite not proffering the evidence at trial, both Defendant and the Court are well aware of what the answer would have been because it was discussed at the pre-trial hearings, so there is a record of that already.

### C. THE COURT EXPRESSLY PRECLUDED PLAINTIFF'S STATEMENTS TO DR. GUERETTE THAT WERE ADMISSIBLE UNDER FED. R. EVID. 803(4) AND ERRONEOUSLY LIMITED THE EXTENT OF DR. GUERETTE'S LAY TESTIMONY.

Defendant contends, as he did at trial, that Plaintiff's counsel's question of Dr. Guerette, "[D]uring your treatment observations of her, was there any indication that these symptoms that she complained about in October of 2019 arose from any other period other than what she relayed to you?" would require an answer that falls within expert territory. This is incorrect because the answer simply entails whether he observed—heard, saw, or felt—anything that would have indicated to him that Plaintiff's injuries originated from some other time or event other than what she had told him already. His answer simply could have been, "No." That's not an expert opinion in this context. It also wouldn't have been an expert opinion for Dr. Guerette to say something like, "I had no knowledge of any other traumatic events that she associated with her symptom." This would fall within his purview as a lay witness and treating physician under Federal Rule of Evidence 701 and *Brown v. Ryan's Family Steak House Mgmt., Inc.*, 113 Fed. Appx. 512, 515 (4th Cir. 2004) given that any statements made by the Plaintiff regarding a related incident or circumstance are statements made for medical treatment and diagnosis. Moreover, Defendant's response totally lacks legal authority to support his contention and fails to challenge and refute Plaintiff's arguments utilizing Rule 701 and *Brown*.

As Plaintiff thoroughly explained in her Motions, Federal Rule of Evidence 803(4) expressly provides that statements from a patient to a doctor for the purposes of medical treatment

3

**JA860**

are admissible as an exception to the rule against hearsay, and the Court recognized this prior to

trial. *See* Doc. 56, p. 32. Notwithstanding, the Court ruled at trial, in front of the jury, that Plaintiff's

statements to Dr. Guerette were not admissible. Doc. 85, p. 113. This is clearly incorrect, but the

Court prohibited Plaintiff's counsel from eliciting this testimony from Dr. Guerette. Defendant's

response acknowledges that Plaintiff's medical records with Dr. Guerette were admitted into

evidence, which include her subjective complaints, therefore Dr. Guerette should have been able

to provide an answer in front of the jury as to whether or not he had knowledge of any other events

that occurred at or near the onset of Plaintiff's complaints. This is one of the several transgressions

at trial that amounts to a miscarriage of justice.

### D. THE COURT OPENED THE DOOR TO EXPERT TESTIMONY THEREFORE PLAINTIFF DID NOT NEED TO MOVE THE COURT TO QUALIFY DR. GUERETTE AS AN EXPERT WITNESS.

In Plaintiff's Motions, she explained that the Court examined Dr. Guerette about

impedances in the wire that connected the battery of the InterStim to Plaintiff's nerves. Doc. 87,

p. 15. The Court asked him a series of questions, which was uninterrupted by Plaintiff's counsel,

and elicited his testimony regarding his inferences of damage to the wires. Doc. 85, p. 114–16. At

the end of his questioning, Defendant's counsel objected to the Court's *own* examination, which it

sustained. Doc. 85, p. 116. This wasn't an objection to any question asked by Plaintiff's counsel—

the Court itself drew out expert testimony, realized it was such, and consequently struck the

testimony resulting from its own questioning. So, contrary to Defendant's assertion in his brief on

page 6, the Court's questioning preceded Defendant's objection.

Through the Court's questioning, it opened the door to expert testimony, but it was unclear

how Plaintiff's counsel was to proceed based on the Court striking its own line of questioning. The

Court consistently held during the pre-trial hearings from May 3, July 12, and September 1 that if

questions are elicited by the Defense from Dr. Guerette that require expert testimony, then that

4

**JA861**

would allow Dr. Guerette to testify as an expert, and Plaintiff's counsel could examine him as such on re-direct. Doc. 31, p. 20; Doc. 56, p. 38–39; Doc. 84, p. 34. There was no instruction from the Court that Plaintiff was required to move to qualify Dr. Guerette as an expert witness in this situation, so Plaintiff didn't waive her arguments on this issue. Besides, the Court and Plaintiff's counsel had elicited testimony about his background, education, and training at the beginning of his direct examination. *See* Doc. 85, p. 107.

### E. THE COURT'S LIMITING INSTRUCTIONS TO THE JURY ABOUT ITS REMARKS DID NOT SAFEGUARD AGAINST ITS INFLUENCE, AND DEFENDANT PRESENTED NO LEGAL AUTHORITY REQUIRING PLAINTIFF TO SHOW THAT THE JURY DISREGARDED THE COURT'S INSTRUCTIONS.

At trial, the District Court extensively questioned each witness presented by Plaintiff and implied its opinion of causation consistent with its remarks during the pre-trial hearings—i.e., favoring the Defense. Under *Quercia v. United States*, which Plaintiff cited in her Motions, a District Court is permitted to clarify evidence for the jury; sometimes, this involves asking questions of witnesses, but its ability to do so is limited. *Quercia v. United States*, 289 U.S. 466, 469 (1933). Defendant doesn't engage with *Quercia* in his brief to any extent, but that case nonetheless deserves further discussion here to explicate the prejudicial error committed by the Court in this action. The District Court in *Quercia* expressly provided to the jury its observations of the criminal defendant's behavior during his testimony and opined that his gesture—wiping his hands—was "almost always an indication of lying." *Id.* at 468. In holding that the District Court committed prejudicial error, the Supreme Court explained that a court, "may not assume the role of a witness," because, "[t]he influence of the trial judge on the jury 'is necessarily and properly of great weight' and 'the lightest word or intimation is received with deference, and may prove controlling.'" *Id.* at 470. The Court also must not "distort . . . or add" to the evidence. *Id.* Finally,

the Supreme Court held that the District Court's error was not cured by the limiting instruction to the jury that the court's statements are not binding on the jury. *Id.* at 472.

Plaintiff's Motion provides extensive arguments accompanied by specific citations to the record that detail the Court's misconduct and demonstrate how its commandeering of the witnesses and opinions about the witnesses' testimony likely prejudiced Plaintiff's case. *See* Doc. 87, p. 16–19. Rather than reiterating those arguments here, Plaintiff only adds that Defendant in his Response provides no references to the facts/record and points to the Court's limiting instruction to the jury as dispositive of the issue of whether the Court invaded the provinces of the jury and counsel. As *Quercia* holds, though, that instruction doesn't necessarily guard against the Court's influences on the jury, so Defendant's argument falls flat. In addition, Defendant claims that there, "is no evidence and no argument that the jury disregarded the instructions." Doc. 88, p. 6. However, Defendant didn't provide any legal authority requiring Plaintiff to show that the jury disregarded the instructions, and *Quercia* does not expressly or impliedly require that either. The Supreme Court simply stated, "we cannot doubt that [the court's conduct] was highly prejudicial." *Quercia*, 289 U.S. at 472. Therefore, the Defense's Response lacks a substantive counter-argument to Plaintiff's claims on this issue.

> **F. THERE WAS ENOUGH EVIDENCE FOR THE ISSUE OF CAUSATION OF PLAINTIFF'S PROLAPSES TO GO TO THE JURY, AND THE COURT'S ERROR LIES IN ITS USE OF INAPPOSITE LAW AND LACK OF REASONING TO SUPPORT ITS ORDER GRANTING DEFENDANT'S RULE 50 MOTION.**

Regarding his Motion under Federal Rule of Civil Procedure 50, Defendant's Response recites the standard of review to grant such a motion, quotes the order, and alleges that Plaintiff's reliance on *Sumner v. Smith*, 220 Va. 222 (1979) and *Todt v. Shaw*, 223 Va. 123 (1982) is misguided.

**JA863**

First, Plaintiff doesn't disagree with Defendant's recitation of the standard of review, but Plaintiff emphasizes that, "the question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party," and the Court must, "draw all reasonable inferences in favor of the non-moving party." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). That the Court must have viewed the evidence in the light most favorable to Plaintiff was a critical analytical requirement because, if the Court had done so with regard to Plaintiff's prolapse injuries, it should have determined that there was enough evidence for the issue to go to the jury. However, the Court's order granting Defendant's Rule 50 Motion lacks detailed reasoning and doesn't explain how there wasn't enough evidence for the issue of Plaintiff's prolapse injuries to go the jury, even if the facts were considered under the appropriate standard of review. There was enough evidence, according to the Court, for the issue of the InterStim to go to the jury, but not the prolapses, and the parties are left with no reasoning as to how the Court arrived at that decision.

Second, the Court's order contains only a single citation to a case from the Fourth Circuit Court of Appeals in which that district court was adjudicating a matter involving North Carolina state law. *See* Doc. 80; *see also Taylor v. Shreeji Swami*, Inc. 820 Fed. App'x 174 (4th Cir. 2020). Defendant's brief doesn't combat Plaintiff's argument that *Taylor* is inapplicable law in this case because it concerns North Carolina state law, which is different from Virginia state law. Plaintiff thus maintains that the Court's reliance upon *Taylor* is a clear error of law because this Court is required to apply substantive Virginia state law under *Erie*, which Defendant's Response doesn't dispute.

Lastly, Defendant disputes Plaintiff's use of *Sumner v. Smith*, 220 Va. 222 (1979) and *Todt v. Shaw*, 223 Va. 123 (1982), to challenge the Court's order, claiming such use is "misguided" because, "[t]he issue in this case is whether or not the Plaintiff presented sufficient evidence for a jury to find that the pelvic prolapse injury was caused by the subject accident without speculating." Doc. 88, p. 7–8. However, Defendant is missing the point and misunderstanding Plaintiff's argument. Plaintiff isn't disputing in her Motions the burden she had to meet; instead, Plaintiff relies on *Sumner* and *Todt* because, under these Virginia Supreme Court holdings, had the Court adhered to them instead of North Carolina law, it should have found that Plaintiff met her burden of producing enough evidence for the issue of her prolapses to go to the jury. Again, The Virginia Supreme Court has established that lay testimony is admissible regarding a causal connection injuries sustained in motor vehicle accident and said testimony is admissible for whatever weight the fact finder may choose to give it, even when medical testimony fails to establish causal connection expressly. *Todt v. Shaw*, 223 Va. 123, 124, 286 S.E.2d 211, 212 (1982); See *Summers,*293 Va. 606, 614, 801 S.E.2d 422, 426 (2017).  Here Defendant cites to *McCauley* which is yet again a misplaced reference as *McCauley* directly states that, "It is of course true that Virginia tort law does not mandate expert testimony to show proof of causation in every case. However, in a products liability action, proof of causation must ordinarily be supported by expert testimony because of the complexity of the causation facts. *See Rohrbough v. Wyeth Labs., Inc.,* 916 F.2d 970, 972 (4th Cir.1990) (holding that essential element of causation in products liability action involving medical vaccine must be proved by expert testimony under West Virginia law)."  The specific language utilized by the Defendant refers to the need for an expert in products liability actions, not motor vehicle tort cases.

Because the Court utilized North Carolina law, Defendant's Rule 50 Motion was granted on an erroneous and improper legal basis, justifying the relief requested in Plaintiff's Motions.

### III.    CONCLUSION

Plaintiff reiterates her request that this Court GRANT Plaintiff's Motion for a New Trial under Rule 59(a). But, should the Court deny this Motion, Plaintiff requests, in the alternative, that the Court to GRANT her Motion under 59(e) to Alter or Amend its judgment granting Defendant's Rule 50 Motion for Judgment as a Matter of Law.


**SAMANTHA ROOP**

By Counsel


_____/s/_____
Samantha Cohn (VSB #89081)
Geoff McDonald & Associates, P.C.
8720 Stony Point Parkway, Suite 250
Richmond, VA 23235
Phone: (804) 888-8888
Facsimile: (804) 359-5426
Email: scohn@mcdonaldinjurylaw.com
*Counsel for Plaintiff*

9

**JA866**

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 27th day of October, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Carter T. Keeney, Esq. (VSB #82275)
Carter & Shands, P.C.
9030 Stony Point Parkway, Suite 530
Richmond, VA 23235
Phone: (804) 747-7470
Facsimile: (804) 747-7977
Email: ckeeney@carterandshands.com
*Counsel for Defendant*

$$\underline{\hspace{2cm} /s/ \hspace{2cm}}$$
Samantha Cohn, Esq.

**JA867**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

SAMANTHA ROOP,
    Plaintiff,

    v.                              Civil No. 3:21cv675 (DJN)

NICHOLAS JAMES DESOUSA,
    Defendant.

## **MEMORANDUM OPINION**

This matter comes before the Court on Plaintiff's Motion for New Trial under Fed. R.

Civ. P. 59(a) or, in the alternative, to Alter or Amend the District Court's Judgment under Fed.

R. Civ. P. 59(c) ("Motion" or "Mot." (ECF No. 87)), following a jury trial for this personal

injury case emanating from a traffic accident.  During the trial, Defendant did not contest

liability or the traditional soft-tissue injuries that result from a car accident.  However, Defendant

did challenge other internal injuries that Plaintiff asserted arose from the accident, namely

whether Plaintiff suffered a pelvic prolapse,[1] damage to her InterStim™ II ("InterStim" or

"InterStim device"),[2] or other injuries to her bladder, pelvis or uterus.  During the trial, the jury

found that Plaintiff failed to meet her burden of proof as to the InterStim device and the Court

---

[1]    "When the muscles and ligaments supporting a woman's pelvic organs weaken, the
pelvic organs can drop lower in the pelvis, creating a bulge in the vagina (prolapse)." *Pelvic
organ prolapse: Overview*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/pelvic-
organ-prolapse/symptoms-causes/syc-20360557 (last visited January 26, 2023).

[2]    "The implanted InterStim™ II system electrically stimulates the sacral nerve, which is
thought to normalize neural communication between the bladder and brain and between the
bowel and brain." *InterStim™ II System: Overview*, Medtronic (February 2022),
https://www.medtronic.com/us-en/healthcare-professionals/products/urology/sacral-
neuromodulation-systems/InterStim-ii.html.

granted Defendant's motion under Rule 50(a)(1) of the Federal Rules of Civil Procedure as to the

pelvic prolapse, finding "an insufficient evidentiary basis for a reasonable jury to find for

Plaintiff on that issue[,]" because expert testimony was necessary to support such a verdict under

Virginia law.[3]  (ECF No. 80.)

Plaintiff's Motion attacks the jury's verdict and the Court's granting of the Rule 50

motion.  However, in doing so, Plaintiff ignores the fundamental problem with her case:  her

_____

[3]     In diversity cases, such as this case, federal courts must apply state substantive law in the adjudication of state-created rights. *Szantay v. Beech Aircraft Corp.*, 349 F.2d 60, 63 (4th Cir. 1965) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)). Thus, "[w]hen sitting in diversity, a federal court is obligated to apply the choice of law principles of the state in which it sits." *AMEX Assur. Co. v. Giordano*, 925 F. Supp. 2d 733, 742 (D. Md. 2013) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). However, federal courts still apply federal procedural rules based on:

> the underlying purpose of *Erie*:  to ensure that in cases where
> a federal court possesses jurisdiction solely on the basis of diversity, "the outcome
> of the litigation in the federal court should be substantially the same, so far as
> legal rules determine the outcome of a litigation, as it would be if tried in a State
> court."

*Structural Concrete Prods., LLC v. Clarendon Am. Ins. Co.*, 244 F.R.D. 317, 322 (E.D. Va. 2007) (quoting *Guar. Trust Co. of N.Y. v. York,* 326 U.S. 99, 109 (1945)).

The case at bar presents a blended substantive and procedural law question. The requirements of expert designation and preclusion of testimony following a failure to designate an expert are governed by Federal Rules of Civil Procedure 26 and 37. The definitions of lay versus expert testimony, and the relevant parameters as a result, are governed by Federal Rules of Evidence 701 and 702, respectively. In contrast, whether or a not an expert is required to establish causation is governed not by federal law but instead by state substantive law which establishes the underlying cause of action. *See, e.g., McCauley v. Purdue Pharma L.P.*, 331 F. Supp. 2d 449, 461 (W.D. Va. 2004) (federal court in Virginia applying Virginia substantive law when sitting in diversity over a products liability action). Here, Plaintiff and Defendant do not contest that Virginia substantive law governs the underlying action and determines whether expert opinion testimony is required to establish causation. (ECF No. 22 at 6 ("Plaintiff agrees with Defendant that since the Court has this case as a matter of diversity jurisdiction, the Court must apply Virginia substantive law. Furthermore, the Plaintiff further agrees that the Court's decision depends on the evidence and types of damages permitted in personal injury cases under Virginia substantive law.").)

counsel mishandled the discovery process by failing to identify an expert witness to support her assertion that the injuries in dispute arose from the accident. And this error permeated the trial of this case, as it undermined Plaintiff's ability to establish causation as to the contested injuries. Despite her counsel's mishandling of discovery, Plaintiff asks the Court to grant a new trial, or in the alternative, amend or alter a judgment against her under Rules 59(a) and (e), respectively.

Specifically, pursuant to Rule 59(a), Plaintiff seeks to set aside the jury's verdict and retry her case. Plaintiff argues that: (1) the Court erred during the first phase of the trial by allowing Defendant to refer to the amount of Plaintiff's claim during the liability phase, (2) by contradicting its prior rulings on Plaintiff's treating physician's testimony, and (3) questioning Plaintiff's witnesses during trial. Alternatively, pursuant to Rule 59(e), Plaintiff moves the Court to amend and reverse its grant of Defendant's Rule 50 motion, because the Court committed a clear error of law by ruling that Plaintiff failed to present sufficient evidence to establish causation as to Plaintiff's pelvic prolapse.

For the reasons that follow, the Court will DENY Plaintiff's Motion for New Trial Under Fed. R. Civ. P. 59(a) or, in the Alternative, to Alter or Amend the District Court's Judgment Under Fed. R. Civ. P. 59(e). (ECF No. 87.)

### RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of a car accident involving Defendant and Plaintiff in Middlesex County, Virginia, on July 17, 2019. (ECF No. 57 at 1.) Defendant admitted that his negligence was the proximate cause of the accident and did not contest that Plaintiff sustained both soft tissue injuries and a head injury as a result. (*Id.*) However, Defendant challenged all other claimed injuries, including whether Plaintiff suffered a pelvic prolapse, damage to her InterStim device or any other injuries to her bladder, pelvis or uterus.

3

**JA870**

The Court bifurcated the trial into two phases. (ECF No. 25.) The first phase of the trial

focused on whether Defendant's negligence caused the contested injuries. After the conclusion

of Plaintiff's evidence, the Court granted Defendant's Rule 50(a) motion as to the alleged pelvic

prolapse and other injuries asserted by Plaintiff involving her pelvic region, but allowed the jury

to decide whether the accident damaged Plaintiff's InterStim device. (ECF No. 78.) The jury

returned a verdict of "not proven" as to the InterStim device. (ECF No. 79.) The case then

moved to the second phase of the trial, during which the parties addressed the appropriate

amount of damages to be awarded to Plaintiff for the uncontested injuries. The jury awarded

damages totaling $105,216 to Plaintiff. (ECF No. 82.)

### A. Failure to Timely Identify Expert Witness as to Contested Injuries

Because Plaintiff's counsel's mismanagement of discovery lies at the heart of the issues

raised in the current motion, the Court recounts in detail the procedural history of the case. The

case was initially filed in the state system on June 3, 2021, but removed to this Court on October

26, 2021. (ECF No. 1.) Thereafter, Plaintiff retained the law firm of Geoff McDonald &

Associates, P.C., specifically attorney Nikita Wolf, to represent her. (ECF Nos. 4, 5.)

Following an initial pretrial conference, the Court set the case for trial to begin with jury

selection on July 21, 2022, and issued a Scheduling and Pretrial Order, specifying deadlines for

the case, including those for Rule 26 disclosures of witnesses and evidence.[4] (ECF No. 8.) On

February 21, 2022, pursuant to the Scheduling and Pretrial Order, Plaintiff filed her Expert

Designations, solely designating Dr. Teresa Camden as an expert witness, indicating that Dr.

---

[4]     On November 15, 2021, Plaintiff filed Plaintiff's Initial Rule 26(a)(1)(A) Disclosures,
listing Plaintiff's current and prior treating physicians — including those at the Intimate
Wellness Institute of Virginia — as individuals with potentially discoverable information,
although Plaintiff listed no individuals by name. (ECF No. 6.)

**JA871**

Camden would testify regarding the treatment for the uncontested injuries. (ECF No. 10.) Importantly, Plaintiff did not designate Dr. Nathan Guerette of the Intimate Wellness Institute of Virginia as an expert, nor any other expert pertaining to the causation of the disputed injuries or the damage to the InterStim device. (*Id.*) Generally, a treating physician need not be designated as an expert and may testify as a lay witness to personal observations stemming from his course of treatment of a plaintiff. *Springs ex rel. C.S. v. Waffle House, Inc.*, 2021 WL 119303, at *3 (D.S.C. Jan. 13, 2021). Some types of causation, however, require an expert designated to opine on such issues, and almost all cases are strengthened by expert opinions on causation. *See, e.g.*, *Sumner v. Smith*, 257 S.E.2d 825, 827 (Va. 1979) ("While failure or inability to adduce direct medical evidence, generally relied upon to establish causal connection between injury and accident, may significantly increase the plaintiff's risk of non-persuasion, such evidence is not a prerequisite to recovery."). Plaintiff's failure to designate any expert on the issue of causation for the challenged injuries lies at the heart of the instant motion.

On March 14, 2022, Plaintiff filed a Motion to Substitute Counsel, substituting Samantha Cohn for Nikita Wolf as her counsel. (ECF No. 12.) Both attorneys worked at the same law firm, Geoff McDonald & Associates, PC., and even though Ms. Cohn had not previously entered her appearance, she had been working on the case with Ms. Wolf. (ECF No. 15 at 3.) The Court granted the motion, substituting Ms. Cohn as counsel for Plaintiff. (ECF No. 13.)

On March 21, 2022, exactly one month after the deadline for Plaintiff's expert witness disclosures, Ms. Cohn moved the Court to extend the deadline for expert disclosure. (ECF No. 14.) In particular, Plaintiff sought to designate Dr. Guerette as an expert. (*Id.*) Defendant responded in opposition, noting that Plaintiff's failure to comply with Rule 26 was neither justified nor harmless. (ECF No. 15 (citing Fed. R. Civ. P. 26(a)(2)(A).) Notably, this case

5

**JA872**

originated in the state system and remained pending there until removed to this Court on October 26, 2021 — more than two years after the accident. (ECF No. 1.)  Importantly, Defense counsel explained that he and Ms. Wolf had deposed Dr. Guerette on February 8, 2022, and Dr. Guerette testified that he could *not* opine to a reasonable degree of medical certainty that the contested injuries resulted from the car accident. (ECF No. 15 at 2.)  As such, Ms. Wolf had informed him that Plaintiff would not be seeking recovery for the contested injuries, which was confirmed thirteen days later when Plaintiff filed her expert witness notice identifying only Dr. Camden as a potential expert witness. (*Id.*)  Yet, after Ms. Cohn replaced Ms. Wolf, she sought to pursue the contested injuries despite Dr. Guerette's deposition testimony and Plaintiff's failure to identify Dr. Guerette (or any other expert as to the challenged injuries) in a timely manner.  The Court denied Plaintiff's motion on March 23, 2022, thereby precluding Plaintiff from relying on Dr. Guerette as an expert witness. (ECF No. 16.)  Plaintiff then moved to voluntarily dismiss her case, but later withdrew the motion. (ECF Nos. 17, 20.)

### B.     Defendant's Motion in Limine

On March 28, 2022, Defendant filed his Motion in Limine to Exclude Dr. Nathan Guerette from Testifying at Trial, to Exclude Plaintiff's Medical Bills for Dr. Guerette's Treatment and to Exclude Any Mention of Any Condition Treated by Dr. Guerette ("MIL" (ECF No. 18)), as well as a Memorandum of Law in support of the motion (ECF No. 19).  Citing to Rule 37(c)(1) of the Federal Rules of Civil Procedure, Defendant correctly explained that when a party fails to properly identify an expert witness under Rule 26(a) or (e), "the party is not allowed to use that information or witness to supply evidence . . . at trial, unless the failure was substantially justified or harmless." Fed. R. Civ. P. 37(c)(1).  In denying Plaintiff's motion to extend, the Court determined that Plaintiff's failure to comply with Rule 26 was neither

6

**JA873**

substantially justified or harmless, as the case was only months away from trial, and to allow

Plaintiff to amend her expert disclosures would have necessarily led to Defendant exploring

rebutting experts and likely a delay of the trial. It bears noting here that Dr. Guerette was not

only known to Plaintiff's counsel before the expert witness disclosure deadline, he was actually

deposed by both sides (with Ms. Cohn being present) *thirteen days before the expert witness

disclosure deadline*. (ECF No. 15 at 2.)

Without expert testimony on the issue of causation pertaining to the contested injuries,

Defendant further argued that the Virginia Supreme Court's decision in *McMunn v. Tatum*, 379

S.E.2d 908 (Va. 1989), precluded Plaintiff from introducing evidence about the contested

injuries, because expert testimony was required to support a finding of causation and the medical

necessity of treatment for the disputed injuries. (ECF No. 19 at 5–6.) Specifically, Defendant

argued: "The causation of a complicated medical issue like a prolapse and bladder issues

certainly requires expert testimony as it is beyond the purview of a layperson. In general, the

causation of a plaintiff's injury requires expert testimony." *Id.* (citing *Fitzgerald v. Manning*,

679 F.2d 341, 350 (4th Cir. 1982)).

Plaintiff responded to the motion, conceding that "there are [sic] no expert designated by

either party" regarding the contested injuries. (ECF No. 22 at 2.) However, Plaintiff relied on

Dr. Guerette's observations as a treating physician, indicating that Dr. Guerette could testify that

"it is more likely than not that the car accident between the Defendant and Plaintiff on July 7,

2019 caused [Plaintiff]'s Interstim to malfunction as well as the prolapses and pelvic floor

dysfunction." (*Id.* at 3–4.) Plaintiff submitted:

> In the instant matter Dr. Guerette is a treating physician who can qualify as an
> expert but will not be doing so as he is a treating physician of [Plaintiff] with
> firsthand participant knowledge who played a personal role in the diagnosis and
> treatment of [Plaintiff] and will only be asked the same.

(*Id.* at 5.)  Plaintiff added that "Dr. Guerette will not offer any opinion testimony that would require him to be disclosed as an expert hybrid/fact witness under Rule 26(a)(2)(c)." (*Id.* at 6.)

Defendant replied, again asserting that expert testimony was needed to establish causation under the Virginia Supreme Court's decision in *McMunn*. (ECF No. 23 at 3.) Indeed, Defendant quoted *McMunn*:

> We now hold that where the defendant objects to the introduction of medical bills, indicating that the defendant's evidence will raise a substantial contest as to either the question of medical necessity or the question of causal relationship, the court may admit the challenged medical bills only with foundation expert testimony tending to establish medical necessity or causal relationship, or both, as appropriate.

(*Id.* (quoting *McMunn*, 379 S.E.2d at 914)).  In short, in Defendant's view, *McMunn* commands expert testimony on the issue of causation, which Dr. Guerette could not offer in his capacity as only a treating physician.

The Court conducted a hearing on the motion on May 3, 2022. ("MIL Tr." (ECF No. 31).) The Court resolved the motion by bifurcating the case:  Phase One would involve whether the car accident caused the contested injuries, while Phase Two focused on the damages resulting from the uncontested injuries, as well as those that the jury found that Plaintiff had proven during Phase One. (MIL Tr. 11:6–13:5.) During Phase One (the causation phase), Dr. Guerette would only be allowed to testify as a treating physician as to his factual observations about the change in Plaintiff's condition from when he last treated her in 2013 until he next saw her in October of 2019, indicating that her InterStim device was no longer functioning. (*Id.* 14:3–11.) However, Dr. Guerette could not opine as to *why* the InterStim device was not working when he saw her for the first time after the accident in October of 2019. (*Id.* 20:13–21.)

The Court gave specific examples of the parameters of his testimony.  For example, the

8

**JA875**

Court explained that Dr. Guerette could testify, "I observed her and this was her condition,"[5] potentially establishing causation by inference. (*Id.* at 5:8–9.) However, Dr. Guerette could not testify as to *why* the device stopped working.[6] (*Id.* at 7:8–11, 10:4–21)  In summary, the Court explicitly instructed Plaintiff that Dr. Guerette could testify (1) that he treated Plaintiff before the accident, (2) that Plaintiff did not require treatment for a period of years, (3) that Plaintiff came back to him after the accident and her InterStim device ceased working, and (4) that Plaintiff no longer felt well at that time. (*Id.* at 10:4–21.)

Additionally, Plaintiff and her partner could testify that they observed that the InterStim was working before the accident and then no longer functioned after the accident. (*Id.* at 5:23–6:8, 10:13–21, 14:5–11, 22:15–24:1.)  Essentially, the Court determined that lay testimony could potentially establish causation in this case, but also cautioned Plaintiff's counsel that her case was "hanging by a gnat's eyelash." [7] (*Id.* at 13:22–14:1, 25:20.)

---

[5]      As an example, the Court said:

> [H]e could say "I'm looking at it and the device is not working." That's a factual
> thing. Now, he can't opine on what the cause is, okay? But [Plaintiff] can say
> that the factual difference is the only thing that caused the change was this
> accident.

(MIL Tr. 6:4–8.)

[6]      The Court reiterated time and time again leading up to trial that Dr. Guerette could merely testify as to observations that he witnessed, not causation. As a lay witness, he could testify as to what he observed: he "can only testify as to his observation and her need for treatment," he "can't opine that it was due to physical force." (FPTC 1 Tr. (ECF No. 56) 33:21–22, 34:7–8.)

[7]      Notably, when asked for her response to the Court's ruling, Plaintiff's counsel stated: "Can I put on the record that you're the smartest judge I've ever been in front of?" (MIL Tr. 21:23–24.) While this comment constitutes obvious hyperbole, it demonstrates Plaintiff's counsel's agreement with the Court's ruling as to the handling of Dr. Guerette's testimony following her discovery blunders.

After the hearing, the Court entered an Order laying out the parameters of its ruling.

(ECF No. 25 at 2.)  The Court then further clarified the parameters of Dr. Guerette's testimony in

a Memorandum Order issued on May 27, 2022, after Defendant filed a stipulation admitting to

liability and indicating that he would not contest the soft tissue injuries that Plaintiff sustained to

her head, neck and back.  (ECF No. 33.)  The Court explained:

> Again, Dr. Guerette may not provide expert testimony as to the cause of Plaintiff's
> injuries.  However, Dr. Guerette may testify as Plaintiff's treating physician in both
> phases of the trial.  During Phase One (addressing the issue of causation), Dr. Guerette
> may only provide testimony about his treatment of Plaintiff during the time period of
> 2011-13 and then the results of his examination when Plaintiff returned to him for
> treatment in October of 2019, including providing testimony on the functionality of the
> Interstim device before and after the accident at issue.  To reiterate, Dr. Guerette may not
> provide any expert testimony about the cause of any injuries that he observed when he
> examined and treated Plaintiff in October of 2019.

(*Id.* at 2.)

The Court understood two facts to be true when ruling in this fashion.  First, the ability to

know whether the InterStim device was properly functioning consisted of simply looking at the

device and seeing whether it was operating — essentially, looking at the "on/off" switch to see if

it worked.  Second, that the pelvic prolapse arose from the damage to the InterStim device —

that the pelvic prolapse directly resulted from the InterStim device not functioning after the

accident.  Indeed, during the hearing on May 3, 2022, Plaintiff's counsel explicitly told the

Court: "The prolapse was never an issue prior to the accident." (MIL Tr. 24:8–9.)  This turned

out not to be accurate.  Quite to the contrary, the trial testimony from Dr. Guerette established

that Plaintiff's pelvic prolapse had no relationship with the functioning of the InterStim device

and, instead, it constituted a progressive issue that began in 2011, well before the accident.

(Trial Tr. (ECF No. 85) 117:25–120:23.)  Furthermore, the InterStim device was still operating

when he examined her in October of 2019, but not functioning correctly.  (*Id.* 114:16–117:16.)

Moreover, the InterStim device does not treat prolapses. (*Id.* 125:24–25.)  In other words, the functioning of the InterStim device had no relationship to the pelvic prolapse, which could only be described as a degenerative condition.[8]

### C.    The Final Pretrial Conference on July 12, 2022

The Court conducted a Final Pretrial Conference ("FPTC") for the case on July 12, 2022. Another discovery issue arose, as Plaintiff had failed to provide in discovery notice of any expert testimony about future damages.  (FPTC 1 Tr. (ECF No. 56) 31:9–32:10.)  Consequently, in an Order issued after the hearing, the Court barred Plaintiff from presenting any evidence of future damages, "because she did not adequately notify Defendant of evidence or expert testimony on this issue."  (ECF No. 55.)  Although this discovery violation has no impact on the issues raised in Plaintiff's motion, it again underscores the inherent defect in her case:  Plaintiff's counsel continuously mishandled the discovery process.

Thereafter, the hearing turned again to the issue of the InterStim Device.  As to Dr. Guerette, the Court again explained the boundaries of his testimony during the first phase of the trial pertaining to causation:

> In phase one, he can testify, "I treated her back in" — that he treated her back in 2011, 2013.  Whatever her physical issues were, he implanted this InterStim device.  It was fine . . . she was fine.  He didn't see her again until October 2019. . . [A]t that time, he performed an evaluation of her, and this is what was wrong with her.  He can't say why.

(FPTC 1 Tr. 32:17–23.)

---

[8]    "Pelvic organ prolapse (POP) is a common symptom of pelvic floor disorders which is characterized by the descent of the uterus, bladder or bowel from their normal anatomical position towards or through the vagina. . . It is becoming necessary to recognize that POP is a degenerative disease that is correlated with age."  Huang, Liwei et al., *Cellular senescence: A pathogenic mechanism of pelvic organ prolapse (Review)*, 22 Molecular Med. Reps. 2155, 2155 (2020).

11

Plaintiff's counsel then indicated that she sought to introduce evidence that the InterStim device had stopped functioning due to physical force (the accident). In making her argument, Plaintiff's counsel explained:

> [T]he InterStim is essentially a pacemaker for your bladder, and it has electronic programming. And [Dr.] Guerette can read that programming. And . . . he can read that and state that the programming indicated a malfunction with physical force on the date of the accident.

(*Id.* 34:19–25.) When explaining the manner that the InterStim operates, Plaintiff's counsel stated that the device produces a readout of information about which Plaintiff's counsel sought to have Dr. Guerette testify; however, yet again, Plaintiff's counsel had not produced the information in discovery. (*Id.* 36:5–37:1.) Because the information was not provided in discovery and because it necessarily entailed expert testimony interpreting the data, the Court precluded Plaintiff from introducing evidence about the data produced from the device, reiterating that Plaintiff's counsel had an obligation to produce this material in discovery so that defense counsel could have an expert review the material to determine whether it was accurate. (*Id.* 35:24–37:1.) Instead, Dr. Guerette's testimony would be limited to simply whether the device was functioning when he examined Plaintiff in October of 2019. (*Id.* 37:5–18.) The Court also explained that, if Plaintiff establishes causation as to the disputed injuries during the first phase of the trial, Dr. Guerette then could testify in Phase Two about the treatment for the disputed injuries in support of Plaintiff's claim for damages. (*Id.* 33:2–12.)

Plaintiff's counsel then indicated for the first time that the InterStim device and Plaintiff's complaints of a pelvic prolapse were separate issues: "The InterStim is simply part of the overactive bladder situation. However, the prolapse is a wholly new and different complaint that was not present previously." (*Id.* 37:23–25.) Again, the Court indicated that Dr. Guerette could testify as the treating physician as to his observations of Plaintiff's condition when he

12

examined her in October of 2019; however, he could not interpret any information derived from

the InterStim device. (*Id.* 38:12–16.) But, again, Plaintiff's counsel's representation that the

pelvic prolapse constituted a "wholly new and different complaint that was not present

previously" turned out to be false, as this progressive condition initially manifested in 2011, as

Dr. Guerette would later explain at trial.

And, again, the Court continued to labor under the misimpression that a connection

existed between the inoperable InterStim device and the pelvic prolapse. At the time of this

hearing, the Court thought that Dr. Guerette could simply look at the InterStim device and

determine that the InterStim device was no longer working. Coupled with testimony from

Plaintiff and her partner that the InterStim device was working before the accident, this would

allow Plaintiff's counsel to argue that the jury could draw the reasonable inference that the

accident caused the InterStim device to no longer function and the pelvic prolapse occurred as a

consequence. However, Dr. Guerette's trial testimony would demonstrate otherwise.

Following the hearing, the Court issued an order that reiterated the parameters of Dr.

Guerette's testimony regarding the InterStim device:

> As it pertains to Plaintiff's InterStim device, the testimony of Dr. Nathan Guerette
> shall be limited to his observations of whether the InterStim was functioning
> during the course of his treatment of Plaintiff. He may not testify as to the cause
> of the device not functioning nor discuss any readouts from the device.

(ECF No. 55.) It bears noting that, during the hearing, the Court cautioned defense counsel that

if he opened the door during cross-examination about the cause of the InterStim not functioning,

the Court would allow Plaintiff's counsel to address the issue. (FPTC 1 Tr. 39:1–9.)

**D.    Second Final Pretrial Conference on September 1, 2022**

Due to COVID-19-related issues, the Court rescheduled the trial from July 19, 2022, to

beginning jury selection on September 12, 2022. (ECF No. 64.) As the trial approached, the

13

**JA880**

Court became concerned about the testimony by Plaintiff's partner, Gerald Barton, regarding the operability of the InterStim device. Consequently, the Court conducted a second Final Pretrial Conference on September 1, 2022, and took testimony from Mr. Barton regarding the InterStim device. (FPTC 2 Tr. (ECF No. 84).)

> During the hearing, Mr. Barton described the InterStim as:
>
> a cell phone-looking device that has a remote piece that attaches or that you hold up against [Plaintiff's] body, and then the cell phone does everything else. . . The InterStim is a small unit inside of her body that has leads that go to her bladder. . . The transponder piece is the piece that you use externally. . . You have two pieces. One of them is the cell phone that you can use to operate, and then you have another piece that goes over her scar where they inserted the InterStim. . . You hold [the piece that goes over her scar] overtop of [the scar]. . . [This piece] is not attached to her body.

(*Id.* 6:19–8:2.) Mr. Barton further explained that he and Plaintiff would check the operability of the InterStim visually on a monthly basis to determine its operability and the battery life. (*Id.* 8:5–23.) According to Mr. Barton, they had checked the operability of the InterStim during the end of June of 2019 shortly before the accident. (*Id.*)

The Court asked Mr. Barton to explain precisely what he would do to check the operability of the InterStim. (*Id.* 8:24–9:10.) Mr. Barton responded that he would hold the cell phone device over Plaintiff's scar, turn the machine on and it would connect with the InterStim device implanted inside of Plaintiff. (*Id.* 9:4–15.) Mr. Barton added: "When you turn it on, it connects with the cell phone; and then you would hold it over the scar, it brings up all of her numbers that her InterStim is set at already, it brings up the InterStim battery life, and at that point you change settings on it." (*Id.* 9:11–15.) At that point, Plaintiff's counsel produced a video from the manufacturer's website (marked as Plaintiff's Exhibit 1 for the hearing) that further explained how the InterStim functioned. (*Id.* 10:13–12:11.) Mr. Barton explained that he

14

**JA881**

essentially placed a communication device over Plaintiff's scar that relayed information to another device that could be programmed. (*Id.* 12:15–13:5.)

When he last checked the device before the accident, Mr. Barton had observed that the battery life for the device was above fifty percent. (*Id.* 13:10–11.) Mr. Barton checked the device again on the day after the accident and he observed that "the communicator and the device were able to communicate and connect, I was able to check battery life, but I was not able to change any settings." (*Id.* 13:24–14:1.) The battery life was still over fifty percent, but he could not change the settings for Plaintiff's comfortability. (*Id.* 14:1–14.) When he had last checked the device shortly before the accident during the end of June, Mr. Barton was able to change the settings, which he would do to give Plaintiff greater comfort when urinating. (*Id.* 16:12–25.)

Defense counsel moved to exclude Mr. Barton's testimony on a variety of grounds. First, Plaintiff's counsel had not provided notice in discovery that Mr. Barton would testify about the functioning of the InterStim device. (*Id.* 20:18–21:9.) However, because defense counsel had the opportunity to depose Mr. Barton but chose not to, the Court rejected this argument. (*Id.* at 20:4–22:3.) Second, defense counsel argued that the Best Evidence Rule required exclusion of the testimony, because the testimony was based on the device and its printouts that had not been produced in discovery and which were no longer available. (*Id.* 22:19–23:6.) The Court rejected this argument as well, determining that Mr. Barton's testimony only addressed the operability of the device, which he could observe, and not an interpretation of the data contained in the printouts from the device. (*Id.* 22:10–23:16.) In making the ruling, the Court explained, as it had done on repeated occasions, that if Plaintiff were to prevail, the defense would have another

15

**JA882**

opportunity to challenge the Court's ruling in post-trial rulings when the Court would have the benefit of hearing all of the evidence. (*Id.* 23:13–24:3.)[9]

Again, the Court addressed the parameters of Dr. Guerette's testimony, indicating that he could testify that the InterStim device was no longer properly functioning, similar to Mr. Barton's testimony. (*Id.* 35:9–14.) Because Plaintiff's medical records included a reference to the device being "expired," the Court concluded that the term "expired" encompassed "not functioning properly." (*Id.* 35:15–36:9, 45:14–19.)

At the conclusion of the hearing, Plaintiff's counsel sought to preclude defense counsel from mentioning the ad damnum during the first phase of the trial, since damages were not at issue in that phase.[10] The Court initially intended to preclude reference to the ad damnum; however, defense counsel correctly pointed out that it implicated the potential bias of both

---

[9]     In her Motion, Plaintiff submits that the Court's comments that it could grant a Rule 50 after the close of her case suggested a bias against her case. (Mot. at 2–3.) Quite the contrary is true. The Court repeatedly explained that it was concerned that it had stretched the boundaries of that permitted under Virginia law by allowing Plaintiff to attempt to establish causation without expert testimony, instead of granting Defendant's motion in limine. *See, e.g.*, (FPTC 1 Tr. 8:14–15 ("I think this is a tight legal issue here[.]")); (*Id.* 12:23–13:2 ("[T]his is going to be a tough issue. . . I want to look at what that evidence looks like in relation to the law.")); (FPTC 2 Tr. 24:2–3 ("I think there's significant legal issues that I'm going to have to look at.")). Notably, the Court also observed that if Plaintiff did meet her burden as to causation, she was likely going to recover a large amount of damages. (FPTC 1 Tr.13:4–5 ("It seems to me if she hits it, she's hitting it big[.]")); (FPTC 2 Tr. 24:4–7 ("On the other hand, if they hit liability . . . I have a feeling the jury is going to be very sympathetic towards [Plaintiff] and I think that number is going to be big.")).

        The Court was concerned about the legal ability to establish causation without expert testimony but thought that the more prudent course of action was to allow Plaintiff to develop the evidence at trial before determining whether, as a matter of law, Plaintiff could establish causation. This decision proved prescient as the evidence tendered by Plaintiff at trial conflicted in significant ways from that described by her counsel during pretrial hearings.

[10]    The transcript incorrectly refers to the "addendum"; however, counsel was addressing the ad damnum. (FPTC 2 Tr. 39:17–20.)

16

**JA883**

Plaintiff and her partner, Mr. Barton, since both could potentially benefit from the millions of dollars that Plaintiff sought. (*Id.* 39:22–42:7.) Consequently, the Court permitted defense counsel to reference the ad damnum purely to establish bias, but also permitted Plaintiff's counsel to establish that the ad damnum arose from Plaintiff's medical treatment and expenses, and also offered to issue a jury instruction regarding the purpose of the question if requested. (*Id.*)

### E.    Relevant Trial Testimony for Phase One

During the first phase of the trial that only addressed causation for the disputed injuries, Plaintiff called three witnesses to testify: Plaintiff, Dr. Guerette, and her partner Mr. Barton. (Trial Tr., Witness Index at 2.) The portions of their testimony relevant to the pending motion are summarized.

Plaintiff indicated that she suffered from interstitial cystitis, which is a painful bladder syndrome. (Trial Tr. 34:16–19.) She had been living with the disorder for a substantial period of time and had previously treated with Dr. Guerette from 2011-13. (*Id.* 35:11–17.) Dr. Guerette was able to get her to a point that she could live comfortably with the installation of an InterStim device in 2013. (*Id.* 35:18–36:18, 109:8–16.) Plaintiff described the InterStim device as "a medical device that's implanted to help control the muscles and the overstimulations that comes from the bladder from [interstitial cystitis]." (*Id.* 36:10–12.) The device alleviated her bladder issues and she was no longer dealing with bladder symptoms by 2019. (*Id.* 36:16–20.) Plaintiff testified that, during her initial treatment with Dr. Guerette, she had not been diagnosed with a pelvic prolapse. Indeed, she had never heard of the term "prolapse" before. (*Id.* 36:21–25.)

Plaintiff described the car accident on July 7, 2019. (*Id.* 40:14–45:2.) The parties stipulated that Plaintiff suffered "injuries to her head, including a concussion, hip, neck, and left

shoulder in the accident.  She also aggravated a pre-existing lower back condition that she had."

(Stipulation No. 3; *Id.* 46:1–4.)  Plaintiff further testified that she had checked the condition of

her InterStim device during the end of June and she had observed that it was operable and

properly functioning.  (Trial Tr. 49:4–50:8.)

 After the accident, Plaintiff began feeling a heaviness in her pelvic area.  (*Id.* 56:12–18.)

The heaviness was similar to what she had experienced in 2013, but it began to worsen.  (*Id.*

57:2–4.)  In October of 2019, Plaintiff returned to see Dr. Guerette.  (*Id.* 63:5–11.)  Her medical

records from the visit indicated pelvic pain that had worsened after the accident, bladder pain and

prolapse heaviness.  (*Id.* 65:16–67:17.)  The injuries from the accident caused her pain when

using the bathroom.  (*Id.* 68:20–24.)  These issues had not been present since 2013.  (*Id.* 68:25–

69:1.)  She examined the InterStim device at the end of July and it was still functioning.  (*Id.*

70:1–10.)  She returned to Dr. Guerette and was diagnosed with a vaginal prolapse.  (*Id.* 70:14–

22.)  Also, her InterStim device was replaced in either January or February of 2020.  (*Id.* 70:23–

71:8.)  The replacement of the InterStim did not offer her any relief.  (*Id.* 71:9–14.)  No other

life events other than the accident in July of 2019 occurred from 2013 until the time that she saw

Dr. Guerette in October 2019.  (*Id.* 73:11–19.)  She had no issues with her pelvic area and the

InterStim device after 2013 until the accident.  (*Id.* 101:21–25.)

 Dr. Nathan Guerette then testified about his treatment of Plaintiff, which began in 2011.

(*Id.* 108:7–117:16.)  He diagnosed her with interstitial cystitis as well as an overactive bladder.

(*Id.* 108:16–19.)  He did not diagnose her with prolapse in 2011 and her pelvic exam at the time

was negative for pelvic organ prolapse.  (*Id.* 108:20–25.)  He continued to treat her until 2013

when he implanted a sacral nerve simulation, known as an InterStim device.  (*Id.* at 109:8–

110:7.)  The purpose of the InterStim device was to address her overactive bladder symptoms

and bladder pain. (*Id.* 109:19–21.) Plaintiff's condition substantially improved with the device by 2013, which is when he last saw her before the accident. (*Id.* 110:8–24.)

Plaintiff returned to see Dr. Guerette in October of 2019. (*Id.* 111:4–6.) Plaintiff then complained of the worsening of her urinary incontinence symptoms, as well as significant urinary urgency and frequency. (*Id.* 111:15–20.) He also observed that she had "apical and exterior pelvic organ prolapse, so her bladder and the top of the vagina were coming down at the time." (*Id.* 112:19–21.) Plaintiff reported to Dr. Guerette that her symptoms began with a car accident that had occurred in July of 2019. (*Id.* 112:24–25.) Ultimately, Dr. Guerette reached two diagnoses of Plaintiff in October of 2019:  (1) her InterStim device was no longer functioning correctly, and (2) the loss of pelvic support. (*Id.* 116:21–24.)

As to the InterStim device, Dr. Guerette explained that it was possible that the battery caused the issue, as it was low in its battery life and near the end of its life. (*Id.* 117:3–16.) Dr. Guerette concluded that the InterStim was simply not functioning properly. (*Id.* 117:16.) He ultimately replaced the InterStim in January of 2020. (*Id.* 123:6–11.) Dr. Guerette also made clear that the InterStim device did not treat Plaintiff's prolapse issues. (*Id.* 125:24–25.)

Regarding the pelvic prolapse, Dr. Guerette conceded that when he examined Plaintiff in 2011, he diagnosed her with cystocele, which constituted a vaginal prolapse that he described as "when the bladder is falling down into the vagina." (*Id.* 118:5–13.) Specifically, he diagnosed her at that time with "first degree cystocele." (*Id.* 119:25.) When Plaintiff returned in October of 2019, "it was a significantly larger cystocele." (*Id.* 120:10–11.) Dr. Guerette testified that the cystocele was progressive and that it had progressed by the time that he had examined her in October 2019. (*Id.* 120:17–23.) Her condition had progressed to being "a second- to third-degree cystocele, which is the tissue nearly getting to the opening of the vagina, as well as a mild

19

**JA886**

uterine and apical, or top of the vagina, prolapse.  The back wall where the rectum is was still

fine." (*Id.* 125:16–20.)

Mr. Barton testified last for Plaintiff during the first phase of the trial, testifying

consistently with his testimony from the pretrial hearing on September 1, 2022. (*Id.* 131:11–

142:5.)  Mr. Barton indicated that Plaintiff had no issues with the InterStim device before the

accident. (*Id.* 134:4–135:10.)  He and Plaintiff would check the device once per month, usually

at the end of the month, to ensure that it was working properly. (*Id.* 135:15–24.)  When they

checked the InterStim at the end of June of 2019, the device was working properly and the

battery level was around 50%. (*Id.* 136:8–23.)  Mr. Barton also indicated that Plaintiff did not

have pelvic pain before the accident. (*Id.* 137:22–138:4.)  However, after the accident, Plaintiff

did endure pelvic issues. (*Id.* 138:10–18.)  Moreover, the InterStim device was not working

properly, because he was unable to change the settings or the functions. (*Id.* 138:19–139:8.)  The

battery life for the device remained roughly at the fifty percent level. (*Id.* 138:25–139:1.)

**F.      Defendant's Rule 50 Motion and the Verdict as to Phase One of the Trial**

At the conclusion of Plaintiff's case, Defendant moved for a directed verdict under Rule

50 of the Federal Rules of Civil Procedure.   When ruling on the motion, the Court stated:

> I have been led to believe, until now, that there is a nexus between the InterStim
> and a pelvic prolapse.  Dr. Guerette said there is no nexus between the two.  They
> are separate issues in my mind.  On the issue of causation, . . . on the InterStim
> device being [broken] from the accident, I think there's enough for that to go to
> the jury.  I have seen no evidence about the pelvic prolapse.

(*Id.* 148:9–17.)  Consequently, the Court denied the motion as it related to the Interstim device,

but granted the motion as to the pelvic prolapse as no evidence existed as to causation that

connected this condition to the accident.  Indeed, during argument on the motion, Plaintiff's

counsel made clear that the two issues were not connected.  Consequently, the Court needed to

20

determine whether Plaintiff had established causation as to each alleged injury (malfunctioning InterStim and pelvic prolapse) separately.

The Court found that insufficient evidence had been presented about the pelvic prolapse. In making the finding, the Court noted that, according to Dr. Guerette's testimony, Plaintiff's pelvic prolapse was progressive in nature, had begun eight years before the accident and, therefore, required expert testimony to support a finding of causation. (ECF No. 80; *Id.* 149:4–157:15.)

After argument by counsel regarding the issue of causation as to the malfunctioning of the InterStim device, the jury deliberated and returned a verdict of "not proven" as to the InterStim device. (ECF No. 79; Trial Tr. 211:13–15.) The case then proceeded to the second phase of the trial during which the jury considered the damages to be awarded to Plaintiff based on the undisputed injuries. The jury returned a verdict awarding a total of $105,216 to Plaintiff. (ECF No. 82.)

On October 14, 2022, Plaintiff filed her motion for a new trial or, alternatively to alter or amend the judgment under Rule 59. (ECF No. 87) On October 21, 2022, Defendant responded in opposition, (ECF No. 88), and on October 27, 2022, Plaintiff replied and filed a Proffer of Excluded Evidence (ECF Nos. 89, 90), rendering this matter ripe for review.

**STANDARDS OF REVIEW**

A.    **Rule 59(a)**

Federal Rule of Civil Procedure 59(a) provides that "[t]he court may, on a motion, grant a new trial on all or some of the issues . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]" Fed. R. Civ. P. 59(a). Rule 59(a) demands a high burden, however. "The court should grant a new trial only if (1) the verdict is against the clear

21

**JA888**

weight of the evidence, (2) is based on evidence which is false, or (3) will result in a miscarriage

of justice, even though there may be substantial evidence which would prevent the direction of a

verdict." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 650 (4th Cir. 2002) (citing

*Knussman v. Maryland*, 272 F.3d 625, 639 (4th Cir. 2001) (quoting *Atlas Food Sys. & Servs.,*

*Inc. v. Crane Nat'l Vendors, Inc.*, 99 F.3d 587, 594 (4th Cir. 1996))). In considering a motion

for a new trial, "'a trial judge may weigh the evidence and consider the credibility of the

witnesses[.]'" *Chesapeake Paper Prods. Co. v. Stone & Webster Eng'g Corp.*, 51 F.3d 1229,

1237 (4th Cir. 1995) (quoting *Poynter by Poynter v. Ratcliff*, 874 F.2d 219, 223 (4th Cir. 1989)).

"The decision to grant or deny a motion for a new trial is 'within the sound discretion of the

district court[.]'" *Id.* (quoting *Wilhelm v. Blue Bell, Inc.*, 773 F.2d 1429, 1433 (4th Cir. 1985)).

The "crucial inquiry is 'whether an error occurred in the conduct of the trial that was so grievous

as to have rendered the trial unfair.'" *Bristol Steel & Iron Works Inc. v. Bethlehem Steel Corp.*,

41 F.3d 182, 186 (4th Cir. 1994) (citation omitted).

### B.    Rule 59(e)

Under Federal Rule of Civil Procedure 59(e), a party can move for the court to alter or

amend a judgment in only one of three situations: "(1) to accommodate an intervening change in

controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear

error of law or prevent manifest injustice." *Zinkland v. Brown*, 478 F.3d 634, 637 (4th Cir.

2007) (quotations omitted). "[T]he rule permits a district court to correct its own errors" but

"may not be used, however, to raise arguments which could have been raised prior to the

issuance of the judgment, nor may they be used to argue a case under a novel legal theory that

the party had the ability to address in the first instance." *Pac. Ins. Co. v. Am. Nat. Fire Ins. Co.*,

148 F.3d 396, 403 (4th Cir. 1998). "It is an extraordinary remedy that should be applied

22

**JA889**

sparingly." *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 378 (4th Cir. 2012) (citing *EEOC v. Lockheed Martin Corp.*, 116 F.3d 110, 112 (4th Cir.1997)).

## ANALYSIS

### A.    Motion for New Trial pursuant to Rule 59(a)

Plaintiff argues that a new trial should be granted under Rule 59(a), because the Court's management of the first phase of the trial prejudiced Plaintiff in three ways: (1) the Court permitted Defendant's counsel to refer to Plaintiff's damages claim during the causation phase of trial; (2) the Court limited Plaintiff's examination of Dr. Guerette to Plaintiff's October 8, 2019 appointment with Dr. Guerette, despite Plaintiff having subsequent appointments; and (3) the Court questioned Plaintiff's witnesses in the presence of the jury. (Mot. at 5–6.) Plaintiff does not argue that the verdict is against the clear weight of the evidence, nor that it is based on evidence which is false. (*Id.* at 4.) Plaintiff solely argues that the jury based its verdict on these procedural inconsistencies and, thus, a new trial is required as the verdict rendered was a severe miscarriage of justice. (*Id.* at 5.) The Court disagrees, finding that Plaintiff does not meet this high burden, because no "error occurred in the conduct of trial that was so grievous as to have rendered the trial unfair." *Bristol Steel & Iron Works Incorp.*, 42 F.3d at 186.

### 1.    Defense counsel's question regarding damages addressed bias.

The Court permitted Defendant's counsel to refer to the amount of Plaintiff's claim against Defendant during Phase One of the case, but sustained Defendant's objection to Plaintiff's counsel's question regarding Plaintiff's claim for damages. Plaintiff argues that this "disable[ed] her from providing any sort of context." (Mot. at 5–6.) Plaintiff correctly notes that, during Phase One of trial, the Court limited testimony to the issue of causation, not damages, which were left for Phase Two. However, before trial, the Court ruled that Defendant

23

**JA890**

could cross-examine witnesses as to bias or potential motive for their testimony, and thus refer to

the requested damages amount. (FPTC 2 Tr. 40:5–21.) The Court also held that Plaintiff could,

on redirect, clarify that the demand number was based upon medical treatment and expenses, and

that the Court would give a jury instruction, if needed, to clarify why this number would come

out in Phase One. (*Id.* 42:3–7.)

　　　　During the trial, Defendant's counsel asked Plaintiff on cross-examination if she was

suing the Defendant for five million dollars, to which Plaintiff replied, "Correct." (Trial Tr.

88:1–3.) On redirect examination, Plaintiff's counsel then asked Plaintiff whether the five

million dollars was "a pie-in-the-sky number?" and Defense counsel objected. (*Id.* 102:13–18.)

The Court sustained the objection, despite its prior ruling. (*Id.*) Plaintiff argues that this left the

jury thinking that Plaintiff was greedy. (Mot. at 9.)

　　　　Importantly, Plaintiff's counsel's question did not comply with the Court's directive that

she could respond to Defense counsel's question by asking Plaintiff if the demand was based on

her medical treatment and injuries. Instead, Plaintiff's counsel asked colloquially whether her

demand was "a pie-in-the-sky number?" The Court interpreted this vague question as addressing

the damages calculation, which was reserved for Phase Two. (FPTC 2 Tr. 102:17–18 ("You'll

get to discuss that down the road. This [phase] is all about causation.").) Consequently, the

Court struck the question as being improper and not tethered to whether Plaintiff (or Mr. Barton)

had a financial motive for their testimony.

　　　　Moreover, Plaintiff did not attempt to argue that the objection was incorrectly sustained

during trial, nor did she seek to re-ask the question in a proper manner or ask the Court to

instruct the jury on this point as the Court had previously offered. Further, Plaintiff's counsel did

not attempt to rehabilitate Mr. Barton on redirect examination when Defense counsel also asked

**JA891**

him about the five-million-dollar demand. (*Id.* 142:17–19.) And, Plaintiff's counsel never mentioned the ad damnum or the issue of bias during closing or rebuttal argument during Phase One. (*Id.* 182:8–188:24; 198:22–201:22.)

Further, even if the Court erred by precluding Plaintiff's counsel from asking her "pie-in-the-sky" question, this does not give rise to a miscarriage of justice nor "was so grievous as to have rendered the trial unfair." *Bristol Steel & Iron Works Inc.*, 41 F.3d at 186. Plaintiff does not present any argument to show that sustaining that objection and preventing that line of questioning weighs so "heavily against the verdict that to deny a new trial would be contrary to the 'interests of justice.'" *United States v. Wood*, 340 Fed. App'x 910, 911 (4th Cir. 2009). Indeed, had the Court not sustained the objection and Plaintiff testified consistent with the Court's previous ruling that her demand arose from the medical treatment that she received, Plaintiff and her partner would still have a motive or bias to testify in a manner that favored their recovery. In other words, Plaintiff suffered no harm from the sustaining of the objection. Accordingly, the Court DENIES Plaintiff's motion for a new trial on this ground.

## 2. Dr. Guerette's testimony conformed with the Court's prior rulings.

Plaintiff also argues that, during Phase One of the trial, the Court inconsistently admitted evidence regarding the limits of Dr. Guerette's testimony as a lay witness. (Mot. at 10.) First, Plaintiff argues that the Court cabined Dr. Guerette's testimony further than necessary and limited Plaintiff's ability to provide evidence about Plaintiff's InterStim device failure. (*Id.* at 11.) Second, Plaintiff argues that the Court permitted Defendant's counsel to "open the door" to expert testimony when he asked for opinions that only an expert witness was qualified to testify to, and, as such, Plaintiff should have been allowed to ask expert opinions of Dr. Guerette. (*Id.* at 10.) This claim constitutes nothing more than Plaintiff's counsel attempting to correct her

25

**JA892**

own trial errors. Thus, the Court disagrees on both fronts, and finds that the Court ruled

consistently with its prior orders.

First, the Court did not err in limiting Dr. Guerette's testimony during Phase One to only

his treatment of Plaintiff in 2019, rather than allowing Plaintiff to ask about additional treatment

thereafter. (Trial Tr. 113:11–114:11.) The Court previously, and repeatedly, limited Dr.

Guerette's testimony to facts regarding his treatment of Plaintiff in 2013, before the accident, and

in October 2019, the first time that Plaintiff saw Dr. Guerette after the accident. *See, e.g.*, (FPTC

2 Tr. 45:1–19.) Any other testimony expanded beyond the scope of lay treating physician

testimony. Plaintiff, by failing to designate Dr. Guerette as an expert, thus could not use such

type of testimony.[11] (FPTC 1 20:13–21.)

Second, Plaintiff argues that Defendant's questioning of Dr. Guerette about Plaintiff's

InterStim diagnosis regarding the term "expired" "opened the door" to expert testimony.[12]

(Mot. at 14–15); *see, e.g.*, *United States v. Catano*, 65 F.3d 219, 226 (1st Cir. 1995) ("A district

court may allow testimony on redirect which clarifies an issue which the defense opened up on

cross-examination even when this evidence is otherwise inadmissible."). Indeed, Plaintiff

correctly notes that the Court held previously that if Defendant opened the door to testimony that

required an expert opinion to answer, then Plaintiff could also ask Dr. Guerette for expert

opinions. (ECF No. 30 at 20.) However, Plaintiff's counsel failed to ask any questions on

---

[11]     *See infra* Analysis Section B, Parts 2–4 (holding that Dr. Guerette was limited to lay
testimony regarding course of treatment).

[12]     Additionally, Plaintiff's counsel argues that the Court should have allowed her to expand
the scope of Dr. Guerette's testimony on direct examination, because Defendant asked questions
about treatment outside the scope of lay testimony. (Mot. at 14.) However, her questions
regarding Plaintiff's treatment in 2019 were asked during the direct examination of Dr. Guerette,
when Defendant could not have yet "opened the door" to expert testimony.

redirect examination that took advantage of the open door. For example, Plaintiff's counsel

could have asked on redirect examination about how Dr. Guerette defined "expired" but she did

not. Plaintiff's counsel cannot now argue that the Court did not permit her to do so when she did

not even try. Plaintiff's counsel asked only five questions on redirect, none of which related to

the term at issue, "expired." (Trial Tr. 125:5–126:5.) Nor did Plaintiff's counsel object to the

scope of Defendant's counsel's questioning. In so not doing, Plaintiff waived any argument that

Defendant's introduction of such expert testimony should have allowed Plaintiff to ask about it.

In short, Plaintiff cannot now ask the Court to "reconsider" something that her counsel

failed to pursue during trial. Therefore, the Court DENIES Plaintiff's motion for a new trial on

this issue.

### 3. The Court's questioning did not prejudice Plaintiff.

In support of her Rule 59(a) motion, Plaintiff lastly argues that the Court influenced the

jury by asking questions of witnesses and summarizing testimony. (Mot. at 16.) However, the

Court has wide discretion in questioning witnesses, especially in a civil trial, and thus, doing so

did not give rise to such unfairness as to render the trial a miscarriage of justice.

First and foremost, the Court can ask questions of witnesses and is permitted to do so

during a civil jury trial. "[I]t is settled that a trial judge possesses broad authority to interrogate

witnesses." *United States v. Godwin*, 272 F.3d 659, 672 (4th Cir. 2001) (citing Fed. R. Evid.

614(b) (ruling that "[t]he court may interrogate witnesses, whether called by itself or by a

party")). Thus, "the judge is entitled to propound questions pertinent to a confused factual issue

which requires clarification. He may also intercede because of seeming inadequacy of

examination or cross-examination by counsel, or to draw more information from reluctant

witnesses or experts who are inarticulate or less than candid." *United States v. Cassiagnol*, 420

27

**JA894**

F.2d 868, 879 (4th Cir. 1970) (citing *Jackson v. United States*, 329 F.2d 893, 894 (D.C. Cir.

1964)). That is exactly what the Court did here.

The Court asked questions to ferret out confusing factual issues and to assist the

inadequate direct examination by counsel. This constitutes behavior well within the province of

a trial judge. Indeed,

> [i]t cannot be too often repeated, or too strongly emphasized, that the function of
> a federal trial judge is not that of an umpire or of a moderator at a town meeting.
> He sits to see that justice is done in the cases heard before him; and it is his duty
> to see that a case on trial is presented in such a way as to be understood by the
> jury, as well as by himself. *He should not hesitate to ask questions for the
> purpose of developing the facts; and it is no ground of complaint that the facts so
> developed may hurt or help one side or the other.*

*Lindsey v. City of Beaufort*, 911 F. Supp. 962, 970 (D.S.C. 1995) (quoting *Simon v. United

States*, 123 F.2d 80, 83 (4th Cir. 1941)) (emphasis added). And, "[i]f a party perceives

such questioning to be improper, an objection may be made 'at the time or at the next available

opportunity when the jury is not present.'" *Godwin*, 272 F.3d at 672 (quoting Fed. R. Evid.

614(c)). Here, despite numerous recesses, Plaintiff's counsel did not object until this post-

verdict motion for a new trial. She made no indication during either phase of trial that she

perceived such questioning to be beyond the scope of the Court's purview.

Furthermore, it is well settled that a judge is permitted to summarize or explain evidence

to assist the jury, so long as the Court retains an air of impartiality during the trial:

> It is within [the judge's] province, whenever he thinks it necessary, to assist the
> jury in arriving at a just conclusion by explaining and commenting upon the
> evidence, by drawing their attention to the parts of it which he thinks important,
> and he may express his opinion upon the facts, provided he makes it clear to the
> jury that all matters of fact are submitted to their determination.

*Quercia v. United States*, 289 U.S. 466, 469 (1933) (citations omitted). Plaintiff makes no claim in her motion that the Court crossed the line of impartiality, nor that the Court only asked or commented on the questioning of one side.

While Plaintiff suggests that the Court's comment to Plaintiff's counsel "it's your burden to establish why that happened," "effectively implied that Plaintiff had failed to prove causation," (Pl. Mot. at 18; Trial Tr. 114:11), this statement almost directly mirrors the jury instructions. The instructions state that "[t]he burden is on the plaintiff, Samantha Roop, to prove by the greater weight of the evidence each injury that she claims and to prove that each injury was caused by the negligence of the Defendant, Nicholas Desousa." (Trial Tr. 174:22–25.)

Additionally, the Court provided the jury with not one, but two, other jury instructions on the Court's role during the trial and how the jury should weigh its comments and questions.[13] These instructions further lend credence to the fact that the Court not only had discretion in questioning witnesses and helping clarifying issues for the jury, but that the parties anticipated the potential for questioning, as did the Court, which sought to limit its influence on the jury from the get-go.

Thus, the Court's questioning constituted an action well within its discretion and does not give rise to a miscarriage of justice nor the conclusion that the trial became substantially unfair.

---

[13]    Jury Instruction Two reads, "No statement or ruling or remark that I may make during the course of the trial is intended to indicate my opinion as to what the facts are. It is the function of the jury to consider the evidence and determine the facts in this case. You, not I, have the duty to determine the facts." (Trial Tr. 165:21–25.)

Jury Instruction Seven continues, "During the course of the trial, I've occasionally asked a few questions of the witnesses. Do not assume that I hold any opinion on the matters to which my question is related. The Court may ask a question simply to clarify a matter — not to help one side of the case or to hurt another side." (*Id.* at 170:8–13.)

29

**JA896**

As Plaintiff failed to reach her burden of proving that any of her three claims caused the trial to be grievously erroneous, *Bristol Steel & Iron Works Inc.*, 41 F.3d at 186, the Court DENIES Plaintiff's motion for a new trial under Rule 59(a).

**B.    Motion to Amend or Alter Judgment pursuant to Rule 59(e)**

Plaintiff alternatively argues that the Court should amend and reverse its grant of Defendant's motion for judgment as a matter of law under Rule 50, because it committed a clear error of law when it ruled that lay testimony was insufficient for the jury to find for Plaintiff on the issue of causation on Plaintiff's pelvic prolapse injuries. (Mot. at 19.) Plaintiff claims that the Court's ruling constituted clear error as it contravened Fourth Circuit precedent concerning requirements of expert witnesses, the Federal Rules of Evidence and Virginia substantive tort law on causation. (*Id.*) The Court disagrees, finding that the complexity of Plaintiff's pelvic injuries required an expert to opine on causation. Here again, we return to Plaintiff's counsel's discovery failings, as Plaintiff's motion presents an attempt to relitigate her case following trial after she failed to designate her key witness as an expert. This she cannot do. *See In re: Reese*, 91 F.3d 37, 39 (7th Cir. 1996) ("A motion under Rule 59(e) is not authorized 'to enable a party to complete presenting h[er] case after the court has ruled against h[er].'").

First, the Court will examine how the Federal Rules of Civil Procedure and Evidence limit expert and lay testimony. Second, the Court will turn to substantive Virginia law requirements regarding expert testimony and causation. Lastly, the Court will analyze whether it committed clear error in limiting Dr. Guerette to lay testimony only and granting Defendant's Rule 50 motion due to the lack of expert testimony on causation regarding Plaintiff's pelvic prolapse. The Court concludes that no error — nonetheless, clear error — was committed and will therefore DENY Plaintiff's Rule 59(e) motion.

1.   **The Federal Rules of Civil Procedure and Evidence govern expert testimony limitations in federal trials.**

Federal Rule of Civil Procedure 26(a)(2) sets forth mandatory expert witness disclosures. Rule 26(a)(2)(A) requires parties to disclose the identity of expert witnesses, while Rule 26(a)(2)(B) provides that witnesses retained to provide expert testimony must supply a report. Federal Rules of Evidence 701 and 702 govern whether a party need designate someone as an expert, and whether that expert requires a report, for civil cases in federal court.

A party that fails to comply with Rule 26 "is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).  Accordingly, "[i]t is clearly within the court's power under Rule 37(c)(1) to exclude witnesses who are not properly identified." *Ingram v. ABC Supply Co., Inc.*, 2010 WL 233859, at *2 (D.S.C. Jan. 14, 2010); *see S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 595 (4th Cir. 2003) (holding that "the district court did not abuse its discretion in excluding [an expert] opinion due to [the plaintiff's] failure to timely disclose it").  Further, "[m]ere inadvertence is an uncompelling explanation for failure to identify treating physicians as experts." *Springs*, 2021 WL 119303, at *3 (citing *Wiseman v. Wal-Mart Stores, Inc.*, 2017 WL 4162238, at *5 (D. Md. Sept. 19, 2017)).  Moreover, courts "need 'to be alert to efforts to smuggle expert testimony into the case . . . by characterizing it as lay testimony.'" *City of Huntington v. AmerisourceBergen Drug Corp.*, 2021 WL 933867, at *5 (S.D.W.V. March 11, 2021) (quoting 8A Charles A. Wright, Arthur R. Miller, and Richard L. Marcus, *Fed. Prac. & Proc. Civ.* § 2031.1 (3d ed. 2020)).

As mentioned above, under Federal Rule of Evidence 701, opinion testimony by lay witnesses must be rationally based on the witness' perception, helpful to clearly understanding

31

**JA898**

the witness' testimony or to determining a fact in issue, and "not based on scientific, technical, or other specialized knowledge" within the scope of Federal Rule of Evidence 702. Testimony based on "scientific, technical, or other specialized knowledge" must be given by witnesses who qualify as experts under Rule 702. *See Ingram*, 2010 WL 233859, at *2 (quoting Fed. R. Evid. 702). Courts have held that a treating physician's testimony about a patient's diagnosis, prognosis, and future medical care is based upon "scientific, technical, or other specialized knowledge," thus requiring expert designation under Fed. R. Civ. P. 26(a)(2)(A). *Id.* (citing *Aumand v. Dartmouth Hitchcock Med. Ctr.*, 611 F. Supp. 2d 78, 88 (D.N.H. 2009)). A treating physician becomes a retained expert when a party intends the physician "to explore areas within their medical expertise but beyond the scope of matters learned during treatment[.]" *Moore v. McKibbon Bros.*, 1999 WL 1940029, at *2 (E.D.N.C. Jan. 8, 1999) (citation omitted). Some courts find that "matters learned within the course of treatment would include observations and opinions about diagnosis, causation, treatment, prognosis, costs of treatment and estimates of future such costs," *id.*, while others place diagnosis, prognosis, and future medical care under Rule 26(a)(2)(A)'s expert disclosure requirement, *Ingram*, 2010 WL 233859, at *2. Furthermore, district courts in this circuit distinguish between treating physician expert testimony which requires reporting and treating physician lay testimony which does not: "reports are not required so long as their testimony relates to information learned during the scope of their treatment[,]" however, retained experts require reports. *Moore*, 1999 WL 1940029, at *2

Courts generally permit treating physicians to testify as fact witnesses but exclude their testimony to the extent it consists of expert opinion testimony. *E.g.*, *Springs*, 2021 WL 119303, at *3 (when plaintiff failed to disclose treating physicians as experts, court permitted them to

32

**JA899**

provide testimony about their observations and course of treatment at the time they treated him, but not any opinions that they formulated based on scientific, technical or specialized knowledge after they treated plaintiff); *Ingram*, 2010 WL 233859, at *3 (when plaintiff failed to disclose treating physicians as experts, court prohibited them from opining on "plaintiff's diagnosis, prognosis, and future medical needs [and restricted them] to providing testimony about their individual factual treatment of plaintiff, as such treatment is documented in the medical records").

Plaintiff argues that a federal district court sitting in diversity, and thus applying Virginia substantive law under *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938), need not require an expert to testify as to causation. Thus, according to Plaintiff, the failure to designate a treating physician as an expert under Federal Rule of Civil Procedure 26(a)(2)(A) should not limit the witness to only lay testimony; a treating physician can testify as to causation as a lay witness and not run afoul of Federal Rule of Civil Procedure 37's preclusion mandate nor the limits on lay testimony under Federal Rule of Evidence 701. The Court disagrees.

### 2. Expert testimony is required under Virginia law to establish complex causation.

The Court turns to Virginia law to determine whether expert testimony was necessary to establish causation for Plaintiff's pelvic prolapse issues.[14] As previously noted, in his pretrial motion in limine, Defendant insisted that Virginia case law, most notably the Virginia Supreme Court's decision in *McMunn*, mandated expert testimony to establish causation for Plaintiff's injuries. (ECF No. 19 at 5-6.) In *McMunn*, the Virginia Supreme Court explained:

---

[14]   *See supra* note 3 (noting that the Court and the parties agree that Virginia law applies to the instant case).

The question whether a particular treatment is medically necessary, however, and the often more difficult question whether it is causally related to a condition resulting from some act or omission on a defendant's part, can usually be determined only by a medical expert qualified in the appropriate field who has studied the plaintiff's particular case.

*McMunn*, 379 S.E.2d at 914. Indeed, as previously noted, the court went on to hold that:

where the defendant objects to the introduction of medical bills, indicating that the defendant's evidence will raise a substantial contest as to either the question of medical necessity or the question of causal relationship, the court may admit the challenged medical bills only with foundation expert testimony tending to establish medical necessity or causal relationship, or both, as appropriate.

*Id.*

However, courts distinguish between simple and complex causation, in part by requiring differing levels of expert testimony and degrees of medical certainty in linking alleged injuries with negligent conduct. For simple causation, such as being hit and a bruise developing, lay testimony often suffices to establish causation. *See, e.g.*, *Todt v. Shaw*, 286 S.E.2d 211, 213 (Va. 1982) (soft tissue injuries following a car accident established by lay testimony). In contrast, for complex causation, such as injuries that arise from interrelated medical issues or exacerbation of preexisting conditions, courts often require expert witnesses to opine on causation, to elucidate issues for the jury and to ensure that jurors do not succumb to logical fallacies in determining liability. *See, e.g.*, *Hartwell v. Danek Med., Inc.*, 47 F. Supp. 2d 703, 709–10 (W.D. Va. 1999) ("Where an expert's opinion merely cites a 'cause and effect' relationship, without supporting medical data which can eliminate other causes, it is merely a conclusory opinion.").

In its pretrial ruling on Defendant's motion in limine, the Court drew a distinction based on the facts as wrongly portrayed at that time by Plaintiff's counsel. The Court allowed Plaintiff to move forward on the issue of causation based on its understanding that the issue was solely whether the InterStim device was operable after the accident, which lay testimony could establish. The Court also believed wrongly that the inoperability of the InterStim device led to

34

**JA901**

the pelvic prolapse, despite Dr. Guerette ultimately testifying at trial that the InterStim device

had no relationship to Plaintiff's prolapse issues. And, as recounted above, Plaintiff's counsel

explicitly told the Court on two occasions that Plaintiff's prolapse issues did not exist before the

accident when, instead, this degenerative condition first arose roughly eight years before the

accident.

The Court's pretrial ruling recognized that the law does not view the necessity for experts

on causation equally — the underlying injury matters. For injuries that most people understand,

and likely have suffered, such as a bruise or broken arm, courts allow treating physicians or lay

witnesses to testify to causation or to establish causation via inferences. Juries can understand,

for example, "I fell off my bike, my arm broke, the fall caused the break." *Cf. Springs*, 2021 WL

119303, at *3 (regarding second-degree burns from spilled hot coffee). However, for complex

causation issues, especially regarding complicated medical injuries, the law recognizes the limits

of lay juror understanding and common knowledge. While a lay person understands what a

bruise feels like, or whether a medical device like an InterStim device is "on" or "off", he or she

likely does not know what an apical vaginal prolapse is or how it progresses, let alone what

causes it.

Additionally, the more that preexisting medical conditions, interrelated injuries, or

overlapping symptoms come into play, the more that an expert is needed. While these types of

injuries often arise under medical practice or products liability cases, rather than car accidents,

this alone does not obviate the need for an expert. *Cf. McCauley v. Purdue Pharma L.P.*, 331 F.

Supp. 2d 449, 464 (W.D. Va. 2004) (in a products liability case "proof of causation must

ordinarily be supported by expert testimony because of the complexity of the causation facts").

In denying Defendant's Rule 50 motion as to the InterStim device, but granting it as to the pelvic prolapse, the Court drew the very distinction that Virginia law commands. For a simple issue such as whether a device is properly functioning, lay testimony, particularly from an experienced user of the device, can establish whether it was simply operable. But that same lay witness cannot interpret specialized data that the device may produce. Similarly, lay testimony cannot support a finding of causation as to a degenerative condition that spans years of treatment that progresses from one stage to another. Virginia law, as well as the law from other courts in this Circuit, support that conclusion.

Plaintiff argues that the Court erred in holding, as a matter of law, in ruling on Defendant's Rule 50 motion, that expert testimony was required to prove causation regarding Plaintiff's pelvic prolapse. (Mot. at 19–21.) The Court disagrees, holding that Plaintiff's pelvic prolapse falls into the latter category of complex causation, thus requiring expert testimony for there to be sufficient evidence for the issue of causation to go to the jury.

First, Plaintiff correctly notes, as does the Court, that tort actions arising under Virginia law do not always require expert testimony to prove the issue of causation: "While failure or inability to adduce direct medical evidence, generally relied upon to establish causal connection between injury and accident, may significantly increase the plaintiff's risk of non-persuasion, such evidence is not a prerequisite to recovery." *Sumner*, 257 S.E.2d at 827; *see also Todt*, 286 S.E.2d at 213 ("[L]ay testimony of causal connection between an automobile accident and injury is admissible for whatever weight the fact finder may choose to give it, even when medical testimony fails to establish causal connection expressly."). However, the above cases differ significantly from the injuries at issue here. In *Sumner*, the plaintiff suffered an automobile accident which caused him back pains for which he sought medical care two days after the

36

**JA903**

accident. 257 S.E.2d at 827. Despite the plaintiff's prior back pain condition, the severity of the accident combined with the immediate injury and treatment by physicians was sufficient to send the issue of causation to the jury based on lay testimony. Yet, a violent accident causing immediate back pain remains a far cry from diagnosis and causation of a degenerative condition such as a pelvic prolapse that began roughly eight years before an accident.

A layperson can understand soft tissue injuries resulting from an accident. Even a simple analysis explains why this is so. Members of the jury have likely pulled a muscle, endured a bruise or broken a bone. Comparatively, the average juror, indeed the average judge, remains simply unqualified to determine when a preexisting, degenerative condition appeared, especially during a stretch of eight years, a time when other medical issues in the same area of the body arose independently from the accident. Indeed, Plaintiff's own counsel clearly misunderstood the nature of her client's injuries, as evinced by her misstatements to the Court during pretrial hearings that the prolapse issue did not exist until after the accident.

Similarly, in *Todt*, following an accident, the plaintiff suffered from back and neck injuries immediately and testified that a year later she continued to have "trouble" and strenuous activity "caused [her] back and stuff to start aching[.]" 286 S.E.2d at 213. The Court held that expert medical testimony was not required to establish the causal connection between the injury and accident, and the plaintiff could rely on whatever weight the fact finder wanted to give her testimony. *Id.* Again, back and neck pain — common injuries stemming from automobile accidents, and their continued aches in the months following — constitute the type of injures that jurors can readily understand. Pelvic prolapse, on the other hand, constitutes a complicated medical issue that takes many forms and can be caused by a myriad of issues, only one of which

37

**JA904**

is physical force.  Thus, prolapse is more akin to the complex issues for which expert testimony is required, either statutorily or via common law.  The Court now turns to complex causation.

As mentioned above, Virginia law itself distinguishes between run-of-the-mill medical causation issues and more complicated issues, such as when a contested treatment is medically necessary.  Indeed, *McMunn* dealt with a complication arising from a dental extraction due to preexisting conditions of the plaintiff.  379 S.E.2d at 909.  The Virginia Supreme Court held that when a defendant objects to the introduction of medical bills — contesting whether a particular treatment is medically necessary or the causal relationship between negligence and injury — then "the court may admit the challenged medical bills only with foundation expert testimony tending to establish medical necessity or causal relationship[.]"  379 S.E.2d at 914; *see also Blanco v. United States*, 2021 WL 9860512, at *8 (E.D. Va. July 15, 2021) (citing *McMunn* for the proposition that expert foundation is required before challenged medical bills are admitted in federal trial).

The requirement of expert testimony to establish causation under Virginia law does not end with contested medical bills, however.  Virginia courts require expert medical testimony regarding proximate causation in medical malpractice and products liability suits, as well.  These cases often involve complicated injuries and complex causation issues.  *See, e.g.*, *Summers v. Syptak*, 801 S.E.2d 422, 426 (Va. 2017) (requiring expert testimony in medical malpractice context); *McCauley*, 331 F.Supp.2d at 464 (requiring expert testimony when applying Virginia law in a products liability action).

For medical malpractice cases, "the general rule is that an expert is required to establish that the defendant['s act] . . . 'was a proximate cause of the injuries claimed.'" *Summers*, 801

38

**JA905**

S.E.2d at 425 (quoting VA Code § 8.01-20.1).[15]  This stems from the fact that these issues "often

fall beyond the realm of common knowledge and experience of a lay jury." *Beverly Enterprises-*

*Virginia, Inc. v. Nichols*, 441 S.E.2d 1, 3 (Va. 1994).  In *Summers*, the existence of the plaintiff's

preexisting conditions made "discerning the causal connection between [the act] and [the

patient's] resulting injuries [] a complicated medical question that is not within the understanding

of a lay person."  801 S.E.2d at 426 (quotation omitted).  "A lay jury is not equipped from

common experience with the knowledge of what can cause the aggravation of complex

preexisting medical problems . . . Consequently, expert testimony is required." *Id.*

     So too here.  Plaintiff's treating physician, Dr. Guerette, testified that, from 2011 to 2013,

Plaintiff experienced bladder issues and was diagnosed with first degree cystocele — the early

stage of prolapse, which is a progressive condition.  (Trial Tr. 125:5–23.)  Six years after last

treating Plaintiff, Dr. Guerette next saw Plaintiff in October of 2019.  At that time, Plaintiff

suffered from a apical vaginal prolapse and cystocele: both types of prolapses that can be caused

by degeneration, according to Dr. Guerette.  This mirrors the situation in *Summers*, where a lay

juror could not parse between an event occurring — either, there, seeing a physician or, here,

getting in an accident — and the cause of the injury.  There, the Court held that proximate cause

could not be proven solely by the logical fallacy *post hoc ergo propter hoc*, which assumes a

causal relationship from a merely sequential one.  *Summers*, 801 S.E.2d at 426–27 (citing

Black's Law Dictionary 1285 (9th ed. 2009) (defining *post hoc ergo propter hoc* as "after this,

therefore because of this").)  Therefore, Virginia courts require plaintiffs to produce an expert in

---

[15]    Under Virginia law, a statutory presumption exists that expert testimony is required for medical malpractice suits.  *Id.* at 426 (citing VA Code § 8.01-20.1).  No such presumption exists for negligence suits under Virginia law, although the analogy still holds true.

such cases. *Id.* (dismissing the action at summary judgment when no expert was produced by the plaintiff).

Similarly, while "Virginia tort law does not mandate expert testimony to show proof of causation in every case . . . in a products liability action, proof of causation must ordinarily be supported by expert testimony because of the complexity of the causation facts." *McCauley*, 331 F. Supp. 2d at 464. In *McCauley*, a federal court applying Virginia law held that "complex medical conditions whose symptoms may overlap and that are properly diagnosed by experienced professionals with appropriate medical knowledge" requires expert testimony on causation. *Id.* The court rejected the idea that the jury be allowed to apply the logical fallacy of *post hoc, ergo propter hoc*, as "[t]he plaintiff's burden [wa]s greater than merely showing a temporal link between [the act] and the injuries they sustained." *Id.* at 465 (finding it was instead evidence of causation that the plaintiffs lacked). While in *McCauley* the plaintiffs put forth an expert, their expert "fail[ed] to make the issue of causation less speculative or conjectural because it fail[ed] to eliminate the possibility that other [things] are to blame for [the plaintiff's] injuries." *Id.* at 463.

Here, Dr. Guerette, while not testifying as an expert, similarly failed to make the issue of causation regarding Plaintiff's prolapse less speculative as he testified to nothing more than the existence of different stages of prolapse at different times spanning an eight-year time period. *See, e.g.*, (Trial Tr. 125:5–23.) Plaintiff's and Mr. Barton's testimony also provided nothing more than temporal changes, which the *McCauley* and *Summers* courts both rejected under Virginia law.

Plaintiff correctly notes that "[i]n certain rare instances, . . . expert testimony is unnecessary because the alleged act of negligence clearly lies within the range of the jury's

common knowledge and experience." *Beverly Enterprises-Virginia, Inc.*, 441 S.E.2d at 3 (not

requiring expert testimony in lawsuit regarding a failure to aid with eating which led to the

plaintiff choking on food). Indeed, this is the very distinction that the Court drew between

simply observing whether the InterStim device was operable in contrast to the complex nature of

a degenerative muscular condition such as pelvic prolapse, where the condition had progressed

over an eight-year time span.[16]

Again, this differs markedly from Plaintiff's complicated theory of pelvic prolapse

causation that spans years and numerous diagnoses and clearly does *not* "lie[] within the range of

the jury's common knowledge." *Id.* While a jury may easily understand how a person can

choke on food or break an arm without an expert explaining it, the average lay-juror has no

knowledge base regarding how, when or why a woman's pelvic muscles prolapse.

### 3.   Sister courts applying analogous substantive state law require expert testimony regarding causation under Federal Rule of Evidence 702.

Sister courts in our circuit applying analogous substantive state law, under the federal

procedural rules, require expert testimony regarding causation when it veers into or close to

traditional expert testimony under Federal Rule of Evidence 702. The Fourth Circuit and district

courts in North Carolina, South Carolina and West Virginia all have required that plaintiffs

provide expert testimony on causation when it flies too close to "scientific, technical, or other

specialized knowledge," Fed. R. Evid. 702, or, alternatively, when the subject matter "is so far

---

[16]     Even though pretrial hearings focused on the InterStim device, the issues with this
device largely constituted a red herring, as Dr. Guerette plainly testified that the InterStim device
played no role as to the pelvic prolapse. (Trial Tr. 125:24–25.) Moreover, Plaintiff offered no
evidence about the impact on her condition from the inoperability of the InterStim device.
Indeed, even though Plaintiff presented to Dr. Guerette in October of 2019 as being in distress,
Dr. Guerette waited three months — until January of 2020 — to replace the device. (*Id.* 123:6–
8.) And, even after he did so, the InterStim device did not improve Plaintiff's condition
regarding her pelvic prolapse. (*Id.* 124:15–17.)

removed from the usual and ordinary experience of the average man that expert knowledge is essential to the formation of an intelligent opinion, only an expert can competently give opinion evidence as to the cause of death, disease, or a physical condition." *Talyor v. Shreeji Swami, Inc.*, 820 Fed. App'x. 174, 176 (4th Cir. 2020) (applying North Carolina law).

The Fourth Circuit has held that while proximate cause "is ordinarily a question to be determined by the jury as a fact in view of the attendant circumstances," "if the evidence be so slight as not reasonably to warrant the inference [of proximate cause], the court will not leave the matter to speculation of the jury." *Id.* at 175–76 (quotations omitted). One such circumstance arises when lay testimony insufficiently establishes causation with respect to injuries alleged and, thus, evidence from a medical expert is required. *Id.* (requiring, under North Carolina law, expert testimony to opine on the plaintiff's exacerbation of his claustrophobia, PTSD, depression, anxiety and GERD following an elevator malfunction).

These states' substantive laws separate the need for an expert to prove causation in a negligence case alleging personal injury with those that do not, based on the level of complexity between the "particular impact and the resulting wound." *Taylor*, 820 Fed. App'x at 176. "Some injuries — such as bruises, lacerations, and broken bones — manifest in such an immediate and apparent manner that any observer can discern the causal relationship . . . But other injuries . . . are beyond the ability of a layman to attribute to a particular event unaided." *Id.* In the latter case, expert medical testimony is essential to establish causation. *Id.* (citing *Gillikin v. Burbage*, 139 S.E.2d 753, 760 (N.C. 1965) ("Where a layman can have no well-founded knowledge and can do no more than indulge in mere speculation (as to the cause of a physical condition), there is no proper foundation for a finding by the trier without expert medical testimony.")); *see also Ingram*, 2010 WL 233859, at *3 (not permitting non-expert treating physicians from providing

42

any expert opinions on diagnosis, prognosis or future medical needs, and restricting them to factual treatment of the plaintiff under South Carolina law); *Stogsdill v. S.C. Dept. of Health & Human Servs.*, 2017 WL 3142497, at *15 (D.S.C. July 25, 2017) (same).

Other states such as West Virginia also require that proximate cause be proven by expert testimony in similar situations. *See Hicks v. Chevy*, 358 S.E.2d 202, 205 (W.Va. 1987) (holding that in a medical malpractice suit "proximate cause of the injury of which the plaintiff complains must ordinarily be by expert testimony"); *see also Rohrbough v. Wyeth Labs., Inc.*, 916 F.2d 970, 972 (4th Cir. 1990) (requiring, under West Virginia products liability law, that proof of causation be by expert testimony, stated in terms of reasonable probability).

While this Court must apply Virginia law to this case, the Fourth Circuit's analysis of North Carolina law to similar facts remains highly persuasive. In *Taylor*, the Circuit Court found that the plaintiff's complex preexisting conditions were "more like a ruptured disc or tingling sensation," which, in other cases, required expert testimony to link their cause to a car accident, while a bruise did not. 820 Fed. App'x at 177. The court held that "whether a particular traumatic event caused a particular exacerbation . . . 'involve[d] complicated medical questions far removed from the ordinary experience and knowledge of layman[,]'" even if a jury person could understand the concepts in the abstract. *Id.* at 178. Thus, since the connection between the injuries alleged and the defendant's negligence "[wa]s the opposite of 'simple, uncontradictory, and obvious' . . . expert medical testimony [wa]s necessary to prove proximate causation." *Id.* The same could be said of Plaintiff's prolapse, which sounds more akin to a ruptured disc than a bruise; prolapses are neither simple nor obvious.

Therefore, in applying the Federal Rules of Evidence and Civil Procedure to Virginia substantive negligence law, and looking to our sister and circuit courts for guidance, the Court

did not err by precluding Dr. Guerette from testifying as to the cause of Plaintiff's prolapses.  As

expert testimony was required to prove causation, nor did the Court err in removing this question

from the jury in granting Defendant's Rule 50 motion.

> **4.      The Court did not commit clear error in limiting a treating
> physician's lay testimony as to causation regarding Plaintiff's pelvic
> prolapse.**

Requiring expert testimony to establish complex causation relating to Plaintiff's pelvic

prolapse did not constitute clear error.  The type of testimony needed for this manner of injury

exceeded the scope of lay testimony that could be submitted to the jury based upon inferences

alone.  As mentioned above, the testimony that Plaintiff sought to introduce through Dr. Guerette

constituted textbook expert testimony.  The injuries at issue are complex, degenerative,

unfamiliar to the average juror, and can stem from many, interrelated causes.  *Taylor*, 820 Fed.

App'x at 178.  Furthermore, even despite numerous briefings and hearings on the issues, the

Court itself, and at times both parties, conflated and confused the injuries and issues of causation,

illustrating the need for expert opinion testimony on these very same issues.  If Plaintiff herself

or her counsel cannot clearly articulate a theory of causation, how can a jury be expected to

delineate nuanced theories of medical causation without any guidance?  Thus, the Court rightly

granted Defendant's Rule 50 motion on the issue of pelvic prolapse, as Plaintiff introduced

insufficient evidence on this injury absent an expert opinion on causation.  *Id.*; *see also Summers*,

801 S.E.2d at 426 (dismissing under Virginia law, medical malpractice suit due to lack of expert

testimony on plaintiff's complex causation issues).

The Supreme Court of Virginia has held that:

> Negligence and an accident, however, do not make a case.  As between them
> there must be causal connect.  "The evidence tending to show casual connection
> must be sufficient to take the question out of the realm of mere conjecture, or
> speculation, and into the realm of legitimate inference, before a question of fact
> for submission to the jury has been made out."

*Wilkins v. Sibley*, 135 S.E.2d 765, 767 (Va. 1964) ("It is incumbent upon the party complaining

to establish by a preponderance of the evidence that the accident occurred as the proximate result

of an act . . .") (quotations omitted).  Plaintiff here failed to make her case and provide more than

"mere conjecture" on the issue of her pelvic prolapse's cause due to the lack of expert testimony.

*Id.*  This is factually and legally insufficient.  *McCauley*, 331 F.Supp.2d at 465 (rejecting the idea

that temporal inferences sufficiently demonstrate causation in order to send the issue to the jury).

As such, the Court did not commit clear error in granting Defendant's Rule 50 motion, because

Plaintiff did not sufficiently provide evidence on causation on her prolapse to submit it as a

question of fact to the jury.  Thus, Plaintiff's motion under Rule 59(e) must fail.

> ### 5.   The Court correctly limited its analysis to the evidence presented at trial.

Furthermore, courts correctly act within their discretion in not allowing evidence to come

in that could have come in sooner.  *Ingle v. Yelton*, 439 F.3d 191, 198 (4th Cir. 2006) (holding

that Rule 59(e) motions may be granted "to account for new evidence not available at trial");

*Zinkland*, 478 F.3d at 637 ("[T]he court, of necessity, has some discretion to determine whether

additional evidence should be considered or further argument heard.").  A court should deny a

Rule 59(e) motion if the evidence is not "new" and the justifications for not presenting it earlier

"were 'strategic decision[s] for which the Plaintiff bears responsibility.'"  *Ingle*, 439 F.3d at 198;

*Zinkand*, 478 F.3d at 637 ("If the court elects to look at additional evidence represented as

having been unavailable at the prior hearing, the court must satisfy itself as to the unavailability

of the evidence and likewise examine the justification for its omission."); *RGI, Inc. v. Unified*

**JA912**

*Indus., Inc.,* 963 F.2d 658, 662 (4th Cir.1992) (concluding that a district court can accept new evidence under Rule 59(e) as long as the party provides justification for why the evidence was not presented previously). Thus, where Plaintiff's clear error argument rests upon the presentation of evidence now that she previously possessed, but did not use due to a decision not to designate Dr. Guerette as an expert, then the Court has substantial discretion to deny the Rule 59(e) motion.

Therefore, the Court DENIES Plaintiff's Rule 59(e) motion as the Court did not commit clear error in (1) requiring expert testimony regarding the pelvic prolapse or (2) not considering the "new" evidence that could have been proffered by Dr. Guerette.

## CONCLUSION

For the reasons stated above, the Court correctly allowed Defendant to discuss the ad damnum during the liability phase, properly limited Dr. Guerette's testimony and questioned witnesses well with its authority, such that demands for a new trial are unwarranted. And even if any error did occur, it did not give rise to a miscarriage of justice, which Rule 59(a) demands. *See VS Techs., LLC v. Twitter, Inc.,* 2012 WL 1481508, at \*11 (holding that the miscarriage of justice prong of a Rule 59(a) motion "requires a policy analysis under which the 'judge's unique vantage point and day-to-day experience with such matters lend expertise'") (quoting *Fairshter v. Am. Nat'l Red Cross,* 322 F. Supp. 2d 646, 650 (E.D. Va. 2004) (quotation omitted)). Additionally, the Court correctly granted Defendant's Rule 50 motion and did not commit clear error when requiring expert testimony on the issue of causation regarding Plaintiff's pelvic prolapse. Thus, the Court hereby DENIES Plaintiff's Motion for New Trial Under Fed. R. Civ. P. 59(a) or, in the Alternative, to Alter or Amend the District Court's Judgment Under Fed. R.

Civ. P. 59(e) (ECF No. 87).

Let the Clerk file this Memorandum Opinion electronically and notify all counsel of

record.

An appropriate Order shall be issued.

_____/s/_____

David J. Novak
United States District Judge

Richmond, Virginia
Date:  March 9, 2023

47

**JA914**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

SAMANTHA ROOP,
    Plaintiff,

v.                                  Civil No. 3:21cv675 (DJN)

NICHOLAS JAMES DESOUSA,
    Defendant.

## ORDER
### (Denying Motion for New Trial or to Alter or Amend Judgment)

This matter comes before the Court on Plaintiff's Motion for New Trial under Fed. R.

Civ. P. 59(a) or, in the alternative, to Alter or Amend the District Court's Judgment under Fed.

R. Civ. P. 59(c) ("Motion" (ECF No. 87)), moving the Court to grant a new trial, or in the

alternative, amend or alter a judgment against her under Rules 59(a) and (e), respectively. For

the reasons stated in the accompanying Memorandum Opinion, and pursuant to Federal Rules of

Civil Procedure 59(a) and (e), the Court hereby DENIES Plaintiff's Motion (ECF No. 87).

Let the Clerk file a copy of this Order electronically and notify all counsel of record.

It is so ORDERED.

                             \_\_\_\_\_/s/_____
                             David J. Novak
                             United States District Judge

Richmond, Virginia
Date: <u>March 9, 2023</u>

**JA915**

AO 450 (Rev. 5/85) Judgment in a Civil Case

# UNITED STATES DISTRICT COURT

--------------Eastern------------------------ DISTRICT OF  ----------------Virginia--------------------
Richmond Division

SAMANTHA ROOP,

      Plaintiff,

v.

NICHOLAS JAMES DESOUSA

      Defendant.

**JUDGMENT IN A CIVIL CASE**
Case number: 3:21cv675 (DJN)

[X] **Jury Verdict**.   This action came before the Court for a trial by jury.   The issues have been tried and the jury has rendered its verdict.

[ ] **Decision by Court**. *This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

 **IT IS ORDERED AND ADJUDGED** that the Plaintiff, Samantha Roop, is awarded damages in the amount of 105,216.00 with no pre-judgment interest.

March 10, 2023
Date

FERNANDO GALINDO,
Clerk

Cheryl N. Garner
(By) Deputy Clerk

**JA916**

United States District Court for the _Eastern_____

District of _Virginia - Richmond Division_____

Docket Number _3:21cv675 (DJN)_____

Samantha Roop, Plaintiff

)
v.                                              )          Notice of Appeal
                                                )
Nicholas DeSousa                                )

_____Samantha Roop_____(name all parties taking the appeal)*
appeal to the United States Court of Appeals for the ____4th____ Circuit from the final judgment
entered on _____March 9, 2023_____ (state the date the judgment was entered).

/s/ _Samantha B. Cohn, Esq._____
VA Bar No. 89081

Attorney for _Plaintiff_____

Address: Geoff McDonald & Associates, P.C.
8720 Stony Point Pkwy, Ste 250
Richmond, VA 23235
Tel: 804-888-8888
Fax: 804-359-5426
Email: scohn@mcdonaldinjurylaw.com

[***Note to inmate filers:*** *If you are an inmate confined in an institution and you seek the timing benefit of Fed. R. App. P. 4(c)(1), complete the Declaration of Inmate Filing and file that declaration along with this Notice of Appeal]*

_____

* See Rule 3(c) for permissible ways of identifying appellants.

**JA917**